# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | |
|---|---|
| COMMONWEALTH OF VIRGINIA,<br>ex rel. Kenneth T. Cuccinelli, II, in his official<br>capacity as Attorney General of Virginia,<br><br>        Plaintiff,<br><br>    v.<br><br>KATHLEEN SEBELIUS, Secretary of the<br>Department of Health and Human Services,<br>in her official capacity,<br><br>        Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)     Civil Action No. 3:10-cv-00188-HEH |

## MEMORANDUM IN SUPPORT OF
## <u>DEFENDANT'S MOTION TO DISMISS</u>

## Table of Contents

Introduction ................................................................................................................1

Argument ...................................................................................................................5

I.  Statement of the case ..................................................................................5

   A.  Statutory background ........................................................................5

   B.  Current proceedings .........................................................................9

II.  Standard of review ......................................................................................9

III.  The complaint should be dismissed for lack of subject matter jurisdiction......................10

   A.  Virginia lacks standing because it has alleged no cognizable injury ........................11

      1.  Virginia cannot sue the federal government to exempt its citizens
          from federal law ...................................................................12

      2.  Virginia has alleged no cognizable injury to its own interests ...........................13

   B.  Virginia cannot evade the procedures prescribed by law for an individual
       to contest a liability under the minimum coverage provision ...................................16

   C.  Virginia's claim of an abstract conflict between state and federal law is not
       ripe for review .................................................................................17

IV.  The complaint should be dismissed for failure to state a claim upon which relief
     may be granted.............................................................................................18

   A.  The comprehensive regulatory measures of the ACA, including the minimum
       coverage provision, are a proper exercise of Congress's powers under the
       Commerce Clause and the Necessary and Proper Clause .........................................19

      1.  The Congressional authority to regulate interstate commerce is broad ............20

      2.  The ACA, and the minimum coverage provision, regulate the interstate
          market in health insurance ........................................................23

      3.  The minimum coverage provision regulates conduct with substantial
          effects on interstate commerce.......................................................25

4. The minimum coverage provision is an integral part of the larger regulatory scheme and is necessary and proper to Congress's regulation of interstate commerce ...................................................................................30

a. The minimum coverage provision is essential to the comprehensive regulation Congress enacted ....................................................................31

b. The minimum coverage provision is also a valid exercise of Congress's power under the Necessary and Proper Clause ......................34

B. The minimum coverage provision is a valid exercise of Congress's independent power under the General Welfare Clause ...............................................35

Conclusion ...........................................................................................................................39

# Table of Authorities

**Cases:**

*Alfred L. Snapp & Son, Inc. v. Puerto Rico*,
    458 U.S. 592 (1982)............................................................................12

*Ashcroft v. Iqbal*,
    129 S. Ct. 1937 (2009)......................................................................10

*Barr v. United States*,
    736 F.2d 1134 (7th Cir. 1984) ..........................................................16

*Bartley v. United States*,
    123 F.3d 466 (7th Cir. 1997) ............................................................17

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)..........................................................................10

*Blodgett v. Holden*,
    275 U.S. 142 (1927)............................................................................5

*Bob Jones Univ. v. Simon*,
    416 U.S. 725 (1974)....................................................................17, 37

*Buckley v. Valeo*,
    424 U.S. 1 (1976)..............................................................................39

*Burroughs v. United States*,
    290 U.S. 534 (1934)..........................................................................35

*Charles C. Steward Mach. Co. v. Davis*,
    301 U.S. 548 (1937)..........................................................................35

*DaimlerChrysler Corp. v. Cuno*,
    547 U.S. 332 (2006)..........................................................................10

*Daniel v. Paul*,
    395 U.S. 298 (1969)..........................................................................30

*FDA v. Brown & Williamson Tobacco Corp.*,
    529 U.S. 120 (2000)..........................................................................38

*Florida v. Mellon*,
    273 U.S. 12 (1927)............................................................................14

*Garcia v. San Antonio Metro. Transit Auth.*,
    469 U.S. 528 (1985)................................................................................15

*Gibbs v. Babbitt*,
    214 F.3d 483 (4th Cir. 2000) ...........................................................18, 21

*Gonzales v. Raich*,
    545 U.S. 1 (2005).......................................................................... *passim*

*Heart of Atlanta Motel v. United States*,
    379 U.S. 241 (1964)................................................................................29

*Helvering v. Davis*,
    301 U.S. 619 (1937).........................................................................14, 36

*Hodel v. Indiana*,
    452 U.S. 314 (1981)................................................................................33

*Hodel v. Va. Surface Mining & Reclamation Ass'n*,
    452 U.S. 264 (1981)................................................................................34

*Hodges v. Abraham*,
    300 F.3d 432 (4th Cir. 2002) ................................................................12

*Int'l Longshoremen's & Warehousemen's Union v. Boyd*,
    347 U.S. 222 (1954)................................................................................18

*Judicial Watch, Inc. v. Rossotti*,
    317 F.3d 401 (4th Cir. 2003) ................................................................17

*Kerns v. United States*,
    585 F.3d 187 (4th Cir. 2009) ................................................................10

*Knowlton v. Moore*,
    178 U.S. 41 (1900)................................................................................36

*License Tax Cases*,
    72 U.S. (5 Wall.) 462 (1867) .......................................................5, 35, 36

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992).........................................................................11, 13

*M'Culloch v. Maryland*,
    17 U.S. (4 Wheat.) 316 (1819)..............................................................34

*Maersk Line Ltd. v. Care,*
　　271 F. Supp. 2d 818 (E.D. Va. 2003) ...........................................................21

*Marchetti v. United States,*
　　390 U.S. 39 (1968).........................................................................................36

*Massachusetts v. EPA,*
　　549 U.S. 497 (2007).............................................................................1, 12, 14

*Massachusetts v. Mellon,*
　　262 U.S. 447 (1923) ..................................................................... 1, 2, 12-14

*McCray v. United States,*
　　195 U.S. 27 (1904).........................................................................................35

*Nebraska v. EPA,*
　　331 F.3d 995 (D.C. Cir. 2003) .....................................................................19

*Nelson v. Sears, Roebuck & Co.,*
　　312 U.S. 359 (1941).......................................................................................37

*New Jersey v. Sargent,*
　　269 U.S. 328 (1926)..................................................................................14, 15

*Nw. Austin Mun. Util. Dist. No. One v. Holder,*
　　129 S. Ct. 2504 (2009) ...................................................................................5

*Perez v. United States,*
　　402 U.S. 146 (1971).......................................................................................20

*Sabri v. United States,*
　　541 U.S. 600 (2004).......................................................................................34

*Simmons v. United States,*
　　308 F.2d 160 (4th Cir. 1962) ........................................................................37

*Sonzinsky v. United States,*
　　300 U.S. 506 (1937).......................................................................................37

*South Carolina v. Katzenbach,*
　　383 U.S. 301 (1966).......................................................................................18

*South Carolina v. Regan,*
　　465 U.S. 367 (1984).......................................................................................17

*South Dakota v. Dole,*
    483 U.S. 203 (1987)................................................................................36

*Steel Co. v. Citizens for a Better Env't,*
    523 U.S. 83 (1998)..............................................................................2, 10

*Texas v. ICC,*
    258 U.S. 158 (1922)................................................................................14

*Texas v. United States,*
    523 U.S. 296 (1998)................................................................................18

*Thomas v. Union Carbide Agric. Prods. Co.,*
    473 U.S. 568 (1985)................................................................................18

*United States v. Aiken,*
    974 F.2d 446 (4th Cir. 1992) .................................................................38

*United States v. Butler,*
    297 U.S. 1 (1936)...................................................................................36

*United States v. Comstock,*
    No. 08-1224 (U.S. May 17, 2010) ....................................................34, 35

*United States v. Dean,*
    670 F. Supp. 2d 457 (E.D. Va. 2009) ...............................................21, 34

*United States v. Doremus,*
    249 U.S. 86 (1919).................................................................................35

*United States v. Jones,*
    976 F.2d 176 (4th Cir. 1992) .................................................................38

*United States v. Kahriger,*
    345 U.S. 22 (1953)............................................................................36, 37

*United States v. Lopez,*
    514 U.S. 549 (1995).............................................................................21-23

*United States v. Malloy,*
    568 F.3d 166 (4th Cir. 2009), *cert. denied*, 130 S. Ct. 1736 (2010)................20

*United States v. Morrison,*
    529 U.S. 598 (2000)......................................................................18, 22, 23

*United States v. Raines,*
  362 U.S. 17 (1960)..............................................................................................18

*United States v. Sage,*
  92 F.3d 101 (2d Cir. 1996)..............................................................................19

*United States v. Salerno,*
  481 U.S. 739 (1987)..........................................................................................19

*United States v. Sanchez,*
  340 U.S. 42 (1950).................................................................................5, 36, 37

*United States v. South-Eastern Underwriters Ass'n,*
  322 U.S. 533 (1944)......................................................................................23, 31

*United States v. West Virginia,*
  295 U.S. 463 (1935)..........................................................................................15

*United States v. Wrightwood Dairy Co.,*
  315 U.S. 110 (1942)..........................................................................................34

*Wash. State Grange v. Wash. State Republican Party,*
  552 U.S. 442 (2008)..........................................................................................19

*Wickard v. Filburn,*
  317 U.S. 111 (1942)................................................................................ *passim*

## Constitution and Statutes:

U.S. CONST., art. I, § 8, cl. 1 ............................................................................34, 35

U.S. CONST., art. I, § 8, cl. 3 ................................................................................20

U.S. CONST., art. I, § 8, cl. 18 .........................................................................20, 34

26 U.S.C. § 4980B ...................................................................................................37

26 U.S.C. § 4980D ...................................................................................................37

26 U.S.C. § 5000A(a) ...............................................................................................36

26 U.S.C. § 5000A(b) .................................................................................16, 36, 37

26 U.S.C. § 5000A(c) ...............................................................................................37

26 U.S.C. § 5000A(d) ....................................................................................29

26 U.S.C. § 5000A(e) ...............................................................................29, 36

26 U.S.C. § 5000A(g) ...............................................................................16, 37

26 U.S.C. § 6671(a) ......................................................................................16

26 U.S.C. § 7421(a) ......................................................................................16

26 U.S.C. § 8001 ...........................................................................................38

26 U.S.C. § 8023 ...........................................................................................38

26 U.S.C. § 9801 .....................................................................................23, 37

26 U.S.C. § 9803 .....................................................................................23, 37

28 U.S.C. § 2201(a) ......................................................................................17

29 U.S.C. § 1181(a) ......................................................................................24

29 U.S.C. § 1182 ...........................................................................................24

42 U.S.C. § 300gg ........................................................................................24

42 U.S.C. § 300gg-1 .....................................................................................24

42 U.S.C. § 1395dd ......................................................................................26

Pub. L. No. 93-406, 88 Stat. 829 (1974) ......................................................23

Pub. L. No. 99-272, 100 Stat. 82 (1985) ......................................................23

Pub. L. No. 104-191, 110 Stat. 1936 (1996) ...........................................23, 24

Pub. L. No. 104-204, 110 Stat. 2935 (1996) .................................................24

Pub. L. No. 105-277, 112 Stat. 2681 (1998) .................................................24

Pub. L. No. 110-343, 122 Stat. 3765 (2008) .................................................24

Pub. L. No. 111-148, 124 Stat. 119 (2010):

    § 1001 .......................................................................................................7

§ 1201.................................................................................................7, 31

§ 1311.......................................................................................................7

§ 1401.......................................................................................................7

§ 1402.......................................................................................................7

§ 1421.......................................................................................................7

§ 1501....................................................................................................8, 25

§ 1501(a) ............................................................................................ *passim*

§ 1501(b) .............................................................................................36, 37

§ 1513.......................................................................................................7

§ 2001.......................................................................................................7

§ 10101(a) ................................................................................................7

§ 10106(a) .......................................................................................... *passim*

Pub. L. No. 111-152, 124 Stat. 1029 (2010):

§ 1002....................................................................................................8, 36

Virginia Code § 38.2-3430.1:1 (2010).................................................9, 11

**Legislative Materials:**

Cong. Budget Office, 2008 Key Issues in Analyzing Major Health Proposals (2008) ......... *passim*

Cong. Budget Office, An Analysis of Health Insurance Premiums Under the Patient
    Protection and Affordable Care Act (Nov. 30, 2009).........................................8

Cong. Budget Office, The Long-Term Budget Outlook (2009) ...................................6

155 Cong. Rec. H4771 (Apr. 27, 2009)...............................................................28

155 Cong. Rec. H6608 (June 11, 2009)...............................................................28

155 Cong. Rec. H8002-8003 (July 10, 2009) ......................................................28

Council of Econ. Advisers, The Economic Case for Health Care Reform (2009) .................26, 28

Council of Econ. Advisers, Economic Report of the President (2010) ........................................26

*The Economic Case for Health Reform: Hearing Before the H. Comm. on the Budget*,
   111th Cong. (2009) .............................................................................................26

*Health Reform in the 21st Century: Insurance Market Reforms: Hearing Before the H.
   Comm. on Ways and Means*, 111th Cong. (2009)................................................27, 32, 35

H.R. REP. NO. 111-443 (2010).......................................................................6-7, 26-27

Letter from Douglas Elmendorf, Director, CBO, to the Hon. Nancy Pelosi, Speaker,
   U.S. House of Representatives (Mar. 20, 2010) ...................................................8-9, 38-39

Joint Comm. on Taxation, Overview, http://www.jct.gov/about-us/overview.html ...................38

Joint Comm. on Taxation, 111th Cong., *Technical Explanation of the Revenue
   Provisions of the "Reconciliation Act of 2010," as amended, in Combination
   with the "Patient Protection and Affordable Care Act"* (Mar. 21, 2010).......................38

S. REP. NO. 111-89 (2009) ...................................................................................26

*State Coverage Initiatives: Hearing Before the Subcomm. on Health for the H. Comm.
   on Ways and Means*, 110th Cong. (2008) ......................................................................24

Statement of Raymond Arth, Nat'l Small Business Ass'n (June 10, 2008) (submitted into
   the record of *47 Million and Counting: Why the Health Care Market Is Broken:
   Hearing Before the S. Comm. on Finance*, 110th Cong. (2008) ......................................27

**Miscellaneous Materials:**

Department of Health and Human Services, Health Insurance Reform and Virginia,
   http://www.healthreform.gov/reports/statehealthreform/virginia.html .............................13

Fed. R. Civ. P. 12(b)(1)...................................................................................10, 39

Fed. R. Civ. P. 12(b)(6)...................................................................................10, 39

Fed. R. Evid. 201 advisory committee's note.................................................................21

Statement of Governor Bob McDonnell on Passage of Federal Health Care Bill (Mar. 22,
   2010), available at http://www.governor.virginia.gov/News/ ...........................................9

**Introduction**

Virginia seeks here to challenge recently enacted federal health care reform legislation. To accept that challenge, this Court would have to make new law and ignore decades of settled precedent. The Court would also have to step beyond the proper role of the Judiciary, for Virginia does not satisfy the basic constitutional prerequisites – in particular, standing to sue – to invoke federal jurisdiction. The Commonwealth asserts it has standing to vindicate a sovereign interest in its new statute purporting to exempt Virginians from any federal requirement to purchase health insurance. A state cannot, however, manufacture its own standing to challenge a federal law by the simple expedient of passing a statute purporting to nullify it. Otherwise, a state could import almost any political or policy dispute into federal court by enacting its side of the argument into state law. It is equally clear that a state cannot, acting "as parens patriae, . . . institute judicial proceedings to protect citizens of the United States from the operation of [federal] statutes," because "it is no part of [a State's] duty or power to enforce [its citizens'] rights in respect of their relations with the federal government." *Massachusetts v. Mellon*, 262 U.S. 447, 485-86 (1923); *see also Massachusetts v. EPA*, 549 U.S. 497, 520 n.17 (2007) (*Mellon* "prohibits" "allowing a State 'to protect her citizens from the operation of federal statutes'") (internal quotation omitted).

This is particularly so given that the only provision Virginia challenges in this litigation – Section 1501 of the Patient Protection and Affordable Care Act ("ACA"), which requires individuals either to obtain a minimum level of health insurance or to pay a penalty if they do not – will impose no obligations on the Commonwealth, even after the law takes effect some four years from now. The provision applies only to individuals, not the state government. Because Virginia itself neither has sustained a direct and concrete injury, nor is in immediate danger of

such an injury, it does not have standing to sue.  In seeking to speak on behalf of unnamed citizens, Virginia brings into a judicial setting arguments that failed in the legislative arena, where a proponent need not show immediate and concrete harm.  As the Supreme Court found in *Mellon*, for an Article III court to resolve such an abstract debate "would be, not to decide a judicial controversy, but to assume a position of authority over the governmental acts of another and coequal department, an authority which [the Court] plainly do[es] not possess."  262 U.S. at 489.  *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 101-02 (1998) ("For a court to pronounce upon the meaning or the constitutionality of a state or federal law when it has no jurisdiction to do so is, by very definition, for a court to act ultra vires.").  Virginia's claim thus fails before the Court can even reach the merits.

Even if Virginia could surmount this jurisdictional barrier, its claim still would fail, because Congress, in adopting the minimum coverage provision, acted well within its authority under the Commerce Clause.  Congress understood that virtually everyone at some point will need medical services, which cost money.  The ACA merely regulates economic decisions on how to pay for those services – whether to pay in advance through insurance or attempt to do so later out of pocket – decisions that substantially affect the vast, interstate health care market.

As Congress found, Americans spent an estimated $2.5 trillion on health care in 2009. Pub. L. No. 111-148, §§ 1501(a)(2)(B), 10106(a), 124 Stat. 119, 907 (2010).  Even so, more than 45 million Americans have neither private health insurance nor the protection of government programs such as Medicaid.  Many of these individuals are uninsured because they cannot afford coverage.  Others are excluded by insurers' restrictive underwriting criteria.  Still others make the economic decision to forego insurance altogether.

Foregoing health insurance, however, is not the same as foregoing health care. When accidents or illnesses inevitably occur, the uninsured still receive medical assistance, even if they cannot pay.  As Congress documented, such uncompensated health care costs – $43 billion in 2008 – are passed on to the other participants in the health care market:  the federal government, state and local governments, health care providers, insurers, and the insured population.   Pub. L. No. 111-148, §§ 1501(a)(2)(F), 10106(a).

Recognizing that the pervasive ills in the health care system require a national solution, Congress adopted a variety of interrelated provisions that seek, among other things, to reduce the number of uninsured Americans and the escalating costs they impose on the health care system. To make health insurance affordable and available, the Act provides for "health benefit exchanges" through which individuals and small businesses may leverage their collective buying power to obtain prices for health insurance that are competitive with group plans.  It provides incentives for employers to offer expanded insurance coverage.  It offers tax credits to certain low-income and middle-income individuals and families, and extends Medicaid to individuals with lower incomes.  And it prohibits insurers from denying coverage to those with pre-existing medical conditions, imposing eligibility rules based on medical factors or claims experience, or revoking insurance other than for fraud or misrepresentation.

The "minimum coverage provision" that Virginia challenges here – *i.e.*, the requirement that, with specified exceptions, all Americans who can afford it either maintain a minimum level of health insurance coverage or pay a penalty – is a linchpin of Congress's reform plan.  *See id.* §§ 1501(a)(2)(H), 10106(a) (absence of minimum coverage requirement would "undercut Federal regulation of the health insurance market").  Based on extensive hearings and expert evidence, Congress concluded that requiring the financially able to purchase health insurance

would spread risks across a larger pool, which (as with all insurance) would allow insurers to charge less for coverage. *Id.* §§ 1501(a)(2)(I), 10106(a). Congress thus found that by "significantly reducing the number of the uninsured, the requirement, together with the other provisions of this Act, will lower health insurance premiums." *Id.* §§ 1501(a)(2)(F), 10106(a). Conversely, Congress determined that, without the minimum coverage provision, the reforms in the Act, such as the ban on denying coverage based on pre-existing conditions, would not work, as they would amplify existing incentives for individuals to "wait to purchase health insurance until they needed care," which in turn would shift even greater costs onto third parties. *Id.* §§ 1501(a)(2)(I), 10106(a). Congress thus determined that the minimum coverage provision "is essential to creating effective health insurance markets in which improved health insurance products that are guaranteed issue and do not exclude coverage of pre-existing conditions can be sold." *Id.*

More broadly, the findings in the Act underscore the rational basis for Congress's conclusion that, "taken in the aggregate," economic decisions to try to pay for health care out of pocket, rather than to pay in advance through insurance, substantially affect interstate commerce. *Gonzales v. Raich*, 545 U.S. 1, 22 (2005). Among other things, these decisions shift costs to third parties, Pub. L. No. 111-148, §§ 1501(a)(2)(F), 10106(a); "increas[e] financial risks to households and medical providers," *id.* §§ 1501(a)(2)(A), 10106(a); raise insurance premiums, *id.* §§ 1501(a)(2)(F), 10106(a); precipitate personal bankruptcies, §§ 1501(a)(2)(G), 10106(a); and impose higher administrative expenses, *id.* §§ 1501(a)(2)(J), 10106(a). Against this backdrop, Congress's authority under the Commerce Clause to impose the minimum coverage provision is clear.

The Commerce Clause, moreover, is not the only source of Congressional power to adopt this statute. Congress also has independent and "extensive" authority to do so as an exercise of its power under Article I, Section 8, to lay taxes and make expenditures to promote the general welfare. *License Tax Cases*, 72 U.S. (5 Wall.) 462, 471 (1867). The Court has held that an exercise of this power is valid even if it has a regulatory function, even if the revenue purpose is subsidiary and the moneys raised "negligible," and whether or not Congress could otherwise assert regulatory authority. *United States v. Sanchez,* 340 U.S. 42, 44 (1950). The minimum coverage provision – which is enforced through a provision in the Internal Revenue Code requiring individuals to pay a penalty with their taxes if they lack required coverage – raises more than negligible revenue. It is a valid exercise of this broad power.

In sum, because Virginia lacks standing to sue, this case does not call upon the Court to judge the "constitutionality of an Act of Congress" – "'the gravest and most delicate duty'" a court may undertake. *Nw. Austin Mun. Util. Dist. No. One v. Holder*, 129 S. Ct. 2504, 2513 (2009) (quoting *Blodgett v. Holden,* 275 U.S. 142, 147-48 (1927) (Holmes, J., concurring)). Even if the Court were to undertake that task, however, clear precedent establishes that the minimum coverage provision falls within Congress's authority to regulate interstate commerce, as well as its power to lay taxes and make expenditures for the general welfare.

Accordingly, the Motion to Dismiss should be granted.

## Argument

### I.  Statement of the Case

#### A.  Statutory Background

In 2009, the United States spent more than 17% of its gross domestic product on health care. Pub. L. No. 111-148, §§ 1501(a)(2)(B), 10106(a). Notwithstanding these extraordinary

expenditures, 45 million people – an estimated 15% of the population – went without health insurance for some portion of 2009, and, absent the new legislation, that number would have climbed to 54 million by 2019. CONG. BUDGET OFFICE ("CBO"), 2008 KEY ISSUES IN ANALYZING MAJOR HEALTH PROPOSALS 11 (Dec. 2008) [hereinafter KEY ISSUES]; *see also* CBO, THE LONG-TERM BUDGET OUTLOOK 21-22 (June 2009).

The record before Congress documents the staggering costs that a broken health care system visits on individual Americans and the nation as a whole.  The millions who have no health insurance coverage still receive medical care, but often cannot pay for it.  The costs of that uncompensated care are shifted to the government, taxpayers, insurers, and the insured.  But cost shifting is not the only harm imposed by the lack of insurance.  Congress found that the "economy loses up to $207,000,000,000 a year because of the poorer health and shorter lifespan of the uninsured," Pub. L. No. 111-148, §§ 1501(a)(2)(E), 10106(a), and concluded that 62 percent of all personal bankruptcies are caused in part by medical expenses, *id.* §§ 1501(a)(2)(G), 10106(a).  All these costs, Congress determined, have a substantial effect on interstate commerce. *Id.* §§ 1501(a)(2)(F), 10106(a).

In order to remedy this enormous problem for the American economy, the Act comprehensively "regulates activity that is commercial and economic in nature: economic and financial decisions about how and when health care is paid for, and when health insurance is purchased." Pub. L. No. 111-148, §§ 1501(a)(2)(A), 10106(a).  First, to address inflated fees and premiums in the individual and small-business insurance market, Congress established health insurance exchanges "as an organized and transparent marketplace for the purchase of health insurance where individuals and employees (phased-in over time) can shop and compare health insurance options."  H.R. REP. NO. 111-443, pt. II, at 976 (2010) (internal quotation omitted).

The exchanges regulate premiums, coordinate participation and enrollment in health plans, and provide consumers with needed information. Pub. L. No. 111-148, § 1311.

Second, the Act builds on the existing system of health insurance, in which most individuals receive coverage as part of their employee compensation. *See* CBO, KEY ISSUES, at 4-5. It creates a system of tax incentives for small businesses to encourage the purchase of health insurance for their employees, and imposes penalties on certain large businesses that do not provide adequate coverage to their employees. Pub. L. No. 111-148, §§ 1421, 1513.

Third, the Act subsidizes insurance coverage for a large portion of the uninsured population. As Congress understood, nearly two-thirds of the uninsured are in families with income less than 200 percent of the federal poverty level, H.R. REP. NO. 111-443, pt. II, at 978 (2010); *see also* CBO, KEY ISSUES, at 27, while 4 percent of those with income greater than 400 percent of the poverty level are uninsured. CBO, KEY ISSUES, at 11. The Act seeks to plug this gap by providing health insurance tax credits and reduced cost-sharing for individuals and families with income between 133 and 400 percent of the federal poverty line, Pub. L. No. 111-148, §§ 1401-02, and expands eligibility for Medicaid to individuals with income below 133 percent of the federal poverty level beginning in 2014. *Id*. § 2001.

Fourth, the Act removes barriers to insurance coverage. As noted, it prohibits widespread insurance industry practices that increase premiums – or deny coverage entirely – to those with the greatest need for health care. Most significantly, the Act bars insurers from refusing to cover individuals with pre-existing medical conditions. Pub. L. No. 111-148, § 1201.[1]

---

[1] It also prevents insurers from rescinding coverage for any reason other than fraud or misrepresentation, or declining to renew coverage based on health status. *Id.* §§ 1001, 1201. And it prohibits caps on the amount of coverage available to a policyholder in a given year or over a lifetime. *Id.* §§ 1001, 10101(a).

Finally, the Act requires that all Americans, with specified exceptions, maintain a minimum level of health insurance coverage, or pay a penalty. Pub. L. No. 111-148, §§ 1501, 10106.[2]  Congress found that this provision "is an essential part of this larger regulation of economic activity," and that its absence "would undercut Federal regulation of the health insurance market."  *Id.* §§1501(a)(2)(H), 10106(a).  That judgment rested on a number of Congressional findings.  Congress found that, by "significantly reducing the number of the uninsured, the requirement, together with the other provisions of this Act, will lower health insurance premiums."  *Id.* §§ 1501(a)(2)(F), 10106(a).  Conversely, and importantly, Congress also found that, without the minimum coverage provision, the reforms in the Act, such as the ban on denying coverage based on pre-existing conditions, would amplify existing incentives for individuals to "wait to purchase health insurance until they needed care," thereby further shifting costs onto third parties.  *Id.* §§ 1501(a)(2)(I), 10106(a).  Congress thus determined that the minimum coverage provision "is essential to creating effective health insurance markets in which improved health insurance products that are guaranteed issue and do not exclude coverage of pre-existing conditions can be sold."  *Id.*

The CBO projects that the reforms in the Act will reduce the number of uninsured Americans by approximately 32 million by 2019.  Letter from Douglas W. Elmendorf, Director, CBO, to the Hon. Nancy Pelosi, Speaker, U.S. House of Representatives 9 (Mar. 20, 2010) [hereinafter CBO Letter to Rep. Pelosi].  It further projects that the Act's combination of reforms, subsidies, and tax credits will reduce the average premium paid by individuals and families in the individual and small-group markets.  *Id.* at 15; CBO, AN ANALYSIS OF HEALTH INSURANCE PREMIUMS UNDER THE PATIENT PROTECTION AND AFFORDABLE CARE ACT 23-25

---

[2]  These provisions have been amended by the Health Care and Education Affordability Reconciliation Act of 2010, Pub. L. No. 111-152, § 1002, 124 Stat. 1029, 1032.

(Nov. 30, 2009).  And CBO estimates that the interrelated revenue and spending provisions in the Act – specifically taking into account revenue from the minimum coverage provision – will yield net savings to the federal government of more than $100 billion over the next decade. CBO Letter to Rep. Pelosi at 2.

### B.    Current Proceedings

Virginia filed this suit on March 23, 2010, the day the President signed the ACA into law. The complaint presents a facial challenge directed exclusively to the Act's minimum coverage provision, which the complaint characterizes as "an essential element of the act . . . without which the statutory scheme cannot function."  Compl. ¶ 5.  The complaint seeks declaratory and injunctive relief holding unconstitutional the minimum coverage provision and striking down the ACA in its entirety on that basis.  Compl. at 6-7.  The complaint also asserts that the ACA is in conflict with recently enacted Virginia Code § 38.2-3430.1:1 (2010), which, as described by Governor McDonnell, "prohibits mandatory insurance purchases for Virginians."[3]  Virginia alleges that this state law "is valid despite the Supremacy Clause of the United States Constitution" because the ACA's minimum coverage requirements (and therefore the ACA as a whole) are unconstitutional.  Compl. ¶ 7.  It asks the Court to declare Virginia Code § 38.2-3430.1:1 "a valid exercise of state power."  Compl. at 6.

## II.    Standard of Review

The Secretary moves to dismiss the complaint for lack of subject matter jurisdiction under Rule 12(b)(1) of the Federal Rules of Civil Procedure.  Virginia bears the burden to show

---

[3]  Statement of Governor Bob McDonnell on Passage of Federal Health Care Bill (Mar. 22, 2010), available at http://www.governor.virginia.gov/News/.  Section 38.2-3430.1:1 states that no resident of Virginia "shall be required to obtain or maintain a policy of individual insurance coverage except as required by a court or the [Virginia] Department of Social Services," and that, subject to certain exceptions, "[n]o provision of this title shall render a resident of this Commonwealth liable for any penalty, assessment, fee, or fine as a result of his failure to procure or obtain health insurance coverage."

subject matter jurisdiction.  *See Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009).

Where, as here, the defendant challenges jurisdiction on the face of the complaint, the complaint

must plead sufficient facts to establish that jurisdiction exists.  *See id.*  This Court must

determine whether it has subject matter jurisdiction before addressing the merits of the

complaint.  *See Steel Co.*, 523 U.S. at 94-95.

The Secretary also moves to dismiss the complaint under Federal Rule of Civil Procedure

12(b)(6) for failure to state a claim upon which relief can be granted.  Under this rule, "the tenet

that a court must accept as true all of the allegations contained in a complaint is inapplicable to

legal conclusions.  Threadbare recitals of the elements of a cause of action, supported by mere

conclusory statements, do not suffice."  *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009); *see also*

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

## III.     The Complaint Should Be Dismissed for Lack of Subject Matter Jurisdiction

In *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332 (2006), the Supreme Court reiterated

that "[n]o principle is more fundamental to the judiciary's proper role in our system of

government than the constitutional limitation of federal-court jurisdiction to actual cases or

controversies."  *Id.* at 341 (internal quotation omitted).  Virginia's challenge to the minimum

coverage provision does not present an actual case or controversy.  First, Virginia claims

standing on behalf of its citizens to challenge federal legislation, but citizens of Virginia are also

citizens of the United States.  The Commonwealth does not have standing to sue the federal

government to exempt Virginians from the operation of federal law.  Because Virginia alleges no

actual or imminent injury to *its own* interests as a state, it may not pursue its claim.  Second, the

Anti-Injunction Act independently bars Virginia's claim; resolution of that claim must await a

proper plaintiff, who follows the procedures set by law for a review of the assessments that

Virginia seeks to challenge now.  Third, Virginia's challenge is unripe because it is doubtful that the minimum coverage provision will ever injure Virginia's interests, and the Commonwealth will suffer no hardship from deferring judicial resolution of its claims.

### A.  Virginia Lacks Standing Because It Has Alleged No Cognizable Injury

To have standing to challenge the Act's minimum health insurance coverage provision, Virginia must show that it has "suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (internal quotations omitted).  As the Commonwealth implicitly recognizes, the minimum coverage provision that it challenges here imposes no imminent injury on anyone; indeed, it does not take effect until 2014. Compl. ¶ 1.  Moreover, even then, the provision will not cause the Commonwealth itself any concrete or particularized injury.

Virginia nonetheless asserts that it has standing because the minimum coverage provision imposes "immediate and continuing burdens" on "its citizens."  Compl. ¶ 4.  Virginia also alleges that the provision imposes "immediate and continuing burdens on Virginia," by injuring its sovereignty.  Compl. ¶¶ 4, 7.  In particular, the Commonwealth asserts that the Act conflicts with recently enacted Virginia Code § 38.2-3430.1:1 (2010), and that "[t]he Commonwealth of Virginia has an interest in asserting the validity" of its enactment.  Compl. ¶¶ 4, 7.  Virginia reasons that "[t]he collision between the state and federal schemes . . . creates an immediate, actual controversy involving antagonistic assertions of right," Compl. ¶ 4, which allows it to challenge Congress's authority to enact the minimum coverage provision.  Neither effort to establish standing has any merit.

### 1.   Virginia Cannot Sue the Federal Government to Exempt Its Citizens from Federal Law

Virginia cannot convert its political dispute with the federal government into a legal claim through the vehicle of a *parens patriae* suit brought on behalf of its citizens. The Supreme Court rejected a similar attempt by a state to invalidate federal health care legislation in *Massachusetts v. Mellon*, 262 U.S. 447 (1923). There, the state claimed that the federal Maternity Act, which sought to "protect the health of mothers and infants," exceeded Congress's enumerated powers. *Id.* at 479. In rejecting the state's standing, the Court explained that the citizens of a state "are also citizens of the United States," and therefore "[i]t cannot be conceded that a state, as parens patriae, may institute judicial proceedings to protect citizens of the United States from the operation of the statutes thereof." *Id.* at 485. The Court stressed that "it is no part of [a State's] duty or power to enforce [its citizens'] rights in respect of their relations with the federal government." *Id.* at 485-86. In this regard, the Court emphasized, "it is the United States, and not the state, which represents [its citizens] as parens patriae." *Id.* The Supreme Court recently reiterated that its decision in *Mellon* "prohibits" a state from suing federal defendants "to protect her citizens from the operation of federal statutes." *Massachusetts v. EPA*, 549 U.S. 497, 520 n.17 (2007); *see also Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592, 610 n.16 (1982) ("A State does not have standing as *parens patriae* to bring an action against the Federal Government."); *Hodges v. Abraham*, 300 F.3d 432, 444 (4th Cir. 2002) (suit "in which [a] state asserts [an] injury to [the] well-being of its populace . . . cannot be maintained against the Federal Government"). Virginia thus cannot bring this suit against the federal government on the theory that the minimum coverage provision will burden or otherwise injure Virginia's citizens.

This settled law precludes Virginia from pursuing any of its citizens' potential claims against the federal government. However, the infirmity of the *parens patriae* claim is particularly striking here given that the Commonwealth's effort to invalidate this federal legislation advances not the well-being of its populace generally, but only the interests of the small minority of its citizens who, come 2014, are not covered by a private or governmental health insurance policy, choose not to obtain health insurance, and are not exempt from the minimum coverage provision. Other citizens, who would benefit from the Act's many reforms, would suffer harm if Virginia were to prevail on its claim.[4] All these individuals, of course, are also citizens of the United States whom Congress has determined are entitled to the benefits of the Act. The point here is not to sort out these conflicting interests, or to assess the relative efficacy of sovereign representation. It is, rather, to note the conflicting interests even within Virginia, and to highlight that federal legislation by its nature already reflects a balance – struck through the democratic process – between the competing interests of the citizenry. *Mellon*, 262 U.S. at 486.

### 2. Virginia Has Alleged No Cognizable Injury to Its Own Interests

Nor does Virginia have standing to sue on its own behalf to challenge the minimum coverage provision, as that provision does not impose any obligations whatsoever on Virginia as a state. A state has standing to challenge federal action that threatens its own distinct interests only when the federal action "inva[des] a legally protected interest," causing an injury to the state that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560. A state suffers a cognizable injury when, for example, its

---

[4] For example, the Department of Health and Human Services estimates that, under the ACA, 1.2 million uninsured Virginians will gain coverage, 684,000 Virginia residents will qualify for premium tax credits to help them purchase insurance on the exchanges, and 93,400 small businesses in Virginia could gain the benefit of the Act's tax credits for coverage for their employees. *See* http://www.healthreform.gov/reports/statehealthreform/virginia.html.

physical territory is harmed.  *See Massachusetts v. EPA*, 549 U.S. at 522-23 (holding Massachusetts had standing to sue over EPA's failure to regulate greenhouse gas emissions because "rising seas," caused in part by these emissions, "have already begun to swallow Massachusetts' coastal land").

By contrast, Massachusetts lacked standing in *Mellon* to challenge a federal statute affecting its citizens, because the alleged harm to the Commonwealth's abstract interest in its own sovereignty was not in itself a justiciable injury.  262 U.S. at 484-85; *see also New Jersey v. Sargent*, 269 U.S. 328, 337 (1926) (allegations that provisions of federal law "go beyond the power of Congress and impinge on that of the state . . . do not suffice as a basis for invoking an exercise of judicial power"); *Texas v. ICC*, 258 U.S. 158, 162-63 (1922) (state's claim of infringement upon state sovereignty was merely "an abstract question of legislative power," not a justiciable case or controversy).  These decisions make clear that the "antagonistic assertions of right" alleged here, Compl. ¶ 4, do not frame a controversy under Article III, because Virginia is asking this Court "to adjudicate, not rights of person or property, not rights of dominion over physical domain, not quasi sovereign rights actually invaded or threatened, but abstract questions of political power, of sovereignty, of government."  *Mellon*, 262 U.S. at 484-85.

Virginia cannot manufacture standing by passing legislation that purports to exempt its citizens from any requirement to purchase health insurance.  The principle was established long ago that, under the Supremacy Clause, such a state law purporting to nullify federal law "must yield," *Florida v. Mellon*, 273 U.S. 12, 17 (1927), *see Helvering v. Davis*, 301 U.S. 619, 645 (1937) ("The issue is a closed one.  It was fought out long ago.").  The "conflict" gives rise to no legitimate sovereign interest, and provides no basis for Virginia to receive an advisory opinion whether its state law is valid on the ground that the federal law is not.  Settled law confirms that

such abstract policy disputes are not proper subjects for judicial resolution.  In *United States v. West Virginia*, 295 U.S. 463, 469 (1935), for example, West Virginia licensed construction of a dam pursuant to a state law, and the United States contended that a federal license was required under the Federal Water Power Act.  The State contended that the federal statute exceeded Congress's power, and that the state act was therefore superior.  *Id.* at 469.   Although recognizing that there was a concrete dispute between the United States and the private dam builder (who sought to build without a federal license), the Supreme Court dismissed the complaint as between the United States and West Virginia, holding that it presented merely a "difference of opinion" between the state and federal governments, not a case or controversy.  *Id.* at 473-74; *see also New Jersey*, 269 U.S. at 337 (holding that state lacked standing to challenge provisions of Federal Water Power Act that were allegedly contrary to the state's water policies).

If states could manufacture standing in the way Virginia attempts to do here, every policy dispute lost in the legislative arena could be transformed into an issue for decision by the courts. If, for example, Virginia objected to its citizens having to pay the minimum wage, it could pass a statute purporting to exempt them from federal minimum wage legislation, and then sue the federal government based on the Commonwealth's alleged sovereign interest in the vitality of its law.  Or if Virginia objected to its citizens having to pay Social Security taxes, it could pass a statute purporting to exempt them from those taxes and sue the federal government based on the ostensible sovereign interest thereby created.  The standing requirement is intended precisely to prevent litigation that is merely politics by other means.  If Virginia's policy preferences conflict with federal policy adopted by the elected representatives of the people, Virginia must seek relief in the political arena, rather than the federal courts.  *Cf. Garcia v. San Antonio Metro. Transit*

*Auth.*, 469 U.S. 528, 552 (1985) ("State sovereign interests" are best protected "by procedural safeguards inherent in the structure of the federal system.")

In sum, the minimum coverage provision will not operate on Virginia as a state, will not require Virginia to take any action whatsoever before, on, or after the date that it goes into effect in 2014, and will cause no concrete injury to the Commonwealth's distinct interests. Virginia therefore does not have standing to challenge the provision.

### B. Virginia Cannot Evade the Procedures Prescribed by Law for an Individual to Contest a Liability under the Minimum Coverage Provision

Wholly apart from Virginia's failure to establish standing, this Court lacks jurisdiction for a second reason. Virginia seeks to restrain the federal government from enforcing the penalty specified under the minimum coverage provision for those who refuse to obtain health insurance. The Anti-Injunction Act ("AIA"), however, bars Virginia from seeking such relief. The AIA provides that, with statutory exceptions inapplicable here, "no suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court by any person, whether or not such person is the person against whom such tax was assessed." 26 U.S.C. § 7421(a). It does not matter whether the payment sought to be enjoined is labeled as a "penalty" rather than a "tax." *Cf.* 26 U.S.C. § 5000A(b) (imposing a "penalty"). With exceptions immaterial here, that penalty is "assessed and collected in the same manner" as other penalties under the Internal Revenue Code, 26 U.S.C. § 5000A(g)(1), and, like these other penalties, falls within the bar of the AIA. 26 U.S.C. § 6671(a); *see, e.g., Barr v. United States*, 736 F.2d 1134, 1135 (7th Cir. 1984) ("Section 6671 provides that the penalty at issue here is a tax for purposes of the Anti-Injunction Act."). Applying the AIA here serves its statutory purpose, to preserve the Government's ability to collect such assessments expeditiously with "a minimum of

preenforcement judicial interference and to require that the legal right to disputed sums be determined in a suit for refund." *Bob Jones Univ. v. Simon*, 416 U.S. 725, 736 (1974) (internal quotation omitted).[5]  District courts accordingly lack jurisdiction to order the abatement of any liability for a tax or a penalty, apart from their power to consider validly-filed claims for refunds. *See Bartley v. United States*, 123 F.3d 466, 467-68 (7th Cir. 1997).

This is not a case like *South Carolina v. Regan*, 465 U.S. 367 (1984), where the Supreme Court permitted a state to challenge the revocation of a tax exemption for state-issued bonds, when the tax substantially harmed the state's ability to issue bonds and the state could not rely on those buyers to assert its claims.  *Id.* at 371-72, 380-81.   Virginia has not identified any concrete harm to itself, nor any reason why, after 2014, any Virginia citizens who are subject to the penalty should be excused from the normal method of presenting any claims – paying the penalty and, if they wish, challenging its validity in a refund action.  *See Judicial Watch, Inc. v. Rossotti*, 317 F.3d 401, 408 n.3 (4th Cir. 2003) ("Because of the strong policy animating the Anti-Injunction Act, and the sympathetic, almost unique, facts in *Regan*, courts have construed the *Regan* exception very narrowly . . . .").   Accordingly, the Anti-Injunction Act bars Virginia's premature effort here to enjoin enforcement of the penalty provisions relating to the minimum coverage provision.

### C.       Virginia's Claim of an Abstract Conflict between State and Federal Law Is Not Ripe for Review

This Court lacks jurisdiction for a third reason: Virginia's challenge to a provision that does not take effect until 2014 is not ripe.  The legal question Virginia seeks to present is not fit

---

[5]  The Declaratory Judgment Act, 28 U.S.C. § 2201(a), similarly bars declaratory relief here, providing jurisdiction to the district courts to grant such relief  "except with respect to Federal taxes."  As the Supreme Court noted in *Bob Jones University*, 416 U.S. at 732 n.7, the tax exception to the Declaratory Judgment Act demonstrates the "congressional antipathy for premature interference with the assessment or collection of any federal tax."

for judicial review because it rests upon "contingent future events that may not occur as anticipated, or indeed may not occur at all." *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 580-81 (1985) (internal quotation omitted).  No "collision between the state and federal schemes," Compl. ¶ 4, can occur until 2014, and even then it is unclear if, or how, Virginia's statute could ever be enforced.  Instead, the validity of the minimum coverage provision could be determined in the type of refund action the AIA seeks to preserve, without the participation of Virginia or consideration of its law.  Withholding court consideration in the interim, moreover, works no hardship to the state, since the law does not require it "to engage in, or to refrain from, any conduct." *Texas v. United States*, 523 U.S. 296, 301 (1998).  As the Court has recognized repeatedly, "[d]etermination of the scope and constitutionality of legislation in advance of its immediate adverse effect in the context of a concrete case involves too remote and abstract an inquiry for the proper exercise of the judicial function." *Int'l Longshoremen's & Warehousemen's Union v. Boyd*, 347 U.S. 222, 224 (1954); *see also South Carolina v. Katzenbach*, 383 U.S. 301, 317 (1966) (state could not challenge provision of federal law before it had been enforced in that state); *United States v. Raines*, 362 U.S. 17, 22 (1960) ("The delicate power of pronouncing an Act of Congress unconstitutional is not to be exercised with reference to hypothetical cases thus imagined.").

## IV.   The Complaint Should Be Dismissed for Failure to State a Claim upon Which Relief May Be Granted

Even if this Court had subject matter jurisdiction, Virginia's constitutional challenge to the Act would fail.  "'Due respect for the decisions of a coordinate branch of Government demands that [this Court] invalidate a congressional enactment only upon a plain showing that Congress has exceeded its constitutional bounds.'" *Gibbs v. Babbitt*, 214 F.3d 483, 490 (4th Cir. 2000) (quoting *United States v. Morrison*, 529 U.S. 598, 607 (2000)).  Moreover, in presenting a

facial challenge to a federal statute, as the Commonwealth does here, a plaintiff may prevail only "by 'establish[ing] that no set of circumstances exists under which the Act would be valid,' *i.e.*, that the law is unconstitutional in all of its applications."   *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008) (quoting *United States v. Salerno,* 481 U.S. 739, 745 (1987)); *see also Nebraska v. EPA*, 331 F.3d 995, 998 (D.C. Cir. 2003) (rejecting facial Commerce Clause challenge to federal statute); *United States v. Sage*, 92 F.3d 101, 106 (2d Cir. 1996) (same).   Virginia cannot make this showing.

### A.     The Comprehensive Regulatory Measures of the ACA, Including the Minimum Coverage Provision, Are a Proper Exercise of Congress's Powers under the Commerce Clause and the Necessary and Proper Clause

Virginia asserts that the minimum coverage provision exceeds Congress's authority under the Commerce Clause.   Its claim is mistaken, for two primary reasons.   First, the provision regulates *economic* decisions regarding the way in which health care services are paid for – decisions that, in the aggregate, have a direct and substantial effect on interstate commerce. Second, Congress had far more than a rational basis to find the provision to be an essential element of the Act's larger (and unchallenged) regulatory effort to regulate the interstate business of insurance.   The provision prohibits participants in the health care market from shifting the costs of their care to third parties, and also prevents individuals from relying on the Act's reforms (such as the ban on denying coverage for people with pre-existing conditions) to delay the purchase of health insurance until illness strikes.   In short, on the basis of detailed Congressional findings, which were the product of extensive hearings and debate, the provision at issue directly addresses cost-shifting in those markets, quintessentially economic activity, and it forms an essential part of a comprehensive, intricately interrelated regulatory scheme. Moreover, in focusing on services people almost certainly will receive, and regulating the

economic decision whether to pay for health care in advance, through insurance, or to try to pay later, out of pocket, the provision, contrary to Virginia's claim, does not open the door to regulation of a full range of life choices.  For these reasons, the provision falls well within the Constitution's broad grant of authority to Congress to regulate interstate commerce.  And because the provision is reasonably adapted as a means to accomplish the ends of the Act, it also falls well within Congressional authority under the Necessary and Proper Clause.

### 1.    The Congressional Authority to Regulate Interstate Commerce Is Broad

The Constitution grants Congress the power to "regulate Commerce . . . among the several States," U.S. CONST., art. I, § 8, cl. 3, and to "make all Laws which shall be necessary and proper" to the execution of that power, *id*. cl. 18.  This grant of authority is broad.  Congress may "regulate the channels of interstate commerce"; it may "regulate and protect the instrumentalities of interstate commerce, and persons or things in interstate commerce"; and it may "regulate activities that substantially affect interstate commerce."  *Gonzales v. Raich*, 545 U.S. 1, 16-17 (2005).  In assessing whether an activity substantially affects interstate commerce, Congress may consider the aggregate effect of a particular form of conduct in deciding whether to exercise its Commerce Clause authority.  The question is not whether any one person's conduct, considered in isolation, affects interstate commerce, but whether there is a rational basis for concluding that the *class of activities*, "taken in the aggregate" at least has some substantial effect on interstate commerce.  *Raich*, 545 U.S. at 22; *see also Wickard v. Filburn*, 317 U.S. 111, 127-28 (1942).  In other words, "'[w]here the class of activities is regulated and that class is within the reach of federal power, the courts have no power to excise, as trivial, individual instances of the class.'"  *Raich*, 545 U.S. at 23 (quoting *Perez v. United States*, 402 U.S. 146, 154 (1971) (internal quotation omitted)); *see also United States v. Malloy,* 568 F.3d 166, 180

(4th Cir. 2009), *cert. denied*, 130 S. Ct. 1736 (2010) (applying *Raich* to uphold ban on child pornography produced for personal use); *United States v. Dean*, 670 F. Supp. 2d 457, 460 (E.D. Va. 2009).

In exercising its Commerce Clause power, Congress may reach even wholly intrastate, non-commercial matters when it concludes that the failure to do so would undercut the operation of a larger program regulating interstate commerce. *Raich*, 545 U.S. at 18. Thus, when "a general regulatory statute bears a substantial relation to commerce, the *de minimis* character of individual instances arising under that statute is of no consequence." *Id*. at 17 (internal quotation omitted). *See also id.* at 37 (Scalia, J., concurring in the judgment) (noting that Congress's authority to make its regulation of commerce effective is "distinct" from its authority to regulate matters that substantially affect interstate commerce); *Gibbs*, 214 F.3d at 497; *Dean*, 670 F. Supp. 2d at 460.

In assessing these Congressional judgments regarding the impact on interstate commerce and the necessity of individual provisions to the overall scheme of reform, the task of the Court "is a modest one." *Raich*, 545 U.S. at 22. The Court need not itself measure the impact on interstate commerce of the activities Congress sought to regulate, nor need the Court calculate how integral a particular provision is to a larger regulatory program. The Court's task instead is to determine "whether a 'rational basis' exists" for Congress's conclusions. *Id.* (quoting *United States v. Lopez*, 514 U.S. 549, 557 (1995)). Under rational basis review, this Court may not second-guess the factual record upon which Congress relied.[6]

The Supreme Court's decisions in *Raich* and in *Wickard* illustrate the breadth of the Commerce power and the deference accorded Congress's judgments. In *Raich*, the Court

---

[6] This Court accordingly may consider that record in its review of this motion to dismiss. *See Maersk Line Ltd. v. Care*, 271 F. Supp. 2d 818, 821 n.1 (E.D. Va. 2003); *see also* FED. R. EVID. 201 advisory committee's note.

sustained Congress's authority to prohibit the possession of home-grown marijuana intended solely for personal use.  It was sufficient that the Controlled Substances Act "regulates the production, distribution, and consumption of commodities for which there is an established, and lucrative, interstate market." *Raich*, 545 U.S. at 26.  Similarly, in *Wickard*, the Court upheld a penalty on wheat grown for home consumption despite the farmer's protests that he did not intend to put the commodity on the market.  It was sufficient that the existence of homegrown wheat, in the aggregate, could "suppl[y] a need of the man who grew it which would otherwise be reflected by purchases in the open market," thus undermining the efficacy of the federal price stabilization scheme.  *Wickard*, 317 U.S. at 128.  Thus, in each case, the Court upheld obligations even on individuals who claimed not to participate in interstate commerce, because those obligations were components of broad schemes regulating interstate commerce.

*Raich* came after the Court's decisions in *United States v. Lopez*, 514 U.S. 549 (1995), and *United States v. Morrison*, 529 U.S. 598 (2000), and thus it highlights the central focus and limited scope of those decisions.  Unlike *Raich*, and unlike this case, neither *Lopez* nor *Morrison* involved regulation of economic activity.  And neither case addressed a measure that was integral to a comprehensive scheme to regulate activities in interstate commerce.  *Lopez* was a challenge to the Gun-Free School Zones Act of 1990, "a brief, single-subject statute making it a crime for an individual to possess a gun in a school zone." *Raich*, 545 U.S. at 23.  Possessing a gun in a school zone is not an economic activity.  Nor was the prohibition against possessing a gun "'an essential part of a larger regulation of economic activity, in which the regulatory scheme could be undercut unless the intrastate activity were regulated.'" *Id.* at 24 (quoting *Lopez*, 514 U.S. at 561).  Indeed, the argument that this provision affected interstate commerce had to posit an extended chain reaction – guns near schools lead to violent crime; such violent

crime imposes costs; and insurance spreads those costs.  The Court found this reasoning too attenuated to sustain the gun law "'under [the Court's] cases upholding regulations of activities that arise out of or are connected with a commercial transaction, which viewed in the aggregate, substantially affects interstate commerce.'"  *Id.* (quoting *Lopez*, 514 U.S. at 561).  Likewise, the statute at issue in *Morrison* simply created a civil remedy for victims of gender-motivated violent crimes.  *Id.* at 25.  Gender-motivated violent crimes are not an economic activity either, and the statute at issue focused on violence against women, not on any broader regulation of economic activity.

### 2. The ACA, and the Minimum Coverage Provision, Regulate the Interstate Market in Health Insurance

Regulation of a vast interstate market that consumes more than 17.5% of the annual gross domestic product is well within the compass of congressional authority under the Commerce Clause.  Pub. L. No. 111-148, §§ 1501(a)(2)(B), 10106(a).  It has long been established that Congress has the power to regulate the interstate health insurance market.  *See United States v. South-Eastern Underwriters Ass'n*, 322 U.S. 533, 553 (1944).  Congress has repeatedly exercised its power over this field, both by providing directly for government-funded health insurance through the Medicare Act, and by adopting over a period of more than 35 years numerous statutes regulating the content of policies offered by private insurers.[7]

---

[7] In 1974, Congress enacted the Employee Retirement and Income Security Act, Pub L. No. 93-406, 88 Stat. 829 ("ERISA"), which establishes federal requirements for health insurance plans offered by private employers.  A decade later, Congress passed the Consolidated Omnibus Budget Reconciliation Act of 1985, Pub. L. No. 99-272, 100 Stat. 82 ("COBRA"), which allows workers and their families who lose their health benefits under certain circumstances the right to continue receiving certain benefits from their group health plans for a time.  In 1996, Congress enacted the Health Insurance Portability and Accountability Act, Pub. L. No. 104-191, 110 Stat. 1936 ("HIPAA"), to improve access to health insurance by, among other things, generally prohibiting group plans from discriminating against individual participants and beneficiaries based on health status, requiring insurers to offer coverage to small businesses, and limiting the pre-existing condition exclusion period for group plans.  26 U.S.C. §§ 9801-03; 29 U.S.C.

This long history of federal regulation of the health insurance market buttressed Congress's understanding that only it, and not the states, could act effectively to counter the national health care crisis.  Because important components of health insurance regulation – for example, the Medicare program and the regulation of workplace-sponsored insurance through ERISA – are already provided by the federal government, "[e]xpecting states to address the many vexing health policy issues on their own is unrealistic, and constrains the number of states that can even make such an effort."  *State Coverage Initiatives: Hearing Before the Subcomm. on Health of the H. Comm. on Ways and Means*, 110th Cong. 7 (2008) (testimony of Alan R. Weil, Exec. Dir., National Academy of State Health Policy).  Moreover, reform at the national level will avoid the complexities, and thus the costs, that inevitably result from a reliance on a patchwork of state health insurance regulations.  *Id.* at 28 (statement of Trish Riley, Director, Maine Governor's Office of Health Policy and Finance).

Congress accordingly undertook this comprehensive regulation of the interstate market in health insurance.  The Act regulates health insurance provided through the workplace by adopting incentives for employers to offer or expand insurance coverage.  The Act regulates health insurance provided through government programs by, among other things, expanding

---

§§ 1181(a), 1182; 42 U.S.C. §§ 300gg, 300gg-1.  HIPAA added similar requirements for individual insurance coverage to the Public Health Service Act.  Pub. L. No. 104-191, § 111, 110 Stat. 1979.  *See also* Mental Health Parity Act of 1996, Pub. L. No. 104-204, 110 Stat. 2944 (regulating annual or lifetime dollar limits on mental health benefits); Newborns' and Mothers' Health Protection Act of 1996, Pub. L. No. 104-204, 110 Stat. 2935 (requiring plans that offer maternity coverage to provide at least a 48-hour hospital stay following childbirth); Women's Health and Cancer Rights Act of 1998, Pub. L. No. 105-277, § 902, 112 Stat. 2681, 2681-436 (requiring certain plans to offer benefits related to mastectomies).  More recently, Congress passed the Paul Wellstone and Pete Domenici Mental Health Parity and Addiction Equity Act of 2008, Pub. L. No. 110-343, § 512, 122 Stat. 3765, 3881 ("MHPAEA"), requiring parity in financial requirements and treatment limitations for mental health benefits and medical and surgical benefits.  MHPAEA §§ 701-02.  The ACA builds on these laws regulating health insurance.

Medicaid.  The Act regulates health insurance sold to individuals or in small group markets by establishing exchanges that enable individuals to pool their purchasing power and obtain affordable insurance.  And the Act regulates the overall scope of health insurance coverage by affording subsidies and tax credits to the large majority of the uninsured; by ending industry practices that have made insurance unobtainable or unaffordable for many people; and, in Section 1501 of the Act, by requiring most Americans who can afford insurance to obtain a minimum level of coverage or to pay a penalty for the failure to do so.

Section 1501, like the Act as a whole, regulates decisions about how to pay for services in the health care market.  These decisions are quintessentially economic, and are squarely within the traditional scope of Commerce Clause regulation.  As Congress expressly recognized, "decisions about how and when health care is paid for, and when health insurance is purchased" are "economic and financial" and therefore "commercial and economic in nature."  Pub. L. No. 111-148, §§ 1501(a)(2)(A), 10106(a).[8]

### 3.   The Minimum Coverage Provision Regulates Conduct with Substantial Effects on Interstate Commerce

Congress needed no extended chain of inferences to determine that decisions about how to pay for health care, particularly decisions about whether to obtain health insurance or to attempt to pay for health care out of pocket, have in the aggregate a substantial effect on the interstate health care market.  Individuals who forego health insurance coverage do not thereby forego health care.  To the contrary, many of the uninsured will "receive treatments from traditional providers for which they either do not pay or pay very little, which is known as 'uncompensated care.'"  CBO, KEY ISSUES, at 13; *see also* COUNCIL OF ECONOMIC ADVISERS

---

[8]  Although Congress is not required to set forth particularized findings of an activity's effect on interstate commerce, when, as here, it does so, courts "will consider congressional findings in [their] analysis." *Raich*, 545 U.S. at 21.

("CEA"), THE ECONOMIC CASE FOR HEALTH CARE REFORM 8 (June 2009) (submitted into the record for *The Economic Case for Health Reform: Hearing Before the H. Comm. on the Budget*, 111th Cong. 5 (2009).  In this country, a minimum level of health care is guaranteed.  Under the Emergency Medical Treatment and Labor Act, 42 U.S.C. § 1395dd, for example, hospitals that participate in Medicare and offer emergency services are required to stabilize any patient who arrives, regardless of whether he has insurance or otherwise can pay for that care.  CBO, KEY ISSUES, at 13.  In addition, most hospitals are nonprofit organizations that "have some obligation to provide care for free or for a minimal charge to members of their community who could not afford it otherwise."  *Id.*  For-profit hospitals "also provide such charity or reduced-price care." *Id.*

"Uncompensated care," of course, is not free of cost.  In the aggregate, that uncompensated cost amounted to $43 billion dollars in 2008, or about 5 percent of overall hospital revenues.  CBO, KEY ISSUES, at 114.  These costs are subsidized by public funds. Through programs such as Disproportionate Share Hospital payments, the federal government paid for tens of billions of dollars in uncompensated care for the uninsured in 2008 alone.  H.R. REP. NO. 111-443, pt. II, at 983 (2010); *see also* CEA, THE ECONOMIC CASE, at 8.  The remaining costs are borne in the first instance by health care providers, which in turn "pass on the cost to private insurers, which pass on the cost to families."  Pub. L. No. 111-148, § 1501(a)(2)(F), 10106(a).  This cost-shifting effectively creates a "hidden tax" reflected in fees charged by health care providers and premiums charged by insurers.  CEA, ECONOMIC REPORT OF THE PRESIDENT 187 (Feb. 2010); *see also* H.R. REP. NO. 111-443, pt. II, at 985 (2010); S. REP. NO. 111-89, at 2 (2009).

Furthermore, as premiums increase, more people who see themselves as healthy decide not to buy coverage.  This self-selection further narrows the risk pool and that, in turn, further increases the price of coverage for those who are insured.  The result is a self-reinforcing "premium spiral."  *Health Reform in the 21st Century: Insurance Market Reforms: Hearing Before the H. Comm. on Ways and Means*, 111th Cong. 118-19 (2009) (submission for the record of American Academy of Actuaries); *see also* H.R. REP. NO. 111-443, pt. II, at 985 (2010).  Small employers particularly suffer from the effect of this premium spiral, due to their relative lack of bargaining power.  *See* H.R. REP. NO. 111-443, pt. II, at 986-88 (2010); Statement of Raymond Arth, Nat'l Small Business Ass'n at 5 (June 10, 2008) (submitted into the record of *47 Million and Counting: Why the Health Care Market Is Broken: Hearing Before the S. Comm. on Finance*, 110th Cong. (2008)) (noting need for insurance reform and minimum coverage provision to limit growth of small business premiums).

Although many people have been unable to afford health insurance, the putative "economic liberty" that Virginia seeks to champion includes the decisions of some to engage in market timing.  They will purchase insurance in later years, but choose in the short term to incur out-of-pocket costs with the backup of the emergency room services that hospitals must provide whether or not the patient can pay.  *See* CBO, KEY ISSUES at 12 (noting that the percentage of uninsured older adults in 2007 was roughly half the percentage of uninsured younger adults).  By making the economic calculation to opt out of the health insurance pool during these years, these individuals skew premiums upward for the insured population.  Yet, in later years when they need care, many of these uninsured will opt back into the health insurance system maintained in the interim by an insured population that has borne the costs of uncompensated care.

Thus, if, as Virginia claims, the decision of some individuals not to obtain health insurance is "rational[]," Compl. ¶ 13, it is so because the health care system in place before the ACA allowed such uninsured individuals to "free ride" – that is, to transfer many of their health care costs to commercial health care providers, insurers, and governments, who in turn must pass these costs on to the insured and to taxpayers.  *See* CBO, KEY ISSUES, at 13-14; 155 Cong. Rec. H8002-8003 (July 10, 2009) (statement of Rep. Broun, citing cost-shifting by the uninsured); 155 Cong. Rec. H6608 (June 11, 2009) (statement of Rep. Murphy, same); 155 Cong. Rec. H4771 (Apr. 27, 2009) (statement of Rep. Fleming, same).  *See also* CEA, THE ECONOMIC CASE, at 17 (explaining that "the uninsured obtain some free medical care through emergency rooms, free clinics, and hospitals, which reduces their incentives to obtain health insurance").

In the aggregate, these economic decisions regarding how to pay for health care services – including, in particular, decisions to forego coverage and to pay later or, if need be, to depend on free care – have a substantial effect on the interstate health care market.  Congress may use its Commerce Clause authority to regulate these direct and aggregate effects.  *See Raich*, 545 U.S. at 16-17; *Wickard*, 317 U.S. at 127-28.

Virginia cannot brush aside these marketplace realities by claiming that an individual who decides to go without insurance coverage is "entirely passive," and therefore beyond the reach of the Commerce Clause; nor is Virginia correct to assert that allowing regulation of such decisions removes all boundaries on the Commerce Clause.  Compl. ¶¶ 17-18.[9]  Those assertions misunderstand both the nature of the regulated activity and the scope of Congress's power. Congress found, and Virginia appears to concede, that the decision to try to pay for health care services without reliance on insurance is "economic and financial,"  Pub. L. No. 111-148,

---

[9]  Virginia concedes that Congress may regulate non-economic activity, at least through the Necessary and Proper Clause.  Compl. ¶ 19.

§§ 1501(a)(2)(A), 10106(a);  *see also* Compl. ¶ 14 (describing decision to forego coverage as "economic").  But individuals who make that economic choice have not opted out of health care; they are not passive bystanders divorced from the health care market.  They have chosen a method of payment for the services they will receive, no more "passive" than a decision to pay by credit card rather than by check.  Congress specifically focused on those who have such an economic choice, exempting certain individuals who cannot purchase health insurance for religious reasons, as well as those who cannot afford insurance, or who would suffer hardship if required to purchase it.  26 U.S.C. § 5000A(d), (e).  And Congress found that this class of volitional economic decisions, taken in the aggregate, results each year in billions of dollars in uncompensated health care costs that are passed on to governments and other third parties.  *See, e.g.,* Pub. L. No. 111-148, §§ 1501(a)(2)(F), 10106(a).  Virginia's attempt to characterize those economic decisions as "entirely passive" cannot obscure that those decisions have a direct and substantial effect on the interstate health care market in which the uninsured participate, and thus are subject to federal regulation.

The ACA in fact regulates economic activity far more directly than provisions the Supreme Court has previously upheld.  In *Wickard*, for example, the Court upheld a system of production quotas, despite the plaintiff farmer's claim that the statute effectively required him to purchase wheat on the open market rather than grow it himself.  The Court reasoned that "[h]ome-grown wheat in this sense competes with wheat in commerce.  The stimulation of commerce is a use of the regulatory function quite as definitely as prohibitions or restrictions thereon."  317 U.S. at 128; *see also id.* at 127 ("The effect of the statute before us is to restrict the amount which may be produced for market *and the extent as well to which one may forestall resort to the market* by producing to meet his own needs.") (emphasis added).  *See also Heart of*

*Atlanta Motel v. United States*, 379 U.S. 241, 258-59 (1964) (Commerce Clause reaches decisions *not to engage* in transactions with persons with whom plaintiff did not wish to deal); *Daniel v. Paul*, 395 U.S. 298 (1969) (same).  And in *Raich*, the plaintiffs likewise claimed that their home-grown marijuana was "entirely separated from the market" and thus not subject to regulation under the Commerce Clause.  The Court rejected their claim as well.  545 U.S. at 30. Similarly to those cases, the ACA regulates a class of individuals who almost certainly will participate in the health care market, who have decided to finance that participation in one particular way, and whose decisions impose substantial costs on other participants in that market. Despite any claim by Virginia that its citizens start from outside the market for health insurance, their economic decisions have a substantial effect on the larger market for health care services from which they do not stand apart.  That empowers Congress to regulate.

### 4.   The Minimum Coverage Provision Is an Integral Part of the Larger Regulatory Scheme and Is Necessary and Proper to Congress's Regulation of Interstate Commerce

The minimum coverage provision is a valid exercise of Congress's powers for a second reason.  The ACA's reforms of the interstate insurance market – particularly its requirement that insurers guarantee coverage for all individuals, even those individuals with pre-existing medical conditions – could not function effectively without the minimum coverage provision.  The provision is an essential part of a larger regulation of interstate commerce, and thus, under *Raich,* is well within Congress's Commerce Clause authority.  Analyzing the minimum coverage provision under the "Necessary and Proper Clause" leads to the same conclusion for fundamentally the same reason.  The provision is a reasonable means to accomplish Congress's goal of ensuring access to affordable coverage for all Americans.  It is therefore necessary and

proper to the valid exercise of Congress' Commerce Clause power, and it stands on that basis as well.

### a. The Minimum Coverage Provision is Essential to the Comprehensive Regulation Congress Enacted

As Virginia itself recognizes, Compl. ¶ 5, the minimum coverage provision is an "essential" part of the Act's larger regulatory scheme for the interstate health care market.  As explained above, the Act adopts a series of measures to increase the availability and affordability of health insurance, including, in particular, measures to prohibit an array of insurance industry practices that have denied coverage or have increased premiums for those with the greatest health care needs.  Beginning in 2014, the Act will bar insurers from refusing to cover individuals with pre-existing medical conditions, and from setting eligibility rules based on health status, medical condition, claims experience, or medical history.  Pub. L. No. 111-148, § 1201.  Virginia does not and cannot contend that these provisions, which directly regulate the content of insurance policies sold nationwide, are outside the scope of the Commerce Clause power.  *See, e.g.*, *South-Eastern Underwriters Ass'n*, 322 U.S. at 553.

Congress found that, absent the minimum coverage provision, these new regulations would encourage more individuals to forego insurance, thereby aggravating current problems with cost-shifting and increasing insurance prices.  The new insurance regulations would allow individuals to "wait to purchase health insurance until they needed care" – at which point the ACA would obligate insurers to provide those individuals with health insurance, subject to no coverage limits and despite the pre-existing conditions they may have at that time.  Pub. L. No. 111-148, §§ 1501(a)(2)(I), 10106(a).  These regulations thus increase the incentives for individuals to "make an economic and financial decision to forego health insurance coverage" until their health care needs become substantial, *id.* §§ 1501(a)(2)(A), 10106(a), taking

advantage of the ACA's reforms to join a coverage pool that has been maintained in the interim by the premiums paid by other market participants.  Without a minimum coverage provision, this market timing would increase the costs of uncompensated care and the premiums for the insured pool, creating pressures that would "inexorably drive [the health insurance] market into extinction."  *Health Reform in the 21st Century*, at 13 (written statement of Uwe Reinhardt, Ph.D., Professor of Political Economy, Economics, and Public Affairs, Princeton University).[10] Accordingly, Congress found that the minimum coverage provision is "essential" to its broader effort to regulate health insurance industry underwriting practices that prevented many from obtaining health insurance, Pub. L. No. 111-148, §§ 1501(a)(2)(I), (J), 10106(a).

In other respects as well, the minimum coverage provision is essential to the Act's comprehensive scheme to ensure that health insurance is available and affordable.  In addition to regulating industry underwriting practices, the Act promotes availability and affordability through (a) "health benefit exchanges" that enable individuals and small businesses to obtain competitive prices for health insurance, (b) incentives for employers to offer expanded insurance coverage, (c) tax credits to certain low-income and middle-income individuals and families, and (d) the extension of Medicaid to individuals with lower incomes.  The minimum coverage provision works in tandem with these and other reforms, to reduce the upward pressure on premiums caused by the practice of medical underwriting.  This process of individualized review of an applicant's health status is costly, resulting in administrative fees that are responsible for 26 to 30 percent of the cost of premiums in the individual and small group markets.  Pub. L. No.

---

[10]  *See also id.* at 101-02 (testimony of Dr. Reinhardt); *id.* at 123-24 (submission for the record of National Association of Health Underwriters) (observing, based on the experience of "states that already require guaranteed issue of individual policies, but do not require universal coverage," that "[w]ithout near universal participation, a guaranteed-issue requirement . . . would have the perverse effect of encouraging individuals to forego buying coverage until they are sick or require sudden and significant medical care").

111-148, §§ 1501(a)(2)(J), 10106(a).  And medical underwriting yields substantially higher risk-adjusted premiums or outright denial of insurance coverage for an estimated one-fifth of applicants.  CBO, KEY ISSUES, at 81.  "By significantly increasing health insurance coverage and the size of purchasing pools, which will increase economies of scale, the requirement, together with the other provisions of this Act, will significantly reduce administrative costs and lower health insurance premiums," and is therefore "essential to creating effective health insurance markets that do not require underwriting and eliminate its associated administrative costs."  Pub. L. No. 111-148, §§ 1501(a)(2)(J), 10106(a).

Congress thus rationally found that a failure to regulate the decision to forego insurance – *i.e.,* the decision to shift one's costs on to the larger health care system – would undermine the "comprehensive regulatory regime," *Raich,* 545 U.S. at 27, framed in the Act.  Specifically, Congress had ample basis to conclude that a failure to regulate this "class of activity" would "undercut the regulation of the interstate market" in health insurance.  *Raich*, 545 U.S. at 18; *see id.* at 37 (Scalia, J., concurring in the judgment) ("Congress may regulate even noneconomic local activity if that regulation is a necessary part of a more general regulation of interstate commerce.").  Without the minimum coverage provision, insurance risks would be spread across a smaller and less healthy pool of insureds, driving up costs and thereby undermining Congress's efforts, through health benefit exchanges, employer incentives and tax credits, to ensure the availability of affordable health insurance.  The minimum coverage provision is thus an integral part of the ACA's "comprehensive framework for regulating" healthcare, *Raich,* 545 U.S. at 24, and that broad regulation of the interstate health care market is plainly within Congress's Article I authority.  The Commerce Clause requires nothing more.  *See Hodel v. Indiana*, 452 U.S. 314, 329 n.17 (1981).

### b.  The Minimum Coverage Provision Is Also a Valid Exercise of Congress's Power under the Necessary and Proper Clause

Because the minimum coverage provision is essential to Congress's overall regulatory reform of the interstate health care and health insurance markets, it is also a valid exercise of Congress's authority under the Necessary and Proper Clause, U.S. CONST., art. I, § 8, cl. 18, to accomplish that goal.  "[T]he Necessary and Proper Clause grants Congress broad authority to enact federal legislation." *United States v. Comstock*, No. 08-1224, slip op. at 5 (U.S. May 17, 2010).  It has been settled since *M'Culloch v. Maryland*, 17 U.S. (4 Wheat.) 316 (1819), that this clause affords Congress the power to employ any means "reasonably adapted to the end permitted by the Constitution." *Hodel v. Va. Surface Mining & Reclamation Ass'n*, 452 U.S. 264, 276 (1981) (internal quotation omitted).  And when Congress legislates in furtherance of a legitimate end, its choice of means is accorded broad deference.  *See Sabri v. United States,* 541 U.S. 600, 605 (2004) (explaining that *M'Culloch* established "review for means-ends rationality under the Necessary and Proper Clause"); *see also Comstock*, slip op. at 6; *Dean*, 670 F. Supp. 2d at 460-61.  "[W]here Congress has the authority to enact a regulation of interstate commerce, 'it possesses every power needed to make that regulation effective.'" *Raich*, 545 U.S. at 36 (Scalia, J., concurring in the judgment) (quoting *United States v. Wrightwood Dairy Co.*, 315 U.S. 110, 118-19 (1942)).

As Congress found, and as Virginia itself acknowledges, *see* Compl. ¶ 5, the minimum coverage provision not only is adapted to, but indeed is "essential" to achieving key reforms of the interstate health insurance market.  As noted, the Act imposes requirements on insurers, which bar them from denying coverage or charging higher rates based on medical conditions, including pre-existing conditions.  There can be no reasonable dispute that Congress has the

power under the Commerce Clause to impose these requirements, and indeed they are consistent with decades of Congressional regulation of the offerings of private insurers.  *See supra* note 7. Without the minimum coverage provision, healthy individuals would have overwhelmingly strong incentives to forego insurance coverage, knowing that they could obtain coverage later if and when they became ill.  As a result, the cost of insurance would skyrocket, and the larger system of reforms would fail.  *See, e.g.*, *Health Reform in the 21st Century*, at 13 (written statement of Dr. Reinhardt).   Congress thus rationally concluded – indeed, the logic is compelling -- that the minimum coverage provision is necessary to make the other regulations in the Act effective, and the provision is easily justified under the Necessary and Proper Clause. *See Comstock*, slip op. at 7 ("'If it can be seen that the means adopted are really calculated to attain the end, the degree of their necessity, the extent to which they conduct to the end, the closeness of the relationship between the means adopted and the end to be attained, are matters for congressional determination alone.'") (quoting *Burroughs v. United States*, 290 U.S. 534, 547-48 (1934)).

> **B.      The Minimum Coverage Provision Is a Valid Exercise of Congress's Independent Power under the General Welfare Clause**

Virginia's challenge here fails on the merits for an additional reason.  Independent of its Commerce Clause authority, Congress is vested with the "Power To lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States[.]"  U.S. CONST., art. I, § 8, cl. 1.  Subject to nominal constraints concerning the allocation of particular types of taxes, the power of Congress to use its taxing and spending power under the General Welfare Clause has long been recognized as "extensive." *License Tax Cases*, 72 U.S. (5 Wall.) 462, 471 (1867); *see also McCray v. United States*, 195 U.S. 27, 56-59 (1904); *United States v. Doremus*, 249 U.S. 86, 93 (1919); *Charles C. Steward*

*Mach. Co. v. Davis*, 301 U.S. 548, 581 (1937).  Congress may use its power under this Clause

even for purposes that would exceed its powers under the other provisions of Article I.  *See*

*United States v. Sanchez*, 340 U.S. 42, 44 (1950) ("Nor does a tax statute necessarily fail because

it touches on activities which Congress might not otherwise regulate."); *see also United States v.*

*Butler*, 297 U.S. 1, 66 (1936); *Knowlton v. Moore*, 178 U.S. 41, 59-60 (1900) (Congress could

tax inheritances, even assuming that it could not regulate inheritances under the Commerce

Clause).

Although "the constitutional restraints on taxing are few," *United States v. Kahriger*, 345

U.S. 22, 28 (1953), *overruled in part on other grounds by Marchetti v. United States*, 390 U.S.

39 (1968), under Article I, Section 8, Clause 1, one such limitation is that this power must be

used to "provide for the . . . general Welfare."  As the Supreme Court held seventy-five years ago

with regard to the Social Security Act, such decisions of how best to provide for the general

welfare are for the representative branches, not for the courts.  *Helvering v. Davis*, 301 U.S. 619,

640 (1937); *id.* at 645 & n.10.  *See also South Dakota v. Dole*, 483 U.S. 203, 207 (1987).

The minimum coverage provision falls within Congress's "extensive" General Welfare

authority.  *License Tax Cases*, 72 U.S. at 471.  The Act requires individuals not otherwise

exempt to obtain "minimum essential coverage" or pay a penalty.  Pub. L. No. 111-148,

§ 1501(b) (adding 26 U.S.C. § 5000A(a), (b)(1)).  Individuals who are not required to file

income tax returns for a given year are not subject to this provision.  *Id.* § 1501(b) (as amended

by Pub. L. No. 111-152, § 1002)  (adding 26 U.S.C. § 5000A(e)(2)).  In general, the penalty is

calculated as the greater of a fixed amount or a percentage of the individual's household income,

but cannot exceed the national average premium for the lowest-tier plans offered through health

insurance exchanges for the taxpayer's family size.  *Id.* § 1501(b) (adding 26 U.S.C.

§ 5000A(c)(1), (2)).  If the penalty applies, the individual must report it on his return for the taxable year, as an addition to his income tax liability.  *Id.* (adding 26 U.S.C. § 5000A(b)(2)). The penalty is assessed and collected in the same manner as other penalties imposed under the Internal Revenue Code.[11]

That the provision has a regulatory purpose does not place it beyond Congress's taxing power.[12]  *Sanchez*, 340 U.S. at 44 ("It is beyond serious question that a tax does not cease to be valid merely because it regulates, discourages, or even definitely deters the activities taxed); *see also Kahriger*, 345 U.S. at 27-28; *cf. Bob Jones Univ.*, 416 U.S. at 741 n.12 (noting that the Court has "abandoned" older "distinctions between regulatory and revenue-raising taxes").[13]  So long as a statute is "productive of some revenue," the courts will not second-guess Congress's exercise of its General Welfare Clause powers, and "will not undertake, by collateral inquiry as to the measure of the regulatory effect of a tax, to ascribe to Congress an attempt, under the guise of taxation, to exercise another power denied by the Federal Constitution."  *Sonzinsky v. United*

---

[11]  The Secretary of the Treasury may not collect the penalty by means of liens or levies, and may not bring a criminal prosecution for a failure to pay the penalty.  Pub. L. No. 111-148, § 1501(b) (adding 26 U.S.C. § 5000A(g)(2)).  The revenues derived from the minimum coverage penalty are paid into general revenues.

[12]  Congress has long used the taxing power as a regulatory tool, and in particular as a tool to regulate how health care is paid for in the national market.  HIPAA, for example, limits the ability of group health plans to exclude or terminate applicants with pre-existing conditions, and imposes a tax on any such plan that fails to comply with these requirements.  26 U.S.C. §§ 4980D, 9801-03.  In addition, the Internal Revenue Code requires group health plans to offer COBRA continuing coverage to terminated employees, and similarly imposes a tax on any plan that fails to comply with this mandate.  26 U.S.C. § 4980B.

[13]  Nor does the statutory label of the minimum coverage provision as a "penalty" matter. "In passing on the constitutionality of a tax law [the Court is] concerned only with its practical operation, not its definition or the precise form of descriptive words which may be applied to it." *Nelson v. Sears, Roebuck & Co.*, 312 U.S. 359, 363 (1941) (internal quotation omitted).  *See also Simmons v. United States*, 308 F.2d 160, 166 n.21 (4th Cir. 1962) ("[I]t has been clearly established that the labels used do not determine the extent of the taxing power.").

*States*, 300 U.S. 506, 514 (1937); *see also United States v. Jones*, 976 F.2d 176, 183-84 (4th Cir. 1992); *United States v. Aiken*, 974 F.2d 446, 448-49 (4th Cir. 1992).

The minimum coverage provision easily meets this standard.  The Joint Committee on Taxation specifically included the provision in its review of the "Revenue Provisions" of the Act and the Reconciliation Act, analyzing the provision as a "tax," an "excise tax," and a "penalty." *See* Joint Comm. on Taxation, 111th Cong., *Technical Explanation of the Revenue Provisions of the "Reconciliation Act of 2010," as amended, in Combination with the "Patient Protection and Affordable Care Act"* 31 (Mar. 21, 2010).[14]  Moreover, the Joint Committee, along with the CBO, on multiple occasions predicted how much revenue this provision would raise and considered that amount in determining the impact of the bill on the deficit.  In assessing the final version of the bill, the CBO estimated that the minimum coverage provision would produce about $4 billion in annual revenue once it is fully in effect.  CBO Letter to Rep. Pelosi at tbl. 4 at 2.  Thus, as Congress recognized, the minimum coverage provision produces revenue alongside its regulatory purpose, which is all that Article I, Section 8, Clause 1 requires.

In any event, just as a court should interpret the "words of a statute . . .  in their context and with a view to their place in the overall statutory scheme," *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) (internal quotation omitted), so, too, the Court should analyze the purpose and function of the minimum coverage provision in context, as an integral part of the overall statutory scheme it advances.  Here, in order to expand insurance coverage, Congress, among other things, enacted tax credits for individuals and employers as well as tax penalties for certain employers that do not offer insurance, offered subsidies to low income

---

[14] The Joint Committee on Taxation is "a nonpartisan committee of the United States Congress, originally established under the Revenue Act of 1926" that "is closely involved with every aspect of the tax legislative process." *See* Joint Committee on Taxation, Overview, http://www.jct.gov/about-us/overview.html; *see also* 26 U.S.C. §§ 8001-23.

households to purchase insurance from the health benefit exchanges, broadened eligibility for Medicaid and authorized significant federal expenditures to cover the increased costs of that expansion, and made additional tax assessments on pharmaceutical and medical device manufacturers, as well as insurance companies, to help finance the additional coverage.   In determining the budgetary impact of the legislation, the CBO examined the combined, interconnected effects of all these provisions.  *See* CBO Letter to Rep. Pelosi at 2-6 & tbl.1, tbl.2.

Congress reasonably concluded that the minimum coverage provision would increase the number of persons with insurance, permit the restrictions imposed on insurers to function efficiently, and lower insurance premiums.  Pub. L. No. 111-148, §§ 1501(a), 10106(a).  And Congress determined, also with substantial reason, that this provision was essential to the success of its comprehensive scheme of reform.  Congress acted well within its prerogatives under the General Welfare Clause to include the minimum coverage provision as an integrated component of the interrelated revenue and spending provisions in the Act, and as a measure necessary and proper to the overall goal of advancing the general welfare.  *See, e.g.*, *Buckley v. Valeo*, 424 U.S. 1, 90 (1976) (grant of power under the General Welfare Clause "is quite expansive, particularly in view of the enlargement of power by the Necessary and Proper Clause").

### Conclusion

For the foregoing reasons, the Complaint should be dismissed pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure for lack of subject-matter jurisdiction, or, in the alternative, pursuant to Rule 12(b)(6) of those Rules for failure to state a claim upon which relief may be granted.

DATED this 24th day of May, 2010.

Respectfully submitted,

TONY WEST
Assistant Attorney General

IAN HEATH GERSHENGORN (admitted *pro hac vice*)
Deputy Assistant Attorney General

NEIL H. MacBRIDE
United States Attorney

By:      <u>/s/ Jonathan H. Hambrick</u>
JONATHAN H. HAMBRICK, VSB # 37590
Assistant United States Attorney
Office of the United States Attorney
600 East Main Street, Suite 1800
Richmond, Virginia 23219
Telephone:    (804) 819-5400
Fax:          (804) 819-7417
Email:        jay.h.hambrick@usdoj.gov

JENNIFER R. RIVERA, VSB # 29281
Director
SHEILA M. LIEBER (admitted *pro hac vice*)
Deputy Director
JOEL McELVAIN (admitted *pro hac vice*)
ERIKA L. MYERS (admitted *pro hac vice*)
Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., NW, Room 7332
Washington, D.C. 20001
Telephone:    (202) 514-2988
Fax:          (202) 616-8202
Email:        Joel.McElvain@usdoj.gov

*Attorneys for the Defendant*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 24th day of May, 2010, I filed the foregoing electronically, and that this filing constitutes service on the following persons, who are registered users of this Court's ECF system:

> Earle Duncan Getchell, Jr.
> Charles E. James, Jr.
> Stephen R. McCullough
> Wesley Glenn Russell, Jr.
> Office of the Attorney General
> 900 E. Main Street
> Richmond, Virginia 23219

>    /s/ Jonathan H. Hambrick
> JONATHAN H. HAMBRICK, VSB # 37590
> Assistant United States Attorney
> Office of the United States Attorney
> 600 East Main Street, Suite 1800
> Richmond, Virginia 23219
> Telephone:   (804) 819-5400
> Fax:   (804) 819-7417
> Email:   jay.h.hambrick@usdoj.gov

41