**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA**

**RICHMOND DIVISION**

| | | |
|---|---|---|
| **COMMONWEALTH OF VIRGINIA** | ) | |
| **EX REL. KENNETH T. CUCCINELLI, II,** | ) | |
| in his official capacity as | ) | |
| Attorney General of Virginia, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | **Civil Action No. 3:10cv188** |
| | ) | |
| **KATHLEEN SEBELIUS,** | ) | |
| Secretary of the Department | ) | |
| of Health and Human Services, | ) | |
| in her official capacity, | ) | |
| | ) | |
| Defendant. | ) | |

**PLAINTIFF'S MEMORANDUM IN OPPOSITION
TO MOTION TO DISMISS**

KENNETH T. CUCCINELLI, II
Attorney General of Virginia

E. DUNCAN GETCHELL, JR.
Virginia State Bar No. 14156
State Solicitor General
dgetchell@oag.state.va.us
*Counsel of Record*

STEPHEN R. MCCULLOUGH
Virginia State Bar No. 41699
Senior Appellate Counsel
smccullough@oag.state.va.us

CHARLES E. JAMES, JR.
Chief Deputy Attorney General

WESLEY G. RUSSELL, JR.
Virginia State Bar No. 38756
Deputy Attorney General
wrussell@oag.state.va.us

OFFICE OF THE ATTORNEY GENERAL
900 East Main Street
Richmond, Virginia 23219

Telephone:  (804) 786-2436
Facsimile:  (804) 786-1991

*Counsel for the
Commonwealth of Virginia*

TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ...................................................................... iii

INTRODUCTION ................................................................................. 1

ARGUMENT ...................................................................................... 11

   I.     VIRGINIA HAS STANDING TO PROSECUTE THIS ACTION ...................... 11

   II.    THE ANTI-INJUNCTION ACT DOES NOT BAR VIRGINIA'S CLAIM ........................................................................... 17

   III.   THIS CASE AND CONTROVERSY IS FULLY MATURE AND RIPE FOR ADJUDICATION ...................................................... 20

   IV.   THE INDIVIDUAL MANDATE AND ITS PENALTY PROVISION ARE BEYOND THE OUTER LIMITS OF THE COMMERCE CLAUSE. ................................................................ 20

       A.   The Individual Mandate and its Penalty Provision Violate Foundational Understandings .......................................... 22

          1.   The Individual Mandate and its Penalty Provision are Not Supported by the Text of the Commerce Clause ..................... 22

          2.   The Historical Context in which the Commerce Clause was Drafted Makes it Highly Unlikely that it Included a Power to Command a Citizen to Purchase Goods or Services From Another ............................................................... 24

          3.   There is No Tradition of Using the Commerce Clause to Require a Citizen to Purchase Goods or Services from Another Citizen .......................................................... 26

       B.   The Individual Mandate and its Penalty Provision are Outside of the Outer Limits of the Commerce Clause as Measured by Supreme Court Precedent .............................................. 28

       C.   The Individual Mandate and its Penalty Provision Cannot Be Sustained Under the Taxing Power ........................................ 31

       D.   The Individual Mandate and its Penalty Provision are Not Sustainable Under the Necessary and Proper Clause .................... 37

i

CONCLUSION ........................................................................................................................ 39

CERTIFICATE OF SERVICE ............................................................................................... 41

# TABLE OF AUTHORITIES

Page

CASES

*Abbott Labs v. Gardner*,
387 U.S. 136 (1967) ............................................................................................ 5, 20

*Alaska v. U.S. Dept. of Transp.*,
868 F.2d 441 (D.C. Cir. 1989) ............................................................................ 3, 16

*Alfred L. Snapp & Sons v. Puerto Rico ex rel. Barez*,
458 U.S. 592 (1982) .................................................................................... 1, 3, 12, 16

*Bd. of Tr.s of the Univ. of Ill. v. United States*,
289 U.S. 48 (1933) ........................................................................................... 32, 36

*Blanchette v. Conn. Gen. Ins. Corp.*,
419 U.S. 102 (1974) .......................................................................................... 4, 20

*Child Labor Tax Case*,
259 U.S. 20 (1922) .................................................................................... 11, 33, 34

*Daniel v. Paul*,
395 U.S. 298 (1969) ................................................................................................. 31

*Diamond v. Charles*,
476 U.S. 54 (1986) ...................................................................................... 1, 16, 19

*Enochs v. Williams Packing & Navigation Co.*,
370 U.S. 1 (1962) ..................................................................................................... 19

*Florida v. Mellon*,
273 U.S. 12 (1927) ................................................................................................... 12

*Garcia v. San Antonio Metro. Transit Auth.*,
469 U.S. 528 (1985) ................................................................................................ 13

*Gibbons v. Ogden*,
22 U.S. (9 Wheat.) 1 (1824) ....................................................................... 23, 26, 29

*Gonzales v. Oregon*,
546 U.S. 243 (2006) .......................................................................................... 15, 31

*Gonzales v. Raich*,
　545 U.S. 1 (2005) ................................................................................................ *passim*

*Gregory v. Ashcroft*,
　501 U.S. 452 (1991) .......................................................................................................... 2

*Heart of Atlanta Motel v. United States*,
　379 U.S. 241 (1964) ........................................................................................................ 31

*Helvering v. Davis*,
　301 U.S. 619 (1937) ........................................................................................................ 13

*In re: International Primate Protection League v.*
*Administrators of Tulane Ed. Fund*,
　500 U.S. 72 (1991) .......................................................................................................... 17

*Knowlton v. Moore*,
　178 U.S. 41 (1900) .......................................................................................................... 33

*Leckie Smokeless Coal Company v.*
*United Mine Workers of America*,
　99 F.3d 573 (4th Cir. 1996) ........................................................................................... 19

*Linder v. Calero-Portocarrero*,
　251 F.3d 178 (D.C. Cir. 2001) ........................................................................................ 18

*Lochner v. New York*,
　198 U.S. 45 (1905) .......................................................................................................... 27

*M'Culloch v. Maryland*,
　17 U.S. (4 Wheat.) 316 (1819) .............................................................................. 3, 10, 21

*Maine v. Taylor*,
　477 U.S. 131 (1986) .................................................................................................... 1, 16

*Marbury v. Madison*,
　5 U.S. (1 Cranch) 137 (1803) ........................................................................................... 3

*Martin v. Hunter's Lessee*,
　14 U.S. (1 Wheat.) 304 (1816) ..................................................................................... 2, 14

*Massachusetts v. EPA*,
　549 U.S. 497 (2007) ................................................................................................ 1, 12, 15

*Massachusetts v. Mellon*,
　262 U.S. 447 (1923) ................................................................................................. *passim*

*Nelson v. Sears, Roebuck & Co.*,
    312 U.S. 359 (1941) .................................................................... 36

*New Jersey v. Sargent*,
    269 U.S. 328 (1926) .................................................................... 12

*New York v. United States*,
    505 U.S. 144 (1992) .......................................................... 2, 3, 14

*Ohio v. USDOT*,
    766 F.2d 228 (6th Cir. 1985) ...................................................... 3, 16

*Printz v. United States*,
    521 U.S. 898 (1997) ........................................................ 2, 14, 17

*R.R. Bd. v. Alton R.R. Co.*,
    295 U.S. 330 (1934) .................................................................... 27

*Railway Executives Ass'n v. Gibbons*,
    455 U.S. 457 (1982) .............................................................. 11, 33

*Rosenberger v. Rector & Visitors of the Univ. of Va.*,
    515 U.S. 819 (1995) .................................................................... 32

*Sierra Club v. Morton*,
    405 U.S. 727 (1972) .......................................................... 1, 16, 19

*Simmons v. United States*,
    308 F.2d 160 (4th Cir. 1962) ...................................................... 36

*Sonzinsky v. United States*,
    300 U.S. 506 (1937) .............................................................. 35, 36

*South Carolina v. Regan*,
    465 U.S. 367 (1984) ...................................................... 5, 18, 19, 20

*Stolt-Nielsen S.A. v. Animal Feeds Int'l Corp.*,
    ___ U.S. ___, 2010 U.S. LEXIS 3672 (2010) ................................ 4, 20

*Stoner v. Santa Clara County Office of Educ.*,
    502 F.3d 1116 (9th Cir. 2007) .................................................... 18

*Tex. Ofc. Of Pub. Util. Counsel v. FCC*,
    183 F.3d 393 (5th Cir. 1999) ...................................................... 3, 16

*Texas v. ICC*,
    258 U.S. 158 (1922) .................................................................... 12

*Thomas v. United States,*
    192 U.S. 363 (1904) ................................................................ 11, 32

*United States v. Aiken,*
    974 F.2d 446 (4th Cir. 1992) ................................................... 35

*United State. v. Bly,*
    510 F.3d 453 (4th Cir. 2007) ................................................... 18

*United States v. Butler,*
    297 U.S. 1 (1936) ................................................................... 32, 33

*United States v. Comstock,*
    ____ U.S. ____, 2010 U.S. LEXIS 3879 (2010) ................. 9, 10, 37, 38

*United States v. Cooper Corp.,*
    312 U.S. 600 (1941) ................................................................ 17

*United States v. Jones,*
    976 F.2d 176 (4th Cir. 1992) ................................................... 35

*United States v. Lopez,*
    514 U.S. 549 (1995) ............................................................ *passim*

*United States v. Mine Workers,*
    330 U.S. 258 (1947) ................................................................ 17

*United States v. Morrison,*
    529 U.S. 598 (2000) ............................................................ *passim*

*United States v. Regence Blue Cross Blueshield of Utah,*
    472 F.3d 702 (10th Cir. 2006) ................................................. 18

*United States v. Sanchez,*
    340 U.S. 42 (1950) ................................................................. 33

*United States v. West Virginia,*
    295 U.S. 463 (1935) ................................................................ 13

*Vermont Agency of Natural Res. v. United States,*
    529 U.S. 765 (2000) ................................................................ 17

*VOPA v. Reinhard,*
    403 F.3d 185 (4th Cir. 2005) ................................................... 17, 18

*Wickard v. Filburn,*
    317 U.S. 111 (1942) ............................................................ *passim*

*Woods v. Cloyd W. Miller Co.*,
  333 U.S. 138 (1948) .......................................................................................... 10


*Wyoming ex rel. Crank v. United States*,
  539 F.3d 1236 (10th Cir. 2008) ............................................................. 4, 16

## CONSTITUTIONAL PROVISIONS

Art. I, § 7 ........................................................................................................... 37

Art. I, § 8 ......................................................................................... 11, 22, 32, 37

ART. I, § 9 ............................................................................................ 11, 32, 37

## STATUTES

1 U.S.C. § 1 ........................................................................................................ 17

26 U.S.C. § 7343 ................................................................................................ 17

26 U.S.C. § 7421(a) ........................................................................................ 5, 17

26 U.S.C. § 7701 ................................................................................................ 17

28 U.S.C. § 2201(a) ........................................................................................ 5, 17

28 U.S.C. § 2403(b) ........................................................................................... 17

42 U.S.C. § 1395dd .............................................................................................. 9

Health Care and Education Reconciliation Act of 2010,
Pub. L. No. 111-152, 124 Stat. 1029 (2010) ...................................................... 6

Patient Protection and Affordable Care Act,
Pub. L. No. 111-148, 124 Stat. 119 (2010) ........................................................ 6

PPACA § 10907 ............................................................................................ 10, 31

PPACA § 1501 .............................................................................................. 10, 31

PPACA § 1501(a)(2)(B) ...................................................................................... 6

PPACA § 5000A(b)(1) ................................................................................. 31

PPACA § 9001................................................................................. 10, 31

PPACA § 9004................................................................................. 10, 31

PPACA § 9015................................................................................. 10, 31

PPACA § 9017................................................................................. 10, 31

PPACA §5000A ................................................................................. 36

*Virginia Code* § 2.2-111 ................................................................. 12

## COURT RULES

Federal Rule Civil Procedure Rule 12(b)(6) ......................................... 15, 39

## LEGISLATIVE HISTORY

Cong. Rec. Dec. 11, 2009 S12977 ......................................................... 7

Cong. Rec. Dec. 11, 2009 S12981 ......................................................... 7

Cong. Rec. Dec. 14, 2009 S13144 ......................................................... 7

Cong. Rec. Dec. 17, 2009 S13344 ......................................................... 7

Cong. Rec. Dec. 22, 2009 S13756 ......................................................... 7

Cong. Rec. Dec. 3, 2009 S12263 ........................................................... 7

Cong. Rec. Dec. 5, 2009 S12487 ........................................................... 7

Cong. Rec. Mar. 10, 2010 H1307 .......................................................... 7

Cong. Rec. Nov 17, 2009 S11397 .......................................................... 6

Cong. Rec. Nov 17, 2009 S11401 .......................................................... 7

Cong. Rec. Nov. 19, 2009 S11819 ......................................................... 7

Cong. Rec. Nov. 2, 2009 S10965 ........................................................... 6

Cong. Rec. Nov 2, 2009 S10973.................................................................................... 6

Cong. Rec. Nov. 30, 2009 S11982................................................................................. 7

Cong. Research Serv. *Requiring Individuals to Obtain Health Insurance:*
*A Constitutional Analysis* 3 (2009) ............................................................................... 6

FEDERALIST PAPERS

The Federalist No. 42.................................................................................................... 26

The Federalist No. 82 (C. Rossiter ed. 1961) ................................................................ 2

OTHER AUTHORITIES

Baily, N.
   *Dictionarium Britannicum or a more complete*
   *Universal Etymological English Dictionary*
   *than any Extant* (London 1730) ............................................................................... 22

Bancroft, George
   *History of the United States*,
   (New York D. Appleton and Company 1896)........................................................... 25

Currie, David P.
   *The Constitution in the Supreme Court*
   *the First Hundred Years 1789-1888*
   (University of Chicago Press 1985)........................................................................... 28

Littleton, Adam
   *Dr. Adam Littleton's Latin dictionary, in four Parts:*
   *I. An English-Latin, II. A Latin-classical,*
   *III. A Latin-Proper, IV. A Latin-barbarous*,
   Part II (no pagination) (6th ed. London 1735) ....................................................... 22

Mair, John
   *The Tyro's Dictionary, Latin and English*
   (2d ed. Edinburgh 1763) .......................................................................................... 22

Smith, Adam
*Wealth of Nations,*
(Prometheus Brooks Amherst N.Y. 1991) .............................................................. 24

Tansill, Charles C.
*Documents Illustrative of the Formation of the Union*
*of the American States Library of Congress Legislative*
*Reference Service,* Government Printing Office No. 398 (1927)
http://avalon.law-yale.edu/18th_century/resolves.asp ........................................... 24

Webster, Noah
*An American Dictionary of the English Language*
(S. Converse New York 1828) ................................................................................ 23

*A Pocket Dictionary* (3d ed. London 1765) ............................................................... 22

Black's Law Dictionary (West 9th ed. 2008) ............................................................. 23

Press Release, Virginia Secretary of Health and Human Resources,
*Virginia Secretary of Health and Human Resources*
*Dr. Bill Hazel Announces Virginia Health Reform Initiative*
(May 14, 2010), http://www.hhr.virginia.gov/News/viewRelease.cfm?id=175 ....... 5

*The American Heritage Dictionary*
(Houghton Mifflin Co. Boston 1981) ..................................................................... 32

*The Budgetary Treatment of an Individual Mandate to*
*Buy Health Insurance*, CBO Memorandum, at 1
(August 1994) http://www.cbo.gov/ftpdocs/48xx/doc4816/doc38.pdf .................... 5

*The Declaration and Resolves of the First Continental Congress*
of October 14, 1774 .............................................................................................. 24

*The Founder's Constitution,*
Volume 2, Article 1, Section 8, Clause 3 (Commerce),
Document 9 http://press-pubs.uchicago.edu/Founders/a1_8_3_commerces9.html.
(The University of Chicago Press) ......................................................................... 26

## INTRODUCTION

In the view of Secretary Sebelius, federalism is so withered and near death that States lack the power and right to go to federal court to test the validity of their own enactments when they conflict with federal law.  The Supreme Court has never said this but has often said the opposite.  *Maine v. Taylor,* 477 U.S. 131, 137 (1986) ("a State clearly has a legitimate interest in the continued enforceability of its own statutes"); *Diamond v. Charles*, 476 U.S. 54, 62 (1986) ("a State has standing to defend the constitutionality of its statute").

In arguing that Virginia lacks standing for want of immediate, concrete harm, the Secretary confuses quasi-sovereign (*parens patriae* and proprietary) standing with sovereign standing/sovereign interest injury.  Compare *Massachusetts v. EPA*, 549 U.S. 497 (2007), and *Massachusetts v. Mellon*, 262 U.S. 447 (1923), with *Alfred L. Snapp & Sons v. Puerto Rico ex rel. Barez*, 458 U.S. 592 (1982).  Two core sovereign interests remaining with the states

> are easily identified:  First, the exercise of sovereign power over individuals and entities within the relevant jurisdiction - - **this involves the power to create and enforce a legal code, both civil and criminal**; second, the demand for recognition from other sovereigns - - most frequently this involves the maintenance and recognition of borders.  **The former is regularly at issue in constitutional litigation.**  The latter is also a frequent subject of litigation, particularly [under the original jurisdiction of the Supreme Court.].

*Alfred L. Snapp & Sons,* 458 U.S. at 601 (emphasis added).

In *Diamond*, the Court made clear that not only does a State have standing to defend one of its legislative enactments, it is the only party who has such standing.

> "[T]he power to create and enforce a legal code, both civil and criminal" is one of the quintessential functions of a State.  *Alfred L. Snapp & Sons v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 601 (1982).  **Because the State alone is entitled to create a legal code, only the State has the kind of 'direct stake' identified in *Sierra Club v. Morton*, 405 U.S. [727,] 740 [(1972)], in defending the standards embodied in that code.**

*Diamond*, 476 U.S. at 65 (emphasis added).

1

So when the Secretary asserts dismissively that "[a] state cannot, however, manufacture its own standing to challenge a federal law by the simple expedient of passing a statute purporting to nullify it," (Mem. in Support at 1), she fails to appreciate the fact that a State, acting within the scope of its sovereign interests while claiming to exercise a traditional state authority, is uniquely different from any other litigant precisely because of its power to enact a code of law.  Her use of the term "nullify" is likewise jurisprudentially inapt.  As Justice O'Connor noted in *New York v. United States*, 505 U.S. 144, 155 (1992), a State which seeks the aid of the federal courts in resolving competing claims of state and federal power acts in accordance with the foundational and traditional function of those courts.

> In 1788, in the course of explaining to the citizens of New York why the recently drafted Constitution provided for federal courts, Alexander Hamilton observed:  "The erection of a new government, whatever care or wisdom may distinguish the work, cannot fail to originate questions of intricacy and nicety; and these may, in a particular manner, be expected to flow from the establishment of a constitution founded upon the total or partial incorporation of a number of distinct sovereignties."  The Federalist No. 82, p. 491 (C. Rossiter ed. 1961).  Hamilton's prediction has proved quite accurate.  While no one disputes the proposition that "the Constitution created a Federal Government of limited powers," *Gregory v. Ashcroft*, 501 U.S. 452, 457, 115 L. Ed. 2d 410, 111 S. Ct. 2395 (1991); and while the *Tenth Amendment* makes explicit that "the powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people"; the task of ascertaining the constitutional line between federal and state power has given rise to many of the Court's most difficult and celebrated cases.  At least as far back as *Martin v. Hunter's Lessee*, 14 U.S. (1 Wheat.) 304, 324, 4 L. Ed. 97 (1816), the Court has resolved questions "of great importance and delicacy" in determining whether particular sovereign powers have been granted by the Constitution to the Federal Government or have been retained by the States.

*See also Printz v. United States*, 521 U.S. 898 (1997).

Despite the Secretary's attempt to characterize this lawsuit as a policy battle, it is not. This is a legal contest.  At issue is whether a state law survives because the federal law that

would displace it is beyond the power of Congress to enact, or whether the state law must yield to a valid federal enactment.  In other words, this is precisely the sort of legal dispute that courts have adjudicated since earliest days of the Republic.  *See, e.g., M'Culloch v. Maryland*, 17 U.S. (4 Wheat.) 316 (1819) (voiding state tax on the Bank of the United States); *New York v. United States*, 505 U.S. 144 (upholding a state challenge to federal statute on the basis that Congress exceeded its power to regulate interstate commerce).  As the Court said a long time ago, and as is still true today, "[i]t is emphatically the province of the judiciary to say what the law is." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803).

What the Virginia Health Care Freedom Act ("HCFA") accomplishes in this case is to transform Tenth Amendment issues of the sort found to be merely abstract in *Massachusetts v. Mellon*, 262 U.S. 447 (1923), into an immediate and concrete dispute within the ambit of the sovereign standing cases.[1]  Not only is the concept of sovereign standing firmly established in the Supreme Court but in the Circuit Courts of Appeals as well.  *Alaska v. U.S. Dept. of Transp.*, 868 F.2d 441, 443-45 (D.C. Cir. 1989) (holding that when the "pre-emptive effect [of federal regulations] is the injury of which petitioners complain, we are satisfied that the States meet the standing requirements of Article III"); *Tex. Ofc. Of Pub. Util. Counsel v. FCC*, 183 F.3d 393, 449 (5th Cir. 1999) ("states have a sovereign interest in 'the power to create and enforce a legal code.") (citing *Alfred L. Snapp & Sons*); *Ohio v. USDOT*, 766 F.2d 228, 232-33 (6th Cir. 1985) ("This Court concludes that since Ohio is litigating the constitutionality of its own statute, duly

---

[1] This is especially true where, as here, the Commonwealth is legislating in an area that has traditionally been viewed as belonging to the States under their police powers. Another distinguishing difference between PPACA and *Mellon*, as noted by the twenty states suing in the United States District Court for the Northern District of Florida, is that when a radical change is made to an enormous and entrenched federal program administered by the States without providing a mechanism to exit the program, States are being forced to give way in matters sufficient to create Article III standing.

enacted by the Ohio General Assembly, Ohio has a sufficient stake in the outcome of this litigation to give it standing to seek judicial review of" a federal rule pre-empting state law) (declaratory judgment action); *Wyoming ex rel. Crank v. United States*, 539 F.3d 1236, 1242 (10th Cir. 2008) (State had standing to defend its expungement statute vitiated by agency interpretation of federal law).

The Secretary's argument that Virginia's claims are not ripe must also fail.  The collision between the Virginia HCFA and the federal enactment is immediate and complete with respect to the legal principles at issue.  Because the ultimate clash between the federal and state law is patent, "it is irrelevant to the existence of a justiciable controversy that there will be a time delay before the disputed provisions will come into effect."  *Stolt-Nielsen S.A. v. Animal Feeds Int'l Corp.*, ___ U.S. ___, 2010 U.S. LEXIS 3672, *17, n.2 (2010), *quoting Regional Rail Reorganization Act Cases*, 419 U.S. 102, 143 (1974).  *See also Blanchette v. Conn. Gen. Ins. Corp.*, 419 U.S. 102, 143 (1974) (same).  Furthermore, in the unlikely event that timing issues affect the ripeness question in cases such as this, the affidavit of William A. Hazel, Jr., M.D., Secretary of Health and Human Resources for the Commonwealth of Virginia, demonstrates that the challenged federal enactment has already begun to have present effect on the operations of the Commonwealth.  *See* Exhibit A.  Not only has Virginia already been required to decide whether or not to participate in a state insurance exchange under the federal law, with its decision not to participate resulting in Virginia forgoing millions of dollars, its employees and officials are presently having to deviate from their ordinary duties to begin the administrative response to the changes in federal law as they cascade through the Medicaid and insurance regulatory systems. *See also* Press Release, Virginia Secretary of Health and Human Resources*, Virginia Secretary of Health and Human Resources Dr. Bill Hazel Announces Virginia Health*

*Reform Initiative* (May 14, 2010), http://www.hhr.virginia.gov/News/viewRelease.cfm?id=175 (discussing formation of Virginia's Health Reform Initiative to deal with the changes included within PPACA).  Present effects on the operations of a party militate in favor of ripeness and standing.  *Abbott Labs v. Gardner,* 387 U.S. 136, 152 (1967).

The final barrier to reaching the merits thrown up by the Secretary also must be disregarded.  The Anti-Injunction Act ("AIA"), 26 U.S.C. § 7421(a), and its parallel in the Declaratory Judgment Act, 28 U.S.C. § 2201(a), establish a "pay and sue" rule whereby assessed taxes must be paid before being challenged.  This makes it highly unlikely that the word "person" in the Anti-Injunction Act includes a State.  And, in any event, the United States Supreme Court in *South Carolina v. Regan*, 465 U.S. 367 (1984), made clear that the AIA is inapplicable to claims such as those asserted by Virginia in this case.

Turning to the merits, Secretary Sebelius relies chiefly on the Commerce Clause for the authority of Congress to pass the Individual Mandate and its penalty provision.  However, a claim of power under the Commerce Clause to regulate the status of being uninsured is unprecedented, as Congress well knew prior to passing the law.  *See The Budgetary Treatment of an Individual Mandate to Buy Health Insurance*, CBO Memorandum, at 1 (August 1994) http://www.cbo.gov/ftpdocs/48xx/doc4816/doc38.pdf ("A mandate requiring all individuals to purchase health insurance would be an unprecedented form of federal action.  The government has never required people to buy any good or service as a condition of lawful residence in the United States. An individual mandate would have two features that, in combination, would make it unique.  First, it would impose a duty on individuals as members of society.  Second, it would require people to purchase a specific service that would be heavily regulated by the federal government.")

Although the Patient Protection and Affordable Care Act, Pub. L. No. 111-148, 124 Stat. 119 (2010), ("PPACA") *amended by* the Health Care and Education Reconciliation Act of 2010, Pub. L. No. 111-152, 124 Stat. 1029 (2010), contains a solemn declaration and findings that Congress acted under the Commerce Clause, PPACA § 1501(a)(2)(B), Congress clearly did not take "a hard look" at the federalism issues raised by the Individual Mandate and its penalty provision.  *See United States v. Morrison,* 529 U.S. 598, 663 (2000) (Breyer dissenting) (recognizing that the Supreme Court might employ heightened scrutiny under the Commerce Clause where Congress acted in haste without taking "a hard look" at federalism issues or if it otherwise followed questionable procedures.).  It is true that the Senate Finance Committee in 2009 asked the Congressional Research Service to speak to the constitutionality of the Individual Mandate, including the penalty provision, but the response was equivocal:  "Whether such a requirement would be constitutional under the Commerce Clause is perhaps the most challenging question posed by such a proposal, as it is a novel issue whether Congress may use this clause to require an individual to purchase a good or a service."  Cong. Research Serv.  *Requiring Individuals to Obtain Health Insurance: A Constitutional Analysis* 3 (2009).  Despite this dusty answer, Congress proceeded to pass the individual mandate employing procedures that ensured that no mature, considered look at the federalism issues could take place.  Cobbled together in secret, PPACA was passed by the Senate, largely or totally unread, on a party line vote, literally in the dead of night on Christmas Eve, against the will of the people as measured by most polls; a product of such florid deal-making as to generate scornful popular terms such as "the Louisiana Purchase" and "the Cornhusker Kickback."  *See, e.g.*, Cong. Rec. Nov. 2, 2009 S10965 (no bill); *id.*, S10973 (bill being drafted behind closed doors); *id.*, Nov 17, 2009 S11397 ("The majority leader has had in his office a secret bill that he is working on that we have not seen yet."); *id.*,

6

S11401 (No Child Left Behind got 7 weeks on the floor – "We don't even have a bill yet"); *id.*, Nov. 19, 2009 S11819 (bill is a shell, not the real one); *id.*, Nov. 30, 2009 S11982 (Official debate begins); *id.*, Dec. 3, 2009 S12263 (bill has been on floor for 3 days and never has been in committee); *id.*, Dec. 5, 2009 S12487 (majority will not slow down); *id.*, Dec. 11, 2009 S12981 ("We are going to have three Democratic amendments and one Republican amendment voted on, and the Democrats wrote the bill"); *id.*, S12977 (votes on amendments blocked; "In the meantime, this backroom deal that is being cut, which we haven't seen – supposedly it has been sent to the CBO to see what it would cost"); *id.*, Dec. 14, 2009 S13144 ("There is somewhere in this building a hidden bill, known as the manager's amendment, which is being drafted by one or two or three people . . ."); *id.*, Dec. 17, 2009 S13344 (bill is not being given the legislative time it deserves because the polls show a majority of Americans are against it and thus it has become a political nightmare for the majority who now simply want to ram it through before Christmas even though "no one outside the majority leader's conference room has seen it yet"); *id.*, Dec. 22, 2009 S13756 (Nebraska deal). Because an intervening election in Massachusetts removed the availability of cloture in the Senate, PPACA was passed by the House of Representatives unaltered, and then subjected to minor amendment in a reconciliation process dealing as much with college loans as with health care. *Id.*, Mar. 10, 2010 H1307 (reconciliation being used because bill could not re-pass the Senate).

In contrast, the General Assembly of Virginia passed several identical versions of the Virginia HCFA on a bi-partisan basis, with margins as high as 90 to 3 in the House of Delegates and 25 to 15 in the Senate. *See* SB 417 Individual health insurance coverage; resident of State

shall not be required to obtain a policy. *See* http://leg1.state.va.us/cgi-bin/legp504.exe?101+sum+SB417.[2]

The Secretary's position is not simply weakened by the fact that the Individual Mandate and the accompanying penalty are unprecedented and that PPACA was hurriedly adopted; the enactment is also clearly beyond the outer limits of the Commerce Clause when constitutional text, first principles and controlling precedent are considered.  The claimed power is contrary to the text as its words are presently understood; contrary to what the words have meant historically; contrary to traditional practices in regulating commerce; and contrary to controlling precedent.

That precedent takes a positive and negative form.  Positively, the furthest the Commerce Clause has ever been extended has been to permit regulation of a commodity, which taken in the aggregate, substantially affects the common stock of that commodity in interstate commerce; that is, affects supply and demand.  *Gonzales v. Raich*, 545 U.S. 1 (2005); *Wickard v. Filburn*, 317 U.S. 111 (1942).  Negatively, the Supreme Court has held that non-economic activities cannot be regulated under the Commerce Clause even if they have an aggregate effect on commerce. *United States v. Morrison*, 529 U.S. 598 (2000); *United States v. Lopez*, 514 U.S. 549 (1995). *Morrison* and *Lopez* establish another rule for defining this negative outer limit of the Commerce Clause:  no construction of that clause which lacks principled limits will be entertained because that would amount to a *de facto* national police power.  *Morrison,* supra; *United States v. Lopez,* 514 U.S. at 564-66.

---

[2] At the time of passage of the HCFA, the Virginia House of Delegates contained 59 Republicans, 39 Democrats and 2 Independents, while the Virginia Senate contained 22 Democrats and 18 Republicans.

Nowhere in her filing does the Secretary propose a principled limit for the claimed power, and, of course, none exists.  Such a limit surely cannot be found in the argument that health insurance is unique because virtually everyone will need medical services at some point. That argument is based upon the assumption that everyone who does not voluntarily buy insurance reduces the pool to pay for cost shifting; cost shifting which is directly attributable to market distortions brought about by prior legislation mandating universal emergency room treatment.  *See* Emergency Medical Treatment and Active Labor Act, 42 U.S.C. § 1395dd.  That circumstance creates no principled limitation because market distortion is a feat which can be endlessly replicated by government.

The principled constitutional line heretofore maintained by the Supreme Court runs between the economic and the non-economic; between activity which can be regulated and inactivity which has never been.  If commerce comprehends a decision **not** to engage in economic activity, and the command to purchase health insurance or pay a penalty is valid, Congress has a power under the Commerce Clause indistinguishable from a national police power, a result rejected in *Morrison* and *Lopez*.

Even in the modern regulatory state, a citizen should have a right to escape commercial regulation by not acting commercially.  But if the Individual Mandate and its penalty provision are valid under the Commerce Clause, there is no principled rule by which there is a right to be left alone with respect to any subject susceptible to economic regimentation nor would there be any possible way to say that any power of economic regulation remained to the States to the exclusion of the federal government.  Under *Lopez* and *Morrison*, this is fatal.

The Secretary's constitutional difficulties are not relieved by an appeal to the Necessary and Proper Clause.  *United States v. Comstock*, ____ U.S. ____, 2010 U.S. LEXIS 3879 (2010).

9

In *Comstock*, two of the justices (Scalia and Thomas) stated categorically that non-economic activity cannot be regulated under the Commerce Clause no matter what its aggregate effect may be on commerce.   The remaining justices, five in the majority and two concurring, upheld the claimed power to civilly commit federal prisoners at the end of their sentences only because the right to control such prisoners is deeply historical and quite narrow, posing no threat to the police powers reserved for the States.   *Comstock* is strong and recent precedent for the proposition that broad, unlimited, and ahistorical claims of Congressional power will not be sustained under the Necessary and Proper Clause.   Furthermore, the Necessary and Proper Clause cannot make "proper" a means contrary to "the letter and spirit of the constitution."   *M'Culloch v. Maryland*, 17 U.S. (4 Wheat.) at 421.   Any claim of power antithetical to the continued recognition of the federated character of our government cannot satisfy that standard.   *See Raich*, 545 U.S. at 39 (Scalia concurring).

The Secretary briefly argues in the alternative that the Individual Mandate and its accompanying penalty can be sustained under the taxing power.   (Mem. in Support at 35-38). The threshold problem with this argument is that Congress staked its claim to a power to enact both Individual Mandate and the associated penalty on the Commerce Clause.   PPACA § 1501. It also called the required payment for failing to meet the Individual Mandate a "penalty," even though elsewhere it imposed taxes denominated as such.   PPACA at §§ 9001, 9004, 9015, 9017 and 10907.   Although a statement or lack of statement by Congress concerning the source of its power is not strictly dispositive, *Woods v. Cloyd W. Miller Co.*, 333 U.S. 138 (1948), in the tax arena, courts ordinarily will not look behind Congress' label whether Congress calls as an enactment a tax or calls it something else.   Certainly Congress' label is at least relevant when the thing in question, historically and intrinsically, is not a tax.   A penalty imposed on account of a

decision not to buy something does not fall within any ordinary, usual, or historical meaning of the word "tax." Using the word tax in this way is simply unprecedented. In legal taxonomy, a command joined with a civil penalty partakes of the police power, not of taxation.

Furthermore, under our constitutional scheme, taxes consist of income taxes, Amend. 16, direct taxes subject to apportionment, Art. I, § 9, and indirect taxes (*i.e.* duties, imposts, and excises) subject to the Uniformity Clause, Art. I, § 8. *See Thomas v. United States,* 192 U.S. 363, 370 (1904) (the taxes enumerated in the document "apparently embrace all forms of taxation contemplated by the Constitution."). A penalty on account of a status caused by inaction is not based on income; is not a land or capitation tax; and is not a duty, impost or excise on things, persons or occupations; the traditional subjects of taxation.[3]

The final reason why the penalty cannot be sustained under the taxing power is a decision of the Supreme Court, binding on this Court, holding that when a tax is imposed for the purpose of regulation, it confers no power to act beyond the enumerated powers to regulate. *Child Labor Tax Case*, 259 U.S. 20 (1922). *See also Railway Executives Ass'n v. Gibbons*, 455 U.S. 457 (1982).

## ARGUMENT

### I.    VIRGINIA HAS STANDING TO PROSECUTE THIS ACTION.

The Secretary's standing arguments are premised on two legal errors. The first legal error is that Virginia has not demonstrated a cognizable Article III injury from the Individual Mandate and its penalty provision. Because Virginia has a sovereign interest in its enactments, standing is conferred by the purported effect of the federal enactment requiring Virginia to

---

[3] If the Individual Mandate penalty were a tax known to the Constitution, the closest it would come to an enumerated tax would be a capitation tax. In that case, it would be unconstitutional for want of apportionment.

"yield" under the Supremacy Clause. *Mellon*, 262 U.S. at 482.  The second error is based upon the assumption that Virginia is proceeding in *parens patriae*.  While Virginia has a *parens patriae* statute, *Virginia Code* § 2.2-111, the Commonwealth is not suing under it.  Furthermore, Virginia recognizes that *Massachusetts v. Mellon* stands for the proposition that States cannot sue the federal government under *parens patriae* principles because their citizens are also citizens of the United States.

In making her standing argument, the Secretary cites precedent without recognizing its true doctrinal import.  For example, she cites *Massachusetts v. EPA*, 549 U.S. at 522-23, (Mem. in Support at 14), without recognizing that Massachusetts' standing in that case was quasi-sovereign, requiring a showing of harm of the sort required of an individual litigant, 549 U.S. at 522-23, not sovereign standing of the sort recognized in *Alfred L. Snapp & Sons*, 458 U.S. at 601-02.  The Secretary must know the difference between quasi-sovereign and sovereign standing because she cites *Alfred L. Snapp & Sons*, albeit for its discussion of *parens patriae* principles and not for its description of sovereign standing.  (Mem. in Support at 12).

The Secretary's use of *Massachusetts v. Mellon* fails to notice that the dispute in that case was deemed "abstract" precisely because the State was not required to give way in any respect. 262 U.S. at 482.  Instead, its participation in the federal program at issue was entirely voluntary. *Id.* at 483.  *See also New Jersey v. Sargent*, 269 U.S. 328 (1926) (State claims abstract because no right of State was being or about to be affected); *Texas v. ICC*, 258 U.S. 158 (1922) (same).

*Florida v. Mellon*, 273 U.S. 12 (1927), also cited by the Secretary, (Mem. in Support at 14), was an original jurisdiction case.  Special considerations may be operative in such cases. *Alfred L. Snapp & Sons*, 458 U.S. at 603, n.12.  Be that as it may, Florida's first claim was disallowed because it sounded in *parens patriae*.  273 U.S. at 18.  The claimed direct injury – an

assertion that an unquestionably constitutional federal tax might cause taxpayers to withdraw property from the State – was rejected as "purely speculative and, at most, only remote and indirect." *Id.* at 16-18.

*Helvering v. Davis*, 301 U.S. 619 (1937), cited by the Secretary at pages 14 and 36 of her Memorandum, is not a state standing case at all. *United States v. West Virginia*, 295 U.S. 463 (1935), is a state standing case, albeit a very unusual one. There, although its real dispute was with a private dam builder that had been licensed by the State, the United States attempted to invoke the original jurisdiction of the Supreme Court in a suit against the dam builder and the State. A state license had been issued under the authority of a state law which provided "that 'nothing contained in this act shall be construed to interfere with the exercise of jurisdiction by the government of the United States over navigable streams.'" 295 U.S. at 472. Furthermore, issuance of the state license was a prerequisite to the federal license which the dam builder had failed to obtain. Unsurprisingly, the Supreme Court refused to hear the case, saying that until the federal right to regulate "is threatened with invasion by acts of the State, which serve both to define the controversy and to establish its existence in the judicial sense, there is no question which is justiciable by a federal court." *Id.* at 474. Conversely, the Secretary has conceded that the Individual Mandate in PPACA and the Virginia HCFA are in conflict, citing Governor McDonnell's statement regarding the HCFA. (Mem. in Support, p. 9).

The Secretary ends her discussion of standing with the extravagant assertion that state enactments can have no bearing on standing lest States be able to "manufacture" it. (Mem. in Support at 15). Under this view, such enactments have no judicial significance, and States have only a political remedy. (Mem. in Support at 15-16 (citing *Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528, 552 (1985)). This is decidedly not the law. *Massachusetts v. Mellon* only

established the propositions (1) that States may not bring *parens patriae* suits against the federal government because their citizens are also citizens of the United States and (2) States may not assert abstract Tenth Amendment claims where a federal law does not require a state to do an involuntary act or to otherwise give way.   262 U.S. at 482 ("Nor does the statute require the states to do or yield anything.").   Where an actual collision between state and federal law exists, the federal court system is the intended and traditional authority to determine the proper allocation of sovereign power under the Constitution.  *New York v. United States,* 505 U.S. 144; *Printz v. United States,* 521 U.S. 898.  As we saw above, the Court in *New York v. United States*, was quite emphatic on this point:

> In 1788, in the course of explaining to the citizens of New York why the recently drafted Constitution provided for federal courts, Alexander Hamilton observed:   "The erection of a new government, whatever care or wisdom may distinguish the work, cannot fail to originate questions of intricacy and nicety; and these may, in a particular manner, be expected to flow from the establishment of a constitution founded upon the total or partial incorporation of a number of distinct sovereignties."   Hamilton's prediction has proved quite accurate. While no one disputes the proposition that "the Constitution created a Federal Government of limited powers," and while the *Tenth Amendment* makes explicit that "the powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people"; the task of ascertaining the constitutional line between federal and state power has given rise to many of the Court's most difficult and celebrated cases.   At least as far back as *Martin v. Hunter's Lessee*, the Court has resolved questions "of great importance and delicacy" in determining whether particular sovereign powers have been granted by the Constitution to the Federal Government or have been retained by the States.

505 U.S. at 155 (citations omitted).

While in *Massachusetts v. Mellon* the State had not been ordered to do anything or to give way, in *New York v. United States*, the State was ordered to do something and to give way by passing a law.  In *Printz*, the State was ordered to give way by using its officers in the service

14

of the United States government.  Here, the entire thrust of the Secretary's Rule 12(b)(6) Motion is that this Court should rule that Virginia's law must give way.  Furthermore, because the general power to command action resides in the police power, the Secretary is asking for a ruling that requires Virginia to give way with respect to a matter of traditional state power.  *See Gonzales v. Oregon*, 546 U.S. 243, 270 (2006) ("protection of the lives, limbs, health, comfort and quiet of all persons" falls within State police power).

Certainly, the purposes of standing, to ensure that the parties "have 'such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination,'" are easily made out here.  *Massachusetts v. EPA*, 549 U.S. at 517.  In light of these general principles, it is not surprising that the Supreme Court has repeatedly recognized a State's standing to defend the constitutionality of its code of laws.  The United States Supreme Court has recognized that, unlike cases where a State seeks to sue under a *parens patriae* theory, States always have standing to defend their truly sovereign prerogatives, such as protecting their legislative enactments.  In discussing limitations on *parens patriae* standing, the Court has noted that such claims are

> perhaps best understood by comparing [them] to other kinds of interests that a State may pursue and then by examining those interests that have historically been found to fall within this category.
>
> Two sovereign interests are easily identified: First, the exercise of sovereign power over individuals and entities within the relevant jurisdiction -- **this involves the power to create and enforce a legal code, both civil and criminal**; second, the demand for recognition from other  sovereigns -- most frequently this involves the maintenance and recognition of borders.  **The former is regularly at issue in constitutional litigation.**  The latter is also a frequent  subject  of  litigation,  particularly  in  this  Court.

*Alfred L. Snapp & Sons*, 458 U.S. at 601 (emphasis added); *Maine v. Taylor*, 477 U.S. at 137 (upholding the standing of the State of Maine because "a State clearly has a legitimate interest in the continued enforceability of its own statutes."); *Diamond v. Charles*, 476 U.S. at 62 ("a State has standing to defend the constitutionality of its statute.").  Not only does a State have standing to defend one of its legislative enactments, the Court in *Diamond* made clear that it is the only party to have such standing.

> "[T]he power to create and enforce a legal code, both civil and criminal" is one of the quintessential functions of a State.  *Alfred L. Snapp & Sons* v. *Puerto Rico ex rel. Barez*, 458 U.S. 592, 601 (1982).  **Because the State alone is entitled to create a legal code, only the State has the kind of "direct stake" identified in *Sierra Club v. Morton*, 405 U.S., at 740, in defending the standards embodied in that code.**

*Id*. at 65 (emphasis added).

This doctrine of sovereign standing has also found deep acceptance in the federal Circuit Courts of Appeal.  *Alaska v. U.S. Dept. of Transp.*, 868 F.2d at 443-45 (holding that when the "pre-emptive effect [of federal regulations] is the injury of which petitioners complain, we are satisfied that the states meet the standing requirements of Article III"); *Tex. Ofc. Of Pub. Util. Counsel v. FCC*, 183 F.3d at 449 ("states have a sovereign interest in 'the power to create and enforce a legal code.") (citing *Alfred L. Snapp & Sons*); *Ohio v. USDOT*, 766 F.2d at 232-33 ("This Court concludes that since Ohio is litigating the constitutionality of its own statute, duly enacted by the Ohio General Assembly, Ohio has a sufficient stake in the outcome of this litigation to give it standing to seek judicial review of" a federal rule pre-empting state law) (declaratory judgment action); *Wyoming ex rel. Crank v. United States*, 539 F.3d at 1242 (State had standing to defend its expungement statute vitiated by agency interpretation of federal law). Because the operation of PPACA violates Virginia's sovereignty by purportedly invalidating a Virginia statute under the Supremacy Clause, Virginia has standing in this action.  *See Printz*,

521 U.S. at 932 ("It is the very *principle* of separate state sovereignty that such a law offends, and no comparative assessment of the various interests can overcome that fundamental defect.") (emphasis in original).[4]

## II.      THE ANTI-INJUNCTION ACT DOES NOT BAR VIRGINIA'S CLAIM.

The Anti-Injunction Act ("AIA"), 26 U.S.C. § 7421(a), and its parallel in the Declaratory Judgment Act, 28 U.S.C. § 2201(a), establish a "pay and sue" rule under which assessed taxes must be paid before a taxpayer may sue to challenge them.  However, the AIA speaks in terms of "any person," a formulation that does not include a State.  1 U.S.C. § 1; 26 U.S.C. § 7343; 26 U.S.C. § 7701. It is a canon of federal statutory interpretation that, unless Congress has clearly manifested a different intention, the word "person" in a federal statute shall not be interpreted as including a State.  In *Vermont Agency of Natural Res. v. United States*, 529 U.S. 765, 780-81 (2000), the Supreme Court emphasized its

> longstanding interpretive presumption that "person" does not include the sovereign. *See United States v. Cooper Corp.*, 312 U.S. 600, 604, 85 L. Ed. 1071, 61 S. Ct. 742 (1941); *United States v. Mine Workers,* 330 U.S. 258, 275, 91 L. Ed. 884, 67 S. Ct. 677 (1947). . . .  The presumption is, of course, not a "hard and fast rule of exclusion," *Cooper Corp.*, 312 U.S. at 604-605, but it may be disregarded only upon some affirmative showing of statutory intent to the contrary. *See International Primate Protection League v. Administrators of Tulane Ed. Fund*, 500 U.S. 72, 83, 114 L. Ed. 2d 134, 111 S. Ct. 1700 (1991).

*Id.* at 780-81.  This view has been repeatedly adopted by both the Fourth Circuit and by other federal Circuit Courts of Appeals. *See, e.g., VOPA v. Reinhard*, 403 F.3d 185, 189 (4th Cir. 2005) ("[t]he word 'person' in a federal statute generally includes 'corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals.'  At

---

[4] Congress itself has so far recognized state sovereignty that it requires notice to a State and grants a right of intervention whenever non-state litigants place the constitutionality of a state statute in question in federal court.  28 U.S.C. § 2403(b).

the same time, the Supreme Court has held that 'person' should generally not be construed to include the sovereign.") (citations omitted); *United State. v. Bly*, 510 F.3d 453, 464 (4th Cir. 2007) (Motz concurring in judgment) ("The Supreme Court has expressly recognized that the 'presumption that "person" does not include the sovereign" in federal statutes is 'longstanding.'"); *Stoner v. Santa Clara County Office of Educ.*, 502 F.3d 1116, 1121 (9th Cir. 2007); *United States v. Regence Blue Cross Blueshield of Utah*, 472 F.3d 702, 717 (10th Cir. 2006); *Linder v. Calero-Portocarrero*, 251 F.3d 178, 181 (D.C. Cir. 2001). Because the Secretary has not pointed to any affirmative evidence of statutory intent to apply the AIA to a sovereign State, she has failed to overcome the general presumption that "person" in a statute does not include the sovereign; consequently, the AIA simply has no application here. *Reinhard*, 403 F.3d at 190.

Furthermore, despite the Secretary's arguments to the contrary, (Mem. in Support at 17), the inapplicability of the AIA to Virginia, under the circumstances existing here, is settled law. *South Carolina v. Regan*, 465 U.S. at 378-80. In *Regan*, the Court held that

> the Anti-Injunction Act's purpose and the circumstances of its enactment indicate that Congress did not intend the Act to apply to actions brought by aggrieved parties for whom it has not provided an alternative remedy. In this case, if the plaintiff South Carolina issues bearer bonds, its bondholders will, by virtue of § 103(j)(1), be liable for the tax on the interest earned on those bonds. South Carolina will incur no tax liability. Under these circumstances, the State will be unable to utilize any statutory procedure to contest the constitutionality of § 103(j)(1). Accordingly, the Act cannot bar this action.

There can be no serious dispute that Virginia's claims in this case fall squarely within this *Regan* exception.[5] As Secretary Sebelius concedes, Virginia will not be required to pay the

---

[5] The other recognized exception to the bar of the AIA is when the party seeking the declaration/injunction "(1) was certain to succeed on the merits, and (2) could demonstrate that collection would cause him irreparable harm." *South Carolina v. Regan*, 465 U.S. at 374,

penalty for failure to meet the Individual Mandate. (Mem. in Support at 1 and 12). Just like South Carolina in *Regan*, Virginia will incur no direct financial liability under the challenged penalty provision, and therefore, "will be unable to utilize any statutory procedure to contest the constitutionality" of the penalty. *Regan*, 465 U.S. at 380. Accordingly, just as in *South Carolina v. Regan*, the AIA "cannot bar this action." *Id.*

Virginia's claim in this regard is actually stronger than South Carolina's in *Regan*. In *Regan*, the Court recognized but rejected the argument that "the State may obtain judicial review of its claims by issuing bearer bonds and urging a purchaser of those bonds to bring a suit . . . ." *Id.* at 380. Here, Virginia would be denied even that inadequate remedy because **only** Virginia has standing to defend the insult to its sovereignty. *Diamond*, 476 U.S. at 65. ("Because the State alone is entitled to create a legal code, only the State has the kind of 'direct stake' identified in *Sierra Club v. Morton*, 405 U.S., at 740, in defending the standards embodied in that code."). Given that the only way in which the injury to Virginia's sovereign interests can be addressed is through this suit, the AIA does not serve as a bar to Virginia's action.[6]

_____

(*citing, Enochs v. Williams Packing & Navigation Co.*, 370 U.S. 1, 6-7 (1962)). Given that Virginia's claim fits neatly into the "no alternative remedy" exception, there is no need to reach the question of whether or not Virginia's claim also falls into the *Williams Packing* exception. However, given that Secretary Sebelius' defense of the Individual Mandate and associated penalty is premised on the Court finding that there are no positive or negative limits on Congress' powers under the Commerce Clause, Virginia can meet prong 1 of the *Williams Packing* exception. Similarly, given that the insult to Virginia's sovereignty could never be addressed if the AIA bars this action, Virginia also meets the irreparable harm prong of the *Williams Packing* exception.

[6] Because the AIA does not bar this action, the Declaratory Judgment Act's exception for actions involving taxes does not bar the action either. *In Re: Leckie Smokeless Coal Company v. United Mine Workers of America*, 99 F.3d 573, 583-84 (4th Cir. 1996) (holding that the AIA and the tax-exclusion provision of the Declaratory Judgment Act "are, in underlying intent and practical effect, coextensive. . . . In light of the two provisions' coextensive nature, a finding that one of the two statutes does not bar [the suit] will necessitate a finding that the other statute does not pose an obstacle either.") (citations omitted). Under *Leckie*, the Court should find that, because

III.    **THIS CASE AND CONTROVERSY IS FULLY MATURE AND RIPE FOR ADJUDICATION.**

The Secretary devotes less than a full page to her formalistic ripeness argument.  Her argument, however, has no application where, as here, the collision between the HCFA and PPACA is certain to occur; a collision which is already patent even though the HCFA will not take effect until July 1, 2010 and the collection of the penalty will only begin after January 1, 2014.  "Where the inevitability of the operation of a statute against certain individuals is patent, it is irrelevant to the existence of a justiciable controversy that there will be a time delay before the disputed provisions will come into effect."  *Stolt-Nielsen S.A. v. Animal Feeds Int'l Corp.*, ___ U.S. ___, 2010 U.S. LEXIS 3672, *17, n.2, *quoting Regional Rail Reorganization Act Cases*, 419 U.S. at 143.  *See also Blanchette v. Conn. Gen. Ins. Corp.*, 419 U.S. at 143 (same).  Once again, the Secretary's argument is foreclosed by settled Supreme Court authority.

Ripeness is also satisfied because Virginia is already feeling present effects of the statute.  *Abbott Labs v. Gardner*, 387 U.S. at 139.  As the affidavit of Secretary Hazel establishes, the Commonwealth has already been forced to elect whether to establish a state insurance exchange, foregoing substantial sums by deciding not to do so.  Its employees and officials have already had to alter their former routine to prepare for the effects of PPACA as the changes it makes cascade through Virginia's Medicaid and insurance regulatory systems. Exhibit A.

IV.    **THE INDIVIDUAL MANDATE AND ITS PENALTY PROVISION ARE BEYOND THE OUTER LIMITS OF THE COMMERCE CLAUSE.**

According to the Secretary, "economic decisions" are within the scope of the Commerce Clause; the Individual Mandate and its associated penalty are an essential element of the regulatory scheme; Congress' findings are supported by "extensive hearings and debate;" and the

the *South Carolina v. Regan* exception to the AIA applies, the tax-exclusion provision of the Declaratory Judgment Act could not bar the action.  *Id*. at 584.

claimed power "does not open the door to regulation of a full range of life choices." (Mem. in Support at 19-20).

In fact, the Supreme Court has never extended the Commerce Clause beyond the regulation of (1) "use of the channels of interstate commerce;" (2) "the instrumentalities of interstate commerce;" and (3) "**activities** that substantially affect interstate commerce." *Lopez*, 514 U.S. at 558-59 (emphasis added). The passive status of being uninsured falls within none of these categories whether or not that status can be traced back to an "economic decision." The Secretary's argument is in essence an appeal to the Necessary and Proper Clause, which cannot be used contrary to the letter and spirit of the Constitution. *M'Culloch v. Maryland*, 17 U.S. (4 Wheat.) at 421. Because the power claimed here would alter the federal structure of the Constitution by creating an unlimited power indistinguishable from a national police power, it cannot be a proper use of the Necessary and Proper Clause. *Morrison*, 529 U.S. at 618-19 ("We always have rejected readings of the Commerce Clause and the scope of federal power that would permit Congress to exercise a police power.")

The findings of Congress upon which the Secretary relies were adopted following an unusually truncated debate. See pp. 6-7, *supra*. And while the Secretary argues that the claimed power is susceptible to principled limits, crucially she nowhere states what or where those limits are. Because those limits are not judicially discernible, the claimed power is contrary to constitutional text, first principles and precedent.

### A.  The Individual Mandate and its Penalty Provision Violate Foundational Understandings.

#### 1.  The Individual Mandate and its Penalty Provision are Not Supported by the Text of the Commerce Clause.

Article I, § 8 of the Constitution provides that "The Congress shall have Power . . . To regulate Commerce with Foreign Nations, and among the several States, and with the Indian Tribes."  If the Founders accepted contemporary suggestions that the word "commerce" is derived from the Latin *commercium*, *see* N. Baily, *Dictionarium Britannicum or a more complete Universal Etymological English Dictionary than any Extant* (London 1730), and *A Pocket Dictionary* (3d ed. London 1765), both available at The Library of Virginia Special Collections, then, being classically educated for the most part, they would have understood commerce as comprehending "traffick, dealing, merchandise, buying and selling, bartering of wares; also an intercourse or correspondence of dealing; acquaintance, converse; business, affair; intelligence."  Adam Littleton, *Dr. Adam Littleton's Latin dictionary, in four Parts: I. An English-Latin, II. A Latin-classical, III. A Latin-Proper, IV. A Latin-barbarous*, Part II (no pagination) (6th ed. London 1735) (Library of Virginia).  Or had they consulted John Mair, *The Tyro's Dictionary, Latin and English* at 96 (2d ed. Edinburgh 1763) (Library of Virginia with autograph of P. Henry, and of Patrick Henry Fontaine), they would have seen the word defined as "trade, traffic, commerce, intercourse."  Those who stopped with an English dictionary might have seen commerce defined as "trade or traffick in buying or selling."  N. Baily, *supra*.  This collection of terms is the way that the word has been historically understood both in language and law.  Noah Webster in 1828 defined commerce as "an interchange or mutual change of goods, wares, productions, or property of any kind, between nations or individuals, either by barter, or by purchase and sale; trade; traffick."  Noah Webster, *An American Dictionary of the*

*English Language* at 42 (S. Converse New York 1828) (facsimile).  These terms echo in *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 189-90 (1824) ("Commerce, undoubtedly is traffic, but it is something more:  it is intercourse.  It describes the commercial intercourse between nations, and parts of nations, in all its branches, and is regulated by prescribing rules for carrying on that intercourse.").  *See also* Black's Law Dictionary at 304 (West 9th ed. 2008) ("The exchange of goods and services, especially on a large scale involving transportation between cities, states and nations.").

Those in the founding generation who spoke with precision could distinguish between commerce on the one hand, and manufacturing or agriculture on the other, as distinct things. *Lopez*, 514 U.S. at 586 (1995) (Thomas concurring).  Distinct but not unrelated.  Almost all manufacture is done for trade.  And while pure subsistence farming is conceptually possible, what farmer will forgo profit from his surplus?  Mr. Filburn in the famous wheat case was subject to a marketing order because it was his practice to feed his wheat to his cattle and poultry, some of which he then sold, together with eggs and milk.  *Wickard v. Filburn*, 317 U.S. at 114, 118-19.  (Agricultural Adjustment Act of 1938 defined marketing wheat "in addition to its conventional meaning" as including "feeding (in any form) to poultry or livestock which, or the products of which, are sold, bartered, or exchanged.").  Even where an agricultural product is raised for home consumption, it is still part of the total stock which in the aggregate regulates and controls price through the law of supply and demand. *Raich*, 545 U.S. 1.

For the founding generation, commerce, industry, labor, agriculture, trade, and navigation were all constituents of "a certain propensity in human nature . . . to truck, barter, and exchange one thing for another"; the end result of which was that mankind brought "the different produces of their respective talent . . . , as it were, into a common stock, where every man may purchase

23

whatever part of the produce of other men's talents he has occasion for."  Adam Smith, *Wealth of Nations,* at 9-10, 19, 22-23, 26, 81 (Prometheus Brooks Amherst N.Y. 1991) (facsimile).  This is commerce.  Its hallmarks are spontaneity and voluntary activity; not a command to buy something.

### 2. The Historical Context in which the Commerce Clause was Drafted Makes it Highly Unlikely that it Included a Power to Command a Citizen to Purchase Goods or Services From Another.

The American Revolution and American Independence were the direct result of parliament's claimed right to legislate for America, joined with actual attempts to do so.  The Stamp Act, repealed in the face of furious opposition, was the first attempt.  Then came the Townshend Acts placing a duty on paper, glass, lead, paint and tea.

As the struggle continued, all of the taxes except those on tea were repealed leading to the Boston Tea Party, the Intolerable Acts, and the First Continental Congress.  Throughout the period from the Stamp Act forward, Americans responded with non-importation and non-consumption agreements.

*The Declaration and Resolves of the First Continental Congress* of October 14, 1774 "cheerfully consent[ed] to the operation of such acts of the British Parliament, as are bonfide, restrained for the regulation of our external commerce, for the purpose of securing the commercial advantages of the whole empire to the mother-country, and the commercial benefits of its respective members."  However, Congress at the same time and in the same document promised "To enter into a non-importation, non-consumption, and non-exportation agreement or association."  Charles C. Tansill, *Documents Illustrative of the Formation of the Union of the American States Library of Congress Legislative Reference Service,* Government Printing Office No. 398 (1927) http://avalon.law.yale.edu/18th_century/resolves.asp.  Such boycott agreements were generally considered lawful even by the royal colonial governments.  For example "[a]t

New York the merchants held a meeting to join with the inhabitants of Boston; and against the opinion of the governor, the royal council decided that the meetings were legal; that the people did but establish among themselves certain rules of economy, and had a right to dispose of their own fortune as they pleased."  George Bancroft, *History of the United States*, Vol. III at 287 (New York D. Appleton and Company 1896).  Later, in the same colony "where the agreement of non-importation originated, every one, without so much as dissentient, approved it as wise and legal; men in high station declared against the revenue acts; and the governor wished their repeal."  *Id.* at 359.  In Massachusetts, Governor Hutchinson

> looked to his council; and they would take no part in breaking up the system of non-importation.  He called in all the justices who lived within fifteen miles; and they thought it not incumbent to interrupt the proceedings.  He sent the sheriff into the adjourned meeting of the merchants with a letter to the moderator, requiring them in his majesty's name to disperse; and the meeting of which justices of peace, selectmen, representatives, constables, and other officers made a part, sent him an answer that their assembly was warranted by law.

*Id.* at 369.  Even where legislatures were dissolved to prevent the adoption of resolutions, the non-importation movement continued. In 1769, upon dissolution of the Virginia General Assembly, the burgesses met by themselves and "adopted the resolves which Washington had brought with him from Mount Vernon, and which formed a well digested, stringent, and practical scheme of non-importation."  "The assembly of Delaware adopted the Virginia resolutions word for word: and every colony South of Virginia followed the example."  *Id.* at 348.  In light of this experience, the founding generation would have regarded as preposterous any suggestion that Great Britain could have solved its colonial problems by commanding Americans to purchase tea under the generally conceded power of parliament to regulate commerce.

Additional historical arguments against the power of Congress to enact the Individual Mandate and its penalty provision can be almost endlessly adduced.  For example, Alexander

Hamilton at the New York convention "not[ed] that there would be just cause for rejecting the Constitution if it would enable the Federal Government to 'penetrate the recesses of domestic life, and control, in all respects, the private conduct of individuals.'"  *Lopez*, 514 U.S. at 592. What cannot be adduced is a countervailing historical example under the Commerce Clause in favor of the mandate and its associated penalty.

### 3.   There is No Tradition of Using the Commerce Clause to Require a Citizen to Purchase Goods or Services from Another Citizen.

"For nearly a century" after *Gibbons v. Ogden, supra*, the Court's first Commerce Clause case, its "decisions . . . under the *Commerce Clause* dealt rarely with questions of what Congress might do in the exercise of its granted power under the Clause, and almost entirely with the permissibility of state activity which it was claimed discriminated against or burdened interstate commerce." *Wickard,* 317 U.S. at 121.  Whatever else might be said about these dormant or negative Commerce Clause cases, they seem to have advanced the core intent of the Commerce Clause, at least as understood by Madison.

Writing in January 1788 in No. 42 of *The Federalist*, James Madison discussed the regulation of Foreign and Indian Commerce without clearly differentiating Interstate Commerce. *The Founder's Constitution,* Volume 2, Article 1, Section 8, Clause 3 (Commerce), Document 9 http://press-pubs.uchicago.edu/Founders/a1_8_3_commerces9.html.  (The University of Chicago Press).  Years later he explained why in a letter dated February 13, 1829 to Joseph C. Cabel.

> For a like reason, I made no reference to the "power to regulate commerce among the several States."  I always foresaw that difficulties might be started in relation to that power which could not be fully explained without recurring to views of it, which, however just, might give birth to specious though unsound objections.  Being in the same terms with the power over foreign commerce, the same extent, if taken literally, would belong to it. Yet it is very certain that it grew out of the abuse of the power by the importing States in taxing the non-importing, and was intended as a negative and preventive provision against injustice among the States

themselves, rather than as a power to be used for the positive purposes of the General Government, in which alone, however, the remedial power could be lodged.

*Id.*

Nevertheless, beginning with the Interstate Commerce Act in 1887, the Sherman Antitrust Act in 1890, and many other enactments after 1903, Congress began asserting its positive power under the Commerce Clause.  In doing so, it was met at first with significant checks from the Supreme Court.  *Wickard,* 317 U.S. at 121-22 and 122, n.20 (collectively cases striking down Congressional enactments).  "In general," the Court protected state authority over intrastate commerce by excluding from it "activities such as 'production,' 'manufacturing,' and 'mining,'" and by removing from its definition activities that merely affected interstate commerce, unless the effect was "direct" rather than indirect.  *Id.* at 119-20.  With respect to citizens, the reach of the Commerce Clause was limited by the Fifth Amendment which, prior to 1938, was held to protect economic liberty through substantive due process.  *R.R. Bd. v. Alton R.R. Co.,* 295 U.S. 330 (1934); *see also Lopez*, 514 U.S. at 606 (Souter dissenting).  Because this regime viewed the regulation of economic activity to be illegitimate unless that activity harmed or threatened harm to someone else, *Lochner v. New York,* 198 U.S. 45 (1905), it is inconceivable that the Commerce Clause prior to 1938 would have been deemed to reach and control a citizen's decision not to engage in a commercial activity.  The question thus becomes, has the Supreme Court decided any case in the post-*Lochner* era that would warrant extending the Commerce Clause to authorize the Individual Mandate and its penalty provision?  The answer is strongly in the negative.

**B. The Individual Mandate and its Penalty Provision are Outside of the Outer Limits of the Commerce Clause as Measured by Supreme Court Precedent.**

Although *Wickard* has been described as "perhaps the most far reaching example of Commerce Clause authority over intrastate activity," *Lopez,* 514 U.S. at 560, it involved the voluntary activity of raising a commodity which, in the aggregate, was capable of affecting the common stock of wheat. Some of Mr. Filburn's commodities, as a matter of past practice, had been placed into commerce, and homegrown wheat in the aggregate would affect the total common stock, with a resulting effect on price. The Agricultural Adjustment Act of 1938 contained "a definition of 'market' and its derivatives, so that as related to wheat, in addition to its conventional meaning, it also mean[t] to dispose of 'by feeding (in any form) to poultry or livestock which, or the products of which, are sold, bartered, or exchanged, or to be so disposed of.'" *Wickard,* 317 U.S. at 118-19. It was Filburn's practice to sell milk, poultry and eggs from animals fed with his home grown wheat. *Id.* at 114. The parties stipulated that the use of home grown wheat was the largest variable (greater than 20 per cent) in the domestic consumption of wheat. *Id.* at 125, 127. This, in turn, permitted the Supreme Court to hold that "even if [an] **activity** be local and though it may not be regarded as commerce, it may still, whatever its nature, be reached by Congress if it exerts a substantial economic effect on interstate commerce, and this irrespective of whether such effect is what might at some earlier time have been defined as 'direct' or 'indirect.'" *Id.* at 125 (emphasis added). This marks the affirmative outer limits of the Commerce Clause.

What *Wickard* stands for, as *Lopez* and *Morrison* make clear, is **not** the proposition that the case "expand[s] the commerce power to cover virtually everything," as used to be said. *See* David P. Currie, *The Constitution in the Supreme Court the First Hundred Years 1789-1888*, at 170 and note 89 (University of Chicago Press 1985). Instead, *Wickard* establishes the principle

28

that, when activity has a substantial aggregate impact on interstate commerce, there is no as-applied, *de minimis* constitutional defense to regulation under the Commerce Clause. *See Raich*, 545 U.S. at 47-48 (O'Connor dissenting) ("The task is to identify a mode of analysis that allows Congress to regulate more than nothing (by declining to reduce each case to its litigants) and less than everything (by declining to let Congress set the terms of analysis.")).

*Wickard* describes itself as a return to the pure and sweeping doctrine established by *Gibbons* following the Court's excursion into Lochnerism. *Wickard*, 317 U.S. at 119-25. However, the dictum of the *Wickard* Court that Chief Justice Marshall had made statements in *Gibbons* with respect to the Commerce Clause "warning that effective restraints on its exercise must proceed from political rather than from judicial processes" was a tautology that conceals more than it reveals. *Wickard*, 317 U.S. at 120. It is a tautology because it is true of any enumerated power that, when Congress is validly acting under the power, the only effective restraints are political unless some other positive prohibition applies. *See Morrison,* 529 U.S. at 616, n. 7 (The "assertion that from *Gibbons* on, public opinion has been the only restraint on the congressional exercise of the commerce power is true only insofar as it contends that political accountability is and has been the only limit on Congress' exercise of the commerce power *within that power's outer bounds* . . . *Gibbons* did not remove from this Court the authority to define that boundary.") (emphasis in original)). What it conceals is Marshall's actual holding in *Gibbons* that the terms "to regulate" and "Commerce . . . among the several States" are bounded, with judicially ascertainable meaning, and his further holding that the Commerce Clause does not reach transactions between man and man which affect only intrastate commerce. *Gibbons,* 22 U.S. (9 Wheat.) at 189-90, 196.

Since *Wickard,* the Supreme Court has progressed no further than to hold that Congress can regulate three things under the Commerce Clause: (1) "use of the channels of interstate commerce" (2) "the instrumentalities of interstate commerce," and (3) "**activities** that substantially affect interstate commerce." *Lopez,* 514 U.S. at 558-59 (emphasis added). The majority in *Raich* (Stevens, Kennedy, Souter, Ginsburg, and Breyer) went no further than displaying a willingness to accept congressional findings that home grown marijuana in the aggregate has a substantial effect on interstate commerce. *Raich,* 545 U.S. at 18-19. The challenge in *Raich* was not facial, but involved an atomized, as-applied challenge of the sort foreclosed by *Wickard*. *Id.* at 15, 23.

In addition to the affirmative, tripartite definition of the commerce power, the Supreme Court has developed a workable negative rule for determining when the outer limits of the Commerce Clause have been exceeded: a facial challenge will succeed when Congress seeks to regulate non-economic activities, particularly where the claimed power has no principled limits, requiring the Court "to conclude that the Constitution's enumeration of powers does not presuppose something not enumerated and that there never will be a distinction between what is truly national and what is truly local." *Lopez,* 514 U.S. at 566-68. (Rehnquist for the Court, joined by O'Connor, Scalia, Kennedy, and Thomas) (citations omitted). As Justice Kennedy stated in his concurrence in *Lopez*: "Although it is the obligation of all officers of the Government to respect the constitutional design, the Federal balance is too essential a part of our constitutional structure and plays too vital a role in securing freedom for us to admit inability to intervene when one or the other level of Government has tipped the scales too far." *Id.* at 578 (citations omitted).

That principle was found applicable in *Morrison* because the federal government was attempting to exercise police powers denied to it by the Constitution. *Id.* at 618-19 ("'We *always* have rejected readings of the *Commerce Clause* and the scope of federal power that would permit Congress to exercise a police power.'") (emphasis in original) (citations omitted). Not only are the Individual Mandate and its penalty provision a part of the police power conceptually, but historically commands to act, such as vaccination and school attendance laws have been justified under the state police power. *See Gonzales v. Oregon*, 546 U.S. at 270 ("protection of the lives, limbs, health, comfort and quiet of all persons" falls within state police power). Furthermore, the decision not to buy insurance is not itself even a part of the business of insurance.[7]

Having demonstrated that the Individual Mandate and its penalty provision are not comprehended within the outer limits of the Commerce Clause, it remains to be considered whether the same can be supported as a lawful tax or a valid exercise of authority under the Necessary and Proper Clause.

### C. The Individual Mandate and its Penalty Provision Cannot Be Sustained Under the Taxing Power.

First, it must be remembered that it was Congress itself which called the payment for failure to comply with the Individual Mandate a "penalty." PPACA § 1501 at § 5000A(b)(1). Elsewhere in PPACA, Congress levied taxes denominated as such, demonstrating that it knew how to draw the distinction. *See, e.g.*, PPACA, §§ 9001, 9004, 9015, 9017, and 10907. In the taxing arena, the Supreme Court has refused to permit litigants to denominate as a tax that which

---

[7] *Heart of Atlanta Motel v. United States*, 379 U.S. 241 (1964), and *Daniel v. Paul*, 395 U.S. 298 (1969), do not aid the inquiry in any way. (*See* Mem. in support at 29-30). Both involved voluntary, active business enterprises, not passive inactivity. The power to regulate an enterprise in interstate commerce extends to prohibiting acts of racial discrimination, which, in any event, are not usually viewed as mere inaction as opposed to active, actionable conduct.

Congress has denominated an exercise of commerce power.  *Bd. of Tr.s of the Univ. of Ill. v. United States*, 289 U.S. 48, 58 (1933) ("But if the Congress may thus exercise the power, and asserts, as it has asserted here, that it is exercising it, the judicial department may not attempt in its own conception of policy to distribute the duties thus fixed by allocating some of them to the exercise of the admitted power to regulate commerce and others to an independent exercise of the taxing power.").

Second, the Individual Mandate penalty, speaking historically and in light of traditional norms, is simply not a tax. "'A tax, in the general understanding of the term, and as used in the Constitution, signifies an exaction for the support of the Government.'"  *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 841 (1995), *quoting*, *Butler v. United States*, 297 U.S. 1, 61 (1936). The purpose of the penalty is to alter conduct in hopes that the penalty will not be collected.

The Constitution recognizes direct taxes, which must be apportioned, Art. I, § 9; income taxes, which need not be apportioned, Amend. XVI; and duties, imposts and excises, which must be uniform throughout the United States.  Art. I, § 8.  These "apparently embrace all forms of taxation contemplated by the Constitution."  *See Thomas*, 192 U.S. at 370 (pre-Sixteenth Amendment analysis of direct taxes and indirect taxes).  Historically, direct taxes were taxes on persons or things, while duties, imposts and excises have never meant a tax on a decision not to purchase or not to do something unrelated to a larger voluntary business or other undertaking.  And while the Individual Mandate penalty was codified in the same act as actual excise taxes, excises historically are taxes "on the production, sale, or consumption of certain commodities" or are business license taxes.  *The American Heritage Dictionary* at 457 (Houghton Mifflin Co. Boston 1981).  Finally, even if the penalty were a tax, as long as it is being used for regulation, it

must pass muster under some other enumerated power justifying the regulation; here, the Commerce Clause. *Child Labor Tax Case*, 259 U.S. 20 (1922). *See also R.R. Labor Executives' Ass'n v. Gibbons*, 455 U.S. at 468-69 (alternative power will not be used to support enactment if it evades the limits of another grant).

*United States v. Sanchez*, 340 U.S. 42 (1950), is not to the contrary. The Secretary cites *Sanchez* for the proposition that "Congress may use its [taxing power] even for purposes that would exceed its powers under other provisions of Article I." (Mem. in Support, p. 36). She also quotes this language from *Sanchez*: "'Nor does a tax statute necessarily fail because it touches on activities which Congress might not otherwise regulate.'" 340 U.S. at 44. While this is true as far as it goes, it is not true in any way that advances the Secretary's argument, as her own illustration demonstrates. (Mem. in Support at 36). She cites *Knowlton v. Moore*, 178 U.S. 41, 59-60 (1900), for the proposition that "Congress could tax inheritances, even assuming it could not regulate inheritances under the Commerce Clause." Thus, while Congress can tax what it cannot regulate, it cannot use a tax to regulate that which it cannot otherwise regulate. *Child Labor Tax Case*, *supra*.

The Secretary's citation to and reliance on *United States v. Butler*, 297 U.S. 1 (1936) is puzzling. (Mem. in Support, p. 36). A cursory review of *Butler* leads inexorably to the conclusion that the ruling in *Butler* supports Virginia's overall position and is fatal to that of the Secretary.

In *Butler*, the Court was faced with a portion of the Agricultural Adjustment Act of 1933 that purported to tax, among other things, the processing of certain agricultural products, including cotton. *Butler*, 297 U.S. at 53, 57-8. However, it achieved this by taxing the agricultural processors and returning those funds to farmers who had complied with the Act's

provisions.  The Court recognized that the Act represented a poorly camouflaged attempt to use the taxing power to take property from Citizen A to give it to Citizen B, noting that it was

> [b]eyond cavil the sole object of the legislation . . . to restore the purchasing power of agricultural products to a parity with that prevailing in an earlier day; to take money from the processor and bestow it upon farmers who will reduce their acreage for the accomplishment of the proposed end, and, meanwhile to aid these farmers during the period required to bring the prices of their crops to the desired level.

*Id*. at 58-9.  The Court recognized that the asserted tax was "an indispensable part in the plan of regulation . . ." and was the "necessary means for the intended control of agricultural production."  *Id*. at 59.

Having recognized that the purported tax was central to Congress' regulatory scheme, the Court held it to be beyond the scope of the taxing power, saying a

> tax, in the general understanding of the term, and as used in the Constitution, signifies an exaction for the support of the Government.  The word has never been thought to connote the expropriation of money from one group for the benefit of another.  We may concede that the latter sort of imposition is constitutional when imposed to effectuate regulation of a matter in which both groups are interested and in respect of which there is a power of legislative regulation.  But manifestly no justification for it can be found unless as an integral part of such regulation.  **The exaction cannot be wrested out of its setting, denominated an excise for raising revenue and legalized by ignoring its purpose as a mere instrumentality for bringing about a desired end.**  To do this would be to shut our eyes to what all others than we can see and understand.

*Id*. at 61, *citing*, *Child Labor Tax Case*, 259 U.S. 20, 37 (emphasis added).  The Court continued its analysis, recognizing that

> [t]he question is not what power the Federal Government ought to have but what powers in fact have been given by the people.  It hardly seems necessary to reiterate that ours is a dual form of government; that in every state there are two governments, -- the state and the United States.  Each State has all governmental powers save such as the people, by their Constitution, have conferred upon the United States, denied to the States, or reserved to themselves.  The federal union is a government of delegated

> powers.  It has only such as are expressly conferred upon it and such as are
> reasonably to be implied from those granted.  In this respect we differ
> radically from nations where all legislative power, without restriction or
> limitation, is vested in a parliament or other legislative body subject to no
> restrictions except the discretion of its members.

*Butler*, 297 U.S. at 63.

The Secretary also wishes to analogize PPACA's Individual Mandate penalty to cases

under the National Firearms Act, specifically *Sonzinsky v. United States.*, 300 U.S. 506 (1937);

*United States v. Jones*, 976 F.2d 176 (4th Cir. 1992); and *United States v. Aiken*, 974 F.2d 446

(4th Cir. 1992).  (Mem. in Support, p. 37-8).  Specifically, the Secretary cites these cases for a

proposition supposedly grounded in a quotation that she takes from *Sonzinsky*.  The relevant part

of the quotation, as taken from the Secretary's Memorandum, is as follows:

> So long as a statute is "productive of some revenue," the courts will not
> second-guess Congress's exercise of its General Welfare Clause powers,
> and "will not undertake, by collateral inquiry as to the measure of the
> regulatory effect of a tax, to ascribe to Congress an attempt, under the
> guise of taxation, to exercise another power denied by the Federal
> Constitution."  *Sonzinsky v. United States*, 300 U.S. 506, 514 (1937); *see
> also United States v. Jones*, 976 F.2d 176, 183-84 (4th Cir.1992); *United
> States v. Aiken*, 974 F.2d 446, 448-49 (4th Cir. 1992).

(Mem. in Support, p. 37-8).  However, important words have been omitted.  The full quotation is

as follows:

> [I]t has long been established that an Act of Congress **which on its face
> purports to be an exercise of the taxing power** is not any the less so
> because the tax is burdensome or tends to restrict or suppress the thing
> taxed.  Inquiry into the hidden motives which may move Congress to
> exercise a power constitutionally conferred upon it is beyond the
> competency of courts.  They will not undertake, by collateral inquiry as to
> the measure of the regulatory effect of a tax, to ascribe to Congress an
> attempt, under the guise of taxation, to exercise another power denied by
> the Federal Constitution.

*Sonzinsky*, 506 U.S. at 513-14 (emphasis added) (citations omitted).  By necessary implication,

*Sonzinsky* not only stands for the proposition that courts ordinarily will not second-guess

35

Congress when it acts under its taxing power, it also stands for the proposition that courts will ordinarily not permit litigants to second-guess Congress when it has elected not to invoke its taxing power.  *See also Bd. of Tr.s of the Univ. of Ill. v. United States*, 289 U.S. at 58 ("But if the Congress may thus exercise the power, and asserts, as it has asserted here, that it is exercising it, the judicial department may not attempt in its own conception of policy to distribute the duties thus fixed by allocating some of them to the exercise of the admitted power to regulate commerce and others to an independent exercise of the taxing power.").

Obviously, this has significant implications for this case.  Unlike the provisions at issue in *Sonzinsky*, the Individual Mandate penalty is not "an Act of Congress **which on its face purports to be an exercise of the taxing power** . . . ." *Sonzinsky*, 506 U.S. at 513 (emphasis added).  Quite the contrary, Congress elected to call the penalty a "penalty."  PPACA, §5000A.[8] Furthermore, the Secretary's attempt to use a report of the staff of the Joint Committee on Taxation to transform the Individual Mandate "penalty" into a "tax," (Mem. In Support at 38), should be rejected.

Written months **after** PPACA passed the Senate, the report does not even qualify as "legislative history."  It does not record floor debates and does not detail the contemporaneous thoughts of members of Congress as PPACA was passed in the chamber that wrote it.  Because the report was produced at a time when PPACA could not be changed in the House of

---

[8] The Secretary's reliance on *Nelson v. Sears, Roebuck & Co.*, 312 U.S. 359 (1941) and *Simmons v. United States*, 308 F.2d 160 (4th Cir. 1962) is also misplaced.  (*See* Mem. in Support, at 37, n.13).  In both cases, the respective courts were unquestionably faced with tax laws.  In *Nelson*, the Court was asked to determine "the constitutionality of the Iowa Use **Tax**" upon mail order transactions between Iowans and a company located out of State.  *Nelson*, 312 U.S. at 360 (emphasis added).  The issue in *Simmons* was whether prize money received for catching a fish was "income."  *Simmons*, 308 F.2d at 166, n.21.

Representatives without it being defeated in the Senate, the report represents a blatant attempt to influence judicial review while evading Article I, § 7's requirements of bicameralism and presentment.  Finally, it is interesting to note, that the staff of the Joint Committee is not even consistent in its terminology.  It calls the penalty an "excise tax" in the headings, but labels it a "penalty" in the text.  Report at 31-34.

Of course, it is not clear why the Secretary is engaging in such contortions.  For if the Individual Mandate penalty were to be found a tax at all, it would be a tax on all persons of a certain status.  That would make it a capitation tax which would fail for want of apportionment.  Art. I, § 9.

Ultimately, the problem with the tax argument is the same problem as with the Commerce Clause argument: it is anti-textual and anti-historical.  The imposition of a penalty for failing to obey a command to do what the government wants is neither commerce nor taxation; it is an exercise of police power denied to the federal government.  That is, unless it finds support in the Necessary and Proper Clause, which it does not.

### D.   The Individual Mandate and its Penalty Provision are Not Sustainable Under the Necessary and Proper Clause.

Each enumerated power of Congress is modified by this statement:  "To make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers, and all other Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof."  Art. I, § 8.  On May 17, 2010, the United States Supreme Court spoke to the meaning of the Necessary and Proper Clause in opinions which foreclose the use of that constitutional provision to sustain the Individual Mandate and its penalty provision.  *United States v. Comstock*, ____ U.S. ____, 2010 U.S. LEXIS 3879 (2010).  Beginning with the dissent, Justice Thomas and Justice Scalia categorically state:  "Under the Court's precedents, Congress

may not regulate **non-economic activity** (such as sexual violence) based solely on the effect such activity may have, in individual cases or in the aggregate, on interstate commerce." *Id.* at * 65 (citing *Morrison* and *Lopez*) (emphasis added).   Under that view, by definition, Congress cannot regulate based upon aggregation of the non-economic inactivity of not owning health insurance.[9]

With respect to the concurrences, Justice Kennedy concurred because the civil commitment of federal prisoners at issue was a narrow, traditional function of the federal government which is not in competition with the general state police power.   *Id.* at * 49-50. Justice Alito concurred because the power to hold federal prisoners was supported by deep history, going back to the First Congress, and the power of civil commitment is merely incidental to that ancient power.   *Id.* at * 52-56.

The majority opinion upheld the law under a five part test:   First, is there means-ends rationality between the enumerated power and the means chosen?   Second, is the activity one of long standing?   Third, if the reach of a longstanding practice is being extended, is it a reasonable one? Fourth, does the statute properly account for state interests?   Fifth, are the links between the means chosen and an enumerated power too attenuated?   *Id.* at * 13-35.

When the majority applied these factors to the facts of *Comstock*, they upheld the civil commitment statute because of "(1) the breadth of the Necessary and Proper Clause, (2) the long

---

[9] The Secretary claims that "Virginia concedes that Congress may regulate non-economic activity through the Necessary and Proper Clause. Compl., Par. 19."  (Mem. in Support at 28). What Virginia actually said was: "Regulation of non-economic activity is possible only through the Necessary and Proper Clause.  *Gonzalez v. Raich*, 545 U.S. 1, 39 (2005) (Scalia, concurring in judgment)."  (Compl., Par. 19).   As the dissent in *Comstock* makes clear, this passage, in context, means that a commodity that is not the subject of economic activity can be regulated under the Necessary and Proper Clause before it enters commerce if it has a substantial effect in the aggregate on interstate commerce.   This is the affirmative outer limit of Congress' power to regulate commerce.

history of Federal involvement in this area, (3) the sound reasons for the statute's enactment in light of the Government's custodial interest in safeguarding the public from dangers posed by those in Federal custody, (4) the statute's accommodation of state interests [the States have a right of first refusal for custody upon release but historically have wanted nothing to do with paying for these federal prisoners], and (5) the statute's narrow scope." *Id.* at * 40-41.

Here, in contrast, (1) the rationality of the ends-means fit is weak because there is a traditional Anglo-American dislike of compulsion in financial transactions involving government, not only at the time of the Founding, but extending back to forced loans under the Stuarts; (2) the history of federal involvement is nonexistent; (3) therefore, the Individual Mandate and its penalty provision are not a reasonable extension of a pre-existing practice; (4) the asserted power represents a claim of police power in competition with that of the States, and (5) the claimed power has no principled limits.  The Necessary and Proper Clause simply does not save the Congressional overreach inherent in a command to purchase a good or service from another citizen under threat of a civil penalty.

## CONCLUSION

The Secretary's attempts to avoid the merits must be rejected.  Virginia clearly has standing, the controversy is ripe, and there is no Anti-Injunction Act bar.  On the merits, the Secretary's Rule 12(b)(6) motion is due to be denied.  The claimed power is unconstitutional under every ordinary measure of constitutional adjudication.  The claimed power cannot be sustained under the Commerce Clause because it is contrary to the text, contrary to the historical meaning of the words used in the text, contrary to the historical context of the Clause, contrary to the traditional uses of the provision, and beyond the affirmative and negative limits of the Clause as established by precedent.  The enactment likewise cannot be sustained under the Necessary

39

and Proper Clause because the means chosen are not narrow and historically grounded, but rather, are unprecedented and unbounded.   A claimed power equivalent to a national police power cannot be necessary and proper because it is contrary to the letter and spirit of the Constitution.  The same demolition of our constitutional structure cannot be achieved by labeling something a tax which intrinsically, historically, and constitutionally is not a tax.  Nor can an alternative grant of power be used to evade the limits of the Commerce Clause.

WHEREFORE, the Commonwealth of Virginia prays that the motion be denied.


Respectfully submitted,

KENNETH T. CUCCINELLI, II
Attorney General of Virginia

CHARLES E. JAMES, JR.
Chief Deputy Attorney General

E. DUNCAN GETCHELL, JR.
State Solicitor General

WESLEY G. RUSSELL, JR.
Deputy Attorney General

STEPHEN R. MCCULLOUGH
Senior Appellate Counsel


*/s/* E. Duncan Getchell, Jr.
E. Duncan Getchell, Jr., VSB #14156
Attorney for Commonwealth of Virginia
Office of the Attorney General
900 East Main Street
Richmond, Virginia  23219
(804) 786-2436 (Telephone)
(804) 786-1991 (Fax)
dgetchell@oag.state.va.us

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 7th day of June, 2010, I electronically filed the foregoing with

the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF)

to the following:

Erika Myers
erika.l.myers@usdoj.gov

Ian Gershengorn
ian.gershengorn@usdoj.gov

Joel McElvain
joel.mcelvain@usdoj.gov

Jonathan Holland Hambrick
jay.h.hambrick@usdoj.gov

Sheila M. Lieber
slieber@civ-usdoj.gov


*/s/*   E. Duncan Getchell, Jr._____
E. Duncan Getchell, Jr., VSB #14156
Attorney for Commonwealth of Virginia
Office of the Attorney General
900 East Main Street
Richmond, Virginia  23219
(804) 786-2436 (Telephone)
(804) 786-1991 (Fax)
dgetchell@oag.state.va.us