# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### RICHMOND DIVISION

|  |  |  |
|---|---|---|
| COMMONWEALTH  OF VIRGINIA EX REL. KENNETH T. CUCCINELLI, II, in his official capacity as Attorney General of Virginia, **Plaintiff**, | ) ) ) ) ) ) |  |
| v. | ) ) | **No. 3:10-cv-00188-HEH** |
| KATHLEEN SEBELIUS, Secretary of the Department of Health and Human Services, in her official capacity, **Defendant.** | ) ) ) ) ) ) |  |

**BRIEF AMICI CURIAE OF THE AMERICAN CENTER FOR LAW & JUSTICE, U. S. REPS. PAUL BROUN, TODD AKIN, ROB BISHOP, JOHN BOEHNER, MICHAEL BURGESS, DAN BURTON, ERIC CANTOR, MIKE CONAWAY, MARY FALLIN, JOHN FLEMING, VIRGINIA FOXX, TRENT FRANKS, SCOTT GARRETT, LOUIE GOHMERT, BOB GOODLATTE, JEB HENSARLING, WALTER JONES, STEVE KING, DOUG LAMBORN, ROBERT LATTA, MICHAEL MCCAUL, CATHY MCMORRIS RODGERS, JERRY MORAN, MIKE PENCE, JEAN SCHMIDT, LAMAR SMITH, TODD TIAHRT, ZACH WAMP, AND THE CONSTITUTIONAL COMMITTEE TO CHALLENGE THE PRESIDENT & CONGRESS ON HEALTH CARE IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**

John P. Tuskey*
Laura Hernandez (VA Bar #29853)
AMERICAN CENTER FOR
LAW & JUSTICE
1000 Regent University Dr.
Virginia Beach, VA  23464
(757) 226-2489

Jay Alan Sekulow*
Colby M. May (VA Bar #19734)
    *Counsel of Record*
Stuart J. Roth*
AMER. CENTER FOR LAW & JUSTICE
201 Maryland Ave., NE
Washington, DC  20002
(202) 546-8890

* - Not admitted in this court
*Attorneys for Amici Curiae*

## CORPORATE & FINANCIAL DISCLOSURE STATEMENTS

Pursuant to Local Rule 7.1 of the Eastern District of Virginia and to enable Judges and Magistrate Judges to evaluate possible disqualifications or recusal, the undersigned counsel for the American Center for Law & Justice ("ACLJ"), various members of Congress, and the Constitutional Committee to Challenge the President & Congress on Health Care in the above captioned action, certifies that there are no parents, trusts, subsidiaries and/or affiliates of the ACLJ that have issued shares or debt securities to the public.

Pursuant to Fourth Circuit Local Rule 26.1, the ACLJ declares it is a non-profit legal corporation dedicated to the defense of constitutional liberties secured by law. The ACLJ states that it has no parent corporation and issues no stock. No publicly held corporation has a direct financial interest in the outcome of this litigation due to the ACLJ's participation.

# TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................................ ii

TABLE OF AUTHORITIES ................................................................................... iii

INTEREST OF AMICI ............................................................................................ 1

ARGUMENT ........................................................................................................... 2

I.   THE COMMERCE CLAUSE DOES NOT EMPOWER CONGRESS TO COERCE
     INDIVIDUAL PURCHASES MERELY BECAUSE DECISIONS NOT TO PURCHASE
     AFFECT INTERSTATE COMMERCE. ............................................................... 4

II.  THE ABSENCE OF A SEVERABILITY CLAUSE IN THE PATIENT PROTECTION
     AND AFFORDABLE CARE ACT INCREASES THE LIKELIHOOD OF IMMEDIATE
     HARM TO THE STATES. ................................................................................. 12

CONCLUSION ...................................................................................................... 24

CERTIFICATE OF COMPLIANCE ..................................................................... 25

CERTIFICATE OF SERVICE .............................................................................. 26

# TABLE OF AUTHORITIES

**CASES:**                                                                                    Page

*Alaska Airlines, Inc. v. Brock*, 480 U.S. 678 (1987)........................................ 18-20

*Champlin Ref. Co. v. Corp. Comm'n of Okla.*, 286 U.S. 210 (1932). .................... 18

*Gonzales v. Raich*, 545 U.S. 1 (2005)............................................................. 6-7, 22

*Gregory v. Ashcroft*, 501 U.S. 452 (1991)................................................................3

*Hill v. Wallace*, 259 U.S. 44 (1922)........................................................... 19

*Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172 (1999)..... 18-19

*NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1 (1937). ....................................4

*United States v. Lopez*, 514 U.S. 549 (1995)................................................. 3-6, 11

*United States v. Morrison*, 529 U.S. 598 (2000). ................................................. 4, 6

*Wickard v. Filburn*, 317 U.S. 111 (1942). ................................................. 4, 6-7, 22

*Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952)........................... 11

**STATUTES:**

Emergency Economic Stabilization Act of 2008, Pub. L. No. 110-343, 122 Stat. 3765 (codified in part in 12 U.S.C. §§5201-02, 5211-41) ........................ 7-8

Patient Protection and Affordable Care Act of 2010, Pub. L. No. 111-148, 124 Stat. 119, *amended by* Health Care and Education Reconciliation Act   of   2010, Pub. L. No. 111-152, 124 Stat. 1029. .................................................passim

U.S. Const. art. I, § 8, cl. 3........................................................................................4

**OTHER AUTHORITIES:**

Affordable Health Care for America Act of 2009, H.R. 3962, 111th Cong. (engrossed as agreed to or passed by House), *available at* http://frwebgate.access.gpo.gov/cgi-bin/getdoc.cgi?dbname=111_cong_ bills&docid=f:h3962eh.txt.pdf. ................................................................... 20

Gov. Arnold Schwarzenegger, Press Conference to Discuss Federal Health Care Reform (Apr. 29, 2010) (transcript available at http://gov.ca. gov/speech/15034/)................................................................................. 17-18

*Implementation of Federal Health Care Reform: Joint Hearing Before S. Subcomm. on Health & Human Servs. & Assembly Comm. on Health*, 2009-10 Sess. (2009-10) (statement of Jon Kingsdale, Exec. Director, Commonwealth of Massachusetts Health Insurance Connector Authority), http://senweb03.senate.ca.gov/committee/ standing/health/ California_Testimony_of_Jon_Kingsdale.pdf............................................17

Mem. in Supp. of Gov't's Mot. to Dismiss. ................................................ 9, 20, 22

Mike Geeslin & Dianne Longley, Overview of Federal Health Insurance Reform Requirements and TDI Implementation Planning, Apr. 22, 2010, http://www.tdi.state.tx.us/reports/documents/fedhlthreform4222010.ppt............. 16

National Governor's Association, Health Reform Implementation Resource Center, http://www.nga.org/portal/site/nga/menuitem.751b186f65e10b568a2781105 01010a0/?vgnextoid=7f8844ce25208210VgnVCM1000005e00100aRCRD& vgnextchannel=92ebc7df618a2010VgnVCM1000001a01010aRCRD.  12-13

Oklahoma Insurance Department, Patient Protection and Affordable Care Act, http://www.ok.gov/oid/PPAC.html (last visited May 26, 2010)...................16

OpenCongress, H.R. 3962 - Affordable Health Care for America Act, http://www.opencongress.org/bill/111-h3962/show (last visited May 27, 2010). ................................................................................................ 19-20

Posting of Rosalind Helderman to the Virginia Politics Blog, http://voices. washingtonpost.com/virginiapolitics/2010/05/former_speaker_of_the_house. html (May 14, 2010, 16:01 ET)................................................................. 14

Posting of Suzy Khimm to MoJo Blog, http://motherjones.com/mojo/2010/ 03/how-states-could-sabotage-health-reform (Apr. 1, 2010, 3:00 PDT). .... 12

Press Release, Gov. Chris Gregoire, Gov. Gregoire Takes Immediate Steps to Implement Healthcare Reform in Washington State (April 1, 2010), http://www.governor.wa.gov/news/news-view.asp?pressRelease= 1469&newsType=1. ................................................................................... 15

Press Release, U.S. Dep't of the Treasury, Secretary Paulson Statement on Stabilizing the Automotive Industry (Dec. 19, 2008), http://www. treas.gov/press/releases/hp1332.htm. ............................................................8

Press Release, Virginia Secretary of Health and Human Resources, Virginia Secretary of Health and Human Resources Dr. Bill Hazel Announces Virginia Health Reform Initiative (May 14, 2010), http://www.hhr.virginia.gov/News/viewRelease.cfm?id=175. .............. 13-14

Texas Department of Insurance, Federal Health Care Reform Resource Page, http://www.tdi.state.tx.us/consumer/cpmhealthcare.html (last visited May 27, 2010). ....................................................................................................... 15

*The Federalist No. 14*, (James Madison) (George W. Cary & James McClellan eds., 2001)....................................................................................................2

*The Federalist No. 45*, (James Madison) (George W. Cary & James McClellan eds., 2001). .................................................................................................................2

The Hopper, http://blog.senatedemocrats.wa.gov/the-hopper/health-reform-implementation-panel-gets-to-work-wednesday/ (May 24, 2010)......... 14-15

Tiffany Kary & Chris Scinta, *JPMorgan Gave Lehman $138 Billion After Bankruptcy (Update3)*, Bloomberg.com, Sept. 16, 2008, http://www. bloomberg.com/apps/news?pid=20601087&sid=aX7mhYCHmVf8&refer= home.................................................................................................................8

Victoria Colliver, *State Lawmakers Discuss Health Care Challenges*, San Fran. Chron., May 13, 2010, *available at* http://articles.sfgate.com/2010-05-13/bay-area/20896084_1_health-law-federal-law-new-law. ................. 16-17

# INTEREST OF AMICI[1]

The American Center for Law and Justice (ACLJ) is a law firm committed to insuring the ongoing viability of constitutional freedoms in accordance with principles of justice. ACLJ attorneys have argued or participated as amicus curiae in numerous cases involving constitutional issues before the Supreme Court of the United States and lower federal courts.

This brief is also filed on behalf of United States Representatives Paul Broun, Todd Akin, Rob Bishop, John Boehner, Michael Burgess, Dan Burton, Eric Cantor, Mike Conaway, Mary Fallin, John Fleming, Virginia Foxx, Trent Franks, Scott Garrett, Louie Gohmert, Bob Goodlatte, Jeb Hensarling, Walter Jones, Steve King, Doug Lamborn, Robert Latta, Michael McCaul, Cathy McMorris Rodgers, Jerry Moran, Mike Pence, Jean Schmidt, Lamar Smith, Todd Tiahrt, and Zach Wamp. These amici currently are members of the United States House of Representatives in the One Hundred Eleventh Congress.

This brief is also filed on behalf of the Constitutional Committee to Challenge the President and Congress on Health Care, which consists of over 70,000 Americans from across the country who oppose the individual mandate.

Amici are dedicated to the founding principles of limited government, and to

---

[1] This *amici curiae* brief is filed upon motion for leave to file. The Plaintiff has consented to the participation of movants as *amici* in this case. The Defendant, when contacted, stated that it takes no position on movants' motion for leave.

the corollary precept that the Commerce Clause contains boundaries that Congress may not trespass no matter how serious the nation's healthcare problems.  Amici believe that the individual insurance mandate provision of the Patient Protection and Affordable Care Act, Pub. L. No. 111-148, § 1501, 124 Stat. 119 (2010), *amended by* Health Care and Education Reconciliation Act of 2010, Pub. L. No. 111-152, 124 Stat. 1029 (hereinafter PPACA) exceeds any power granted under the Commerce Clause.  Moreover, amici believe that no jurisdictional impediment exists to deciding this case now because of the costs states must incur now or in the near future to prepare to implement the PPACA.

## ARGUMENT

James Madison wrote, "The powers delegated . . . to the federal government are few and defined. Those which are to remain in the State governments are numerous and indefinite." *The Federalist No. 45*, at 241 (James Madison) (George W. Cary & James McClellan eds., 2001).  "In the first place it is to be remembered that the general government is not to be charged with the whole power of making and administering laws. Its jurisdiction is limited to certain enumerated objects . . . ." *The Federalist No. 14*, at 65 (James Madison) (*Id.*).

Put simply, Congress cannot pass just any law that seems to most efficiently address a national problem. Every federal law must derive from one of

the grants of authority found in the Constitution. This the individual insurance mandate does not do.

Although its Commerce Clause jurisprudence reflects a drift away from the Founders' vision of limited federal government, the Supreme Court has nonetheless steadily affirmed the foundational principle that limits on federal authority are essential to liberty. "Just as the separation and independence of the coordinate branches of the Federal Government serve to prevent the accumulation of excessive power in any one branch, a healthy balance of power between the States and the Federal Government will reduce the risk of tyranny and abuse from either front." *Gregory v. Ashcroft*, 501 U.S. 452, 458 (1991); *see also United States v. Lopez*, 514 U.S. 549, 552 (1995) (the constitutionally mandated division of authority "was adopted by the Framers to ensure protection of our fundamental liberties" (*quoting Ashcroft*, 501 U.S. at 458)).

Interpreting the Commerce power in this case to enable Congress to force American citizens to purchase health insurance would place Americans' economic liberty in serious jeopardy. There is no principled basis for limiting such power to health insurance purchases because every purchasing decision may have a rippling effect on interstate commerce.

## I.   The Commerce Clause Does Not Empower Congress to Coerce Individual Purchases Merely Because Decisions not to Purchase Affect Interstate Commerce.

The individual health insurance mandate is a novelty in Congress's regulatory history. For the first time, Congress has asserted the power to coerce commercial transactions. The Commerce Clause has never been understood, however, to regulate inactivity. Every one of the Supreme Court's cases deals with economic activity or "endeavor." *See, e.g.*, *United States v. Morrison*, 529 U.S. 598, 611 (2000).

Congress has the power "[t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." U.S. Const. art. I, § 8, cl. 3. The Supreme Court has cautioned that the commerce power

> must be considered in the light of our dual system of government and may not be extended so as to embrace effects upon interstate commerce so indirect and remote that to embrace them, in view of our complex society, would effectually obliterate the distinction between what is national and what is local and create a completely centralized government.

*NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 37 (1937). After more than a half century of increasingly imaginative interpretation,[2] in *United States v. Lopez*, 514 U.S. 549 (1995), and *United States v. Morrison*, 529 U.S. 598 (2000), the

---

[2] The most notorious example of the Court's expansive understanding of the Commerce Clause is *Wickard v. Filburn*, 317 U.S. 111, 125 (1942), in which the Court held that the Commerce Clause authorized Congress to regulate how much wheat a farmer could grow, even for his own personal consumption.

Court reaffirmed the notion that there are limits to Congress's power under the Commerce Clause.

In *Lopez*, the Court held the Gun Free School Zones Act unconstitutional because it was a criminal statute that had "nothing to do with 'commerce' or any sort of economic enterprise, however broadly one might define those terms." 514 U.S. at 561. Nor was the Act "an essential part of a larger regulation of economic activity, in which the regulatory scheme could be undercut unless the intrastate activity were regulated." *Id.* Surveying its Commerce Clause jurisprudence, the Court remarked that it had "upheld a wide variety of congressional Acts regulating intrastate economic *activity* where we have concluded that the activity substantially affected interstate commerce." *Id.* at 559 (emphasis added). The Court repeatedly emphasized that *economic activity* was what triggered Congress's Commerce Clause power to regulate.  The Court concluded that:

> To uphold the Government's contentions here, we would have to pile inference upon inference in a manner that would bid fair to convert congressional authority under the Commerce Clause to a general police power of the sort retained by the States. Admittedly, some of our prior cases have taken long steps down that road, giving great deference to congressional action. The broad language in these opinions has suggested the possibility of additional expansion, but we decline here to proceed any further. To do so would require us to conclude that the Constitution's enumeration of powers does not presuppose something not enumerated, and that there never will be a distinction between what is truly national and what is truly local. This we are unwilling to do.

*Id.* at 567-68 (citations omitted); *see also id.* at 578 (Kennedy, J., concurring) (the Court has a "duty to recognize meaningful limits on the commerce power of Congress," and "[t]he statute before us upsets the federal balance to a degree that renders it an unconstitutional assertion of the commerce power . . . .").

In *Morrison,* the Court held § 13981 of the Violence Against Women Act unconstitutional, again because the class of activities regulated was not economic. Holding that the law was beyond the scope of the commerce power, 529 U.S. at 617, the Court reiterated that "where we have sustained federal regulation of intrastate activity based upon the activity's substantial effects on interstate commerce, the activity in question has been some sort of economic *endeavor.*" *Id.* at 611 (emphasis added).

Thus, *Lopez* and *Morrison* establish that the Commerce Clause power is limited to economic activity, however local or trivial in scope.  *See, e.g.*, *Gonzales v. Raich*, 545 U.S. 1 (2005) (regulation of marijuana grown for home use); *Wickard v. Filburn*, 317 U.S. 111 (1942) (regulation of wheat grown for personal consumption).  But there must be activity.  To be engaged in commerce, one must actually be doing something.   Not even the most expansive Supreme Court Commerce Clause cases support the notion that Congress can regulate inactivity, or coerce commercial activity where none exists.

If Congress can coerce a commercial transaction by simply asserting, as it did in the PPACA, that coercing the transaction "is commercial and economic in nature, and substantially affects interstate commerce," PPACA, Pub. L. No. 111-148, §1501(a)(1), 124 Stat. 119 (2010), and listing a series of "Effects on the National Economy and Interstate Commerce," *id.* §1501(a)(2), *amended by* §10106(a), then the universe of commercial transactions Congress could compel would be practically limitless.  Under *Raich* and *Wickard*, no commercial activity can be considered too trivial or local to elude the Commerce power. When that principle is coupled with the federal government's implicit assumption in the PPACA that Congress can regulate commercial inactivity by coercing citizens to purchase any given product, there is no obstacle to an economy completely controlled by the federal government.

For example, the federal government bailed out General Motors under the authority of the Emergency Economic Stabilization Act of 2008. Pub. L. No. 110-343, 122 Stat. 3765 (codified in part in 12 U.S.C. §§5201-02, 5211-41). This act created the "Troubled Assets Relief Program" ("TARP"), which allowed the Secretary of the Treasury to purchase troubled assets from financial institutions and to guarantee troubled assets issued before March 14, 2008. 12 U.S.C. §§ 5211(a)(1), 5212(a)(1) (Supp. II 2008). The Act also established the Financial Stability Oversight Board, which reviews programs developed under the Act,

makes recommendations to the Treasury Department, and reports suspected fraud. 12 U.S.C. § 5214 (Supp. II 2008).  In December 2008, the U.S. Treasury authorized loans of up to $13.4 billion of TARP funds for General Motors and $4.0 billion of TARP funds for Chrysler.  Press Release, U.S. Dep't of the Treasury, Secretary Paulson Statement on Stabilizing the Automotive Industry (Dec. 19, 2008), http://www.treas.gov/press/releases/hp1332.htm.

Based on the foregoing history, Congress could rationally determine that requiring all Americans above a certain income level to purchase a new GM or Chrysler automobile would address the instability of a segment of the American automotive industry and help ensure that the bailout's purpose—GM's and Chrysler's survival—is achieved. Under Congress's reasoning, the decision whether to buy a car is "commercial and economic in nature, and [when aggregated with all similar decisions] substantially affects interstate commerce."

Similarly, to shore up the financial services industry, Congress could compel Americans to make certain investments with Lehman Brothers.[3] To foster the nation's energy independence, any number of purchases could be compelled. Indeed, Congress could rationally determine that a lack of exercise contributes to

---

[3] The collapse of Lehman was the largest bankruptcy in American history, creating massive market instability. Tiffany Kary & Chris Scinta, *JP Morgan Gave Lehman $138 Billion After Bankruptcy (Update 3)*, Bloomberg.com, Sep. 16, 2008, http://www.bloomberg.com/apps/news?pid=20601087&sid=aX7mhYCHmVf8&refer=home.

poor health, which increases health care expenses and the cost of health care insurance, and poses a threat to Congress's attempt to lower health care and health care insurance costs. If so, under the reasoning that would support finding the individual mandate a valid exercise of Congress's power to regulate commerce, Congress could require Americans to purchase health club memberships.

The government, however, posits that because "accidents or illness [will] inevitably occur," the uninsured will receive health care even if they cannot pay. Mem. in Supp. of Gov't's Mot. to Dismiss at 3 (hereinafter Gov. Mem.); *see generally id.* at 25–30.   In essence, the government presumes that all Americans are present participants in the health care market, so that the decision whether to buy health insurance is really a decision about how to pay for the health care they will inevitably receive. *See id.* at 25-30. The government argues that the individual mandate, therefore, regulates an economic activity by participants in a market the federal government has power to regulate.

The government's attempt to convert into commercial activity the decision not to engage in commercial activity is clever but unavailing.  The argument does nothing to relieve the concern that finding the individual mandate to be a legitimate exercise of Congress's power to regulate interstate commerce would allow Congress unprecedented power to control individual decisions concerning whether to participate in commercial activity.  Take the GM and Chrysler example.  Most

would say that a person who does not own an automobile and is not seeking presently to buy an automobile is not participating in the automobile market.  But the point of owning an automobile is to provide transportation, and everyone inevitably needs to get from one place to another.  Thus, all people are participants in the broader market for transportation, a market which includes the automobile market.   Deciding to forego buying a car and depend instead on public transportation, taxis, or even walking is, by the government's reasoning, engaging in economic activity—that is, deciding which type of transportation to use—that may be regulated by Congress if the aggregate of those decisions substantially affects interstate commerce.

The upshot is that all private purchasing decisions (negative and affirmative) can be characterized under the government's theory as commercial and economic activity and, in the aggregate, affect interstate commerce. Upholding the individual mandate to force private citizens to buy health insurance will thus strip any remaining limits on Congress's power to control individual economic behavior. When President Truman attempted a similar expansion of federal power over a substantial portion of the economy,[4] the Supreme Court was keenly aware of the threat to the Constitution and to Americans' liberty.   As Justice Frankfurter explained in his concurring opinion:

---

[4] Truman attempted to seize the nation's steel mills to ensure the economic and financial stability of the market.

The Founders of this Nation were not imbued with the modern cynicism that the only thing that history teaches is that it teaches nothing. They acted on the conviction that the experience of man sheds a good deal of light on his nature. It sheds a good deal of light not merely on the need for effective power, if a society is to be at once cohesive and civilized, but also on the need for limitations on the power of governors over the governed.

To that end they rested the structure of our central government on the system of checks and balances. For them the doctrine of separation of powers was not mere theory; it was a felt necessity. Not so long ago it was fashionable to find our system of checks and balances obstructive to effective government. It was easy to ridicule that system as outmoded—too easy. The experience through which the world has passed in our own day has made vivid the realization that the Framers of our Constitution were not inexperienced doctrinaires. These long-headed statesmen had no illusion that our people enjoyed biological or psychological or sociological immunities from the hazards of concentrated power. It is absurd to see a dictator in a representative product of the sturdy democratic traditions of the Mississippi Valley. *The accretion of dangerous power does not come in a day. It does come, however slowly, from the generative force of unchecked disregard of the restrictions that fence in even the most disinterested assertion of authority.*

*Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 593-94 (1952)

(Frankfurter, J., concurring) (emphasis added).

The principles of federalism and a federal government of limited enumerated powers, like the separation of powers, are part of the system of checks and balances the *Youngstown* Court found essential to limiting governmental power and protecting liberty. Upholding the individual mandate would effectively confer upon Congress "a plenary police power," *Lopez*, 514 U.S. at 566, over all

individual economic decisions and place the economic liberty of all Americans at risk.

## II.     The Absence of a Severability Clause in the Patient Protection and Affordable Care Act Increases the Likelihood of Immediate Harm to the States.

The individual insurance mandate portions of the PPACA become effective in 2014.  PPACA, Pub. L. No. 111-148, § 1501(b), 124 Stat. 119 (2010). States must nevertheless incur immediate and significant legislative, administrative, and other costs to prepare to fully implement the PPACA. Thus, the burdens imposed on the states by the PPACA include not only inevitable future requirements, but also present significant expenditures and alterations to their existing regulatory schemes.

Most notably, the PPACA uses a system of state-based insurance exchanges. *Id.* § 1321.   That system charges the states with extensive legislative and administrative burdens in developing and administrating the exchanges. *See,     e.g.*,     Posting     of     Suzy     Khimm     to     MoJo     Blog, http://motherjones.com/mojo/2010/03/how-states-could-sabotage-health-reform (April 1, 2010, 3:00 PDT). The National Governor's Association has recognized the "significant role" that states play in implementing the PPACA, and that "[s]ome components of the law must be developed and implemented quickly, while other[s] will involve a complex set of state decisions and long-term planning

and implementation." National Governor's Association, Health Reform Implementation Resource Center, http://www.nga.org/portal/site/nga/menuitem.751b186f65e10b568a278110501010a 0/?vgnextoid=7f8844ce25208210VgnVCM1000005e00100aRCRD&vgnextchanne l=92ebc7df618a2010VgnVCM1000001a01010aRCRD (last visited May 27, 2010).

The immediate impact the law will have on the states that amici Members of Congress represent can be seen in the following examples:

- Virginia's Secretary of Health and Human Resources recently announced the establishment of a Health Care Reform Initiative "to prepare Virginia for the implementation of federal health reform by planning for the expansion of Medicaid eligibility." Press Release, Virginia Secretary of Health and Human Resources, Virginia Secretary of Health and Human Resources Dr. Bill Hazel Announces Virginia Health Reform Initiative (May 14, 2010), http://www.hhr.virginia.gov/News/viewRelease.cfm?id=175. In speaking about the Initiative, Secretary Hazel said,

> "Virginia is one of many states challenging the Patient Protection and Affordable Care Act and the Healthcare and Education Affordability Reconciliation Act. However this lawsuit could take two to three years to be settled. As we wait for court decisions, the Commonwealth must comply with the acts and begin preparing for implementation of federal health care reform."

13

*Id.* According to the press release, Virginia's Initiative will, among other things, "manage activities related to federal health care reform" and "serve as the liaison between the Governor's office, agencies and entities affected by health care reform, lead development of the required Health Insurance Exchange and identify and coordinate grants to fund health care reform." *Id.* Additionally, Virginia's Governor, Bob McDonnell, "announced he will soon hire a Health Care Reform Coordinator to help Virginia expand its Medicaid eligibility, plan for new health care exchanges that the law mandates in 2014 and make Virginia's system more affordable." Posting of Rosalind Helderman to the Virginia Politics Blog, http://voices.washingtonpost.com/virginiapolitics/2010/05/former_speaker_of_the_house.html (May 14, 2010, 16:01 ET).

- In Washington, the legislature created the Joint Legislative Select Committee "to oversee health care reform in Washington . . . ." The Hopper, http://blog.senatedemocrats.wa.gov/the-hopper/health-reform-implementation-panel-gets-to-work-wednesday/ (May 24, 2010). "Early action items" for the Committee to consider "include insurance market reforms going into effect this year, the federal high risk pool for people with pre-existing conditions, and the state's Medicaid waiver request to help fund the Basic Health Plan." *Id.* The co-chair of the Committee has stated that

"'[t]here's a lot of work to do here on the ground in getting these sweeping reforms implemented' . . . ." *Id.* Additionally, Governor Gregoire "signed an executive order creating a Health Care Cabinet to implement health care reform in Washington to maximize efficiencies and bring the full benefits of the new law to all Washington citizens." Press Release, Gov. Chris Gregoire, Gov. Gregoire Takes Immediate Steps to Implement Healthcare Reform in Washington State (April 1, 2010), http://www.governor.wa.gov/news/news-view.asp?pressRelease=1469&newsType=1.   Among other things, the Cabinet "will write and implement the policies and rules necessary to carry out health care reform statewide for all affected state agencies, including consolidating duties, functions and powers related to the state's overall health care purchasing." *Id.* The Cabinet is to report back to Governor Gregoire by August 1, 2010, "with recommendations for any changes to state law necessary to be submitted in the 2011 legislative session." *Id.*

- The Texas Department of Insurance ("TDI") has created a "Federal Health Care Reform Resource Page" to update consumers on health care reform. Texas Department of Insurance, Federal Health Care Reform Resource Page, http://www.tdi.state.tx.us/consumer/cpmhealthcare.html (last visited May 27, 2010).   The website includes a link to a PowerPoint presentation given to the House Select Committee on Federal Legislation, which includes slides

on the "Fiscal Impact on TDI," (which included possible "areas of increased costs for TDI in 2010"), implementation planning, and challenges to implementation. Mike Geeslin & Dianne Longley, Overview of Federal Health Insurance Reform Requirements and TDI Implementation Planning, at 29-32, Apr. 22, 2010, http://www.tdi.state.tx.us/reports/documents/fedhlthreform4222010.ppt. Two of the challenges noted in the presentation were that "[p]rovisions effective within [the] first 6 months will require aggressive implementation effort," and "[l]ong term fiscal planning as new federal HHS regulations are issued periodically during next 4 years." *Id.* at 32.

- The Oklahoma Insurance Department has taken steps to educate the public on the health care legislation by creating a website with links to information about the law. Oklahoma Insurance Department, Patient Protection and Affordable Care Act, http://www.ok.gov/oid/PPAC.html (last visited May 26, 2010).

- In May, California's Senate and Assembly health committees held a joint hearing at which health experts testified "about the challenges California faces in carrying out the federal health overhaul law, including the creation of the virtual marketplace where consumers will go to buy coverage in 2014." Victoria Colliver, *State Lawmakers Discuss Health Care Challenges*,

16

San Fran. Chron., May 13, 2010, *available at* http://articles.sfgate.com/2010-05-13/bay-area/20896084_1_health-law-federal-law-new-law.  At the hearing, Jon Kingsdale, the executive director of the Health Connector, Massachusetts's exchange, congratulated the committee members on "tackling these tough issues so expeditiously," noting that

> the process from legislative drafting to full implementation took four years in Massachusetts, and we already had the insurance reforms set forth under the federal Accountable Care Act, such as community rating, in place in Massachusetts prior to our 2006 reform legislation. By getting a head start now, in 2010, you can anticipate and better oversee the many changes coming to California's health insurance markets.

*Implementation of Federal Health Care Reform, Joint Hearing Before S. Subcomm. on Health & Human Servs. & Assembly Comm. on Health*, 2009-10 Sess. (2009-10) (statement of Jon Kingsdale, Exec. Director, Commonwealth of Massachusetts Health Insurance Connector Authority), http://senweb03.senate.ca.gov/committee/standing/health/California_Testimony_of_Jon_Kingsdale.pdf (last visited May 28, 2010).

- California Governor Arnold Schwarzenegger announced the creation of a Health Care Reform Taskforce to focus on implementing parts of the PPACA, including "develop[ing] a health insurance purchasing pool so that small businesses and individuals can shop for insurance at competitive

rates." Gov. Arnold Schwarzenegger, Press Conference to Discuss Federal Health Care Reform (Apr. 29, 2010), http://gov.ca.gov/speech/15034/. He also stated that he would "call a special session, if necessary, to ensure that we make the required statutory changes on time." *Id.*

If certain provisions of the PPACA are altered or ruled unconstitutional, the costs incurred by states could well go for naught. This is especially so given that the PPACA contains no severability provision. Generally, invalidating one provision of a law as unconstitutional does not invalidate the rest of the law, provided the unconstitutional provisions are severable from the other provisions. *Alaska Airlines, Inc. v. Brock*, 480 U.S. 678, 684 (1987). Here, however, under the generally applicable rules concerning severability, the individual mandate is not severable.

The Supreme Court has set forth its standard for determining whether severance is possible: "Unless it is evident that the Legislature would not have enacted those provisions which are within its power, independently of that which is not, the invalid part may be dropped if what is left is fully operative as a law." *Id.* (internal quotations marks omitted); *Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 191 (1999); *Champlin Ref. Co. v. Corp. Comm'n of Okla.*, 286 U.S. 210, 234 (1932). "The inquiry into whether a statute is severable is essentially an inquiry into legislative intent." *Mille Lacs Band of Chippewa*

*Indians*, 526 U.S. at 191. Nevertheless, "Congress could not have intended a constitutionally flawed provision to be severed from the remainder of the statute if the balance of the legislation is incapable of functioning independently." *Alaska Airlines, Inc.*, 480 U.S. at 684. A court must ask "whether [after removing the invalid provision] the [remaining] statute will function in a manner consistent with the intent of Congress." *Id.* at 685 (original emphasis omitted).

Even where a severability clause is present, courts must decide whether the unconstitutional portions of the challenged act are "so intertwined" with other provisions, that the other provisions cannot stand. In *Hill v. Wallace*, Congress enacted a scheme to control Boards of Trade associated with the sale of grain, and enacted a penalty tax to compel compliance. 259 U.S. 44, 63-64 (1922). The Court found the tax provisions unconstitutional and ruled that the regulatory provisions must also fail because they were "so interwoven" with the tax provision they could not operate separately. *Id.* at 70.

Here, two factors lead to the conclusion that the individual mandate is not severable: First, Congress removed a severability clause from the original House bill.  Second, by the government's own assertion, the remaining portions of the bill cannot function without the individual mandate provision.

First, the Affordable Health Care for America Act (H.R. 3962) passed the House of Representatives on November 7, 2009. OpenCongress, H.R. 3962–

Affordable Health Care for America Act, http://www.opencongress.org/bill/111-h3962/show (last visited May 27, 2010). That Act contained a severability provision, section 255, that would have allowed other provisions of the Act to remain in force if any specific provision was found unconstitutional. Affordable Health Care for America Act, H.R. 3962, 111th Cong. § 255 (2009) (engrossed as agreed to or passed by House), *available at* http://frwebgate.access.gpo.gov/cgi-bin/getdoc.cgi?dbname=111_cong_bills&docid=f:h3962eh.txt.pdf. However, the bill passed by both Houses and signed into law by the President—The Patient Protection and Affordable Care Act—lacks any such severability provision. Pub. L. No. 111-148, 124 Stat. 119 (2010). That Congress failed to include a severability provision in the final bill indicates that Congress did not intend for the bill's individual provisions to be severable.

Moreover, as the government repeatedly asserts, *see* Gov. Mem. at 3-4, 8, 19, 30-33, the individual insurance mandate is related to other provisions of the PPACA in such a way that without it, the elaborate insurance scheme enacted by the PPACA could not function as intended. Consistent with the Supreme Court's reasoning in *Alaska Airlines, Inc.*, Congress could not have intended the insurance mandate to be severable if severing it would allow an inoperable regulatory scheme to stand. *See* 480 U.S. at 684. Specifically, one of the PPACA's more touted provisions forbids providers from refusing health insurance coverage to individuals

on the basis of preexisting conditions. Pub. L. No. 111-148, § 1201, 124 Stat. 119 (2010). Without the insurance mandate provision, an individual could refrain from purchasing health insurance coverage until he incurred an actual injury or illness requiring medical care.  As Congress recognized in its own findings,

> Under sections 2704[5] and 2705[6] of the Public Health Service Act (as added by section 1201 of this Act), if there were no [individual mandate] requirement, many individuals would wait to purchase health insurance until they needed care.  By significantly increasing health insurance coverage, the requirement, together with the other provisions of this Act, will minimize this adverse selection and broaden the health insurance risk pool to include healthy individuals, which will lower health insurance premiums. The requirement is essential to creating effective health insurance markets in which improved health insurance products that are guaranteed issue and do not exclude coverage of preexisting conditions can be sold.

*Id*. §1501(a)(2)(I), *amended by* §10106(a).

The PPACA would forbid insurers from denying coverage.  Without the individual mandate, the potential for free-riding could soon result in the insolvency of any private or co-operative insurance provider that depends on premium dollars. The PPACA contains exchanges made up of insurance providers, but does not contain any completely government administered and supported plan or so-called "public option." *See generally* Pub. L. No. 111-148, 124 Stat. 119 (2010). Because

---

[5] "Prohibition of Preexisting Condition Exclusions or other Discrimination Based on Health Status." Patient Protection and Affordable Care Act, Pub. L. No. 111-148, § 1201, 124 Stat. 119 (2010) (section 1201 of the PPACA amends "Part A of title XXVII of the Public Health Service Act (42 U.S.C. 300gg et seq.) . . . .").

[6] "Prohibiting Discrimination Against Individual Participants and Beneficiaries Based on Health Status." *Id*.

21

the envisioned health care insurance providers would depend upon premium dollars, the individual mandate is designed to bolster the providers' solvency in each insurance exchange and thus the operation of the entire regulatory scheme. *See also* Gov. Mem. at 31-33 (explaining how the individual mandate is connected to other parts of the PPACA).

Because the individual mandate is so essential to the overall operation of the PPACA, it is highly probable that without it, there would be no PPACA.[7] In this

---

[7] This is not to say that the interconnection between the individual mandate and the rest of the PPACA, while relevant to the issue of severability, is a basis for concluding that the individual mandate is within Congress's power under the Commerce Clause or Necessary and Proper Clause. Although the Court noted in *Raich* that the laws upheld in *Wickard* and *Raich* were essential parts of a regulatory scheme, *Raich* does *not* stand for the broad proposition that Congress is free to pass otherwise unconstitutional laws by somehow connecting them to a larger regulatory program. *Wickard* and *Raich* held that federal regulation of a particular type of economic activity—the production and consumption of a marketable commodity—can, in some circumstances, be applied to reach that type of existing economic activity at a purely local level when regulating that local economic activity, in the aggregate, is necessary and proper to the effective national regulation of that economic activity.

Here, by contrast, Congress is not seeking to regulate existing local economic activity as a necessary component of regulating that type of economic activity nationwide, but rather has forced individuals who are not engaged in the economic activity of buying and maintaining health insurance to do so. The PPACA is akin to a law that would force people not presently farming to grow and sell wheat. Congress can find no support from *Wickard*, *Raich*, or other cases for the proposition that it can—for the first time in our Nation's history—declare that individuals who are not engaged in a particular economic activity must engage in that activity solely because other statutory provisions are attached to and connected with that mandate.

sense, while the individual mandate is not itself directed at state governments, without that mandate there can be little doubt that the provisions that do directly affect states—for example, the insurance exchanges and Medicaid eligibility expansion—would not exist.   Therefore, but for the individual mandate, states would not have to incur the present costs that the PPACA imposes on them.

That the individual mandate is not severable from the federal insurance regulatory scheme enacted under the PPACA only exacerbates the harm to the states.  If the individual mandate is found unconstitutional, the entire health care scheme created by the PPACA would unravel, and the significant regulatory and administrative costs the states must soon incur to comply with the PPACA's requirements will be in vain. In fact, not only will states incur these costs to no avail, it is likely that states will have to undergo further expenditures to return their individual systems to a workable model. These significant economic harms to the states could be avoided by adjudicating the constitutionality of the individual mandate provisions now, before the states undertake additional costs and sweeping and costly legislative and regulatory action.

## CONCLUSION

Amici therefore respectfully request that the Court deny the Defendant's

Motion to Dismiss.


Respectfully submitted this of 7th day of June, 2010,

John P. Tuskey*                          Jay Alan Sekulow*
Laura Hernandez (VA Bar #29853)          Colby M. May (VA Bar #19734)
AMERICAN CENTER FOR                          *Counsel of Record*
LAW & JUSTICE                            Stuart J. Roth*
1000 Regent University Dr.               AMERICAN CENTER FOR
Virginia Beach, VA  23464                LAW & JUSTICE
(757) 226-2489                           201 Maryland Ave., NE
                                         Washington, DC  20002
                                         (202) 546-8890


   * - Not admitted in this court


   *Attorneys for Amici Curiae*

# CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

■    this brief contains 5332 words, excluding the parts
       of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

■    this brief has been prepared in a proportionally spaced typeface using
       Microsoft Word 2007 in Times New Roman, 14 point font.

/s/ Colby M. May

*Attorney for Amici Curiae*

Dated: June 7, 2010

## CERTIFICATE OF SERVICE

I hereby certify that on the 7th day of June, 2010, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to the following:

Earle Duncan Getchell, Jr.
Charles E. James, Jr.
Stephen R. McCullough
Wesley Glenn Russell, Jr.
Office of the Attorney General
900 E. Main Street
Richmond, Virginia 23219

Jonathan Holland Hambrick
Office of the U.S. Attorney
600 E Main St
Suite 1800
Richmond, VA 23219

Erika Myers
Ian Gershengorn
Joel McElvain
Sheila M. Lieber
Department of Justice Federal Programs Branch
20 Massachusetts Ave NW
Room 7332
Washington, DC 20001

  /s/ Colby M. May
Colby M. May (VA Bar #19734)
AMERICAN CENTER FOR
LAW & JUSTICE
201 Maryland Ave., NE
Washington, DC  20002
(202) 546-8890