**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA**

**Richmond Division**

| | |
|---|---|
| COMMONWEALTH OF VIRGINIA ) <br> EX REL. KENNETH T. CUCCINELLI II, ) <br> in his official capacity as Attorney General ) <br> of Virginia, ) <br> ) <br>     Plaintiff ) <br> ) <br> v. ) <br> ) <br> KATHLEEN SEBELIUS, ) <br> SECRETARY OF THE DEPARTMENT ) <br> OF HEALTH AND HUMAN SERVICES, ) <br> in her official capacity, ) <br> ) <br>     Defendant ) <br> _____ ) | Civil Action No. 3:10-cv-00188-HEH |

**BRIEF *AMICI CURIAE* OF
SMALL BUSINESS MAJORITY FOUNDATION, INC. AND
THE MAIN STREET ALLIANCE IN SUPPORT OF
DEFENDANT'S MOTION TO DISMISS**

This Brief *Amici Curiae* is filed by Small Business Majority Foundation, Inc., and The Main Street Alliance, in support of the Motion to Dismiss filed by the Defendant, Secretary Kathleen Sebelius, on May 24, 2010.

### I. INTERESTS OF *AMICI*

Small Business Majority Foundation, Inc. ("SBMF") is a national, nonpartisan organization, founded and run by small business owners across the United States. SBMF is a District of Columbia non-profit organization exempt from tax as an educational organization under section 501(c)(3) of the Internal Revenue Code. SBMF advocates the interests of small business owners and researches and disseminates policy proposals addressing the special interests and needs of small businesses. Over the past few years, SBMF has been focused on the

biggest single problem facing small businesses: the skyrocketing cost of health care. The enactment and successful implementation of the Patient Protection and Affordable Care Act, Pub. L. No. 111-148, 124 Stat. 199, the law that is the subject of this lawsuit, is of paramount importance to SBMF and the small business owners whose interests SBMF promotes.

The Main Street Alliance ("MSA"), a national network of small business coalitions, is a program of Northwest Federation of Community Organizations, a Washington State nonprofit charitable and educational organization exempt from tax under section 501(c)(3) of the Internal Revenue Code. MSA creates opportunities for small business owners to advocate for themselves on public policy issues affecting small business owners, their employees and the communities they serve. MSA's members have identified the need to make health care reform work for small businesses as the top priority for the MSA.

These two organizations, SBMF and MSA, bring to the consideration of the issues in this case the unique perspective of small business owners that is not represented by either of the parties or the other *amici* that have, to date, filed briefs addressing the Defendant's Motion to Dismiss.

## II. ARGUMENT

Congress' Commerce Power is at its apex when Congress regulates "economic activity." *Gonzales v. Raich,* 545 U.S. 1, 25–26 (2005). Few laws will have a more substantial impact on interstate commerce than the Patient Protection and Affordable Care Act, Pub L. No. 111-148, 124 Stat. 119 (the "PPACA"). Congress determined that the PPACA would reverse a longstanding trend of rapidly increasing health insurance premiums, *see* PPACA §§ 1501(a)(2)(B), 10106(a), and ensure that nearly every American is insured. *Id*. § 10106(a).

Small businesses will especially benefit from these reforms. Small businesses must pay 10–18 percent more than large firms for the same health policy, Jon Gabel, et al., *Generosity And Adjusted Premiums In Job-Based Insurance: Hawaii Is Up, Wyoming Is Down*, 25 Health Affairs 832, 840 (2006). In part for this reason, small businesses are far less likely to offer health benefits to their workers, and thus are less able to compete for the most talented employees. By reducing the cost of health insurance, the PPACA will not only enable small employers that currently offer health benefits to reduce this rapidly-growing expense, it will also enable more such companies to provide health benefits in the first place—thus enhancing their power to compete with larger companies. Additionally, by ensuring that nearly every worker will carry insurance, the PPACA increases small business productivity by reducing the amount of employee time lost to serious illness or injury.

The beneficial effects of the PPACA on small business will have an enormously positive effect on the U.S. economy as a whole. Small businesses represent 99.7 percent of all employer firms; pay 44 percent of the total U.S. private payroll; and have generated 64 percent of all net new jobs over the past fifteen years. U.S. Small Business Administration, *FAQ's: Frequently Asked Questions: Advocacy Small Business Statistics and Research*, available at http://web.sba.gov//faqs/faqindex.cfm?areaID=24.

The provisions of the PPACA requiring all individuals to carry a minimum level of insurance or pay a penalty, PPACA § 1501(a)(2)(G), are an essential element of the PPACA's scheme to lower premiums and ensure near-universal coverage, benefiting small businesses. As explained below, these provisions are well within Congress' power under the Commerce Clause. Accordingly, this Court should uphold the minimum coverage provision.

### A. SMALL BUSINESSES WILL PARTICULARLY BENEFIT FROM THE MINIMUM COVERAGE PROVISION'S SUBSTANTIAL POSITIVE EFFECT ON INTERSTATE COMMERCE

Congress determined that administrative costs for private health insurance were $90 billion in 2006. PPACA § 10106(a). These administrative costs are particularly difficult to bear for small businesses which lack the economies of scale that benefit larger employers. Similarly, by virtue of their small size, small employers lack the bargaining power that major employers enjoy when negotiating health insurance premiums. As a result, small employers pay an average of 10 to 18 percent more to provide the same level of health benefits as a large employer. Gabel, *supra*, at 840.

The minimum coverage provision will mitigate small business' competitive disadvantage in two ways. First, by reducing the cost of insurance, the minimum coverage provision will enable more small businesses to offer health benefits, thus increasing their ability to compete in the job market with large employers. Between 2000 and 2009, the number of firms with less than 200 employees that offer health benefits declined from 57 percent to 46 percent. Kaiser Family Foundation, *Employer Health Benefits*: *2009 Annual Survey* 50 (2009), *available at* http://ehbs.kff.org/. Those small employers that do offer coverage often cannot afford to provide the same level of coverage to their employees. Forty-eight percent of small business employees have insurance that caps the total amount of care they may receive, as compared with 37 percent of large firm employees. Michelle M. Doty, et al., *Out of Options: Why So Many Workers in Small Businesses Lack Affordable Health Insurance, and How Health Care Reform Can Help*, 67 The Commonwealth Fund, *available at*

http://www.commonwealthfund.org/Content/Publications/Issue-Briefs/2009/Sep/Out-of-

Options.aspx (Sep. 9, 2007).  Similarly, small business employees are three times as likely to have a plan with no prescription drug coverage, as compared to large firms.  *Id.*

This gap between the coverage offered by large employers and the coverage offered by small firms leads to a phenomenon known as "job lock."  Employees of companies that offer insurance are reluctant to leave jobs that provide health care for jobs that do not, even if the new job could better harness that employee's particular skills.  *See* Brigitte C. Madrian, *Health Insurance and Job Mobility: Is There Evidence of Job-Lock?*, 109 Q. J. of Econ. 27, 43 (1994) (determining that job lock "accounts for a 25–30 percent reduction in [job] mobility"); *see also* Kevin T. Stroupe, *et al.*, *Chronic Illness and Health Insurance Related-Job Lock*, 20 J. of Pol'y Analysis & Mgmt. 525, 525 (2001) (finding that workers with chronic illnesses or a family member with chronic illness are 40 percent less likely to voluntarily leave a job which provides health benefits than a similarly-situated healthy worker with a healthy family).

"Job lock" causes harm beyond trapping workers in jobs they may not want. It also keeps small employers who cannot afford to offer good health benefits to their workers from hiring the most hard working and talented staff.  By reducing premiums, the minimum coverage provision will enable more small businesses to offer health insurance to their employees, thus empowering them better to compete with large businesses for top talent.

Additionally, by requiring nearly every worker to carry insurance, the minimum coverage provision will increase small business productivity by reducing the amount of worker downtime attributable to illness or injury.  As explained in Part B, *infra*, uninsured workers are far more likely to delay coverage until their condition has deteriorated significantly, not only resulting in higher medical bills, but in more days of lost work.  In 2009, the U.S. economy suffered "between $124 billion and $248 billion in lost productivity . . . due to the almost 52 million

uninsured Americans who live shorter lives and have poorer health." Peter Harbage & Ben Furnas, *The Cost of Doing Nothing on Health Care*, Center for American Progress (May 29, 2009), *available at* http://www.americanprogress.org/issues/2009/05/pdf/cost_doing_nothing.pdf Indeed, according to the Institute of Medicine, "the estimated benefits across society in healthy years of life gained by providing health insurance coverage are likely greater than the additional social costs of providing coverage to those who now lack it." *Id.*

Small businesses suffer disproportionately from this lost productivity. Because of their small size, such employers lack a "reserve pool" of employees who can fill in for an absent worker while that worker is out sick or in the hospital. Mark V. Paul, et al., *A General Model of the Impact of Absenteeism on Employers and Employees*, 11 Health Econ. 221, 227 (2002). By achieving near-universal coverage, the minimum coverage provisions will drastically reduce the tens of billions of dollars in lost productivity costs the U.S. economy suffers every year due to uninsured workers. Additionally, these provisions will help to close the competitiveness gap between large employers and those who are less able to compensate for a sick worker, reduce job lock and enhance small business job creation. It is beyond dispute that the reduction of the competitiveness gap between large and small businesses has a "substantial effect on interstate commerce." *Raich*, 545 U.S. at 17.

### B. THE MINIMUM COVERAGE PROVISION SUBSTANTIALLY AFFECTS INTERSTATE COMMERCE BY REDUCING PREMIUMS AND ENSURING THAT NEARLY ALL INDIVIDUALS WILL CARRY INSURANCE

Congress determined that, absent the PPACA, national health spending would increase from $2.5 trillion per year to $4.7 trillion by 2019. PPACA § 1501(a)(2)(B). The PPACA, however, will eventually reduce this rate of growth by 15% to 20%. Business Roundtable, *Health Care Reform: Creating a Sustainable Health Care Marketplace* 23 (Nov. 2009),

*available at*

http://www.businessroundtable.org/sites/default/files/Hewitt_BRT_Sustainable%20Health%20Care%20Marketplace_Final.pdf.  In this way the PPACA will save consumers and businesses hundreds of billions of dollars in the process.  The minimum coverage provision will contribute to these savings in three ways.

*First*, by requiring almost all individuals to carry insurance, Congress determined that the provision will drastically reduce the $43 billion in uncompensated care hospitals currently provide to uninsured patients.  PPACA § 10106(a).  Under the Emergency Medical Treatment and Labor Act, 42 U.S.C. § 1395dd, most hospitals must stabilize any person who presents themselves to an emergency room, even if that person is unable to pay.  Moreover, because uninsured individuals often delay care until their condition has deteriorated significantly, the costs of treating uninsured patients often exceed the costs of treating the same condition in insured individuals.  Families USA, *Health Reform: Help for Americans with Pre-Existing Conditions* 9 (2010), *available at* http://www.familiesusa.org/assets/pdfs/health-reform/pre-existing-conditions.pdf.  These costs are then passed on to other consumers, burdening the average family with $1000 a year in increased premiums.  PPACA § 10106(a).

Even if the minimum coverage provision had been enacted as a standalone provision, rather than as part of a comprehensive regulatory scheme, it would reduce the number of uninsured Americans by 41%, or 21.5 million individuals.  RAND Corp., *Analysis of the Patient Protection and Affordable Care Act (H.R. 3590)* 9 (2010), *available at* http://www.rand.org/pubs/research_briefs/2010/RAND_RB9514.pdf.  "By significantly reducing the number of the uninsured, the [minimum coverage] provision, together with the other provisions of the Act, will lower health insurance premiums."  PPACA § 10106(a)

7

*Second*, the minimum coverage provision will reduce premiums by expanding insurance pools to include younger and healthier members.  The purpose of health insurance is to dilute the impact of an unexpected and expensive illness by spreading the risk of the cost of such illness across a large number of individuals.  *Group Life & Health Ins. Co. v. Royal Drug Co.*, 440 U.S. 205, 211 (1979).   Because insurance plan participants place their premiums into a pool that any participant can draw upon if they are ill, pools made up of younger, healthier individuals tend to have lower costs than pools with older, less-healthy individuals—the healthier the average member of the pool, the lower premiums will be.

Young adults, however, "are disproportionately represented among people who lack health insurance, accounting for 30 percent of the 46 million uninsured people under age 65, even though they comprise just 17 percent of the population."  Sara R. Collins & Jennifer L. Nicholson, *Rite of Passage: Young Adults and the Affordable Care Act of 2010*, 87 The Commonwealth Fund (May 2010), *available at* http://www.commonwealthfund.org/~/media/Files/Publications/Issue%20Brief/2010/May/1404_Collins_rite_of_passage_2010_v3.pdf.  Likewise, over 60 percent of the uninsured are in "excellent" or "very good" health.  Lisa Dubay & Allison Cook, *How Will the Uninsured be Affected by Health Reform?* (Urban Institute August 2009), *available at* http://www.urban.org/uploadedpdf/411950_uninsured.pdf.  Accordingly, those individuals who are the most likely to contribute more in premiums to an insurance pool than they take out in benefits are also the least likely to join that pool in the first place.  By requiring the overwhelming majority of these young, healthy individuals to carry insurance, the minimum coverage provision will reduce premiums by encouraging those individuals who are least likely to require expensive care to join insurance pools.

*Finally*, the minimum coverage provision is essential to ensuring that other provisions of the PPACA function as they are intended to function.  Historically, insurance companies have prevented uninsured individuals from intentionally delaying the purchase of insurance until they become ill or injured by denying coverage to individuals with preexisting conditions.  Section 1101 of the PPACA, however, forbids insurers from continuing this practice.

Congress determined that, absent a minimum coverage provision, "many individuals would wait to purchase health insurance until they needed care," thus allowing them to draw benefits from an insurance pool into which they had not paid.  PPACA § 10106(a).  Because of this "adverse selection" problem, in every single state which has required insurers to guarantee issue to all individuals—without also requiring all individuals to carry insurance—premiums have increased, in some cases to the point of unsustainability.  *See* Jonathan Gruber, *Why We Need the Individual Mandate*, Center for American Progress, April 8, 2010, at 2, *available at* http://www.americanprogress.org/issues/2010/04/pdf/individual_mandate.pdf; Len M. Nichols, *State Regulation: What Have We Learned So Far?*, 25 J. of Health Politics, Pol'y & L. 175, 189 (2000).  By contrast, the Massachusetts health insurance program has been successful—lowering costs of a nongroup insurance policy by 40 percent from 2006-2009, the period during which such costs rose nationally by 14 percent—precisely because the Massachusetts system *does* include a minimum coverage provision.  Jonathan Gruber, *Why we need the individual mandate*, Center for American Progress, *available at* http://www.americanprogress.org/issues/2010/04/pdf/individual_mandate.pdf.

The minimum coverage provision will reduce premiums, increase insurance coverage and strengthen the viability of risk pools.  All of these actions directly address significant threats to and problems with the national market for health care.  Additionally, the minimum coverage

provision is necessary to ensure that PPACA's ban on discrimination against individuals with preexisting conditions does not undermine the viability of the national health insurance market.

"When Congress decides that the 'total incidence' of a practice poses a threat to a national market, it may regulate the entire class." *Raich*, 545 U.S. at 15 (internal citation omitted). Congress has the authority under the Commerce Clause to regulate individual decisions and activities that form "part of an 'economic class of activities that have a substantial effect on interstate commerce.'" *United States v. Forrest*, 429 F.3d 73, 78 (4th Cir. 2005) (quoting *Raich*, 545 U.S. at 16). The purchase of health insurance clearly meets that test. For these reasons, the minimum coverage provisions of the PPACA are well within Congress' power under the Commerce Clause.

### III. CONCLUSION

For the reasons set forth above, Defendant's Motion to Dismiss should be granted.

June 17, 2010                               Respectfully submitted,

 /s/ John Hardin Young_____
John Hardin Young, VSB No. 13553
Joseph E. Sandler
Elizabeth F. Getman
SANDLER, REIFF & YOUNG, P.C.
300 M Street, S.E. Suite 1102
Washington, DC 20003
202.479.1111
young@sandlerreiff.com

*Counsel for Amici Curiae Small Business Majority Foundation, Inc. and The Main Street Alliance*