# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA

### RICHMOND DIVISION

| | | |
|---|---|---|
| COMMONWEALTH OF | ) | |
| VIRGINIA EX REL. KENNETH | ) | |
| T. CUCCINELLI, II, | ) | |
| in his official capacity as Attorney | ) | |
| General of Virginia, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 3:10-cv-00188-HEH |
| | ) | |
| KATHLEEN SEBELIUS, | ) | |
| Secretary of the Department | ) | |
| of Health and Human Services, | ) | |
| in her official capacity, | ) | |
| Defendant. | ) | |
| _____ | ) | |

BRIEF *AMICI CURIAE* OF THE MARCH OF DIMES FOUNDATION, THE AMERICAN ASSOCIATION OF PEOPLE WITH DISABILITIES, THE ARC OF THE UNITED STATES, BREAST CANCER ACTION, FAMILIES USA, THE FAMILY VIOLENCE PREVENTION FUND, FRIENDS OF CANCER RESEARCH, MENTAL HEALTH AMERICA, NATIONAL BREAST CANCER COALITION, THE NATIONAL ORGANIZATION FOR RARE DISORDERS, THE NATIONAL PARTNERSHIP FOR WOMEN & FAMILIES, NATIONAL PATIENT ADVOCATE FOUNDATION, THE NATIONAL SENIOR CITIZENS LAW CENTER, THE NATIONAL WOMEN'S LAW CENTER, THE OVARIAN CANCER NATIONAL ALLIANCE, RAISING WOMEN'S VOICES FOR THE HEALTH CARE WE NEED, AND UNITED CEREBRAL PALSY IN SUPPORT OF MOTION TO DISMISS

_____

**FINANCIAL DISCLOSURE**

The Internal Revenue Service has determined that all *Amici* for this brief are organized and operated exclusively for charitable or educational purposes pursuant to Section 501(c)(3) or (4) of the Internal Revenue Code and are exempt from income tax.  As such, *Amici* have nothing to report under Local Civil Rule 7.1(A)(1)(a).

# TABLE OF CONTENTS

FINANCIAL DISCLOSURE ................................................................................................ i

TABLE OF CONTENTS.................................................................................................... ii

TABLE OF AUTHORITIES ............................................................................................. iii

INTERESTS OF *AMICI CURIAE* ....................................................................................1

SUMMARY OF ARGUMENT ...........................................................................................1

ARGUMENT .....................................................................................................................2

I. Congress Determined with Overwhelming Empirical and Expert Support that a Minimum Coverage Provision is Essential to Make Effective a Prohibition on Exclusion from Coverage Based on Preexisting Medical Conditions ........................................................................................2

II. State Health Insurance Reform Demonstrates that a Minimum Coverage Provision is Essential to the Success of a Ban on Excluding From Coverage Patients with Preexisting Conditions.........4

    A. State Bans on Excluding From Coverage People With Preexisting Conditions That Were Not Accompanied by a Minimum Coverage Provision Have Been Unsuccessful ....5

    B. Massachusetts Successfully Banned Excluding from Insurance Plans Patients With Preexisting Conditions by Requiring Minimum Coverage.................................................8

III. The Ban on Excluding from Coverage People with Preexisting Conditions, Combined with a Minimum Coverage Provision, Rectifies Pervasive Industry Practices that Generate Direct and Substantial Adverse Effects on Interstate Commerce....................................................................10

    A. The Preexisting Conditions Provision will Reduce Health Care Costs for Millions of Americans ..........................................................................................................................11

    B. Uninsured Individuals Receiving Free Care Drive Up Costs to Insured Individuals and Small Businesses.................................................................................................................12

    C. The Preexisting Conditions Provision Will Reduce Medical Bankruptcies .................14

    D. The Preexisting Conditions Provision Will Reduce "Job Lock" ..................................15

    E. The Preexisting Conditions Provision Will Reduce Preventable Deaths......................17

CONCLUSION.................................................................................................................17

CERTIFICATE OF SERVICE .........................................................................................19

# TABLE OF AUTHORITIES

**Cases**

*Fed. Ins. Co. v. Raytheon Co.*,
  426 F.3d 491 (1st Cir. 2005) _____ 2

*Gonzales v. Raich*,
  545 U.S. 1 (2005) _____ 2, 9

*Group Life & Health Ins. Co. v. Royal Drug Co.*,
  440 U.S. 205 (1979) _____ 15

**Statutes**

29 U.S.C §§ 1181 & 82_____ 16

42 U.S.C. § 1395dd_____ 13

1998 Kentucky Laws Ch. 496 (H.B. 315) _____ 5

Act of May 19, 1997, ch. 188, sec. 11, § 420-G:7, I(a) (2003) _____ 6

Ark. Code Ann. § 23-66-206(14)(G) (2009) _____ 12

Health Insurance Reform Act, ch. 79, sec. 9, Wash. Laws of 2000 _____ 7

Ky. Rev. Stat. Ann. § 304.17A-060(2)(A) (West 1994)_____ 5

Mass. Gen. Laws ch. 111M, §§ 1-5 _____ 4, 8

Mass. Gen. Laws ch. 176M, § 3(a)_____ 4, 8

N.H. Rev. Stat. Ann. § 420-G:6 (1994) _____ 5

N.J. Stat. Ann. § 17B:27A-22 (West) _____ 5

Okla. Stat. tit. 36, § 6060.10, 2010 _____ 12

Pub L. No. 111-148, 124 Stat. 119 (2010) _____ passim

Vt. Stat. Ann. tit. 8, § 4080B(d)(1) _____ 5

Wash. Rev. Code § 48.43.012(1) _____ 5

**Regulations**

11 N.C. Admin. Code 12.1900 et seq. _____ 12

**Legislative Materials**

Cong. Budget Office, Key Issues in Analyzing Major Health Proposals (2008) _____ 1, 13

S. Rep. No. 111-89 (2009) _____ 3

Statement of Sandy Praeger, Chair of the Health Insurance and Managed Care Committee,
    National Association of Insurance Commissioners, *Roundtable Discussion on Expanding
    Health Care Coverage: Hearing Before the Senate Finance Committee*, 111th Cong. (2009)  3

Statement of Jennifer Wittney Horton *Terminations of Individual Health Policies by Insurance
    Companies: Hearing Before the Subcomm. on Oversight and Investigations of the House
    Comm. On Oversight and Investigations*, 111th Cong. (2009) _____ 16

**Miscellaneous Materials**

Blumberg, Linda J., & John Holahan, *Do Individual Mandates Matter?,* Urban Institute, Jan.
    2008_____ 3

Committee on the Consequences of Uninsurance, Institute of Medicine, Health Insurance is a
    Family Matter (2002) _____ 13

Committee on Understanding Premature Birth & Assuring Healthy Outcomes, Institute of
    Medicine, Preterm Birth: Causes, Consequences, and Prevention (2007) _____ 11, 12

Crawford, E.D., et al, *A Retrospective Analysis Illustrating the Substantial Clinical & Economic
    Burden of Prostate Cancer*, 13 Prostate Cancer & Prostatic Diseases 162 (2010) _____ 14

Doty, Michelle M., et al., *Failure to Protect: Why the Individual Insurance Market is Not a
    Viable Option for Most U.S. Families*, Commonwealth Fund, July 21, 2009 _____ 16

*Focus on Health Reform: Glossary of Key Health Reform Terms*, Kaiser Family Found., Oct. 16,
    2009_____ 2

Fox, Kimberley, et al., Market and Regulatory Reforms to Expand Health Insurance Coverage
    (2002) _____ 8

Furnas, Ben, & Peter Harbage, *The Cost-shift from the Uninsured*, Center for Am. Progress,
    March 24, 2009 _____ 13, 14

Grady, Denise, *After Caesareans, Some See Higher Insurance Cost*, N.Y. Times, June 1, 2008 11

Gruber, Jonathan, *Getting the Facts Straight on Health Care Reform*, 361 New Eng. J. of Med. 2497 (2009) _____ 4

Gruber, Jonathan, Massachusetts Institute of Technology, The Senate Bill Lowers Non-Group Premiums: Updated for New CBO Estimates (2009) _____ 8, 9

Hall, Mark A., *An Evaluation of New York's Reform Law*, 25 J. Health Politics, Pol'y & L. 71 (2000) _____ 6, 7

Hall, Mark A., *An Evaluation of Vermont's Reform Law*, 25 J. Health Politics, Pol'y & L. 101 (2000) _____ 7

Himmelstein, David U., et al., *Medical Bankruptcy in the United Stats, 2007: Results of a National Study*, 122 Am. J. of Med. 741 (2007)_____ 15

Kirk, Adele M., *Riding the Bull: Experience with Individual Market Reform in Washington, Kentucky and Massachusetts*, 25 J. Heath Politics, Pol'y & L. 133 (2000) _____ 5, 7

Long, Sharon K., *On The Road To Universal Coverage: Impacts Of Reform In Massachusetts At One Year*, 27 Health Affairs w270 (2008) _____ 9

Madrian, Brigitte C., *Health Insurance and Job Mobility: Is There Evidence of Job-Lock?*, 109 Q. J. of Econ. 27 (1994) _____ 15

Maine Bureau of Insurance, *White Paper: Maine's Individual Health Insurance Market*, January 22, 2001_____ 5, 6, 7

Meropol, Neal J, & Kevin A. Schulman, *Cost of Cancer Care: Issues and Implications*, 25 J. Clinical Oncology 180 (2007) _____ 14

Monheit, Alan C., et al., *Community Rating and Sustainable Individual Health Insurance Markets in New Jersey*, 23.4 Health Affairs 167 (2004) _____ 6

National Women's Law Center, Nowhere to Turn: How the Individual Health Insurance Market Fails Women (2008) _____ 12

Obama, Barack, Presidential Address to a Joint Session of Congress (Sep. 9, 2009) _____ 16

Ostrom, Carol M., *Washington 'a Step Ahead' of Health Law*, Seattle Times, Apr. 1, 2010 ___ 8

Pollitz, Karen, et al.*, How Accessible is Individual Health Insurance for Consumers in Less-Than-Perfect Health?,* Kaiser Fam. Found., June 2001 _____ 11, 12, 16

Salganicoff, Alina, et al., *Women and Health Care: A National Profile*, Kaiser Fam. Found., Jul. 2005_____ 11

Sebastian, Christine et al., *Health Reform: Help for Americans with Pre-Existing Conditions*, Families USA, May 2010 _____ 10

Stroupe, Kevin T., et al., *Chronic Illness and Health Insurance Related-Job Lock*, 20 J. Pol'y Analysis & Mgmt. 525 (2001) _____ 15

Tu, Ha T., & Peter J. Cunningham, *Public Coverage Provides Vital Safety Net for Children with Special Health Care Needs*, Center for Studying Health Sys. Change, Sept. 2005 _____ 10

U.S. Census Bureau, 2010 Statistical Abstract: Income, Expenditures, Poverty & Wealth (2009) _____ 14

Wilper, Andrew P., et al., *Health Insurance and Mortality in US Adults*, 99 Am. J. Pub. Health 2289 (2009) _____ 17

## INTERESTS OF AMICI CURIAE

*Amici Curiae* are non-profit education and advocacy organizations that work nationwide to promote the independence and well-being of persons affected with a variety of health risks. *Amici* have long served these populations and encouraged awareness of their needs through litigation, administrative advocacy, legislative advocacy, and coalition-building. *Amici* are profoundly concerned about the impact the Court's decision may have on their clients' and constituencies' access to affordable health care and insurance. The interests of the *amici* are further set forth in the attached appendix ("Appendix A").

## SUMMARY OF ARGUMENT

The Patient Protection and Affordable Care Act, Pub L. No. 111-148, 124 Stat. 119 (2010) ("ACA"), is an integrated package of interdependent parts, designed by Congress to achieve near-universal health insurance coverage, § 1501(a)(2)(D), lower health insurance premiums, § 1501(a)(2)(H), and eliminate or reform an array of widespread practices by health insurance companies that deny, truncate, or otherwise limit coverage. Congress determined that these goals can only be achieved in concert with another provision requiring most Americans to carry a minimum level of insurance or pay a tax (hereafter, "minimum coverage provision").[1] § 1501(a)(2)(G). Both empirical studies and the experience of the states demonstrate that Congress was correct. Individuals who do not carry insurance are nonetheless participants in the health care market and, collectively, shift billions of dollars of costs onto third parties. Cong. Budget Office, Key Issues in Analyzing Major Health Proposals 114 (2008), *available at* http://www. cbo.gov/ftpdocs/99xx/doc9924/12-18-KeyIssues.pdf. The minimum coverage provision

---

[1] The Complaint asserts a challenge to the "individual mandate" of Section 1501 of the ACA and the ACA "as a whole." Compl. ¶ 20. The term "individual mandate" is not contained in the ACA. Subtitle F, Part I of the ACA is entitled "Individual Responsibility."  Section 1501 of that Part is entitled "Requirement to Maintain Minimum Essential Coverage."  We will forthwith refer to these provisions as the "minimum coverage provision."

addresses this cost-shifting and forms an essential part of the ACA's broader reforms. In particular, one of the most problematic of the insurance industry practices targeted by the ACA – the exclusion from coverage of persons with preexisting medical conditions – cannot be prohibited on an effective or sustainable basis without a minimum coverage provision.

As explained below, the ACA's minimum coverage provision is a necessary and proper means to ensure that the prohibition on the exclusion of persons with preexisting conditions from insurance plans – a practice having undeniably substantial effects on interstate commerce – achieves its intended result. Accordingly, the minimum coverage provision lies well within Congress's power to make all laws necessary and proper to the regulation of interstate commerce. *See Gonzales v. Raich*, 545 U.S. 1, 36 (2005) (Scalia, J., concurring) ("[W]here Congress has the authority to enact a regulation of interstate commerce, 'it possesses every power needed to make that regulation effective.'" (quoting *United States v. Wrightwood Dairy Co.*, 315 U.S. 110, 118 (1942)).

## ARGUMENT

### I.   CONGRESS DETERMINED WITH OVERWHELMING EMPIRICAL AND EXPERT SUPPORT THAT A MINIMUM COVERAGE PROVISION IS ESSENTIAL TO MAKE EFFECTIVE A PROHIBITION ON EXCLUSION FROM COVERAGE BASED ON PREEXISTING MEDICAL CONDITIONS

"Adverse selection" occurs when persons with a higher than average health risk disproportionately enroll in a given insurance plan. Currently healthy consumers will tend to delay the purchase of health insurance until they become ill or injured – thus forcing the insurance plan to pay them substantially more in benefits than they have previously paid in premiums, and increasing premiums for those who are insured. *See Fed. Ins. Co. v. Raytheon Co.*, 426 F.3d 491, 499 (1st Cir. 2005) (describing adverse selection as "insuring the building already on fire"). *See also Focus on Health Reform: Glossary of Key Health Reform Terms*,

Kaiser Family Found., Oct. 16, 2009, *available at* http://www.kff.org/healthreform/upload/7909.pdf. Adverse selection thus defeats the creation of a workable risk pool, wherein the risk of illness and injury is spread across a broad and varied population.

This phenomenon of adverse selection is severely aggravated when the government prohibits insurers from denying coverage outright to consumers with disabilities or preexisting conditions, Pub. L. No. 111-148, §2704. By itself, this prohibition would give consumers sharply increased economic incentives to refrain from purchasing insurance until they become seriously ill or injured – knowing that at that point insurers would be barred from turning them away. Congress recognized that, under such circumstances, premiums for insurance would rise so sharply that the requirement to accept individuals despite preexisting conditions could become unsustainable. *See* §§ 1501(a)(2)(G) & 5000A; *see also* S. Rep. No. 111-89, at 5 (2009) ("To ensure the insurance market reforms function properly, the [bill] would create a personal responsibility requirement for health care coverage[.]")

Congress' judgment was based on considerable and peer-reviewed evidence demonstrating that without an individual responsibility requirement, "many individuals will not choose to obtain coverage … [and] adverse selection will occur . . . ." Linda J. Blumberg & John Holahan, *Do Individual Mandates Matter?,* Urban Institute, Jan. 2008, *available at* http://www.urban.org/uploadedpdf/411603_individual_mandates.pdf. In hearings before Congress, testimony on behalf of the National Association of Insurance Commissioners noted that due to the "severe adverse selection" resulting from the "elimination of preexisting condition exclusions for individuals, State regulators can support these reforms to the extent they are coupled with an effective and enforceable individual purchase mandate and appropriate income-sensitive subsidies to make coverage affordable." *Roundtable Discussion on Expanding Health Care Coverage: Hearing*

*Before the Senate Finance Committee*, 111th Cong. 3 (2009) (statement of Sandy Praeger, Chair

of the Health Insurance and Managed Care Committee, National Association of Insurance

Commissioners). Indeed, "[w]ithout the individual mandate, fundamental insurance-market

reform is impossible[.]" Jonathan Gruber, *Getting the Facts Straight on Health Care Reform*,

361 New Eng. J. of Med. 2497, 2498 (2009), at http://healthcarereform.nejm.org/?p=2473. In

short, the success of the key goals of the legislation hinges on the minimum coverage provision.

As Virginia's Attorney General acknowledges in his complaint, this requirement is "an essential

element of the [ACA] . . . without which the statutory scheme cannot function." Compl. ¶ 5.

## II.   STATE HEALTH INSURANCE REFORM DEMONSTRATES THAT A MINIMUM COVERAGE PROVISION IS ESSENTIAL TO THE SUCCESS OF A BAN ON EXCLUDING FROM COVERAGE PATIENTS WITH PREEXISTING CONDITIONS

Congress' judgment that a minimum coverage provision is necessary is supported not

only by expert opinion, but also by the experience of states which have actually attempted to bar

health insurers from turning away prospective beneficiaries on the basis of preexisting medical

conditions.  Congress identified the Massachusetts health care reform experience as a model for

the ACA's individual responsibility provision requiring minimum coverage.  Pub L. No. 111-

148, § 1501(a)(2)(D).

The Massachusetts legislation utilizes the minimum coverage provision to offset the

possible repercussions of the law's ban on excluding from coverage people with preexisting

conditions. Mass. Gen. Laws Ch. Ch. 111M §§ 1–5; 176M § 2(c)(1) (Massachusetts). In contrast,

seven states which banned such exclusions or similar disadvantaged treatment of persons with

preexisting conditions but did not require minimum coverage have suffered from sky-rocketing

insurance premium costs, reductions in individuals with coverage, and reductions in insurance

products and providers.

A.     *State Bans on Excluding From Coverage People With Preexisting Conditions That Were Not Accompanied by a Minimum Coverage Provision Have Been Unsuccessful*

Kentucky, Maine, New Hampshire, New Jersey, New York, Vermont, and Washington enacted legislation that requires insurers to guarantee issue to all consumers in the individual market, but do not have a minimum coverage provision. *See* Ky. Rev. Stat. Ann. § 304.17A-060(2)(A) (West 1994) (Kentucky, repealed); Me. Rev. Stat. Ann. Tit. 24-A. § 2736-C(3) (Maine); N.H. Rev. Stat. Ann. § 420-G:6 (1994) (New Hampshire); N.J. Stat. Ann. § 17B:27A-22 (West) (New Jersey); NY CLS Ins § 3231, 3232 (New York); Vt. Stat. Ann. tit. 8, § 4080B(d)(1) (Vermont); Wash. Rev. Code § 48.43.012(1) (Washington). All of these laws have had detrimental effects on the insurance markets in those states, and raised costs for consumers.

"The departure of nearly all insurers from Kentucky's individual market is probably the most widely known aspect of its reforms." Adele M. Kirk, *Riding the Bull: Experience with Individual Market Reform in Washington, Kentucky and Massachusetts*, 25 J. Heath Politics, Pol'y & L. 133, 152 (2000) ("Riding the Bull"). By late 1996, only two providers were still selling new policies in Kentucky's individual market, and the most commonly cited reason given by the departing companies to explain their departure was the preexisting conditions provision. *Id.* at 152–53. Kentucky's reforms were eventually repealed in 1998. *See* 1998 Kentucky Laws Ch. 496 (H.B. 315)

Maine experienced a similar loss of insurance providers from its individual market after its preexisting conditions provision was enacted in 1993. A 2001 report found that 13 of 18 major carriers ceased issuing new policies to individuals during the eight years since the provision became law. Maine Bureau of Insurance, *White Paper: Maine's Individual Health Insurance Market*, January 22, 2001, at 8 ("White Paper"). The report had equally grim news

about the rate of premium increases in the state. Many insurance providers doubled their premiums in just three years or less, and all but one of the state's HMOs experienced "at least one rate increase of 25% or more in 1998 or 1999." *Id.* at 6, 7 & 10.

The same Maine report cited New Hampshire as a cautionary tale of a state whose individual indemnity market completely collapsed. According to the report,

> New Hampshire was nearly left with no carriers in the market when Blue Cross Blue Shield of New Hampshire announced it was withdrawing from the individual market. The New Hampshire Insurance Department took emergency measures to preserve the market. Under the system adopted through emergency rulemaking, and later by statute, all group health insurance and excess loss carriers in New Hampshire are assessed an amount (36 cents monthly in 2000) per covered person. Funds are distributed to individual carriers according to a formula designed to compensate those with large losses.

*Id.* at 5. In 2003, New Hampshire amended its law to permit preexisting conditions to be excluded for 9 months. Act of May 19, 1997, ch. 188, sec. 11, § 420-G:7, I(a) (2003).

After New Jersey's preexisting conditions provision took effect in 1993, that state's individual insurance market became plagued by skyrocketing premiums. Between 1996 and 2001, the cost of the most generous individual insurance plans rose by more than 350 percent. Alan C. Monheit et al., *Community Rating and Sustainable Individual Health Insurance Markets in New Jersey*, 23.4 Health Affairs 167, 169–70 (2004). Even HMO plans, which tend to resist premium increases, nearly doubled in price during this same timeframe. *Id.*

New York enacted preexisting condition provisions for the individual market in 1993. Consequently, the portion of non-elderly New Yorkers without insurance worsened from 16.5 percent in 1992 to 20 percent in 1997; while during the same period of time the national average of Americans without coverage worsened from 17.8 percent to 18.4 percent. Mark A. Hall, *An Evaluation of New York's Reform Law*, 25 J. Health Politics, Pol'y & L., 71, 76-77 (2000). New

York went from being ahead of the national average to well-behind the national average in just five years.

In addition, many of New York's insurers imposed dramatic premium increases, with Blue Cross' rates for individual indemnity coverage rising approximately 40 percent a year for the first two years after New York's law took effect. *Id.* at 84. A study of the New York individual market concludes that "[f]ollowing reform, the overall percentage of the population with insurance has worsened, and enrollment in the individual market has steadily diminished. Prices have increased substantially more than in other portions of the market, due to adverse selection." *Id.* at 97.

Like New York, Vermont saw substantial increases in premiums after its similar insurance reform measures took effect in 1993. Mark A. Hall, *An Evaluation of Vermont's Reform Law*, 25 J. Health Politics, Pol'y & L. 101, 115 (2000).

Severe consequences resulted from Washington's law. Within just a few years, non-managed care options disappeared entirely from the individual market. Riding the Bull at 140; White Paper at 5. Among HMOs in the individual market, "[t]he trend since 1994 has been toward higher deductible and/or more managed products as insurers have progressively closed lower deductible, less tightly managed products." Riding the Bull at 140. The state's only insurer in the individual policy market, Premera Blue Cross, stopped selling new individual policies. *Id.* By 2000, some Washington counties had no private individual coverage available at all. White Paper at 5.

In 1999, the Washington state legislature modified its law to permit insurers to deny coverage to certain high-risk consumers. Health Insurance Reform Act, ch. 79, sec. 9, Wash. Laws of 2000 12. Since these reforms went into effect in 2000, some major insurers have

returned to the individual market, but premiums in the individual market have fallen only slightly. [2] Kimberley Fox et al., Market and Regulatory Reforms to Expand Health Insurance Coverage 11 (2002), *available at* http://www.ofm.wa.gov/shpo/healthin/options/2002/ 415reforms.pdf.

As these seven states demonstrate, preexisting conditions provisions, absent a minimum coverage provision, are a failed experiment. At best, they result in premium increases. At worst, they can cause the total collapse of a state's individual insurance market. A provision that makes all individuals insurable regardless of medical condition cannot succeed without a minimum coverage provision.

B.      *Massachusetts Successfully Banned Excluding from Insurance Plans Patients With Preexisting Conditions by Requiring Minimum Coverage*

Where seven states have failed, the state of Massachusetts achieved impressive results by implementing reforms that are similar to the ACA. *See* Jonathan Gruber, Massachusetts Institute of Technology, The Senate Bill Lowers Non-Group Premiums: Updated for New CBO Estimates 1 (2009) ("Senate Bill Lowers"). Moreover, although the ACA reflects Congress' determination that a national solution was necessary to control rising costs in a nationwide $2.5 trillion health care market, Congress also cited Massachusetts' health reform as a model for part of that nation-wide solution. *See* Pub L. No. 111-148 § 10106(a).

In mid-2006, Massachusetts Governor Mitt Romney signed a health reform bill which, among other things, included a minimum coverage provision. Mass. Gen. Laws ch. 111M, § 1–5. Massachusetts law already had a preexisting conditions provision. Mass. Gen. Laws ch. 176M, §

---

[2] Some other aspects of Washington state's health reform have been successful.  Carol M. Ostrom, *Washington 'a Step Ahead' of Health Law*, Seattle Times, Apr. 1, 2010, http://seattletimes.nwsource.com/ html/localnews/2011504803_statehealthreform02m.html."

3(a). The results were both striking and immediate. Although nationwide individual premiums increased an average of 14 percent over the next few years, "the average individual premium in [Massachusetts] fell from $8537 at the end of 2006 to $5143 in mid-2009, a *40% reduction while the rest of the nation was seeing a 14% increase*." Senate Bill Lowers at 1 (emphasis in original). Likewise, during the first year that the Massachusetts law was in effect, "the share of all adults reporting out-of-pocket spending in excess of $500 dropped by about four percentage points under reform…." Sharon K. Long, *On The Road To Universal Coverage: Impacts Of Reform In Massachusetts At One Year*, 27 Health Affairs w270, w278 (2008). (Some of this effect can be attributed to the fact that the law also subsidized insurance coverage for some state residents.)

The lesson of Massachusetts and the other seven states is clear. Comprehensive health reform which includes a preexisting conditions provision must have an accompanying minimum coverage provision to be successful. Because a minimum coverage provision is essential to enacting the ACA's preexisting conditions provision, it falls squarely within Congress' authority under the Commerce and Necessary and Proper Clauses. Congress does not simply have the power to regulate interstate commerce, "'it possesses every power needed to make that regulation effective.'" *Raich*, 545 U.S. at 36 (Scalia, J., concurring in the judgment) (quoting *Wrightwood Dairy Co.*, 315 U.S. at 118–19.) Without the minimum coverage provision, the preexisting conditions provision will be more than just ineffective—it will be counterproductive.

III.   **THE BAN ON EXCLUDING FROM COVERAGE PEOPLE WITH PREEXISTING CONDITIONS, COMBINED WITH A MINIMUM COVERAGE PROVISION, RECTIFIES PERVASIVE INDUSTRY PRACTICES THAT GENERATE DIRECT AND SUBSTANTIAL ADVERSE EFFECTS ON INTERSTATE COMMERCE**

The prohibition on excluding from coverage persons with preexisting conditions,[3] combined with the minimum coverage provision, form part of a broader and carefully designed program to enhance affordability and access, and to provide both incentives and appropriate exemptions toward that end.  The combination of these two provisions will benefit tens of millions of Americans, as an estimated 57.2 million Americans under the age of 65 suffer from such a condition.  Christine Sebastian et al., *Health Reform: Help for Americans with Pre-Existing Conditions*, Families USA, May 2010, at 2, *available at* http://www.familiesusa.org/ assets/pdfs/health-reform/pre-existing-conditions.pdf ("Help for Americans").  This problem cuts across the entire U.S. population.  About 13.5 million children have special health needs,  Ha T. Tu & Peter J. Cunningham, *Public Coverage Provides Vital Safety Net for Children with Special Health Care Needs*, Center for Studying Health Sys. Change, Sept. 2005, at 1, *available at* http://www.hschange.com/CONTENT/778/778.pdf.  But preexisting conditions are most common among older Americans who, by virtue of their advanced age, are more likely to require the kind of expensive medical attention which health insurance is intended to cover.  Nearly half of all adults between the ages of 55 and 64 suffer from a preexisting condition, and thus could be denied insurance coverage absent the ACA's preexisting conditions provision.  Help for Americans at 3.  This provision can be expected to reduce health care costs, prevent medical bankruptcies, encourage fluidity in the job market, and eliminate the economic costs from thousands of deaths each year.

---

[3] The ACA's preexisting conditions provision does not take effect for adults until 2014.  Pub. L. No. 111-148 § 2001.

A.      *The Preexisting Conditions Provision Will Reduce Health Care Costs For Millions of Americans*

Many of the 57.2 million Americans with preexisting conditions currently can be denied coverage outright, forcing them to pay even catastrophic medical costs out-of-pocket.  *See* Karen Pollitz et al*., How Accessible is Individual Health Insurance for Consumers in Less-Than-Perfect Health?,* Kaiser Fam. Found., June 2001, at 31, *available at* http://www.kff.org/insurance/20010620a-index.cfm  ("How Accessible") (finding that insurers in the individual market consider certain conditions to be "uninsurable"). Indeed, even many people with very minor conditions can be denied coverage—one study found that individual insurers will deny coverage to a young, otherwise-healthy woman 8 percent of the time, simply because she suffers from hay fever.  *Id.* at 7.  Likewise, even temporary conditions such as pregnancy can be grounds for complete denial of care, *id.* at 19 n.27, potentially imposing enormous unanticipated costs on uninsured women, *see* Committee on Understanding Premature Birth & Assuring Healthy Outcomes, Institute of Medicine, Preterm Birth: Causes, Consequences, and Prevention 398 (2007) ("Preterm Birth") (estimating the total costs of medical treatment for preterm births alone to be $16.9 billion in 2005).

Indeed, the weight of preexisting condition exclusions falls particularly hard on women. Women are more likely than men to suffer from chronic conditions.  *See* Alina Salganicoff et al., *Women and Health Care: A National Profile*, Kaiser Fam. Found., Jul. 2005, at 8, *available at* http://www.kff.org/womenshealth/7336.cfm.  Insurance companies have denied coverage to women based solely on their history of having had a Cesarean section or required them to show proof of sterilization.  Denise Grady, *After Caesareans, Some See Higher Insurance Cost*, N.Y. Times, June 1, 2008, at A26, *available at* http://www.nytimes.com/2008/06/01/health/01insure.html. Survivors of domestic violence may also face preexisting condition coverage

11

denials, National Women's Law Center, Nowhere to Turn: How the Individual Health Insurance

Market Fails Women 8 (2008), *available at* http://nwlc.org/reformmatters/NWLCReport-

NowhereToTurn-WEB.pdf  ("Insurers in D.C. and the following nine states are allowed to deny

coverage to domestic violence survivors: Arkansas, Idaho, Mississippi, North Carolina, North

Dakota, Oklahoma, South Carolina, South Dakota, and Wyoming").[4]

Other individuals with preexisting conditions will be issued insurance, but only if they

agree to pay increased premiums, to accept a higher co-payment or deductible, to exclude their

preexisting condition from coverage, to accept an annual or lifetime cap on coverage, or all four.

How Accessible at i–iii & 24.  Insurers typically substantially limit the benefits available to

children with long-term health conditions.  Treatment such as rehabilitation services, for

example, is "usually limited to 3 months after an acute event that usually requires

hospitalization."  Preterm Birth at 459.

For Americans denied meaningful access to health insurance, every illness is a potential

brush with economic ruin.  Likewise, many Americans with disabilities or other preexisting

conditions find that, although they are technically able to purchase insurance, the increased cost

of covering their disability or condition effectively prices them out of the market. The

preexisting conditions provision will remove both of these dangers, also removing a substantial

burden to interstate commerce in the process.

B.    *Uninsured Individuals Receiving Free Care Drive Up Costs to Insured*
      *Individuals and Small Businesses*

Individuals remain uninsured for a variety of reasons.  Some cannot afford coverage,

some are denied coverage because of preexisting conditions, and some choose to forego

---

[4] Recently, three of these states have prohibited the practice of excluding survivors of domestic violence from coverage.  Arkansas: 2009 Ark. Acts 619, § 1 (amending Ark. Code Ann. § 23-66-206(14)(G) (2009)); Oklahoma: Act of June 7, 2010, Okla. Stat. tit. 36, § 6060.10, 2010 Okla. Sess. Laws 385 (effective Nov. 1, 2010); North Carolina: 11 N.C. Admin. Code 12.1900 *et seq.* (2010).

purchasing insurance in the hope that they will never require expensive medical treatment or that if they do, it will be available in any event.  Uninsured individuals seeking care for preexisting conditions or who have unexpected health care costs due to illness or injury can lead to increased costs for other, insured Americans.  This is because "[t]hose who are uninsured are less likely to get the care that they need when they need it and are more likely to delay seeking care—often until a condition becomes so serious that treatment can no longer be put off."  Help for Americans*, at 9; *see also* Committee on the Consequences of Uninsurance, Institute of Medicine, Health Insurance is a Family Matter 106 (2002) ("Uninsured children often receive care late in the development of a health problem or do not receive any care. As a result, they are at higher risk for hospitalization for conditions amenable to timely outpatient care and for missed diagnoses of serious and even life-threatening conditions.").

Under the Emergency Medical Treatment and Labor Act, 42 U.S.C. § 1395dd, however, a patient who allows his condition to deteriorate until it requires expensive treatment to stabilize must still receive treatment from most emergencies rooms even if he is unable to pay.  Cong. Budget Office, Key Issues in Analyzing Major Health Proposals 13 (2008).  These high costs of stabilizing a dangerous condition are then distributed to other consumers.

When an uninsured individual cannot afford to pay for the care that he or she receives, the cost of that care is passed along to those who are insured.  According to a recent study, this "hidden tax" on health insurance accounts for roughly 8 percent of the average health insurance premium.  Ben Furnas & Peter Harbage, *The Cost-shift from the Uninsured*, Center for Am. Progress, March 24, 2009, available at: http://www.americanprogressaction.org/issues/2009/03/pdf/cost_shift.pdf.  This cost-shift added, on average, $1,100 to each family premium in 2009 and about $410 to an individual premium.  In a high-cost state such as Florida, the cost-shift is

even greater, increasing annual average family premiums by $1,400 and individual premiums by $510 per year.  *Id.*

For those who can afford health insurance coverage, and choose not to purchase care, the decision to remain uninsured is clearly an economic activity.  Those who have resources and intend to self-insure cannot, in all cases guarantee that when faced with a life-threatening illness or traumatic injury, that they will have the resources to bear 100 percent of their health care costs. According to a recent study, the cost of active treatment for prostate cancer had an average 2-year cost of $59,286.  E.D.Crawford et al., *A Retrospective Analysis Illustrating the Substantial Clinical & Economic Burden of Prostate Cancer*, 13 Prostate Cancer & Prostatic Diseases 162 (2010).  For colorectal cancer patients, the cost of treatment can exceed hundreds of thousands of dollars.  The cost of drugs alone can range from $150,000 to $200, 000 for a course of treatment.  Neal J. Meropol & Kevin A. Schulman, Kevin, A., *Cost of Cancer Care: Issues and Implications*, 25 J. Clinical Oncology 180 (2007), *available at* http://dceg.cancer.gov/ files/genomicscourse/meropol-011007.pdf.  By comparison, U.S. Census Bureau data shows, median household income for 2007 at $50,740, and median household net worth in 2007 was $120,300. U.S. Census Bureau, 2010 Statistical Abstract: Income, Expenditures, Poverty & Wealth (2009), available at http://www.census.gov/compendia/statab/cats/income_expenditures_ poverty_wealth.html (last visited June 11, 2010). By enhancing access to insurance, the preexisting conditions provision increases the likelihood that patients will seek treatment early, and thus will not pass on elevated costs to other consumers.

C.    *The Preexisting Conditions Provision Will Reduce Medical Bankruptcies*

At its core, health insurance exists to "distribute[] risk" away from an individual unfortunate enough to be struck with an expensive illness or injury and spread these costs among

14

a large pool of individuals. *Group Life & Health Ins. Co. v. Royal Drug Co.*, 440 U.S. 205, 239

(1979). Without access to insurance, persons with preexisting conditions are constantly at risk of

being struck by an unpredictable and unaffordable hospital bill, forcing them to declare

bankruptcy in the face of medical debt.

In enacting the ACA, Congress found that "[h]alf of all personal bankruptcies are caused

in part by medical expenses," Pub L. No. 111-148, § 1501(a)(2)(E). One study estimates that

"62.1% of all bankruptcies have a medical cause," and the share of bankruptcies attributable to

such causes increased by 50 percent between 2001 and 2007. David U. Himmelstein et al.,

*Medical Bankruptcy in the United Stats, 2007: Results of a National Study*, 122 Am. J. of Med.

741, 742 (2007). By increasing access to health insurance, the preexisting conditions provision

will reduce the number of Americans hit by catastrophic medical bills, thus decreasing the

substantial burden medical bankruptcies impose on interstate commerce.

> D.      *The Preexisting Conditions Provision Will Reduce "Job Lock"*

Absent the preexisting conditions provision, thousands of American workers will forego

an opportunity to start a business, join a smaller company, or otherwise pursue a new job

opportunity because of fear that they will be unable to obtain health insurance if they leave their

current job. According to one empirical study, this "job lock" phenomenon "accounts for a 25–

30 percent reduction in [job] mobility." Brigitte C. Madrian, *Health Insurance and Job Mobility:*

*Is There Evidence of Job-Lock?*, 109 Q. J. of Econ. 27, 43 (1994); *see also* Kevin T. Stroupe et

al., *Chronic Illness and Health Insurance Related-Job Lock*, 20 J. Pol'y Analysis & Mgmt. 525,

525 (2001) (finding that workers with chronic illnesses or a family member with chronic illness

are 40 percent less likely to voluntarily leave a job which provides health benefits than a

similarly-situated healthy worker with a healthy family). Moreover, Congress was well aware of

job lock when it was debating the ACA. *See Terminations of Individual Health Policies by Insurance Companies: Hearing Before the Subcomm. on Oversight and Investigations of the House Comm. On Oversight and Investigations*, 111th Cong. (2009) (statement of Jennifer Wittney Horton) ("I have had to take jobs that I do not want, and put my career goals on hold to ensure that I can find health insurance."); President Barack Obama, Address to a Joint Session of Congress (Sep. 9, 2009) ("More and more Americans worry that if you . . . change your job, you'll lose your health insurance too.").

Although group health plan participants with preexisting conditions typically have the benefit of policy terms that provide some protections against exclusion, pursuant to federal statutory requirements, *see* 29 U.S.C §§ 1181 & 82, the individual insurance market has not been regulated in this way. Accordingly, for millions of Americans with preexisting conditions, the only way to ensure access to quality and affordable health care is to receive insurance through an employer. *See* How Accessible at 19 n.27 (finding that insurers in the individual market consider certain conditions to be "uninsurable").

Entrepreneurs and small businesses are the hardest hit by job lock. According to one study, "[e]mployers are responding to rising health care costs and declining economic growth by dropping coverage altogether, or by shifting to less-generous benefit plans . . . ." Michelle M. Doty et al., *Failure to Protect: Why the Individual Insurance Market is Not a Viable Option for Most U.S. Families*, Commonwealth Fund, July 21, 2009, at 1, *available at* http://www. commonwealthfund.org/Content/Publications/Issue-Briefs/2009/Jul/Failure-to-Protect.aspx ("Failure to Protect"). More than three quarters of workers who are forced into the individual insurance market are either self-employed or worked in firms with fewer than 20 workers. *Id.* at 3.

Thus, excluding individuals with preexisting conditions from coverage stifles entrepreneurship; it leads workers to choose large employers over promising young companies; it forces workers to limit their career path to jobs which offer health benefits; and it discourages workers from going where their talents lead them.  By eliminating such exclusions in the individual market, the ACA will significantly reduce—if not eliminate altogether—these substantial burdens to interstate commerce.

     E.      *The Preexisting Conditions Provision Will Reduce Preventable Deaths*

Finally, and most tragically, a recent Harvard Medical School study found that nearly 45,000 deaths every year are associated with a lack of health insurance.  Andrew P. Wilper et al., *Health Insurance and Mortality in US Adults*, 99 Am. J. Pub. Health 2289, 2295 (2009).  Beyond the terrible human tragedies of each of these deaths, this figure represents tens of thousands of workers whose productive lives are cut short, often leaving their families without a source of income.  By increasing access to lifesaving health insurance, the preexisting conditions provision would prevent many of these tragic deaths, removing a substantial burden on interstate commerce.

**CONCLUSION**

For these reasons, *amici* respectfully submit that the Court should grant defendants' Motion to Dismiss.

Dated:  June 17, 2010                    Respectfully submitted,


                                         /s/ Angela H. France
                                         Angela H. France
                                         VSB # 46862
                                         H. Scott Johnson, Jr.
                                         VSB # 41586
                                         PCT Law Group, PLLC
                                         1725 Duke Street, Suite 240
                                         Alexandria, VA 22314
                                         (703) 881-9141
                                         afrance@pctlg.com
                                         sjohnson@pctlg.com
                                         *Counsel of Record*

                                         Ian Millhiser*
                                         Center for American Progress
                                         1333 H St., NW, 10th floor
                                         Washington, DC 20005
                                         (202) 481-8228
                                         imillhiser@americanprogress.org

                                         Rochelle Bobroff*
                                         Simon Lazarus*
                                         Sergio E. Munoz*
                                         Federal Rights Project
                                         National Senior Citizens Law Center
                                         1444 I St., NW, Suite 1100
                                         Washington, DC 20005
                                         (202) 289-6976
                                         rbobroff@nsclc.org
                                         slazarus@nsclc.org
                                         smunoz@nsclc.org

                                         * Not admitted in this Court

                                         *Attorneys for Amici Curiae*

18

## CERTIFICATE OF SERVICE

I hereby certify that on June 17, 2010, I electronically filed the foregoing by using the

CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will

be accomplished by the CM/ECF system.


Date: June 17, 2010

/s/ Angela H. France
Angela H. France
VSB # 46862
H. Scott Johnson, Jr.
VSB # 41586
PCT Law Group, PLLC
1725 Duke Street, Suite 240
Alexandria, VA 22314
(703) 881-9141
afrance@pctlg.com
sjohnson@pctlg.com
*Counsel of Record*

*Attorneys for Amici Curiae*

**APPENDIX A**

**INDIVIDUAL STATEMENTS OF INTEREST**
**OF *AMICI CURIAE***

**The March of Dimes** ("Foundation") is a national voluntary health agency founded in

1938 by President Franklin D. Roosevelt to conquer polio.  Today, the Foundation works to

improve the health of women of childbearing age, infants and children by preventing birth

defects, prematurity and infant mortality through research, community services, education, and

advocacy. The Foundation is a unique collaboration of scientists, clinicians, parents, members of

the business community, and other volunteers affiliated with 51 chapters in every state, the

District of Columbia, and Puerto Rico.  The March of Dimes is deeply concerned with the impact

the Court's decision will have on access to health coverage for women of childbearing age

(particularly those at risk for a complicated pregnancy), infants and children (especially those

with special health care needs such as conditions associated with preterm birth and birth defects).

**The American Association of People with Disabilities** ("AAPD") is the country's

largest cross-disability membership organization working to organize the disability community

to be a powerful voice for change -- politically, economically, and socially.  Since 1995, through

its programs and policy and legislative advocacy, AAPD has worked to make the goals of the

Americans with Disabilities Act -- equal opportunity, full participation, economic self-

sufficiency and independent living -- a reality for all individuals with disabilities.  AAPD is

extremely concerned about the impact that the Court's decision may have on its members and all

Americans with disabilities' access to health insurance.

**The Arc of the United States** ("Arc") is a national non-profit organization founded in

1950 to advocate on behalf of and improve the daily lives of individuals with intellectual and

developmental disabilities and their families. Through its over 140,000 members and more than

1

730 state and local chapters across the nation, the Arc is devoted to protecting the rights of people with intellectual and developmental disabilities and promoting and improving supports and services for them and their families. Recognizing the critical importance of health care coverage for all, the Arc has worked for many years for the elimination of exclusions from health insurance based on preexisting conditions. By definition, people with intellectual and developmental disabilities have preexisting conditions. People with intellectual and developmental disabilities are often the victims of these exclusionary practices, losing or being denied health coverage due to their preexisting condition of intellectual or developmental disability regardless of actual health status.

**Breast Cancer Action** ("BCA") is a national education and advocacy organization that carries the voices of people affected by breast cancer to inspire the changes necessary to end the breast cancer epidemic. BCA has over 30,000 members throughout the United States.  The majority of our members are living with a breast cancer diagnosis, or at high risk for developing the disease. One of BCA's goals is to ensure that patients' interests come first in health care policy.  Once a person has been diagnosed with breast cancer, or found to have a genetic predisposition to the disease, she or he is classified by the insurance industry as having a preexisting condition. This classification increases the likelihood that the individual will be unable to obtain health insurance, or only able to obtain coverage at a very high cost.  As a result, many people with or at risk from breast cancer are locked into jobs that provide health care coverage, or are confronted with a serious risk of medical bankruptcy if they leave their jobs, lose insurance coverage, and get sick or sick again.  The high cost of breast cancer treatments make it essential that people with and at risk for breast cancer be able to get insurance coverage

irrespective of preexisting conditions.  BCA's members will be seriously adversely affected if any of the ACA's elements are invalidated.

**Families USA** is the national organization for health care consumers. It is a nonprofit, nonpartisan organization dedicated to the achievement of high-quality, affordable health coverage and care for all Americans. For the past 28 years, Families USA has led various coalition efforts designed to expand health coverage for American families.  The expansion of coverage under the ACA is a central component of ensuring affordable health coverage and care for millions of Americans who are currently unable to obtain affordable insurance. Families USA therefore has a strong interest in ensuring the successful implementation of the ACA.

The **Family Violence Prevention Fund** ("FVPF") is a national nonprofit organization that works to end violence against women and children. The FVPF mobilizes concerned individuals, children's groups, allied professionals, women's rights, civil rights, and other social justice organizations to join the campaign to end violence through public education/prevention campaigns, public policy reform, model training, advocacy programs, and organizing.  For more than a decade, the Family Violence Prevention Fund's groundbreaking and highly successful National Health Initiative on Domestic Violence has been improving the health care response to domestic violence through public policy reform and health education and prevention efforts.  The FVPF has particular interest in the elimination of insurance discrimination against individuals with disabilities or preexisting conditions.   Before the Patient Protection and Affordable Care Act was signed, there were no laws prohibiting insurance companies in several states and the District of Columbia from discriminating against victims by declaring domestic violence, or a medical condition caused by domestic violence, to be a preexisting condition. Access to health care is critical for domestic violence victims and the FVPF joins with *amici* in support of the

3

minimum coverage requirement as an effective and fiscally viable mechanism to sustain the elimination of insurance discrimination against individuals with preexisting medical conditions.

**Friends of Cancer Research** ("Friends") is a non-profit cancer research think tank that advocates for the advancement of biomedical research. Working with the entire cancer research and advocacy community, Friends is dedicated to overcoming the barriers standing between patients and the most promising cancer treatments. Friends is seriously concerned about the impact that the Court's decision will have on access to affordable, quality care for cancer patients and Americans with increased risk for cancer.

**Mental Health America** ("MHA"), previously known as the National Mental Health Association, is a non-profit consumer/patient advocacy organization that is dedicated to improving access to quality behavioral health services for all Americans. MHA has over three hundred affiliates across the United States and has been committed to improving mental health care and addiction treatment and promoting mental wellness for over one hundred years. Mental health and addiction treatment have historically been subject to blatantly discriminatory limits on coverage through private insurance plans that block access to effective and critically needed therapies. Moreover, a large proportion of currently uninsured individuals are in need of mental health care and/or addiction treatment but are without adequate means to access these services. Thus, MHA supports implementation of the new minimum coverage and prohibition on denials of coverage based on preexisting medical conditions provisions as fundamental components of the new federal initiative to provide health insurance coverage to the uninsured and underinsured.

The **National Breast Cancer Coalition** ("NBCC") is a non-profit organization that is dedicated to ending breast cancer through the power of grassroots action and advocacy. NBCC

increases funding for breast cancer research; monitors how those funds are spent; expands access to quality health care for all; and ensures that trained advocates influence all decision making that impacts breast cancer. NBCC is deeply concerned about the impact that the Court's decision may have on access to health insurance for the women and men with or at risk for breast cancer.

The **National Organization for Rare Disorders** ("NORD") is a non-profit organization that advocates for the nearly 30 million men, women, and children in the United States affected by the estimated 7,000 known rare diseases. Since 1983, NORD has served as their primary representative providing advocacy, information and referrals, networking, mentoring, and other services to help patients, their families, and rare disease patient organizations. NORD is deeply concerned about the impact that the Court's decision may have on rare disease patients' access to health insurance.

The **National Partnership for Women & Families** ("National Partnership") is a nonprofit, nonpartisan organization that uses public education and advocacy to promote access to quality, affordable health care, work and family policies, and fairness in the workplace. The National Partnership has devoted significant resources to ensuring that women and their families have reliable affordable health care, comprehensive coverage including the full range of reproductive health services, access to health professionals who deliver the highest quality of care, and protection against unfair insurance market practices that create barriers to obtaining or keeping health insurance.

**National Patient Advocate Foundation** represents the interest of patients served by Patient Advocate Foundation which provides case management services to individuals with chronic, life-threatening or debilitating conditions.  National Patient Advocate Foundation has

led an advocacy effort to eliminate pre-existing conditions waiting periods and exclusions in all insurance markets since 2006.

The **National Senior Citizens Law Center** ("NSCLC") is a non-profit organization that advocates nationwide to promote the independence and well-being of low-income older persons and persons with disabilities. For more than 35 years, NSCLC has served these populations through litigation, administrative advocacy, legislative advocacy, and assistance to attorneys in legal aid programs.  NSCLC's *Herbert Semmel Federal Rights Project* works to ensure that courts uphold rights provided and protected by federal laws. NSCLC is profoundly concerned about the impact that the Court's decision may have on its clients' access to health insurance.

**The National Women's Law Center** ("NWLC") is a non-profit legal advocacy organization that that has been working since 1972 to advance and protect women's legal rights. Women have long faced great difficulty obtaining comprehensive, affordable health coverage due to harmful and discriminatory health insurance industry practices.   NWLC is profoundly concerned about the impact that the Court's decision may have on women's access to health insurance.

The **Ovarian Cancer National Alliance** is the nation's leading ovarian cancer advocacy organization.  As the Washington, D.C. arm of the ovarian cancer movement, the Ovarian Cancer National Alliance works to save women's lives through education, awareness, and advocacy.  The health care system plays an integral role in early detection and treatment of ovarian cancer, and in turn, saving women's lives. The Ovarian Cancer National Alliance stands ready to work with Congress, the Administration, and others in the community to increase access to health care and health insurance coverage, improve the nation's health care system, and work

6

to ensure that the nation's scarce resources are allocated to ensure the provision of quality, evidence-based, outcomes driven, comprehensive care for all patients in need.

**Raising Women's Voices for the Health Care We Need** ("RWV") is a national initiative working to make sure women's voices are heard in the health reform debate and women's concerns are addressed by policymakers developing national and state health reform plans. RWV has a special focus on engaging women of color, low-income women, immigrant women, young women, women with disabilities and members of the lesbian, gay, bisexual, and transgender community. In addition to bringing the concerns of these constituencies to federal advocacy forums, RWV has 22 regional coordinators in 19 states who do community organizing, advocacy, and public education with women at the state and local levels. RWV and the women we represent are particularly concerned with the challenge to the prohibition on health insurance exclusions for preexisting conditions that was included in the new health reform law because insurers have denied coverage to women on the basis of such preexisting conditions as pregnancy, having had a previous c-section delivery, being a breast cancer survivor, and having been a victim of domestic violence as well as chronic conditions such as asthma and diabetes.

**United Cerebral Palsy** is one of the oldest and largest national organizations dedicated to improving the lives of people with disabilities.  Founded in 1949, the organization advances the independence, productivity, and full citizenship of people with disabilities through a network of 94 affiliates in 34 states and the District of Columbia, serving over 176,000 children and adults every day.  United Cerebral Palsy was a major leader in supporting enactment of the Patient Protection and Affordable Care Act.