## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

| | | |
|---|---|---|
| **COMMONWEALTH OF VIRGINIA EX REL. KENNETH T. CUCCINELLI, II,** in his official capacity as Attorney General of Virginia, <br><br> Plaintiff, <br><br> v. <br><br> **KATHLEEN SEBELIUS** Secretary of the Department of Health and Human Services, in her official capacity, <br><br> Defendant. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | No. 3:10-cv-00188-HEH |

### BRIEF AMICUS CURIAE OF LANDMARK LEGAL FOUNDATION IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

/s/ William H. Hurd  (VA Bar #16967)
Ashley L. Taylor, Jr. (VA Bar #36521)
Timothy J. St. George  (VA Bar #77349)
TROUTMAN SANDERS LLP
1001 Haxall Point
Richmond, VA 23219
(804) 697-1286
(804) 698-6018 (facsimile)
Local Counsel

Mark R. Levin*
Michael J. O'Neill*
Landmark Legal Foundation
19415 Deerfield Ave
Suite 312
Leesburg, VA 20176
(703) 554-6100
(703) 554-6119 (facsimile)
(703) 554-6119

Richard P. Hutchison
Landmark Legal Foundation
3100 Broadway
Suite 1210
Kansas City, MO 64111
816-931-1175
816-931-1115 (Facsimile)

Attorneys for Amicus Curiae
* - Not admitted in this court

# TABLE OF CONTENTS

Table of Contents.................................................................................................... ii

Table of Authorities............................................................................................... iii

Argument.................................................................................................................. 1

   I.  OVERVIEW........................................................................... 1

   II.  ARGUMENT........................................................................ 3

     A.  The PPACA's Individual Insurance Mandate Is An Unprecedented And Unconstitutional Police Power Impermissible Under Either The Commerce Clause Or The Necessary And Proper Clause....................................... 3

        1.  The Commerce Clause In Historical Context.............................. 3

        2.  The Individual Mandate Violates The Commerce Clause................. 5

            a.  Commerce means commerce............................................... 5

            b.  The Insurance Mandate is an Impermissible Police Power............ 7

     B.  There Is No Historical Support For The Proposition That Congress May Compel Private Individuals To Engage In Commerce With Other Private Parties...................................................................................... 8

     C.  The Supreme Court's Commerce Clause And Necessary And Proper Clause Jurisprudence Does Not Support the Proposition That Congress May Compel Private Individuals To Engage In Commerce.................................. 9

        1.  The Individual Mandate Cannot Survive Commerce Clause Scrutiny... 9

        2.  The Individual Mandate Does Not Satisfy the Necessary and Proper Clause............................................................................10

            a.  The Necessary and Proper Clause is Restrained....................11

            b.  *United States v. Comstock* Reaffirms Limits on Necessary and Proper Clause..........................................................12

            c.  The Individual Mandate Fails *Comstock's* Five Part Test.........14

     D.  PPACA Impermissibly Infringes Personal Liberty................................. 15

E.  Virginia Has Standing To Challenge The PPACA, Which Infringes
Impermissibly On The Commonwealth's Sovereignty...........................16

III. CONCLUSION............................................................................  19

## TABLE OF AUTHORITIES

**Cases**
*Brennan v. Titusville*, 153 U.S. 289 (1894) ................................................................. 7
*Garcia v. San Antonio Metropolitan Transit Authority*, 469 U.S. 528 ......................... 8
*Gonzales v. Raich*, 545 U.S. 1 (2005) ................................................... 12, 13, 16
*Helvering v. Davis*, 301 U.S. 619 (1937) ............................................................ 10
*McCullough v. Maryland*, 4 Wheat. 316 (1819) ............................................ 14, 17
*Massachusetts v. Mellon*, 262 U.S. 447 (1923) ............................................ 21, 22
*New York v. United States*, 505 U.S. 144 (1992) ........................................... 8, 14
*Printz v. United States*, 521 U.S. 898 (1997) ...................................................... 14
*Railroad Co. v. Fuller* 84 U.S. (17 Wall.) 568 (1873) ........................................... 7
*United States v. Comstock*, 560 U.S. ___ (2010), 2010 Lexis 3879 ...................... *passim*
*United States v. Darby*, 312 U.S. 100 (1941) ..................................................... 12
*United States v. Lopez*, 514 U.S. 549 (1995) ............................................... *passim*
*United States v. Morrison*, 529 U.S. 598 (2000) ............................................. 10, 11
*Wickard v. Filburn*, 317 U.S. 111 (1942) ...................................................... 2, 11

**Constitution and Statutes**
Art. I, Sec. 8 Commerce Clause ............................................................... *passim*
Art. I, Sec. 8 Necessary and Proper Clause ................................................. *passim*
Patient Protection and Affordable Care Act, Pub. L. No. 111-148, Section 1501, 124 Stat. 119
 (2010) ............................................................................................................. 3

**Other Authorities**
Black's Law Dictionary (5th Ed. 1984) .............................................................. 6, 7
Randy E. Barnett, *Is the Rehnquist Court an "Activist" Court? The Commerce Clause Cases*, 73
 U. Colo. L. Rev. 1275 (2002) .......................................................................... 8
Randy E. Barnett, *The Original Meaning of the Commerce Clause*, 68 U.Chi.L.Rev. 101, 116
 (2001) .......................................................................................................... 5, 6
Robert H. Bork and Daniel E. Troy, *Locating the Boundaries: The Scope of Congress's Power to
 Regulate Commerce*, 25 Harv. J.L. & Pub. Pol'y 849, 858 (2002) ...................... 4, 6
Milton Friedman, *Capitalism and Freedom*, University of Chicago Press (2002) .............. 19
James Madison, "Letter to Edmund Pendleton, January 21, 1792," *The Papers of James
 Madison*, ed. Robert A. Rutland et al., vol. 14 (Charlottesville: University Press of Virginia,
 1984) ............................................................................................................ 20
The Federalist No. 7 ........................................................................................... 4
The Federalist No. 32 .................................................................................... 20, 21
The Federalist No. 33 ........................................................................................ 3
The Federalist No. 39 ....................................................................................... 15
Webster's II New Riverside Dictionary (Houghton Mifflin Company, 1996) .................. 7

## ARGUMENT

### I.   OVERVIEW

This case is about individual liberty, state sovereignty and federalism.  The federal government's memorandum in support of its motion to dismiss the Commonwealth of Virginia's challenge to the Patient Protection and Affordable Care Act, Pub. L. No. 111-148, Section 1501, 124 Stat. 119 (2010) (PPACA)'s individual mandate eviscerates 230 years of constitutional understanding and Supreme Court Commerce Clause jurisprudence, fundamentally misapprehends the Necessary and Proper Clause and is most decidedly not an application of federal power that advances the General Welfare of the People.  Amicus Curiae Landmark Legal Foundation ("Landmark")[1] urges the court to accept this brief, which presents a unique and valuable perspective not found in the Parties' briefs.

The Commerce Clause is written in uncomplicated, plain English.  It states that "[Congress shall have power] To regulate Commerce with foreign Nations, and among the several States, and with the Indian tribes[.]"  It does not say what the government wishes it said, i.e., that Congress shall have the power to compel individuals to participate in commerce, to compel individuals to enter into private contracts with other individuals, or to compel individuals to purchase goods or services they neither desire nor need.  Such an approach to governance would have been utterly foreign and repulsive to the Framers.

Congress can tax interstate commerce, it can regulate interstate commerce, it can even prohibit certain types of interstate commerce, but it cannot compel an individual to enter into a legally binding private contract against the individual's will and interests.  There is nothing in the

---

[1] This amicus curiae brief is filed upon motion for leave to file.  Plaintiff consents to Movant's participation.  Defendant takes no position on Movant's motion for leave to file amicus brief.

history of this nation, let alone the history of the Constitution and the Commerce Clause in particular, that endorses such a radical departure from precedent, law, and logic by this Congress and Executive. Moreover, the federal government urges this Court in the alternative to embrace a congressional effort to bootstrap through the Necessary and Proper Clause an impermissible national police power under the guise of a "comprehensive regulatory program."2

This Court must not bend to the demands of temporary politicians who seek to change fundamentally and permanently the relationship between the citizen and government in a manner that no past Congress or Executive have undertaken and which the Constitution clearly does not grant.

---

2 The federal government's flagship case, *Wickard v. Filburn*, 311 U.S. 111 (1942) in no way supports the PPACA's individual mandate. In fact, it underscores its unconstitutionality. In that case, the government did not mandate a farmer to grow wheat. It sought to regulate the wheat the farmer, with his own free will, chose to grow. Herein lies the obstacle the government cannot overcome. Under the federal government's logic, what would stop the government from compelling a farmer to grow wheat or to grow corn or to raise livestock or to undertake some other activity he has no intention of pursuing? Indeed what would stop the federal government from compelling an individual to participate in agricultural activities or any other private activities? And once unleashed, what are the limits to this new, unconstitutional grant of power? Perhaps this Court will make such an inquiry of the government.

II.     **ARGUMENT**

   A.     **The PPACA's Individual Insurance Mandate Is An Unprecedented And Unconstitutional Police Power Impermissible Under Either The Commerce Clause Or The Necessary And Proper Clause.**

   Nowhere in the historical record is there any indication whatsoever that the Framers of the Constitution ever contemplated the federal government having the power under the Commerce Clause -- or any other clause -- to compel a citizen to purchase a good or service from another citizen or private entity.   There is absolutely nothing to support the government's claimed authority. Nothing.

   Yet the federal government asks this Court to dismiss the Commonwealth of Virginia's complaint, arguing that the law is so obviously in Defendant's favor that the Commonwealth fails to state a claim.   The federal government is wrong, its arguments are misplaced and its motion to dismiss is unsupported by law or fact.   The Complaint states a claim, the Commonwealth has standing, and this controversy is ripe for the Court's consideration.

   1.     **The Commerce Clause in Historical Context.**

   The United States of America were on the brink of financial disaster in the wake of the Revolutionary War.   The central government was largely without substantive authority and in disarray.   With the Articles of Confederation ineffective in practice, leaders from the several states gathered in Philadelphia at the Federal Convention of 1787 to address the Articles' many defects.   Chief among their concerns was dealing with Confederacy's inability to effectively construct a stable national economy.   Four "grand committees" were created to consider the most pressing matters – of these committees two dealt with commerce.   See Robert H. Bork and Daniel E. Troy, Locating the Boundaries: The Scope of Congress's Power to Regulate Commerce, 25 Harv. J.L. & Pub. Pol'y 849, 858 (2002).   Bork and Troy provide important

historical context for the economic and political climate of the day and its influence on the

Framers' drafting of the Commerce Clause.

> The American Revolution dramatically altered the regulation of the internal and external commerce of the colonies. Before the Declaration of Independence, Britain regulated and monitored trade among the colonies. When this regulation was eliminated, and no real power took its place under the Articles, uncertainty and retaliatory trade barriers begin to spread among the States. Many States passed laws interfering directly with commerce, including port fees, taxes, and exclusionary trade laws.
>
> The political effect of the increasing tension between various States led some to fear that unregulated commercial warfare would turn to interstate war. "Border quarrels" had already erupted, and more could be expected.   "It is not at all probable," Hamilton argued, that:
>
>> [the] unbridled spirit [of enterprise] would pay much respect to those regulations of trade by which particular States might endeavor to secure exclusive benefits to their own citizens. The infractions of these regulations, on one side, the efforts to prevent and repel them, on the other, would naturally lead to outrages, and these to reprisals and wars.

*Id.* at 855-56 (quoting The Federalist No. 7, at 31 (Alexander Hamilton) (Clinton Rossiter ed., 1999))

It was in this context – the elimination of trade barriers between and among the states -- that the Framers drafted the Commerce Clause.  It had absolutely nothing to do with mandating an individual's participation in commerce by compelling an individual to enter into a private, legally binding contract against his will.   And it is on this basis alone that the Court must conclude that the federal government's argument that commercial inactivity constitutes commercial activity under the Commerce Clause is without any merit.

2.      **The Individual Mandate Violates The Commerce Clause.**

a.      **Commerce means commerce.**

Article I, Section 8 of the Constitution provides that "The Congress shall have Power . . . To regulate Commerce with Foreign Nations, and among the several States, and with the Indian Tribes." At the time the Constitution and its Commerce Clause were framed and ratified, "'commerce' consisted of selling, buying, and bartering, as well as transporting for these purposes." *United States v. Lopez*, 514 U.S. 549, 585 (1995) (Thomas, J. concurring.) Not only was the customary meaning of "commerce" well understood, the Framers' usage of the term is well documented. "Having examined every use of the term 'commerce' that appears in the reports of the state ratification conventions, I found that the term was uniformly used to refer to trade or exchange rather than all gainful activity." Randy E. Barnett, *The Original Meaning of the Commerce Clause*, 68 U.Chi.L.Rev. 101, 116 (2001). "Commerce" was ascribed the same meaning as "trade." *Id.* at 115-125.[3]

As Bork and Troy concluded very clearly from the historical record *"[i]n short, 'commerce' does not seem to have been used during the founding era to refer to those acts that precede the act of trade.* Interstate commerce seems to refer to interstate trade – that is, commerce is 'intercourse for the purposes of trade in any and all forms, including the transportation, purchase, sale, and exchange of commodities between the . . . citizens of different

---

[3] "Virginia wins the prize for the most mentions of the word: seventy-four. Here, as elsewhere, there is not a single instance of 'commerce' being used unambiguously in the broader sense. To the contrary, the most striking evidence is the dominance of a conception of commerce that is even narrower than 'trade' or 'exchange'--also manifested by Pinckney's reference in the South Carolina debates to 'privileges with regard to shipping.' In Virginia, I count at least seventeen references that link 'commerce' in some way to ports, shipping, navigation, or the 'carrying trades.' In other words, on these occasions, the term 'commerce' is limited to conveying or transporting the articles of trade, rather than to the entire act of trading." Barnett, at 121.

States." Bork and Troy, 25 Harv. J.L. & Pub. Pol'y, at 864 (internal citations omitted; emphasis added in part.)

Of course, each of these concepts constitutes *interactions* consisting of *activity* freely engaged in by individuals in the marketplace.  Moreover, these interactions must *follow* the act of trade rather than *precede* trade as the federal government argues in this case.

Modern definitions for commerce are no less dependent on marketplace intercourse.  For example, Black's Law Dictionary defines "commerce" as "[t]he exchange of goods, productions, or property of any kind; the buying, selling, and exchanging of articles; Intercourse by way of trade and traffic between different peoples or states and the citizens or habitants thereof, including not only the purchase, sale, and exchange of commodities, but also the instrumentalities and agencies by which it is promoted and the means and appliances by which it is carried on and transportation of persons as well as of goods by land and sea."  Black's Law Dictionary (5th Ed. 1984) (citing *Brennan v. Titusville*, 153 U.S. 289 (1894); *Railroad Co. v. Fuller* 84 U.S. (17 Wall.) 568 (1873)).  Webster's II New Riverside Dictionary defines commerce as "the buying and selling of goods: business."  (Houghton Mifflin Company, 1996).  Each of these definitions still convey what in the Framers' day – and in the modern day -- was well understood: commerce requires marketplace *activity* and does not extend to marketplace *inactivity*.

Even so, the individual mandate urged by the government takes market place inactivity one step further into absurdity in that it seeks to compel an individual to engage in a private, legally binding activity against his will and interests.

> b. **The Insurance Mandate is an Impermissible Police Power.**

The mandatory insurance purchasing provision and enforcement mechanism at issue in Virginia's complaint establish the kind of national police power the U. S. Supreme Court has

always rejected. "As the courts have always recognized, the text of the Constitution does not grant Congress a general 'police power' to pass any legislation it may deem to be in the public interest. Instead, the Constitution confines Congress to its enumerated powers and allows it to execute those powers by means of laws that are 'necessary and proper.'" Randy E. Barnett, *Is the Rehnquist Court an "Activist" Court? The Commerce Clause Cases*, 73 U. Colo. L. Rev. 1275, 1281 (2002). *See United States v. Lopez*, 514 U.S. 549, 584 (Thomas, J. concurring.) ("Although we supposedly applied the substantial effects test for the past 60 years, we *always* have rejected readings of the Commerce Clause and the scope of federal power that would permit Congress to exercise a police power; our cases are quite clear that there are real limits to federal power," citing *New York v. United States*, 505 U.S. 144, 155 (1992).)

"By assigning the Federal Government power over 'certain enumerated objects only,' the Constitution 'leaves to the several States a residuary and inviolable sovereignty over all other objects.' The Federalist No. 39 (J. Madison). The purpose of this design is to preserve the 'balance of power between the States and the Federal Government . . . [that] protect[s] our fundamental liberties.'" *United States v. Comstock*, 560 U.S. ___ (2010), 2010 LEXIS 3879, at *92-93 (Thomas, J., dissenting) (quoting *Garcia v. San Antonio Metropolitan Transit Authority*, 469 U.S. 528, 572 (Powell, J., dissenting)).

To reach its conclusion that the individual mandate scheme is permissible and that the Commonwealth of Virginia's complaint should be dismissed outright, the federal government twists a pretzel out of the enumerated interstate commerce power – one where marketplace *inactivity* becomes marketplace *activity* in order to justify the exercise of an obvious police power to compel individual, private conduct. As such, the government seeks not the appropriate use of its police power but, instead, unfettered police power, the limits of which the government itself cannot even define.

7

**B.**     **There is no Historical Support for the Proposition that Congress May Compel Private Individuals to Engage in Commerce With Other Private Parties.**

NEVER in this country's history has any governmental entity been empowered to command private citizens *solely because of their status as a citizen* to buy any good or service from another private citizen or entity.   We are aware of no federal or state constitutional provision, statute, or ordinance so commanding.   And we are aware of no example heretofore when any governmental body even attempted such an abuse of authority.

American history is replete with government efforts to influence the free market through a laundry list of incentives and disincentives.   It has become a common practice largely upheld by the courts.   Taxes, surtaxes, excise taxes, tax credits, tax deductions, tax abatements – all designed to influence commerce while funding government operations.   Myriad federal and state regulations, county and municipal zoning ordinances, and a variety of other government influences affect private market decisions Americans make literally millions of times every day. Importantly, they do not mandate that private citizens enter into legally binding contracts to purchase goods or services from other private citizens or entities.   This further demonstrates the radical departure from history and law demanded by this current government in its brief.

Moreover, it should be emphasized that even where the federal government has required citizens to pay a portion of their earnings into government run benefit programs such as Social Security and Medicare, the payments have been in the form of defined taxes.   *See Helvering v. Davis*, 301 U.S. 619, 635 (1937).   Here, the government specifically avoided that constitutional route.

C.    **The Supreme Court's Commerce Clause and Necessary and Proper Clause Jurisprudence Does Not Support the Proposition that Congress May Compel Private Individuals to Engage in Commerce.**

The federal government declares that the Supreme Court's decision in *Gonzales v. Raich*, 545 U.S. 1 (2005) "illustrates the breadth of the Commerce power and the deference accorded Congress's judgments." Movant's Brief, Doc. 22 at 32. Moreover, the government argues that *Raich* "highlights the central focus and limited scope" of two other recent Supreme Court Commerce Clause cases, *United States v. Lopez*, 514 U.S. 549 (1995) and *United States v. Morrison*, 529 U.S. 598 (2000). Movant's Brief, *id.* But the federal government's analysis is simplistic and narrow. The federal government misses the fundamental constitutional question before this Court by applying the Supreme Court's "substantial effects on commerce" test in cookie-cutter fashion to the wrong "activities." Essentially, the federal government's position is that *Lopez* and *Morrison* do not have any bearing on Virginia's complaint because the underlying legislation in each of those cases did not involve commercial activity. The irony of this position is lost on the government. The government asks this Court to re-write the Commerce Clause to define the individual mandate as commerce when, in fact, there is no commerce but for the government unconstitutionally compelling individuals to enter into private, legally binding contracts they neither want nor need.

In any event, the federal government's analysis ignores the Supreme Court's admonition that "[i]n assessing the validity of congressional regulation, none of our Commerce Clause cases can be viewed in isolation." *Raich*, 545 at 15. "Recitation without explanation is misleading and incomplete." *Raich*, 545 U.S. at 34 (Scalia, J. concurring).

1.    **The Individual Mandate Cannot Survive Commerce Clause Scrutiny.**

The Commerce Clause analysis urged by the federal government in this case is whether an individual's decision NOT to purchase health insurance substantially affects interstate

commerce. *See Raich*, 545 U.S. at 16 (citing *Wickard v. Filburn*, 317 U.S. 111 (1942)).   But in *Raich* and *Wickard*, individuals actually produced or possessed a tangible product for which there was a market, legal or illegal.   In the instant matter, respecting the individual there is no product or service that has been created. There is nothing.   Therefore, nothing is being withheld from commerce by the individual because there is no commerce involving the individual. Indeed, it is the insurance company that creates the product or service, much like the farmer who grows wheat, etc., and is therefore subject to certain regulatory authority. But not the individual citizen, who is the target of the government's unconstitutional mandate.   Accordingly, the individual mandate cannot survive scrutiny as an enumerated power set forth in the Commerce Clause. The analysis must therefore turn to the Necessary and Proper Clause.   *Id.* at 36 (Scalia, J. concurring.)   ("As we implicitly acknowledged in *Lopez*, however, Congress's authority to enact laws necessary and proper for the regulation of interstate commerce is not limited to laws directly against economic activities that have a substantial effect on interstate commerce.")

### 2. The Individual Mandate Does Not Satisfy the Necessary and Proper Clause.

The relevant question for analyzing the individual mandate under the Necessary and Proper Clause is whether the mandate is "'reasonably adapted' to the attainment of a legitimate end under the commerce power." *Id.* at 37 (citing *United States v. Darby*, 312 U.S. 100, 118-119 (1941)). What constitutes a "reasonably adapted" means – and the potential for Congressional mischief in asserting federal power under the Necessary and Proper Clause – has been a recurring concern since the Framing.

In his defense of the Necessary and Proper (and Supremacy) Clause found in The Federalist No. 33, Alexander Hamilton explained the Framer's repugnance for the kind of federal power grab embodied in the PPACA:

These two clauses have been the sources of much virulent invective, and petulant declamation, against the proposed constitution.  They have been held up to the people in all the exaggerated colours of misrepresentation; as the pernicious engines by which their local governments were to be destroyed, and their liberties exterminated; as the hideous monster whose devouring jaws would spare neither sex nor age, nor high nor low, nor sacred nor profane, and yet, strange as it may appear, after all this clamour, to those who may not have happened to contemplate them in the same light, it may be affirmed with perfect confidence, that the constitutional operation of the intended government would be precisely the same, if these clauses were entirely obliterated, as if they were repeated in every article.  They are only declaratory of a truth, which would have resulted by necessary and unavoidable implication from the very act of constitution a federal government, and vesting it with certain specific powers.  This is so clear a proposition that moderation itself can scarcely listen to the railings which have been so copiously vented against this part of the plan, without emotions that disturb its equanimity.

*Id.* at 172.

Today the federal government argues for exactly the kind of power Hamilton mockingly insisted it was never granted under the Necessary and Proper Clause -- a federal enactment  that is indeed a hideously monstrous federal power grab with precedential jaws fully capable of devouring any remnant of state (and individual) sovereignty.

### a.    The Necessary and Proper Clause is Restrained.

Fortunately, the Supreme Court understands that "there are . . . restraints upon the Necessary and Proper Clause authority.  As Chief Justice Marshall wrote in *McCullough v. Maryland*, even when the end is constitutional and legitimate, the means must be "appropriate" and "plainly adapted" to that end.  Moreover, they may not be otherwise "prohibited" and must be "consistent with the letter and spirit of the constitution."  These phrases are not merely hortatory.  For example, cases such as *Printz v. United States,* 521 U.S. 898 (1997), and *New York v. United States*, 505 U.S. 144 (1992), affirm that a law is not "'proper for carrying into Execution the Commerce Clause'" "[w]hen [it] violates [a constitutional] principle of state

sovereignty." *Printz, supra,* at 923-924; *see also New York, supra,* at 166; *Raich,* at 39 (Scalia, J. concurring.).

Thus, the difficult question for this Court is not whether a private individual's inactivity evidenced by not purchasing health insurance is "commerce" or even "substantially affects commerce" under the Commerce Clause as the government wrongly argues. And the question is not whether compelling an individual to purchase an insurance policy as required by the PPACA is necessary to the successful implementation of the PPACA. The question is whether it is appropriate and plainly adapted to an enumerated federal power for the federal government to require an individual to purchase a good or service from another individual or private entity *for any purpose* regardless of whether or not that purpose is necessary for carrying into execution a broad federal government program. It is clear that Congress had myriad constitutional ways to legislate a health care regime that would have achieved its intended purposes. The individual mandate was not one of them. Rather than damage permanently our constitutional construct by unleashing both intended and unintended consequences that fundamentally alter the nature of this Republic, Congress must be required to consider legislative alternatives that do no violence to the Constitution yet advance its policy and political objectives.

> **b.**    ***United States v. Comstock* Reaffirms Limits on Necessary and Proper Clause**

The federal government points to the Supreme Court's recent Necessary and Proper Clause examination in *United States v. Comstock*. Properly read, however, *Comstock* does not help advance the federal government's arguments. The federal government points to *Comstock*'s declaration that "'[i]f it can be seen that the means adopted are *really calculated to attain the end*, the degree of their necessity, the extent to which they conduct to the end, the closeness of the relationship between the means adopted and the end to be attained, are matters for

congressional determination alone.'" Movant's Memorandum in Support, Doc. 22 at 46 (emphasis added). However, just a few lines earlier the federal government claimed that "[w]ithout the minimum coverage provision, healthy individuals would have overwhelmingly strong incentives to forego insurance coverage, knowing that they could obtain coverage later if and when they became ill. As a result, the cost of insurance would skyrocket, and the larger system of reforms would fail." *Id.*

Since the federal government has introduced this argument, which appears to be a desperate "throw in the kitchen sink" argument, we shall address it. What the federal government does not and cannot explain – and what, in any event, requires *evidence* -- is how many healthy individuals who currently have "overwhelmingly strong incentives to forego insurance coverage" are suddenly going to forego the same overwhelmingly strong incentives to forego insurance coverage and simply pay the government's fine under the PPACA. Insurance costs will still "skyrocket, and the larger system of reforms will fail." Accordingly, the mandatory coverage requirement is not really or even reasonably calculated to attain and will not conduct the federal government's program to the end desired. It will, however, allow the government to confiscate and spend huge sums of money from individuals without going through the appropriate taxing and budgetary process.

The rational basis referred to in the Commerce Clause context is a demonstrated link in fact, based on empirical demonstration. *See Comstock*, 2010 LEXIS 3879, at * 45 (Kennedy, J. concurring). In fact, the cost analyses relating to this program change nearly daily, much of it is driven by politics, and the various federal agencies and offices involved in crunching numbers often issue conflicting predictions. The federal government's motion to dismiss, however, does not and cannot provide an empirical demonstration that the individual mandate is up to the task ascribed it by Congress. Rather, it cites to sweeping generalizations about who will be required

13

to buy insurance or in the alternative pay a fine without even asserting that either of these will solve the problem purported to be addressed, i.e. uncompensated health care. Indeed, the government's program continues to incentivize individuals NOT to buy insurance. This "kitchen sink" argument, which is speculative and incoherent, hardly overcomes the significant constitutional obstacles before the government, and certainly should not be the basis for dismissing the case without evidence.

### c.    The Individual Mandate Fails *Comstock*'s Five Part Test

While *Comstock* establishes a five-part test for evaluating the Necessary and Proper Clause question in that case, the Supreme Court still looks to *McCullough v. Maryland*, 4 Wheat. 316 (1819) to "define the scope of the Necessary and Proper Clause": "Let the end be legitimate, let it be within the scope of the constitution, and all means which are appropriate, which are plainly adapted to that end, which are not prohibited, but consistent with the letter and spirit of the constitution, are constitutional. *Comstock*, 2010 LEXIS 3879, at *15 (quoting *McCullough*, 4 Wheat. at 421).

Applying the "means-ends" rational relationship principle developed by the Supreme Court's Necessary and Proper Clause cases, the *Comstock* court used a five part test to evaluate a federal civil commitment statute, which the Supreme Court upheld. However, when applied to the PPACA's mandatory insurance purchase provision, the federal government flunks the *Comstock* test.

First, the Necessary and Proper Clause grants Congress broad authority to enact federal legislation. While Amicus Curiae rejects strongly the propriety of federalizing the health care system, that issue is not before this Court. Second, the *Comstock* civil commitment statute constituted a "modest addition to a set of federal prison-related mental-health statutes that have existed for many decades." *Id*. at *20. Of course, in this case the government is proposing to

exercise a radically new police power, one the Constitution does not grant. Third, "Congress reasonably extended its longstanding civil commitment system to cover mentally ill and sexually dangerous persons who are already in federal custody . . . ." *Id.* at *28. Again, here the Congress creates an unprecedented, entirely new coercive power. Fourth, the statute properly accounts for state interests. *Id.* at *31. Not so here. In fact, an unprecedented number of states are challenging the constitutionality of the statute in defense of its citizens. Fifth, the links between the civil commitment statute and "an enumerated Article I power are not too attenuated. Neither is the statutory provision too sweeping in its scope." *Id.* at *34-35. Here the links between the mandatory individual insurance provision, which creates a sweeping unprecedented power, and any enumerated power are extremely attenuated.

The PPACA fails the Necessary and Proper Clause tests set forth both in *McCullough v. Maryland* and *Comstock*. As Justice Kennedy explained in his *Comstock* concurrence, when the inquiry is whether a federal law has sufficient links to an enumerated power to be within the scope of federal authority, the analysis depends not on the number of links, but the strength of the chain. *Id.* at *42. Here, the links may be few, but the chain is paper-thin and violates the Constitution. "Simply because Congress may conclude that a particular activity substantially affects interstate commerce does not necessarily make it so." *Id.* at *45 (citing *Lopez*).

### D.    PPACA Impermissibly Infringes Personal Liberty.

"Political freedom means the absence of coercion of a man by his fellow man. The fundamental threat to freedom is power to coerce, be it in the hands of a monarch, a dictator, an oligarchy, or a momentary majority. The preservation of freedom requires the elimination of such concentration of power to the fullest extent and the dispersal and distribution of whatever power cannot be eliminated – a system of checks and balances. By removing the organization of economic activity from the control of political authority, the market eliminates this source of

15

coercive power.  It enables economic strength to be a check to political power rather than a reinforcement."  Milton Friedman, *Capitalism and Freedom*, University of Chicago Press, p. 15 (2002).  With the PPACA, the federal government seeks to remove two checks on its power – individual economic liberty and state sovereignty.    Like Freidman, the federal government understands that: "Fundamentally, there are only two ways of co-ordinating the economic activities of millions.  One is central direction involving the use of coercion – the techniques of the army and of the modern totalitarian state.  The other is voluntary co-operation of individuals – the technique of the marketplace."  *Id.* at 13.  The temporary ruling majority in Congress today may be motivated by admirable motives but that is not enough to justify unconstitutional legislative and regulatory action.   More importantly, it is impossible to draw a reasonable distinction between the individual mandate here and a variety of potentially abusive private transaction mandates that might follow in its wake.  The Court need not be a fan of the late Dr. Friedman or the free market to recognize the obvious danger inherent in giving its approval to such open-ended federal power over the individual, which the Constitution does not grant to any Congress.

"If Congress can do whatever in their discretion can be done by money, and will promote the general welfare, the government is no longer a limited one possessing enumerated powers, but an indefinite one subject to particular exceptions."  James Madison, "Letter to Edmund Pendleton, January 21, 1792," *The Papers of James Madison,* ed. Robert A. Rutland et al., vol. 14 (University Press of Virginia, 1984).

### E.    Virginia Has Standing To Challenge The PPACA, Which Infringes Impermissibly On The Commonwealth's Sovereignty.

The general and sweeping police power seized by the federal government in the PPACA both broadly and respecting the individual mandate in particular is exactly the kind of federal

authority the Framers sought to quarantine.  In Federalist 32, Alexander Hamilton vigorously defended the Constitution's intended structural protection of state sovereignty:

> An entire consolidation of the states into one complete national sovereignty, should imply an entire subordination of the parts; and whatever powers might remain in them, would be altogether dependent on the general will.  But as the plan of the convention aims only at a partial union or consolidation, the state governments would clearly retain all the rights of sovereignty which they before had, and which were not, by that act, *exclusively* delegated to the United States. This exclusive delegation, or rather this alienation of state sovereignty, would only exist in three cases: where the constitution in express terms granted an exclusive authority to the union; where it granted, in one instance, an authority to the union, and in another, prohibited that states from exercising the like authority; and where it granted an authority to the union, to which a similar authority in the states would be absolutely and totally *contradictory* and *repugnant.*

> The necessity of a concurrent jurisdiction in certain cases, results from the division of the sovereign power; and the rule that all authorities, of which the states are not explicitly divested in favour of the union, remain with them in full vigour, is not only a theoretical consequence of that division, but is clearly admitted by the whole tenor of the instrument which contains the articles of the proposed constitution.

The Federalist No 32, (New York: Barnes & Noble Classics (2006)), 168-69, 171.

The PPACA seeks to prevent the Commonwealth of Virginia from exercising its authority to duly pass and execute legislation defending the state and its citizens from an unconstitutional federal police power.

The federal government first argues that 1) Virginia does not have standing to defend its citizens from a federal statute; and 2) the Commonwealth does not have standing on its own and cannot create manufacture standing by enacting a state statute.  Both arguments fail.

The federal government asserts wrongly that *Massachusetts v. Mellon*, 262 U.S. 447 (1923) prevents Virginia from suing under *parens patriae* principles because their citizens are

also citizens of the United States. Of course, Virginia is not bringing its action under the Commonwealth's *parens patriae* statute, but even if it was, the federal government misapplies *Mellon*. In *Mellon*, the Supreme Court held that Massachusetts did not have standing because the statute challenged did not compel Massachusetts to participate, and Massachusetts elected not to participate, in the federal program the state sought to challenge. *Mellon*, 262 U.S. at 480. The Court went on to conclude that Massachusetts' political disagreement did not constitute a justiciable case or controversy under the Constitution. *Id.* In so holding, the Court held that since citizens of Massachusetts were also citizens of the United States, "[i]t cannot be conceded that a state, as *parens patriae*, may institute judicial proceedings to protect citizens of the United States from the operation of the statutes thereof." *Id.* at 485. However, the Court limited its holding by noting that "[w]e need not go so far as to say that a state may never intervene by suit to protect its citizens against any form of enforcement of unconstitutional acts of Congress." Were it proceeding as *parens patriae*, the Commonwealth would be presenting just such a suit.

Moreover, the federal government's argument that the Commonwealth has attempted to manufacture standing through legislative enactment is made without any evidentiary support. There has been no discovery conducted, no affidavits submitted, and no deposition testimony from relevant state officials presented to demonstrate the federal government's claims. Rather, this Court is expected to dutifully dismiss this complaint based on the federal government's political spin that somehow an overwhelmingly bipartisan legislative enactment was "subterfuge" rather than an effort to represent the will of its people.

Virginia's sovereignty is intact and she is right to defend it with full vigor. The federal government's arguments to the contrary would be appalling to James Madison, who in Federalist 45 assured New Yorkers that:

> The powers delegated by the proposed constitution to the federal government, are few and defined. Those which are to remain in the state governments, are numerous and indefinite. The former will be exercised principally on external objects, as war, Peace, negotiation, and foreign commerce; with which last the power of taxation will, for the most part, be connected. The powers reserved to the several states will extend to all the objects which, in the ordinary course of affairs, concern the lives, liberties and properties of the people; and the internal order, improvement, and prosperity of the state.

The Federalist No 32, (New York: Barnes & Noble Classics (2006)).

Our national experience has demonstrated that Madison's expectations have not entirely been fulfilled. However, the federal government's attempt through its motion to dismiss to squelch the Commonwealth of Virginia in this matter is without justification and must be rejected. However seemingly noble the aim of the PPACA, the Act must follow the constitutionally prescribed procedure and respect state sovereignty and federalism in the process. This is especially true where, as here, the Congress had available a variety of plainly constitutional alternatives for accomplishing the same objective. Congress's establishment of the sweeping new federal police power to enforce the individual mandate is a dramatic example of the kind of all-powerful federal government the Framers sought to avoid in the Constitution.

## III.   CONCLUSION

For the foregoing reasons, the federal government's motion to dismiss should be denied.