**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA**

**RICHMOND DIVISION**

| | | |
|---|---|---|
| COMMONWEALTH OF VIRGINIA, | ) | |
| EX REL. KENNETH T. CUCCINELLI, II, | ) | |
| in his official capacity as Attorney General | ) | |
| of Virginia, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. 3:10-cv-188-HEH |
| v. | ) | (Electronically Filed) |
| | ) | |
| KATHLEEN SEBELIUS, Secretary of the | ) | |
| Department of Health and Human Services, | ) | |
| in her official capacity, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| _____/ | | |

**BRIEF OF WASHINGTON LEGAL FOUNDATION
AS *AMICUS CURIAE* IN OPPOSITION TO
DEFENDANT'S MOTION TO DISMISS**

The Washington Legal Foundation (WLF) hereby submits this brief in opposition to

Secretary Kathleen Sebelius's motion (Dkt. 21) to dismiss this action for lack of subject-matter

jurisdiction under Fed. R. Civ. P. 12(b)(1) and for failure to state a claim upon which relief can

be granted under Fed. R. Civ. P. 12(b)(6).  WLF supports each of the arguments made by the

Commonwealth of Virginia in its response (Dkt. 28) to the motion, but writes separately to

address the Secretary's contention that the individual mandate contained in Section 1501 of the

Patient Protection and Affordable Care Act is a valid exercise of Congress's power under the

Necessary and Proper Clause of the U.S. Constitution.  Specifically, WLF argues that  the

Supreme Court's opinion last month in *United States v. Comstock*, ___ U.S. ___, No. 08-1224,

2010 WL 1946729 (U.S. May 17, 2010), demonstrates that only narrow, limited, and deeply

historical claims of congressional power will be sustained under the Necessary and Proper

Clause.  As explained in detail below, Section 1501 of the PPACA fails to satisfy the five-part

test established by *Comstock* to determine whether a statute is a "necessary and proper" means of

exercising the federal authority.  Accordingly, the Secretary's motion should be denied.

## IDENTITY AND INTERESTS OF *AMICUS CURIAE*

The interests of the Washington Legal Foundation (WLF) are more fully set forth in its

accompanying motion for leave to file this brief.  Founded in 1977, WLF is a public interest law

and policy center with supporters in all 50 states, including Virginia.  WLF regularly appears

before federal and state courts to promote economic liberty, free enterprise, and a limited and

accountable government.  In particular, WLF regularly litigates in support of efforts to ensure a

strict separation of powers – both among the three branches of the federal government and

between federal and state governments – as a means of preventing too much power from being

concentrated within a single governmental body.  *See, e.g., Free Enter. Fund v. Pub. Co.*

*Accounting Oversight Bd.*, No. 08-861 (U.S., dec. pending); *United States v. Lopez*, 514 U.S. 549

(1995); *United States v. King*, Crim. No. 09-30442 (9th Cir., dec. pending).

The Framers of the Constitution sought to maintain a balance of power between federal

and state governments as a means of reducing the risks of tyranny and abuse by governments at

every level.  WLF is concerned that the federal government is upsetting that balance by seeking

to regulate Americans' economic *inactivity*—an individual's decision *not* to purchase health

insurance—which is far afield from the enumerated powers assigned to the federal government

under Article I of the Constitution.  Further, WLF fears that, if Congress's power under Article I

is construed to include the authority to command Americans to purchase health insurance or pay

a penalty, then the congressional power will become virtually indistinguishable from a national

police power.

## INTRODUCTION AND SUMMARY OF ARGUMENT

Section 1501 of the Patient Protection and Affordable Care Act, Pub. L. No. 111-148, 124 Stat 119 (2010) (PPACA), contains an individual mandate that will require (after December 31, 2013) all uninsured Americans, including uninsured Virginians, to purchase health insurance for themselves and their dependents or else face a civil penalty (Dkt. 1 at 1).  During the 2010 regular session, the Virginia General Assembly passed, and Virginia's governor signed into law, the Virginia Health Care Freedom Act (VHCFA), Va. Code § 38.2-3430.1:1, which provides in pertinent part that "[n]o resident of this Commonwealth . . . shall be required to obtain or maintain a policy of individual insurance coverage except as required by a court or the Department of Social Services where an individual is named as a party in a judicial or administrative proceeding" (Dkt. 1 at 2).

On March 23, 2010, the Commonwealth of Virginia (the Commonwealth), acting through its Attorney General, filed a complaint for declaratory and injunctive relief (Dkt. 1) asking this Court to declare that Section 1501 of the PPACA is unconstitutional because the individual mandate exceeds the enumerated powers conferred upon Congress.  Likewise, the complaint asks the Court to declare that the VHCFA is a valid exercise of state power (Dkt. 1 at 6-7).  In response, the Secretary of Health and Human Services (the Secretary) moved to dismiss this action for lack of subject-matter jurisdiction under Fed. R. Civ. P. 12(b)(1) and for failure to state a claim upon which relief can be granted under Fed. R. Civ. P. 12(b)(6).  In support of her motion, the Secretary argues in part that the individual mandate contained in Section 1501 of the PPACA is a valid exercise of Congress's power under the Necessary and Proper Clause (Dkt. 22 at 30-35).  *Amicus* WLF submits this brief solely to address that argument.

Last month, the U.S. Supreme Court clarified the sweep of the Necessary and Proper Clause in such a way as to foreclose the Secretary's use of that provision to sustain Congress's enactment of Section 1501 of the PPACA.  In *United States v. Comstock*, the Supreme Court established that only narrow, limited, and deeply historical claims of congressional power will be sustained under the Necessary and Proper Clause.  *Comstock* required the Supreme Court to decide whether the federal government had the constitutional authority to civilly detain mentally ill sexual predators who were otherwise eligible for release following the completion of their criminal sentence.  Unlike the civil commitment statute upheld in *Comstock*, the power asserted by Congress under the PPACA is broad, virtually unlimited, and entirely novel.  Because only narrow, limited, and deeply historical claims of congressional power can be sustained under the Necessary and Proper Clause after *Comstock*, Section 1501 of the PPACA cannot survive scrutiny.

First, by providing an additional basis for searching judicial review of congressional action, the Necessary and Proper Clause is an integral part of the Constitution's overall system of checks and balances.  *Comstock* reaffirms that the Necessary and Proper Clause is not broad enough to sustain a statute that is not otherwise tethered to a constitutionally enumerated power. In invoking the Necessary and Proper Clause, the Secretary purports to rely on Congress's enumerated authority under the Commerce Clause.  But as the Commonwealth's brief persuasively demonstrates, an individual's passive status as "uninsured" simply does not implicate the traditional Commerce Clause power.  Thus, both the PPACA's individual mandate and its penalty provision exceed the outer limits of Congress's power under the Commerce Clause.  Absent a legitimate anchor to an enumerated congressional power under the Constitution, the Secretary cannot rely on the Necessary and Proper Clause to vindicate the

individual mandate.

Second, contrary to the Secretary's claim, there is no longstanding history of federal regulation of health insurance.  *Comstock* turned in large part on the historical fact that the federal role in establishing a prison system in America enjoyed ancient roots.  In sharp contrast to the lengthy history of federal involvement at issue in *Comstock*, federal involvement in private health insurance is an entirely modern phenomenon.  Indeed, throughout much of this nation's history, the Supreme Court consistently held that regulation of the insurance industry was exclusively a state concern that did not constitute regulation of "interstate commerce" within the meaning of the Commerce Clause.  Even the Secretary concedes that the earliest congressional legislation affecting the "business of insurance" was passed within only the last thirty-six years.  But whatever the recent history of federal regulation of the health insurance industry, there is *no* history of the federal government's forcing uninsured Americans to purchase health insurance policies.

Third, the PPACA fails entirely to accommodate state interests.  Writing for the majority in *Comstock*, Justice Breyer emphasized that the statute upheld there did not invade state sovereignty or otherwise improperly limit the powers that remain with the States, but rather required accommodation of state interests.  In marked contrast, the PPACA gives the federal government sole authority to penalize Virginia residents for choosing not to obtain health care insurance—in direct contravention of Virginia law.  Rather than cooperate with or defer to the Commonwealth of Virginia, the PPACA irreconcilably collides with Virginia's own anti-mandate enactment.  The Commonwealth's obligation to initiate this litigation demonstrates, rather starkly, that the PPACA not merely ignores but offends vital state interests.  The PPACA contains neither a severability provision nor a provision allowing individual states to opt out of

Section 1501, nor does it authorize the federal government to relinquish control of health insurance coverage to the states when asked to do so.  Accordingly, it cannot be said to accommodate state interests in any way.

Finally, the PPACA's scope is not sufficiently narrow.  In upholding Congress's civil-commitment power, *Comstock* emphasized that the federal statute at issue was "narrow in scope" and constituted a "narrowly tailored means of pursuing the Government's legitimate interest." *Comstock*, 2010 WL 1946729, at *14.  Unlike *Comstock*, the PPACA cannot possibly be said to be "narrow in scope" or narrowly tailored.  Rather, the PPACA seeks to force every uninsured American, under pain of monetary penalty, to purchase private health insurance.  This sweeping individual mandate applies to the rich and the poor, the young and the old, and the healthy and the sick alike.  Although the Secretary insists that healthcare is unique because everyone will need to purchase medical services at some point (Dkt. 22 at 25-27), this argument only further exposes that the PPACA's reach is truly unlimited and not narrowly tailored.  Because no principled limit exists for the power the Secretary seeks to exercise, the PPACA essentially amounts to a claim of general "police power, which the Founders denied the National Government and reposed to the States."  *Comstock*, 2010 WL 1946729, at *14 (quoting *United States v. Morrison*, 528 U.S. 598, 618 (2000)).

## ARGUMENT

### THE PPACA IS NOT A VALID EXERCISE OF CONGRESSIONAL POWER UNDER THE NECESSARY AND PROPER CLAUSE.

Exactly one month ago today, on May 17, 2010, the Supreme Court clarified the sweep of the Necessary and Proper Clause in such a way as to foreclose the Secretary's use of that provision to sustain Congress's enactment of Section 1501 of the PPACA.  The case, *United States v. Comstock*, involved whether the federal government had the constitutional authority to

civilly detain mentally ill sexual predators who were otherwise eligible for release following the completion of their criminal sentences. *See Comstock*, 2010 WL 1946729, at *5.   The sole question framed by the Court was "whether the Necessary and Proper Clause, Art. I, § 8, cl. 18, grants Congress authority sufficient to enact the statute before [it]." *Id.* Although, in considering the particular statute at issue, the Court answered that question in the affirmative, Justice Breyer used the occasion to announce an important new test for evaluating the scope of congressional power under the Necessary and Proper Clause.

*Comstock* establishes five factors that, considered together, establish the appropriate limits of congressional authority under the Necessary and Proper Clause:  (1) the scope of the Necessary and Proper Clause; (2) the history of federal involvement in the specific legislative arena; (3) the soundness of the reasons for the statute's enactment in light of the government's legitimate interest;[1] (4) the statute's accommodation of state interests; and (5) the narrowness of the statute's scope. *Id.* at *15.  As *Comstock* clarifies, a statute will be found to constitute a legitimate means to implement a constitutionally enumerated power only when the claim of congressional power is narrow in scope, accommodates state interests, and has deep historical roots.  Unlike the statute upheld in *Comstock*, the PPACA is not "a discrete and narrow exercise of authority over a small class of persons already subject to the federal power." *Id.* at *19 (Kennedy, J., concurring).   Because only narrow, limited, and deeply historical claims of congressional power can be sustained under the Necessary and Proper Clause after *Comstock*, Section 1501 of the PPACA cannot survive scrutiny.

---

[1] Both the Secretary and the PPACA claim that the purpose of the PPACA is to rein in systemic health care costs.  WLF does not address the soundness of Congress's reasons for enacting the PPACA.

A.      **The Necessary and Proper Clause cannot authorize a statute that is not otherwise tethered to a constitutionally enumerated power.**

Each enumerated power of Congress is modified by the Necessary and Proper Clause, which permits Congress only "[t]o make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers, and all other Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof."   U.S. Const., Art. I, § 8, cl. 18.   Faced with the unenviable task of driving a square peg of sweeping legislation into the round hole provided by the Constitution, the Secretary purports to rely on the Necessary and Proper Clause in an attempt to rescue Section 1501 of the PPACA from the Constitution's carefully prescribed limits on congressional power.   *See* Dkt. 22 at 34 ("Because the minimum coverage provision is essential to Congress's overall regulatory reform of interstate health care and health insurance markets, it is also a valid exercise of Congress's authority under the Necessary and Proper Clause.").   But, as the Supreme Court has repeatedly held, the Necessary and Proper Clause cannot make "proper" a law contrary to "the letter and spirit of the [C]onstitution."   *M'Culloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 421 (1819).

While confirming that Congress may use broad means to accomplish an otherwise constitutionally proper end, *Comstock* reinforces the venerable understanding that every law enacted by Congress first must be based on an enumerated power found in the Constitution. *Comstock*, 2010 WL 1946729, at *5 ("[E]very [] statute must itself be legitimately predicated on an enumerated power.").[2]   "The Necessary and Proper Clause does not give Congress *carte*

---

[2] As envisioned by the Founders, "the powers delegated by the proposed Constitution to the federal government [we]re few and defined.  Those which [we]re to remain in the State governments are numerous and indefinite."  *United States v. Lopez*, 514 U.S. 549, 552 (1995) (citations and quotations omitted); *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 176 (1803) ("The powers of the legislature are defined and limited; and that those limits may not be mistaken, or forgotten, the constitution is written.").  Notably, the Constitution grants the federal

blanche" but "requires an 'appropriate' link between a power conferred by the Constitution and the law enacted by Congress." *Id.* at *20 (Alito, J., concurring).  In other words, the Necessary and Proper Clause merely permits Congress to carry out its pre-existing powers by "appropriate" means that are "plainly adopted to a [constitutional] end." *M'Culloch*, 17 U.S. at 421.  This limitation serves a vital constitutional purpose "by requiring executory laws to be *peculiarly within Congress's domain or jurisdiction*—that is, by requiring that such laws not usurp or expand the constitutional powers of any federal institutions or infringe upon the retained rights of the state or of individuals."  Gary Lawson & Patricia B. Granger, *The "Proper" Scope of Federal Power:  A Jurisdictional Interpretation of the Sweeping Clause*, 43 DUKE L. J. 267, 271 (1993).  Because it provides an additional basis for searching judicial review of congressional action, the Necessary and Proper Clause is an integral part of the Constitution's overall system of checks and balances.

In *M'Culloch v. Maryland*, Chief Justice Marshall recognized that, as a structural constraint, the Necessary and Proper Clause clarifies the limits of congressional power and provides the judiciary with a basis to review and strike down an overreaching federal law: "[S]hould congress, under the pretext of executing its powers, pass laws for the accomplishment of objects not intrusted to the government; it would become the painful duty of this tribunal, should a case requiring such a decision come before it, to say, that such an act was not the law of the land." *M'Culloch* , 17 U.S. at 423.  When called upon to do so, the Supreme Court has often relied upon the Necessary and Proper Clause to declare a congressional act "not the law of the

government power over "certain enumerated objects only," but "leaves to the several States a residuary and inviolable sovereignty over all other objects." THE FEDERALIST No. 39, at 285 (J. Madison).  Of course, the primary purpose of this design is to preserve the "balance of power between the States and the Federal Government . . . [that] protect[s] our fundamental liberties." *Garcia v. San Antonio Metro. Transit Auth.*, 469 U. S. 528, 572 (1985) (Powell, J., dissenting); *New York v. United States*, 505 U. S. 144, 181 (1992).

land." *See, e.g., Alden v. Maine*, 527 U.S. 706, 731-33 (1999) (invalidating a provision of the

Fair Labor Standards Act and rejecting the government's argument that "the specific Article I

powers delegated to Congress necessarily include, by virtue of the Necessary and Proper Clause

or otherwise, the incidental authority to subject the States" to activities that would abrogate the

States' rights); *Printz v. United States*, 521 U.S. 898, 923-24 (1997) (holding that the Brady

Handgun Violence Prevention Act was neither a "necessary" nor "proper" means to accomplish

a legitimate congressional power because it violated state sovereignty); *New York v. United

States*, 505 U.S. 144, 166 (1992) (holding unconstitutional a provision in the Low-Level

Radioactive Waste Policy Act because "even where Congress has the authority under the

Constitution to pass laws requiring or prohibiting certain acts, it lacks the power directly to

compel the States to require or prohibit those acts").[3]

Attempting to invoke the broad means available under the Necessary and Proper Clause,

the Secretary purports to rely on Congress's enumerated authority under the Commerce Clause,

suggesting that the PPACA "falls well within the Constitution's broad grant of authority to

Congress to regulate interstate commerce" (Dkt. 22 at 20).  Of course, the U.S. Constitution

delegates to Congress the power "to regulate Commerce with foreign Nations, and among the

several States, and with Indian Tribes."  U.S. Const., Art. I, § 8, cl. 3.  Yet the Supreme Court

---

[3] *See also Buckley v. Valeo*, 424 U.S. 1, 43-44 (1976) (declaring invalid a provision of the Federal Election Campaign Act because "Congress could not, merely because it concluded that such a measure was 'necessary and proper' to the discharge of its substantive legislative authority" vest in itself a power which was not authorized under the Constitution); *United States v. Fox*, 95 U.S. 670, 672 (1877) (holding that the Necessary and Proper Clause does not authorize Congress to penalize purely intrastate fraud committed pre-bankruptcy, despite its enumerated power under Article I, § 8, cl.4 "to establish uniform laws on the subject of bankruptcies throughout the United States"); *United States v. Dewitt*, 76 U.S. 41, 43-44 (1869) (finding unconstitutional a law that criminalized the mixing and selling of "illuminating oils" because Congress sought to impose "a police regulation, relating exclusively to the internal trade of the State").

has long expressed the need to guard the boundaries of congressional power.  While the powers conferred on Congress are undoubtedly quite broad, "even those modern-era precedents which have expanded congressional power under the Commerce Clause confirm that this power is subject to outer limits." *United States v. Lopez*, 514 U.S. 549, 556-57 (1995); *United States v. Morrison*, 529 U.S. 598, 608 (2000) ("[E]ven under our modern, expansive interpretation of the Commerce Clause, Congress' regulatory authority is not without effective bounds.").

Indeed, the Supreme Court has never extended congressional power under the Commerce Clause beyond the regulation of (1) the channels of interstate commerce; (2) the instrumentalities of interstate commerce and persons or things in interstate commerce; and (3) activities that substantially affect interstate commerce.  *Gonzales v. Raich*, 545 U.S. 1, 16-17 (2005).  As the Commonwealth's brief persuasively demonstrates, an individual's passive status as "uninsured" implicates *none* of these categories.  *See* Dkt. 28 at 8 ("The claimed power is contrary to the text as its words are presently understood; contrary to what the words have meant historically; contrary to traditional practices in regulating commerce; and contrary to controlling precedent."). Simply put, Congress has no authority under the Commerce Clause to enact an individual mandate requiring uninsured Americans, subject to a civil penalty, to purchase health insurance for themselves and their dependents.

In sum, both the PPACA's individual mandate and its penalty provision exceed the outer limits of Congress's power under the Commerce Clause.  Absent a legitimate anchor to an enumerated congressional power under the Constitution, the Secretary cannot rely on the Necessary and Proper Clause to vindicate the individual mandate.  Because, after *Comstock*, only narrow, limited, and deeply historical claims of congressional power will be sustained under the Necessary and Proper Clause, Section 1501 of the PPACA cannot survive scrutiny.

**B.      There is no longstanding history of federal regulation of health insurance.**

*Comstock* turned in large part on the historical fact that the federal role in establishing a prison system in America enjoyed ancient roots.  Indeed, writing for the majority, Justice Breyer relied on a "longstanding federal statutory framework, which had been in place since 1855." *Comstock*, 2010 WL 1946729,  at *10.  Likewise, Justice Alito concurred with the result because Congress's power to detain federal prisoners had a deep history, having "been recognized since the beginning of our country."  *Id.* at *20 (Alito, J., concurring).  Following the ratification of the Constitution, for instance, the First Congress had established "An Act for the Punishment of certain Crimes against the United States" and gave "United States marshals the responsibility of securing federal prisoners."  *Id.*  This deep tradition of federal involvement in establishing a penal system weighed in favor of the statute at issue.

In her brief in support of dismissal, the Secretary states that "[i]t has long been established that Congress has the power to regulate the interstate health insurance market" (Dkt. 22 at 23).  But neither the breadth of this conclusory claim, nor its constant repetition, can transform the settled historical record.  In sharp contrast to the lengthy history of federal involvement at issue in *Comstock*, "[f]ederal involvement in health is *a fairly new occurrence in U.S. history.*"  JENNIE JACOBS KRONENFELD, THE CHANGING FEDERAL ROLE IN U.S. HEALTH CARE POLICY 67 (Praeger Publishers, 1997) (emphasis added).  "While a few laws and special concerns were passed prior to the twentieth century, the bulk of the federal health legislation that has health impact . . . has actually been passed in the past 50 or so years."  *Id.*  Indeed, modern healthcare in the United States "occupies a completely different place in the economy, in the mind of the public, and in its impact on the government at all levels than it did 100 years ago, at the beginning of the twentieth century, or at the beginning of the country in the late 1700s, when

the U.S. Constitution was adopted." *Id.* at 1.

Notably, throughout much of this nation's history, the Supreme Court consistently held that regulation of the insurance industry was exclusively a state concern that did not constitute regulation of "interstate commerce" within the meaning of the Commerce Clause. *See, e.g, Paul v. Virginia*, 75 U.S. 168, 170 (1868) ("The issuing of a policy of insurance is not a transaction of commerce within the meaning of the [Commerce Clause], even though the parties be domiciled in different States, but is a simple contract of indemnity against loss."); *see also Fire Ass'n of Philadelphia v. People of New York*, 119 U.S. 110, 118 (1886) (reaffirming the precedent that "issuing a policy of insurance is not a transaction of commerce," therefore permitting each state to regulate the insurance industry according to its own rules); *Liverpool & London Life & Fire Ins. Co. v. Massachusetts*, 77 U.S. 566, 573 (1870) (reaffirming that "the business of insurance, as ordinarily conducted, was not commerce, and that a corporation of one State, having an agency by which it conducted that business in another State, was not engaged in commerce between the States"). This view rested on the Court's reasoning that "[i]f the power to regulate interstate commerce applied to all the incidents to which said commerce might give rise and to all contracts which might be made in the course of its transaction, that power would embrace the entire sphere of mercantile activity in any way connected with trade between the States." *Hooper v. People of California*, 155 U.S. 648, 655 (1895). The Court's repeated verdict on this question was "not concerned with any matter of distinction between [types of] insurance," whether it be marine, fire, or health insurance. *Id.* at 653.[4]

---

[4] Although this long line of cases no longer has any bearing on the current interpretation of the Commerce Clause, WLF cites them to demonstrate, rather conclusively, that no deep tradition of regulating health insurance existed at the national level during the 18th and 19th centuries. Moreover, this view persisted well into the twentieth century. *See Bothwell v. Buckbee-Mears Co.*, 275 U.S. 274, 276-77 (1927) (reaffirming that "[a] contract of insurance,

Although this view eventually fell out of favor, even *United States v. South-Eastern Underwriters Ass'n*, 322 U.S. 533 (1944), the key case cited by the Secretary in support of Congress's purported power under Section 1501, recognized that "a contract of insurance, considered as a thing *apart from negotiation and execution*, does not itself constitute interstate commerce" (emphasis added). 322 U.S. at 546-47. Of course, *South-Eastern* concerned Congress's ability to enforce the Sherman Anti-Trust Act against insurance companies engaged in interstate commerce, not Congress's plenary power to mandate the purchase of health insurance coverage by all uninsured Americans.

In any event, the Secretary's brief is noticeably silent on the fact that, in direct response to *South-Eastern*, Congress enacted the McCarran-Ferguson Act, 15 U.S.C. § 1011 (1945), which created an exemption from federal antitrust law for the "business of insurance" and provided that federal regulation of insurance could neither be inferred nor assumed unless explicitly announced by federal law. Despite *South-Eastern*'s holding, Congress saw no compelling need for the federal government to intrude into insurance regulation, but instead sought to ensure that insurance remained primarily a state matter (as it had been exclusively prior to 1944). *See*, e.g., Timothy S. Jost & Mark A. Hall, *The Role of State Regulation in Consumer-Driven Health Care*, 31 Am. J. L. & Med. 395, 398 (2005) (explaining that McCarran-Ferguson

---

although made with a corporation having its office in a state other than that in which the insured resides and in which the interest insured is located, is not interstate commerce"); *Northwestern Mutual Life Ins. Co. v. Wisconsin*, 247 U.S. 132, 138 (1918) (affirming its view of earlier precedents and their holdings); *New York Life Ins. Co. v. Deer Lodge County*, 231 U.S. 495, 502-512 (1913) (detailing a clearly established history of precedents in this area and reasoning that "they constitute a formidable body of authority and strongly invoke the sanction of the rule of *stare decisis*" for the holding that "contracts of insurance are not commerce at all, neither state nor interstate"); *New York Life Ins. Co. v. Cravens*, 178 U.S. 389, 393, 401 (1900) ("The business of life insurance is not commerce, and therefore a state statute regulating contracts of life insurance made between residents of the state and corporations of other states is not invalid as a regulation of interstate commerce.").

"rearticulated the position that insurance regulation is principally the domain of the states, and that Congress preempts state regulation only if it clearly and considerately expresses an intent to do so").

In the years since the McCarran-Ferguson Act, only recently has Congress enacted federal legislation directed at health insurance. Indeed, the Secretary concedes that the earliest congressional legislation affecting the "business of insurance" was passed within only the last thirty-six years. The Secretary cites a handful of recent federal legislation, beginning with the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. §§ 1001-1453, to demonstrate that "Congress has repeatedly exercised its power over this field" for "a period of more than 35 years" (Dkt. 22 at 23). Based on this paltry legislative pedigree, the Secretary purports to rely on a "long history of federal regulation of the health insurance market" (Dkt. 22 at 24). In marked contrast, however, *Comstock* relied on a "longstanding federal statutory framework, which had been in place since 1855." *Comstock*, 2010 WL 1946729, at *10.

More importantly, Section 1501 of the PPACA does not regulate health insurance providers. Instead, as the Secretary admits, "[t]he provision applies only to individuals" (Dkt. 22 at 1). In other words, the PPACA seeks to regulate uninsured people who, by definition, have *no connection* with health insurance providers. Whatever the recent history of federal regulation of the health insurance industry, the history of the federal government's forcing uninsured Americans to purchase health insurance policies is nonexistent. Indeed, no court has ever held that the Commerce Clause, even when aided by the Necessary and Proper Clause, authorizes Congress to require citizens to buy a private good or service such as health insurance. *See, e.g., Requiring Individuals to Obtain Health Insurance: A Constitutional Analysis*, Cong. Research Serv. (2009), at 3 ("[I]t is a novel question whether Congress may use this clause to require an

individual to purchase a good or service."); *The Budgetary Treatment of an Individual Mandate to Buy Health Insurance*, Cong. Budget Office Memorandum (August 1994), at 1 ("A mandate requiring all individuals to purchase health insurance would be an unprecedented form of federal action.  The government has never required people to buy any good or service as a condition of lawful residence in the United States.").  Consistent with *Comstock*, the lack of any significant or meaningful historical anchor for the novel power attempted by the PPACA weighs heavily against the Secretary's claim of power under the Necessary and Proper Clause.

### C.      The PPACA does not accommodate state interests.

*Comstock* also hinged on the Supreme Court's assurance that the federal statute at issue "properly accounts for state interests." *Comstock*, 2010 WL 1946729, at *11.  In its analysis of the federal civil commitment statute, *Comstock* detailed the myriad ways in which the federal government was required to cooperate with and defer to the state during the custody or transfer of each federal prisoner.  By requiring federal authorities to relinquish federal authority over the prisoner whenever a state asserted its own, the statute deferred to the state's desire to take control of the prisoner.  *Id*. at *12.  Writing for the Court, Justice Breyer emphasized that the statute at issue did not "invade state sovereignty or otherwise improperly limit the powers that remain with the States," but rather required accommodation of state interests when facilitating the custody and transfer of a federal prisoner.  *Id*. at *11-12.  In part due to its accommodation of state interests, the statute in *Comstock* was upheld by the Supreme Court as a legitimate exercise of federal power.

Concurring with the majority, Justice Kennedy wrote separately to caution that "[i]t is of fundamental importance to consider whether essential attributes of state sovereignty are compromised by the assertion of federal power under the Necessary and Proper Clause; if so,

that is a factor suggesting that the power *is not one properly within the reach of federal power.*" *Id.* at *18 (Kennedy, J., concurring) (emphasis added).  Because the statute at issue did "not supersede the right and responsibility of the States" and "involve[d] little intrusion upon the ordinary processes and powers of the States," Justice Kennedy agreed that the federal civil commitment statute was a "necessary and proper" exercise of congressional authority.

Unlike the statute at issue in *Comstock*, the PPACA fails entirely to accommodate state interests.  The PPACA gives the federal government sole authority to penalize Virginia residents for choosing not to obtain health care insurance—in direct contravention of Virginia law.  Rather than cooperate with or defer to the Commonwealth of Virginia, the PPACA irreconcilably collides with Virginia's own anti-mandate enactment.  Perforce the Supremacy Clause, the PPACA directly undercuts the Virginia General Assembly's interest in protecting its residents from being required to purchase individual insurance coverage.  The Commonwealth's obligation to initiate this litigation demonstrates, rather starkly, that the PPACA not merely ignores but offends vital state interests.  The PPACA contains neither a severability provision nor a provision allowing individual states to opt out of Section 1501.  Nor does it authorize the federal government to relinquish control of health insurance coverage over to the states when asked to do so.  Accordingly, it cannot be said to accommodate state interests in any way.[5] Consistent with *Comstock*, the PPACA's failure to accommodate state interests weighs heavily against the Secretary's claim of power under the Necessary and Proper Clause.

**D.     The statute's scope is not sufficiently narrow.**

In upholding Congress's civil-commitment power, *Comstock* emphasized that the federal

---

[5] Evidencing the depth of the states' dissatisfaction with the individual mandate, twenty-one states (including Virginia) have initiated litigation seeking to overturn Section 1501 of the PPACA.  *See State of Florida, et al. v. Sebelius*, No. 3:10-cv-91 (N.D. Fla. 2010).

statute at issue was a "narrowly tailored means of pursuing the Government's legitimate interest." *Comstock*, 2010 WL 1946729, at *14.  Importantly, the *Comstock* statute was "narrow in scope," "applied to only a small fraction of federal prisoners," and its reach was "limited to individuals already in the custody of the Federal Government." *Id.* at *2.  Unlike *Comstock*, the PPACA is not "a discrete and narrow exercise of authority over a small class of persons." *Id.* at *19 (Kennedy, J., concurring).

The PPACA cannot possibly be said to be narrowly tailored or "narrow in scope." Rather, the PPACA seeks to force every uninsured American, under pain of monetary penalty, to purchase private health insurance.  This sweeping individual mandate applies to the rich and the poor, the young and the old, and the healthy and the sick alike.  The Secretary insists that healthcare is unique since everyone will need to purchase medical services at some point (Dkt. 22 at 25-27), but this argument only further exposes that the PPACA's reach is truly unlimited and not narrowly tailored.  Indeed, as the Commonwealth demonstrates, "[t]here is no principled rule by which there is a right to be left alone with respect to any subject susceptible to economic regimentation nor would there be any possible way to say that any power of economic regulation remained to the States to the exclusion of the federal government" (Dkt. 28 at 9).

No principled limit exists for the power the Secretary seeks to exercise under the PPACA.  The federal power claimed under the PPACA essentially amounts to a claim of general "police power, which the Founders denied the National Government and reposed to the States." *Comstock*, 2010 WL 1946729, at *14 (quoting *United States v. Morrison*, 528 U.S. 598, 618 (2000)); *see* Dkt. 28 at 9 ("Because the power claimed here would alter the federal structure of the Constitution by creating an unlimited power indistinguishable from a national police power, it cannot be a proper use of the Necessary and Proper Clause.").  Indeed, under the view

advanced by the Secretary, the combination of the Commerce Clause and the Necessary and

Proper Clause would render the rest of Congress's enumerated Article I powers superfluous.  In

contrast to the statute upheld in *Comstock*, the PPACA is simply "too sweeping in its scope."

*Comstock*, 2010 WL 1946729, at *13.

<div align="center">

**<u>CONCLUSION</u>**

</div>

*Amicus* Washington Legal Foundation respectfully requests that the court deny

Defendant's motion to dismiss in its entirety.

Date:  June 17, 2010

<div style="margin-left: 40%;">

Respectfully submitted,

 /s/ Richard A Samp
Daniel J. Popeo
Cory L. Andrews
Richard A. Samp (VA Bar # 33856)
  *Counsel of Record*
WASHINGTON LEGAL FOUNDATION
2009 Massachusetts Ave., N.W.
Washington, D.C. 20036
(202) 588-0302
(202) 588-0386 (facsimile)
rsamp@wlf.org

</div>

*Counsel wish to thank Calli Bailey, a third-year law student at Texas Tech University School of
Law, for her valuable assistance in preparing this brief.

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Fed. R. Civ. P. 7.1 and Local Rule 7.1 of the Eastern District of Virginia, the Washington Legal Foundation (WLF) states that it is a non-profit corporation organized under Section 501(c)(3) of the Internal Revenue Code.  WLF has no parents, trusts, subsidiaries, or affiliates that have issued shares of stock or debt securities to the public.  No publicly held corporation has an interest in the outcome of this litigation due to WLF's participation.

## CERTIFICATE OF SERVICE

I hereby certify that on the 17th day of June, 2010, I electronically filed the foregoing

with the Clerk of the Court using the CM/ECF system, which will automatically send a

notification of such filing (NEF) to the following persons who are registered users of this Court's

CM/ECF system:

Kenneth T. Cuccinelli
Earle Duncan Getchell, Jr.
Charles E. James, Jr.
Stephen R. McCullough
Wesley Glenn Russell, Jr.
OFFICE OF THE ATTORNEY
GENERAL OF VIRGINIA
900 E. Main Street
Richmond, Virginia 23219

Jonathan Holland Hambrick
OFFICE OF THE U.S. ATTORNEY
600 E. Main St., Suite 1800
Richmond, Virginia 23219

Erika Myers
Ian Gershengorn
Joel McElvain
Shelia M. Leiber
UNITED STATES DEPARTMENT OF JUSTICE
FEDERAL PROGRAMS BRANCH
20 Massachusetts Ave., NW
Room 7332
Washington, DC 20001

                              /s/ Richard A Samp
                              Richard A. Samp (VA Bar # 33856)
                                *Counsel of Record*
                              WASHINGTON LEGAL FOUNDATION
                              2009 Massachusetts Ave., N.W.
                              Washington, D.C. 20036
                              (202) 588-0302
                              (202) 588-0386 (facsimile)
                              rsamp@wlf.org