**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
Richmond Division

| | |
|---|---|
| COMMONWEALTH OF VIRGINIA,<br>ex rel. Kenneth T. Cuccinelli, II, in his official<br>capacity as Attorney General of Virginia,<br><br>       Plaintiff,<br><br>       v.<br><br>KATHLEEN SEBELIUS, Secretary of the<br>Department of Health and Human Services,<br>in her official capacity,<br><br>       Defendant. | )<br>)<br>)<br>)<br>)<br>)   Civil Action No. 3:10-cv-00188-HEH<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**REPLY MEMORANDUM IN SUPPORT OF**
**DEFENDANT'S MOTION TO DISMISS**

## Table of Contents

Introduction ............................................................................................................................1

Argument ...............................................................................................................................2

I.     The complaint should be dismissed for lack of subject matter jurisdiction ....................2

      A.      Virginia lacks standing because it has alleged no cognizable injury ......................2

      B.      The Anti-Injunction Act bars Virginia's challenge to the penalties imposed
            under the minimum coverage provision ......................................................................6

      C.      Virginia's claim of an abstract conflict between state and federal
            law is not ripe for review .........................................................................................8

II.     The complaint should be dismissed for failure to state a claim upon which
      relief may be granted .............................................................................................................8

      A.      The comprehensive regulatory measures of the ACA, including the
            minimum coverage provision, are a proper exercise of Congress's
            powers under the Commerce and Necessary and Proper Clauses .........................8

            1.      The minimum coverage provision regulates conduct with
                  substantial effects on interstate commerce ................................................10

            2.      The minimum coverage provision is an integral part of the
                  larger regulatory scheme ...........................................................................14

      B.      The minimum coverage provision is a valid exercise of
            Congress's independent power under the General Welfare Clause ......................16

Conclusion ..........................................................................................................................20

# Table of Authorities

**Cases:**

*A. Magnano Co. v. Hamilton,*
    292 U.S. 40 (1934) ................................................................................................19

*Alaska v. U.S. Dep't of Transp.,*
    868 F.2d 441 (D.C. Cir. 1989) .............................................................................5

*Alexander v. "Americans United", Inc.,*
    416 U.S. 752 (1974) ............................................................................................6-7

*Alfred L. Snapp & Son, Inc. v. Puerto Rico,*
    458 U.S. 592 (1982) ...........................................................................................3, 4

*Bob Jones Univ. v. Simon,*
    416 U.S. 725 (1974) ..........................................................................................6, 19

*Brooks v. Maryland Gen. Hosp.,*
    996 F.2d 708 (4th Cir. 1993) ..............................................................................11

*Bryan v. Rector & Visitors of Univ. of Va.,*
    95 F.3d 349 (4th Cir. 1996) ................................................................................14

*Brzonkala v. Va. Polytechnic Inst.,*
    169 F.3d 820 (4th Cir. 1999), *aff'd*, 529 U.S. 598 (2000) .......................................12

*Burroughs v. United States,*
    290 U.S. 534 (1934) ...........................................................................................16

*California v. Regan,*
    641 F.2d 721 (9th Cir. 1981) ................................................................................6

*Carter v. Carter Coal Co.,*
    298 U.S. 238 (1936) ...........................................................................................19

*Charles C. Steward Mach. Co. v. Davis,*
    301 U.S. 548 (1938) .......................................................................................18, 19

*Child Labor Tax Case,*
    259 U.S. 20 (1922) .............................................................................................19

*DaimlerChrysler v. Cuno,*
    547 U.S. 332 (2006) .............................................................................................8

*Enochs v. Williams Packing & Nav. Co.*,
370 U.S. 1 (1962) ........................................................................................7

*Gibbs v. Babbitt*,
214 F.3d 483 (2000) ..................................................................................15

*Gonzales v. Raich*,
545 U.S. 1 (2005) ................................................................................ *passim*

*Hill v. Wallace*,
259 U.S. 44 (1922) ....................................................................................19

*Hoffman v. Hunt*,
126 F.3d 575 (4th Cir. 1997) ........................................................1, 11, 12

*Hylton v. United States*,
3 U.S. (3 Dall.) 171 (1796) ......................................................................20

*Judicial Watch, Inc. v. Rossotti*,
317 F.3d 401 (4th Cir. 2003) .......................................................................7

*Illinois v. City of Chicago*,
137 F.3d 474 (7th Cir. 1998) ....................................................................7-8

*Illinois Dep't of Transp. v. Hinson*,
122 F.3d 370 (7th Cir. 1997) .......................................................................5

*In re Leckie Smokeless Coal Co.*,
99 F.3d 573 (4th Cir. 1996) .........................................................................7

*Lewis v. Casey*,
518 U.S. 343 (1996) .....................................................................................8

*Lochner v. New York*,
198 U.S. 45 (1905) ..................................................................................2, 14

*Lottery Case*,
188 U.S. 321 (1903) ...................................................................................16

*M'Culloch v. Maryland*,
17 U.S. (4 Wheat 316 (1819) .....................................................................16

*Massachusetts v. EPA*,
549 U.S. 497 (2007) .................................................................................2, 3

*Massachusetts v. Mellon,*
262 U.S. 447 (1923)................................................................................2-4

*Minnesota v. United States,*
525 F.2d 231 (8th Cir. 1975) ..................................................................6

*Ohio v. U.S. Dep't of Transp.,*
766 F.2d 228 (6th Cir. 1985) ..................................................................5

*Pac. Ins. Co. v. Soule,*
74 U.S. (7 Wall.) 433 (1868) ..................................................................20

*Sabri v. United States,*
541 U.S. 600 (2004)................................................................................13

*Simmons v. United States,*
308 F.2d 160 (4th Cir. 1962) ..................................................................17

*Sonzinsky v. United States,*
300 U.S. 506 (1937)................................................................................18

*South Carolina v. Regan,*
465 U.S. 367 (1984)................................................................................7

*Texas Office of Pub. Util. Counsel v. FCC,*
183 F.3d 393 (5th Cir. 1999) ..................................................................5

*Texas v. United States,*
523 U.S. 296 (1998)................................................................................8

*United States v. Butler,*
297 U.S. 1 (1936)...................................................................................18

*United States v. Clintwood Elkhorn Min. Co.,*
553 U.S. 1 (2008)...................................................................................7

*United States v. Comstock,*
130 S. Ct 1949 (2010).............................................................................16

*United States v. Darby,*
312 U.S. 100 (1941)................................................................................12

*United States v. Gould,*
568 F.3d 459 (4th Cir. 2009), *cert. denied*, 130 S. Ct. 1686 (2010)......................10

*United States v. Lopez,*
    514 U.S. 549 (1995)................................................................................11, 12, 15

*United States v. Morrison,*
    529 U.S. 598 (2000)..................................................................................................12

*United States v. Sanchez,*
    340 U.S. 42 (1950)....................................................................................................19

*United States v. Wrightwood Dairy Co.,*
    315 U.S. 110 (1942)..................................................................................................15

*Veazie Bank v. Fenno,*
    75 U.S. 533 (1869)....................................................................................................20

*Wickard v. Filburn,*
    317 U.S. 111 (1942)..................................................................................................10

*Wyoming v. United States,*
    539 F.3d 1236 (10th Cir. 2008) ..................................................................................5

## Constitution and Statutes:

U.S. Const. art. I, § 8, cl. 1..........................................................................................17, 19

U.S. Const. amend. XVI ....................................................................................................20

26 U.S.C. § 2001................................................................................................................20

26 U.S.C. § 5000A(a) ..................................................................................................17, 20

26 U.S.C. § 5000A(b)(1)....................................................................................................20

26 U.S.C. § 5000A(b)(2)....................................................................................................17

26 U.S.C. § 5000A(b)(3)....................................................................................................17

26 U.S.C. § 5000A(c)(1)...............................................................................................17, 20

26 U.S.C. § 5000A(c)(2)...............................................................................................17, 20

26 U.S.C. § 5000A(e)(1)....................................................................................................20

26 U.S.C. § 5000A(e)(2)...............................................................................................17, 20

26 U.S.C. § 6651 ................................................................................................................20

26 U.S.C. § 7421(a) ...........................................................................................................6

28 U.S.C. § 2201(a) ...........................................................................................................7

42 U.S.C. § 1395dd ..........................................................................................................11

Pub. L. No. 111-148, 124 Stat. 119 (2010) :

    § 1201 ....................................................................................................................15
    § 1501 ................................................................................................................9, 17
    § 1501(a)(2)(F) .................................................................................................9, 10
    § 1501(a)(2)(I) .................................................................................................9, 15
    § 10106(a) ...................................................................................................9, 10, 15

Pub. L. No. 111-152, 124 Stat. 1029 (2010) ...................................................................17

Virginia Code § 38.2-3430.1:1 (2010) ..............................................................................3

**Legislative Materials:**

Congressional Budget Office, *Key Issues in Analyzing Major Health Insurance Proposals* (2008) ...................................................................................................10

Congressional Budget Office, *Nonprofit Hospitals and the Provision of Community Benefits* (2006) .....................................................................................................10

131 Cong. Rec. S28,569 (Oct. 23, 1985) (statement of Sen. Dole) ..................................14

Council of Economic Advisers, *Economic Report of the President* (Feb. 2010) ............10

*Health Reform in the 21st Century: Insurance Market Reforms: Hearing Before the H. Comm. on Ways and Means*, 111th Cong. (2009) ............................................15

H. Res. 1225, 111th Cong.  (2010) ..................................................................................17

H.R. Rep. No. 111-443 (2010) .........................................................................................18

Joint Committee on Taxation, Report JCX-47-09 (Nov. 5, 2009) ...................................18

S. Res. 13, 111th Cong. (2009) ........................................................................................17

## Introduction

Virginia asks this Court to resolve policy differences between the state and federal governments as to the wisdom of the Patient Protection and Affordable Care Act ("ACA"). There is, however, no actual case or controversy that could establish the Court's jurisdiction to referee this policy dispute. Virginia lacks standing to bring its challenge to the ACA's minimum coverage provision, as it can assert no injury from that provision to any legitimate interest it holds as a state. Virginia's argument to the contrary invokes a state statute declaring the federal provision to be inoperative within its borders. But a statute that seeks to do nothing more than exempt Virginia citizens from the operation of federal law implicates no state interest besides the *parens patriae* function that Virginia concedes (and the Supreme Court has held) cannot ground Article III standing. Indeed, Virginia seeks to do precisely what the Supreme Court said it cannot do, sue the federal government to protect its citizens from the operation of federal statutes. To the extent those citizens object to the minimum coverage provision of the ACA, they can avail themselves of the one recourse that Congress has provided, and challenge any penalties after assessment and payment in an ordinary refund suit. Virginia's invocation of an abstract interest in sovereignty cannot create new remedies in violation of Congress's express ban on tax injunctions.

Virginia fares no better on the merits. It admits, as it must, that "health insurance is unique because virtually everyone will need medical services at some point." Mem. in Opp. 9. Nor does Virginia dispute that the uninsured consume medical services and shift their health care costs onto other participants in the health care market. Congress has power to regulate this substantial interference with the interstate market in health care services. *E.g.*, *Hoffman v. Hunt*, 126 F.3d 575, 583-88 (4th Cir. 1997). Moreover, absent the minimum coverage provision, the

1

Act's broader regulation of health insurance, such as the requirement that insurers cannot deny coverage to Americans based on pre-existing medical conditions, would increase incentives for individuals to wait to obtain coverage until they need care.  The minimum coverage provision will minimize this adverse selection.  It is thus essential to the comprehensive regulatory scheme, which also places it firmly within Congress's powers under the Commerce Clause and the Necessary and Proper Clause.  In addition to these powers, Congress has independent authority under the General Welfare Clause to enact a penalty to enforce the provision.  Contrary to Virginia's dire assertions, recognizing this Congressional authority over economic decisions regarding how to pay for health care does not open the door to regulation of non-economic decisions that do not concern methods of payment, or do not substantially affect interstate commerce.  Nor may Virginia invoke its *Lochner*-era understanding of the law to challenge the ACA as a "market distortion."  As a policy argument, it addresses the wrong forum.  As a legal argument, it is an anachronism.

## Argument

### I.   The Complaint Should Be Dismissed for Lack of Subject Matter Jurisdiction

#### A.   Virginia Lacks Standing Because It Has Alleged No Cognizable Injury

Virginia does not – and cannot – dispute three principles that govern this Court's jurisdiction.  *First*, a "naked contention that Congress has usurped the reserved powers of the several states by the mere enactment of [a] statute" is an "abstract question[] of political power, of sovereignty, of government" outside the scope of Article III jurisdiction.  *Massachusetts v. Mellon*, 262 U.S. 447, 483, 485 (1923).  *Second*, a State cannot, acting "as parens patriae, . . . institute judicial proceedings to protect citizens of the United States from the operation of [federal] statutes."  *Id.* at 485; *see also Massachusetts v. EPA*, 549 U.S. 497, 520 n.17 (2007).

*Third*, a State cannot pass a statute that purports to declare federal law to be a nullity, for "state action cannot circumscribe Congress' plenary commerce power." *Gonzales v. Raich*, 545 U.S. 1, 29 (2005). Yet Virginia argues that it can evade the first two principles by violating the third. It claims that, by enacting a state law that purports only to protect its citizens from the operation of a federal statute, it somehow "transform[ed] Tenth Amendment issues of the sort found to be merely abstract in *Massachusetts v. Mellon* . . . into an immediate and concrete dispute within the ambit of the sovereign standing cases." Mem. in Opp. 3. This attempt at jurisdictional alchemy fails.

Disclaiming *parens patriae* standing, *but see* Compl. ¶ 4, Virginia now asserts that it is suing to vindicate its "'sovereign power over individuals and entities within [its] jurisdiction'" – *i.e.*, its "'power to create and enforce a legal code.'" Mem. in Opp. 15 (quoting *Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592, 601 (1982)). According to Virginia, it was "acting within the scope of its sovereign interests" and "exercis[ing] a traditional state authority," Mem. in Opp. 2, when it adopted Virginia Code § 38.2-3430.1:1 (2010).[1] It thus claims standing to challenge the ACA because "the Secretary is asking for a ruling that requires Virginia to give way with respect to a matter of traditional state power." Mem. in Opp. 15.

But that is just *parens patriae* standing by another name. It would nullify the holdings in *Mellon* and *Massachusetts v. EPA* if the Commonwealth could grant itself standing to challenge virtually any federal law simply by enacting a statute purporting to exempt Virginians from the operation of federal law. A state may not sue the United States "to protect her citizens from the operation of federal statutes." *Massachusetts v. EPA*, 549 U.S. at 520 n.17; *see also Mellon*, 262 U.S. at 485. Relabeling that effort does not alter this rule.

---

[1]   For the Court's convenience, the Secretary is submitting an appendix of excerpts of relevant statutory materials.

Nor can Virginia avoid the limits of Article III by contending that it was "acting within the scope of its sovereign interests" or "exercis[ing] a traditional state authority," Mem. in Opp. 2, when it enacted the state statute.  Again, the Supreme Court has made clear that "it is *no part* of [a State's] duty or power to enforce [its citizens'] rights in respect of their relations with the federal government."  *Mellon*, 262 U.S. at 485-86 (emphasis added).  Just as a state lacks power to sue to protect its citizens from the operation of federal statutes, it also lacks any "traditional" or "sovereign" power to enact a statute that confers that standing on itself, or that purports to shield its citizens from federal law.  *See Alfred L. Snapp & Son*, 458 U.S. at 602 ("Interests of private parties are obviously not in themselves sovereign interests, and they do not become such simply by virtue of the State's aiding in their achievement.").

Yet that is all that Virginia's statute attempts to do.  With passage of the federal law imminent, Virginia declared that no resident "shall be required" to obtain insurance or be held "liable" for any penalty for not obtaining it.  The obvious target of this bill, the only party "requiring" or "holding liable," is the federal government.  Virginia does not, and cannot, contend that its statute has any independent regulatory force apart from its attempt to declare rights under federal law.  Nor does the statute create any enforcement apparatus.  Indeed, the statute carves out from its protection purchases of insurance required by "a court or the Department of Social Services," purchases students are required to make "by an institution of higher education," and voluntary applications "for coverage under a state-administered program pursuant to Title XIX or XXI of the Social Security Act."  *See* Compl. ¶ 3.  By preserving state insurance-purchase requirements, the state law makes clear that its sole purpose is to instruct the federal government that Virginia's citizens are exempt from the minimum coverage provision of federal law.  A statute that does not advance the state's independent regulatory interests, and

instead purports solely to shield state citizens from the operation of federal law, implicates no state interest that can sustain Article III standing.

This case is thus a far cry from the cases cited by Virginia in which states had standing to defend their ability to enforce their legal codes. States exercise their police powers and advance their own regulatory agenda – as opposed to proclaiming that the federal government may not apply federal law to their citizens – when they regulate airline price advertising within their borders, *Alaska v. U.S. Dep't of Transp.*, 868 F.2d 441 (D.C. Cir. 1989); exercise authority over revenues telecommunication carriers earn from intrastate services, *Texas Office of Pub. Util. Counsel v. FCC*, 183 F.3d 393 (5th Cir. 1999); require pre-notification before shipment of special nuclear material through their borders, *Ohio v. U.S. Dep't of Transp.*, 766 F.2d 228 (6th Cir. 1985); or establish when persons with state misdemeanor convictions are eligible for state-issued firearm permits, *Wyoming v. United States*, 539 F.3d 1236 (10th Cir. 2008). In each of these cases, the state exercised regulatory power over individuals or entities, and standing turned on the asserted injury to its ability to enforce those regulations. *Compare Illinois Dep't of Transp. v. Hinson*, 122 F.3d 370, 372-73 (7th Cir. 1997) (state lacked cognizable injury where ability to enforce statutes was not hindered). None of these cases involved a naked attempt by a state to confer on its citizens an unauthorized exemption from federal law.

In short, when the Supreme Court ruled that a state cannot sue to shield its citizens from federal law, it acknowledged no exception where a state passes a statute – or for that matter, issues a regulation or executive order – that purports to confer such protection. By embedding its anticipated legal claim in some legislative or executive action before framing it in a complaint, a state does not thereby "transform" an abstract question into a case or controversy under Article III.

**B.     The Anti-Injunction Act Bars Virginia's Challenge to the Penalties Imposed under the Minimum Coverage Provision**

The Anti-Injunction Act likewise bars jurisdiction here.  That statute provides in relevant part that "no suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court by any person, whether or not such person is the person against whom such tax was assessed." 26 U.S.C. § 7421(a).  The Anti-Injunction Act requires any challenge to the minimum coverage provision to be brought by the right plaintiff (one subject to the penalty under that provision) in the right forum (a refund suit) at the right time (after assessment and payment of the penalty).

Invoking a "presumption" that the term "person" does not include the sovereign, Virginia argues that it is exempt from Section 7421(a).  Mem. in Opp. 17.  If Virginia were correct, any state not only could bring anticipatory suits on behalf of its residents to bar the federal government from collecting future federal tax liabilities, but also could sue to challenge its own tax liabilities, putting billions of dollars in tax payments outside the reach of the Anti-Injunction Act and fundamentally altering the federal tax scheme.  Unsurprisingly, no court has ever read the statute this way; to the contrary, courts have routinely applied the statute to states.  *See California v. Regan*, 641 F.2d 721 (9th Cir. 1981); *Minnesota v. United States*, 525 F.2d 231 (8th Cir. 1975).  That approach is consistent with the plain meaning of the statute.  From 1867 to 1966, the statute provided simply that "no suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court." *See Bob Jones Univ. v. Simon*, 416 U.S. 725, 731-32 n.6 (1974).  As the Supreme Court has noted, Congress added the phrase beginning with "by any person" in 1966 not to narrow the Anti-Injunction Act, but to make clear that it *extended* to third parties who were not themselves the subject of the tax.  *Id.*  The addition of this phrase "reaffirm[ed] the plain meaning of the original language of the Act," *Alexander v.*

6

*"Americans United," Inc.*, 416 U.S. 752, 760 n.11 (1974), and that plain meaning encompasses Virginia.  Moreover, Virginia asserts that the Anti-Injunction Act is "coextensive" with the bar on declaratory relief involving federal taxes, Mem. in Opp. 19 n.6, yet the tax exception to the Declaratory Judgment Act, 28 U.S.C. § 2201(a), is not limited to "persons," however defined.  Thus, even if Virginia's asserted presumption applied, it would be easily overcome here.

Nor does Virginia fall within the judicial exception to the statutory bar on injunctions established in *South Carolina v. Regan*, 465 U.S. 367 (1984).[2]  In that case, South Carolina suffered a concrete injury from revocation of a federal tax exemption for state bonds, and lacked other avenues of redress.  As the state was not the taxpayer, it could not bring a refund claim. And there was at best a "mere possibility" that buyers of the bonds would assert the state's constitutional claims in a refund suit.  The Supreme Court therefore allowed the state to sue.  *Id.* at 381.  The *Regan* exception, however, does not apply beyond this "very narrow[]" – indeed, "almost unique" – set of facts.  *Judicial Watch, Inc. v. Rossotti*, 317 F.3d 401, 408 n.3 (4th Cir. 2003); *see In re Leckie Smokeless Coal Co.*, 99 F.3d 573, 584 (4th Cir. 1996) (applying exception where seller could not rely on purchaser to raise tax-related claim).  This is not such a case.  Virginia suffers no concrete injury from the minimum coverage provision, and, after 2014, a proper plaintiff in a refund action could present the claims Virginia wishes to assert here. Virginia argues that it alone "has standing to defend the insult to its sovereignty," Mem. in Opp. 19, but it is plainly wrong.  *See Illinois v. City of Chicago*, 137 F.3d 474, 478 (7th Cir. 1998)

---

[2]  Virginia briefly asserts that it falls within a second judicially-created exception to the Anti-Injunction Act, which permits suits to remedy exceptionally clear and irreparable infringements.  Mem in Opp. 18 n.5, citing *Enochs v. Williams Packing & Nav. Co.*, 370 U.S. 1 (1962).  Congress acted well within its Article I powers by enacting the ACA.  To say the least, the merits of Virginia's contrary claim are not "so obvious that the Government [has] no chance of prevailing."  *United States v. Clintwood Elkhorn Min. Co.*, 553 U.S. 1, 14 (2008).  And Virginia also has no irreparable injury, as it is not subject to the minimum coverage provision at all.  *See Judicial Watch*, 317 F.3d at 407.

("the right litigant [to contest a preemptive federal statute] is not the author of the state law, but a person claiming benefits under that law").  The Anti-Injunction Act thus controls.

### C.     Virginia's Claim of an Abstract Conflict between State and Federal Law Is Not Ripe for Review

Virginia's challenge is also not ripe.  The state statute is purely declaratory, with no enforcement mechanism.  Thus, contrary to Virginia's claim that the "collision" between its state statute and the ACA "is certain to occur," Mem. in Opp. 20, in fact there will be no collision, much less one that is certain.  The case is thus not fit for review.

And Virginia suffers no hardship from the "abstraction" of a supposed threat to federalism.  *Texas v. United States*, 523 U.S. 296, 302 (1998).  It asserts that it is "already feeling present effects," not alleged in its Complaint, from other, unchallenged provisions of the ACA, such as the "effect" of its decision to forego funds available under the Act to establish temporary high-risk insurance pools.  Mem. in Opp. 20.  But ripeness, like standing, "is not dispensed in gross."  *Lewis v. Casey*, 518 U.S. 343, 358 n.6 (1996); *see DaimlerChrysler v. Cuno*, 547 U.S. 332, 352-53 (2006).  Virginia must show that it suffers hardship from the particular provision that it has challenged, not from other provisions of the ACA whose constitutionality it does not dispute.  It cannot make that showing, and this Court therefore lacks jurisdiction.

## II.    The Complaint Should Be Dismissed for Failure to State a Claim upon Which Relief May Be Granted

### A.     The Comprehensive Regulatory Measures of the ACA, Including the Minimum Coverage Provision, Are a Proper Exercise of Congress's Powers under the Commerce and Necessary and Proper Clauses

Congress enacted the ACA to address a national crisis – an interstate health care market in which tens of millions of Americans went without insurance coverage and in which the costs of medical treatment spiraled out of control.  As part of a comprehensive reform effort to reduce

the ranks of the uninsured, the ACA regulates economic decisions regarding the way in which health care services are paid for.  The Act regulates payment for those services through employer-sponsored health insurance; through governmental programs such as Medicaid; and through insurance sold to individuals or to small groups in the new exchanges.  The Act also regulates the terms of health insurance policies, ending industry practices that have denied insurance to many people, most notably the refusal to insure persons with pre-existing medical conditions.  And, in Section 1501, the Act requires most Americans who can afford insurance in this interstate market to obtain a minimum level of coverage or to pay a penalty.

The minimum coverage provision of Section 1501 falls within Congress's authority under the Commerce Clause, for two principal reasons.  First, the economic decisions that the Act regulates as to how to pay for health care services have direct and substantial effects on the interstate health care market.  In 2008 alone, the uninsured incurred $43 billion in health care costs for which they were unable to pay, and those costs were passed on to health care providers, insurers, the insured population, and taxpayers.  Pub. L. No. 111-148, §§ 1501(a)(2)(F), 10106(a).  Second, the minimum coverage provision is essential to the Act's larger regulation of the interstate business of health insurance.  As Congress recognized, for example, if the bar on denying coverage to people with pre-existing conditions were not coupled with a minimum coverage provision, individuals would have powerful incentives to wait until they fall ill before they purchase health insurance.  Pub. L. No. 111-148, §§ 1501(a)(2)(I), 10106(a).  The Act would fail in its efforts to reform the interstate health insurance market, expand coverage, and limit costs.  Because the minimum coverage provision is integral to the Act's larger regulation of interstate commerce, Congress had the power under the Commerce Clause and the Necessary and Proper Clause to enact it.

1.    **The Minimum Coverage Provision Regulates Conduct with Substantial Effects on Interstate Commerce**

*Gonzales v. Raich*, 545 U.S. 1, 16-17 (2005), reaffirms that the Commerce Clause affords Congress broad authority to "regulate activities that substantially affect interstate commerce." This includes power not only to regulate markets directly, but also to regulate even non-commercial matters that have economic effects.  "'But even if appellee's activity be local and though it may not be regarded as commerce, it may still, whatever its nature, be reached by Congress if it exerts a substantial economic effect on interstate commerce.'"  *United States v. Gould*, 568 F.3d 459, 472 (4th Cir. 2009), *cert. denied*, 130 S. Ct. 1686 (2010) (quoting *Wickard v. Filburn*, 317 U.S. 111, 125 (1942)).  The question is only whether Congress could rationally find that the class of activities it seeks to regulate has, in the aggregate, a substantial and direct effect on interstate commerce. *See Raich*, 545 U.S. at 22.

The Secretary's initial memorandum detailed the substantial effects that arise from economic decisions regarding how to pay for health care services.  In the aggregate, decisions to forego insurance coverage and instead attempt to pay for health care out of pocket drive up the cost of insurance and hinder small employers in providing coverage to their employees.  The costs of caring for the uninsured who prove unable to pay, $43 billion in 2008 alone, are shifted to providers, to the insured population in the form of higher premiums, to governments, and to taxpayers.  Pub. L. No. 111-148, §§ 1501(a)(2)(F), 10106(a); *see also* COUNCIL OF ECONOMIC ADVISERS, ECONOMIC REPORT OF THE PRESIDENT 187 (Feb. 2010).

These costs of uncompensated care arise in part because, in this country, a person who is unable to pay for emergency care will not be left to die at the hospital door.  *See* CONG. BUDGET OFFICE ("CBO"), KEY ISSUES IN ANALYZING MAJOR HEALTH INSURANCE PROPOSALS 13 (2008); *see also* CBO, NONPROFIT HOSPITALS AND THE PROVISION OF COMMUNITY BENEFITS 1-2 (2006).

This established tradition is reflected in the Emergency Medical Treatment and Labor Act ("EMTALA"), 42 U.S.C. § 1395dd, which Congress enacted in 1986 in response to a "concern that hospitals were abandoning the longstanding practice of providing emergency care to all due to increasing pressures to lower costs and maximize efficiency." *Brooks v. Maryland Gen. Hosp.*, 996 F.2d 708, 710 (4th Cir. 1993).

Virginia does not dispute that the uninsured consume tens of billions of dollars in uncompensated care each year, shifting their costs onto other participants in the health care market. Its concession resolves the matter, because Congress may regulate activity that, in the aggregate, imposes substantial and direct burdens on an interstate market. Indeed, even prior to *Raich*, the Fourth Circuit had made clear that Congress may regulate even *noneconomic* activity that burdens an interstate market. Like every other court of appeals to address the issue, the court upheld the Freedom of Access to Clinic Entrances Act ("FACE Act"), which makes it unlawful to obstruct access to a reproductive health care facility. *See Hoffman v. Hunt*, 126 F.3d 575, 583-88 (4th Cir. 1997), *cert. denied*, 523 U.S. 1136 (1998). "Although this regulated activity is not itself commercial or economic in nature, it is closely connected with, and has a direct and profound effect on, the interstate commercial market in reproductive health care services." *Id.* at 587. Accordingly, the statute was sustained "under the line of Supreme Court authority 'upholding regulations of activities that arise out of or are connected with a commercial transaction, which viewed in the aggregate, substantially affects interstate commerce.'" *Id.* at 588 (quoting *United States v. Lopez*, 514 U.S. 549, 561 (1995)).

The relevant question then is not (as Virginia would have it, Mem. in Opp. 8) whether the immediate subject of the regulation is economic, but whether it is "related to interstate commerce in a manner that is clear, relatively direct, and distinct from the type of relationship that can be

hypothesized to exist between every significant activity and interstate commerce." *Brzonkala v. Va. Polytechnic Inst.*, 169 F.3d 820, 837 (4th Cir. 1999) (en banc), *aff'd sub nom. United States v. Morrison*, 529 U.S. 598 (2000). In invalidating the cause of action created by the Violence Against Women Act ("VAWA") for victims of gender-motivated violence, the Fourth Circuit contrasted those acts of violence, which "lack[ed] a meaningful connection with any particular, identifiable economic enterprise or transaction," 169 F.3d at 834, with the FACE Act's regulation of conduct "that 'is closely and directly connected with an economic activity' – the operation of abortion clinics." *Id.* (quoting *Hoffman*, 126 F.3d at 587-88).

It is thus unsurprising that, in the 70 years since the Supreme Court overruled its prior stringent limits on the Commerce Clause, *see United States v. Darby*, 312 U.S. 100 (1941), it has invalidated statutes as beyond the reach of the commerce power only twice. In both cases, as explained previously, the statute had at best a highly attenuated connection to any economic activity, and did not form part of a broader scheme of economic regulation. In *Morrison*, the Court invalidated the cause of action created in VAWA, finding that any link between gender-motivated violence and economic activity could be established only through a chain of speculative assumptions. Similarly, in *Lopez*, the Court struck down a ban on possession of a handgun in a school zone because the ban was not part of an overall scheme of firearms regulation, and it related to economic activity only insofar as the presence of guns near schools might impair learning, which in turn might undermine economic productivity. The Court reasoned that Congress may not "pile inference upon inference" to find a link between the regulated activity and interstate commerce. *Lopez*, 514 U.S. at 567.[3]

---

[3] In contrast to *Lopez* and *Morrison*, moreover, where the federal enactments entered into areas that states could and did address through their traditional police powers, *see Morrison*, 529 U.S. at 618; *Lopez*, 514 U.S. at 581-83, Congress here is regulating an *interstate* market in which

"No piling is needed here to show that Congress was within its prerogative" to regulate interstate commerce. *Sabri v. United States*, 541 U.S. 600, 608 (2004). It is difficult to imagine legislation more clearly economic than regulation of how health care services are financed. And the decision whether to purchase insurance, or to attempt to pay for health care out of pocket, is plainly "economic," as Virginia itself concedes. Compl. ¶ 14. These decisions – viewed in the aggregate – have clear and direct effects on providers, taxpayers, and the insured population who ultimately, and inevitably, pay for the care that is provided to those who go without insurance. Congress may address those effects under the Commerce Clause.

Virginia nonetheless insists that upholding the minimum coverage provision would abandon all principled limits on Congress's commerce power. "Surely," it contends, "a limit cannot be found in the argument that health insurance is unique because virtually everyone will need medical services at some point." Mem. in Opp. 9. Virginia must acknowledge that no one can guarantee his health, or ensure that he will never participate in the health care market. The healthy 20-year-old biker who is struck by a car instantly becomes a consumer of costly medical care. The question is how to pay for health care expenses – through insurance, or through an attempt to pay out of pocket with a backstop of uncompensated care funded by third parties. It is this phenomenon of cost-shifting – a phenomenon with proven, substantial, and direct effects on the interstate health care market – that is unique to the context of health insurance. The regulation of the economic decisions that produce these effects does not open the floodgates to regulation of non-economic decisions that are unrelated to methods of payment, or that bear only an attenuated connection to interstate commerce.

---

states have been unable to curtail the spiraling costs on their own. *See* Mem. in Supp. of Mot. to Dismiss 24.

Unable to dispute this, Virginia argues that regulations like EMTALA and the ACA are a "market distortion." Mem. in Opp. 9. In Virginia's view, the emergency medical treatment statute itself was apparently an unconstitutional intrusion on the *Lochner*-era understanding of the Commerce Clause, *see* Mem. in Opp. 27, and Congress may not "replicate" its distortion of the interstate health care market to move it farther from the ideal of an unregulated market in which only those who can afford to pay will receive life-saving medical care. Mem. in Opp. 9. What Virginia deems a departure from pure free market principles, many others regard as a "reasonable and humane" response, 131 Cong. Rec. S28,569 (Oct. 23, 1985) (statement of Sen. Dole), to a "national scandal." *Bryan v. Rector & Visitors of Univ. of Va.*, 95 F.3d 349, 352 (4th Cir. 1996). The characterization, however, is beside the point. Congress's authority under the Commerce Clause is not confined to actions that would satisfy Virginia's conception of market efficiency. It has long been established that "a constitution is not intended to embody a particular economic theory." *Lochner v. New York*, 198 U.S. 45, 75-76 (1905) (Holmes, J., dissenting). "Market distortion" or not, the hospital and insurance regulations of EMTALA and the ACA are just that, regulations of markets, and are well within the Congressional power to regulate matters with substantial effects on interstate commerce. There is accordingly no basis for Virginia's hyperbolic suggestion that Congress intends to "endlessly" distort markets to justify limitless Commerce Clause powers. *See Raich*, 545 U.S. at 25 n.34 (rejecting speculation that Congress will use commerce power as a pretext to target local conduct).

> **2.    The Minimum Coverage Provision Is an Integral Part of the Larger Regulatory Scheme**

In addition to its authority to regulate matters with substantial effects on interstate commerce, Congress may regulate even wholly intrastate, wholly non-economic matters that form "'an essential part of a larger regulation of economic activity, in which the regulatory

scheme could be undercut unless the intrastate activity were regulated.'" *Raich*, 545 U.S. at 24-25 (quoting *Lopez*, 514 U.S. at 561); *see also Gibbs v. Babbitt*, 214 F.3d 483, 497 (4th Cir. 2000). When, in 2014, the Act bars insurers from refusing to cover individuals with pre-existing conditions and from setting eligibility rules based on health status or claims experience, Pub. L. No. 111-148, § 1201, all persons will be insurable. The Act will thus provide all Americans with immediate protection against the risk of being unable to obtain insurance in the event of unexpected and possibly catastrophic illness or injury.

Virginia does not dispute that the ACA protects individuals by removing this risk. Nor does Virginia dispute that this federal guarantee would lead some individuals to "wait to purchase health insurance until they needed care." Pub. L. No. 111-148, §§ 1501(a)(2)(I), 10106(a). This prospect makes the minimum coverage provision "essential" to the larger regulatory scheme of the ACA, *id.*, as Virginia itself concedes. Compl. ¶ 5. In the absence of the minimum coverage provision, the incentive for delay would drive the insurance market "into extinction." *Health Reform in the 21st Century: Insurance Market Reforms: Hearing before the H. Comm. on Ways and Means*, 111th Cong. 13 (2009) (statement of Uwe Reinhardt, Ph.D.).

Because Congress has power to ensure the vitality of its broader regulatory scheme, adoption of the minimum coverage provision falls within the Commerce Clause power. For similar reasons, the minimum coverage provision is a valid exercise of Congress's authority under the Necessary and Proper Clause. If Congress has authority to enact a regulation of interstate commerce – as it plainly does for its regulations of the terms on which insurers offer health insurance products on the interstate market – "it possesses every power needed to make that regulation effective." *United States v. Wrightwood Dairy Co.*, 315 U.S. 110, 118-19 (1942)). "'If it can be seen that the means adopted are really calculated to attain the end, the

degree of their necessity, the extent to which they conduce to the end, the closeness of the relationship between the means adopted and the end to be attained, are matters for congressional determination alone.'"   *United States v. Comstock*, 130 S. Ct. 1949, 1957 (2010) (quoting *Burroughs v. United States*, 290 U.S. 534, 547-48 (1934)).

Virginia cannot deny that the minimum coverage provision satisfies the rational basis standard applied since *M'Culloch v. Maryland*, 17 U.S. (4 Wheat) 316 (1819), under the Necessary and Proper Clause.  It instead argues that *Comstock* (without saying so) overthrew those centuries of precedent and demanded a heightened standard of review for exercises of power under the Necessary and Proper Clause.  Mem. in Opp. 38-39.  But *Comstock* did no such thing.  It instead reiterated *M'Culloch* and its progeny, which recognize that the Clause "'leaves to Congress a large discretion as to the means that may be employed in executing a given power.'"  *Comstock*, 130 S. Ct. at 1957 (quoting *Lottery Case*, 188 U.S. 321, 355 (1903)).[4]

**B.      The Minimum Coverage Provision Is a Valid Exercise of Congress's Independent Power under the General Welfare Clause**

The minimum coverage provision falls within Congress's Article I authority for an additional reason.   The provision prescribes a penalty, to be reported and paid with an individual's annual tax return, for the failure to obtain qualifying insurance coverage.  In addition to its power to regulate interstate commerce and to adopt provisions necessary and proper to the regulation of commerce, Congress has independent authority under the General Welfare Clause,

---

[4]   Virginia suggests, without explanation, that the minimum coverage provision is not "proper" under the Necessary and Proper Clause because it is "contrary to 'the letter and spirit of the Constitution.'"  Mem. in Opp. at 10.  It is axiomatic that Congress may not use the clause to adopt a statute that is prohibited by another constitutional provision.  *See Comstock*, 130 S. Ct. at 1957.  Virginia does not, and cannot, contend that the minimum coverage provision violates any other constitutional provision.  Absent such a violation, Congress, not Virginia, determines what is "proper."   "[T]he relevant inquiry is simply 'whether the means chosen are reasonably related to the attainment of a legitimate end under the commerce power.'"   *Comstock*, 130 S. Ct. at 1957 (quoting *Raich*, 545 U.S. at 37 (Scalia, J., concurring in the judgment)).  They are.

U.S. CONST. art. I, § 8, cl. 1, to prescribe this penalty.  Virginia raises four arguments to the contrary.  None is availing.

First, Virginia argues that Congress did not intend to exercise its General Welfare Clause authority at all, because it did not specifically denominate the Section 1501 penalty as a "tax."  Mem. in Opp. 31.  But "it has been clearly established that the labels used do not determine the extent of the taxing power."  *Simmons v. United States*, 308 F.2d 160, 166 n.21 (4th Cir. 1962).  The substance of the minimum coverage provision shows that it is an exercise of Congress's independent taxing power, as well as its commerce power.  The provision is codified in the Internal Revenue Code in a subtitle labeled "Miscellaneous Excise Taxes."  Individuals who fail to obtain qualifying insurance coverage, and who are not exempt, must pay the resulting penalty with their annual income tax.  26 U.S.C. § 5000A(b)(2).  Taxpayers whose household income is below the statutory threshold requiring individuals to file income tax returns are not subject to the penalty.  26 U.S.C. § 5000A(e)(2).  If the penalty applies, it is calculated by reference to the individual's household income for federal tax purposes.  26 U.S.C. § 5000A(c)(1), (2).  The taxpayer's responsibility for family members turns on their status as dependents under the Internal Revenue Code.  26 U.S.C. § 5000A(a), (b)(3).  The substantial revenues resulting from the penalty are paid into the general treasury.  And Congress recognized the revenue-raising nature of this provision when it addressed amendments to it in the Health Care and Education Reconciliation Act, Pub. L. No. 111-152, which was limited to changes with a significant effect on the federal budget.  *See* H. Res. 1225, 111th Cong. (2010); S. Con. Res. 13, 111th Cong. § 202 (2009).  Congress thus treated the provision as an exercise of its taxing power in addition

to its commerce power.  *See* H.R. REP. NO. 111-443, pt. I at 265 (2010) (describing taxing provision).[5]

Second, Virginia argues that the minimum coverage provision has a regulatory purpose and therefore cannot be sustained as an exercise of the taxing power.  Mem. in Opp. 32.  But "[e]very tax is in some measure regulatory" to the extent "it interposes an economic impediment to the activity taxed as compared with others not taxed." *Sonzinsky v. United States*, 300 U.S. 506, 513 (1937).  Nonetheless, the "confines [of the taxing and spending power] are set in the clause which confers it, and not in those of section 8 which bestow and define the legislative powers of the Congress.  It results that the power of Congress to authorize expenditure of public moneys for public purposes is not limited by the direct grants of legislative power found in the Constitution." *United States v. Butler*, 297 U.S. 1, 66 (1936).[6]  Congress thus may exercise the taxing power, even if it acts with a regulatory purpose, and even if that regulatory purpose is beyond its Commerce Clause authority.  "'From the beginning of our government, the courts have sustained taxes although imposed with the collateral intent of effecting ulterior ends which, considered apart, were beyond the constitutional power of the lawmakers to realize by legislation

---

[5] As noted in the Secretary's initial brief, the Joint Committee on Taxation analyzed the minimum coverage provision as a taxing measure.  Virginia claims that the Committee sought to manipulate the legislative history by reporting on the provision's revenue effects after the Senate passed a bill.  Mem. in Opp. 36-37.  The Committee, which is nonpartisan, began considering the minimum coverage provision as a revenue-raising provision well before the Senate acted.  *See* Report JCX-47-09 (Nov. 5, 2009).

[6] Contrary to Virginia's claim, *Butler* did not confine Congress's power to tax and spend for the general welfare to those ends specified elsewhere in Article I, Section 8.  It held instead that Congress did not exercise that power when it derived revenues from some participants in a regulatory program and directed those revenues to other participants in that program, rather than to the general treasury.  297 U.S. at 61; *see also Charles C. Steward Machine Co. v. Davis*, 301 U.S. 548, 592 (1937).  The revenues from the minimum coverage provision, however, go into the general treasury, and the Act does not direct them to a particular end.

directly addressed to their accomplishment.'"  *United States v. Sanchez*, 340 U.S. 42, 44-45 (1950) (quoting *A. Magnano Co. v. Hamilton*, 292 U.S. 40, 47 (1934)).

Virginia is likewise wrong to suggest that "while Congress can tax what it cannot regulate, it cannot use a tax to regulate that which it cannot otherwise regulate."  Mem. in Opp. 33 (citing *Child Labor Tax Case*, 259 U.S. 20 (1922)).  The Supreme Court has abandoned its earlier "distinctions between regulatory and revenue-raising taxes," *Bob Jones Univ.*, 416 U.S. at 741 n.12, and there is no basis to revive those distinctions here.  Even if those earlier cases had any lingering validity, at most they suggest that a court may invalidate only punitive or coercive penalties, and even then, only those that coerce the taxpayer into a separate administrative scheme with detailed enforcement mechanisms not allowable under the Commerce Clause.  *See, e.g.*, *Child Labor Tax Case*; *Hill v. Wallace*, 259 U.S. 44 (1922); *Carter v. Carter Coal Co.*, 298 U.S. 238 (1936).  Here, the minimum coverage provision is neither punitive nor coercive; the maximum penalty is no greater than the cost of obtaining insurance.  Moreover, the penalty does not force taxpayers to submit to broad regulation of their own conduct; the larger regulatory scheme of the ACE is aimed instead at health insurers, employers, and other entities.

Third, Virginia argues that the penalty under the minimum coverage provision exceeds the scope of the General Welfare Clause because it is not within one of the various categories of taxes mentioned in the Constitution, *e.g.*, "Taxes, Duties, Imposts, and Excises," U.S. Const., art. I, § 8, cl. 1.  Mem. in Opp. 32.  The Supreme Court rejected this argument in *Charles C. Steward Machine Co. v. Davis*, 301 U.S. 548 (1937), upholding the employment taxes in the Social Security Act against a claim that they did not qualify as "excises."  "The subject-matter of taxation open to the power of the Congress is as comprehensive as that open to the power of the states."  *Id.* at 581.  "Whether the tax is to be classified as an 'excise' is in truth not of critical

19

importance.  If not that, it is an 'impost' or a 'duty.'"  *Id*. at 581-82.   The General Welfare Clause power "may be applied to every object of taxation, to which it extends, in such measure as Congress may determine. . . .  [I]t was the intention of the Convention that the whole power should be conferred."  *Veazie Bank v. Fenno*, 75 U.S. 533, 541 (1869).[7]

Last, Virginia asserts that the minimum coverage provision is a "capitation tax" that must be apportioned by population under Article I, Section 9.  Mem. in Opp. 37.  *But see id.* at 11 (penalty "is not a land or capitation tax").  A capitation tax is one imposed "simply, without regard to property, profession, or any other circumstance."  *Hylton v. United States*, 3 U.S. (3 Dall.) 171, 175 (1796) (opinion of Chase, J.); *see also Pac. Ins. Co. v. Soule*, 74 U.S. (7 Wall.) 433, 444 (1868); *Veazie Bank*, 75 U.S. at 540-44.  The Supreme Court has never invalidated a provision as a capitation tax, and the minimum coverage provision cannot be the first.  It does not impose a flat tax "without regard to" the taxpayer's circumstances.  To the contrary, among other exemptions, it excuses persons with incomes below the threshold for filing a return, as well as persons for whom the cost of qualifying coverage would exceed 8% of household income.  26 U.S.C. § 5000A(e)(1), (2).  The penalty further varies with the taxpayer's income, subject to a set dollar floor, and a cap equal to the cost of qualifying coverage.  26 U.S.C. § 5000A(c)(1), (2).  And, of course, the penalty does not apply at all if the taxpayer obtains coverage.  26 U.S.C. § 5000A(a), (b)(1).  The minimum coverage provision thus is tailored to the individual's circumstances, including income.  *See also* U.S. Const. amend. XVI.   It is not a capitation tax.

### Conclusion

For the foregoing reasons, the Motion to Dismiss should be granted.

---

[7]  Virginia argues that the penalty is not a tax because no tax has ever been imposed "on a decision not to purchase or not do something unrelated to larger voluntary business or other undertaking."  Mem. in Opp. at 32.  This contention ignores the penalty for a failure to file a return or to pay taxes when due, 26 U.S.C. § 6651, and the estate tax, *id.* § 2001.

DATED this 22nd day of June, 2010.

Respectfully submitted,

TONY WEST
Assistant Attorney General

IAN HEATH GERSHENGORN (admitted *pro hac vice*)
Deputy Assistant Attorney General

NEIL H. MacBRIDE
United States Attorney


By:      /s/ Jonathan H. Hambrick
JONATHAN H. HAMBRICK, VSB # 37590
Assistant United States Attorney
Office of the United States Attorney
600 East Main Street, Suite 1800
Richmond, Virginia 23219
Telephone:     (804) 819-5400
Fax:             (804) 819-7417
Email:          jay.h.hambrick@usdoj.gov

JENNIFER R. RIVERA, VSB # 29281
Director
SHEILA M. LIEBER (admitted *pro hac vice*)
Deputy Director
JOEL McELVAIN (admitted *pro hac vice*)
Senior Counsel
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., NW, Room 7332
Washington, D.C. 20001
Telephone:     (202) 514-2988
Fax:             (202) 616-8202
Email:          Joel.McElvain@usdoj.gov

*Attorneys for the Defendant*

## CERTIFICATE OF SERVICE

I hereby certify that on the 22nd day of June, 2010, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to the following:

Earle Duncan Getchell, Jr.
Charles E. James, Jr.
Stephen R. McCullough
Wesley Glenn Russell, Jr.
Office of the Attorney General
900 E. Main Street
Richmond, Virginia 23219


    /s/ Jonathan H. Hambrick
JONATHAN H. HAMBRICK, VSB # 37590
Assistant United States Attorney
Office of the United States Attorney
600 East Main Street, Suite 1800
Richmond, Virginia 23219
Telephone:     (804) 819-5400
Fax:           (804) 819-7417
Email:         jay.h.hambrick@usdoj.gov