### IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF VIRGINIA
### Richmond Division

| | | |
|---|---|---|
| COMMONWEALTH OF VIRGINIA | ) | |
| EX REL. KENNETH T. CUCCINELLI, II, | ) | |
| in his official capacity as Attorney | ) | |
| General of Virginia, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 3:10CV188–HEH |
| | ) | |
| KATHLEEN SEBELIUS, | ) | |
| SECRETARY OF THE DEPARTMENT | ) | |
| OF HEALTH AND HUMAN SERVICES, | ) | |
| in her official capacity, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION
### (Defendant's Motion to Dismiss)

This is a narrowly-tailored facial challenge to the constitutionality of Section 1501

of the Patient Protection and Affordable Care Act, Pub. L. No. 111-148, 124 Stat. 119

(2010). This provision, in essence, requires individuals to either obtain a minimum level

of health insurance coverage or pay a penalty for failing to do so. According to the

Complaint, which seeks declaratory and injunctive relief, the enactment of Section 1501

not only exceeds the power of Congress under the Commerce Clause and General

Welfare Clause of the United States Constitution, but is also directly at tension with

Virginia Code Section 38.2-3430.1:1 (2010), commonly referred to as the Virginia Health

Care Freedom Act.

The case is presently before the Court on Defendant's Motion to Dismiss, filed

pursuant to Federal Rules of Civil Procedure 12(b)(1) and (b)(6).  Both sides have filed

extensive and thoroughly researched memoranda supporting their respective positions.

The Court heard oral argument on July 1, 2010.  Although this case is laden with public

policy implications and has a distinctive political undercurrent, at this stage the sole

issues before the Court are subject matter jurisdiction and the legal sufficiency of the

Complaint.

I.

In the Complaint, the Commonwealth of Virginia (the "Commonwealth") assails

Section 1501 (or "Minimum Essential Coverage Provision") on a number of fronts.  First,

the Commonwealth contends that requiring an otherwise unwilling individual to purchase

a good or service from a private vendor is beyond the outer limits of the Commerce

Clause.  In the Commonwealth's view, the failure—or refusal—of its citizens to elect to

purchase health insurance is not "economic activity" and therefore not subject to federal

regulation under the Commerce Clause.  Succinctly put, the Commonwealth defies the

Secretary to point to any Commerce Clause jurisprudence extending its tentacles to an

individual's decision not to engage in economic activity.  Furthermore, they argue that

since Section 1501 exceeds this enumerated power, Congress cannot invoke either the

Necessary and Proper Clause or its taxation powers to regulate such passive economic

inactivity.

Alternatively, the Commonwealth maintains that Section 1501 is in direct conflict

2

with the Virginia Health Care Freedom Act.  The Commonwealth argues that the

enactment of Section 1501 therefore encroaches on the sovereignty of the Commonwealth

and offends the Tenth Amendment to the Constitution.

The Defendant in this case is Kathleen Sebelius, in her official capacity as

Secretary of the Department of Health and Human Services (the "Secretary").  The

Secretary's Motion to Dismiss, filed under both Fed. R. Civ. P. 12(b)(1) and (b)(6), has

several distinct strands.  The Secretary argues initially that the Attorney General of

Virginia, in his official capacity, lacks standing to challenge Section 1501, thereby

depriving this Court of subject matter jurisdiction.  Because the mandatory insurance

provision is not effective until 2014, the Secretary also maintains that the issues are not

ripe for immediate resolution.

With respect to the merits, the Secretary contends that the Complaint lacks legal

vitality and therefore fails to state a cause of action.  She asserts that the Minimum

Essential Coverage Provision is amply supported by time-honored applications of

Congress's Commerce Clause powers and associated regulatory authority under the

Necessary and Proper Clause.  The theoretical foundation for the Secretary's position is

predicated on factual findings by Congress that Section 1501 is the central ingredient of a

complex health care regulatory scheme.  Its core underpinning is the notion that every

individual will need medical services at some point.  Everyone, voluntarily or otherwise,

is therefore either a current or future participant in the health care market.

3

To underwrite this health care scheme and guarantee affordable coverage to every individual, the cost of providing these services must be defrayed from some source, particularly as to the individuals who are uninsured. To address the annual deficit caused by uncompensated medical services, which according to the Secretary is approximately $43 billion, Congress included the penalty provision in Section 1501 to coax all individuals to purchase insurance. Because Section 1501, like the Act as a whole, regulates decisions about how to pay for services in the health care market and the insurance industry, the Secretary reasons that it necessarily affects interstate commerce.

Lastly, the Secretary contends that Section 1501 is a valid exercise of Congress's independent authority to use its taxing and spending power under the General Welfare Clause. Therefore, she argues that this action is barred by the Anti-Injunction Act.

## II.

Turning first to the standing issue, relying on *Massachusetts v. Mellon*, 262 U.S. 447, 43 S. Ct. 597 (1923), the Secretary argues that the Attorney General's prosecution of this case, on behalf of the citizens of the Commonwealth of Virginia, is barred by the long-standing doctrine of *"parens patriae." Id.* at 485, 43 S. Ct. at 600. In *Mellon*, the U.S. Supreme Court noted that because citizens of an individual state are also citizens of the United States, "[i]t cannot be conceded that a State, as parens patriae, may institute judicial proceedings to protect citizens of the United States from the operation of the statutes thereof." *Id.* The Court further stated in *Mellon* that "it is no part of [a State's]

4

duty or power to enforce [its citizens'] rights in respect of their relations with the federal government." *Id.* at 485-86, 43 S. Ct. at 600. Therefore, the Secretary contends that a state does not have standing as *parens patriae* to bring an action against the federal government. *Id.*; *see Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 610 n.16, 102 S. Ct. 3260, 3270 (1982).

The Secretary further maintains that the congressional enactment at issue, Section 1501, imposes no obligation on the Commonwealth as a sovereign. The Secretary marginalizes the conflict between Section 1501 and the Virginia Health Care Freedom Act as a political policy dispute manufactured for the sole purpose of creating standing. The resulting abstract policy dispute causes no imminent injury to the sovereign and is thus insufficient to support standing to challenge a federal enactment. *Mellon*, 262 U.S. at 484-85, 43 S. Ct. at 600.

On the other hand, the Commonwealth views the task at hand differently. In prosecuting the immediate action, the Commonwealth, through its Attorney General, is not simply representing individual citizens, it is defending the constitutionality and enforceability of its duly enacted laws. The Commonwealth maintains that its standing to defend its legislative enactments is a fossilized principle uniformly recognized by the U.S. Supreme Court, citing *Diamond v. Charles*, 476 U.S. 54 (1986).

> "[T]he power to create and enforce a legal code, both civil and criminal" is one of the quintessential functions of a State. *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 601, 102 S. Ct. 3260, 3265-66, 73 L. Ed. 2d 995 (1982). Because the State alone is entitled to create a legal

code, only the State has the kind of "direct stake" identified in *Sierra Club v. Morton*, 405 U.S. [727,] 740, 92 S. Ct. [1361,] 1369 [(1972)], in defending the standards embodied in that code.

*Diamond*, 476 U.S. at 65, 106 S. Ct. at 1705.

The Commonwealth draws a clear distinction between this case and those relied upon by the Secretary. The Commonwealth argues that it is not prosecuting this case in a *parens patriae*, or quasi-sovereign capacity. In the immediate case, the Commonwealth is exercising a core sovereign power because the effect of the federal enactment is to require Virginia to yield under the Supremacy Clause. Unlike *Mellon*, irrespective of its underlying legislative intent, the Virginia statute is directly in conflict with Section 1501 of the Patient Protection and Affordable Care Act.[1]

A subsidiary element of the Secretary's argument that this Court lacks subject matter jurisdiction is the alleged absence of any imminent injury to sovereign interest. The Commonwealth counters that the conflict between federal and state law is "immediate and complete with respect to the legal principles at issue." (Pl.'s Mem.

---

[1]In 1945, Congress passed the McCarran-Ferguson Act, 15 U.S.C. § 1011, *et seq.*, in reaction to the U.S. Supreme Court's decision in *United States v. South-Eastern Underwriters Ass'n*, 322 U.S. 533, 64 S. Ct. 1162 (1944). The Act expressly declared that the continued regulation and taxation of the business of insurance, and all who engage in it, should be subject to the laws of the several states unless Congress specifically states the contrary. *Life Partners, Inc. v. Morrison*, 484 F.3d 284, 292 (4th Cir. 2007), *cert. denied*, 2007 U.S. Lexis 12349 (Dec. 3, 2007); *see also Prudential Ins. Co. v. Benjamin*, 328 U.S. 408, 430, 66 S. Ct. 1142, 1155 (1946). The Secretary argues that the language of Section 1501 is sufficient to imply an intent on the part of Congress to in effect preempt any state regulation to the contrary. The Commonwealth appears to disagree. (Tr. 48-49, July 1, 2010.) The demarcation between state and federal responsibility in this area will require further development in future proceedings in order to adequately address the Commonwealth's Tenth Amendment argument.

Opp'n Mot. Dismiss 4.) By way of further elucidation, the Commonwealth contends that

it has already begun taking steps to prepare for the implementation of the Patient

Protection and Affordable Care Act. It asserts that "officials are presently having to

deviate from their ordinary duties to begin the administrative response to the changes in

federal law as they cascade through the Medicaid and insurance regulatory systems."

(Pl.'s Mem. Opp'n Mot. Dismiss 4.)

The next facet of the Secretary's challenge to the Court's subject matter

jurisdiction in this case invokes the Anti-Injunction Act, 26 U.S.C. § 7421(a).[2] The Anti-

Injunction Act provides, in pertinent part, that "no suit for the purpose of restraining the

assessment or collection of any tax shall be maintained in any court by any person,

whether or not such person is the person against whom such tax was assessed." 26 U.S.C.

§ 7421(a). The Secretary argues that the restraining effect of this Act is broad enough to

include payments which are labeled a "penalty rather than a tax," as the Secretary styles

the assessment in this case for failure to purchase the requisite insurance coverage.

(Def.'s Mem. Supp. Mot. Dismiss 16.) Because the Secretary maintains that the

immediate action constitutes an abatement of a tax liability or penalty, she claims the

---

[2] By implication, this argument would also include parallel provisions in the Declaratory Judgment Act, 28 U.S.C. § 2201(a). "Though the Anti-Injunction Act concerns federal courts' subject matter jurisdiction and the tax-exclusion provision of the Declaratory Judgment Act concerns the issuance of a particular remedy, the two statutory texts are, in underlying intent and practical effect, coextensive." *In re Leckie Smokeless Coal Co.*, 99 F.3d 573, 583 (4th Cir. 1996). "In light of the two provisions' coextensive nature, a finding that one of the two statutes does not bar the debtors in the instant cases from seeking and obtaining free and clear orders will necessitate a finding that the other statute does not pose an obstacle either." *Id.* at 584.

District Court lacks jurisdiction. The Secretary's position is that the only appropriate relief vehicle for a citizen seeking to challenge the penalty provisions of Section 1501 would be to pay the required penalty and sue for a refund. *See Bob Jones Univ. v. Simon*, 416 U.S. 725, 736, 94 S. Ct. 2038, 2046 (1974).

The Commonwealth urges a more narrow interpretation of the Anti-Injunction Act. The Commonwealth contends that the word "person" used in the operative portion of the Anti-Injunction Act does not include a state. The U.S. Supreme Court, as well as the Fourth Circuit, has almost uniformly held that the word "person" appearing in a federal statute should not be interpreted as including a state. There is a "longstanding interpretive presumption that 'person' does not include the sovereign." *Vt. Agency of Natural Res. v. United States ex rel. Stevens*, 529 U.S. 765, 780, 120 S. Ct. 1858, 1866 (2000); *see also Va. Office for Prot. & Advocacy v. Reinhard*, 405 F.3d 185, 189 (4th Cir. 2005). "The presumption is, of course, not a hard and fast rule of exclusion, but it may be disregarded only upon some affirmative showing of statutory intent to the contrary." *Vt. Agency of Natural Res.*, 529 U.S. at 781, 120 S. Ct. at 1867 (internal citations omitted). The Commonwealth argues that the Secretary has failed to overcome the requisite presumption because she cannot point to any persuasive authority that the Anti-Injunction Act applies to states. Therefore, the Commonwealth argues that the Anti-Injunction Act does not apply to its prosecution of this case.

Alternatively, the Commonwealth contends that the claims advanced in this case

8

fall squarely within an exception to the Anti-Injunction Act recognized in *South Carolina v. Regan*, 465 U.S. 367, 104 S. Ct. 1107 (1984). In *Regan*, the Supreme Court observed that the Anti-Injunction Act was not intended to bar "actions brought by aggrieved parties for whom [Congress] has not provided an alternative remedy." *Id.* at 378, 104 S. Ct. at 1114. Because the Commonwealth contends that only the sovereign has standing to seek judicial vindication of its own statutes, it claims the effect of the Anti-Injunction Act would be to deny the Commonwealth a remedy to address the effect of the federal enactment at issue.

Although the Commonwealth's contention that the term "person" in the Anti-Injunction Act does not apply to states may be well-founded, this Court believes it is clear that the *Regan* exception applies in this case.[3] As the Supreme Court held in *Regan*, the Anti-Injunction Act "was intended to apply only when Congress has provided an alternative avenue for an aggrieved party to litigate its claims on its own behalf." *Id.* at 381, 104 S. Ct. at 1115; *see also In re Leckie Smokeless Coal Co.*, 99 F.3d at 584. Additionally, the *Regan* Court emphasized that, "the indicia of congressional intent–the [Anti-Injunction] Act's purposes and the circumstances of its enactment–demonstrate that Congress did not intend the Act to apply where an aggrieved party would be required to depend on the mere possibility of persuading a third party to assert his claims." *Regan,*

---

[3] This Court can also not ignore the fact that the Commonwealth's Complaint does not challenge the penalty provision of the Patient Protection and Affordable Care Act, though the two undeniably act in tandem.   Instead, the Complaint exclusively attacks the constitutionality of the mandate to purchase health care insurance.

9

465 U.S. at 381, 104 S. Ct. at 1115. However, "[b]ecause of the strong policy animating the Anti-Injunction Act, and the sympathetic, almost unique, facts in *Regan*, courts have construed the *Regan* exception very narrowly . . . ." *Judicial Watch, Inc. v. Rossotti*, 317 F.3d 401, 408 n.3 (4th Cir. 2003).

Despite this narrow interpretation, this Court finds the justification for allowing an exception to the Anti-Injunction Act in *Regan* applies with equal strength to the circumstances in this case. First, the Supreme Court found that "instances in which a third party may raise the constitutional rights of another are the exception rather than the rule." *Regan*, 465 U.S. at 380, 104 S. Ct. at 1115 (citing *Singleton v. Wulff*, 428 U.S. 106, 114, 96 S. Ct. 2868, 2874 (1976)). Thus, in this case, without standing to defend the constitutionality of a state's right to create and enforce its own legal code, an individual taxpayer would be unable to assert the constitutional rights of the Commonwealth. Second, "to make use of this remedy the State 'must first be able to find [an individual] willing to subject himself to the rigors of litigation against the Service, and then must rely on [him] to present the relevant arguments on [its] behalf.'" *Id.* (citing *Bob Jones*, 416 U.S. at 747 n.21, 94 S. Ct. at 2051). Due to the magnitude, cost, and *sui generis* interest of Virginia in this case, even if standing was not an issue, it appears the Commonwealth would be hard-pressed to find a suitable party to argue the case on its behalf.

Third, and perhaps most importantly, "[b]ecause it is by no means certain that the State would be able to convince a taxpayer to raise its claims, reliance on the remedy

suggested by the Secretary would create the risk that the Anti-Injunction Act would entirely deprive the State of any opportunity to obtain review of its claims." *Id.* at 380-81, 104 S. Ct. at 1115. Applying this logic to the Commonwealth, as a sovereign entity not required to purchase insurance under Section 1501, Virginia will never be assessed the fine imposed under the Patient Protection and Affordable Care Act, and consequently, never afforded an opportunity to pay the penalty and request a refund. Therefore, this Court concludes that "[b]ecause Congress did not prescribe an alternative remedy for the plaintiff in this case, the Act does not bar this suit." *Id.* at 381, 104 S. Ct. at 1115-16.

Although this lawsuit has the collateral effect of protecting the individual interests of the citizens of the Commonwealth of Virginia, its primary articulated objective is to defend the Virginia Health Care Freedom Act from the conflicting effect of an allegedly unconstitutional federal law. Despite its declaratory nature, it is a lawfully-enacted part of the laws of Virginia. The purported transparent legislative intent underlying its enactment is irrelevant. The mere existence of the lawfully-enacted statute is sufficient to trigger the duty of the Attorney General of Virginia to defend the law and the associated sovereign power to enact it.[4] As the U.S. Supreme Court noted in *Alfred L. Snapp & Son, Inc.*, it is common ground that states have an interest as sovereigns in exercising "the power to create and enforce a legal code." *Alfred L. Snapp & Son, Inc.*, 458 U.S. at 601,

---

[4]Federal courts have long recognized the duty of state Attorneys General to defend the laws of their states. *See* Fed. R. Civ. P. 5.1(a)(2) (requiring that any party challenging the constitutionality of a state statute serve notice on the state Attorney General).

102 S. Ct. at 3265.  With few exceptions, courts have uniformly held that individuals do not have standing to bring a Tenth Amendment claim. *Kennedy v. Allera*, -- F.3d --, 2010 WL 2780188, at *8 (4th Cir. July 15, 2010) (citing *Brooklyn Legal Servs. Corp. B v. Legal Servs. Corp.*, 462 F.3d 219, 234-36 (2d Cir. 2006)).

The power of the Attorney General to prosecute claims on behalf of the state he or she represents remains unsettled despite centuries of legal debate.[5]  This is particularly true in cases involving suits against the federal government. *See Alaska v. U.S. Dep't of Transp.*, 868 F.2d 441, 443 n.1 (D.C. Cir. 1989).  Reviewing courts, in their standing analysis, have distinguished cases where the individual interests of citizens are purely at stake from those in which the interest of the state, as a separate body politic, is implicated.  The former is distinguished by legal commentators from the latter as quasi-sovereignty as opposed to sovereignty.  While standing jurisprudence in the area of quasi-sovereign or *parens patriae* standing defies simple formulation, courts have uniformly held that "where a harm is widely shared, a sovereign, suing in its individual interest, has standing to sue where that sovereign's individual interests are harmed, wholly apart from the alleged general harm." *Ctr. for Biological Diversity v. U.S. Dep't of Interior*, 563 F.3d 466, 476-77 (D.C. Cir. 2009) (citing *Massachusetts v. EPA*, 549 U.S. 497, 127 S. Ct.

---

[5]Given the stake states have in protecting their sovereign interests, they are often accorded "special solicitude" in standing analysis. *Massachusetts v. EPA*, 549 U.S. 497, 520, 127 S. Ct. 1438, 1455 (2007).

1438 (2007)).[6]

Closely analogous to the immediate case is *Wyoming ex rel. Crank v. United States*, 539 F.3d 1236 (10th Cir. 2008). There the State of Wyoming sought declaratory and injunctive relief against a decision of the United States Bureau of Alcohol, Tobacco, Firearms and Explosives, which determined that a Wyoming statute purportedly establishing a procedure to expunge domestic violence misdemeanor convictions, in order to restore lost firearms rights, would not have the intended effect under federal law. As in the immediate case, the United States challenged the Article III standing of the State of Wyoming to seek judicial relief from the conflicting federal regulation. The Tenth Circuit held that Wyoming's stake in the controversy was sufficiently adverse to warrant Article III standing.

Relying on the teachings of *Alfred L. Snapp & Son, Inc.*, the Tenth Circuit observed that the states have a legally protected sovereign interest in "the exercise of sovereign power over individuals and entities within the relevant jurisdiction[, which] involves the power to create and enforce a legal code." *Wyoming*, 539 F.3d at 1242 (quoting *Alfred L. Snapp & Son, Inc.*, 458 U.S. at 601, 102 S. Ct. at 3265). "Federal regulatory action that preempts state law creates a sufficient injury-in-fact to satisfy this prong. Accordingly, we conclude that Wyoming has sufficiently alleged an injury-in-fact

_____

[6]Of course, Article III standing has other elements. A plaintiff must demonstrate: (i) an injury-in-fact that is both concrete and particularized, as well as actual or imminent; (ii) an injury that is traceable to the conduct complained of; and (iii) an injury that is redressable by a decision of the court. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560-61, 112 S. Ct. 2130, 2136 (1992).

. . . ." *Id.* at 1242 (internal citations omitted).

This Court finds the Tenth Circuit's standing analysis in *Wyoming* to be sound and adopts its principled and logical reasoning in this case. The Commonwealth, through its Attorney General, satisfies Article III's standing requirements under the facts of this case.

III.

Resolution of the standing issue resolves only a single strand of the case or controversy requirements of Article III subject matter jurisdiction. The matter must also be ripe for adjudication. In other words, the claim must be sufficiently mature and issues sufficiently defined and concrete to create an actual justiciable controversy. *See Blanchette v. Conn. Gen. Ins. Corps. (Reg'l Rail Reorganization Act Cases)*, 419 U.S. 102, 138-39, 95 S. Ct. 335, 356 (1974). "[R]ipeness is peculiarly a question of timing . . . ." *Id.* at 140, 95 S. Ct. at 357. It implicates both constitutional limitations and prudential consideration. *Reno v. Catholic Soc. Servs. Inc.*, 509 U.S. 43, 57 n.18, 1135 S. Ct. 2485, 2496 (1993). In determining whether a claim is ripe for judicial review, courts evaluate "'the fitness of the issues for judicial decision' and 'the hardship of withholding court consideration.'" *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 130 S. Ct. 1758, 1767 n.2 (2010) (quoting *Nat'l Park Hospitality Ass'n v. Dep't of Interior*, 538 U.S. 805, 808, 123 S. Ct. 2026, 2031 (2003)). "The burden of proving ripeness falls on the party bringing suit." *Miller v. Brown*, 462 F.3d 312, 319 (4th Cir. 2006).

This element of the Secretary's argument is closely intertwined with her contention

14

that Virginia has not demonstrated that it will suffer a hardship from the provision it

challenges because the Minimum Essential Coverage Provision does not go into effect

until 2014. This lack of immediate impact, in her view, renders the Commonwealth's

challenge premature. To support this contention, the Secretary relies principally on *South

Carolina v. Katzenbach*, 383 U.S. 301, 86 S. Ct. 803 (1966). *Katzenbach* involved a suit

to enjoin enforcement of certain provisions of the Voting Rights Act of 1965, particularly

those sections providing civil and criminal sanctions against interference with the

exercise of rights guaranteed by the Act. The *Katzenbach* Court found those sections of

the statute imposing criminal penalties to be premature for constitutional review, but held

that the regulatory portions were ripe for judicial consideration.

It is important to note that the Supreme Court has historically drawn a distinction

between the ripeness analysis employed for criminal statutes as opposed to other

regulatory enactments. *Reg'l Rail Reorganization Act Cases*, 419 U.S. at 143 n.29, 95 S.

Ct. at 358. Unlike a regulatory statute, the decision to initiate criminal prosecutions

resides within the discretion of prosecutors—and allows for citizens to voluntarily bring

their conduct within the bounds of the law. *Id.* The Minimum Essential Coverage

Provision presently before the Court lacks criminal remedies. In fact, it specifically

waives criminal prosecution or sanctions for failure to pay a penalty levied by the Act. 26

U.S.C. § 5000A(g)(2)(A). Therefore, neither prosecutorial discretion nor self-regulated

citizen conduct considerations are present here. With certain delineated exceptions, 26

U.S.C. § 5000A(a) mandates that a citizen purchase, or otherwise obtain insurance, or face a monetary assessment. The central issue in this case is the Commonwealth's sovereign interest in upholding the Virginia Health Care Freedom Act. The issues presented are purely legal and further development of the factual record would not clarify the issues for judicial resolution. *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 581, 105 S. Ct. 3325, 3333 (1985).

While the mandatory compliance provisions of the Minimum Essential Coverage Provision do not go into effect until 2014, that does not mean that its effects will not be felt by the Commonwealth in the near future. This provision will compel scores of people who are not currently enrolled to evaluate and contract for insurance coverage. Individuals currently insured will be required to be sure that their present plans comply with this regulatory regimen. Insurance carriers will have to take steps in the near future to accommodate the influx of new enrollees to public and private insurance plans. Employers will need to determine if their current insurance satisfies the statutory requirements.

More importantly, the Commonwealth must revamp its health care program to ensure compliance with the enactment's provisions, particularly with respect to Medicaid. This process will entail more than simple fine tuning. Unquestionably, this regulation radically changes the landscape of health insurance coverage in America.

The Supreme Court, and the preponderance of reviewing courts of appeals, have

16

not been reticent to consider the constitutionality of legislative enactments prior to their date of effectiveness when the resulting alleged injury is impending and more than a "mere possibility." *See Pierce v. Soc'y of Sisters*, 268 U.S. 510, 45 S. Ct. 571 (1925) (ruling a year prior to the challenged law's date of effectiveness was permissible); *see also Virginia v. Am. Booksellers Ass'n.*, 484 U.S. 383, 392-93, 108 S. Ct. 636, 642-43 (1988) (upholding a pre-enforcement challenge to a state law on First Amendment grounds). Again, the alleged injury in this case is the collision between state and federal law. Neither the White House nor Congress has given any indication that the Minimum Essential Coverage Provision at issue will not be enforced, and the Court sees no reason to assume otherwise. *Am. Booksellers Ass'n.*, 484 U.S. at 393, 108 S. Ct. at 643. Nor do the facts before the Court here present a "hypothetical" case, *United States v. Raines*, 362 U.S. 17, 22, 80 S. Ct. 519, 523 (1960), or a "remote and abstract . . . inquiry." *Int'l Longshoremen's Union, Local 37 v. Boyd*, 347 U.S. 222, 224, 74 S. Ct. 447, 448 (1954).

The issues in this case are fully framed, the underlying facts are well settled, and the case is accordingly ripe for review. The Commonwealth has therefore satisfied all requirements of Article III standing.

IV.

Turning to the merits of the Complaint, it is important to keep in mind that the Court's mission at this stage is narrow. To survive a Rule 12(b)(6) challenge, a complaint need only state a legally viable cause of action. "A motion to dismiss under Rule 12(b)(6)

17

tests the sufficiency of a complaint; importantly, it does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992), *cert. denied*, 510 U.S. 828, 114 S. Ct. 93 (1993). In reviewing a 12(b)(6) motion, the complaint must be construed in the light most favorable to the plaintiff, assuming its factual allegations to be true. *Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S. Ct. 2229, 2232 (1984).

This time-honored standard is a bit more difficult to apply in the context of this case. The congressional enactment under review—the Minimum Essential Coverage Provision—literally forges new ground and extends Commerce Clause powers beyond its current high watermark. Counsel for both sides have thoroughly mined relevant case law and offered well reasoned analyses. The result, however, has been insightful and illuminating, but short of definitive. While this Court's decision may set the initial judicial course of this case, it will certainly not be the final word.

The historically-accepted contours of Article I Commerce Clause power were restated by the Supreme Court in *Perez v. United States*, 402 U.S. 146, 150, 91 S. Ct. 1357, 1359 (1971). First, Congress can regulate the channels of interstate commerce. *Id.* Second, Congress has the authority to regulate and protect the instrumentalities of interstate commerce and persons or things in interstate commerce. *Id.* Third, Congress has the power to regulate activities that substantially affect interstate commerce. *Id.* It appears from the argument and memoranda of counsel that only the third category is

implicated in the case at hand.

In arguing that an individual's decision not to purchase health insurance is in effect "economic activity," the Secretary relies on an aggregation theory. In other words, the sum of individual decisions to participate or not in the health insurance market has a critical effect on interstate commerce. The Secretary's argument is drawn in large measure from the teachings of the Supreme Court in *Gonzales v. Raich*, 545 U.S. 1, 125 S. Ct. 2195 (2005), wherein the Court noted:

> [O]ur case law firmly establishes Congress' power to regulate purely local activities that are part of an economic "class of activities" that have a substantial effect on interstate commerce. . . . When Congress decides that the "total incidence" of a practice poses a threat to a national market, it may regulate the entire class. . . . In this vein, we have reiterated that when "a general regulatory statute bears a substantial relation to commerce, the *de minimis* character of individual instances arising under that statute is of no consequence."

*Gonzales*, 545 U.S. at 17, 125 S. Ct. at 2205-06 (quoting *United States v. Lopez*, 514 U.S. 549, 558, 115 S. Ct. 1624, 1629 (1995)).

In the Secretary's view, without full market participation, the financial foundation supporting the health care system will fail, in effect causing the health care regime to "implode." At oral argument, the Deputy Assistant Attorney General of the United States, on behalf of the Secretary, described the collective effect of the Minimum Essential Coverage Provision as the critical element of the national health care scheme, "[a]nd what the [congressional] testimony was, was if you do the preexisting condition exclusion and no differential health care status, without a minimum coverage type

19

provision, it will inexorably drive that market into extinction. And what somebody said more succinctly was, the market will implode." (Tr. 33:7-13, July 1, 2010.)

To support this argument, the Secretary compared the market impact of the universal insurance requirement to regulation of wheat harvested for personal consumption or marijuana grown for personal use. In *Wickard v. Filburn*, 317 U.S. 111, 63 S. Ct. 82 (1942), acknowledged by most constitutional scholars as the most expansive application of the Commerce Clause, the Supreme Court upheld the power of Congress to regulate the personal cultivation and consumption of wheat on a private farm. The Court reasoned that the consumption of such non-commercially produced wheat reduced the amount of commercially produced wheat purchased and consumed nationally, thereby affecting interstate commerce. The Court concluded:

> [The fact that] appellee's own contribution to the demand for wheat may be trivial by itself is not enough to remove him from the scope of federal regulation where, as here, his contribution, taken together with that of many others similarly situated, is far from trivial. . . . But if we assume that it is never marketed, it supplies a need of the man who grew it which would otherwise be reflected by purchases in the open market.

*Wickard*, 317 U.S. at 127-28, 63 S. Ct. at 90-91.

Similarly, in *Gonzales v. Raich*, the Supreme Court concluded that the aggregate effect of personal growth and consumption of marijuana for medicinal purposes, pursuant to California law, had a sufficient impact on interstate commerce to warrant regulation under the Commerce Clause. "Like the farmer in *Wickard*, respondents are cultivating, for home consumption, a fungible commodity for which there is an established, albeit

20

illegal, interstate market. . . . Here too, Congress had a rational basis for concluding that leaving home-consumed marijuana outside federal control would similarly affect price and market conditions." *Gonzales*, 545 U.S. at 18-19, 125 S. Ct. at 2206-07.

In response, the Commonwealth highlights what it perceives to be the critical distinction between the line of cases relied upon by the Secretary and the Commerce Clause application presently before the Court. What the Supreme Court deemed to be "economic activity" in *Wickard* and *Raich* necessarily involved a voluntary decision to perform an act, such as growing wheat or cultivating marijuana. The Commonwealth argues that this critical element is absent in the regulatory mechanism established in the Minimum Essential Coverage Provision. This provision, the Commonwealth maintains, requires a person to perform an involuntary act and as a result, submit to Commerce Clause regulation. The Commonwealth continues that neither the U.S. Supreme Court nor any circuit court of appeals has upheld the extension of Commerce Clause power to encompass economic inactivity.

Drawing on the logic articulated in *United States v. Lopez*, 514 U.S. 549, 115 S. Ct. 1624 (1995), and *United States v. Morrison*, 529 U.S. 598, 120 S. Ct. 1740 (2000), which limited the boundaries of Commerce Clause jurisdiction to activities truly economic in nature and that actually affect interstate commerce, the Commonwealth contends that a decision not to purchase a product, such as health insurance, is not an economic activity. It is a virtual state of repose—or idleness—the converse of activity.

21

At best, Section 1501 regulates future activity in anticipation of need.

In *United States v. Morrison*, the Court acknowledged that its "interpretation of the Commerce Clause has changed as our Nation has developed. . . . [E]ven [our] modern-era precedents which have expanded congressional power under the Commerce Clause confirm that this power is subject to outer limits." *Morrison*, 529 U.S. at 607-08, 120 S. Ct. at 1748-49 (quoting *NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 57 S. Ct. 615 (1937)). The Court in *Morrison* also noted that "the existence of congressional findings is not sufficient, by itself, to sustain the constitutionality of Commerce Clause legislation." *Morrison*, 529 U.S. at 614, 120 S. Ct. at 1752. Finally, in *Morrison*, the Court rejected "the argument that Congress may regulate noneconomic, violent criminal conduct based solely on that conduct's aggregate effect on interstate commerce." *Id.* at 617, 120 S. Ct. at 1754.

The Commonwealth further maintains that the Secretary's position finds no sustenance in the Necessary and Proper Clause. U.S. Const. art. I, § 8. This clause grants Congress broad authority to pass laws in furtherance of its constitutionally-enumerated powers. The Commonwealth draws the Court's attention to several observations of the Supreme Court in the recent case of *United States v. Comstock*, 130 S. Ct. 1949 (2010). The Court in *Comstock* began its analysis by quoting Chief Justice Marshall in *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316 (1819): "Let the end be legitimate, let it be within the scope of the constitution, and all means which are appropriate, which are plainly

adapted to that end, which are not prohibited, but consistent with the letter and spirit of

the constitution, are constitutional." *Comstock*, 130 S. Ct. at 1956 (quoting *McCulloch*,

17 U.S. (4 Wheat.) at 421).

In commenting on Chief Justice Marshall's remarks, the Court in *Comstock* noted

that:

> [W]e have since made clear that, in determining whether the Necessary and Proper Clause grants Congress the legislative authority to enact a particular federal statute, we look to see whether the statute constitutes a means that is rationally related to the implementation of a constitutionally enumerated power. . . . [T]he relevant inquiry is simply whether the means chosen are reasonably adapted to the attainment of a legitimate end under the commerce power or under other powers that the Constitution grants Congress the authority to implement.

*Id.* at 1956-57 (internal citations omitted).

The Commonwealth maintains that even if a congressional enactment is noble and

legitimate, the means adapted to enforce it under the Necessary and Proper Clause must

be within the letter and spirit of the Constitution. In other words, it must have a firm

constitutional foundation rooted in Article I. The goals of those portions of the Patient

Protection and Affordable Care Act directly pertinent to health care, i.e., universal health

insurance coverage, no exclusion of persons with preexisting conditions, a requirement

that all people receiving health care pay for such services in a timely fashion, etc., are

laudable. The Commonwealth argues, however, that the Necessary and Proper Clause

cannot be employed as a vehicle to enforce an unconstitutional exercise of Commerce

Clause power, no matter how well intended. If a person's decision not to purchase health

insurance at a particular point in time does not constitute the type of economic activity subject to regulation under the Commerce Clause, then logically, an attempt to enforce such provision under the Necessary and Proper Clause is equally offensive to the Constitution.

In rebuttal, the Secretary reiterates her position that a person cannot simply elect to avoid participation in the health care market. It is inevitable, in her view, that every person—today or in the future—healthy or otherwise—will require medical care. The Minimum Essential Coverage Provision simply provides a vehicle for prompt and dependable payment for such services if and when rendered. The Secretary also rejects the notion that the imposition of a monetary penalty for failing to perform a lawful act is alien to the spirit of the Constitution. The Secretary points out that sanctions have historically been imposed for failure to timely file tax returns or truthfully report or pay taxes due, as well as failure to register with the Selective Service or report for military duty. These examples, as the Commonwealth aptly notes, are directly tethered to a specific constitutional provision empowering Congress to assess taxes and provide and maintain an Army and Navy. U.S. Const. art. I, § 8. No specifically articulated constitutional authority exists to mandate the purchase of health insurance or the assessment of a penalty for failing to do so.

As previously mentioned, the Commerce Clause aspect of this debate raises issues of national significance. The position of the parties are widely divergent and at times

24

novel. The guiding precedent is informative, but inconclusive. Never before has the Commerce Clause and associated Necessary and Proper Clause been extended this far. At this juncture, the Court is not persuaded that the Secretary has demonstrated that the Complaint fails to state a cause of action with respect to the Commerce Clause element. This portion of the Complaint advances a plausible claim with an arguable legal basis.

V.

The final aspect of the Secretary's Rule 12(b)(6) challenge raises an even closer and equally unsettled issue under congressional taxing powers. Contrary to pre-enactment representations by the Executive and Legislative branches, the Secretary now argues alternatively that the Minimum Essential Coverage Provision is a product of the government's power to tax for the general welfare. (Tr. 19:16-17, July 1, 2010.) This is of course supported by the placement of the penalty provisions within the Internal Revenue Code. Because the Secretary contends that the Minimum Essential Coverage Provision is an exercise of the less bridled power of Congress to tax, this element of the argument presents a much closer question than the preceding Commerce Clause debate.

The Secretary suggests that the constitutional analysis under the Tax Clause involves only two factors. Relying on *United States v. Aiken*, 974 F.2d 446 (4th Cir. 1992), she asserts that the power of Congress to lay and collect taxes, duties, and excises, under Article I, Section 8 of the U.S. Constitution, requires only that it be a revenue-raising measure and that the associated regulatory provisions bear a reasonable relation to

the statute's taxing purpose. *Id.* at 448; *see also Sonzinsky v. United States*, 300 U.S. 506, 513, 57 S. Ct. 554, 555-56 (1937); *United States v. Doremus*, 249 U.S. 86, 39 S. Ct. 214 (1919). According to the Secretary, the power of Congress to tax for the general welfare is checked only by the electorate. "Unless there are provisions, extraneous to any tax need, courts are without authority to limit the exercise of the taxing power." *United States v. Kahriger*, 345 U.S. 22, 31, 73 S. Ct. 510, 515 (1953), *overruled on other grounds, Marchetti v. United Sates*, 390 U.S. 39, 88 S. Ct. 697 (1968). The Secretary points out that the power of Congress to use its taxing and spending power under the General Welfare Clause has long been recognized as extensive. *McCray v. United States*, 195 U.S. 27, 56-59, 24 S. Ct. 769, 776-78 (1904). Furthermore, the Secretary notes that Congress may use its power under the Tax Clause even for purposes that would exceed its powers under other provisions of Article I. *United States v. Sanchez*, 340 U.S. 42, 44, 71 S. Ct. 108, 110 (1950).

Therefore, the Secretary argues that because the Minimum Essential Coverage Provision in fact generates revenue and its regulatory features are rationally related to the goal of requiring every individual to pay for the medical services they receive, "that's the end of the ballgame." (Tr. 44:11, July 1, 2010.)

Initially, in response, the Commonwealth contends that the noncompliance penalty provision in Section 1501 does not meet the historical criteria for a tax.[7] Aside from

---

[7]"[A] tax is a pecuniary burden laid upon individuals or property for the purpose of supporting the Government." *United States v. Reorganized CF&I Fabricators of Utah, Inc.*, 518

being referred to in Section 1501 at Section 5000A(b)(1) as a "penalty," the clear purpose

of the assessment is to regulate conduct, not generate revenue for the government.[8]  In

fact, the Commonwealth adds that if there is full compliance—if everyone purchases

health insurance as required—this provision will generate no revenue.  The

Commonwealth's doubt as to its purported purpose is heightened further by the prefatory

language of Section 1501 which describes it as a derivative of the Commerce Clause.

The Solicitor General of Virginia correctly noted during oral argument that the power of

Congress to exact a penalty is more constrained than its taxing authority under the

General Welfare Clause—it must be in aid of an enumerated power.  *Sunshine Anthracite*

*Coal Co. v. Adkins*, 310 U.S. 381, 393, 60 S. Ct. 907, 912 (1940); *United States v. Butler*,

297 U.S. 1, 61, 56 S. Ct. 312, 317 (1936).

Although the Commonwealth concedes that the power of Congress to tax exceeds

its ability to regulate under the Commerce Clause, it is not without limitation.  "[T]he law

is that Congress can tax under its taxing power that which it can't regulate, but it can't

regulate through taxation that which it cannot otherwise regulate." (Tr. 81:18-21, July 1,

2010 (citing *Bailey v. Drexel Furniture Co. (Child Labor Tax Case)*, 259 U.S. 20, 37, 42

---

U.S. 213, 224, 116 S. Ct. 2106, 2112 (1996) (internal citations omitted). On the other hand, a
penalty imports the notion of a punishment for an unlawful act or omission. *Id.* "The two words
[tax vs. penalty] are not interchangeable . . . and if an exaction [is] clearly a penalty it cannot be
converted into a tax by the simple expedient of calling it such." *United States v. La Franca*, 282
U.S. 568, 572, 51 S. Ct. 278, 280 (1931).

[8]In contrast, the Commonwealth points out that elsewhere in the Act, Congress
specifically described levies as taxes, such as Sections 9001, 9004, 9015, and 9017.

S. Ct. 449, 450 (1922).) To amplify its point, the Commonwealth focuses the Court's

attention on a series of cases in which the Supreme Court struck down certain "regulatory

taxes" as an unconstitutional encroachment on the state's power of regulation under the

Tenth Amendment. *See Butler*, 297 U.S. at 68, 56 S. Ct. at 320; *Linder v. United States*,

268 U.S. 5, 17-18, 45 S. Ct. 446, 449 (1925); *Child Labor Tax Case*, 259 U.S. at 35, 42 S.

Ct. at 451. In commenting on the limitations on the power of Congress to levy taxes to

promote the general welfare, the Court in *Butler* noted that, "despite the breadth of the

legislative discretion, our duty to hear and to render judgment remains. If the statute

plainly violates the stated principle of the Constitution, we must so declare." *Butler*, 297

U.S. at 67, 56 S. Ct. at 320; *see also Kahriger*, 345 U.S. at 29, 73 S. Ct. at 513.[9]

By analogy, the Commonwealth argues that the Minimum Essential Coverage

Provision not only invokes rights reserved to the states, but also seeks to compel activity

beyond the reach of Congress. As discussed above, the division of responsibility for

regulating insurance between the Commonwealth and the federal government, to the

extent relevant, is yet to be adequately staked out in this case.

The centerpiece of the Complaint at issue is its contention that Congress lacks the

authority to regulate economic inactivity. Lacking such power to regulate a person's

decision not to participate in interstate commerce, logically, the Commonwealth argues,

---

[9]Citing commentaries from a number of constitutional scholars, the Secretary maintains
that this line of cases has fallen into desuetude. The Commonwealth counters that none of these
cases have been overruled by the U.S. Supreme Court.

Congress would not have the power to tax or impose a penalty for such inactivity. This, of course, is the core issue in this case.

To bolster its position, the Commonwealth suggests that a careful survey of constitutional history yields no basis for such extension of Tax Clause powers. In its Memorandum in Opposition to Motion to Dismiss, the Commonwealth observes that "historically, direct taxes were taxes on persons or things, while duties, imposts, and excises have never meant a tax on a decision not to purchase or not to do something unrelated to a larger voluntary business or other undertaking." (Pl. Mem. Opp'n Mot. Dismiss 32.)

In her opposition, the Secretary rejoins that the Commonwealth misinterprets the limitations of Congress's power under the Tax Clause. "[A] tax statute [does not] necessarily fall because it touches on activities which Congress might not otherwise regulate." *Sanchez*, 340 U.S. at 44, 71 S. Ct. at 110. For example, the Secretary argues that Congress can tax inheritances even though the regulation of estates and inheritances is beyond Congress's Commerce Clause powers. *Knowlton v. Moore*, 178 U.S. 41, 59-60, 20 S. Ct. 747, 755 (1900). The Secretary stresses that "[i]t is beyond serious question that a tax does not cease to be valid merely because it regulates, discourages, or even definitely deters the activities taxed." *Sanchez*, 340 U.S. at 44, 71 S. Ct. at 110. "[A] tax is not any the less a tax because it has a regulatory effect . . . ." *Sonzinsky*, 300 U.S. at 513, 57 S. Ct. at 556 (internal citations omitted).

Casting aside many aspects of the Commonwealth's argument, the Secretary contends that in the final analysis, the Minimum Essential Coverage Provision falls within Congress's extensive general welfare authority. She also underscores that decisions of how best to provide for the general welfare are for the representative branches, not for the courts. *Helvering v. Davis*, 301 U.S. 619, 640, 57 S. Ct. 904, 908 (1937). "Inquiry into the hidden motives which may move Congress to exercise a power constitutionally conferred upon it is beyond the competency of courts." *Sonzinsky*, 300 U.S. at 513-14, 57 S. Ct. at 556.

In enacting Section 1501 of the Patient Protection and Affordable Care Act, Congress made extensive findings on the substantial effect of decisions to purchase health insurance on the vast interstate health care market. These findings alone, in the Secretary's view, provide more than adequate support for her contention that the penalty (or tax) at issue is rationally related to the objective of maintaining a financially viable health care market by requiring everyone to pay for the services they receive. She adds, through counsel, "[t]hat consuming health care services without paying for them is activity, plain and simple." (Tr. 92:12-14, July 1, 2010.) In this context, a consumer's failure to act is a clear burden on interstate commerce.

The Secretary appeared to concede during oral argument, however, that if the ability to require the Minimum Essential Coverage Provision is not within the letter and spirit of the Constitution, than the penalty necessarily fails. As the Deputy Assistant

Attorney General of the United States appeared to note in his response to the Court, "if it is unconstitutional, then the penalty would fail as well." (Tr. 21:10-11, July 1, 2010.)

## VI.

While this case raises a host of complex constitutional issues, all seem to distill to the single question of whether or not Congress has the power to regulate—and tax—a citizen's decision not to participate in interstate commerce. Neither the U.S. Supreme Court nor any circuit court of appeals has squarely addressed this issue. No reported case from any federal appellate court has extended the Commerce Clause or Tax Clause to include the regulation of a person's decision not to purchase a product, notwithstanding its effect on interstate commerce. Given the presence of some authority arguably supporting the theory underlying each side's position, this Court cannot conclude at this stage that the Complaint fails to state a cause of action.[10]

The Secretary's Motion to Dismiss will therefore be denied. Resolution of the controlling issues in this case must await a hearing on the merits.

---

[10] "It is well-established that defendants bear the burden of proving that plaintiffs' claims fail as a matter of law." *Bennett v. MIS Corp.*, 607 F.3d 1076, 1091 (6th Cir. 2010). "Under Rule 12(b)(6), the party moving for dismissal has the burden of proving that no claim has been stated." James Wm. Moore, et al., *Moore's Federal Practice* § 12.34(1)(a) (3d ed. 2010).

An appropriate Order will accompany this Memorandum Opinion.

_____/s/_____
Henry E. Hudson
United States District Judge

Date: Aug. 2, 2010
Richmond, VA