**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA**
Richmond Division

| | |
|---|---|
| COMMONWEALTH OF VIRGINIA,<br>ex rel. Kenneth T. Cuccinelli, II, in his official<br>capacity as Attorney General of Virginia,<br><br>       Plaintiff,<br><br>    v.<br><br>KATHLEEN SEBELIUS, Secretary of the<br>Department of Health and Human Services,<br>in her official capacity,<br><br>       Defendant. | )<br>)<br>)<br>)<br>)<br>)   Civil Action No. 3:10-cv-00188-HEH<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**MEMORANDUM IN SUPPORT OF
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

**Table of Contents**

Introduction.................................................................................................................1

Statement of undisputed material facts......................................................................3

I.      The widespread lack of insurance coverage in the interstate market.................4

II.     Insurance industry incentives to deny coverage under prior law........................6

III.    The substantial economic effects of the lack of insurance coverage ................8

IV.     The reforms of the Affordable Care Act..........................................................11

V.      The minimum coverage provision as an essential part of the Act's
        insurance industry reforms...............................................................................13

VI.     The revenue-raising effect of the minimum coverage provision ......................16

Standard of review....................................................................................................16

Argument ..................................................................................................................18

I.      Congress validly exercised its commerce power to enact the minimum
        coverage provision, because the provision is integral to the ACA's larger
        regulatory scheme ............................................................................................18

        A.      Congress has broad authority to regulate interstate commerce ............18

        B.      Congress has constitutional power to regulate the interstate
                market in health insurance ...................................................................21

        C.      Congress exercised this constitutional authority by barring insurers
                from denying coverage, or charging discriminatory rates, to those
                with pre-existing conditions..................................................................24

        D.      The minimum coverage provision is an integral part of the larger
                regulatory scheme and is necessary and proper to Congress's
                regulation of interstate commerce........................................................25

                1.      The minimum coverage provision is essential to the
                        comprehensive regulation Congress enacted .............................26

                2.      The minimum coverage provision is also a valid exercise
                        of Congress's power under the Necessary and Proper Clause..................28

i

II.     Congress validly exercised its commerce power to enact the minimum
        coverage provision, because the provision regulates conduct with
        substantial effects on interstate commerce ........................................................31

        A.      The uninsured substantially affect interstate commerce by
                shifting the costs of their care on to other market participants ...........................31

        B.      Virginia cannot deny these substantial effects by characterizing
                the decision to forego Insurance as "inactivity" .....................................................33

III.    The minimum coverage provision is a valid exercise of Congress's
        independent power under the General Welfare Clause.....................................................39

        A.      The minimum coverage provision has a revenue-raising purpose, and
                so is valid under the General Welfare Clause .......................................................39

        B.      The General Welfare Clause power is independent of the
                commerce power ...................................................................................................44

Conclusion ........................................................................................................................45

# Table of Authorities

*Cases:*                                                                                          *Page:*

*Abril v. Virginia,*
    1445 F.3d 182 (4th Cir. 1998) ............................................................................43

*Adventure Res., Inc. v. Holland,*
    137 F.3d 786 (4th Cir. 1998) ............................................................................43

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242 (1986) .........................................................................................17

*Barnett Bank of Marion County, N.A. v. Nelson,*
    517 U.S. 25 (1996) ....................................................................................22, 24

*Berman v. Parker,*
    348 U.S. 26 (1954) ...........................................................................................38

*Bob Jones Univ., v. Simon*
    416 U.S. 725 (1974) ....................................................................................42, 45

*Burroughs v. United States,*
    290 U.S. 534 (1934) .........................................................................................29

*Buckley v. Valeo,*
    424 U.S. 1 (1976) .............................................................................................30

*Canal Ins. Co. v.  Distrib. Servs., Inc.,*
    320 F.3d 488 (4th Cir. 2003) ............................................................................37

*Carter v. Carter Coal Co.,*
    298 U.S. 238 (1936) .........................................................................................45

*Charles C. Steward  Mach. Co. v. Davis,*
    301 U.S. 548 (1937) .........................................................................................40

*In re Chateaugay Corp.,*
    53 F.3d 478 (2d Cir. 1995) ...............................................................................41

*Child Labor Tax Case,*
    259 U.S. 20 (1922) ...........................................................................................45

*City of Boerne v. Flores,*
    521 U.S. 507 (1997) .........................................................................................22

*Cases:* *Page:*

*Daniel v. Paul,*
    395 U.S. 298 (1969) ................................................................................ 36

*Gibbs v. Babbitt,*
    214 F.3d 483 (4th Cir. 2000) ....................................................... 17, 19, 28

*Gonzales v. Raich,*
    545 U.S. 1 (2005) ............................................................................. *passim*

*H.B. Rowe Co. v. Tippett,*
    --- F.3d ---, 2010 WL 2871076 (4th Cir. 2010) ................................. 17, 39

*Heart of Atlanta Motel v. United States,*
    379 U.S. 241 (1964) ................................................................................ 36

*Helvering v. Davis,*
    301 U.S. 619 (1937) ................................................................................ 40

*Hill v. Wallace,*
    259 U.S. 44 (1922) ................................................................................. 45

*Hodel v. Indiana*
    452 U.S. 314 (1981) ................................................................................ 19

*Hoffman v. Hunt,*
    126 F.3d 575 (4th Cir. 1997) .................................................................. 19

*Humana Inc. v. Forsyth,*
    525 U.S. 299 (1999) ................................................................................ 23

*INS v. Chadha,*
    462 U.S. 919 (1983) ................................................................................ 30

*Knowlton v. Moore,*
    178 U.S. 41 (1900) ................................................................................. 40

*In re Leckie Smokeless Coal Co.,*
    99 F.3d 573 (4th Cir. 1996) .................................................................... 43

*License Tax Cases,*
    72 U.S. (5 Wall.) 462 (1867) ................................................................. 40

*Life Partners, Inc. v. Morrison,*
    484 F.3d 284 (4th Cir. 2007) .................................................................. 22

*Cases:*                                                              *Page:*

*Luxton v. North River Bridge Co.,*
   153 U.S. 525 (1894)..................................................................38

*M'Culloch v. Maryland,*
   17 U.S. (4 Wheat.) 316 (1819)................................................28

*Maersk Line Ltd. v. Care,*
   271 F. Supp. 2d 818 (E.D. Va. 2003) .....................................3

*McCray v. United States,*
   195 U.S. 27 (1904)..................................................................40

*Nebraska v. EPA,*
   331 F.3d 995 (D.C. Cir. 2003) ...............................................17

*Nelson v. Sears, Roebuck & Co.,*
   312 U.S. 359 (1941)................................................................42

*News & Observer Pub. Co. v. Raleigh-Durham Airport Auth.,*
   597 F.3d 570 (4th Cir. 2010) ..................................................16

*Nurad, Inc. v. William E. Hooper & Sons Co.,*
   966 F.2d 837 (4th Cir. 1992) ..................................................38

*Perez v. United States,*
   402 U.S. 146 (1971)................................................................18

*Sabri v. United States,*
   541 U.S. 600 (2004)..........................................................21, 28

*Simmons v. United States,*
   308 F.2d 160 (4th Cir. 1962) ..................................................42

*Sonzinsky v. United States,*
   300 U.S. 506 (1937)................................................................42

*South Dakota v. Dole,*
   483 U.S. 203 (1987)................................................................40

*United States v. Aiken,*
   974 F.2d 446 (4th Cir. 1992) ..................................................42

*Cases:*                                                                           *Page:*

*United States v. Butler,*
    297 U.S. 1 (1936)..................................................................................40

*United States v. Comstock,*
    130 S. Ct. 1949 (2010) .............................................................. *passim*

*United States v. Darby,*
    312 U.S. 100 (1941).......................................................................20, 30

*United States v. Dean,*
    670 F. Supp. 2d 457 (E.D. Va. 2009) ....................................18, 19, 28

*United States v. Doremus,*
    249 U.S. 86 (1919)................................................................................40

*United States v. Gould*
    568 F.3d 459 (4th Cir. 2009), *cert. denied*, 130 S. Ct. 1686 (2010)................................33, 36

*United States v. Johnson,*
    114 F.3d 476 (4th Cir. 1997) ..............................................................36

*United States v. Jones,*
    976 F.2d 176 (4th Cir. 1992) ..............................................................42

*United States v. Kahriger,*
    345 U.S. 22 (1953), *overruled in part on other grounds by*
    *Marchetti v. United States*, 390 U.S. 39 (1968).............................. 40, 41

*United States v. Lopez,*
    514 U.S. 549 (1995)........................................................................20, 21

*United States v. Malloy,*
    568 F.3d 166 (4th Cir. 2009), *cert. denied*, 130 S. Ct. 1736 (2010).......................................18

*United States v. Morrison*,
    529 U.S. 598 (2000)........................................................................17, 20

*United States v. Olin Corp.,*
    107 F.3d 1506 (11th Cir. 1997) ..........................................................38

*United States v. Sage,*
    92 F.3d 101 (2d Cir. 1996)...........................................................17, 36, 39

*Cases:*                                                                                    *Page:*

*United States v. Salerno,*
    481 U.S. 739 (1987)..............................................................................................17

*United States v. Sanchez,*
    340 U.S. 42 (1950)...........................................................................................40, 41

*United States v. South-Eastern Underwriters Ass'n,*
    322 U.S. 533 (1944)..............................................................................21, 22, 25, 28

*United States v. Wrightwood Dairy Co.,*
    315 U.S. 110 (1942)........................................................................................1, 29

*Wash. State Grange v. Wash. State Republican Party,*
    552 U.S. 442 (2008)..............................................................................................17

*West Virginia v. U.S. Dep't of Health & Human Servs.,*
    289 F.3d 281 (4th Cir. 2002) .............................................................................17

*Wickard v. Filburn,*
    317 U.S. 111 (1942)................................................................................ *passim*

*Woods v. Cloyd W. Miller Co.,*
    333 U.S. 138 (1948)..............................................................................................43

**Constitution:**

U.S. Const. art. I, § 8, cl. 1...................................................................................40

U.S. Const. art. I, § 8, cl. 3...................................................................................18

U.S. Const. art. I, § 8, cl. 18.................................................................................18

**Statutes:**

6 U.S.C. § 443(a)(1)...............................................................................................37

15 U.S.C. §§ 1011-15 .............................................................................................22

15 U.S.C. § 1012(b) ...........................................................................................23, 24

16 U.S.C. § 1441(c)(4)............................................................................................37

18 U.S.C. § 228(a) ..................................................................................................36

*Statutes:* *Page:*

26 U.S.C. § 4980B .................................................................................................41, 44

26 U.S.C. § 4980D ......................................................................................................41

26 U.S.C. § 5000A ................................................................................................. *passim*

26 U.S.C. § 5761 .........................................................................................................44

26 U.S.C. §§ 8001-23 ..................................................................................................42

26 U.S.C. § 9701 .........................................................................................................43

26 U.S.C. §§ 9801-03 ............................................................................................26, 44

29 U.S.C. §§ 1181(a), 1182 ........................................................................................26

30 U.S.C. § 1257(f) .....................................................................................................37

42 U.S.C. § 2210(a) .....................................................................................................37

42 U.S.C. § 2243(d)(1) ................................................................................................37

42 U.S.C. § 2458c(b)(2)(A) .........................................................................................37

42 U.S.C. § 4001(c) .....................................................................................................37

42 U.S.C. § 4012a ........................................................................................................37

42 U.S.C. § 9601 *et seq.* ..............................................................................................37

42 U.S.C. § 9606 .........................................................................................................37

42 U.S.C. § 9607 .........................................................................................................37

42 U.S.C. § 1395dd .......................................................................................................5

45 U.S.C. § 358(a) .......................................................................................................37

49 U.S.C. § 13906(a)(1) ..............................................................................................37

Pub. L. No. 93-406, 88 Stat. 829 (1974).....................................................................23

Pub. L. No. 99-272, 100 Stat.82 (1985)...................................................................... 23

***Statutes:***                                                                   ***Page:***

Pub. L. No. 104-191, 110 Stat. 1936 (1996)...................................................................23

Pub. L. No. 104-204, 110 Stat. 2935 (1996)...................................................................23

Pub. L. No. 105-277, 112 Stat. 2681 (1998)...................................................................23

Pub. L. No. 110-343, 122 Stat. 3765 (2008)...................................................................23

Pub. L. No. 111-148, 124 Stat. 119 (2010):

    § 1001....................................................................................................................12
    § 1201..........................................................................................................12, 13, 25
    § 1311....................................................................................................................11
    § 1401-02..............................................................................................................12
    § 1421....................................................................................................................11
    § 1501....................................................................................................................12
    § 1501(a)(2)(A)........................................................................................11, 13, 33
    § 1501(a)(2)(B)..............................................................................................4, 21
    § 1501(a)(2)(F)........................................................................................10, 13, 32
    § 1501(a)(2)(G)......................................................................................................8
    § 1501(a)(2)(H).....................................................................................................13
    § 1501(a)(2)(I)........................................................................................13, 15, 27
    § 1501(a)(2)(J)....................................................................................7, 15, 16, 27
    § 1501(b)...............................................................................................................40
    § 1513....................................................................................................................12
    § 2001....................................................................................................................12
    § 10101(a).............................................................................................................12
    § 10106.................................................................................................................12
    § 10106(a) .................................................................................................. *passim*

Pub. L. No. 111-152, § 1002, 124 Stat. 1029, 1032 (2010) ....................................12, 41

***Legislative Materials:***

*47 Million and Counting: Why the Health Care Marketplace Is Broken*: Hearing
    *Before the S. Comm. on Finance,* 110th Cong. (2008)................................11, 15, 27

*Consumer Choices and Transparency in the Health Insurance Industry: Hearing*
    *Before the S. Comm. on Commerce, Science & Transp.*, 111th Cong. 29 (2009) ....................7

*Health Reform in the 21st Century: Insurance Market Reforms: Hearing Before*
    *the H. Comm. on Ways and Means,* 111th Cong. (2009)................................ *passim*

H.R. Rep. No. 111-443 (2010)....................................................................... *passim*

*Legislative Materials:*                                                                 *Page:*

Joint Comm. on Taxation, 111th Cong., *Technical Explanation of the Revenue Provisions*
  *of the "Reconciliation Act of 2010," as amended, in Combination with*
  *the "Patient Protection and Affordable Care Act"* 31 (Mar. 21, 2010) ..................................42

Letter from Douglas W. Elmendorf, Director, CBO, to the Hon. Nancy Pelosi, Speaker,
  U.S. House of Representatives (Mar. 20, 2010) ............................................................16, 43

S. Rep. No. 111-89 (2009) ....................................................................................................10, 32

*State Coverage Initiatives: Hearing Before the Subcomm. on Health of the*
  *H. Comm. on Ways and Means,* 110th Cong. 28 (2008) .........................................................23

*The Economic Case for Health Reform: Hearing Before the H. Comm. on the Budget*,
  111th Cong. 5 (2009) .............................................................................................................4

*Miscellaneous:*

Alan C. Monheit, et al., *Community Rating and Sustainable Individual Health Insurance*
  *Markets in New Jersey*, 23 HEALTH AFFAIRS 167 (2004).........................................................14

Bradley Herring, *The Effect of the Availability of Charity Care to the Uninsured on the*
  *Demand for Private Health Insurance*, 24 J. OF HEALTH ECON. 225 (2005).........................5, 9

Congressional Budget Office, AN ANALYSIS OF HEALTH INSURANCE PREMIUMS UNDER
  THE PATIENT PROTECTION AND AFFORDABLE CARE ACT  (Nov. 30, 2009) ............................16

Congressional Budget Office, HOW MANY PEOPLE LACK HEALTH INSURANCE AND FOR
  HOW LONG? (May 2003)  ....................................................................................................6, 34

Congressional Budget Office, KEY ISSUES IN ANALYZING MAJOR HEALTH INSURANCE
  PROPOSALS (Dec. 2008) .................................................................................................. *passim*

Congressional Budget Office, NONPROFIT HOSPITALS AND THE PROVISION OF COMMUNITY
  BENEFITS (2006)......................................................................................................................9

Congressional Budget Office, THE LONG-TERM BUDGET OUTLOOK
  (June 2009)..............................................................................................................................4

Council of Economic Advisers, ECONOMIC REPORT OF THE PRESIDENT (Feb. 2010)..............10, 32

Council of Economic Advisers, THE ECONOMIC CASE FOR HEALTH CARE
  REFORM (June 2009) ........................................................................................................ *passim*

*Miscellaneous:*                                                                                                              *Page:*

Families USA Foundation, *Health Reform: Help for Americans with Pre-Existing
   Conditions*, at 2 (2010) ................................................................................................8

Fed. R. Evid. 201 advisory committee's note ........................................................................3

J.P. Ruger, *The Moral Foundations of Health Insurance*, 100 Q.J. MED: AN
   INTERNATIONAL JOURNAL OF MEDICINE 53 (2007) ...........................................................4, 35

Jack Hadley et al., *Covering the Uninsured in 2008: Current Costs, Sources of Payment,
   and Incremental Costs 2008*, 27 HEALTH AFFAIRS 399 (2008) ...................................9

Jonathan Gruber, *Getting the Facts Straight on Health Care Reform*, 316 NEW ENG. J.
   MED. 2497, 2498 (2009) .......................................................................................15

Jonathan Gruber, PUBLIC FINANCE AND PUBLIC POLICY 442 (3d ed. 2002).............................5, 8

Jonathan Gruber, Mass. Inst. of Tech., *The Senate Bill Lowers Non-Group Premiums:
   Updated for New CBO Estimates*, (Nov. 27, 2009).................................................15

June E. O'Neill & Dave M. O'Neill, *Who Are the Uninsured?: An Analysis of
   America's Uninsured Population, Their Characteristics, and Their
   Health* 14 (Employment Policies Institute 2009)...............................................6, 34

Katherine Baicker & Amitabh Chandra, *Myths and Misconceptions
   About U.S. Health Insurance*, 27 HEALTH AFFAIRS w534 (2008) ............................5

Letter from Mitt H. Romney, Governor of Massachusetts, to State Legislature
   (Apr. 12, 2006)......................................................................................................15

M. Moshe Porat, et al., *Market Insurance versus Self Insurance: The Tax-Differential
   Treatment and Its Social Cost*, 58 J. RISK & INSURANCE 657 (1991) ....................34

M.E. Martinez & R.A. Cohen, Health Insurance Coverage: *Early Release of Health
   Insurance Estimates From the National Health Interview Survey,
   January-June 2009*, National Center for Health Statistics (Dec. 2009) ................10

Mark A. Hall & Carl E. Schneider, Patients as Consumers: Courts, Contracts, and the New
   Medical Marketplace, 106 MICH. L. REV. 643 (2008)...............................................9

Mark V. Pauly, *Risks and Benefits in Health Care: The View from Economics*, 26 HEALTH
   AFFAIRS 653, 658 (2007) .....................................................................................6, 35

National Center for Health Statistics, HEALTH, UNITED STATES, 2009 (2010)...............................6

***Miscellaneous:***                                                                                        ***Page:***

Sara Rosenbaum, *Can States Pick Up the Health Reform Torch?*,
    362 New Engl. J. Med. E29 (2010) .........................................................................................8

Stephen T. Parente & Tarren Bragdon, *Healthier Choice: An Examination of*
    *Market-Based Reforms for New York's Uninsured*, Medical Progress
    Report No. 10, (Manhattan Institute, Sept. 2009) ...............................................................14

U.S. Census Bureau, Census Population Survey, *Annual Social and Economic Supplement*
    (2009).....................................................................................................................................10

William H. Frist, *An Individual Mandate for Health Insurance Would Benefit All,*
    U.S. News & World Report (Sept.28, 2009) ......................................................................14

**Introduction**

Despite the political controversy surrounding the provision of the Patient Protection and
Affordable Care Act ("ACA," or "the Act") that requires most Americans to obtain a minimum
level of health insurance coverage, or instead to pay a tax penalty, as a legal matter the provision
is well within the traditional bounds of Congress's Article I powers.  First, the Act is an
important, but incremental, advance that builds on prior reforms of the interstate health insurance
market over the last 35 years.  Focusing in particular on insurance industry practices that have
prevented millions of Americans from obtaining affordable insurance, the Act bars insurers from
denying coverage to those with pre-existing conditions, or from charging discriminatory
premiums on the basis of medical history.  Congress recognized that these reforms of business
practices in the insurance industry were required to protect consumers and to correct a pervasive
failure in the interstate health insurance market.  Such reforms are indisputably within
Congress's power under the Commerce Clause.  Congress also rationally found – indeed, the
evidence overwhelmingly corroborates – that the minimum coverage provision is necessary to
ensure that these guaranteed-issue and community-rating reforms succeed.  Congress has the
authority under the commerce power to take measures to ensure the success of its larger reforms
of the interstate market.  *Gonzales v. Raich*, 545 U.S. 1, 18 (2005).  The same result follows if
the provision is analyzed under the Necessary and Proper Clause, given that, if Congress has the
power to enact a regulation of interstate commerce, "it possesses every power needed to make
that regulation effective."  *United States v. Wrightwood Dairy Co.*, 315 U.S. 110, 118-19 (1942).

Second, even considered in isolation, the minimum coverage provision easily falls within
the commerce power, for it regulates conduct that has substantial effects on interstate commerce.
The uninsured do not forego participation in the interstate health care market.  They receive tens

of billions of dollars in health care services, and in many cases, it turns out, cannot pay.  In the aggregate, the uninsured shift $43 billion in the cost of their care annually to other market participants, including providers, patients (in the form of higher costs), insurers, and the insured population (in the form of higher premiums).  Congress has the power to address these substantial effects on the interstate market.  *Raich*, 545 U.S. at 17.  Nor may Virginia assert that the uninsured sit passively outside of the market.  To the contrary, the large majority of the uninsured regularly migrate in and out of insurance coverage.  That is, the uninsured, as a class, often make, revisit, and revise economic decisions as to how to finance their health care needs.  Congress may regulate these economic actions when they substantially affect interstate commerce.  Nor is it unprecedented, as Virginia claims, for Congress to address these economic effects by requiring the purchase of insurance.  Insurance-purchase requirements have long been fixtures in the United States Code.  It has also been established for more than a century that Congress has power to compel a transaction – in particular, to require the sale of property through eminent domain – in order to make a regulation of interstate commerce effective.  In any event, in *Wickard v. Filburn*, 317 U.S. 111 (1942), the Court upheld a regulation that the plaintiff farmer claimed effectively "was forcing some farmers into the market to buy what they could provide for themselves."  *Id.* at 129.  And in *Raich*, the Court likewise rejected a claim that Congress could not regulate the plaintiffs' home-grown marijuana because it was "entirely separated from the market."  545 U.S. at 30.

Third, Congress repeatedly treated the minimum coverage provision as a tax.  It is in the Internal Revenue Code.  Its penalty operates as an addition to an individual's income tax liability on his annual tax return, which is calculated by reference to income.  It is enforced by the Internal Revenue Service.  And it will raise a projected $4 billion annually for general revenues.

2

The provision thus falls easily within Congress's independent authority to lay taxes and make expenditures for the general welfare.  Virginia contends that Congress may not impose a tax with a regulatory purpose under the General Welfare Clause power, but this is plainly wrong.  All taxes serve some regulatory purpose, and the courts have long disclaimed any attempt to distinguish taxes with regulatory purposes from other taxes for the purpose of the taxing power.

As this Court has recognized, Virginia has brought a "facial challenge" to the minimum coverage provision.  (Doc. 84 at 1.)  In this facial challenge, Virginia bears the heavy burden of showing that there are *no* possible circumstances in which the provision could be constitutionally applied.  It cannot meet this burden.  It cannot show the provision would be unconstitutional in *any* of its applications, and it certainly cannot show, even under its anachronistic commerce clause theories, that the provision is unconstitutional in *all* of them.

## Statement of Undisputed Material Facts

1.  Congress gave detailed consideration to the structure of the reforms of the interstate health insurance market that it enacted in the ACA, as shown by the more than fifty hearings that it held on the subject in the 110th and 111th Congresses alone.  *See* H.R. REP. NO. 111-443, pt. II, at 954-68 (2010) (Ex. 1).  The following facts well exceed a rational basis for Congress to conclude that it had authority under Article I of the Constitution to enact the ACA, and in particular, the minimum coverage provision:[1]

---

[1]  This Court does not independently review the facts underlying Congress's conclusion that it had the Article I authority to enact a statute.  The Court's task instead is to determine "whether a 'rational basis' exists" for Congress to so conclude.  *Gonzales v. Raich*, 545 U.S. 1, 22 (2005) (quoting *United States v. Lopez*, 514 U.S. 549, 557 (1995)).  The "legislative facts" underlying the conclusion are accordingly not subject to courtroom proof.  *See* FED. R. EVID. 201 advisory committee's note; *see also Maersk Line Ltd. v. Care*, 271 F. Supp. 2d 818, 821 n.1 (E.D. Va. 2003).

I.      **The Widespread Lack of Insurance Coverage in the Interstate Market**

2.  In 2009, the United States spent more than 17 percent of its gross domestic product on health care.  Pub. L. No. 111-148 ("ACA"), §§ 1501(a)(2)(B), 10106(a).[2]

3.  Notwithstanding these expenditures, 45 million people – an estimated 15% of the population – went without health insurance for some portion of 2009.  Absent the new statute, that number would have climbed to 54 million by 2019.  CONG. BUDGET OFFICE ("CBO"), KEY ISSUES IN ANALYZING MAJOR HEALTH INSURANCE PROPOSALS 11 (Dec. 2008) [hereinafter KEY ISSUES] (Ex. 2); *see also* CBO, THE LONG-TERM BUDGET OUTLOOK 21-22 (June 2009) (Ex. 3).

4.  The pervasive lack of insurance has occured because "[t]he market for health insurance . . . is not a well-functioning market."  COUNCIL OF ECONOMIC ADVISERS ("CEA"), THE ECONOMIC CASE FOR HEALTH CARE REFORM 16 (June 2009) (submitted into the record for *The Economic Case for Health Reform: Hearing Before the H. Comm. on the Budget*, 111th Cong. 5 (2009)) [hereinafter THE ECONOMIC CASE] (Ex. 4).  There are several features that are unique to the national health insurance market that have caused that market to fail, and that have prevented many from obtaining needed insurance.

5.  Health insurance is a unique market.  With rare exceptions, individuals cannot make a personal choice to eliminate the current or potential future consumption of health care services.  Nor can individuals reliably predict whether they or their families will need health care.  They may go without health care for many years, then unexpectedly suffer a debilitating injury or disease and suddenly incur high or even catastrophic health care costs.  *See* J.P. Ruger, *The Moral Foundations of Health Insurance*, 100 Q.J. MED. 53, 54-55 (2007) (Ex. 5).  This combination of universal need and unavoidable uncertainty gave rise to the private health

_____

[2]  Although Congress is not required to set forth particularized findings of an activity's effect on interstate commerce, when, as here, it does so, courts "will consider congressional findings in [their] analysis."  *Raich*, 545 U.S. at 21.

insurance industry, as well as federal programs such as Medicare and Medicaid, and federal

regulation under statutes such as ERISA, COBRA, EMTALA, and HIPAA.  In this market,

everyone is a participant because everyone, in one way or another, is faced with managing the

financial risks associated with unpredictable future health care costs.  Katherine Baicker &

Amitabh Chandra, *Myths and Misconceptions About U.S. Health Insurance*, 27 HEALTH AFFAIRS

w533, w534 (2008) (Ex. 6); Jonathan Gruber, PUBLIC FINANCE AND PUBLIC POLICY 442-28 (3d

ed. 2009) (Ex. 7).

6.  When a person does fall ill, he is effectively assured of at least a basic level of care,

without regard to his insured status.  Under the Emergency Medical Treatment and Labor Act, 42

U.S.C. § 1395dd, for example, hospitals that participate in Medicare and offer emergency

services are required to stabilize any patient who arrives, regardless of whether he has insurance

or otherwise can pay for that care.  CBO, KEY ISSUES, at 13.  In addition, most hospitals are

nonprofit organizations that "have some obligation to provide care for free or for a minimal

charge to members of their community who could not afford it otherwise."  *Id*.  For-profit

hospitals "also provide such charity or reduced-price care."  *Id*.

7.  Because of the availability of this backstop of free care, many persons have an

incentive not to obtain insurance, knowing that they will not bear the full cost of their decision to

attempt to pay for their health care needs out-of-pocket.  THE ECONOMIC CASE, at 17. *See also*

Bradley Herring, *The Effect of the Availability of Charity Care to the Uninsured on the Demand*

*for Private Health Insurance*, 24 J. OF HEALTH ECON. 225, 226 (2005) (Ex. 8).

8.  Most individuals make economic decisions whether to attempt to pay for their

anticipated health care needs through insurance, or to attempt (often unsuccessfully) to pay out-

of-pocket.  In making these decisions, individuals weigh the cost of insurance against the cost of

their potential out-of-pocket expenses.  *See* Mark V. Pauly, *Risks and Benefits in Health Care: The View from Economics*, 26 HEALTH AFFAIRS 653, 657-58 (2007) (Ex. 9).

9.  Individuals regularly revisit these economic decisions whether to purchase insurance or attempt to finance their health care needs through another manner.  Movement in and out of insured status is "very fluid."  Of those who are uninsured at some point in a given year, about 63% have coverage at some other point during the same year.  CBO, HOW MANY PEOPLE LACK HEALTH INSURANCE AND FOR HOW LONG?, 4, 9 (May 2003) (Ex. 10); *see also* KEY ISSUES, at 11.

10.  Empirical studies document the universal need for, and use of, health care services.  Far from being inactive bystanders, the vast majority of the population – even of the uninsured population – has participated in the health care market by receiving medical services.  *See* June E. O'Neill & Dave M. O'Neill, *Who Are the Uninsured?:  An Analysis of America's Uninsured Population, Their Characteristics, and Their Health*, 20-22 (2009) (Ex. 11) (94% of even long-term uninsured have received some level of medical care); *see also* National Center for Health Statistics, HEALTH, UNITED STATES, 2009 at 318 (2010) (for 2007, 62.6% of uninsured at a given point in time had at least one visit to a doctor or emergency room within the year) (Ex. 12).

11.  The health insurance market is also unique due to the extreme distribution of risk within the market.  The large majority of medical expenditures are incurred by a small percentage of the population.  "About 20 percent of the population accounts for 80 percent of health spending," with "the sickest one-percent accounting for nearly one-quarter of health expenditures."  H.R. REP. NO. 111-443, pt. II, at 990 (internal quotation omitted).

## II.  Insurance Industry Incentives to Deny Coverage Under Prior Law

12.  Because of the extremely uneven distribution of risk, insurers seek to exclude those they deem most likely to incur expenses.  *47 Million and Counting:  Why the Health Care*

*Marketplace Is Broken: Hearing Before the S. Comm. on Finance*, 110th Cong. 51-52 (2008) (statement of Mark Hall, Professor of Law and Public Health, Wake Forest Univ.) (Ex. 13).  That is, they adopt practices designed – albeit imperfectly – to "cherry-pick healthy people and to weed out those who are not as healthy."  H.R. REP. NO. 111-443, pt. II, at 990 (internal quotation omitted).

13.   These practices include medical underwriting, or the individualized review of an insurance applicant's health status.  This practice is costly, resulting in administrative fees that are responsible for 26 to 30 percent of the cost of premiums in the individual and small group markets.  ACA, §§ 1501(a)(2)(J), 10106(a).  Medical underwriting yields substantially higher risk-adjusted premiums or outright denial of insurance coverage for an estimated one-fifth of applicants, a portion of the population that is most in need of coverage.  CBO, KEY ISSUES, at 81.

14.   These practices also include: denial of coverage for those with pre-existing conditions, even minor ones; exclusion of pre-existing conditions from coverage; higher, and often unaffordable, premiums based on the insured's medical history; and rescission of policies after claims are made.  *Id.*  These practices are often harsh and unfair for consumers, in that "many who need coverage cannot obtain it, and many more who have some type of insurance may not have adequate coverage to meet their health care needs."  *Health Reform in the 21st Century: Insurance Market Reforms: Hearing Before the H. Comm. on Ways and Means*, 111th Cong. 53 (2009) (Linda Blumberg, Senior Fellow, Urban Inst.) (Ex. 14).  Insurers often revoke coverage even for relatively minor pre-existing conditions.  *Consumer Choices and Transparency in the Health Insurance Industry: Hearing Before the S. Comm. on Commerce, Science & Transp.*, 111th Cong. 29-30 (2009) (Karen Pollitz, Research Professor, Georgetown Univ. Health Policy Inst.) (Ex. 15).

15.  More than 57 million Americans have some pre-existing medical condition, and thus, absent reform, risk denial or rescission of insurance coverage.  Families USA Foundation, *Health Reform: Help for Americans with Pre-Existing Conditions*, at 2 (2010) (Ex. 16).  Given that insurers operate in interstate commerce and can gauge their participation in state markets based on the nature of regulation there, *see* Sara Rosenbaum, *Can States Pick Up the Health Reform Torch?*, 362 NEW ENGL. J. MED. e29, at 3 (2010) (Ex. 17), Congress concluded that there was a need for regulatory protection at a national level.

## III.    The Substantial Economic Effects of the Lack of Insurance Coverage

16.  Aside from these issues of cost and consumer protection, Congress found that the widespread inability of Americans to obtain affordable coverage, or to obtain coverage at all, also has significant additional economic effects.  For example, 62 percent of all personal bankruptcies are caused in part by medical expenses.  ACA, §§ 1501(a)(2)(G), 10106(a).

17.  Moreover, the uncertainty that many Americans experience as to whether they can obtain coverage also constrains the labor market.  The phenomenon of "job lock," in which employees avoid changing employment because they fear losing coverage, is widespread.  Employees are 25% less likely to change jobs if they are at risk of losing health insurance coverage in doing so.  THE ECONOMIC CASE at 36-37; *see also* Gruber, PUBLIC FINANCE AND PUBLIC POLICY at 431.

18.  Insurance industry reform to guarantee coverage would alleviate "job lock" and increase wages, in the aggregate, by more than $10 billion annually, or 0.2% of the gross domestic product.  THE ECONOMIC CASE at 36-37.

19.  One result of industry practices that deny, impede, or raise the cost of insurance coverage is that many millions of people are uninsured.  In the aggregate, the uninsured shift

much of the cost of their care onto other persons.  The uninsured continue to receive health care

services, but empirical evidence shows they pay only a small portion of the cost.  For example,

one estimate found that hospitals collect from uninsured patients on average only 10% of the cost

of their care.  Mark A. Hall & Carl E. Schneider, *Patients as Consumers: Courts, Contracts, and

the New Medical Marketplace*, 106 MICH. L. REV. 643, 665 n.121 (2008) (Ex. 18).

20.   This phenomenon is not limited to the uninsured with the lowest incomes.   On

average, uninsured persons with incomes of more than 300% of the federal poverty level pay for

less than one half of the cost of the medical care that they receive.  Herring, 24 J. OF HEALTH

ECON. at 229-30.

21.   The costs of "uncompensated care" for the uninsured fall on other participants in the

health care market.  In the aggregate, that cost shifting amounted to $43 billion in 2008, about 5

percent of overall hospital revenues.  CBO, KEY ISSUES, at 114.  Indeed, this figure may

underestimate the cost shifting.  One study estimated that the uninsured in 2008 collectively

received $86 billion in care during the time they lacked coverage, including $56 billion in

services for which they did not pay, either in the form of bad debts or in the form of reduced-cost

or free charitable care.  Jack Hadley et al., *Covering the Uninsured in 2008: Current Costs,

Sources of Payment, and Incremental Costs 2008*, 27 HEALTH AFFAIRS w399, w401 (2008) (Ex.

19); CBO, KEY ISSUES, at 114; *see also* CBO, NONPROFIT HOSPITALS AND THE PROVISION OF

COMMUNITY BENEFITS 1-2 (2006) (Ex. 20).

22.   Public funds subsidize these costs.  For example, through Disproportionate Share

Hospital payments, the federal government paid for tens of billions of dollars in uncompensated

care for the uninsured in 2008 alone.  Congress determined that preventing or reducing cost-

shifting would lower these public subsidies.  H.R. REP. NO. 111-443, pt. II, at 983; *see also* THE ECONOMIC CASE, at 8.

23.   The remaining costs in the first instance fall on health care providers, which in turn "pass on the cost to private insurers, which pass on the cost to families."  ACA, § 1501(a)(2)(F), 10106(a).  This cost-shifting effectively creates a "hidden tax" reflected in fees charged by health care providers and premiums charged by insurers.  CEA, ECONOMIC REPORT OF THE PRESIDENT 187 (Feb. 2010) (Ex. 21); *see also* H.R. REP. NO. 111-443, pt. II, at 985 (2010); S. REP. NO. 111-89, at 2 (2009) (Ex. 22).

24.   When premiums increase as a result of cost-shifting by the uninsured, more people who see themselves as healthy make the economic calculation not to buy, or to drop, coverage. For many, this economic calculation leads them to wait to obtain coverage until they grow older, when they anticipate greater health care needs.  *See* CBO, KEY ISSUES at 12 (percentage of uninsured older adults in 2007 was roughly half the percentage of uninsured younger adults). *See also* M.E. Martinez & R.A. Cohen, *Health Insurance Coverage: Early Release of Estimates From the National Health Interview Survey, January-June 2009*, National Center for Health Statistics, at 2 (Dec. 2009) (Ex. 23); U.S. Census Bureau, Census Population Survey, *Annual Social and Economic Supplement* (2009) (Table H101, data on coverage status by age) (available at www.census.gov/hhes/www/cpstables/032009/health/ h01_001.htm) (Ex. 24).

25.   This self-selection further narrows the risk pool, which, in turn, further increases the price of coverage for the insured.  The result is a self-reinforcing "premium spiral."  *Health Reform in the 21st Century: Insurance Market Reforms* at 118-19 (2009) (American Academy of Actuaries); *see also* H.R. REP. NO. 111-443, pt. II, at 985.

26.  This premium spiral particularly hurts small employers, due to their relative lack of bargaining power.  *See* H.R. REP. NO. 111-443, pt. II, at 986-88; THE ECONOMIC CASE at 37-38; *see also 47 Million and Counting* at 36 (Raymond Arth, Nat'l Small Business Ass'n) (noting need for insurance reform and minimum coverage provision to stem rise of small business premiums).

**IV.    The Reforms of the Affordable Care Act**

27.  To address the economic effects of these market failures, as well as to protect consumers, the Patient Protection and Affordable Care Act comprehensively "regulates activity that is commercial and economic in nature: economic and financial decisions about how and when health care is paid for, and when health insurance is purchased."  ACA, §§ 1501(a)(2)(A), 10106(a).  The comprehensive reform has five main components.

28.  First, to address inflated premiums in the individual and small-business insurance market, Congress established health insurance Exchanges "as an organized and transparent marketplace for the purchase of health insurance where individuals and employees (phased-in over time) can shop and compare health insurance options."  H.R. REP. NO. 111-443, pt. II, at 976 (internal quotation omitted).  Exchanges review premiums, coordinate participation and enrollment in health plans, implement procedures to certify qualified health plans, and educate consumers.  ACA, § 1311.

29.  Second, the Act builds on the existing system of employer-based health insurance, in which most individuals receive coverage as part of employee compensation.  *See* KEY ISSUES, at 4-5.  It creates tax incentives for small businesses to purchase health insurance for employees, and imposes penalties on certain large businesses that do not provide employees adequate coverage.  ACA, §§ 1421, 1513.

11

30.  Third, the Act provides financial assistance to support the purchase of coverage for a large portion of the uninsured population.  As Congress understood, nearly two-thirds of the uninsured are in families with income less than 200 percent of the federal poverty level, H.R. REP. NO. 111-443, pt. II, at 978; *see also* KEY ISSUES, at 27, while 4 percent of those with income greater than 400 percent of the poverty level are uninsured.  KEY ISSUES, at 11.  The Act reduces this gap by providing premium tax credits for individuals and families with income between 100 and 400 percent of the federal poverty line, ACA, §§ 1401-02, and expands eligibility for Medicaid to individuals with income below 133 percent of the federal poverty level beginning in 2014.  *Id*. § 2001.

31.  Fourth, the Act removes barriers to insurance coverage.  As noted above, a variety of insurance industry practices have increased premiums for or denied coverage to those with the greatest health care needs.  Most significantly, the Act bars insurers from refusing to cover individuals with pre-existing medical conditions.  ACA, § 1201.  The Act also prevents insurers from rescinding coverage for any reason other than fraud or intentional misrepresentation, or declining to renew coverage based on health status.  *Id.* §§ 1001, 1201.  Further, with limited exceptions, the Act prohibits insurers from charging higher premiums on the basis of the insured's prior medical history.  *Id.* § 1201.  And it prohibits caps on the coverage available to a policyholder in a given year or over a lifetime.  *Id.* §§ 1001, 10101(a).

32.  Finally, the Act requires that all Americans, with specified exceptions, maintain a minimum level of health insurance coverage, or pay a penalty.  ACA, §§ 1501, 10106 (as amended by Health Care and Education Reconciliation Act of 2010, Pub. L. No. 111-152, § 1002, 124 Stat. 1029, 1032).

**V.     The Minimum Coverage Provision as an Essential Part of the Act's
           Insurance Industry Reforms**

33.   Congress found that this minimum coverage provision "is an essential part of this larger regulation of economic activity," and that its absence "would undercut Federal regulation of the health insurance market."  *Id.* §§1501(a)(2)(H), 10106(a).  That judgment rested on a number of Congressional findings.  Congress found that, by "significantly reducing the number of the uninsured, the requirement, together with the other provisions of this Act, will lower health insurance premiums."  *Id.* §§ 1501(a)(2)(F), 10106(a).  Conversely, and importantly, Congress also found that, without the minimum coverage provision, the reforms in the Act, such as the ban on denying coverage or charging more based on pre-existing conditions, would amplify existing incentives for individuals to "wait to purchase health insurance until they needed care," thereby further shifting costs onto third parties.  *Id.* §§ 1501(a)(2)(I), 10106(a).  Congress thus determined that the minimum coverage provision "is essential to creating effective health insurance markets in which improved health insurance products that are guaranteed issue and do not exclude coverage of pre-existing conditions can be sold."   *Id.*

34.   These Congressional findings are amply supported.  The new "guaranteed issue" and "community rating" requirements under Section 1201 of the Act ensure that all Americans can obtain coverage subject to no coverage limits and despite the pre-existing conditions they may have at that time.  ACA, § 1201.  Because these new insurance regulations would allow individuals to "wait to purchase health insurance until they needed care," *id.*, §§ 1501(a)(2)(I), 10106(a), they would increase the incentives for individuals to "make an economic and financial decision to forego health insurance coverage" until their health care needs become substantial, *id.* §§ 1501(a)(2)(A), 10106(a).

35.  Individuals who would make that decision would take advantage of the ACA's reforms by joining a coverage pool maintained in the interim through premiums paid by other market participants.  Without a minimum coverage provision, this market timing would increase the costs of uncompensated care and the premiums for the insured pool, creating pressures that would "inexorably drive [the health insurance] market into extinction."  *Health Reform in the 21st Century: Insurance Market Reforms*, at 13 (Uwe Reinhardt, Ph.D., Professor of Political Economy, Economics, and Public Affairs, Princeton University); *see also* William H. Frist, *An Individual Mandate for Health Insurance Would Benefit All*, U.S. NEWS & WORLD REPORT (Sept. 28, 2009) (politics.usnews.com/opinion/articles/2009/09/28/frist-an-individual-mandate-for-health-insurance-would-benefit-all.html) (Ex. 25).

36.  This danger is not merely theoretical, but instead is borne out in the experience of states that have attempted "guaranteed issue" and "community rating" reforms without an accompanying minimum coverage provision.  After New Jersey enacted a similar reform, its individual health insurance market experienced higher premiums and decreased coverage.  *See* Alan C. Monheit, et al., *Community Rating and Sustainable Individual Health Insurance Markets in New Jersey*, 23 HEALTH AFFAIRS 167, 168 (2004) (Ex. 26) (describing potential for "adverse-selection death spiral" in a market with guaranteed issue); *see also Health Reform in the 21st Century: Insurance Market Reforms* at 101-02 (Dr. Reinhardt).

37.  Likewise, after New York enacted a similar reform, "the market for individual health insurance in New York has nearly disappeared."  Stephen T. Parente & Tarren Bragdon, *Healthier Choice: An Examination of Market-Based Reforms for New York's Uninsured*, MEDICAL PROGRESS REPORT No. 10 at i (Manhattan Institute, Sept. 2009) (Ex. 27).

38.  In contrast, Massachusetts enacted "guaranteed issue" and "community rating" reforms, coupled with a minimum coverage provision.  Its reforms have succeeded.  Since 2006, the average individual premium in Massachusetts has decreased by 40%, compared to a 14% *increase* in the national average.  Jonathan Gruber, Mass. Inst. of Tech., *The Senate Bill Lowers Non-Group Premiums: Updated for New CBO Estimates*, at 1 (Nov. 27, 2009) (available at www.whitehouse.gov/files/documents/Gruber_Report_4.pdf) (Ex. 28).  *See also* Letter from Mitt H. Romney, Governor of Massachusetts, to State Legislature at 1-2 (Apr. 12, 2006) (Ex. 29) (signing statement for Massachusetts bill, noting need for insurance coverage requirement to prevent cost-shifting by the uninsured).

39.  In short, "fundamental insurance-market reform is impossible" if the guaranteed-issue and community-rating reforms are not coupled with a minimum coverage provision.  Jonathan Gruber, *Getting the Facts Straight on Health Care Reform*, 316 NEW ENG. J. OF MED. 2497, 2498 (2009) (Ex. 30).  This is because "[a] health insurance market could never survive or even form if people could buy their insurance on the way to the hospital."  *47 Million and Counting*, at 52 (Prof. Hall).  Accordingly, Congress found that the minimum coverage provision is "essential" to its broader effort to regulate health insurance industry underwriting practices that have prevented many from obtaining health insurance, ACA, §§ 1501(a)(2)(I), (J), 10106(a).

40.  The minimum coverage provision also addresses the unnecessary costs created by the insurance industry's practice of medical underwriting.  "By significantly increasing health insurance coverage and the size of purchasing pools, which will increase economies of scale, the requirement, together with the other provisions of this Act, will significantly reduce administrative costs and lower health insurance premiums," and is therefore "essential to

creating effective health insurance markets that do not require underwriting and eliminate its

associated administrative costs."  ACA, §§ 1501(a)(2)(J), 10106(a).

**VI.     The Revenue-Raising Effect of the Minimum Coverage Provision**

41.  The CBO projects that the reforms in the Act will reduce the number of uninsured

Americans by approximately 32 million by 2019.  Letter from Douglas W. Elmendorf, Director,

CBO, to the Hon. Nancy Pelosi, Speaker, U.S. House of Representatives 9 (Mar. 20, 2010) (Ex.

31) [hereinafter CBO Letter to Rep. Pelosi].

42.  It further projects that the Act's combination of reforms and tax credits will reduce

the average premium paid by individuals and families in the individual and small-group markets.

*Id.* at 15; CBO, AN ANALYSIS OF HEALTH INSURANCE PREMIUMS UNDER THE PATIENT

PROTECTION AND AFFORDABLE CARE ACT 23-25 (Nov. 30, 2009) (Ex. 32).

43.  CBO estimates that the interrelated revenue and spending provisions in the Act –

specifically taking into account revenue from the minimum coverage provision – will yield net

savings to the federal government of more than $100 billion over the next decade.  CBO Letter to

Rep. Pelosi at 2.

44.   In  particular,  the  CBO  estimates  that  the  minimum  coverage  provision  would

produce about $4 billion in annual revenue once it is fully in effect.  CBO Letter to Rep. Pelosi at

tbl. 4 at 2.

**Standard of Review**

The Secretary moves for summary judgment under Rule 56 of the Federal Rules of Civil

Procedure.  "The moving party is entitled to judgment as a matter of law when the nonmoving

party fails to make an adequate showing on an essential element for which it has the burden of

proof at trial."  *News & Observer Pub. Co. v. Raleigh-Durham Airport Auth.*, 597 F.3d 570, 576

(4th Cir. 2010).  "[T]he mere existence of some alleged factual dispute . . . will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). "Only disputes over facts that might affect the outcome of the [litigation] . . . will properly preclude the entry of summary judgment."  *Id*. at 248.

This case concerns a pure question of law, whether Congress acted within its Article I powers in enacting the ACA.  Virginia faces a heavy burden to show that Congress exceeded its authority.  "'Due respect for the decisions of a coordinate branch of Government demands that [this Court] invalidate a congressional enactment only upon a plain showing that Congress has exceeded its constitutional bounds.'"  *Gibbs v. Babbitt*, 214 F.3d 483, 490 (4th Cir. 2000) (quoting *United States v. Morrison*, 529 U.S. 598, 607 (2000)).

Moreover, as this Court has recognized, Virginia brings a facial challenge to the minimum coverage provision.  To prevail, Virginia has "'a very heavy burden'" to show that the statute "'cannot operate constitutionally under any circumstance.'"  *H.B. Rowe Co. v. Tippett*, --- F.3d ---, 2010 WL 2871076, at *7 (4th Cir. 2010) (quoting *West Virginia v. U.S. Dep't of Health & Human Servs.*, 289 F.3d 281, 292 (4th Cir. 2002)).  In other words, it must "'establish that *no* set of circumstances exists under which the Act would be valid,' *i.e.*, that the law is unconstitutional in *all* of its applications."  *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008) (quoting *United States v. Salerno,* 481 U.S. 739, 745 (1987)) (emphasis added).  *See also Nebraska v. EPA*, 331 F.3d 995, 998 (D.C. Cir. 2003) (rejecting facial Commerce Clause challenge to federal statute); *United States v. Sage*, 92 F.3d 101, 106 (2d Cir. 1996) (same).  Virginia cannot carry this heavy burden.

## Argument

### I.    Congress Validly Exercised Its Commerce Power to Enact the Minimum Coverage Provision, because the Provision Is Integral to the ACA's Larger Regulatory Scheme

#### A.    Congress Has Broad Authority to Regulate Interstate Commerce

The Constitution grants Congress power to "regulate Commerce . . . among the several States," U.S. CONST., art. I, § 8, cl. 3, and to "make all Laws which shall be necessary and proper" to the execution of that power, *id*. cl. 18.  This grant of authority is broad, allowing Congress, among other things, to "regulate activities that substantially affect interstate commerce."  *Gonzales v. Raich*, 545 U.S. 1, 16-17 (2005).  In assessing whether an activity substantially affects interstate commerce, Congress may consider the aggregate effect of a particular form of conduct in deciding whether to exercise its Commerce Clause authority.  The question is not whether any one person's conduct, considered in isolation, affects interstate commerce, but whether there is a rational basis for concluding that the *class of activities*, "taken in the aggregate," substantially affects interstate commerce.  *Raich*, 545 U.S. at 22; *see also Wickard v. Filburn*, 317 U.S. 111, 127-28 (1942).  In other words, "'[w]here the class of activities is regulated and that class is within the reach of federal power, the courts have no power to excise, as trivial, individual instances of the class.'"  *Raich*, 545 U.S. at 23 (quoting *Perez v. United States*, 402 U.S. 146, 154 (1971) (internal quotation omitted)); *see also United States v. Malloy,* 568 F.3d 166, 180 (4th Cir. 2009), *cert. denied*, 130 S. Ct. 1736 (2010) (applying *Raich* to uphold ban on child pornography produced for personal use); *United States v. Dean*, 670 F. Supp. 2d 457, 460 (E.D. Va. 2009).

The commerce power provides authority to Congress in a second way relevant to this case.  In exercising its Commerce Clause power, Congress may also reach even wholly

intrastate, non-commercial matters when it concludes that the failure to do so would undercut a larger program regulating interstate commerce. *Raich*, 545 U.S. at 18; *see also Hoffman v. Hunt*, 126 F.3d 575, 583-88 (4th Cir. 1997). Thus, when "a general regulatory statute bears a substantial relation to commerce, the *de minimis* character of individual instances arising under that statute is of no consequence." *Raich*, 545 U.S. at 17 (internal quotation omitted). *See also id.* at 37 (Scalia, J., concurring in the judgment) (Congress's authority to make its regulation of commerce effective is "distinct" from its authority to regulate matters that substantially affect interstate commerce). For the provisions of "'[a] complex regulatory program'" to fall within Congress's commerce power, "'[i]t is enough that the challenged provisions are an integral part of the regulatory program and that the regulatory scheme when considered as a whole satisfies this test.'" *Gibbs*, 214 F.3d at 497 (quoting *Hodel v. Indiana*, 452 U.S. 314, 329 n.17 (1981)); *see also Dean*, 670 F. Supp. 2d at 460.

In assessing Congressional judgments regarding the impact on interstate commerce of and the necessity of individual provisions to the overall scheme of reform, the Court's task "is a modest one." *Raich*, 545 U.S. at 22. The Court need not itself measure the impact on interstate commerce of the activities Congress sought to regulate, nor need the Court calculate how integral a particular provision is to a larger regulatory program. The Court's task instead is limited to determining "whether a 'rational basis' exists" for Congress's conclusions. *Id.* (quoting *United States v. Lopez*, 514 U.S. 549, 557 (1995)). Under rational basis review, this Court may not second-guess the factual record upon which Congress relied.

The Supreme Court's decisions in *Raich* and in *Wickard* illustrate the breadth of the Commerce power and the deference accorded Congress's judgments. Persons who finance their health care consumption without purchasing insurance are engaged in economic activity to at

19

least as great an extent as the plaintiffs in *Raich*, who consumed only home-grown marijuana.  It was undisputed in *Raich* that Congress could regulate possession of marijuana even when no interstate transaction had taken place.  The plaintiffs urged, however, that persons who grew marijuana for personal use had declined to become part of the market and had not engaged in economic activity.  The Supreme Court rejected this Commerce Clause challenge, finding that "Congress had a rational basis for concluding that leaving home-consumed marijuana outside federal control would . . . affect price and market conditions."  545 U.S. at 19.

*Raich* reflected principles established in *Wickard v. Filburn*, 317 U.S. 111 (1942), where the Court upheld Congress's authority to regulate home-grown wheat to be consumed on Filburn's own farm.  It was irrelevant, the Court explained, that Filburn had chosen to consume home-grown wheat rather than to purchase wheat on the market.  Filburn's consumption of the wheat he produced, when aggregated with the home consumption of other farmers, would have disrupted the federal price scheme and thus was subject to federal regulation.  *See Raich*, 545 U.S. at 19 ("[i]n *Wickard*, we had no difficulty concluding that Congress had a rational basis for believing that, when viewed in the aggregate, leaving home-consumed wheat outside the regulatory scheme would have a substantial influence on price and market conditions").

*Raich* and *Wickard* demonstrate the deference that the Court gives to Congress's judgment regarding how to structure systems of economic regulation.  Indeed, in the nearly 70 years since the Court overruled its *Lochner*-era understanding of the scope of the commerce power in *United States v. Darby*, 312 U.S. 100 (1941), the Court has invalidated statutes as beyond the reach of that power on only two occasions.  *See United States v. Lopez*, 514 U.S. 549 (1995); *United States v. Morrison*, 529 U.S. 598 (2000).  In sharp contrast to the system of health insurance regulation at issue in the ACA, neither of those two statutes purported to regulate

economic activity.  Nor did either of those two statutes have any connection to a broader scheme of economic regulation.  In *Morrison*, the Court invalidated a tort cause of action created in the Violence Against Women Act, finding that any link between gender-motivated violence and economic activity could be found only through a chain of speculative assumptions.  Similarly, in *Lopez*, the Court struck down a ban on possession of a handgun in a school zone because the ban was not part of an overall scheme of firearms regulation, and it related to economic activity only insofar as the presence of guns near schools might impair learning, which in turn might undermine economic productivity.  The Court reasoned that Congress may not "pile inference upon inference" to find a link to interstate commerce.  *Lopez*, 514 U.S. at 567.

In contrast, as shown below, "[n]o piling is needed here to show that Congress was within its prerogative" to regulate interstate commerce.  *Sabri v. United States*, 541 U.S. 600, 608 (2004).  It is difficult to imagine a more directly economic focus of legislation than the regulation of how health care services are financed; the minimum coverage provision thus regulates matters with direct and substantial effects on interstate commerce.  And the minimum coverage provision, further, forms an integral part of the ACA's larger reforms of health insurance industry practices.  Those market reforms fall within the commerce power, and Congress had authority to enact a measure it deemed necessary to make those reforms effective.

**B.**     **Congress Has Constitutional Power to Regulate the Interstate Market in Health Insurance**

Regulation of a vast interstate market for health care constituting more than 17.5 percent of the annual gross domestic product is well within congressional authority under the Commerce Clause.  ACA, §§ 1501(a)(2)(B), 10106(a).  It has also long been established that Congress may regulate interstate insurance markets, including the interstate market for health insurance.  In *United States v. South-Eastern Underwriters Ass'n*, 322 U.S. 533 (1944), the Court recognized

that the business of insurance, by its nature, involves payments from and to insurers among the

various states: "The result is a continuous and indivisible stream of intercourse among the states

composed of collections of premiums, payments of policy obligations, and the countless

documents and communications which are essential to the negotiation and execution of policy

contracts." *Id.* at 541. The Court accordingly held that the business of insurance is interstate

commerce, which Congress has the power to regulate:

> Our basic responsibility in interpreting the Commerce Clause is to make certain
> that the power to govern intercourse among the states remains where the
> Constitution placed it. That power, as held by this Court from the beginning, is
> vested in the Congress, available to be exercised for the national welfare as
> Congress shall deem necessary. No commercial enterprise of any kind which
> conducts its activities across state lines has been held to be wholly beyond the
> regulatory power of Congress under the Commerce Clause. We cannot make an
> exception of the business of insurance.

*Id.* at 552-53.

Congress responded to the decision in *South-Eastern Underwriters* by enacting the

McCarran-Ferguson Act, 15 U.S.C. §§ 1011-15. In enacting the statute, "Congress delegated its

commerce power" over the business of insurance to the states, and, in so doing, protected state

insurance regulations from potential dormant Commerce Clause challenges. *See Life Partners,*

*Inc. v. Morrison*, 484 F.3d 284, 291 (4th Cir. 2007). The statute also protected state insurance

regulations against "inadvertent federal intrusion" by establishing a default rule that federal

statutes of general applicability not be construed to invalidate state insurance laws. *Barnett Bank*

*of Marion Cnty., N.A. v. Nelson*, 517 U.S. 25, 39 (1996). Congress did not, however, disclaim its

own power to regulate the business of insurance under the Commerce Clause.[3] To the contrary,

the McCarran-Ferguson Act recites that Congress has reserved that power to enact statutes that

---

[3] Nor, of course, could a statute overturn the constitutional holding that the Commerce
Clause permits regulation of the business of insurance. *Cf. City of Boerne v. Flores*, 521 U.S.
507, 519 (1997).

"specifically relate[] to the business of insurance."  15 U.S.C. § 1012(b).  Where Congress

exercises that power, its enactment controls over any contrary state law.  *See Humana Inc. v.*

*Forsyth*, 525 U.S. 299, 306 (1999).

For more than 35 years, Congress has repeatedly exercised its reserved constitutional

authority to regulate the business of health insurance, for example, by providing directly for

government-funded health insurance through the Medicare Act, and by adopting numerous

statutes regulating the content of policies offered by private insurers.[4]

This long history of federal regulation of the health insurance market buttressed

Congress's understanding that only it, and not the states, could effectively address the national

health care crisis.  Indeed, the current patchwork of state health insurance regulations has

increased complexity and costs for both insurers and the insured population.  *State Coverage*

*Initiatives: Hearing Before the Subcomm. on Health of the H. Comm. on Ways and Means*, 110th

Cong. 28 (2008) (Trish Riley, Director, Maine Governor's Office of Health Policy and Finance)

---

[4] In 1974, Congress enacted the Employee Retirement and Income Security Act, Pub L. No. 93-406, 88 Stat. 829 ("ERISA"), establishing federal requirements for health insurance plans offered by private employers.  In 1985, Congress passed the Consolidated Omnibus Budget Reconciliation Act of 1985, Pub. L. No. 99-272, 100 Stat. 82 ("COBRA"), allowing certain workers who lose health benefits to continue receiving some benefits from their group health plans for a time.  In 1996, Congress enacted the Health Insurance Portability and Accountability Act, Pub. L. No. 104-191, 110 Stat. 1936 ("HIPAA"), among other things, prohibiting group plans from discriminating against individual participants and beneficiaries based on health status, requiring insurers to offer coverage to small businesses, and limiting the pre-existing condition exclusion.  26 U.S.C. §§ 9801-03; 29 U.S.C. §§ 1181(a), 1182; 42 U.S.C. §§ 300gg, 300gg-1.  HIPAA added similar requirements for individual insurance coverage to the Public Health Service Act.  Pub. L. No. 104-191, § 111, 110 Stat. 1979.  *See also* Mental Health Parity Act of 1996, Pub. L. No. 104-204, 110 Stat. 2944 (regulating limits on mental health benefits); Newborns' and Mothers' Health Protection Act of 1996, Pub. L. No. 104-204, 110 Stat. 2935 (requiring maternity coverage to provide at least a 48-hour hospital stay following childbirth); Women's Health and Cancer Rights Act of 1998, Pub. L. No. 105-277, § 902, 112 Stat. 2681, 2681-436 (requiring certain plans to offer benefits related to mastectomies).  More recently, the Paul Wellstone and Pete Domenici Mental Health Parity and Addiction Equity Act of 2008, Pub. L. No. 110-343, § 512, 122 Stat. 3765, 3881 ("MHPAEA"), required parity between mental health benefits and medical/surgical benefits.  MHPAEA §§ 701-02.  The ACA builds on these laws regulating health insurance.

(Ex. 33).  Moreover, because the federal government already provides important components of health insurance regulation – for example, Medicare and regulation of workplace-sponsored insurance through ERISA – "[e]xpecting states to address the many vexing health policy issues on their own is unrealistic, and constrains the number of states that can even make such an effort."  *Id.* at 7 (Alan R. Weil, Exec. Dir., National Academy of State Health Policy).

Congress accordingly undertook a comprehensive regulation of the interstate market in health insurance, and the ACA "specifically relates to the business of insurance."  15 U.S.C. § 1012(b).  It specifically regulates health insurance provided through the workplace by adopting incentives for employers to offer or expand coverage.  It specifically regulates health insurance provided through government programs by, among other things, expanding Medicaid and enacting changes to Medicare.  It specifically regulates health insurance sold to individuals or small groups by establishing Exchanges that enable individuals to pool their purchasing power to obtain affordable insurance.  And it specifically regulates the overall scope of health insurance coverage by affording subsidies and tax credits to the large majority of the uninsured; by ending industry practices that have made insurance unobtainable or unaffordable for many; and, in Section 1501 of the Act, by requiring most Americans who can afford insurance to obtain a minimum level of coverage or to pay a penalty for the failure to do so.  The Act directly focuses "the relation of insured to insurer and the spreading of risk," and thus is within the McCarran-Ferguson Act's saving clause of 15 U.S.C. § 1012(b).  *See Barnett Bank*, 517 U.S. at 39.

**C.     Congress Exercised This Constitutional Authority by Barring Insurers from Denying Coverage, or Charging Discriminatory Rates, to those with Pre-Existing Conditions**

Two provisions of the Act's comprehensive reforms warrant particular discussion.  The Act reforms insurance industry practices in the individual and small group markets that have

denied coverage to many by preventing insurers from denying (or revoking) coverage for those

with pre-existing conditions, and by preventing insurers from charging discriminatory rates for

those with such conditions.  ACA, § 1201.  As noted above, Congress enacted these "guaranteed

issue" and "community rating" reforms to address a health insurance market that had unfairly

affected consumers and had proven incapable of delivering affordable coverage to those who

need it.  Absent these reforms, the individual and small group insurance markets suffer from a

market failure that prevents millions of American from obtaining necessary coverage.  *See*

*Health Reform in the 21st Century: Insurance Market Reforms*, at 53 (2009) (Dr. Blumberg).

These reforms are within Congress's commerce power.  They regulate the content of

policies sold in the interstate market.  *See South-Eastern Underwriters*, 322 U.S. at 553.  And

Congress adopted them to address the multiple economic effects that result when that market

cannot extend affordable coverage to those who need it:  medical bankruptcies, job lock, and the

shifting of the costs of medical care from the uninsured to the rest of the population.  Statement

of Undisputed Facts, ¶¶ 16-28.  As shown below, Congress also rationally determined that its

comprehensive reforms, including the new "guaranteed issue" and "community rating"

requirements, could not stand alone, and that its regulatory program required a minimum

coverage provision.

### D.    The Minimum Coverage Provision Is an Integral Part of the Larger Regulatory Scheme and Is Necessary and Proper to Congress's Regulation of Interstate Commerce

The minimum coverage provision is a valid exercise of Congress's commerce power

because it is integral to the ACA's larger regulatory program.  The Act's reforms of the interstate

insurance market – particularly its requirement that insurers may not deny coverage to or charge

more for individuals with pre-existing medical conditions – could not function effectively

without the minimum coverage provision.  The provision is an essential part of a larger

regulation of interstate commerce, and thus, under *Raich,* is well within Congress's Commerce

Clause authority.  Analyzing the minimum coverage provision under the Necessary and Proper

Clause leads to the same conclusion for fundamentally the same reason.  The provision is a

reasonable means to accomplish Congress's goal of ensuring access to affordable coverage for

all Americans.  It is therefore necessary and proper to the valid exercise of Congress's

Commerce Clause power, and it stands on that basis as well.

### 1.  The Minimum Coverage Provision Is Essential to the Comprehensive Regulation Congress Enacted

As Virginia itself recognizes, Compl. ¶ 5, the minimum coverage provision is an

"essential" part of the Act's larger regulatory scheme for the interstate health care market.

Virginia does not and cannot contend that the larger regulatory program – including the

requirement that insurers extend coverage to those with pre-existing conditions, at

nondiscriminatory rates – is outside the scope of the Commerce Clause power.

Congress found that, absent the minimum coverage provision, these new regulations

would encourage more individuals to delay or forego health insurance, thereby aggravating

current problems with cost-shifting and increasing insurance prices.  The new insurance

regulations would allow individuals to "wait to purchase health insurance until they needed care"

– at which point the ACA would obligate insurers to provide those individuals with health

insurance, subject to no coverage limits and despite the pre-existing conditions they may have at

that time.  ACA, §§ 1501(a)(2)(I), 10106(a).  The result would be an insurance market that

covers only the sickest, increasing premiums and decreasing coverage, precisely contrary to

Congress' intent.  The resulting premium spiral would increase the costs of uncompensated care

and the premiums for the insured pool, creating pressures that would "inexorably drive [the

health insurance] market into extinction."  *Health Reform in the 21st Century: Insurance Market Reforms*, at 13 (Dr. Reinhardt).  Because "[a] health insurance market could never survive or even form if people could buy their insurance on the way to the hospital," the guaranteed-issue reforms could not create a functioning market unless they are coupled with a minimum coverage provision.  *47 Million and Counting*, at 52 (Prof. Hall).  Accordingly, Congress found that the minimum coverage provision is "essential" to its broader effort to regulate health insurance industry underwriting practices that have prevented many from obtaining health insurance, ACA, §§ 1501(a)(2)(I), (J), 10106(a).

In other respects as well, the minimum coverage provision is essential to the Act's comprehensive scheme to ensure that health insurance is available and affordable.  The minimum coverage provision works in tandem with the Act's reforms, including the guaranteed-issue and community-rating reforms, to reduce the upward pressure on premiums caused by the practice of medical underwriting, which as noted above, contributes to administrative costs of 26 to 30 percent of the cost of premiums in the individual and small group markets.  ACA, §§ 1501(a)(2)(J), 10106(a).

Congress thus rationally found that a failure to regulate the decision to delay or forego insurance – *i.e.,* the decision to shift one's costs on to the larger health care system – would undermine the "comprehensive regulatory regime," *Raich,* 545 U.S. at 27, framed in the Act.  Specifically, Congress had ample basis to conclude that a failure to regulate this "class of activity" would "undercut the regulation of the interstate market" in health insurance.  *Id.* at 18; *see id.* at 37 (Scalia, J., concurring in the judgment) ("Congress may regulate even noneconomic local activity if that regulation is a necessary part of a more general regulation of interstate commerce.").  The minimum coverage provision is an "integral part" of the Act's larger

regulatory program, and "the regulatory scheme when considered as a whole" is plainly a

regulation of interstate commerce; the provision is thus justified under the commerce power.

*Gibbs*, 214 F.3d at 497; *see also Dean*, 670 F. Supp. 2d at 460.

2. **The Minimum Coverage Provision Is Also a Valid Exercise of Congress's Power under the Necessary and Proper Clause**

Because the minimum coverage provision is essential to Congress's overall regulatory

reform of the interstate health care and health insurance markets, it is also a valid exercise of

Congress's authority if the provision is analyzed under the Necessary and Proper Clause, U.S.

CONST., art. I, § 8, cl. 18.  That clause is an enlargement of, rather than a limitation on, the other

powers conferred on Congress under Article I:  "[T]he Necessary and Proper Clause makes clear

that the Constitution's grants of specific federal legislative authority are accompanied by broad

power to enact laws that are 'convenient, or useful' or 'conducive' to the authority's 'beneficial

exercise.'"  *United States v. Comstock*, 130 S. Ct. 1949, 1956 (2010) (quoting *M'Culloch v.

Maryland*, 17 U.S. (4 Wheat.) 316, 413, 418 (1819)).  So long as Congress does not violate

affirmative constitutional limitations, such as the Fourth and Fifth Amendments, the clause

affords the power to employ any "means that is rationally related to the implementation of a

constitutionally enumerated power."  *Comstock*, 130 S. Ct. at 1956-57 (citing *Sabri,* 541 U.S. at

605).  *See also Dean*, 670 F. Supp. 2d at 460-61.  Accordingly, "where Congress has the

authority to enact a regulation of interstate commerce, 'it possesses *every power* needed to make

that regulation effective.'"  *Raich*, 545 U.S. at 36 (Scalia, J., concurring in the judgment)

(quoting *Wrightwood Dairy Co.*, 315 U.S. at 118-19) (emphasis added).

As noted, the Act imposes requirements on insurers, which bar them from denying

coverage or charging higher rates based on medical conditions, including pre-existing conditions.

There can be no reasonable dispute that Congress has the power under the Commerce Clause to

impose these requirements, that is, that Congress enacted the insurance market reforms in "implementation of a constitutionally enumerated power." *Comstock*, 130 S. Ct. at 1957. Nor can there be any reasonable dispute that the minimum coverage provision "constitutes a means that is rationally related to the implementation" of that power. *Id.* As Congress found, and as Virginia itself acknowledges, *see* Compl. ¶ 5, the minimum coverage provision not only is adapted to, but indeed is "essential" to, achieving key reforms of the interstate health insurance market. As noted, if Congress had enacted the insurance industry reforms without the minimum coverage provision, healthy individuals would have overwhelmingly strong incentives to forego insurance coverage, knowing that they could obtain coverage later if and when they become ill. As a result, the cost of insurance would skyrocket, and the larger system of reforms would fail. *See, e.g.*, *Health Reform in the 21st Century: Insurance Market Reforms*, at 13 (Dr. Reinhardt).

Congress thus rationally concluded – indeed, the logic is compelling – that the minimum coverage provision is necessary to make the other regulations in the Act effective, and the provision is easily justified under the Necessary and Proper Clause. *See Comstock*, 130 S. Ct. at 1957 ("'If it can be seen that the means adopted are really calculated to attain the end, the degree of their necessity, the extent to which they conduce to the end, the closeness of the relationship between the means adopted and the end to be attained, are matters for congressional determination alone.'") (quoting *Burroughs v. United States*, 290 U.S. 534, 547-48 (1934)).

Virginia, to the defendant's understanding, has not disputed that the ACA's insurance industry reforms are within the commerce power, or that the minimum coverage provision is a means adopted by Congress to make those larger reforms effective. That is the end of the matter under the Necessary and Proper Clause. Virginia suggests, however, that the clause only permits Congress to exercise a power that otherwise has "a firm constitutional foundation rooted in

Article I." *See* Doc. 84 at 23.  This is not so.  As noted above, the clause expands, rather than limits, the powers otherwise available to Congress under Article I.  *See Darby*, 312 U.S. at 121 (statute will be sustained "when the means chosen, *although not themselves within the granted power*" are "nevertheless deemed appropriate aids to the accomplishment of some purpose within an admitted power of the national government") (emphasis added).

Instead, a provision that is rationally related to the exercise of an enumerated power must be sustained unless it violates an independent constitutional prohibition.  *See Comstock*, 130 S. Ct. at 1957 (noting that, in the absence of a due process claim, the only question before the Court was whether the statute employed a means reasonably adapted to a legitimate end).  *See also INS v. Chadha*, 462 U.S. 919, 941 (1983) ("'Congress has plenary authority in all cases in which it has substantive legislative jurisdiction, so long as the exercise of that authority does not offend some other constitutional restriction.'") (quoting *Buckley v. Valeo*, 424 U.S. 1, 132 (1976)) (internal citation omitted).  Absent any such violation, the question is not whether Congress would otherwise have the Article I power to enact a provision; instead, the only question is "'whether the means chosen are reasonably adapted to the attainment of a legitimate end under the commerce power' or under other powers that the Constitution grants Congress the authority to implement." *Comstock*, 130 S. Ct. at 1957 (quoting *Raich*, 545 U.S. at 37 (Scalia, J., concurring in the judgment)).

Virginia has not argued, nor could it argue, that the minimum coverage provision violates any independent constitutional prohibition.  The minimum coverage provision thus must be sustained so long as it is a means that is rationally related to the permissible end of Congress's insurance industry regulations.  It is, and it falls within Congress' Article I authorities.[5]

---

[5] It is also important to note that Virginia has brought a facial challenge to the minimum coverage provision, and it therefore must show that the provision exceeds Congress's power

II.     **Congress Validly Exercised Its Commerce Power to Enact the Minimum Coverage Provision, because the Provision Regulates Conduct with Substantial Effects on Interstate Commerce**

A.      **The Uninsured Substantially Affect Interstate Commerce by Shifting the Costs of Their Care on to Other Market Participants**

Even if the minimum coverage provision were considered in isolation, it would still fall within the commerce power, as the provision regulates conduct with substantial effects on interstate commerce. Decisions about how to pay for health care, particularly decisions about whether to obtain health insurance or to attempt to pay for health care out of pocket, have, in the aggregate, a substantial effect on the interstate health care market. As noted above, individuals who forego health insurance coverage do not thereby forego health care. To the contrary, the uninsured "receive treatments from traditional providers for which they either do not pay or pay very little, which is known as 'uncompensated care.'" KEY ISSUES, at 13; *see also* THE ECONOMIC CASE, at 8 (June 2009); Statement of Undisputed Facts ¶¶ 19-23.

"Uncompensated care," of course, is not free of cost. In the aggregate, that uncompensated cost amounted to $43 billion dollars in 2008, or about 5 percent of overall hospital revenues. KEY ISSUES, at 114. These costs are subsidized by public funds. Through programs such as Disproportionate Share Hospital payments, the federal government paid for tens of billions of dollars in uncompensated care for the uninsured in 2008 alone. H.R. REP. NO. 111-443, pt. II, at 983; *see also* THE ECONOMIC CASE, at 8. The remaining costs are borne in the first instance by health care providers, which in turn "pass on the cost to private insurers, which pass on the cost to families." ACA, § 1501(a)(2)(F), 10106(a). This cost-shifting effectively creates a "hidden tax" reflected in fees charged by health care providers and premiums charged

under the Commerce and Necessary and Proper Clauses in all conceivable instances. As discussed below, Virginia cannot make such a showing.

by insurers.  CEA, ECONOMIC REPORT OF THE PRESIDENT 187 (Feb. 2010); *see also* H.R. REP.

NO. 111-443, pt. II, at 985; S. REP. NO. 111-89, at 2.

Furthermore, as premiums increase, more people who see themselves as healthy decide

not to buy coverage.  This self-selection further shrinks the risk pool and that, in turn, further

increases the price of coverage for those who are insured.  The result is a self-reinforcing

"premium spiral."  *Health Reform in the 21st Century: Insurance Market Reforms*, at 118-19

(American Academy of Actuaries); *see also* H.R. REP. NO. 111-443, pt. II, at 985.  Small

employers particularly suffer from the effect of this premium spiral, due to their relative lack of

bargaining power.  *See* H.R. REP. NO. 111-443, pt. II, at 986-88.

The putative "economic liberty" that Virginia seeks to champion includes the decisions of

some to engage in market timing.  They will purchase insurance in later years, but choose in the

short term to incur out-of-pocket costs with the backup of the emergency room services that most

hospitals must provide whether or not the patient can pay.  *See* Statement of Undisputed Facts

¶¶ 26-27.  By making the economic calculation to opt out of the health insurance pool during

these years, these individuals skew premiums upward for the insured population.  Yet, in later

years when they need care, many of these uninsured will opt back into the health insurance

system maintained in the interim by an insured population that has borne the costs of

uncompensated care.

Thus, if, as Virginia claims, the decision of some individuals not to obtain health

insurance is "rational[]," Compl. ¶ 13, it is so because the health care system in place before the

ACA allowed such uninsured individuals to "free ride" – that is, to transfer many of their health

care costs to commercial health care providers, insurers, and governments, who in turn pass these

costs on to the insured and to taxpayers.  *See* THE ECONOMIC CASE, at 17 (explaining that "the

uninsured obtain some free medical care through emergency rooms, free clinics, and hospitals, which reduces their incentives to obtain health insurance").

In the aggregate, these economic decisions regarding how to pay for health care services – including, in particular, decisions to delay or forego coverage and to pay later or, if need be, to depend on free care – have a substantial effect on the interstate health care market.  Congress may use its Commerce Clause authority to regulate these direct and aggregate effects.  *See Raich*, 545 U.S. at 16-17; *Wickard*, 317 U.S. at 127-28; *see also United States v. Gould*, 568 F.3d 459, 472 (4th Cir. 2009), *cert. denied*, 130 S. Ct. 1686 (2010).

### B.    Virginia Cannot Deny These Substantial Effects by Characterizing the Decision to Forego Insurance as "Inactivity"

Virginia cannot brush aside these marketplace realities by claiming that an individual who decides to go without insurance coverage is "entirely passive."  Compl. ¶¶ 17-18.  Its assertions misunderstand, first, the nature of the regulated activity and, second, the scope of Congress's power.  First, Congress found, and Virginia apparently does not dispute, that the decision to try to pay for health care services without reliance on insurance is "economic and financial."  ACA, §§ 1501(a)(2)(A), 10106(a); *see also* Compl. ¶ 14 (describing decision to forego coverage as "economic").  As noted, the health care market is unique in that no one can guarantee that they will not participate in that market, nor can anyone predict whether, when, or to what extent he will suffer catastrophic illness or injury.  Health insurance is not an independent consumer product, but a means of managing the risks inherent in a market for health care services in which all inevitably participate.

The minimum coverage provision regulates paradigmatic economic activity – the way that health care is financed.  Individuals who make the economic choice of means other than insurance to finance their medical expenses, then, have not opted out of health care; they are not

33

passive bystanders divorced from the health care market.  To the contrary, the vast majority of even the long-term uninsured still participate in the health care market.  *See* June E. O'Neill & Dave M. O'Neill, *Who Are the Uninsured?*, at 14-15.  And those individuals do not sit passively in relation to the insurance market either.  Instead, individuals constantly make economic decisions as to whether to finance their medical needs through insurance, or to attempt to do so out-of-pocket with the backstop of uncompensated care.  Indeed, a substantial majority of those without insurance coverage at any given point in time are in fact moving in and out of coverage, and have had coverage at some point within the same year.  CBO, How Many Lack Health Insurance and For How Long?, at 4, 9 (May 2003); *see also* Key Issues, at 11.

The decision whether to purchase health insurance on the open market is a decision about how to finance health care consumption during a particular time period.  Economists explain that the purchase of insurance is an economic substitute for other "competing pre-loss risk-financing methods."  *See* M. Moshe Porat, et al., *Market Insurance versus Self Insurance: The Tax-Differential Treatment and Its Social Cost*, 58 J. Risk & Insurance 657, 668 (1991) (Ex. 34). Individuals who are able to purchase insurance through the open market but do not do so instead use other economic means to attempt to pay for the health care that they consume.  These individuals "self-insure, use informal risk-sharing arrangements, diversify assets, draw down savings, sell assets, borrow, or go into debt to cover needed services."  Ruger, 100 Q.J. Med. at 54-55.  These actions reflect an economic assessment of the relevant advantages of market insurance versus other means of attempting to pay for health care services in a particular period. Pauly, 26 Health Affairs at 658.

However, there are inherent uncertainties in the "frequency, timing, and magnitude" of illness and accidents, Ruger, 100 Q.J. Med. at 54-55, and Congress found that individuals who

attempt to finance their health care costs through these alternative mechanisms are routinely unable to do so and instead shift costs to other participants in the health care market. As noted above, by even a conservative estimate, in 2008 alone, $43 billion in health care costs were shifted from the uninsured to other participants in the health care market, including providers, insurers, consumers, governments, and, ultimately, taxpayers.

The minimum coverage provision requires non-exempted individuals either to maintain a certain level of insurance or pay a penalty. It thus discourages methods of health care financing that have been shown to be inadequate and that systematically result in uncompensated care. It is difficult to imagine regulation that is more economic in nature than the regulation of how market participants pay for health care. Persons who finance their health care consumption without purchasing insurance are engaged in economic activity to an even greater extent than the plaintiffs in *Raich*, who consumed only home-grown marijuana and had no intent to enter the marijuana market.

The ACA in fact regulates economic activity far more directly than provisions the Supreme Court has previously upheld. In *Wickard*, for example, the Court upheld a system of production quotas, despite the plaintiff farmer's claim that the statute was effectively "*forcing some farmers into the market* to buy what they could provide for themselves." 317 U.S. at 129 (emphasis supplied). The Court reasoned that "[h]ome-grown wheat in this sense competes with wheat in commerce. The stimulation of commerce is a use of the regulatory function quite as definitely as prohibitions or restrictions thereon." 317 U.S. at 128; *see also id.* at 127 ("The effect of the statute before us is to restrict the amount which may be produced for market *and the extent as well to which one may forestall resort to the market* by producing to meet his own needs.") (emphasis added). *See also Heart of Atlanta Motel v. United States*, 379 U.S. 241, 258-

59 (1964) (Commerce Clause reaches decisions *not to engage* in transactions with persons with

whom plaintiff did not wish to deal); *Daniel v. Paul*, 395 U.S. 298 (1969) (same).  And in *Raich*,

the plaintiffs likewise claimed that their home-grown marijuana was "entirely separated from the

market" and thus not subject to regulation under the Commerce Clause.  The Court rejected their

claim as well.  545 U.S. at 30.

In light of these authorities, the uninsured – whose conduct, in the aggregate,

substantially affects interstate commerce by shifting the cost of their care to other parties –

cannot avoid Commerce Clause regulation by characterizing their conduct as a decision to

remain outside of interstate channels.  The courts, for example, have rejected comparable

challenges to the Child Support Recovery Act, 18 U.S.C. § 228(a), which affirmatively requires

parties to send child support payments in interstate commerce.  *See, e.g., Sage*, 92 F.3d at 105-

06 (rejecting claim that the Act exceeds the commerce power "because it concerns not the

sending of money interstate but the failure to send money"); *see also United States v. Johnson*,

114 F.3d 476, 480 (4th Cir. 1997).  Conduct that substantially affects interstate commerce is

subject to Congressional regulation, even if it may be characterized as a "failure to act."  *See*

*Gould*, 568 F.3d at 470 (Congress can regulate the "failure to register").

It is accordingly uncontroversial that Congress has the power to require private parties to

enter into insurance contracts where the failure to do so would impose costs on other market

participants.  Under the National Flood Insurance Program, for example, an owner of property –

including a residence or other non-commercial property – in a flood hazard area must obtain

flood insurance in order to be permitted to obtain a mortgage or other secured loan from any

regulated financial institution.  42 U.S.C. § 4012a(a), (b), (e).  The statute "protect[s] against the

perils of flood losses and encourage[s] sound land use," 42 U.S.C. § 4001(c), and, as such, is

within Congress's authority.  Similarly, Congress has required all interstate motor carriers to obtain liability insurance, 49 U.S.C. § 13906(a)(1), in order to ensure that the carriers do not shift the financial burden to other parties for any accidents that they may cause.  *See Canal Ins. Co. v. Distrib. Servs., Inc.*, 320 F.3d 488, 489 (4th Cir. 2003).  This requirement is also within the commerce power.[6]

The Congressional authority to protect interstate commerce, both by prohibiting and by requiring conduct, is also central to modern environmental regulation.  Under the Superfund Act, or CERCLA, 42 U.S.C. 9601 *et seq.*, "covered persons," including property owners (whether or not they are engaged in commercial activity), are deemed by the statute to be responsible for environmental damage from the release of hazardous substances.  Such persons are subject to monetary liability, and may be ordered to engage in remediation efforts.  42 U.S.C. §§ 9606, 9607.  The statute imposes a strict liability regime.  A current property owner is subject to CERCLA as a "covered person," and may therefore be subject to a remediation order, without any showing that he caused the contamination.  42 U.S.C. § 9607(a).  And even a former property owner may be subject to CERCLA as a "covered person," even if he only permitted hazardous waste to leak on his property "without any active human participation."  *Nurad, Inc. v. William E. Hooper & Sons Co.*, 966 F.2d 837, 845 (4th Cir. 1992).  The property owner's characterization of his own behavior as "active" or "passive" is irrelevant; otherwise, "an owner could insulate himself from liability by virtue of his passivity," defeating the remedial purposes of the Superfund Act.  *Id.*  Congress's authority to enact the Superfund Act – including its

---

[6]  Nor are these isolated examples.  Congress routinely requires market participants to obtain insurance to prevent them from imposing costs on other parties.  *E.g.*, 6 U.S.C. § 443(a)(1) (sellers of anti-terrorism technology); 16 U.S.C. §1441(c)(4) (entities operating in national marine sanctuary); 30 U.S.C. § 1257(f) (surface coal mining and reclamation operators); 42 U.S.C. § 2210(a) (Price-Anderson Act) (operators of nuclear power plants); 42 U.S.C. § 2243(d)(1) (uranium enrichment facility operators); 42 U.S.C. § 2458c(b)(2)(A) (aerospace vehicle developers); 45 U.S.C. § 358(a) (railroad unemployment insurance).

authority to regulate behavior that a creative defendant could characterize as "passivity" – is well-established, because, in the aggregate, releases of hazardous substances have a substantial effect on interstate commerce.  *See United States v. Olin Corp.*, 107 F.3d 1506, 1510-11 (11th Cir. 1997).

Nor is this Congressional power a recent creation.  To the contrary, Congress has used similar powers for more than a century.  For example, it has long been understood that Congress may exercise the power of eminent domain – that is, the power to compel a private party to enter into a transaction – in furtherance of its enumerated powers, including its Commerce Clause authority.  *See Berman v. Parker*, 348 U.S. 26, 33 (1954) ("Once the object is within the authority of Congress, the right to realize it through the exercise of eminent domain is clear.  For the power of eminent domain is merely the means to the end."); *Luxton v. North River Bridge Co.*, 153 U.S. 525, 529-30 (1894) (collecting cases) (upholding the use of eminent domain as a means to execute Congress's Commerce Clause authority).

The minimum coverage provision similarly effectuates Congress's Commerce Clause authority.  The ACA regulates a class of individuals who almost certainly have participated, and will participate, in the health care market, who have decided to finance that participation in one particular way, and whose economic activities impose substantial costs on other participants in that market.  Despite any claim by Virginia that its citizens stand apart from the health care market, their economic actions have a substantial effect on the larger market for health care services from which they do not stand apart.  That empowers Congress to regulate.

Even if Virginia were correct to characterize the choice of methods to finance health care services as "inactivity" beyond Congressional power to regulate – and it is not – its claim would still fail.  To prevail in this facial challenge, Virginia must show the statute to be unconstitutional

38

in *all* of its applications.  *H.B. Rowe Co.*, --- F.3d ---, at *7; *see also Sage,* 92 F.3d at 106.  The

minimum coverage provision validly regulates a class of persons whose conduct, in the

aggregate, substantially affects interstate commerce.  Thus, under *Raich*, the provision is valid

both facially and in any of its possible applications.  But even if this Court accepted Virginia's

argument that, contrary to *Raich*, the statute improperly reaches individuals who are not market

participants and are not engaged in economic activity, that would not help Virginia in this facial

challenge, because the ACA also reaches individuals who, even on Virginia's theory, are market

participants engaged in economic activity.  Individuals who have, and then drop, health

insurance coverage are "active," even on Virginia's theory.  Individuals who receive medical

services and render payment (fully or incompletely) are "active," even on Virginia's theory.

Thus, even if all of the flawed premises of Virginia's argument are accepted, there still are valid

applications of the minimum coverage provision, and that defeats a facial challenge.

III.    **The Minimum Coverage Provision Is a Valid Exercise of Congress's Independent Power under the General Welfare Clause**

A.    **The Minimum Coverage Provision Has a Revenue-Raising Purpose, and So Is Valid under the General Welfare Clause**

Virginia's challenge here fails on the merits for an additional reason.  Independent of its

Commerce Clause authority, Congress is vested with the "Power To lay and collect Taxes,

Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general

Welfare of the United States[.]"  U.S. CONST. art. I, § 8, cl. 1.  Subject to nominal constraints

concerning the allocation of particular types of taxes, the power of Congress to use its taxing and

spending power under the General Welfare Clause has long been recognized as "extensive."

*License Tax Cases*, 72 U.S. (5 Wall.) 462, 471 (1867); *see also McCray v. United States*, 195

U.S. 27, 56-59 (1904); *United States v. Doremus*, 249 U.S. 86, 93 (1919); *Charles C. Steward*

*Mach. Co. v. Davis*, 301 U.S. 548, 581 (1937).  Congress may use its power under this Clause

even for purposes that would exceed its powers under the other provisions of Article I.  *See*

*United States v. Sanchez*, 340 U.S. 42, 44 (1950) ("Nor does a tax statute necessarily fail because

it touches on activities which Congress might not otherwise regulate."); *see also United States v.*

*Butler*, 297 U.S. 1, 66 (1936); *Knowlton v. Moore*, 178 U.S. 41, 59-60 (1900) (Congress could

tax inheritances, even if it could not regulate inheritances under the Commerce Clause).

Although "the constitutional restraints on taxing are few," *United States v. Kahriger*, 345

U.S. 22, 28 (1953), *overruled in part on other grounds by Marchetti v. United States*, 390 U.S.

39 (1968), under Article I, Section 8, Clause 1, one such limitation is that this power must be

used to "provide for the . . . general Welfare."  As the Supreme Court held seventy-five years ago

with regard to the Social Security Act, such decisions about how best to provide for the general

welfare are for the representative branches, not for the courts.  *Helvering v. Davis*, 301 U.S. 619,

640 (1937); *id.* at 645 & n.10.  *See also South Dakota v. Dole*, 483 U.S. 203, 207 (1987).

The minimum coverage provision falls within Congress's "extensive" General Welfare

authority.  *License Tax Cases*, 72 U.S. at 471.  The Act requires individuals not otherwise

exempt to obtain "minimum essential coverage" or pay a penalty.  ACA, § 1501(b) (adding 26

U.S.C. § 5000A(a), (b)(1)).  Individuals who are not required to file income tax returns for a

given year are not subject to this provision.  *Id.* § 1501(b) (as amended by Pub. L. No. 111-152,

§ 1002)  (adding 26 U.S.C. § 5000A(e)(2)).  In general, the penalty is calculated as the greater of

a fixed amount or a percentage of the individual's household income, but cannot exceed the

national average premium for the lowest-tier plans offered through health insurance exchanges

for the taxpayer's family size.  *Id.* § 1501(b) (adding 26 U.S.C. § 5000A(c)(1), (2)).  If the

penalty applies, the individual must report it on his return for the taxable year, as an addition to

his income tax liability.  *Id.* (adding 26 U.S.C. § 5000A(b)(2)).  The penalty is assessed and collected in the same manner as other penalties imposed under the Internal Revenue Code.[7]  The minimum coverage provision, by adding a liability to be reported in the taxpayer's annual return, and by granting enforcement authority to the Secretary of the Treasury, operates as a taxing measure.  *See In re Chateaugay Corp.*, 53 F.3d 478, 498 (2d Cir. 1995).

That Congress intended to regulate behavior when it enacted the minimum coverage provision does not place the provision beyond Congress's taxing power.  The Supreme Court has upheld such provisions even where, if fully successful in achieving the regulatory purpose, they would completely prevent the activity that is taxed.[8]  *See Sanchez*, 340 U.S. at 44 ("It is beyond serious question that a tax does not cease to be valid merely because it regulates, discourages, *or even definitely deters* the activities taxed") (emphasis added); *see also Kahriger*, 345 U.S. at 27-28; *cf. Bob Jones Univ. v. Simon*, 416 U.S. 725, 741 n.12 (1974) (noting that the Court has "abandoned" older "distinctions between regulatory and revenue-raising taxes").[9]  So long as a

---

[7]  The Secretary of the Treasury may not collect the penalty by means of notices of liens or levies, and may not bring a criminal prosecution for a failure to pay the penalty.  ACA, § 1501(b) (adding 26 U.S.C. § 5000A(g)(2)).  The revenues derived from the minimum coverage penalty are paid into general revenues.

[8]  Congress has long used the taxing power as a regulatory tool, and in particular as a tool to regulate how health care is paid for in the national market.  HIPAA, for example, limits the ability of group health plans to exclude or terminate applicants with pre-existing conditions, and imposes a tax on any such plan that fails to comply with these requirements.  26 U.S.C. §§ 4980D, 9801-03.  In addition, the Internal Revenue Code requires group health plans to offer COBRA continuing coverage to terminated employees, and similarly imposes a tax on any plan that fails to comply with this mandate.  26 U.S.C. § 4980B.

[9]  Nor does the statutory label of the minimum coverage provision as a "penalty" matter.  "In passing on the constitutionality of a tax law [the Court is] concerned only with its practical operation, not its definition or the precise form of descriptive words which may be applied to it." *Nelson v. Sears, Roebuck & Co.*, 312 U.S. 359, 363 (1941) (internal quotation omitted).  *See also Simmons v. United States*, 308 F.2d 160, 166 n.21 (4th Cir. 1962) ("[I]t has been clearly established that the labels used do not determine the extent of the taxing power.").

statute is "productive of some revenue," the courts will not second-guess Congress's exercise of its General Welfare Clause powers, and "will not undertake, by collateral inquiry as to the measure of the regulatory effect of a tax, to ascribe to Congress an attempt, under the guise of taxation, to exercise another power denied by the Federal Constitution." *Sonzinsky v. United States*, 300 U.S. 506, 514 (1937); *see also United States v. Jones*, 976 F.2d 176, 183-84 (4th Cir. 1992); *United States v. Aiken*, 974 F.2d 446, 448-49 (4th Cir. 1992).

The minimum coverage provision easily meets this standard.  The Joint Committee on Taxation specifically included the provision in its review of the "Revenue Provisions" of the Act and the Reconciliation Act, analyzing the provision as a "tax," an "excise tax," and a "penalty." *See* Joint Comm. on Taxation, 111th Cong., *Technical Explanation of the Revenue Provisions of the "Reconciliation Act of 2010," as amended, in Combination with the "Patient Protection and Affordable Care Act"* 31 (Mar. 21, 2010) (Ex. 35).[10]  Moreover, the Joint Committee, along with the CBO, on multiple occasions predicted how much revenue this provision would raise and considered that amount in determining the impact of the bill on the deficit.  Indeed, the Joint Committee more than once specifically incorporated the CBO's estimates of the "*tax* provisions included in Title I" of the Act, which includes the minimum coverage provision.  JCX-10-10, at 3 n.1 (Mar. 11, 2010) (emphasis supplied).   And the CBO, in discussing those provisions, estimated that the minimum coverage provision would produce about $4 billion in annual revenue once it is fully in effect.  CBO Letter to Rep. Pelosi at tbl. 4 at 2.  Thus, as Congress recognized, the minimum coverage provision produces revenue alongside its regulatory purpose, which is all that Article I, Section 8, Clause 1 requires.

---

[10] The Joint Committee on Taxation is "a nonpartisan committee of the United States Congress, originally established under the Revenue Act of 1926" that "is closely involved with every aspect of the tax legislative process." *See* Joint Committee on Taxation, Overview, http://www.jct.gov/about-us/overview.html; *see also* 26 U.S.C. §§ 8001-23.

Virginia has contended that, because Congress did not specifically invoke the General Welfare Clause in enacting the minimum coverage provision, the provision may not now be upheld on that basis. To begin, it is fair to presume that a provision of the Internal Revenue Code that deals with amounts calculated as a percentage of gross income to be paid by "taxpayers" with their "tax returns," is an exercise of the taxing power. There was accordingly no need for Congress to make detailed findings to support its exercise this power. The test under the General Welfare Clause, as noted above, is simply whether the provision is revenue-raising. It plainly is. In any event, "[t]he question of the constitutionality of action taken by Congress does not depend on recitals of the power which it undertakes to exercise." *Woods v. Cloyd W. Miller Co.*, 333 U.S. 138, 144 (1948); *see also Abril v. Virginia*, 1445 F.3d 182, 186 (4th Cir. 1998). The minimum coverage provision imposes involuntary pecuniary burdens for a public purpose, and so is an exercise of the taxing power.

That Congress made findings relating to the Commerce Clause in no way suggests that the minimum coverage provision was not *also* an exercise of authority under the General Welfare Clause. In the Coal Act, Congress also made findings under the Commerce Clause, 26 U.S.C. § 9701 note, yet the Court of Appeals for the Fourth Circuit had no difficulty treating the regulatory assessments under that statute for employees' health coverage as taxes. *Adventure Res., Inc. v. Holland*, 137 F.3d 786, 794 (4th Cir. 1998); *In re Leckie Smokeless Coal Co.*, 99 F.3d 573, 583 (4th Cir. 1996). Indeed, it is not surprising that Congress would make findings relating to the Commerce Clause, but not the General Welfare Clause. The effect of a statute on interstate commerce is partly an empirical determination, as to which legislative findings may be helpful. Whether the statute furthers the general welfare, by contrast, is a policy judgment committed to Congress, as to which findings, particularly in this instance, are unnecessary.

43

**B.      The General Welfare Clause Power Is Independent of the Commerce Power**

Virginia has suggested that the minimum coverage provision may not be sustained under the General Welfare Clause power, because even if the "penalty" could fall under that power, the purportedly separate "mandate" could not be.  This argument depends on the claim that two dependent sections of the same provision can somehow be viewed separately.  Virginia's attempted partition makes no sense.  The "penalty" under 26 U.S.C. § 5000A(b) would have no meaning in a vacuum without subsection (a), and, conversely, the "mandate" of 26 U.S.C. § 5000A(a) would be meaningless by itself, as it lacks any enforcement mechanism other than that in subsection (b).[11]   Indeed, it is not unusual for Congress to structure provisions enacted under the taxing power in the form of a requirement, on the one hand, and a "tax" or a "penalty" for a failure to comply, on the other.  *See, e.g.*, 26 U.S.C. § 5761 (penalty for failure to comply with tobacco registration requirements); 26 U.S.C. § 4980B (tax for failure of group health plan to comply with continuation of coverage requirements); 26 U.S.C. §§ 9801-34 (tax for failure of group health plan to comply with portability requirements).  It would elevate form over substance to claim that these exercises of the taxing power could be valid only if the requirement and the tax or penalty were described in a single sentence.

Virginia has also suggested that the minimum coverage provision may not be sustained independently under the General Welfare Clause, because it imposes a penalty that can be

---

[11]  For this reason, the minimum coverage provision stands or falls in its entirety.  The provision as a whole is valid under the Commerce and Necessary and Proper Clauses, and, alternatively, the provision in its entirety is valid under the General Welfare Clause.  If the provision could not be sustained under either power, or if it violated an independent constitutional violation, then no portion of the provision would be sustained.  Defendant's counsel understood this to be the import of the Court's questioning at the July 1, 2010, argument that is referenced in the Court's memorandum opinion. (Doc. 84 at 31.)  Defendant's counsel in no sense conceded that the provision could not be sustained independently under the General Welfare Clause power; instead, the provision is plainly valid under this power.

sustained, if at all, only under the commerce power.  Its argument rests on several pre-New Deal cases that limited the General Welfare Clause authority in a manner similar to that era's restrictive reading of the commerce power.  *See, e.g., Child Labor Tax Case*, 259 U.S. 20 (1922). But the Supreme Court has long since "abandoned" its earlier "distinctions between regulatory and revenue-raising taxes" that it used to invalidate child labor laws.  *Bob Jones Univ.*, 416 U.S. at 741 n.12.  Even if those earlier cases had any lingering validity, they would not bring the constitutionality of the minimum coverage provision into question.  At most, they suggested that a court may invalidate punitive or coercive penalties, and even then, only those penalties that coerce the taxpayer into a separate administrative scheme with detailed enforcement mechanisms not allowable under the Commerce Clause.  *See, e.g.*, *Child Labor Tax Case*, 259 U.S. at 38; *Hill v. Wallace*, 259 U.S. 44, 68-69 (1922); *Carter v. Carter Coal Co.*, 298 U.S. 238, 289 (1936). Here, the minimum coverage provision is neither punitive nor coercive; the maximum penalty is no greater than the cost of obtaining insurance.  Moreover, the penalty under the minimum coverage provision does not operate coercively to force taxpayers into a separate regulatory regime.  The regulatory effect is from the operation of the taxing provision itself.

## Conclusion

For the foregoing reasons, the Court should award summary judgment to the defendant.

DATED this 3rd day of September, 2010.

Respectfully submitted,

TONY WEST
Assistant Attorney General

IAN HEATH GERSHENGORN (admitted *pro hac vice*)
Deputy Assistant Attorney General

NEIL H. MacBRIDE
United States Attorney


By:      /s/ Jonathan H. Hambrick
JONATHAN H. HAMBRICK, VSB # 37590
Assistant United States Attorney
Office of the United States Attorney
600 East Main Street, Suite 1800
Richmond, Virginia 23219
Telephone:     (804) 819-5400
Fax:              (804) 819-7417
Email:           jay.h.hambrick@usdoj.gov

JENNIFER RICKETTS RIVERA, VSB # 29281
Director
SHEILA M. LIEBER (admitted *pro hac vice*)
Deputy Director
JOEL McELVAIN (admitted *pro hac vice*)
Senior Counsel
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., NW, Room 7332
Washington, D.C. 20001
Telephone:     (202) 514-2988
Fax:              (202) 616-8202
Email:           Joel.McElvain@usdoj.gov

*Attorneys for the Defendant*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 3rd day of September, 2010, I electronically filed the

foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of

such filing (NEF) to the following:

> Earle Duncan Getchell, Jr.
> Charles E. James, Jr.
> Stephen R. McCullough
> Wesley Glenn Russell, Jr.
> Office of the Attorney General
> 900 E. Main Street
> Richmond, Virginia 23219

>> <u>/s/ Jonathan H. Hambrick</u>
>> JONATHAN H. HAMBRICK, VSB # 37590
>> Assistant United States Attorney
>> Office of the United States Attorney
>> 600 East Main Street, Suite 1800
>> Richmond, Virginia 23219
>> Telephone:     (804) 819-5400
>> Fax:               (804) 819-7417
>> Email:           jay.h.hambrick@usdoj.gov