**IN THE**
**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**

**RICHMOND DIVISION**

| | |
|---|---|
| **COMMONWEALTH OF VIRGINIA,** | ) |
| **EX REL. KENNETH T. CUCCINELLI, II,** | ) |
|   **in his official capacity as** | ) |
|   **Attorney General of Virginia,** | ) |
| | ) |
|          **Plaintiff,** | ) |
| **v.** | ) |
| | ) **Civil Action No. 3:10cv188** |
| **KATHLEEN SEBELIUS,** | ) |
|   **Secretary of the Department** | ) |
|   **of Health and Human Services,** | ) |
|   **in her official capacity,** | ) |
| | ) |
|          **Defendant.** | ) |

**PLAINTIFF'S MEMORANDUM IN OPPOSITION**
**TO THE SECRETARY'S**
**MOTION FOR SUMMARY JUDGMENT**

KENNETH T. CUCCINELLI, II
Attorney General of Virginia

E. DUNCAN GETCHELL, JR.
Virginia State Bar No. 14156
Solicitor General
dgetchell@oag.state.va.us
*Counsel of Record*

STEPHEN R. MCCULLOUGH
Virginia State Bar No. 41699
Senior Appellate Counsel
smccullough@oag.state.va.us

CHARLES E. JAMES, JR.
Chief Deputy Attorney General

WESLEY G. RUSSELL, JR.
Virginia State Bar No. 38756
Deputy Attorney General
wrussell@oag.state.va.us

OFFICE OF THE ATTORNEY GENERAL
900 East Main Street
Richmond, Virginia  23219
Telephone:   (804) 786-2436
Facsimile:   (804) 786-1991

*Counsel for the*
  *Commonwealth of Virginia*

September 23, 2010

## TABLE OF CONTENTS

Page

I.    INTRODUCTION ...................................................................................... 1

II.   RESPONSE TO STATEMENT OF FACTS ...................................................... 7

III.  STANDARD OF REVIEW .......................................................................... 8

IV.  THE EXERCISE OF A CLAIMED POWER THAT IS TANTAMOUNT TO A NATIONAL POLICE POWER CANNOT BE SAVED SIMPLY BECAUSE IT IS INTEGRAL TO A LARGER REGULATORY SCHEME .................... 11

    A.   Congress Has Acted Beyond The Outer Limits Of Its Broad Authority To Regulate Interstate Commerce ........................................................... 11

    B.   Notwithstanding The Secretary's Argument To The Contrary, The Mandate And Penalty Are Not "A Valid Exercise Of Congress's Power Under The Necessary And Proper Clause" ...................................................... 15

    C.   The Decision To Forgo Insurance Is Not An Activity Substantially Affecting Commerce Within The Meaning Of The Necessary And Proper Clause ........................................................................................ 19

    D.   The Secretary's Facial Analysis Is Analytically Unsound ........................ 24

V.   THE MANDATE AND PENALTY CANNOT BE SUSTAINED UNDER THE TAXING POWER ........................................................................... 25

CONCLUSION ................................................................................................ 32

CERTIFICATE OF SERVICE .......................................................................... 34

## TABLE OF AUTHORITIES

Page

CASES

*Adventure Res., Inc. v. Holland,*
  137 F.3d 786 (4th Cir. 1998) ............................................................... 30

*Alden v. Maine,*
  527 U.S. 706 (1999)....................................................................... *passim*

*Anderson v. Liberty Lobby,*
  477 U.S. 242 (1986)................................................................................ 8

*Bailey v. Drexel Furniture Co.* (*Child Labor Tax Case*),
  259 U.S. 20 (1922)........................................................... 5, 30, 31, 32

*Bd. of Trs. of the Univ. of Ill. v. United States,*
  289 U.S. 48 (1933)............................................................... 4, 25, 26

*Boerne v. Flores,*
  521 U.S. 507 (1997)............................................................................... 9

*Broadrick v. Oklahoma,*
  413 U.S. 601 (1973)............................................................................... 9

*In re Chateaguay Corp.,*
  53 F.3d 478 (2nd Cir. 1995) ........................................................ 30, 31

*Daniel v. Paul,*
  395 U.S. 298 (1969)............................................................................. 21

*Gibbons v. Ogden,*
  22 U.S. (9 Wheat.) 1 (1824) ............................................................... 1

*Gonzales v. Raich,*
  545 U.S. 1 (2005)......................................................................... *passim*

*H.B. Rowe Co. v. Trippett,*
  ___ F.3d ___, 2010 WL 2872076
  (4th Cir. July 22, 2010)......................................................................... 9

*Heart of Atlanta Motel v. United States,*
  379 U.S. 241 (1964)...................................................................... 16, 21

*Janklow v. Planned Parenthood, Sioux Falls Clinic,*
  517 U.S. 1174 (1996)........................................................................ 10

*Katzenbach v. McClung*,
    379 U.S. 294 (1964) ............................................................................. 15

*Kinsella v. Singleton*,
    361 U.S. 234 (1960) ........................................................................ 15, 17

*Kohl v. United States*,
    91 U.S. (1 Otto) 367 (1876) ............................................................... 24

*In re Leckie Smokeless Coal Co.*,
    99 F.3d 573 (4th Cir. 1996) ............................................................... 30

*Linder v. United States*,
    268 U.S. 5 (1925) ................................................................................. 6

*M'Culloch v. Maryland*,
    17 U.S. (4 Wheat.) 316 (1819) ....................................................... 1, 18

*Nebraska v. EPA*,
    331 F.3d 995 (D.C. Cir. 2003) ........................................................... 10

*Nev. Dep't of Human Res. v. Hibbs*,
    538 U.S. 721 (2003) ........................................................................ 6, 9

*New York v. United States*,
    505 U.S. 144 (1992) ................................................................. 3, 10, 14

*Printz v. United States*,
    521 U.S. 898 (1997) ................................................................... *passim*

*Railway Labor Executives' Ass'n v. Gibbons*,
    455 U.S. 457 (1982) ...................................................................... 5, 32

*RGI, Inc. v. Unified Industries, Inc.*,
    963 F.2d 658 (4th Cir. 1992) ............................................................... 8

*Rodriguez de Quijas v. Shearson/American Express, Inc.*,
    490 U.S. 477 (1989) ......................................................... 2, 6, 12, 27

*Rosenberger v. Rector & Visitors of the Univ. of Va.*,
    515 U.S. 819 (1995) ............................................................................. 4

*Sonzinsky v. United States*,
    300 U.S. 506 (1937) .................................................................... 29, 30

*Sunshine Anthracite Coal Co. v. Adkins*,
    310 U.S. 381 (1940) ........................................................................... 27

*United States v. Aiken*,
   974 F.2d 446 (4th Cir. 1992) ................................................................. 29, 30

*United States v. Bongiorno*,
   106 F.3d 1027 (1st Cir. 1997) ....................................................................... 22

*United States v. Butler*,
   297 U.S. 1 (1936) .......................................................................... 4, 6, 27, 30

*United States v. Comstock*,
   176 L. Ed. 2d 878 (2010) .................................................................... *passim*

*United States v. Coombs*,
   37 U.S. 72 (1838) ......................................................................................... 15

*United States v. Darby*,
   312 U.S. 100 (1941) ..................................................................................... 14

*United States v. Gould*,
   568 F.3d 459 (4th Cir. 2009) ....................................................................... 22

*United States v. Johnson*,
   114 F.3d 476 (4th Cir. 1997) ....................................................................... 22

*United States v. Jones*,
   109 U.S. 513 (1883) ..................................................................................... 24

*United States v. Jones*,
   976 F.2d 176 (4th Cir.1992) ........................................................................ 29

*United States v. Kukafka*,
   478 F.3d 531 (3d Cir. 2007) ........................................................................ 22

*United States v. La Franca*,
   282 U.S. 568 (1931) ......................................................................... 5, 26, 27, 30

*United States v. Lopez*,
   514 U.S. 549 (1995) ............................................................................ *passim*

*United States v. Morrison*,
   529 U.S. 598 (2000) ............................................................................ *passim*

*United States v. Olin Corp.*,
   107 F.3d 1506, (11th Cir. 1997) ................................................................. 23

*United States v. Reorganized CF&I Fabricators of Utah, Inc.*,
   518 U.S. 213 (1996) ............................................................................ *passim*

*United States v. Sage,*
    92 F.3d 101 (2d Cir. 1996) ........................................................... 10, 22

*United States v. Salerno,*
    481 U.S. 739 (1987) ................................................................... 9, 10, 11

*United States v. South-Eastern Underwriters Ass'n,*
    322 U.S. 533 (1944) ............................................................................ 20

*United States v. Wrightwood Dairy Co.,*
    315 U.S. 110 (1942) ............................................................................ 15

*Wash. State Grange v. Wash. State Republican Party,*
    552 U.S. 442 (2008) ....................................................................... 9, 10

*West Virginia v. U.S. Dep't of Health & Human Servs.,*
    289 F.3d 281 (4th Cir. 2002) ......................................................... 9, 10

*Wickard v. Filburn,*
    317 U.S. 111 (1942) .................................................................. *passim*

*Williamson v. Lee Optical of Okla., Inc.,*
    348 U.S. 483 (1955) .............................................................................. 7

## CONSTITUTIONAL PROVISIONS

Art. I, § 7 .......................................................................................... 28

U.S. Const. amend. V ........................................................................ 24

U.S. Const. amend. X ................................................................... 3, 21

U.S. Const., Preamble ...................................................................... 20

## STATUTES

6 U.S.C. § 443(a)(1) ......................................................................... 23

16 U.S.C. § 1441(c )(4) ..................................................................... 23

18 U.S.C. § 228(a) ............................................................................ 22

26 U.S.C. § 7806(b) .......................................................................... 27

30 U.S.C. § 1257(f) ........................................................................... 23

42 U.S.C. § 1395dd ........................................................................................... 20

42 U.S.C. § 2210(a) ........................................................................................... 23

42 U.S.C. § 2243(d)(l) ....................................................................................... 23

42 U.S.C. § 2458c (b)(2)(A) .............................................................................. 23

42 U.S.C. § 4001(c) ........................................................................................... 23

42 U.S.C. § 4012a (a), (b), (c) ........................................................................... 23

42 U.S.C. § 9601, *et seq.*, ................................................................................. 23

45 U.S.C. § 358(a) ............................................................................................. 23

49 U.S.C. § 13906 .............................................................................................. 23

PPACA § 1501 .......................................................................................... 4, 7, 25

PPACA § 5000A(b)(1) ................................................................................... 4, 25

PPACA § 9001 ............................................................................................... 4, 25

PPACA § 9004 ............................................................................................... 4, 25

PPACA § 9015 ..................................................................................................... 25

PPACA § 9017 ............................................................................................... 4, 25

PPACA § 9701(b)(1) .......................................................................................... 30

PPACA § 9701(c) ............................................................................................... 31

PPACA § 9701(c)(1) ........................................................................................... 30

PPACA § 10907 ............................................................................................ 4, 25

Pub. L. No. 102-486, 106 Stat. 2776 (1992) ..................................................... 30

OTHER AUTHORITIES

*The American Heritage Dictionary*
278 (Houghton Mifflin Co., Boston 1981) .......................................................................... 2

Nicholas Quinn Rosenkranz,
*The Subjects of the Constitution*,
62 Stan. L. Rev. 1209, 1236 (2010)............................................................................. 6, 9, 10

*St. George Tucker*,
Appendix in 1 William Blackstone,
*Commentaries: with Notes of Reference To The Constitution and*
*Laws of the Federal Government of the United States and*
*of the Commonwealth of Virginia*, 287 (1803) ...................................................................... 17

## I.  INTRODUCTION

The Secretary begins her Memorandum in Support of Defendant's Motion for Summary Judgment with bald assertions rather than legal demonstration.  For example, she says that the penalty is "a tax penalty . . . well within the bounds of Congress's Article I powers."  (Doc. 91 at 14).  But the penalty enforces the mandate, not a tax, and therefore is not a tax penalty.  Nor is it true as the Secretary says that Congress has the power to take any rational measures whatever "to ensure the success of its larger reforms of the interstate market."  (*Id.*)  The Supreme Court has always held that the Commerce Clause, and the associated Necessary and Proper Clause, have justiciable outer limits.  *M'Culloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 421 (1819) (for a means to be Necessary and Proper it must comport with the letter and spirit of the Constitution); *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 189-90 (1824) (meaning of "interstate commerce" and "regulate" justiciable); *Wickard v. Filburn*, 317 U.S. 111, 122 n.20 (1942) (collecting cases striking down legislation for violations of the Commerce Clause); *United States v. Lopez*, 514 U.S. 549 (1995) (striking congressional enactment because it was beyond the limits of the Commerce Clause); *Printz v. United States*, 521 U.S. 898, 923-24 (1997) ("'When a La[w] . . . for carrying into [e]xecution' the *Commerce Clause* violates the principle of state sovereignty reflected in the various constitutional provisions . . . it is not a 'La[w] . . . *proper* for carrying into [e]xecution the Commerce Clause' and is thus, in the words of The Federalist, 'merely [an] ac[t] of usurpation' which 'deserves to be treated as such.'"); *Alden v. Maine*, 527 U.S. 706, 732-33 (1999) (same); *United States v. Morrison*, 529 U.S. 598, 616 n.7 (2000) (it is the prerogative of the Supreme Court to define the outer boundary of the Commerce Clause and other claims of federal power).

This Court has already stated that "[n]ever before has the Commerce Clause and the associated Necessary and Proper Clause been extended this far." (Doc. 84 at 25). The negative outer limits established in *Lopez, Printz, Alden*, and *Morrison* are preemptory, *Morrison*, 529 U.S. at 618-19 ("'We *always* have rejected readings of the Commerce Clause and the scope of federal power that would permit Congress to exercise a police power'"), and binding on the lower Federal courts. *Rodriguez de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477, 484 (1989) ("If a precedent of th[e] [Supreme] Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to th[e] [Supreme] Court the prerogative of overruling its own decisions.").

In her Answer, the Secretary pled that the status of being uninsured is "an economic **decision**" that "has a substantial effect on interstate commerce." (Doc. 87 at 3-4 ¶ 17). Now she argues that "the minimum coverage provision easily falls within the commerce power, for it regulates **conduct** that has substantial effects on interstate commerce." (Doc. 91 at 14). Referring to the possibility of consuming medical care in the future, while uninsured and otherwise unable to pay for it, as "conduct" is an idiosyncratic use of a word that in all of its definitions as a noun denotes and connotes action. *The American Heritage Dictionary* at 278 (Houghton Mifflin Co., Boston 1981). Nor is "conduct" even the legally apt word. Since *Wickard*, the Supreme Court has progressed no further than to hold that Congress can regulate three things under the Commerce Clause: (1) the "use of the channels of interstate commerce," (2) "the instrumentalities of interstate commerce," and (3) "***activities*** that substantially affect interstate commerce." *Lopez*, 514 U.S. at 558-59 (emphasis added). It is only the third prong

that is at issue in this case and under that prong the operative word is "activities."  And, of course, the status of being uninsured is inactivity; the opposite of activity.

Much more than word play is at issue.  If Congress can commandeer the people into commerce in order to regulate *them*, then the very nature of the relationship between citizen and national government will have been profoundly changed.  For then, in the words of Alexander Hamilton, the Federal Government would be improperly empowered to "'penetrate the recesses of domestic life, and control, in all respects, the private conduct of individuals.'"  *Lopez*, 514 U.S. at 592.  Congress, for all intents and purposes, would have a police power.

"The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."  U.S. Const. amend. X.  It is no more permissible under our federal form of government to commandeer the people (except for traditional rights and duties of citizenship such as compulsory military service, census enumeration and jury service which are themselves tied to enumerated powers), than it is to commandeer state officials or legislatures.  *Printz v. United States*, 521 U.S. 898 (Congress may not commandeer Sheriff/Coroner); *New York v. United States*, 505 U.S. 144 (1992) (Congress may not commandeer States).  In advancing this point, the Commonwealth does not seek to assert any *parens patriae* claims, but to instead demonstrate that the Secretary's claim, that Congress was engaged in ordinary and traditional regulation of commerce when it passed the mandate and penalty, is mistaken.

The Secretary's statement that "[i]nsurance–purchase requirements have long been fixtures in the United States Code," (Doc. 91 at 15), to the extent it is true, is also irrelevant.  As a part of its regulation of those already voluntarily engaged in commerce, Congress has

3

sometimes required insurance relevant to that activity.  This is not precedent for the naked command that those not engaged in commerce must buy a good or service from another citizen.

The assertion that "[i]t has also been established for more than a century that Congress has power to compel a transaction – in particular, to require the sale of property through eminent domain – in order to make a regulation of interstate commerce effective" (Doc. 91 at 15) is founded upon a category error.  Eminent domain is a taking, not a sale.  It is expressly recognized as such in the Fifth Amendment and is bounded by constitutional and judicial protections and limits.

The Secretary's reliance on *Wickard* and *Gonzales v. Raich*, 545 U.S. 1 (2005) (Doc. 91 at 15), is of no moment for the Secretary's position.  Those cases stand merely for the proposition that the affirmative outer limits of the Commerce Clause embrace voluntary cultivation of a commodity which in the aggregate has a substantial effect on interstate commerce.

The statement that "Congress repeatedly treated the minimum coverage provision as a tax" (Doc. 91 at 15) is demonstrably false given the text of the statute.  Congress asserted authority to act only under the Commerce Clause, made Commerce Clause findings, and then called the penalty a penalty, although it denominated taxes as taxes elsewhere in the act.  PPACA § 1501 at § 5000A(b)(1); §§ 9001; 9004; 9017; 10907.  A Court will not re-label as a tax that which Congress has denominated an exercise of its power to regulate commerce.  *Bd. of Trs. of the Univ. of Ill. v. United States*, 289 U.S. 48, 58 (1933).  Furthermore, whether the penalty is a penalty and not a tax is justiciable.  *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 841 (1995) (quoting *United States v. Butler*, 297 U.S. 1, 61 (1936)).  The difference between a tax and a penalty is that "'[a] tax is an enforced contribution to provide for the support

4

of government; a penalty, as the word is here used, is an exaction imposed by statute as punishment for an unlawful act.'" *United States v. Reorganized CF&I Fabricators of Utah, Inc.*, 518 U.S. 213, 224 (1996) (quoting *United States v. La Franca*, 282 U.S. 568, 572 (1931)). Because the penalty will produce no revenue at all if it works as intended, and would, in that circumstance, only alter conduct, it is intrinsically a penalty and not a tax.

Once it is determined that the penalty is just that, a penalty, the Secretary's tax argument collapses back into her Commerce Clause argument. As this Court stated in denying the Secretary's motion to dismiss, "Virginia correctly noted during oral argument that the power of Congress to enact a penalty is more constrained than its taxing power under the General Welfare Clause – it must be in aid of an enumerated power." (Doc. 84 at 27) (citations omitted). That enumerated power cannot be the taxing power because the penalty is in aid of the mandate which is clearly not a tax.

The Secretary's assertion that "[t]he provision thus falls easily within Congress's independent authority to lay taxes and make expenditures for the general welfare" is contrary to binding precedent. (Doc. 91 at 16). Even assuming that a court would first ignore Congress's denomination of the penalty as a penalty, and then alter its essential nature by ignoring its actual function so as to call it a tax, a court would then be met with the rule that when a tax is being used for regulation, it must pass muster under an enumerated power other than the taxing power to justify that regulation. *Bailey v. Drexel Furniture Co.* (*Child Labor Tax Case*), 259 U.S. 20 (1922). *See also Morrison*, 529 U.S. at 618-19 ("'We *always* have rejected readings of the Commerce Clause **and the Scope of Federal Power** that would permit Congress to exercise a police power.'") (bolded emphasis added); *Railway Labor Executives' Ass'n v. Gibbons*, 455 U.S. 457, 468-69 (1982) (alternative power will not be used to support enactment if it evades the

limits of another grant); *Butler*, 297 U.S. at 68; *Linder v. United States*, 268 U.S. 5, 17-18 (1925). If this rule is to be altered, that change can be made only by the Supreme Court of the United States. *Rodriguez de Quijas*, 490 U.S. at 484.

Finally, the Secretary's assertion that the Commonwealth is somehow disadvantaged in mounting a facial challenge to PPACA is mistaken. (Doc. 91 at 16). All claims that Congress has exceeded its enumerated powers are necessarily facial. Nicholas Quinn Rosenkranz, *The Subjects of the Constitution*, 62 Stan. L. Rev. 1209, 1236 (2010) ("A challenge to an action (or 'Act') of Congress must be 'facial.' It makes no sense to speak of 'as applied' challenges to legislative actions, because the challenged action is complete before the application begins."). The binary question of which sovereign, the United States or the Commonwealth, has the power to regulate the uninsured in Virginia, turns on no facts of enforcement, but only on a comparison between the Health Care Freedom Act, PPACA and the Constitution, aided by the usual sources of constitutional construction. 62 Stan. L. Rev. at 1276 ("In other words, in a Commerce Clause case, *lex ipsa loquitur*:  the law speaks for itself."). *See also Id.* at 1279 ("in other words, a Commerce Clause challenge cannot be as applied"); *Nev. Dep't of Human Res. v. Hibbs*, 538 U.S. 721, 743 (2003) (Scalia, J., dissenting) ("When a litigant claims that legislation has denied him individual rights secured by the Constitution, the Court ordinarily asks whether the legislation is constitutional *as applied to him*. When, on the other hand, a federal statute is challenged as going beyond Congress's enumerated powers, under our precedents the Court first asks whether the statute is unconstitutional *on its face*.") (citing, *inter alia, Lopez* and *Morrison* (other internal citations omitted)). Because the mandate and penalty exceed the outer limits of the Commerce Clause and the associated Necessary and Proper Clause, the Secretary is not

entitled to Summary Judgment on her claim that the Virginia Health Care Freedom Act violates the Supremacy Clause.

## II.   RESPONSE TO STATEMENT OF FACTS

1. The Commonwealth agrees that the alleged facts upon which the Secretary relies are not adjudicative facts.  (Doc. 91 at 16 n.1.).  As a consequence, disagreements concerning her alleged legislative facts are no bar to summary judgment.  The Commonwealth denies that any hearings were held or any reports issued with respect to the Senate bill that passed on Christmas Eve 2009.

2. The Commonwealth agrees that reviewing courts "'will consider legislative findings.'" (Doc. 91 at 16 n.1.).  However, the secrecy, haste and parliamentary brutality associated with the passage of PPACA (Doc. 89 at 12-13 ¶ 8) should lead this Court to reject the premise that Congress took a hard look at the basis for its claimed power.   The Congressional Research Service had warned that the mandate was unprecedented (Doc. 89 at 12 ¶ 7), and it is doubtful that a majority of those voting for it on a party line division had read the mammoth bill that emerged for their abbreviated consideration.

3-12. The Commonwealth denies that sources extraneous to § 1501 of PPACA are "'legislative facts'" in the sense that they compose any part of the legislative history of PPACA.  Nor can it be shown that they were before or in the mind of the majorities that passed PPACA.  They are also not entitled to deference as information that Congress might have believed to be true under a rational basis test.  (Doc. 91 at 16 n.1.)  The Commerce Clause rational basis test recognized in *Raich* and *Lopez* should not be confused with the deferential due process rational basis test of *Williamson v. Lee Optical of Okla., Inc.*, 348 U.S. 483, 487-88 (1955).  *See United States v. Comstock*, 176 L. Ed. 2d 878, 900-01

(2010) (Kennedy, J., concurring). Rather, the Commerce Clause rational basis test as it relates to the scope of the Commerce Clause asks whether Congress has a rational basis for believing that "respondents' activities, taken in the aggregate, substantially affect interstate commerce." *Raich*, 545 U.S. at 22. Because there are no activities at issue here, the test is not satisfied and the sources extraneous to PPACA cited in support of the Secretary's argument are legally irrelevant.

13.    See responses 2 and 3-12.

14-15.    See response to 3-12.

16.    See response to 2.

17-22.    See response to 3-12.

23.    See responses 2 and 3-12.

24-26.    See response to 3-12.

27-34.    See responses 2 and 3-12. The Commonwealth of Virginia further responds that PPACA speaks for itself with respect to its operative provisions.

35-38.    See response to 3-12.

39-40.    See response to 27-34.

41.    See response to 3-12.

## III.  STANDARD OF REVIEW

In a motion for summary judgment, the initial burden of showing the absence of a genuine issue of material fact rests on the moving party. *RGI, Inc. v. Unified Industries, Inc.*, 963 F.2d 658, 661 (4th Cir. 1992). Disputed issues of fact will not prevent summary judgment; only disputed issues of material fact can preclude judgment. *Anderson v. Liberty Lobby*, 477 U.S. 242, 247-48 (1986). "[A] claim that Congress violated the Constitution by making a law,

when it made the law, is inherently a 'facial' challenge." 62 Stan. L. Rev. at 1276.  A Commerce

Clause challenge is such a claim, and "in a Commerce Clause case, *lex ipsa loquitur*:  the law

speaks for itself."  *Id.*  That is why the Supreme Court did "not speculate [in *Lopez* and

*Morrison*] about whether either statute could be applied constitutionally under some other

circumstances."  *Id.* at 275.  As Justice Scalia has explained:

> When a litigant claims that legislation has denied him individual rights
> secured by the Constitution, the Court ordinarily asks first whether the
> legislation is Constitutional *as applied to him*.  *See Broadrick v.
> Oklahoma*, 413 U.S. 601, 613 (1973).  When, on the other hand, a Federal
> statute is challenged as going beyond Congress's enumerated powers,
> under our precedents the Court first asks whether the statute is
> unconstitutional *on its face* . . . .  *See United States v. Morrison* . . . ;
> *Boerne v. Flores*, 521 U.S. 507 (1997); *United States v. Lopez*, . . . .

*Hibbs*, 538 U.S. at 743.

The cases cited by the Secretary are not to the contrary.  *H.B. Rowe Co. v. Trippett*, ___

F.3d ___, 2010 WL 2872076 (4th Cir. July 22, 2010), is an equal protection, not an enumerated

powers case.  *Trippett*, * 23 ("When a plaintiff alleges, as Rowe does, that a statute violates the

Equal Protection Clause, not only as applied, but also on its face, the plaintiff bears a heavy

burden") (citing *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450-51

(2008), a First and Fourteenth Amendment case).  *Trippett* also cited *West Virginia v. U.S. Dep't

of Health & Human Servs.*, 289 F.3d 281, 292 (4th Cir. 2002), which in turn cited *United States

v. Salerno*, 481 U.S. 739, 745 (1987).

*West Virginia* is a Tenth Amendment challenge, but the substantive claim was

commandeering through economic coercion.  However, because the Secretary had discretion to

impose a sanction that was too small to be coercive within the meaning of that constitutional

theory, the facial challenge failed.  *West Virginia*, 289 F.3d at 292 ("While it is certainly possible

that, in a given case, the sanction actually imposed by the Secretary might not be proportionate to

the breach and might be constitutionally suspect, the mere possibility of a constitutional violation is insufficient to sustain a facial challenge to a statute.") (citing *United States v. Salerno*, 481 U.S. 739 at 745).

Although *West Virginia* was denominated a Tenth Amendment claim, 289 F.3d at 291 ("West Virginia's Tenth Amendment argument centers on its assertion that the Federal government would withhold *all* of West Virginia's Federal Medicaid Funds unless West Virginia implemented an estate recovery program"), it is not an enumerated powers case *per se* but a structural federalism commandeering claim.  Tellingly, *Salerno* was cited neither in *Printz*, 521 U.S. 898, nor in *New York v. United States*, 505 U.S. 144, the leading commandeering cases. Nor was it cited or applied in *Morrison* or *Lopez*.  And in *Raich*, the facial validity of the statute was conceded, 545 U.S. at 15, leaving the case to fall to the *Wickard* rule against atomized, as applied challenges in commodity cases.

Furthermore, the continuing vitality of *Salerno* in any context is in doubt.  62 Stan. L. Rev. at 1234 ("Just two years ago, the Court acknowledged the uncertain vitality of the rule, but declined to resolve the uncertainty.") (citing *Wash. State Grange*, 552 U.S. at 449 ("While some members of the Court have criticized the *Salerno* formulation, all agree that a facial challenge must fail where the statute has a 'plainly legitimate sweep' . . . . Washington's primary system survives under either standard.")).  *See also Janklow v. Planned Parenthood, Sioux Falls Clinic*, 517 U.S. 1174, 1175 (1996) (Stevens, J., respecting the denial of certiorari) ("*Salerno*'s rigid and unwise dictum has been properly ignored in subsequent cases even outside the abortion context.").

Even if this Court were to find *Nebraska v. EPA*, 331 F.3d 995, 998 (D.C. Cir. 2003), and *United States v. Sage*, 92 F.3d 101, 106 (2d Cir. 1996), persuasive on the proposition that

10

*Salerno* is applicable to at least some Commerce Clause enumerated powers cases, that would be of no practical moment in this case. Because of the nature of the sovereign injury asserted by Virginia, the terms "facial" and "as applied" amount to distinctions without a difference. Because an as applied challenge would ask whether Virginia's claim succeeds under a single, known set of circumstances, it is no different than the facial claim. Either Virginia's police power validly applies to the status of being uninsured, or the federal government can regulate that status under the Commerce Clause. The question is binary and is to be answered by comparing the federal and State enactments to each other and to the Constitution, aided by the usual sources of constitutional construction – i.e., a facial analysis.

## IV. THE EXERCISE OF A CLAIMED POWER THAT IS TANTAMOUNT TO A NATIONAL POLICE POWER CANNOT BE SAVED SIMPLY BECAUSE IT IS INTEGRAL TO A LARGER REGULATORY SCHEME.

### A. Congress Has Acted Beyond The Outer Limits Of Its Broad Authority To Regulate Interstate Commerce.

The Secretary's repeated quotations from *Raich* and *Wickard* establish the affirmative outer limits of the Commerce Clause at a point well short of commanding a citizen to purchase goods or services from another citizen. (Doc. 91 at 31-32). As those quotations demonstrate, the farthest Congress has ever been permitted to go is to "'regulate activities that substantially affect interstate commerce,'" including a "class of activities," which "'taken in the aggregate,' substantially affects interstate commerce." (Doc. 91 at 31). It is only in that context that this statement of the Secretary is true: "Thus, when 'a general regulatory statute bears a substantial relation to commerce, the *de minimus* character of individual instances arising under the statute is of no consequence.' *Raich*, 545 U.S. at 17" (Doc. 91 at 32).

Furthermore, it is not categorically true that "[i]n exercising its Commerce Clause power, Congress may also reach even wholly intrastate, non-commercial matters when it concludes that

11

the failure to do so would undercut a larger program regulating interstate commerce." (Doc. 91 at 31-32) (citing *Raich*).   Although *Raich* permits the regulation of a local noncommercial activity, it defined noncommercial as not for sale.   *Raich*, 545 U.S. at 18.   The power of regulation was nonetheless defined in terms of "an economic 'class of activities' that substantially affect commerce."   *Id.* at 17.   *See also Comstock*, 176 L. Ed. 2d at 908.   ("Under the Court's precedents, Congress may not regulate noneconomic activity based solely on the effect such activity may have, in individual cases or in the aggregate, on interstate commerce." (citing *Morrison* and *Lopez*) (Thomas, J., and Scalia, J., dissenting)).   The Secretary's pronouncement that in a complex regulatory program, "[i]t is enough that the challenged provisions are an integral part of the regulatory program and that the regulatory scheme when considered as a whole satisfies this test," (Doc. 91 at 32), has never won judicial consent in the context of commandeering a citizen into commerce in order to regulate him.   Indeed, the attempt has never even been made before.   In the context of that claim and this case, there is a collision with the negative outer limits of the Commerce Clause.   *Morrison*, 529 U.S. at 618-19 ("'We *always* have rejected readings of the Commerce Clause and the scope of federal power that would permit Congress to exercise a police power.'").   All federal courts below the level of the Supreme Court lack authority to move this boundary.   *Rodriguez de Quijas,* 490 U.S. at 484.

Although there is a Commerce Clause rational basis test, it is not as described by the Secretary.   (Doc. 91 at 32).   Under that test, the Court's task is not "limited to determining 'whether a rational basis exists' for Congress's conclusions" in general.   (Doc. 91 at 32).   As the Secretary correctly notes elsewhere (Doc. 91 at 31), the test, as it relates to the scope of the Commerce Clause, is "whether there is a rational basis for concluding that the *class of activities*, 'taken in the aggregate,' substantially affects interstate commerce."   Nor is it true that "[u]nder

12

rational basis review, this Court may not second-guess the factual record upon which Congress relied." (*Id.*).  Although Congress had made extensive findings with respect to the effect of violence against women on commerce, *Morrison*, 529 U.S. at 628-29, the Supreme Court on review found the links too attenuated and remote to support the enactment.  That it is grammatically possible for Congress to assert a causal link between an activity and commerce "is merely the beginning, not the end, of the constitutional inquiry."  *Comstock*, 176 L. Ed. 2d at 900 (Kennedy, J., concurring) (citing *Lopez*, 514 U.S. at 566-67).  "The inferences must be controlled by some limitations lest, as Thomas Jefferson warned, congressional powers become completely unbounded by linking one power to another *ad infinitum* in a veritable game of 'this is the house that Jack built.'," *Id.*

The crux of the Secretary's argument is found in this grammatically possible, but substantively nonsensical, statement: "Persons who finance their health care consumption without purchasing insurance are engaged in economic activity to at least as great an extent as the plaintiffs in *Raich*." (Doc. 91 at 32-33).  But the Secretary's own theory of the case is that in order to require insurance companies to insure pre-existing conditions at affordable rates, the rationally uninsured must be brought into the system now, lest they wait until they need medical care, and their premiums escape the intended scheme of cross subsidies.  (Doc. 91 at 37-41).  This is not regulation of "[p]ersons who finance their health care consumption without purchasing insurance" (Doc. 91 at 32); it is regulation of the status of being uninsured citizens.  This is not activity as that term has ever been understood in Commerce Clause jurisprudence.  Nor is it true that this is anything like the activities in *Wickard* and *Raich*, the cases that establish the existing affirmative outer limits of the Commerce Clause.  The explanation for the holdings in both of those cases is that when one engages in the voluntary activity of producing a

13

commodity, which in the aggregate affects the price of the whole, one is not entitled to an atomized, as applied defense to such regulation. *Raich*, 545 U.S. at 19 ("In *Wickard* we had no difficulty concluding that Congress had a rational basis for believing that, when viewed in the aggregate, leaving home-consumed wheat outside the regulatory scheme would have a substantial influence on price and market conditions."). Regulation of inactivity is qualitatively-- and constitutionally-- different.

When the Secretary argues incorrectly that in the post-*Lochner* era only two cases support the Commonwealth's position, (Doc. 91 at 33) ("Indeed, in the nearly 70 years since the Court overruled its *Lochner* – era understanding of the scope of the commerce power in *United States v. Darby*, 312 U.S. 100 (1941), the Court has invalidated statutes as beyond the reach of that power on only two occasions.") (citing *Lopez* and *Morrison*), she overlooks *Alden* and *New York v. United States*, while inadvertently emphasizing that no precedent supports her claim of congressional power. To date, the Court has yet to uphold under the Commerce Clause regulation of any intrastate activity that is not itself economic in character. *Morrison*, 529 U.S. at 613 ("thus far in our Nation's history our cases have upheld Commerce Clause regulation of intrastate activity only where that activity is economic in nature."). Nothing in *Raich* altered that fact. *Raich*, 545 U.S. at 18 ("Like the farmer in *Wickard*, respondents are cultivating, for home consumption, a fungible commodity for which there is an established, albeit illegal, interstate commerce.").[1] Nor did *Raich* alter the fact that the Supreme Court "*always* ha[s] rejected

---

[1] Although the Secretary cites Justice Scalia's concurrence in *Raich* in support of the proposition that non-economic local activity can be regulated (Doc. 91 at 40), Justice Thomas' dissent in *Comstock*, which Justice Scalia joined, makes clear his view that true non-economic activity (as opposed to commodity production short of selling) can never be regulated under the Commerce Clause. 176 L. Ed. 2d at 908 ("Under the Court's precedents, Congress may not regulate non-economic activity (such as sexual violence) based solely on the effect such activities may have,

readings of the Commerce Clause and the scope of federal power that would permit Congress to exercise a police power." *Morrison*, 529 U.S. at 618-19.

This negative outer limit of the Commerce Clause is why the Secretary's claim of power must fail. Her theory that activities substantially affecting interstate commerce include the failure to purchase goods or services from another citizen, giving rise to a federal power to require such purchases, would create a particularly strong form of federal police power lacking principled limits. Because no limits on the claimed power have been or can be identified, the Secretary is not entitled to summary judgment.

### B. Notwithstanding The Secretary's Argument To The Contrary, The Mandate And Penalty Are Not "A Valid Exercise Of Congress's Power Under The Necessary And Proper Clause."[2]

In the first place, the Necessary and Proper Clause "by itself, creates no constitutional power." *Kinsella v. Singleton*, 361 U.S. 234, 247-48 (1960). In the second place, the affirmative outer limit of the Commerce Clause relevant to this case – activities substantially affecting interstate commerce – itself depends upon the Necessary and Proper Clause. *Katzenbach v. McClung*, 379 U.S. 294, 301-02 (1964); *United States v. Wrightwood Dairy Co.*, 315 U.S. 110, 119 (1942); *United States v. Coombs*, 37 U.S. 72 (1838). It would be a mistake to assume that that power is part of the Commerce Clause itself that can then be infinitely extended by the Necessary and Proper Clause. *See Raich*, 545 U.S. at 34 (Scalia, J., concurring in the judgment) ("Congress's regulatory authority over intrastate activities that are not themselves part of interstate commerce (including activities that have a substantial effect on interstate commerce) derives from the Necessary and Proper Clause."). Taken together, these cases recognize that

---

in individual cases or in the aggregate, on interstate commerce."). Nothing Justice Scalia has written suggests that inactivity can be regulated.

[2] Doc. 91 at 41.

Congress can regulate intrastate activity where such regulation is connected and appropriate to Congress's power to regulate the interstate market.

In this way, Congress's power remains tethered to the text of the Commerce Clause.  It may reach interstate commerce directly.  It may reach economic intrastate activities substantially affecting interstate commerce even before they ripen into "commerce" through trade, barter or sale, if they affect the common stock of a commodity.  *Raich*; *Wickard*.  And Congress may regulate both through rules such as the rule against racial discrimination upheld in *Heart of Atlanta Motel v. United States*, 379 U.S. 241 (1964).

Regulation can reach many things under the Necessary and Proper Clause.  For example, "Congress, in order to help ensure the enforcement of federal criminal laws enacted in furtherance of its enumerated powers, 'can cause a prison to be erected at any place within the jurisdiction of the United States, and direct that all persons sentenced to imprisonment under the laws of the United States shall be confined there.'"  *Comstock*, 176 L. Ed. 2d at 891.  And "the power 'to establish post offices and post roads' . . . is executed by the single act of *making* the establishment . . . . [f]rom this has been inferred the power and duty of *carrying* the mail along the post road, from one post office to another.  And from this *implied* power, has *again* been inferred the right to *punish* those who steal letters from the post office, or rob the mail."  *Id.* at 897 (citation omitted).

However, the mode of regulation must fit the enumerated power by executing it – not by altering its character.  "When the inquiry is whether a federal law has sufficient links to an enumerated power to be within the scope of federal authority, the analysis depends not on the number of links in the congressional-power chain but on the strength of the chain."  *Id.* at 900 (Kennedy, J., concurring).  But the question of fit is irrelevant unless the thing being regulated is

proper, i.e., the regulation of interstate commerce or of activities substantially affecting interstate commerce. *Id.* at 889-890 (We have "made clear that, in determining whether the Necessary and Proper Clause grants Congress the legislative authority to enact a particular federal statute, we look to see whether the statute constitutes a means that is rationally related to the implementation of a constitutionally enumerated power."); *Id.* at 906 (". . . no matter how 'Necessary' or 'Proper' an Act of Congress may be to its objective, Congress lacks authority to legislate if the objective is anything other than 'carrying into Execution' one or more of the Federal Government's enumerated powers.") (Thomas, J., and Scalia, J., dissenting).

In an attempt to escape the negative outer limits of the Commerce Clause, the Secretary makes the startling claim that any "provision that is rationally related to the exercise of an enumerated power must be sustained [under the Necessary and Proper Clause] unless it violates an independent constitutional prohibition."  (Doc. 91 at 43) (*See also* Doc. 91 at 41) (Necessary and Proper Clause "is an enlargement of, rather than a limitation on, the other powers conferred on Congress under Article I").  This argument stands on its head the notion of a federal government of limited, enumerated powers.

Of course, it has been known for more than two hundred years that the Necessary and Proper Clause neither enlarges any enumerated power nor creates any new power, but merely effectuates enumerated powers. *Kinsella*, 361 U.S. at 247-48; *St. George Tucker*, Appendix in 1 William Blackstone, *Commentaries: with Notes of Reference To The Constitution and Laws of the Federal Government of the United States and of the Commonwealth of Virginia*, 287 (1803) ("The plain import of the clause is, that Congress shall have all the incidental or instrumental powers, necessary and proper for the carrying into execution all the express powers; . . . It neither enlarges any power specifically granted, nor is it a grant of new powers to Congress, but

merely a declaration, for the removal of all uncertainty, that the means of carrying into execution those otherwise granted, are included in the grant."). And if, as seems obvious, the Secretary means to exclude the negative outer limits of the Commerce Clause when she speaks of "an independent Constitutional prohibition," her position is easily and decisively refuted.

Beginning with the Supreme Court's most recent pronouncement on the subject, the majority opinion in *Comstock* recognized that the *Morrison* negative outer limit denying the national government a police power applies to the Necessary and Proper Clause. *Comstock*, 176 L. Ed. 2d at 898 ("Nor need we fear that our holding today confers on Congress a general 'police power, which the Founders denied the National Government and reposed in the States.") (citing *Morrison*). Justice Kennedy in his concurrence in the judgment in *Comstock* expressly stated: "It is of fundamental importance to consider whether essential attributes of State sovereignty are compromised by the assertion of federal power under the Necessary and Proper Clause; if so, that is a factor suggesting that the power is not one properly within the reach of federal power." *Id.* at 902. Justice Alito in his concurrence in the judgment said much the same thing:

> The Necessary and Proper Clause does not give Congress *carte blanche*. Although the term "Necessary" does not mean "absolutely necessary" or indispensable, the term requires an "appropriate" link between a power conferred by the Constitution and the law enacted by Congress. And it is an obligation of this Court to enforce compliance with that limitation.

*Id.* at 904-05 (citing *McCulloch v. Maryland*). Justices Thomas and Scalia in dissent wrote

> Critically, however, *McCulloch* underscores the linear relationship the Clause establishes between the two inquiries: Unless the end itself is 'legitimate,' the fit between means and end is irrelevant. In other words, no matter how "Necessary" or "Proper" an Act of Congress may be to its objective, Congress lacks authority to legislate if the objective is anything other than "carrying into Execution" one or more of the Federal Government's enumerated powers.

*Id.* at 906.

18

Furthermore, the United States Supreme Court elsewhere has emphatically held that the Necessary and Proper Clause is limited by general principles of federalism independent of any direct prohibition. *Alden v. Maine*, 527 U.S. at 732-33 ("When a 'Law . . . for carrying into Execution' the Commerce Clause violates the principle of state sovereignty reflected in the various constitutional provisions . . . it is not a 'Law . . . *proper* for carrying into Execution the Commerce Clause,' and is thus, in the words of The Federalist, 'merely [an] act of usurpation' which 'deserves to be treated as such.'") (citing *Printz*, 521 U.S. at 923-24). Not only are there clear federalism limits on the Necessary and Proper Clause, but those limits compel the conclusion that any attempt to exercise an unenumerated power, such as regulating the status of being uninsured, for the purpose of making the regulation of an enumerated power more efficient, is improper because the unenumerated power by definition is reserved to the States.

Once it is determined that an enactment is improper in this sense, there is nothing further to consider under the Necessary and Proper Clause. That is why the majority opinions in *Morrison* and *Lopez* find it unnecessary to engage the Clause. This makes the Secretary's discussion in her Memorandum of the putative effects of the "conduct" and "decisions" not to have insurance constitutionally beside the point. (Doc. 91 at 44-46). It simply does not matter how necessary the mandate and penalty might be to the congressional scheme. The end being pursued – the exercise of an unenumerated power – is improper under the Necessary and Proper Clause and that is the end of it.

### C.   The Decision To Forgo Insurance Is Not An Activity Substantially Affecting Commerce Within The Meaning Of The Necessary And Proper Clause.

The claim that "the health care market is unique" (Doc. 91 at 46) is false. Any market can be affected through limiting supply or increasing demand. Hence the Agricultural Adjustment Act of 1938 at issue in *Wickard* could have, in economic theory, just as easily

addressed the agricultural crisis by ordering citizens to purchase a certain measure of wheat.  The reason Congress could not adopt this approach is that it would not have been supported by an enumerated power.  In particular, it would not be a regulation of interstate commerce or of economic activities substantially affecting commerce.  Nor is it true that "[h]ealth insurance is not an independent consumer product, but a means of managing the risks inherent in a market for health care services in which all inevitably participate."  (Doc. 91 at 46).  As it existed prior to PPACA, health insurance (defined as a contract of indemnity against fortuitous risks) when voluntarily purchased was a way of managing risks.  And Congress can and has regulated the **business** of insurance under the Commerce Clause.  *United States v. South-Eastern Underwriters Ass'n*, 322 U.S. 533 (1944).  It is also true that Congress has directly regulated aspects of the health care system, principally by mandating emergency room treatment by hospitals receiving federal funds.  Emergency Medical Treatment and Active Labor Act, 42 U.S.C. § 1395dd.  But the question in this case is not whether the federal government can regulate the **business** of health insurance or the **business** of providing health care.  The question is whether it can command a citizen to engage in an activity solely for the convenience of the government in regulating commerce.  That question must be answered in the negative for at least three reasons.

First, the notion that the federal government can issue naked commands that citizens live their lives for the convenience of the government is repugnant to historical constitutional thinking.  The Constitution was adopted not only for the utilitarian benefits of government, but also to "secure the Blessings of Liberty to" the Founders and their "Posterity."  U.S. Const., Preamble.  As Alexander Hamilton told the New York convention, a constitution that "enable[d] the Federal Government to penetrate the recesses of domestic life, and control, in all respects, the private conduct of individuals" would have been unworthy of ratification.

Second, the claim that citizens can be commanded to purchase goods or services from another citizen in order to increase the efficiency of the federal government's regulation of commercial actors goes beyond the negative outer limits of the Commerce Clause, even as aided by the Necessary and Proper Clause, because the claimed power would be unlimited and indistinguishable from a national police power.  *Lopez*; *Morrison*.

Third, the claim that Congress can use unenumerated powers to increase the efficiency of its use of an enumerated power is constitutionally incoherent in a government of enumerated powers.  By definition, *all* unenumerated powers "are reserved to the states respectively, or to the people."  U.S. Const. amend. X.

Nor is it coherent to assert that "[p]ersons who finance their health care consumption without purchasing insurance are engaged in economic activity to an even greater extent than the plaintiffs in *Raich*."  (Doc. 91 at 48).  Short of adoption of an extreme post-modernist view that words are infinitely elastic, it is not true that inaction in the present, with respect to one subject matter (insurance), which can lead to undesirable results in the future, is "activity."  Legislation to avert the evil consequences of inaction partake of the police power, as in state child neglect cases.  Of course, where someone is already engaged in conduct subject to the Commerce Clause, regulation is permissible.  This principle explains why the prohibition of racial discrimination in hotels and motels and other public accommodations was proper under the Commerce Clause.  (Doc. 91 at 48-49) (citing *Heart of Atlanta Motel*, 379 U.S. at 258-59 and *Daniel v. Paul*, 395 U.S. 298 (1969)).  Furthermore, as *Daniel* expressly notes, 395 U.S. at 303, the Civil Rights Act of 1964 has a jurisdictional definition defining its scope in terms of the movement of persons and goods in interstate commerce.

The Secretary's other supposed examples of Congressional regulation of inaction under the Commerce Clause are similarly inapt.  The Child Support Recovery Act, 18 U.S.C. § 228(a), does not create the obligation in question, but enforces it if it involves more than one state, on the theory that multi-state child support orders, like multi-state contracts, are things in interstate commerce.  *See, e.g., United States v. Bongiorno*, 106 F.3d 1027 (1st Cir. 1997); *United States v. Sage*, 92 F.3d 101, 106 (2d Cir. 1996); *United States v. Johnson*, 114 F.3d 476, 480 (4th Cir. 1997) ("we agree with those circuits which have held that the CSRA properly regulates, as a 'thing in interstate commerce,' the obligation created by state-court child support orders when, as the Act requires, and is the situation in this case, the obligated parent and the dependent child reside in different states.") (citing, *inter alia Bongiorno* and *Sage*).  *See also United States v. Kukafka*, 478 F.3d 531, 536 (3d Cir. 2007) ("Act includes explicit jurisdictional element that limits Act's reach to interstate transactions.").

The Secretary also contends that "[c]onduct that substantially affects interstate commerce is subject to Congressional regulation, even if it may be characterized as a 'failure to act.'" (Doc. 91 at 49) (citing *United States v. Gould*, 568 F.3d 459, 470 (4th Cir. 2009)).  This completely misapprehends *Gould*.  There, the Fourth Circuit did not uphold the sex offender registration requirement under the substantially affects interstate commerce prong of the Interstate Commerce Clause at all.  It sustained it under the channels of interstate commerce and the persons in interstate commerce prongs.  *Gould*, 568 F.3d at 471.  Nor did federal jurisdiction attach under the act for mere inaction.  "To satisfy the commerce component of § 2250(a), a sex offender must have been convicted of a qualifying sex offense, and, after conviction, traveled to another state and failed to register or maintain his registration."  *Id.* at 471.  This is substantial, voluntary activity involving interstate commerce as presently understood.

The Secretary next confuses congressional purpose with congressional power.  It is true that Congress requires insurance in a number of enactments.  (Doc. 91 at 49-50, and 50 n.6) (citing 42 U.S.C. § 4001(c); 42 U.S.C. § 4012a (a), (b), (c), (flood insurance); 49 U.S.C. § 13906 (interstate motor carriers); 6 U.S.C. § 443(a)(1) (sellers of anti-terrorism technology); 16 U.S.C. § 1441(c )(4) (entities operating in national marine sanctuary); 30 U.S.C. § 1257(f) (surface coal mining and reclamation operators); 42 U.S.C. § 2210(a) (Price-Anderson Act) (operators of nuclear power plants); 42 U.S.C. § 2243(d)(l) uranium enrichment facility operators); 42 U.S.C. § 2458c (b)(2)(A) (aerospace vehicle developers); 45 U.S.C. § 358(a) (railroad unemployment insurance).  And it is true that in some or all of these cases Congress's purpose is to prevent cost shifting in some sense.  However, federal power attaches by virtue of voluntary commercial activities subjecting the actors to federal regulation.  This hodgepodge of sadly inapposite statutes fails to disguise the fact that the power claimed by the Secretary is radically unprecedented.

The Secretary's discussion of the Super Fund Act, 42 U.S.C. § 9601, *et seq*., confuses the substantive, no fault provisions of CERCLA with congressional jurisdiction.  As *United States v. Olin Corp.*, 107 F.3d 1506, 1510-11 (11th Cir. 1997), a case cited by the Secretary (Doc. 91 at 51), explains, CERCLA lacks either a jurisdictional element or congressional findings with respect to Commerce Clause effects.  In that circumstance, courts will conduct a case-by-case factual analysis to determine whether an activity otherwise covered by CERCLA substantially affects interstate commerce.  In *Olin*, the voluntary activities of operating a chemical factory while storing waste on site were found to substantially affect interstate commerce.

The Secretary's analysis of eminent domain is highly eccentric.  Eminent domain is not a "power to compel a private party to enter into a transaction" (Doc. 91 at 51), it is a taking.  U.S.

Const. amend. V.  *See Kohl v. United States*, 91 U.S. (1 Otto) 367, 372-73 (1876) (inferring power of eminent domain from limitations of the Fifth Amendment); *United States v. Jones*, 109 U.S. 513, 518 (1883) (power inherent).

### D.   The Secretary's Facial Analysis Is Analytically Unsound.

It is not true that PPACA "reaches individuals who, even on Virginia's theory, are market participants engaged in economic activity."  (Doc. 91 at 52).  Even assuming that "[i]ndividuals who have, and then drop, health insurance coverage are 'active'" and that "[i]ndividuals who receive medical services and render payment (fully or incompletely) are 'active,'" (Doc. 91 at 52), that is not what Congress chose to regulate.  Instead, Congress is regulating a mere status that exists after any decision to drop insurance and prior to any receipt of medical care.  The command of the federal government is the unprecedented mandating of a person at rest to enter into a commercial relationship with another citizen.

As demonstrated *supra* in Section III (Standard of Review), enumerated power challenges are inherently facial only.  It simply does not matter in an enumerated power case whether Congress could have regulated a smaller subset of actors had it chosen to do so.  For example, in *Lopez,* Congress could have regulated a subset of gun possession by enacting a jurisdictional requirement that the gun have moved in interstate commerce, 514 U.S. at 561-62, but chose not to.  The Supreme Court did not parse the law on a facial or as applied basis, but instead, struck the enactment on a facial analysis.  The case for a facial invalidation is even stronger here where the regulation of inactivity could not be cured by a jurisdictional element.  The question here is inescapably binary:  which sovereign may regulate the insurance status of citizens *qua* citizen in our system of enumerated federal powers?

## V.   THE MANDATE AND PENALTY CANNOT BE SUSTAINED
##      UNDER THE TAXING POWER.

As this Court observed in its prior opinion, "[c]ontrary to pre-enactment representations by the Executive and Legislative branches, the Secretary now argues alternatively that the Minimum Essential Coverage Provision is a product of the government's power to tax for the general welfare." (Doc. 84 at 25). But the Secretary's difficulties are in no way reduced or avoided by her resort to the taxing power because neither the mandate nor the penalty are taxes. By definition, the mandate is not a tax. It does not seek to raise any revenue, but rather, is a command that citizens purchase health insurance. It is nothing more than an attempt by Congress to commandeer citizens into a commercial transaction so that Congress can then regulate it and them. Turning to the penalty, it is not a tax either because calling it a tax is contrary to the text of PPACA and to binding Supreme Court precedent.

The Secretary first argues that the penalty is a tax because "Congress repeatedly treated the [penalty] as a tax." (Doc. 91 at 15). Contrary to the Secretary's assertion, it was Congress that called the payment for failure to comply with the mandate a "penalty." PPACA § 1501 at § 5000A(b)(1). Elsewhere in PPACA, Congress levied taxes, denominated as such, demonstrating that it knew how to draw the distinction. *See, e.g.*, PPACA, §§ 9001, 9004, 9015, 9017, and 10907. In the taxing arena, the Supreme Court has refused to permit litigants to denominate as a tax that which Congress has denominated an exercise of commerce power. *Bd. of Trs. of the Univ. of Ill. v. United States*, 289 U.S. at 58 ("But if the Congress may thus exercise the power, and asserts, as it has asserted here, that it is exercising it, the judicial department may not attempt in its own conception of policy to distribute the duties thus fixed by allocating some of them to the exercise of the admitted power to regulate commerce and others to an independent exercise of the taxing power.").

25

The Secretary's litigation position – that what Congress labeled a penalty was somehow a tax marketed and passed under another name – contradicts the pre-enactment statements of both political branches.  Not only should a court not re-label an explicit exercise of commerce clause authority a tax, *see Bd. of Trs. of the Univ. of Ill.*, 289 U.S. at 58, it should not even assume that the bill would have passed had it enforced the mandate with a tax. Congress was unwilling to pay for something approximating universal coverage under its traditional taxing and spending powers. Instead, Congress resorted to the naked mandate.

Ultimately, to prevail on her argument, the Secretary would have to demonstrate that there is simply no legal difference between a "penalty" imposed for failure to comply with a command of government and a "tax."  In arguing that there is no distinction between the two, the Secretary contends that they are immaterial "statutory label[s]."  (Doc. 91 at 54 n.9).  This ignores the fact that under longstanding and binding Supreme Court precedent, the differences between a tax and a penalty are justiciable even where Congress calls a penalty a "tax," which, of course, Congress did not do here.

For nearly a hundred years, the United States Supreme Court has recognized that "taxes" and "penalties" are separate and distinct, stating that "'[a] tax is an enforced contribution to provide for the support of government; a penalty, as the word is here used, is an exaction imposed by statute as punishment for an unlawful act.'"  *Reorganized CF&I Fabricators*, 518 U.S. at 224 (quoting *La Franca*, 282 U.S. at 572).  As the *La Franca* court held, the word "tax" and the word "penalty"

> are not interchangeable, one for the other.  No mere exercise of the art of lexicography can alter the essential nature of an act or a thing; and if an exaction be clearly a penalty it cannot be converted into a tax by the simple expedient of calling it such.  That the exaction here in question is not a true tax, but a penalty involving the idea of punishment for infraction of the law is settled . . . .

*La Franca*, 282 U.S at 572.  To prevail, the Secretary's taxing power argument invites this Court to first ignore Congress's express decision to denominate the penalty a "penalty," and then to "alter the essential nature" of the penalty by ignoring its function so that it can be called a tax. Simply put, the taxing power does not and cannot provide the basis for the **penalty**.  In her memorandum, the Secretary ignores the decisions of the Supreme Court that distinguish penalties and taxes.  This is especially odd as this Court, in ruling on the Secretary's motion to dismiss, raised the issue and cited the relevant cases.  (Doc. 84 at 26-27).

The inescapable conclusion that the penalty is just that, a penalty, is fatal to the Secretary's tax argument.  As this Court noted in its prior opinion "the power of Congress to exact a penalty is more constrained than its taxing authority under the General Welfare Clause – it must be in aid of an enumerated power."  (Doc. 84 at 27) (citing *Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381 (1940); *Butler*, 297 U.S. 1).  Because the only enumerated power to which the Secretary could turn is the Commerce Clause, her tax argument collapses back into her Commerce Clause argument.  Because we have already established that the mandate and penalty are well outside the outer limits of the Commerce Clause, limits binding on this Court, *Rodriguez de Quijas*, 490 U.S. 477, the Secretary's motion for summary judgment is due to be denied.

The Secretary, of course, continues to argue that the penalty must be a tax because it is codified in the tax code and collected by the IRS.   (Doc. 91 at 53-54).  But this argument is statutorily barred.   26 U.S.C. § 7806(b) ("No inference, implication, or presumption of legislative construction shall be drawn or made by reason of the location or grouping of any particular section or provision of this title . . . .").  *See also Reorganized CF&I Fabricators*, 518 U.S. at 223 ("No inference of legislative construction should be drawn from the placement of a provision in the Internal Revenue Code").

The Secretary also continues to argue that the penalty must be a tax because the Joint Committee on Taxation used that term in its post-enactment review of PPACA. (Doc. 91 at 55). Written months after PPACA passed the Senate, the report does not even qualify as "legislative history." It does not record floor debates and does not detail the contemporaneous thoughts of members of Congress as PPACA was passed in the chamber that wrote it. Because the report was produced at a time when PPACA could not be changed in the House of Representatives without it being defeated in the Senate, the report cannot be used to influence judicial review because that would evade the bicameralism and presentment requirements of Article I, § 7. Finally, it should be noted that the staff of the Joint Committee was not even consistent in its terminology. It call the penalty an "excise tax" in the headings, but labels it a "penalty" in the text. (Doc. 91-1 at 365-368).

In the end it would not even matter if Congress had called it a tax. There is recent, controlling Supreme Court precedent that demonstrates that the question of whether a provision is a penalty or a tax continues to be a question of law for the Court. In *Reorganized CF&I Fabricators*, 518 U.S. at 224-26, the Supreme Court found a provision to be a penalty even though Congress had called it a tax. The Court did so because a "punishment for an unlawful . . . omission" is a penalty, not a tax. *Id.* Because the PPACA penalty is an exaction for an omission – one that if it operated perfectly would produce no revenue – it is a penalty as a matter of law, and the Secretary's tax argument fails.

Because the penalty is not a tax, the Secretary's general discourse on the taxing power and General Welfare Clause, (Doc. 91 at 52-53), is beside the point. Furthermore, the cases cited establish only the proposition that Congress can tax things that it cannot regulate; a noncontroversial proposition.

Some of what the Secretary says on the subject of taxation nevertheless warrants comment. Just as she argued in support of her motion to dismiss, the Secretary argues in her most recent filing that:

> So long as a statute is "productive of some revenue," the courts will not second-guess Congress's exercise of its General Welfare Clause powers, and "will not undertake, by collateral inquiry as to the measure of the regulatory effect of a tax, to ascribe to Congress an attempt, under the guise of taxation, to exercise another power denied by the Federal Constitution." *Sonzinsky v. United States*, 300 U.S. 506, 514 (1937); *see also United States v. Jones*, 976 F.2d 176, 183-84 (4th Cir.1992); *United States v. Aiken*, 974 F.2d 446, 448-49 (4th Cir. 1992).

(Doc. 91 at 54-55). However, as before, important words have been omitted from a composite quotation. The actual quotation is as follows:

> [I]t has long been established that an Act of Congress **which on its face purports to be an exercise of the taxing power** is not any the less so because the tax is burdensome or tends to restrict or suppress the thing taxed. Inquiry into the hidden motives which may move Congress to exercise a power constitutionally conferred upon it is beyond the competency of courts. They will not undertake, by collateral inquiry as to the measure of the regulatory effect of a tax, to ascribe to Congress an attempt, under the guise of taxation, to exercise another power denied by the Federal Constitution.

*Sonzinsky*, 300 U.S. at 513-14 (emphasis added) (citations omitted). Given that Congress did not pass an act "which on its face purports to be an exercise of the taxing power," the Secretary is actually arguing that *Sonzinsky*, *Jones* and *Aiken* should be read as prohibiting the Court from inquiring into the litigation position adopted by the Secretary; one that is contrary to the text of PPACA and is "contrary to pre-enactment representations by the Executive and Legislative branches . . . ." (Doc. 84 at 25). However, by necessary implication, *Sonzinsky*, *Jones*, and *Aiken*, stand for the proposition that courts will ordinarily not permit litigants, such as the Secretary, to second-guess Congress when, as is the case with the PPACA penalty, it has elected

not to invoke its taxing power and has instead chosen to impose a penalty.  This, of course, is not to suggest that if Congress had called the "penalty" a "tax" it would magically transform what is an unconstitutional penalty into a constitutional exercise of the taxing power. The law is to the contrary.  *See*, *e.g.*, *Reorganized CF&I Fabricators*, 518 U.S. at 224, *La Franca*, 282 U.S at 572, *Butler*, 297 U.S. at 61, and *Child Labor Tax Case*, 259 U.S. at 37.  *See also Sonzinsky*, 300 U.S. at 513 (recognizing and distinguishing *Child Labor Tax Case*).

The Secretary's treatment of *In re Chateaguay Corp.*, 53 F.3d 478 (2nd Cir. 1995) (Doc. 91 at 54), *Adventure Res., Inc. v. Holland*, 137 F.3d 786 (4th Cir. 1998) (Doc. 91 at 56), and *In re Leckie Smokeless Coal Co.*, 99 F.3d 573 (4th Cir. 1996) (Doc. 91 at 56), cases dealing with payments required under the Coal Act, Pub. L. No. 102-486, 106 Stat. 2776, 3036-3056 (1992), also invites comment.  While it is true that, in very particular contexts, these cases determined that payments under the Coal Act were taxes, a review of the issues raised in them reveals that they can be easily distinguished from the instant case and that they provide no support for the position of the Secretary.

Unlike PPACA, the Coal Act did not impose a "penalty."  Rather, the

> purpose of the [Coal] Act was to establish a system whereby each current and former signatory operator--that is, each operator that "is or was a signatory to a coal wage agreement," as such agreements are defined in section 9701(b)(1) of the Act, *see* § 9701(c)(1)--is required to pay for the benefits provided to its own retirees and to share in the cost of providing benefits to orphaned retirees.

*In re Leckie*, 99 F.3d at 576.  Thus, the Coal Act did not impose a "penalty" on coal companies, but rather, required them to pay annual benefit premiums consistent with their obligations under prior agreements.  Specifically,

> the annual premium for an assigned operator equals the sum of the cost of providing health benefits to the company's assigned beneficiaries, its *pro rata* share of death benefit coverage, and its *pro rata* share of the cost of

> health benefits for "orphaned" beneficiaries. The Coal Act restricts
> liability for medical benefit premiums to companies that (1) signed one or
> more Wage Agreements between 1950 and 1988, (2) continue to
> "conduct[] or derive[] revenue from any business activity, whether or not
> in the coal industry," and (3) actually employed at least one retiree
> currently receiving benefits. *Id.*, § 9701(c).

*In re Chateaugay Corp.*, 53 F.3d 478, 486 (1995).  Thus, unlike the penalty in PPACA, Coal Act payments were not imposed because of the failure of a party to comply with a government command.  This distinction is dispositive, as the United States Supreme Court found in *Reorganized CF&I Fabricators*.

The taxing power argument advanced by the Secretary is truly radical.  As she summarizes her position, anything that "imposes involuntary pecuniary burdens for a public purpose . . . is an exercise of the taxing power. . . ," and therefore, is constitutional.  (Doc. 91 at 56).  Not only would adopting this position require this Court to ignore the text of PPACA, the justiciable distinctions between taxes and penalties, and binding Supreme Court precedent, including *Child Labor Tax Case*, 259 U.S. at 37 (regulation by taxation must be supported by some enumerated power other than the taxing power), it would also require the Court to find that the federal government has always had a national police power through the taxing power.  That is so because the Secretary argues that Congress, untethered to any enumerated power other than the power to tax, can order any citizen to do anything so long as it also exacts an "involuntary pecuniary burden" for non-compliance whose proceeds would go to the Treasury.  This not only finds no support in prior decisions of the Supreme Court, it is a proposition that was directly rejected in *Morrison*, which noted that the Court has **"*always* . . . rejected readings of . . . the scope of federal power that would permit Congress to exercise a police power."**  *Morrison*, 529 U.S at 618-19 (bolded emphasis added) (internal quotation and citation omitted).

Accordingly, under multiple, controlling Supreme Court precedents, the Secretary's taxing power argument must be rejected.

## CONCLUSION

The lack of a limiting principle for the Secretary's arguments places the claimed power to enact the mandate and penalty well beyond the outer limits of the Constitution.  Instead of positing limits, the Secretary's argument has grown ever more extreme.  Now she claims that any exaction is valid if it "imposes involuntary pecuniary burdens for a public purpose."  (Doc. 91 at 56).

This places her in a legal predicament because the Secretary ultimately has to win on the Commerce Clause, which she cannot do when her position lacks principled limits.  With respect to the Commerce Clause and the associated Necessary and Proper Clause, this Court has already recognized that the Secretary's arguments go beyond the affirmative and negative limits erected by the controlling Supreme Court precedents.  With respect to the taxing power argument, the rules of decision provided by the Supreme Court render the penalty a penalty and not a tax.  Because it is a naked penalty, and not a tax, it requires an enumerated power for its support.  In this fashion the taxing power argument collapses back into the Commerce Clause argument because no other enumerated power could be posited for the support of the penalty.

The same legal destination would be reached even if the penalty were to be deemed a tax (although there would be additional objections based on a lack of apportionment and non-uniformity).  As long as it is openly used for regulation, a tax would have to pass muster under an enumerated power other than the taxing power.  *Child Labor Tax Case*, 259 U.S. 20; *Railway Labor Executives' Ass'n*, 455 U.S. at 468-69 (alternative power will not be used to support an enactment if it evades the limits of another grant).  *See also Morrison*, 529 U.S. at 618-19 (the

Court has "always . . . rejected readings of . . . the scope of federal power that would permit Congress to exercise a police power.").

As the Congressional Research Service warned prior to enactment, the mandate is an unprecedented means for implementing PPACA's ends with respect to broader coverage.  The means chosen by Congress are especially dangerous to those aspects of ordered liberty protected by federalism because they represent an unlimited and unbounded power, not just to regulate activities, but to directly command the citizen on any subject.  Because the claimed power is contrary to all existing Supreme Court authority, the Commonwealth prays this Court to deny the Secretary's motion.

Respectfully submitted,

KENNETH T. CUCCINELLI, II
Attorney General of Virginia

CHARLES E. JAMES, JR.
Chief Deputy Attorney General

E. DUNCAN GETCHELL, JR.
Solicitor General

WESLEY G. RUSSELL, JR.
Deputy Attorney General

STEPHEN R. MCCULLOUGH
Senior Appellate Counsel


*/s/  E. Duncan Getchell, Jr.*
E. Duncan Getchell, Jr., VSB #14156
Attorney for Commonwealth of Virginia
OFFICE OF THE ATTORNEY GENERAL
900 East Main Street
Richmond, Virginia  23219
(804) 786-2436 (Telephone)
(804) 786-1991 (Fax)
dgetchell@oag.state.va.us

## CERTIFICATE OF SERVICE

I hereby certify that on this 23rd day of September, 2010, I electronically filed the foregoing Plaintiff's Memorandum in Opposition to the Secretary's Motion for Summary Judgment with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to:   Ian Gershengorn, ian.gershengorn@usdoj.gov, Joel McElvain, joel.mcelvain@usdoj.gov, Jonathan Holland Hambrick, jay.h.hambrick@usdoj.gov, Sheila M. Lieber, slieber@civ-usdoj.gov, and all counsel for Amici.   A copy also has been served by first class, postage prepaid, U.S. Mail to Ray Elbert Parker, *Pro Se*, P. O. Box 320636, Alexandria, Virginia 22320.


/s/   E. Duncan Getchell, Jr.
E. Duncan Getchell, Jr., VSB #14156
Attorney for the Commonwealth of Virginia
Office of the Attorney General
900 East Main Street
Richmond, Virginia  23219
(804) 786-2436 (Telephone)
(804) 786-1991 (Fax)
dgetchell@oag.state.va.us