**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
Richmond Division

| | |
|---|---|
| COMMONWEALTH OF VIRGINIA, ) <br> ex rel. Kenneth T. Cuccinelli, II, in his official ) <br> capacity as Attorney General of Virginia, ) <br>   ) <br>        Plaintiff, ) <br>   ) <br>     v. ) <br>   ) <br> KATHLEEN SEBELIUS, Secretary of the ) <br> Department of Health and Human Services, ) <br> in her official capacity, ) <br>   ) <br>        Defendant. ) <br> _____ ) | Civil Action No. 3:10-cv-00188-HEH |

**MEMORANDUM IN OPPOSITION TO**
**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

## Table of Contents

Introduction ........................................................................................................................... 1

Response to plaintiffs' statement of material facts ......................................................... 4

Argument ............................................................................................................................ 6

I.   Congress validly exercised its commerce power to enact the minimum coverage
     provision, because the provision is integral to the ACA's larger regulatory scheme ........ 7

II.  Congress validly exercised its commerce power to enact the minimum coverage
     provision, because the provision regulates conduct with substantial effects on
     interstate commerce ................................................................................................. 13

III. The minimum coverage provision is a valid exercise of Congress's independent
     power under the General Welfare Clause ..................................................................... 19

IV.  The Government's affirmative defenses defeat Virginia's claim ................................... 25

     A.   The Secretary of the Treasury is a necessary and indispensable party ................. 25

     B.   This Court lacks jurisdiction over Virginia's claim ............................................. 28

V.   Virginia misstates the remedies that are available to it ............................................... 29

     A.   Virginia misstates the law governing severability ................................................. 29

     B.   Virginia is not entitled to a permanent injunction ................................................ 33

Conclusion ........................................................................................................................ 37

## Table of Authorities

*Cases:*                                                                         *Page:*

*A. Magnano Co. v. Hamilton,*
   292 U.S. 40 (1934) ................................................................... 22

*Adventure Res., Inc. v. Holland,*
   137 F.3d 786 (4th Cir. 1998) ............................................... 20, 21

*Alaska Airlines, Inc. v. Brock,*
   480 U.S. 678 (1987) ................................................................. 32

*Ayotte v. Planned Parenthood of N. New Eng.,*
   546 U.S. 320 (2006) ........................................................... 29, 30

*Barnett Bank of Marion Cnty., N.A. v. Nelson,*
   517 U.S. 25 (1996) ..................................................................... 7

*Bd. of Trs. of Univ. of Ill. v. United States,*
   289 U.S. 48 (1933) ................................................................... 20

*Berman v. Parker,*
   348 U.S. 26 (1954) ................................................................... 18

*Bob Jones Univ. v. Simon,*
   416 U.S. 725 (1974) ........................................................... 22, 29

*Burroughs v. United States,*
   290 U.S. 534 (1934) ................................................................... 9

*Charles C. Steward Machine Co. v. Davis,*
   301 U.S. 548 (1937) ................................................................. 24

*Child Labor Tax Case,*
   259 U.S. 20 (1922) ........................................................... 21, 23

*Comm. on Judiciary of U.S. House of Representatives v. Miers,*
   542 F.3d 909 (D.C. Cir. 2008) ............................................... 35

*Covenant Media of S.C. v. City of N. Charleston,*
   493 F.3d 421 (4th Cir. 2007) ................................................... 6

*DeWitt v. Hutchins,*
   309 F. Supp. 2d 743 (M.D.N.C. 2004) ................................... 27

*Cases:*                                                                                    *Page:*

*In re Debs,*
   158 U.S. 564 (1895) ........................................................................... 17

*Delta Fin. Corp. v. Paul D. Comanduras & Assocs.,*
   973 F.2d 301 (4th Cir. 1992) ............................................................... 28

*Dep't of Revenue of Mont. v. Kurth Ranch,*
   511 U.S. 767 (1994) ........................................................................... 23

*eBay, Inc. v. MercExchange, LLC,*
   547 U.S. 388 (2006) ........................................................................... 34

*Free Enterprise Fund v. Pub. Co. Accounting Oversight Bd.,*
   130 S. Ct. 3138 (2010) ................................................................. 30, 31

*Gardner v. Gartman,*
   880 F.2d 797 (4th Cir. 1989) ............................................................... 26

*Gibbs v. Babbitt,*
   214 F.3d 483 (4th Cir. 2000) ......................................................... 3, 6, 9

*Golden Gate Rest. Ass'n v. City & County of San Francisco,*
   512 F.3d 1112 (9th Cir. 2008) ............................................................. 35

*Gonzales v. Raich,*
   545 U.S. 1 (2005) ........................................................................ *passim*

*Head Money Cases,*
   112 U.S. 580 (1884) ........................................................................... 25

*Hill v. Wallace,*
   259 U.S. 44 (1922) ............................................................................. 23

*Hodel v. Indiana,*
   452 U.S. 314 (1981) ............................................................................. 9

*Hoffman v. Hunt,*
   126 F.3d 575 (4th Cir. 1997) ............................................................... 15

*Hylton v. United States,*
   3 U.S. (3 Dall.) 171 (1796) ................................................................. 25

*INS v. Chadha,*
   462 U.S. 919 (1983) ........................................................................... 31

*Cases:*                                                                 *Page:*

*Knowlton v. Moore,*
    178 U.S. 41 (1900) ........................................................................ 22, 24

*License Tax Cases,*
    72 U.S. (5 Wall.) 462 (1867) ......................................................... 22

*Loewe v. Lawlor,*
    208 U.S. 274 (1908) ....................................................................... 17

*Luxton v. North River Bridge Co.,*
    153 U.S. 525 (1894) ....................................................................... 11

*M'Culloch v. Maryland,*
    17 U.S. (4 Wheat 316 (1819) ....................................................... 10

*Massachusetts v. Mellon,*
    262 U.S. 447 (1923) ....................................................................... 28

*McCowen v. Jamieson,*
    724 F.2d 1421 (9th Cir. 1984) ....................................................... 26

*Monsanto Co. v. Geertson Seed Farms,*
    130 S.Ct. 2743 (2010) .................................................................... 35

*Nat'l Audubon Soc'y v. Dep't of Navy,*
    422 F.3d 174 (4th Cir. 2005) ......................................................... 33

*Nebraska v. EPA,*
    331 F.3d 995 (D.C. Cir. 2003) ...................................................... 19

*New York v. United States,*
    505 U.S. 144 (1992) ................................................................... 30, 32

*Nourison Rug Corp. v. Parvizian,*
    535 F.3d 295 (4th Cir. 2008) ......................................................... 27

*Nurad, Inc. v. William E. Hooper & Sons Co.,*
    966 F.2d 837 (4th Cir. 1992) ..................................................... 11, 18

*Owens-Illinois, Inc. v. Meade,*
    186 F.3d 435 (4th Cir. 1999) ..................................................... 26, 28

*Pac. Ins. Co. v. Soule,*
    74 U.S. (7 Wall.) 433 (1868) ......................................................... 25

*Cases:*                                                                                    *Page:*

*Rodriguez de Quijas v. Shearson/American Express,*
    490 U.S. 477 (1989) ................................................................................. 1

*Sabri v. United States,*
    541 U.S. 600 (2004) ......................................................................... 10, 12

*Sanchez-Espinoza v. Reagan,*
    770 F.2d 202 (D.C. Cir. 1985) ......................................................... 35

*Simmons v. United States,*
    308 F.2d 160 (4th Cir. 1962) ........................................................... 20

*Smith v. Reagan,*
    844 F.2d 195 (4th Cir. 1988) ........................................................... 35

*Sonzinsky v. United States,*
    300 U.S. 506 (1937) ......................................................................... 21

*Stanley O. Miller Charitable Fund v. Comm'r,*
    89 T.C. 1112 (1987) ......................................................................... 24

*Tanner Advertising Group, LLC v. Fayette Cnty.,*
    451 F.3d 777 (11th Cir. 2006) ......................................................... 30

*Texas v. United States,*
    523 U.S. 296 (1998) ................................................................... 29, 34

*United States ex. rel. Shaw Envtl., Inc. v. Gulf Ins. Co.,*
    225 F.R.D. 526 (E.D.Va. 2005) ....................................................... 26

*United States v. Butler,*
    297 U.S. 1 (1936) ............................................................................. 23

*United States v. City of Huntington,*
    999 F.2d 71 (4th Cir. 1993) ............................................................. 21

*United States v. Comstock,*
    130 S. Ct. 1949 (2010) .......................................................... 9, 10, 12

*United States v. Constantine,*
    296 U.S. 287 (1935) ......................................................................... 23

*United States v. Dean,*
    670 F. Supp. 2d 457 (E.D. Va. 2009) ......................................... 10, 32

*Cases:*                                                                           *Page:*

*United States v. Gould,*
    568 F.3d 459 (4th Cir. 2009) ......................................................... 14

*United States v. LaFranca,*
    282 U.S. 568 (1931) ...................................................................... 22

*United States v. Lopez,*
    514 U.S. at 567 (1995) ............................................................... 9, 12

*United States v. Morrison,*
    529 U.S. 598 (2000) .................................................................. 6, 12

*United States v. Oakland Cannabis Buyers' Coop.,*
    532 U.S. 483 (2001) ...................................................................... 35

*United States v. Ptasynski,*
    462 U.S. 74 (1983) ......................................................................... 25

*United States v. Sanchez,*
    340 U.S. 42 (1950) ..................................................................... 3, 22

*United States v. Sage,*
    92 F.3d 101 (2nd Cir. 1996) ......................................................... 19

*United States v. South-Eastern Underwriters Ass'n,*
    322 U.S. 533 (1944) .................................................................. 7, 17

*United States v. Wrightwood Dairy Co.,*
    315 U.S. 110 (1942) ....................................................................... 9

*Va. Soc'y for Human Life v. FEC,*
    263 F.3d 379 (4th Cir. 2001) ......................................................... 36

*Veazie Bank v. Fenno,*
    75 U.S. 533 (1869) ................................................................... 24, 25

*Wash. State Grange v. Wash. State Republican Party,*
    552 U.S. 442 (2008) ........................................................................ 3

*Weinberger v. Romero-Barcelo,*
    456 U.S. 305 (1982) ................................................................. 33, 35

*West Virginia v. U.S. Dep't of Health & Human Servs.,*
    289 F.3d 281 (4th Cir. 2002) ....................................................... 6, 19

*Cases:*                                                                         *Page:*

*Wickard v. Filburn,*
   317 U.S. 111 (1942) ............................................................................ 4, 14

*Wyoming v. Lujan,*
   969 F.2d 877 (10th Cir. 1992) ....................................................... 28

***Constitution and Statutes:***

U.S. Const. art. I, § 8, cl. 1........................................................................20, 25

U.S. Const. amend. X.................... ......................................................... 12

U.S. Const. amend. XVI ...................................... ..................................24

15 U.S.C § 1012(b) ............................................................................ 7

26 U.S.C. § 138(c) ................................................................... 20

26 U.S.C. § 2001 .................................................................... 24

26 U.S.C. § 4942 .................................................................... 24

26 U.S.C. § 5000A(a) .......................................................... 21, 25

26 U.S.C. § 5000A(b) .......................................................... 21, 25

26 U.S.C. § 5000A(c) ....................................................... 21, 23, 25

26 U.S.C. § 5000A(e) ......................................................... 21, 25

26 U.S.C. § 5000A(g) ........................................................ 5, 23, 26

26 U.S.C. § 5731(c) ................................................................... 20

26 U.S.C. § 6651 .................................................................... 24

26 U.S.C. § 6684 ................................................................... 20

26 U.S.C. § 6702C ................................................................... 20

26 U.S.C. § 7421(a) ................................................................... 29

26 U.S.C. § 7801(a) ........................................................... 5, 26

***Constitution and Statutes:***                                                                      ***Page:***

42 U.S.C. § 4012a ............................................................................................. 18

Pub. L. No. 102-486, §19142(a)(1) (1992) ............................................. 20

Pub. L. No. 111-152, 124 Stat. 1029 (2010)
    § 2001 .......................................................................................... 32
    § 2214 .......................................................................................... 32

Pub. L. No. 111-148, 124 Stat. 119 (2010)
    § 1201........................................................................................7
    § 1332.......................................................................................12
    § 1501(b)............................................................ ................... 5, 26
    § 1501(a)(2)(F).............................................. ................ 14
    § 1501(a)(2)(G)......................................................... 13
    § 1501(a)(2)(I)................................................ ......... 4, 8
    § 2301....................................................... .................... 33
    § 2402....................................................... ................... 33
    § 2405....................................................... ................... 33
    § 2954....................................................... ................... 33
    § 4002....................................................... .................... 33
    § 10106(a)................................................................ .......... *passim*

***Miscellaneous:***

Bradley Herring, *The Effect of the  Availability of Charity Care to the Uninsured on the
    Demand for Private Health Insurance*, 24 J. of Health Econ. 225  (2005) ............................ 16

Centers for Disease Control and Prevention, *Summary Health Statistics for U.S. Children:
    National Health Interview Survey 2008* (2009) ................................................. 16

CONGRESSIONAL BUDGET OFFICE, HOW MANY LACK HEALTH INSURANCE AND FOR HOW
    LONG? (MAY 2003).......................................................................... ..... 16

COUNCIL OF ECONOMIC ADVISERS, ECONOMIC REPORT OF THE
    PRESIDENT (Feb. 2010)........................... ..... ...............................14

75 Fed. Reg. 34,538 (June 17, 2010) ...................................................... 27

75 Fed. Reg. 43,330 (July 23, 2010) ....................................................... 26

***Miscellaneous:***                                                                                    ***Page:***

Federal Rules of Civil Procedure:
      Rule 12(h)(1) ................................................................................. 28
      Rule 12(h)(2) ................................................................................. 28
      Rule 16(b) ..................................................................................... 26
      Rule 19(a) ..................................................................................... 26
      Rule 19(b) ................................................................................ 27, 28
      Rule 19(c) ..................................................................................... 27

*Health Reform in the 21st Century: Insurance Market Reforms: Hearing Before the*
    *H. Comm. on Ways and Means*, 111th Cong. (2009).. ........................................ 7

H.R. Rep. No. 111-443 (2010) ..................................................................... 7, 13, 21

Jonathan Gruber, PUBLIC FINANCE AND PUBLIC POLICY (3d ed. 2009)....................... ............ 15

J.P. Ruger, *The Moral Foundations of Health Insurance*, 100 Q.J. Med. 53 (2007).... ............ 15

June E. O'Neill & Dave M. O'Neill, *Who Are the Uninsured?: An Analysis of America's
Uninsured Population, Their Characteristics, and Their Health* (2009) .................................... 15

Kaiser Fam. Found., *Uninsured and Untreated: A Look at Uninsured Adults Who Received
    No Medical Care for Two Years* (2010) ...................................................................... 16

Katherine Baicker & Amitabh Chandra, *Myths and Misconceptions About U.S. Health
    Insurance*, 27 HEALTH AFFAIRS w533 (2008) ............................................................... 15

Mark V. Pauly, *Risks and Benefits in Health Care: The View from Economics*, 26 HEALTH
    AFFAIRS 653 (2007)................................................................................. ............ 16

Notice 2010-38, 2010-20 I.R.B. 682 (Apr. 27, 2010) ................................................. 27

Paul Starr, THE SOCIAL TRANSFORMATION OF AMERICAN MEDICINE (1982)........... .................. 11

**Introduction**

Virginia places great emphasis on the principle that lower courts cannot overturn

decisions of the Supreme Court.  (Pl.'s Mem. in Supp. of Mot. for Summ. J. at 21-24, citing

*Rodriguez de Quijas v. Shearson/American Express*, 490 U.S. 477 (1989)).  This principle is

true.  But it is Virginia that seeks to resurrect the jurisprudence pre-dating the New Deal, and to

ignore the Supreme Court's precedents in force today.  This Court, however, is bound by the

Supreme Court's current decisions, and they recognize Congressional authority to regulate an

interstate market as massive and vital as the health care market, a market that constitutes one-

sixth of the country's gross domestic product.  That is what the Patient Protection and Affordable

Care Act ("ACA") does.  At one point or another nearly every American will go to a doctor or

visit a hospital.  The minimum coverage provision of the ACA simply regulates how they pay for

those health care services.  Virginia's argument that this regulation of economic activity in this

important interstate market falls outside Congress's Commerce Clause powers rests upon the

mistaken factual premise that the ACA regulates "mere passivity."  As the record amply

demonstrates, this is not true.  No person can guarantee that he will divorce himself entirely from

the market for health care services.  The health care market is distinctive in this respect.  Because

the minimum coverage provision regulates the means of payment in a market in which all are

participants, the Congressional power to enact it does not in any way imply a power to require

individuals to participate in other markets or to take any other action.

Virginia also would have this Court overturn the Supreme Court's current decisions

recognizing Congressional authority to regulate activities with substantial effects on interstate

commerce.  *See, e.g., Gonzales v. Raich*, 545 U.S. 1, 17 (2005).  Virginia does not dispute that

the uninsured use health care services, and that the consumption of health care services by the

uninsured shifts $43 billion in unpaid costs annually to other participants in the market. Nonetheless, Virginia maintains that Congress's regulation of the way in which health care services are paid for does not constitute a valid regulation of activities with substantial effects on interstate commerce.  Virginia cannot disregard controlling precedent by decreeing that the substantial effects on commerce here simply do not count.  Nor can it justify this departure from precedent by pronouncing a new legal rule of its own making, that Congress may not enact any regulation a state could instead adopt under its police powers.  (Pl.'s Mem. 15.)  Supreme Court precedent is, and has long been, to the contrary, as reflected by the scores of areas in which Congress and the states work together in shaping public policy.

Virginia also would upend the Supreme Court's present-day holdings that Congress may adopt measures necessary to ensure the effectiveness of a larger regulation of interstate commerce.  *See Raich*, 545 U.S. at 18.  Virginia does not dispute that the ACA's insurance industry reforms – requiring insurers to accept all Americans, including those with pre-existing medical conditions, for coverage and barring discrimination in premiums based on health status – are well within the Congress's commerce power.  Nor does it dispute that the minimum coverage provision is necessary to make these larger regulations of the interstate market effective.  These concessions themselves provides sufficient basis for upholding the minimum coverage.  Instead of applying the Supreme Court's current case law, Virginia again invents a new rule, arguing that courts may uphold exercises of the commerce power only if they are "deeply historical."  (Pl.'s Mem. 24.)  This new legal rule is not compatible with the ones that currently govern Congressional authority under the Commerce Clause.

In addition, Virginia would have this Court override Supreme Court decisions that renounced the standards used to strike down child labor laws in the 1920s.  Those decisions

2

allow Congress to adopt taxing measures with a regulatory purpose so long as they raise revenues for the support of the government. *E.g., United States v. Sanchez*, 340 U.S. 42, 44-45 (1950). The Supreme Court has applied the same legal standard in reviewing such measures for the last 60 years, and the minimum coverage provision readily satisfies it. The provision raises revenue for the general treasury by creating a tax penalty that is added to the taxpayer's annual tax liability if the taxpayer does not maintain minimum coverage.

Lastly, Virginia seeks to have this Court disregard the Supreme Court's repeated admonitions that a facial challenge to a federal statute can prevail only if the plaintiff can prove that the statute is not capable of *any* constitutional applications. *See Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008). Instead, Virginia argues that the facial nature of its challenge distinguishes away cases like *Raich,* which, the Commonwealth claims, is inapposite because it was merely an as-applied challenge, *e.g.*, Pl.'s Mem. 14. But the law for many decades has recognized that it is immeasurably *more* difficult for a plaintiff to prevail in a facial challenge than in an as-applied challenge. In bringing a facial challenge, Virginia ignores the fatal flaw that many applications of the minimum coverage provision would be constitutional even under the Commonwealth's newly-invented tests.

Virginia's departures from current Supreme Court precedent reflect an overall approach that reverses the polarity of constitutional jurisprudence. It asserts that this Court is free to strike down the ACA because no previous case has upheld a precisely parallel provision. The law, though, is just the opposite. This Court must presume the constitutionality of federal legislation. *See, e.g.*, *Gibbs v. Babbitt*, 214 F.3d 483, 490 (4th Cir. 2000). Virginia cannot overcome this heavy presumption by creating its own rules, or by trying to resurrect rules that the Supreme Court has long since rejected. Virginia cannot meet its heavy burden to show that the ACA is

unconstitutional in any of its applications, let alone in all of them.  Virginia's summary judgment

motion should be denied, and the Secretary's motion should be granted.

### Response to Plaintiff's Statement of Material Facts

1.  The Secretary does not dispute that the Virginia legislature has enacted Virginia Code

§ 38.2-3430.1:1, but disputes that the statute is more than declaratory.  In any event, the statute is

not material.  State law cannot revoke powers granted by the Constitution to Congress.  *Raich*,

545 U.S. at 29 ("Just as state acquiescence to federal regulation cannot expand the bounds of the

Commerce Clause, so too state action cannot circumscribe Congress' plenary commerce

power.") (internal citations omitted); *see also Wickard v. Filburn*, 317 U.S. 111, 124 (1942) ("no

form of state activity can constitutionally thwart the regulatory power granted by the commerce

clause to Congress").

2.  The Secretary does not dispute that Virginia has accurately quoted the text of Virginia

Code § 38.2-3430.1:1.  For the reasons stated in paragraph 1 above, this fact is not material.

3.  The Secretary does not dispute that Congress has enacted the Patient Protection and

Affordable Care Act ("ACA"), Pub. L. No. 111-148, 124 Stat. 119 (2010).

4.  The Secretary disputes this statement, as it mischaracterizes the cited material.  The

Secretary does not dispute the findings that Congress actually made.  Congress found that,

without a minimum coverage provision, the insurance market reforms in the Act, such as the ban

on denying coverage to persons because of pre-existing conditions or charging more on the basis

of those conditions, would amplify existing incentives for individuals to "wait to purchase health

insurance until they needed care," thereby shifting greater costs onto third parties.  ACA,

§§ 1501(a)(2)(I), 10106(a).  Congress accordingly found that the minimum coverage provision

"is an essential part of [the Act's] larger regulation of economic activity," and that its absence

"would undercut Federal regulation of the health insurance market."  *Id.* §§ 1501(a)(2)(H), 10106(a).  Congress did not find that the minimum coverage provision was essential to every element of the ACA.

5.  The Secretary does not dispute that no single provision of the ACA explicitly addresses severability.  This statement is not material, however, for the reasons discussed below at pages 29-33.

6.  The Secretary disputes this statement.  She is responsible for the administration of a number of the provisions of the ACA.  However, the Secretary of the Treasury administers the minimum coverage provision at issue in this suit.  ACA, § 1501(b) (adding 26 U.S.C. § 5000A(g)); *see* 26 U.S.C. § 7801(a).  The Secretary of the Treasury is not a party in this suit.

7.  The Secretary disputes this statement.  The Senate Finance Committee asked the Congressional Research Service ("CRS") to prepare a report addressing the constitutionality of the minimum coverage provision, and CRS concluded in its report that Congress could use its power under the General Welfare Clause to enact the minimum coverage provision.  The Secretary disputes that the minimum coverage provision is "unprecedented."  This statement, in any event, is not material.

8.  The Secretary does not dispute that the Senate adopted the ACA by a vote of 60-39, and the House of Representatives adopted it by a vote of 219-212.  This fact, however, is not material.  The constitutionality of a statute adopted by a majority vote of both Houses of Congress and signed by the President does not turn on the partisan affiliations of the proponents or the opponents of the statute.

9.  The Secretary does not dispute that the Virginia legislature has enacted Virginia Code § 38.2-3430.1:1.  This fact is not material, however, nor are the party affiliations of the Virginia

legislators who voted for and against this legislative statement of position, for the reasons set forth in paragraphs 1 and 8 above.

10.  The Secretary disputes this statement.  The minimum coverage provision does not impose any burdens or obligations on Virginia as a state.  Any actions that Virginia may undertake as a state pursuant to other provisions of the ACA are irrelevant to its standing to challenge the minimum coverage provision.  "[A] plaintiff must establish that he has standing to challenge *each provision* of [a statute] by showing that he was injured by application of *those provisions*."  *Covenant Media of S.C. v. City of N. Charleston*, 493 F.3d 421, 430 (4th Cir. 2007) (emphasis added).

## Argument

As Virginia recognizes, it bears the burden to prove its entitlement to relief.  (Pl.'s Mem. 1.)  Virginia, however, does not bear just the ordinary burden of any plaintiff that seeks summary judgment.  Instead, because it seeks a declaration that a federal statute, duly enacted by the elected representatives of the people, is unconstitutional, it must make "'a plain showing that Congress has exceeded its constitutional bounds.'"  *Gibbs*, 214 F.3d at 490 (quoting *United States v. Morrison*, 529 U.S. 598, 607 (2000)).  And because Virginia brings a facial challenge to the statute, it "has a very heavy burden to carry, and must show that the [statute] cannot operate constitutionally under any circumstance."  *West Virginia v. U.S. Dep't of Health & Human Servs.*, 289 F.3d 281, 292 (4th Cir. 2002).

Virginia cannot carry this very heavy burden.  Indeed, it has not even attempted to do so, as its statement of facts alleges only the existence of its state statute and the existence of the ACA.  Virginia nowhere attempts to allege any factual support whatsoever for its extraordinary assertion that the ACA is not only unconstitutional, but that it is unconstitutional in every

possible application.  Virginia's summary judgment motion fails because it has not sustained its

burden of proof, and because its claims rest on legal propositions that either are no longer the

law, or never have been.

I.      **Congress Validly Exercised Its Commerce Power to Enact the Minimum Coverage Provision, because the Provision Is Integral to the ACA's Larger Regulatory Scheme**

Congress enacted the ACA to address a national crisis – an interstate health care market

in which tens of millions of Americans went without insurance coverage and in which the costs

of medical treatment spiraled out of control.  As part of a comprehensive reform effort to reduce

the ranks of the uninsured, the ACA regulates economic decisions regarding the way in which

health care services are paid for.  The Act regulates payment for those services through

employer-sponsored health insurance; through governmental programs such as Medicaid; and

through insurance sold to individuals or to small groups in the new exchanges.  The Act also

regulates the terms of health insurance policies, ending industry practices that have denied

insurance to and inflicted burdens on many people, most notably the refusal to insure persons

because of pre-existing medical conditions.  As the Secretary explained in her opening brief,

these reforms directly regulate the interstate market in health insurance, and so fall well within

Congress's authority to regulate that market under its commerce power.  *See United States v.*

*South-Eastern Underwriters Ass'n*, 322 U.S. 533, 552-53 (1944).[1]

In particular, the ACA enacts new reforms of insurance industry practices to address a

market failure in the individual and small group markets.  The Act prevents insurers from

---

[1] Nor is the McCarran-Ferguson Act implicated.  The Act as a whole, and the minimum coverage provision in particular, addresses "the relation of insured to insurer and the spreading of risk" and thus falls within the savings clause of 15 U.S.C § 1012(b) for federal statutes that have preemptive effect over state insurance regulations.  *See Barnett Bank of Marion Cnty., N.A. v. Nelson*, 517 U.S. 25, 39 (1996).  Contrary to Virginia's claim, Pl.'s Mem. 16 n.1, there is no "express waiver" rule under the McCarran-Ferguson Act.  *See id.* at 43.

denying or revoking coverage for those with pre-existing conditions, and it prevents insurers from charging discriminatory rates for persons because of those conditions.  ACA, § 1201. Congress reasonably determined these "guaranteed issue" and "community rating" reforms to be necessary to create a functioning market.  Absent these reforms, insurers would be unable on their own to extend coverage to those who need it, and further would be unable to address the high premiums that inevitably result from their need to individually underwrite health insurance policies.  *See Health Reform in the 21st Century: Insurance Market Reforms: Hearing Before the H. Comm. on Ways and Means*, 111th Cong. 53 (2009) (Linda Blumberg, Senior Fellow, Urban Inst.); *see also* H.R. REP. NO. 111-443, pt. II, at 990 (2010).  With these reforms, however, all Americans will be insurable, and all Americans will have protection against the risk of being unable to obtain (or of losing) insurance in the event of unexpected and possibly catastrophic illness or injury.

Congress also determined that the minimum coverage provision of Section 1501 is necessary to give effect to these insurance industry reforms.  If the bar on denying coverage to or charging more for people because of pre-existing conditions were not coupled with a minimum coverage provision, individuals would have powerful incentives to wait until they fall ill before they purchase health insurance.  ACA, §§ 1501(a)(2)(I), 10106(a).  Instead of creating a functioning health insurance market that alleviates the inequities in the current market and extends affordable coverage to more people, the industry reforms without the minimum coverage opinion would create a spiral of rising premiums and a declining number of individuals covered. The minimum coverage provision thus is "'an essential part of a larger regulation of economic activity, in which the regulatory scheme could be undercut unless the intrastate activity were

regulated,'" and is well within the commerce power. *Raich*, 545 U.S. at 24-25 (quoting *United States v. Lopez*, 514 U.S. 549, 561 (1995)); *see also Gibbs*, 214 F.3d at 497.

Virginia does not dispute that the insurance industry reforms are within the commerce power.  Nor does it dispute that the minimum coverage provision is necessary to make these larger regulations of the interstate market effective.  Indeed, it concedes that the minimum coverage provision is "essential" to the ACA's regulatory scheme, Compl. ¶ 5, and devotes a large portion of its briefing to a reiteration of its agreement with the government on this point. (Pl.'s Mem. 25-28.)  Its concessions establish that Congress acted within its commerce power. For the provisions of "'[a] complex regulatory program'" to fall within the commerce power, "'[i]t is enough that the challenged provisions are an integral part of the regulatory program and that the regulatory scheme when considered as a whole satisfies this test.'"  *Gibbs*, 214 F.3d at 497 (quoting *Hodel v. Indiana*, 452 U.S. 314, 329 n.17 (1981)); *see also United States v. Dean*, 670 F. Supp. 2d 457, 460 (E.D. Va. 2009).

For similar reasons, the minimum coverage provision is a valid exercise of Congress's authority under the Necessary and Proper Clause.  If Congress has authority to enact a regulation of interstate commerce – as it plainly does for its regulations of the terms on which insurers offer health insurance products on the interstate market – "it possesses every power needed to make that regulation effective."  *United States v. Wrightwood Dairy Co.*, 315 U.S. 110, 118-19 (1942). "'If it can be seen that the means adopted are really calculated to attain the end, the degree of their necessity, the extent to which they conduce to the end, the closeness of the relationship between the means adopted and the end to be attained, are matters for congressional determination alone.'"  *United States v. Comstock*, 130 S. Ct. 1949, 1957 (2010) (quoting *Burroughs v. United States*, 290 U.S. 534, 547-48 (1934)).

So long as a provision is rationally related to the implementation of an enumerated power, it must be sustained under the Necessary and Proper Clause, absent a claim that the provision violates some independent constitutional prohibition.  *See, e.g.*, *Sabri v. United States*, 541 U.S. 600, 605 (2004); *Dean*, 670 F. Supp. 2d at 460-61.  The Act's "guaranteed issue" and "community rating" reforms of the insurance market are, unquestionably, exercises of the commerce power.  The minimum coverage provision is not only rationally related, but is "essential," to the implementation of these reforms.  And Virginia does not – because it cannot – claim that the minimum coverage provision violates the Due Process Clause or any other independent constitutional prohibition.  That is the end of the matter.

Virginia nonetheless argues that *Comstock*, without saying so, overthrew centuries of precedent and demanded a heightened standard of review for exercises of power under the Necessary and Proper Clause.  (Pl.'s Mem. 17.)  *Comstock* did no such thing.  It instead reiterated the "breadth" of that clause, reciting the long line of cases since *M'Culloch v. Maryland*, 17 U.S. (4 Wheat) 316 (1819), establishing that Congress – not the courts and not Virginia – gets to choose how to implement its enumerated powers, so long as its choices have a rational basis.  *See Comstock*, 130 S. Ct. at 1957.  The remainder of what Virginia inflates into a "five part test," (Pl.'s Mem. 17), consisted of the reasons establishing why, in that specific case, the system of civil commitment procedures at issue there was rationally connected to the implementation of congressional powers, even though – unlike *Raich* and unlike this case – those procedures did not directly further a scheme authorized by a specific enumerated power.

In any event, Virginia cannot meet even the "five part test" it invents.  For example, despite its repeated concessions that the minimum coverage provision is "essential" to the ACA's insurance industry reforms, the Commonwealth now backtracks to claim that "the

rationality of the ends-means fit is weak" because there is a traditional "dislike" of compelled transactions.  (Pl.'s Mem. 17.)  Likes or dislikes, however, whether contemporary or historical, are not the constitutional measure of Congress's legislative choices.  By importing this question of policy preferences, Virginia misreads the rational basis test under the Commerce Clause and under the Necessary and Proper Clause.  Virginia also ignores, among other things, the long-established authority of Congress to exercise eminent domain – that is, the power to compel a transaction – in furtherance of Commerce Clause regulations, *see Luxton v. N. River Bridge Co.*, 153 U.S. 525, 529-30 (1894); the long list of insurance-purchase requirements in the United States Code; and the 30-year-old Superfund Act, which compels property owners to enter into transactions to remedy contamination on their properties, *see Nurad, Inc. v. William E. Hooper & Sons Co.*, 966 F.2d 837, 845 (4th Cir. 1992).  (*See* Def.'s Mem. in Supp. of Mot. for Summ. J. at 36-38.)

Virginia also argues that the minimum coverage provision is invalid because "the history of federal involvement is nonexistent" and because the provision is "not a reasonable extension of a pre-existing practice."  (Pl.'s Mem. 17.)  These arguments, again, are irrelevant under the governing law, which looks only to whether the provision is rationally connected to the implementation of the commerce power – a standard that the minimum coverage provision plainly meets.  The arguments are also factually wrong.  The federal government has regulated the field of health insurance for decades, *see* Def.'s Mem. at 23 n.4, indeed, for the entire period the national health care and health insurance markets have existed in their current form.[2]

Virginia next asserts that the minimum coverage provision is not valid because it is "in competition with" the state's exercise of their police powers.  (Pl.'s Mem. 17.)  But the same

---

[2] *See, e.g.,* Paul Starr, THE SOCIAL TRANSFORMATION OF AMERICAN MEDICINE 320-27 (1982) (describing growth of national commercial health insurance market after World War II).

could be said of *many* exercises of Congressional power.  As *Comstock* itself makes clear, "[t]he powers 'delegated to the United States by the Constitution' include those specifically enumerated powers listed in Article I along with the implementation authority granted by the Necessary and Proper Clause.  Virtually by definition, these powers are not powers that the Constitution 'reserved to the States.'"  130 S. Ct. at 1962 (quoting U.S. CONST. amend. X.)  If a measure is rationally related to the implementation of other enumerated powers, it is valid under the Necessary and Proper Clause, and the Tenth Amendment is not implicated at all.[3]

Last, Virginia argues that the minimum coverage provision cannot be valid because it rests on a claim of a "national police power" for which there is "no principled limit."  (Pl.'s Mem. 17, 23-24.)  But the limits of Congress's commerce powers are set forth in Supreme Court precedent, and the minimum coverage provision falls well within them.  Under *Lopez* and *Morrison*, the Supreme Court has recognized that Congress may not use the Commerce Clause to regulate a purely non-economic subject matter, if that subject matter bears no more than an "attenuated" connection to interstate commerce, and if the regulation does not form part of a broader scheme of economic regulation.  *Morrison*, 529 U.S. at 615; *Lopez*, 514 U.S. at 567 (Congress may not "pile inference upon inference" to find a link between the regulated activity and interstate commerce).

In contrast to *Lopez* and *Morrison*, "[n]o piling is needed here to show that Congress was within its prerogative" to regulate interstate commerce.  *Sabri*, 541 U.S. at 608.  The ACA does not depend on "attenuated" links between its subject matter and interstate commerce.  It instead

---

[3]  The Act permits a state to apply to waive the operation of certain of its provisions, including the minimum coverage provision, within its borders if the state can establish that an alternative plan would provide comprehensive coverage.  ACA, § 1332.  Given this procedure, it is hard to understand Virginia's claim that the ACA does not make an "accommodation of state interests."  (Pl.'s Mem. 17.)

directly regulates an economic subject matter, the financing of payments in a unique market – the market for health services in which all participate and in which all bear (in the absence of insurance) the risk of large, unexpected, and unpredictable expenses that they will shift to the rest of the population.  Virginia, despite bearing the burden of proof at this stage, nowhere has disputed the obvious point that financing decisions within this market are "economic"; indeed, it expressly, and properly, concedes that they are.  Compl. ¶ 14.  Despite its burden of proof, Virginia also does not and cannot dispute that these economic decisions have clear and direct effects on the larger economy, through a surfeit of personal bankruptcies, *see* ACA, §§ 1501(a)(2)(G), 10106(a); through the phenomenon of "job lock," in which many people avoid changing employment for fear of losing coverage, *see* COUNCIL OF ECONOMIC ADVISERS ("CEA"), THE ECONOMIC CASE FOR HEALTH CARE REFORM 36-37 (June 2009); and through the shifting of costs on to the providers, taxpayers, and the insured population who ultimately, and inevitably, pay for the care that is provided to those who go without insurance, *see* H.R. REP. NO. 111-443, pt. II, at 983 (2010).  Nor, despite its burden of proof, has Virginia ever disputed (indeed, it expressly concedes) that the minimum coverage provision is an essential part of the Act's larger reforms of the interstate health insurance market.

In sum, *Lopez* and *Morrison* amply explain the distinctions between the Congressional commerce power and the claim of a "national police power" that Virginia fears.  The ACA falls well within the former, and in no way implicates the latter.

## II.   Congress Validly Exercised Its Commerce Power to Enact the Minimum Coverage Provision, because the Provision Regulates Conduct with Substantial Effects on Interstate Commerce

Even if viewed in isolation from the larger statutory scheme of which it is a part, the minimum coverage provision is well within Congress's commerce power, as it regulates conduct

with substantial effects on interstate commerce.  As noted above, *Raich* reaffirms that the Commerce Clause affords Congress broad authority to "regulate activities that substantially affect interstate commerce."  545 U.S. at 16-17.  This includes power not only to regulate markets directly, but also to regulate even non-commercial matters that have clear and direct economic effects.  "'But even if appellee's activity be local and though it may not be regarded as commerce, it may still, whatever its nature, be reached by Congress if it exerts a substantial economic effect on interstate commerce.'"  *United States v. Gould*, 568 F.3d 459, 472 (4th Cir. 2009), *cert. denied*, 130 S. Ct. 1686 (2010) (quoting *Wickard v. Filburn*, 317 U.S. 111, 125 (1942)).  The question is only whether Congress could rationally find that the class of activities it seeks to regulate has, in the aggregate, a substantial and direct effect on interstate commerce. *See Raich*, 545 U.S. at 22.

The Secretary has already explained the numerous substantial effects on interstate commerce that arise from economic decisions regarding how to pay for health care services.  In the aggregate, decisions to forego insurance coverage and instead attempt to pay for health care out of pocket drive up the cost of insurance and hinder small employers in providing coverage to their employees.  The costs of caring for the uninsured who prove unable to pay, $43 billion in 2008 alone, are shifted to providers, to the insured population in the form of higher premiums, to governments, and to taxpayers.  ACA, §§ 1501(a)(2)(F), 10106(a); *see also* CEA, ECONOMIC REPORT OF THE PRESIDENT 187 (Feb. 2010).

As noted, despite its burden of proof, Virginia nowhere disputes that the uninsured consume tens of billions of dollars in uncompensated care each year, or that the uninsured shift their costs onto other participants in the health care market.  This resolves the matter, because Congress may regulate activity that, in the aggregate, imposes substantial and direct burdens on

14

an interstate market.  *See, e.g.*, *Hoffman v. Hunt*, 126 F.3d 575, 583-88 (4th Cir. 1997).  Virginia

instead attempts to sidestep this point by asserting that the decision as to how to finance one's

health care needs is "mere passivity."  (Pl.'s Mem. 8.)

But Virginia cannot rest on such assertions to satisfy its burden of proof on summary

judgment.  Contrary to Virginia's assertions, the record that actually exists amply refutes the

notion that the uninsured, as a class, are "passive."  The health care market is unlike any other

market, because no one can guarantee that he will not participate in it.  Indeed, no one can

guarantee that he will not, without warning, suffer catastrophic illness or injury, which, in the

absence of insurance, would impose enormous costs on other market participants.  *See* J.P.

Ruger, *The Moral Foundations of Health Insurance*, 100 Q.J. MED. 53, 54-55 (2007).  And

health insurance is not an independent consumer product, but instead is a method to manage the

risks that are inherent in the unique health care market.  *See* Katherine Baicker & Amitabh

Chandra, *Myths and Misconceptions About U.S. Health Insurance*, 27 HEALTH AFFAIRS w533,

w534 (2008); Jonathan Gruber, PUBLIC FINANCE AND PUBLIC POLICY 442-28 (3d ed. 2009).  The

uninsured simply do not sit "passively" apart from a health care market in which all, inevitably,

participate.

Congress was not required to ignore these facts.  But even if one were to consider only

the present-day behavior of the uninsured, it is apparent that, as a class, they in no way sit

"passively" apart from the health care market.  To the contrary, the vast majority of the

uninsured have engaged, and will continue to engage, in the economic activity of seeking and

receiving health care services.  *See* June E. O'Neill & Dave M. O'Neill, *Who Are the*

*Uninsured?: An Analysis of America's Uninsured Population, Their Characteristics, and Their*

*Health*, at 14-15, 20-22 (2009).[4]  Likewise, the vast majority of the uninsured do not sit

"passively" in relation to the health insurance market.  Instead, movement in and out of

insurance coverage is "highly fluid," with a substantial majority of those without insurance

coverage at any given point in time in fact moving in and out of coverage, and having had

coverage at some point within the same year.  CBO, HOW MANY LACK HEALTH INSURANCE AND

FOR HOW LONG?, at 4, 9 (May 2003); *see also* CBO, KEY ISSUES IN ANALYZING MAJOR HEALTH

INSURANCE PROPOSALS, at 11 (Dec. 2008).  Those who go without insurance coverage, including

those who migrate in and out of insurance coverage, necessarily make economic assessments that

compare the relevant advantages of market insurance against those of other means of attempting

to pay for health care services in a particular period.  *See* Mark V. Pauly, *Risks and Benefits in*

*Health Care: The View from Economics*, 26 HEALTH AFFAIRS 653, 657-58 (2007); Bradley

Herring, *The Effect of the Availability of Charity Care to the Uninsured on the Demand for*

*Private Health Insurance*, 24 J. OF HEALTH ECON. 225, 226 (2005).

 As Congress reasonably found, individuals who attempt to finance their health care costs

through means other than insurance are routinely unable to pay their costs, and they shift those

costs on to other participants in the health care market.  As noted above, by even a conservative

estimate, in 2008 alone, the uninsured shifted $43 billion of their health care costs on to other

participants in the health care market, including providers, insurers, consumers, governments,

and, ultimately, taxpayers.  The conduct of the uninsured – their economic decisions as to how to

---

[4]  *See also* Kaiser Fam. Found., *Uninsured and Untreated: A Look at Uninsured Adults Who Received No Medical Care for Two Years*, at 1 (2010) (www.kff.org/uninsured/upload/ 8083.pdf) (noting that 62% of the uninsured below 133% of the Federal Poverty Level have used some medical care in the last two years); Centers for Disease Control and Prevention, *Summary Health Statistics for U.S. Children: National Health Interview Survey 2008*, at 37, tbl. 13 (2009) (www.cdc.gov/nchs/data/series/sr_10/sr10_244.pdf) (noting that nearly half of uninsured children had seen a doctor in the last six months and 85% had seen a doctor in the last two years).

finance their health care needs, their active use of the health care system, their migration in and out of coverage, and their shifting of costs on to the rest of the system when they cannot pay – plainly is economic activity. Indeed, the uninsured are even more directly engaged in economic activity than the plaintiffs in *Raich*, who consumed only home-grown marijuana and had no intent to enter the marijuana market.

Congress is not powerless to address the shifting of the bill for the uninsured population's health care costs. Virginia's claim to the contrary depends on an extended analogy to the colonial-era practice of boycotts. (Pl.'s Mem. 8-12.) Because members of the colonies regularly entered into boycott agreements – that is, agreements not to purchase a good or a product – Virginia reasons, the Commerce Clause cannot be read to authorize the regulation of that practice. By analogy, Virginia further reasons that the Commerce Clause also cannot be read to authorize the minimum coverage provision. But Congress plainly has the power to regulate boycotts as restraints of trade, and indeed that power was recognized even before the New Deal Court. *See, e.g.*, *Loewe v. Lawlor*, 208 U.S. 274, 301-02 (1908) (secondary boycott by labor union unlawful under Sherman Act); *In re Debs*, 158 U.S. 564, 586 (1895) (boycott of railroad operators unlawful under Interstate Commerce Act of 1887). *See also South-Eastern Underwriters Ass'n*, 322 U.S. at 535 (boycott of insurer unlawful under Sherman Act).

Virginia's claim, then, ultimately depends on its insistence that the choice of one method to finance one's inevitable health care expenditures is "passivity," while the choice of another method is "activity." Congressional power does not turn on Virginia's characterizations. But if it did, numerous nonsensical results would follow. Virginia must acknowledge, for example, that even under its theory an individual who receives health care services has engaged in economic activity, and Congress could regulate at that time how the individual pays. But under

Virginia's theory, in which one method of payment is "passivity" beyond the commerce power, it would be unclear whether Congress could regulate payment by a person who has a doctor's appointment scheduled for tomorrow, a week from now, or a year from now.  Likewise, Virginia must acknowledge that even under its own theory, an individual who currently has an insurance policy is engaged in economic activity.  But Virginia's approach would leave it unclear whether an individual became "passive," and therefore supposedly beyond the reach of the commerce power, if he dropped his policy yesterday, a week ago, or a year ago.  These are not the types of question on which constitutional powers should turn, yet they flow inevitably from Virginia's theory.

In fact, Congress's commerce power has never turned on whether a creative party could describe his conduct as "active" or "passive."  A property owner, for example, cannot exempt himself from Superfund regulation by claiming that he was only "passive" in allowing contamination on his property.  *Nurad, Inc.*, 966 F.2d at 845.  The subjects of the numerous insurance-purchase requirements in the United States Code could not exempt themselves from those requirements by calling themselves "passive."  *See, e.g.,* 42 U.S.C. § 4012a.  Nor could a property owner call himself "passive" and defeat Congress's exercise of its eminent domain power to require a transaction, where Congress does so in furtherance of its commerce powers. *See, e.g., Berman v. Parker*, 348 U.S. 26, 33 (1954).

The relevant standard, then, is simply whether the target of regulation has substantial and direct effects on interstate commerce.  Here, the decisions regarding how to pay for health care do have those effects, and, under *Raich*, regulation of those decisions is valid under the Commerce Clause.  *See Raich*, 545 U.S. at 16-17.  Virginia attempts to avoid the result dictated by *Raich* by asserting that that case involved an as-applied challenge, whereas this case involves

a facial challenge. (Pl.'s Mem. 14-15.) This is true. Indeed, as the minimum coverage provision

does not apply to Virginia, the Commonwealth could *only* bring a facial challenge. But far from

helping Virginia's claim, the point is fatal. The Commonwealth's burden is immensely *more*

difficult in this facial challenge. In an as-applied challenge, a plaintiff need only show that a

statute has unconstitutionally been applied to him; in this facial challenge, Virginia must show

the statute to be unconstitutional in *all* of its applications. *West Virginia v. U.S. Dep't of Health*

*& Human Servs.*, 289 F.3d at 292. *See also Nebraska v. EPA*, 331 F.3d 995, 998 (D.C. Cir.

2003) (rejecting facial Commerce Clause challenge to federal statute); *United States v. Sage*, 92

F.3d 101, 106 (2d Cir. 1996) (same). The minimum coverage provision validly regulates a class

of persons whose conduct, in the aggregate, substantially affects interstate commerce. Thus,

under *Raich*, the provision is valid both facially and in any of its possible applications. But even

under Virginia's invented theory of "passivity," the statute covers individuals who are engaged

in economic activity – those who migrate in and out of insurance coverage or who are using and

being charged for medical services. Indeed, for Virginia's facial challenge to succeed under its

theory, this Court would have to conclude that no uninsured individual would ever use or be

charged for medical services, and that no uninsured individual would ever make an active

decision whether to purchase insurance. Because such a showing cannot be made, Virginia's

facial challenge must fail.

## III.   The Minimum Coverage Provision Is a Valid Exercise of Congress's Independent Power under the General Welfare Clause

The minimum coverage provision falls within Congress's Article I authority for a third

reason. The provision prescribes a tax penalty, to be reported and paid with an individual's

annual tax return, for the failure to obtain qualifying insurance coverage. In addition to its power

to regulate conduct with substantial effects on interstate commerce and to adopt provisions

necessary and proper to the regulation of commerce, Congress has independent authority under the General Welfare Clause, U.S. CONST. art. I, § 8, cl. 1, to enact the provision. Virginia repeats the series of arguments that it has raised before, in an attempt to defeat this independent basis of authority. None of its arguments has any force.

*First*, Virginia argues that Congress did not intend to exercise its General Welfare Clause authority at all, because it denominated the minimum coverage provision as a "penalty" and not as a "tax." (Pl.'s Mem. 18.) But "it has been clearly established that the labels used do not determine the extent of the taxing power." *Simmons v. United States*, 308 F.2d 160, 166 n.21 (4th Cir. 1962). The substance of the provision instead controls over any labels.[5] As the Secretary has previously explained, Def.'s Mem. at 43, and as the Fourth Circuit has recognized, a provision may qualify as an exercise of the taxing power even where Congress has made findings under the Commerce Clause in support of that provision. *See Adventure Res., Inc. v. Holland*, 137 F.3d 786, 794 (4th Cir. 1998) (Coal Act premiums are taxes); Pub. L. No. 102-486, § 19142(a)(1) (1992) (finding with regard to Coal Act that "the production, transportation, and use of coal substantially affects interstate and foreign commerce and the national public interest").[6]

In substance, a tax is "[a]n involuntary pecuniary burden, regardless of name, laid upon individuals or property" for the purpose of supporting the government. *United States v. City of*

---

[5] Numerous provisions in the Internal Revenue Code impose assessments that are described as "penalties." *See, e.g.*, 26 U.S.C. §§ 138(c)(2); 5731(c); 6684; 6720C. The constitutionality of these exercises of the General Welfare Clause power is not in doubt.

[6] Virginia's contrary argument turns on its misreading of another pre-New Deal case. (Pl.'s Mem. 18, quoting *Bd. of Trs. of Univ. of Ill. v. United States*, 289 U.S. 48, 58 (1933)). That case held, unexceptionally, that a statute that could be valid under both the commerce power and the taxing power was not subject to constitutional limits on one of those powers – there, the since-overturned prohibition of federal taxes on state instrumentalities. *Id.*

*Huntington*, 999 F.2d 71, 73 n.4 (4th Cir. 1993); *see also Adventure Res., Inc.*, 137 F.3d at 794.

The minimum coverage provision easily meets this standard.  The substantial revenues derived

from the provision are paid into the general treasury.  Further, the provision is codified in the

Internal Revenue Code in a subtitle labeled "Miscellaneous Excise Taxes."  The penalty, if it

applies, is reported with the taxpayer's annual return.  26 U.S.C. § 5000A(b)(2).  The income

threshold for the penalty to apply is based on the statutory threshold requiring individuals to file

income tax returns.  26 U.S.C. § 5000A(e)(2).  If the penalty applies, it is calculated by reference

to the individual's household income for federal tax purposes.  26 U.S.C. § 5000A(c)(1), (2).

The taxpayer's responsibility for family members turns on their status as dependents under the

Internal Revenue Code.  26 U.S.C. § 5000A(a), (b)(3).  Congress thus treated the provision as an

exercise of its taxing power in addition to its commerce power.  *See* H.R. REP. NO. 111-443, pt. I

at 265 (2010) (describing taxing provision).[7]

    *Second*, Virginia argues that the minimum coverage provision has a regulatory purpose

and therefore cannot be sustained as an exercise of the taxing power.  (Pl.'s Mem. 19.)  But

"[e]very tax is in some measure regulatory" to the extent "it interposes an economic impediment

to the activity taxed as compared with others not taxed."  *Sonzinsky v. United States*, 300 U.S.

506, 513 (1937).  Congress thus may exercise the taxing power, even if it acts with a regulatory

purpose, and even if that regulatory purpose is beyond its Commerce Clause authority.  "'From

the beginning of our government, the courts have sustained taxes although imposed with the

collateral intent of effecting ulterior ends which, considered apart, were beyond the constitutional

---

[7]  As noted by the bipartisan Joint Committee on Taxation, the penalty under the minimum coverage provision is "assessed through the Code and accounted for as *an additional amount of Federal tax owed*," JCX-18-10, at 33 (emphasis supplied), pursuant to "IRS authority *to assess and collect taxes* . . . generally provided in subtitle F, 'Procedure and Administration' in the Code."  *Id.* at 33 n.68.

power of the lawmakers to realize by legislation directly addressed to their accomplishment.'" *United States v. Sanchez*, 340 U.S. 42, 44-45 (1950) (quoting *A. Magnano Co. v. Hamilton*, 292 U.S. 40, 47 (1934)).  Congress's power to impose regulatory taxes – even taxes that regulate conduct assumed to be beyond the commerce power – was not invented by the New Deal Court. It instead has long been recognized.  *See Knowlton v. Moore*, 178 U.S. 41, 59-60 (1900) (Congress can, with a regulatory purpose, tax inheritances, even assuming that it could not directly regulate inheritances under the Commerce Clause); *License Tax Cases*, 72 U.S. (5 Wall.) 462, 470-71 (1867) (Congress can, with a regulatory purpose, tax the business of selling lottery tickets or liquor, even assuming it could not regulate the business directly).

Virginia's fallback argument is that, if Congress generally has the power to impose regulatory taxes, there is some category of such taxes that could only be imposed under the commerce power.  (Pl.'s Mem. 21, citing *Child Labor Tax Case*, 259 U.S. 20 (1922)).  Virginia contends that the *Lochner*-era cases in support of this theory have not been overruled by the Supreme Court, and so are binding on this Court.  But the Supreme Court has expressly and unequivocally "abandoned" its earlier "distinctions between regulatory and revenue-raising taxes," citing specifically the cases that Virginia now relies on.  *Bob Jones Univ. v. Simon*, 416 U.S. 725, 741 n.12 (1974).  That the Supreme Court used the term "abandoned" rather than "overruled" hardly helps Virginia's position.

Even if these antiquated cases had survived, however, they would not be relevant here. Those cases, for example, reviewed exercises of the taxing power to determine if they were instead "punishments for an unlawful act."  *United States v. LaFranca*, 282 U.S. 568, 572 (1931); *see also Dep't of Revenue of Mont. v. Kurth Ranch*, 511 U.S. 767, 781 (1994).  The minimum coverage provision does not impose any criminal "punishment"; indeed, it makes clear

that a criminal prosecution cannot lie for a failure to obtain coverage.  26 U.S.C.

§ 5000A(g)(2)(A).  The minimum coverage provision lacks other hallmarks of criminal

punishment that were relied on by the *Lochner*-era cases.  In striking down the child labor laws

in the 1920s, for example, the Court relied on the *scienter* element of a taxing provision to hold

that the provision was punitive rather than an exercise of the taxing power.  259 U.S. at 36-37.

The minimum coverage provision has no *scienter* element.  The Court also found an intent to

"punish rather than to tax" where a statute imposed a disproportionately large and coercive

penalty.  *United States v. Constantine*, 296 U.S. 287, 294 (1935); *see also Child Labor Tax Case*,

259 U.S. at 36; *Hill v. Wallace*, 259 U.S. 44, 67 (1922).  And, as the Secretary has previously

discussed, the Court invalidated measures where Congress used large penalties to coerce persons

into a regulatory regime separate from the taxing provision itself.  *See Child Labor Tax Case*,

259 U.S. at 38; *United States v. Butler*, 297 U.S. 1, 59 (1936); *Constantine*, 296 U.S. at 296; *Hill*,

259 U.S. at 68-69.  Here, the minimum coverage provision imposes neither a coercive nor a

disproportionate penalty.  The tax penalty it prescribes, as low as $95 in 2014, can be no greater

than the cost of qualifying insurance, 26 U.S.C. § 5000A(c)(1)(B).  And the regulatory effect of

the provision arises from the operation of the tax penalty itself, not from the coercion of

taxpayers into a separate administrative scheme.  Even on the assumption that the Court today

would still strike down the child labor laws it invalidated in 1922, the rationale of such a

decision, hinging on disproportionate "punishments," would not extend to the minimum

coverage provision.

     *Third*, Virginia argues that the minimum coverage provision exceeds the scope of the

taxing power, because it imposes a tax that is purportedly outside the particular categories of

taxes that Congress may impose under the General Welfare Clause power.  (Pl.'s Mem. 20-21.)

The Supreme Court rejected this argument in *Charles C. Steward Mach. Co. v. Davis*, 301 U.S. 548 (1937), upholding the employment taxes in the Social Security Act against a claim that they did not qualify as "excises."  "The subject-matter of taxation open to the power of the Congress is as comprehensive as that open to the power of the states."  *Id.* at 581.  The General Welfare Clause power "may be applied to every object of taxation, to which it extends, in such measure as Congress may determine. . . .  [I]t was the intention of the Convention that the whole power should be conferred.  The definition of particular words, therefore, became unimportant." *Veazie Bank v. Fenno*, 75 U.S. 533, 541 (1869).

Virginia's claim on this score turns on its repeated assertion that an "excise" has "never meant a tax on a decision not to purchase or not to do something unrelated to a larger voluntary business or other undertaking."  (Pl.'s Mem. 20-21.)  Its contention continues to ignore, for example, the penalty for a failure to file a return or to pay taxes when due, 26 U.S.C. § 6651, and the estate tax, *id.* § 2001.  The constitutionality of neither provision is in doubt.  *See Knowlton*, 178 U.S. at 59-60.  Virginia's contention also cannot be squared with the tax on private foundations that fail to distribute a sufficient proportion of their income, 26 U.S.C. § 4942.  Such a foundation, though "inactive" under Virginia's theory, is subject to a tax of as much as 100% of its undistributed income.  26 U.S.C. § 4942(b).  The constitutionality of this provision, too, is not in doubt.  *See Stanley O. Miller Charitable Fund v. Comm'r*, 89 T.C. 1112 (1987).

*Last*, despite its earlier concession that the minimum coverage provision does not impose a "capitation tax" that must be apportioned by population under Article I, Section 9 (Doc. 28 at 11), Virginia now argues the contrary.  (Pl.'s Mem. 22 n.2.)  It had it right the first time.  A capitation tax is one imposed "simply, without regard to property, profession, or any other circumstance."  *Hylton v. United States*, 3 U.S. (3 Dall.) 171, 175 (1796) (opinion of Chase, J.);

*see also Pac. Ins. Co. v. Soule*, 74 U.S. (7 Wall.) 433, 444 (1868); *Veazie Bank*, 75 U.S. at 540-44. The Supreme Court has never invalidated a provision as a capitation tax, and the minimum coverage provision cannot be the first. It does not impose a flat tax "without regard to" the taxpayer's circumstances. To the contrary, among other exemptions, it excludes persons with household incomes below the threshold for filing a return, as well as persons for whom the cost of qualifying coverage would exceed 8% of household income. 26 U.S.C. § 5000A(e)(1), (2). The penalty further varies with the taxpayer's income, subject to a set dollar floor, and a cap equal to the cost of qualifying coverage. 26 U.S.C. § 5000A(c)(1), (2). And, of course, the penalty does not apply at all if the taxpayer obtains coverage. 26 U.S.C. § 5000A(a), (b)(1). The minimum coverage provision thus is tailored to the individual's circumstances, including income. *See also* U.S. CONST. amend. XVI. It is not a capitation tax.[8]

## IV.   The Government's Affirmative Defenses Defeat Virginia's Claim

### A.   The Secretary of the Treasury Is a Necessary and Indispensable Party

Virginia's motion for summary judgment should be denied, and summary judgment should be awarded to the Secretary, because Virginia can gain no effective relief against her. Virginia challenges the minimum coverage provision of Section 1501 of the ACA. The Secretary of the Treasury, not the Secretary of Health and Human Services, is responsible for the administration of that provision. ACA, § 1501(b) (adding 26 U.S.C. § 5000A(g)); *see* 26 U.S.C. § 7801(a). The Secretary of the Treasury is not a party to this litigation, and cannot be added

---

[8] Virginia also suggests that the minimum coverage provision imposes a "non-uniform" tax. (Pl.'s Mem. 22 n.2.) Taxes must be "uniform" under Article 1, Section 8, Clause 1. An indirect tax is uniform when the tax "operates with the same force and effect in every place where the subject of it is found." *Head Money Cases*, 112 U.S. 580, 594 (1884); *see also United States v. Ptasynski*, 462 U.S. 74, 82 (1983). The minimum coverage provision applies nationally, and so poses no uniformity issue. *See Ptasynski*, 462 U.S. at 86.

now.  Because the Secretary of the Treasury is a necessary and indispensable party to this action,

Virginia's claim cannot survive.

Federal Rule of Civil Procedure 19 creates a "two-step inquiry."  *Owens-Illinois, Inc. v.*

*Meade*, 186 F.3d 435, 440 (4th Cir. 1999).  The court first determines whether a party is

necessary.  The court then determines if the necessary party can be added to the action, and, if

the party cannot be added, whether the proceeding can continue in the party's absence.  *Id.*  In

this case, this inquiry dictates that Virginia's claim cannot proceed in the absence of the

Secretary of the Treasury.

First, the Secretary of the Treasury is a necessary party because "the court cannot accord

complete relief" to Virginia in its challenge to the minimum coverage provision if the officer

who administers that provision is not subject to Virginia's suit.  Fed. R. Civ. P. 19(a)(1)(A).

"[T]he naming of one government party or the wrong government official does not place the

proper government party or official on notice of the suit."  *Gardner v. Gartman*, 880 F.2d 797,

799 (4th Cir. 1989).  A holding that the minimum coverage provision is unconstitutional would

"necessarily constrain[] the future options of the Secretary" of the Treasury in his administration

of that provision, and for that reason his participation is necessary.  *McCowen v. Jamieson*, 724

F.2d 1421, 1424 (9th Cir. 1984).  Virginia contends that the Secretary of the Treasury is not

necessary because "PPACA will fall" before his duties "accrue."  (Pl.'s Mem. 33.)  Its reasoning

is precisely backwards; Virginia must sue the correct defendant before it can be determined if the

provision it challenges will fall or not.[9]

---

[9] Its premise, in any event, is incorrect.  Numerous duties have already "accrued" to the Secretary of the Treasury.  *See, e.g.*, 75 Fed. Reg. 43,330 (July 23, 2010) (interim regulations on insurance plan claims procedures); 75 Fed. Reg. 34,538 (June 17, 2010) (interim regulations on treatment of grandfathered insurance plans); Notice 2010-38, 2010-20 I.R.B. 682 (Apr. 27, 2010) (tax treatment of extension of insurance policies to cover children up to age 26).

Second, the Secretary of the Treasury cannot now be joined to this action, as Virginia cannot show good cause to do so.  This Court set a May 15, 2010 deadline for motions to join additional parties, or to amend the pleadings in this action.  (Doc. 6, ¶ 2.)  That deadline has long since passed.  Virginia has not sought leave to amend its complaint.  If it were to do so, it would be required to meet the "good cause" standard of Fed. R. Civ. P. 16(b) to justify its violation of the scheduling order.  (Doc. 6, ¶ 2.)  *See Nourison Rug Corp. v. Parvizian*, 535 F.3d 295, 298 (4th Cir. 2008).  "[G]ood cause is not shown if the amendment could have been timely made." *DeWitt v. Hutchins*, 309 F. Supp. 2d 743, 748 (M.D.N.C. 2004).  There is no reason that Virginia could not have timely amended its complaint to name the proper party defendant.  That the Secretary of the Treasury, not the Secretary of Health and Human Services, is responsible for the administration of the minimum coverage provision is apparent from the face of the Act itself. Virginia attempts to show "good cause" for its failure to name the correct defendant by asserting that the government should have averted to the matter earlier.  (Pl.'s Mem. 33.)  But Virginia, not the government, is the master of its own complaint; its attorneys' "[m]istake of law, misunderstanding of the rules, [or] inadvertence do not amount to 'good cause.'"  *United States ex. rel. Shaw Envtl., Inc. v. Gulf Ins. Co.*, 225 F.R.D. 526, 528 (E.D.Va. 2005); *see also* Fed. R. Civ. P. 19(c)(2) (requiring plaintiff to plead reasons for nonjoinder).

Third, this action cannot proceed in the Secretary of the Treasury's absence.  The Secretary of the Treasury would be prejudiced if a provision he is charged with administering is deemed unconstitutional in his absence.  Fed. R. Civ. P. 19(b)(1).  Prejudice cannot be lessened by shaping the relief that Virginia requests, as there is no middle ground between a ruling that Section 1501 is constitutional and one that it is not.  Fed. R. Civ. P. 19(b)(2).  Any judgment in the Secretary of the Treasury's absence could not be adequate, as the relief that Virginia seeks

would have to run against him for its (alleged) injuries to be satisfied.  Fed. R. Civ. P. 19(b)(3).

And other adequate remedies exist, as individual citizens could vindicate Virginia's claim that

the statute is unconstitutional (if that claim had any merit) in future refund actions.[10]  Fed. R.

Civ. P. 19(b)(4).  Accordingly, the Secretary of the Treasury is indispensable, and Virginia may

not proceed with its claim in this suit.  *See Owens-Illinois, Inc*, 186 F.3d at 441-42 (discussing

Rule 19(b) factors).[11]

> ## B.      This Court Lacks Jurisdiction over Virginia's Claim

Virginia's summary judgment motion should also be denied, and judgment should be

awarded to the Secretary, because this Court lacks subject matter jurisdiction over Virginia's

claim.  First, Virginia lacks both Article III and prudential standing to seek to exempt its citizens

from the minimum coverage provision.  Such a claim violates the rule that a state cannot, acting

"as parens patriae, . . . institute judicial proceedings to protect citizens of the United States from

the operation of [federal] statutes."  *Massachusetts v. Mellon*, 262 U.S. 447, 485 (1923).  *See*

*Wyoming v. Lujan*, 969 F.2d 877, 882-83 (10th Cir. 1992) (recognizing that *parens patriae* rule

is of both Article III and prudential dimensions).  Second, Virginia's claim is not ripe, either as a

constitutional matter or prudentially, because it asserts only the "abstraction" of a conflict

---

[10]  This Court has previously suggested that private individuals could not assert Virginia's Tenth Amendment claim.  (Doc. 84 at 12.)  There are two types of Tenth Amendment claims: first, a claim that Congress has exceeded its Article I powers, and, second, a claim that Congress has directly compelled the states to enforce a regulatory regime.  A private party who otherwise satisfies the requirements for jurisdiction does have standing to raise the first sort of claim, even though only a state could raise the latter sort of claim.  *See* Brief for the United States at 9-14, *Bond v. United States*, No. 09-1227 (U.S. 2010) (confessing error and inviting summary reversal in case where private individual was denied standing to pursue "mirror-image" Tenth Amendment claim).  Only the first sort of Tenth Amendment claim is at issue in this case.

[11]  Virginia devotes most of its argument on this point not to a discussion of the Rule 19 standards, but instead to a claim that the government waived this defense by not presenting it in a motion to dismiss.  The law in this circuit is to the contrary, *Delta Fin. Corp. v. Paul D. Comanduras & Assocs.*, 973 F.2d 301, 306 n.5 (4th Cir. 1992), as are the Federal Rules of Civil Procedure.  *See* Fed. R. Civ. P. 12(h)(1), (2).

between a state law and a provision of federal law that does not require it to take any action. *Texas v. United States*, 523 U.S. 296, 302 (1998). Third, Virginia's claim is barred by the Anti-Injunction Act, 26 U.S.C. § 7421(a), as the relief it seeks would have the effect of prohibiting the Secretary of the Treasury from assessing or collecting the penalties under the minimum coverage provision. *See Bob Jones Univ.*, 416 U.S. at 731. The Secretary recognizes that the Court has ruled to the contrary on these points, but invites the Court to reconsider its jurisdictional holdings on the basis of the briefing that she presented with her motion to dismiss.

## V.  Virginia Misstates the Remedies that Are Available to It

### A.  Virginia Misstates the Law Governing Severability

Virginia contends that, if this Court were to declare the minimum coverage provision unconstitutional, the Act "must be struck down in its entirety." (Pl.'s Mem. 24.) Virginia presents no serious argument to support its choice of the "most blunt remedy" possible – that is, total invalidation of the statute. *Ayotte v. Planned Parenthood of N. New Eng.*, 546 U.S. 320, 330 (2006). It argues only that, because the minimum coverage provision is essential to the insurance industry reforms of Section 1201 of the Act such as the ban on exclusions for pre-existing conditions, the entire Act must fall. This argument wrongly conflates the insurance industry reforms with the Act as a whole, which contains over 450 provisions that address a wide variety of topics. Further, Virginia's argument wrongly conflates the law governing the scope of Congress's commerce power and the law governing severability. Congressional power under the Commerce Clause turns, at least in part, on whether a provision is integral to a larger regulation of economic activity. *See, e.g.*, *Raich*, 545 U.S. at 24-25. Severability, as discussed below, turns on the separate questions of whether the remainder of a statute could remain legally operative after one provision falls, and whether it is evident that Congress would have wanted additional

provisions to fall with the one invalidated.  *See, e.g.*, *Free Enterprise Fund v. Pub. Co.*

*Accounting Oversight Bd.*, 130 S. Ct. 3138, 3161-62 (2010).[12]

      Instead of applying Virginia's legally baseless approach, this Court (if it were to rule in

Virginia's favor at the merits stage) should defer until the remedies stage any decision on the

extent to which other provisions of the Act would fall with the minimum coverage provision.

Working through the complex permutations presented by the issue of severability is an effort

best undertaken in separate briefing if this case reaches that stage, instead of in response to

Virginia's throw-away, parting shot in its summary judgment brief.  *See Tanner Adver. Grp.,*

*LLC v. Fayette Cnty.*, 451 F.3d 777, 797 n.4 (11th Cir. 2006) (Birch, J., concurring) (noting that

issues of severability arise at remedies stage, not merits stage).

      Virginia's casual treatment of the complex issue of severability stems from its apparent

misunderstanding of the governing principles.  Contrary to Virginia's assertions, there is a strong

presumption that a court should invalidate no more of a statute than necessary to remedy an

(alleged) constitutional violation.  "Generally speaking, when confronting a constitutional flaw

in a statute, we try to limit the solution to the problem, severing any problematic portions while

leaving the remainder intact."  *Free Enterprise Fund*, 130 S. Ct. at 3161 (internal quotation

omitted).  "Because the unconstitutionality of a part of an Act does not necessarily defeat or

affect the validity of its remaining provisions, the normal rule is that partial, rather than facial,

invalidation is the required course."  *Id.* (internal quotations omitted).[13]  Courts must "strive to

salvage" as much of a statute as possible, as only the statute, and not the court's ruling, is a

---

[12]  Indeed, in *Raich* itself, even though the case turned in part on whether the ban on
intrastate possession of marijuana was integral to the Controlled Substances Act's larger
regulation of the interstate market in controlled substances, there was no suggestion that the
statute as a whole would have fallen if the possession ban had been stricken.

[13]  Virginia cites *Free Enterprise Fund*, but for a different (and irrelevant) proposition.
(Pl.'s Mem. 23-24.)

product of the democratic process:  "[W]e try not to nullify more of a legislature's work than is necessary, for we know that a ruling of unconstitutionality frustrates the intent of the elected representatives of the people."  *Ayotte*, 546 U.S. at 328-29 (internal quotation omitted).

The Court has applied this strong presumption for decades.  In *New York v. United States*, 505 U.S. 144, 186 (1992), for example, the Court stated that "[t]he standard for determining the severability of an unconstitutional provision is well established:  Unless it is evident that the Legislature would not have enacted those provisions which are within its power, independently of that which is not, the invalid part may be dropped if what is left is fully operative as a law." *See also INS v. Chadha*, 462 U.S. 919, 934 (1983) (provision is "presumed severable if what remains after severance is fully operative as a law") (internal quotation omitted).  Thus, if the remaining portion of the statute is fully operative as law, the plaintiff then bears the burden to show that Congress would have preferred that its statute be completely invalidated.  *See Free Enterprise Fund*, 130 S. Ct. at 3161-62 (it must be "evident" that Congress would have preferred no statute at all for act to be completely invalidated); *Ayotte*, 546 U.S. at 330 ("After finding an application or portion of a statute unconstitutional, we must next ask: Would the legislature have preferred what is left of its statute to no statute at all?").  Virginia argues that the ACA does not include a severability clause, and in the absence of such a clause it must be presumed that the entire Act falls if one provision does.  (Pl.'s Mem. 24.)  Here, too, Virginia misstates the law. "In the absence of a severability clause, . . . Congress's silence is just that – silence – and does not raise a presumption against severability."  *Alaska Airlines, Inc. v. Brock*, 480 U.S. 678, 686 (1987).

Under these principles, some provisions of the Act plainly cannot survive.  As defendants repeatedly have made clear – in passages that Virginia inflates beyond their obvious meaning –

insurance industry reforms in Section 1201 such as guaranteed-issue and community-rating will stand or fall with the minimum coverage provision.  As noted, these reforms within Section 1201 protect the 57 million Americans with pre-existing medical conditions by requiring insurers to issue policies to those persons at non-discriminatory rates.  As Virginia correctly recognizes (Pl.'s Mem. 26-27), these regulations of the interstate insurance market must be coupled with the minimum coverage provision in order to be effective.  Absent a minimum coverage provision, the guaranteed-issue and community-rating reforms in Section 1201 would cause many to drop coverage, leading to a spiral of increased premiums and a shrinking risk pool – the insurance market will "implode."  Because Congress would not have intended this result, these reforms cannot be severed from the minimum coverage provision.[14]

Other parts of the statute, however, are plainly severable.  In section 2001 of the Act, for example, Congress extended Medicaid eligibility to individuals with incomes up to 133% of the federal poverty level, and provided for federal funding to cover the vast majority of the costs of that expansion.  Those Medicaid provisions do not depend on the minimum coverage provision in any way to function as Congress intended, and thus they would remain "fully operative as a law." *New York*, 505 U.S. at 186.  Likewise, the Act contains a series of reforms to the student loan program that are unrelated to health care, and those would plainly survive.  Pub. L. No. 111-152, §§ 2001-2214.  The 10 titles, 59 subtitles, and more than 450 sections of this comprehensive statute address many other topics, including (to name only a few additional examples) abstinence education, ACA § 2954; coverage under Medicaid for freestanding facilities for the delivery of babies, *id.* § 2301; the removal of barriers under Medicaid to home and community-based health care services, *id.* § 2402; funding for the expansion of state aging and disability resource centers,

---

[14] This link establishes that the minimum coverage provision is constitutional, however, as Congress has the power to enact measures to ensure the vitality of its broader regulations of interstate commerce. *See Dean*, 670 F. Supp. 2d at 460.

*id.* § 2405; and funding for the Prevention and Public Health Fund, *id.* § 4002.  Each of these provisions would have to be addressed under any serious severability analysis.  It is far from "evident" that Congress would have preferred all of these provisions to be invalidated if the minimum coverage were to fall.

Virginia's cursory suggestion to the contrary cannot evade the daunting task that would face this Court were it to embark on the remedial efforts that invalidation of the minimum coverage provision would require.  If this case were to reach a remedies stage, the burden would fall on Virginia to demonstrate that each section and subsection of the Act could not survive without the minimum coverage provision.  Virginia has not attempted to meet that burden at this point in the proceedings, and so the Court should not reach the issue now.

### B.        Virginia Is Not Entitled to a Permanent Injunction

Virginia asserts that the Court should not only declare the minimum coverage provision to be unconstitutional, but that it should also enjoin its enforcement, along with an injunction against the operation of the Act's insurance industry reforms discussed above, as well as all other provisions that Virginia (wrongly) contends to be nonseverable from the minimum coverage provision.  But injunctive relief is an "extraordinary remedy."  *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982); *see also Nat'l Audubon Soc'y v. Dep't of Navy*, 422 F.3d 174, 201 (4th Cir. 2005).  To obtain such relief, a plaintiff must demonstrate each of the following:

> (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

*eBay, Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006).  Virginia must show all of these factors, but it can show none of them.

First, Virginia suffers no irreparable injury from the operation of the minimum coverage provision.  It argues that it suffers a "continuing and irreparable sovereign injury" due to the supposed conflict between Section 1501 and Virginia Code § 38.2-3430:1.1.  (Pl.'s Mem. 30.)  But the mere existence of a conflict between state and federal law, without more, cannot constitute irreparable injury.  *Texas v. United States*, 523 U.S. 296 (1998), is instructive.  There, the state had enacted an elections statute.  It brought suit alleging that under some circumstances the application of the state law could be viewed as a violation of the Voting Rights Act of 1965, and it sought a declaratory judgment that the state law was valid.  The state was not required to undertake any action under federal law, and the Supreme Court accordingly found the case not to be ripe.  It noted that, absent any concrete injury to the state, the state's claim of a "threat to federalism" from the possible invalidity of its elections statute was a mere "abstraction" that did not create any hardship.  *Id.* at 302.  Likewise, Virginia cannot show that it suffers an irreparable injury by claiming a threat to the validity of its state statute, which is purely declaratory.  And Virginia clearly suffers no irreparable injury now from the minimum coverage provision, which does not go into effect until 2014.

Second, Virginia cannot show that a lesser remedy, such as a declaratory judgment, would be inadequate.  "An injunction is a drastic and extraordinary remedy, which should not be granted as a matter of course.  If a less drastic remedy . . . [would be] sufficient to redress [Virginia's] injury, no recourse to the additional and extraordinary relief of an injunction [is] warranted."  *Monsanto Co. v. Geertson Seed Farms*, 130 S.Ct. 2743, 2761 (2010).  Virginia does not explain, because it cannot explain, why a declaratory judgment would not be adequate to vindicate its claim that its state statute is valid.  To the contrary, there is a long-standing presumption that a declaratory judgment provides adequate relief as against an executive officer,

34

as it will not be presumed that that officer will ignore the judgment of the Court after appellate

review is exhausted. *See Comm. on Judiciary of U.S. House of Representatives v. Miers*, 542

F.3d 909, 911 (D.C. Cir. 2008) ("[W]e have long presumed that officials of the Executive Branch

will adhere to the law as declared by the court. As a result, the declaratory judgment is the

functional equivalent of an injunction."). *See also Smith v. Reagan*, 844 F.2d 195, 200 (4th Cir.

1988); *Sanchez-Espinoza v. Reagan*, 770 F.2d 202, 208 n.8 (D.C. Cir. 1985).

Third, the balance of harms and the public interest counsel against the issuance of an

injunction. The Supreme Court has cautioned that "courts of equity should pay particular regard

for the public consequences in employing the extraordinary remedy of injunction." *Romero-

Barcelo*, 456 U.S. at 312. "The public interest may be declared in the form of a statute." *Golden

Gate Rest. Ass'n v. City & Cnty. of San Francisco*, 512 F.3d 1112, 1127 (9th Cir. 2008) (internal

quotation omitted). Where the elected branches have enacted a statute based on their

understanding of what the public interest requires, this Court's "consideration of the public

interest is constrained . . . for the responsible public officials . . . have already considered that

interest." *Id*. at 1126-27. Indeed, "a court sitting in equity cannot ignore the judgment of

Congress, deliberately expressed in legislation." *United States v. Oakland Cannabis Buyers'

Coop.*, 532 U.S. 483, 497 (2001) (internal quotation omitted). Here, Congress determined that

the public interest required it to enact a statute to expand coverage, to lower premiums, and to

protect the 57 million Americans who have pre-existing medical conditions from the continuing

threat that they will be unable to obtain, or that they will lose, needed insurance coverage. This

court sitting in equity would not be free to disregard that judgment, even if Virginia had offered

any comparable harm at the other end of the balance.  Virginia has not done so, and its request

for an injunction should be denied.[15]

---

[15] Of course, Virginia could not gain any relief that is broader in scope than what is necessary to remedy its own alleged harms.  *See Va. Soc'y for Human Life v. FEC*, 263 F.3d 379, 392-94 (4th Cir. 2001).  Declaratory relief alone would vindicate its claim that its state statute is superior to the ACA.  At all events, Virginia could not obtain any relief on behalf of potential plaintiffs not before this Court.  *See id.*

**Conclusion**

For the foregoing reasons, the Court should deny the plaintiff's motion for summary

judgment, and should award summary judgment to the defendant.

DATED this 23rd day of September, 2010.

Respectfully submitted,

TONY WEST
Assistant Attorney General

IAN HEATH GERSHENGORN (admitted *pro hac vice*)
Deputy Assistant Attorney General

NEIL H. MacBRIDE
United States Attorney

By:     /s/ Jonathan H. Hambrick
JONATHAN H. HAMBRICK, VSB # 37590
Assistant United States Attorney
Office of the United States Attorney
600 East Main Street, Suite 1800
Richmond, Virginia 23219
Telephone:     (804) 819-5400
Fax:               (804) 819-7417
Email:            jay.h.hambrick@usdoj.gov

JENNIFER RICKETTS RIVERA, VSB # 29281
Director
SHEILA M. LIEBER (admitted *pro hac vice*)
Deputy Director
JOEL McELVAIN (admitted *pro hac vice*)
Senior Counsel
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., NW, Room 7332
Washington, D.C. 20001
Telephone:     (202) 514-2988
Fax:               (202) 616-8202
Email:            Joel.McElvain@usdoj.gov

*Attorneys for the Defendant*

## CERTIFICATE OF SERVICE

I hereby certify that on the 23rd day of September, 2010, I electronically filed the

foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of

such filing (NEF) to the following:

> Earle Duncan Getchell, Jr.
> Charles E. James, Jr.
> Stephen R. McCullough
> Wesley Glenn Russell, Jr.
> Office of the Attorney General
> 900 E. Main Street
> Richmond, Virginia 23219

>    /s/ Jonathan H. Hambrick
> JONATHAN H. HAMBRICK, VSB # 37590
> Assistant United States Attorney
> Office of the United States Attorney
> 600 East Main Street, Suite 1800
> Richmond, Virginia 23219
> Telephone:   (804) 819-5400
> Fax:   (804) 819-7417
> Email:   jay.h.hambrick@usdoj.gov