IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

RICHMOND DIVISION

| | |
|---|---|
| COMMONWEALTH OF VIRGINIA,<br>   ex rel. Kenneth T. Cuccinelli, II,<br>   in his official capacity as Attorney<br>   General of Virginia,<br>           Plaintiff,<br><br>        v.<br><br>KATHLEEN SEBELIUS,<br>   Secretary of the Department of<br>   Health and Human Services,<br>   in her official capacity,<br><br>          Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)   Civil Action No. 3:10-cv-00188-HEH<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

MEMORANDUM OF THE CATO INSTITUTE,
THE COMPETITIVE ENTERPRISE INSTITUTE,
AND PROF. RANDY E. BARNETT AS *AMICI CURIAE*
SUPPORTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND
OPPOSING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Robert A. Levy*
Ilya Shapiro*
David H. Rittgers (VA Bar #77245)
CATO INSTITUTE
1000 Massachusetts Ave., NW
Washington, DC 20001
(202) 842-0200

Hans Bader*
COMPETITIVE ENTERPRISE INSTITUTE
1899 L Street, NW, 12th Floor
Washington, DC 20036
(202) 331-2278

* - Not admitted in this court

Patrick M. McSweeney (VA Bar # 5669)
*Counsel of Record*
G. William Norris, Jr. (VA Bar # 41754)
MCSWEENEY, CRUMP, CHILDRESS &
  TEMPLE, P.C.
11 South 12th Street
Richmond, VA 23219
(804) 783-6802

*Attorneys for* Amici Curiae

**CORPORATE & FINANCIAL DISCLOSURE STATEMENTS**

Pursuant to Local Rule 7.1 of the Eastern District of Virginia and to enable Judges and Magistrate Judges to evaluate possible disqualifications or recusal, the undersigned counsel for the Cato Institute and the Competitive Enterprise Institute in the above captioned action, certify that there are no parents, trusts, subsidiaries and/or affiliates of Cato or CEI that have issued shares or debt securities to the public.

Pursuant to Fourth Circuit Local Rule 26.1, the Cato Institute and CEI each declare that they are nonprofit public policy research foundations dedicated in part to the defense of constitutional liberties secured by law.  Cato and CEI each state that they have no parent corporation.  CEI issues no stock, while Cato has issued a handful of shares that are privately held by its directors.  No publicly held corporation has a direct financial interest in the outcome of this litigation due to the participation of Cato or CEI.

**TABLE OF CONTENTS**

CORPORATE & FINANCIAL DISCLOSURE STATEMENTS ................................................... i

TABLE OF AUTHORITIES .................................................................................................. iii

INTEREST OF *AMICI CURIAE* ..........................................................................................1

SUMMARY OF ARGUMENT ...............................................................................................2

ARGUMENT.........................................................................................................................4

I.      The Mandate is Unconstitutional According to the "Substantial Effects Doctrine" That
        Defines the Scope of the Necessary and Proper Clause in the Context of the Commerce
        Power ......................................................................................................................4

II.     Congress's Taxing Power Does Not Provide a Constitutional Warrant for the Individual
        Mandate...................................................................................................................9

III.    The Individual Mandate Constitutes a "Commandeering of the People" That Is Not
        "Proper" Under the Necessary and Proper Clause...........................................13

CONCLUSION...................................................................................................................17

CERTIFICATE OF COMPLIANCE .........................................................................................18

CERTIFICATE OF SERVICE ................................................................................................19

# TABLE OF AUTHORITIES

**Constitutional Provisions**

U.S. Const. art. I, § 2.................................................................................................11

U.S. Const. art. I, § 8.........................................................................................5, 12, 14

U.S. Const. art. I, § 9.................................................................................................11

U.S. Const. amend. III ...............................................................................................15

U.S. Const. amend. V.................................................................................................15

U.S. Const. amend. X.................................................................................................14

U.S. Const. amend. XIII.............................................................................................15

**Cases**

*Bailey v. Drexel Furniture Co.*, 259 U.S. 20 (1922).................................................3, 12

*Chisholm v. Georgia*, 2 U.S. (2 Dall.) 419 (1793) .........................................................15

*Gibbons v. Ogden*, 22 U.S. 1 (1824) ..............................................................................4

*Gonzales v. Raich*, 545 U.S. 1 (2005)...................................................................7, 8, 13

*Heart of Atlanta Motel, Inc. v. United States*, 379 U.S. 241 (1964)...............................8

*Katzenbach v. McClung*, 379 U.S. 294 (1964) ...............................................................8

*McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316 (1819) ..........................................4, 5

*New York v. United States*, 505 U.S. 144 (1992)......................................................14,16

*NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1 (1937) .......................................6, 9

*Printz v. United States*, 521 U.S. 898 (1997)..........................................................13, 14

*Selective Draft Law Cases*, 245 U.S. 366 (1918) .........................................................15

*Sonzinsky v. United States*, 300 U.S. 506 (1937).........................................................10

*United States v. Darby*, 312 U.S. 100 (1941) ................................................................4

*United States v. La Franca*, 282 U.S. 568 (1931)............................................................................11

*United States v. Lopez*, 514 U.S. 549 (1995) ....................................................................6, 9, 13

*United States v. Morrison*, 529 U.S. 598 (2000) ..............................................................................6

*United States v. Reorganized CF&I Refabricators of Utah, Inc.*, 518 U.S. 213 (1996)................11

*Virginia v. Sebelius*, 702 F. Supp. 2d 598 (E.D. Va. 2010)........................................................9, 17

*Wickard v. Filburn*, 317 U.S. 11 (1942) ..................................................................................3, 5

*Yick Wo v. Hopkins*, 118 U.S. 356 (1886) ....................................................................................15

**Statutes**

Patient Protection and Affordable Care Act, Pub. L. No. 111-148, 124 Stat. 119 (2010):

§ 1501............................................................................................................................10

§ 9001-17 .....................................................................................................................10

**Other Authorities**

Randy E. Barnett, *Commandeering the People: Why the Individual Health Insurance Mandate is Unconstitutional*, N.Y.U. J.L.L. (forthcoming), available at http://ssrn.com/abstract=1680392 ........................................................................5, 8, 14

J. Randy Beck, *The New Jurisprudence of the Necessary and Proper Clause*, 2002 U. Ill. L. Rev. 581 (2002).........................................................................................................................8

Cong. Budget Office, *The Budgetary Treatment of an Individual Mandate to Buy Health Insurance* (1994)...........................................................................................................2

Alexander Hamilton, Opinion on the Constitutionality of a National Bank (February 23, 1791), in Legislative and Documentary History of the Bank of the United States 98 (H. St. Clair & D.A. Hall eds., reprinted Augustus M. Kelley 1967) (1832)..........................................7

Ilya Shapiro, *State Suits Against Health Reform Are Well Grounded In Law—And Pose Serious Challenges*, 29 Health Affairs 1229 (June 2010).............................................................17

George Stephanopoulos, *Obama: Mandate is Not a Tax*, ABC News, Sept. 20, 2009, http://blogs.abcnews.com/george/2009/09/obama-mandate-is-not-a-tax.html.................11

*John Marshall's Defense of McCulloch v. Maryland* (Gerald Gunter ed., Stanford University Press 1969)..................................................................................................................7

Mem. for the Cato Institute et al. as *Amici Curiae* in Supp. of Pl's. Opp'n to Mot. to Dismiss, *Virginia v. Sebelius*, No. 3:10-cv-00188-HEH (E.D. Va. Jun. 17, 2010)..........................10

Steven J. Willis & Nakku Chung, *Constitutional Decapitation and Healthcare*, 128 Tax Notes 169 (2010).................................................................................................................10

## INTEREST OF *AMICI CURIAE*[1]

The Cato Institute was established in 1977 as a nonpartisan public policy research foundation dedicated to advancing the principles of individual liberty, free markets, and limited government. Cato's Center for Constitutional Studies was established in 1989 to promote the principles of limited constitutional government that are the foundation of liberty. Toward those ends, Cato publishes books and studies, conducts conferences, and publishes the annual *Cato Supreme Court Review*. It also files amicus briefs with the courts, including in cases focusing on the Commerce Clause and the Necessary and Proper Clause such as *United States v. Morrison*, 529 U.S. 598 (2000), *Gonzales v. Raich*, 545 U.S. 1 (2005), and *United States v. Comstock*, 130 S. Ct. 1949 (2010). The present case centrally concerns Cato because it represents the federal government's most egregious attempt to exceed its constitutional powers.

The Competitive Enterprise Institute is a public interest group founded in 1984 and dedicated to free enterprise, limited government, and civil liberties. It studies and publishes on a wide range of regulatory issues, including those involving health and safety, drugs, biotechnology, and medical innovation—as well as the regulation of insurance markets. CEI attorneys have argued or participated as *amicus curiae* in numerous constitutional cases before the Supreme Court and other federal courts. Senior Attorney Hans Bader was also co-counsel in *Morrison*, the last Supreme Court decision to strike down a law as beyond Congress's Commerce Clause powers.

Randy E. Barnett is the Carmack Waterhouse Professor of Legal Theory at the Georgetown University Law Center. Prof. Barnett has taught constitutional law, contracts, and

---

[1] This *amici curiae* brief is filed upon motion for leave to file. The Plaintiff has consented to the participation of movants as *amici* in this case. The Defendant, when contacted through counsel, stated that she takes no position on movants' motion for leave.

criminal law, among other subjects, and has published more than 90 articles and reviews, as well as eight books.   His book, *Restoring the Lost Constitution: The Presumption of Liberty* (Princeton, 2004), and other scholarship concerns the original meaning of the Commerce and Necessary and Proper Clauses and their relationship to the powers enumerated in the Constitution.   His constitutional law casebook, *Constitutional Law: Cases in Context* (Aspen 2008), is widely used in law schools throughout the country.   In 2004 he argued *Gonzales v. Raich* in the Supreme Court.   In 2008, he was awarded a Guggenheim Fellowship in Constitutional Studies.

## SUMMARY OF ARGUMENT

This memorandum incorporates by reference the memorandum *amici* filed supporting Virginia's opposition to the Secretary's motion to dismiss.   The briefing at that stage of the litigation, coupled with the memoranda filed by Virginia on the instant cross-motions for summary judgment, more than adequately conveys our concerns regarding the federal government's having exceeded its constitutional powers in enacting the individual mandate.   Put simply, neither the Commerce Clause (alone or as executed via the Necessary and Proper Clause) nor the taxing power, nor any other provision the Secretary—or anyone—has been able to identify provides a constitutional warrant for an "economic mandate" of the kind contemplated here.

As stated previously, "The government has never required people to buy any good or service as a condition of lawful residence in the United States."   Cong. Budget Office, *The Budgetary Treatment of an Individual Mandate to Buy Health Insurance* 1 (1994).   Nor has it ever said that every man and woman faces a civil penalty for declining to participate in the

marketplace. And never before have courts had to consider such a breathtaking assertion of raw power. Even in *Wickard v. Filburn*, 317 U.S. 11 (1942), the federal government claimed "merely" the power to regulate what farmers grew, not to *mandate* that people become farmers, much less to force people to purchase farm products.

*Amici* file this memorandum to highlight three simple points: First, although Congress can regulate "economic activities that substantially affect interstate commerce," non-economic activities, including inactivity, are not subject to Congress's Commerce Clause power. They simply cannot be shoehorned into a regulatory scheme under the Necessary and Proper Clause as interpreted in the context of the commerce power. Second, the assertion in this case of the taxing power as associated with the General Welfare Clause also fails in that (a) as a threshold matter, the individual mandate is not a tax; (b) if it is a tax, it's unconstitutional because it is neither apportioned (if a direct tax) nor uniform (if an excise tax); and (c) Congress cannot use its taxing power as a backdoor means of regulating an activity unless such regulation is authorized elsewhere in the Constitution. *Bailey v. Drexel Furniture Co.*, 259 U.S. 20, 37-38 (1922). Third, an "economic mandate" of the kind at issue here—even if it were deemed "necessary" to Congress's regulatory scheme—constitutes a "commandeering of the people" that is constitutionally impermissible because it is not "proper."

This case thus boils down to Congress's purported execution of its regulatory authority over interstate commerce via the Necessary and Proper Clause, which action goes beyond its constitutional powers for the reasons stated here, in our previous memorandum, and in briefing by Virginia and other *amici*. Virginia's motion for summary judgment must be granted, and the Secretary's denied.

3

# ARGUMENT

I.      **The Mandate is Unconstitutional According to the "Substantial Effects Doctrine" That Defines the Scope of the Necessary and Proper Clause in the Context of the Commerce Power**

Since the New Deal, the Supreme Court has asked whether an "economic activity substantially affects interstate commerce" when considering whether it falls under Congress's power to regulate interstate commerce.  The significant New Deal cases, however, found the authority for the "substantial effects doctrine" not in the inherent power of the Commerce Clause, but in its execution via the Necessary and Proper Clause.  Although the prevailing legal orthodoxy describes the New Deal Commerce Clause cases as expanding the definition of "commerce," a closer examination of these cases shows that the definition of "commerce" remained the same while the substantial effects doctrine became the "necessary and proper" means by which Congress exercises its Commerce Clause power.

In *United States v. Darby*, 312 U.S. 100 (1941), for example, the Court considered the power of Congress to "prohibit the employment of workmen in the production of goods 'for interstate commerce' at other than prescribed wages and hours." *Id.* at 105.  Rather than stretching the definition of "commerce," the Court focused on how congressional power "extends to those activities intrastate which so affect interstate commerce or the exercise of the power of Congress over it as to make regulation of them appropriate means to the attainment of a legitimate end, the exercise of the granted power of Congress to regulate interstate commerce." *Id.*  The authority cited for this proposition did not come from *Gibbons v. Ogden*, 22 U.S. 1 (1824)—the Commerce Clause case which the Court had already cited throughout its opinion— but instead from the foundational Necessary and Proper Clause case of *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316 (1819).

4

The Court's language in *Darby* makes it more apparent that the authority for the substantial effects doctrine rests, and always has rested, on the Necessary and Proper Clause. An "appropriate means to the attainment of a legitimate end" explicitly references Chief Justice Marshall's seminal explanation of the Necessary and Proper Clause: "Let the *end be legitimate*, let it be within the scope of the constitution, and all *means* which are *appropriate*, which are plainly adapted to that end, which are not prohibited, but consistent with the letter and spirit of the constitution, are constitutional." *Id.* at 421 (emphasis added). Moreover, the phrase in *Darby*, "the exercise of the granted power," calls forth the language of the Clause itself, "carries into execution the foregoing powers." U.S. Const. art I, § 8, cl. 18.

A year after *Darby*, in *Wickard v. Filburn*, 317 U.S. 111 (1942), the Court continued this reasoning—that "commerce" was not being redefined but rather the challenged measures were a necessary and proper means for regulating commerce as historically understood. Like *Darby*, *Wickard* is explicit in its reliance on the Necessary and Proper Clause, citing *Gibbons* and *McCulloch, id.* at 130, n.29, as authority for congressional power—even if Roscoe Filburn's personal production of wheat "may not be regarded as commerce." *Id.* at 125. Thus, contrary to the conventional academic view, *Wickard* did not expand the Commerce Clause to include the power to regulate intrastate activity that, when aggregated, substantially affects interstate commerce. "Instead, *Wickard* actually stands for the proposition that this intrastate activity can be regulated because the failure to do so would impede the government's ability to regulate the interstate price of wheat by restricting supply." Randy E. Barnett, *Commandeering the People: Why the Individual Health Insurance Mandate is Unconstitutional*, N.Y.U. J.L.L. (forthcoming), *available at* http://ssrn.com/abstract=1680392.

Fast forward 50 years when the Court clarified the substantial effects doctrine by confining the power of Congress under the Commerce and Necessary and Proper Clause to the regulation of the intrastate *economic* activity. Again, as in *Wickard* and *Darby*, the Court did not redefine "commerce" but only refined its evaluation of whether the means adopted by Congress were necessary and proper to the end of regulating commerce.

In *United States v. Lopez*, 514 U.S. 549 (1995), the Court found that "[e]ven *Wickard*, which is perhaps the most far-reaching example of Commerce Clause authority over intrastate activity, involved economic activity in a way that possession of a gun in a school zone does not." *Id.* at 560. Five years later, in *United States v. Morrison*, 529 U.S. 598 (2000), the Court held that the gender-motivated violence regulated by the Violence Against Women Act was not itself economic activity and thus had only an "indirect and remote" or "attenuated" effect on interstate commerce. *Id.* at 608 (quoting *Lopez*, 514 U.S. at 556-57 (quoting *NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 37 (1937)), 615.

Chief Justice Rehnquist described the limits of Congress's power as follows: "Where *economic* activity substantially affects interstate commerce, legislation regulating that activity will be sustained." *Lopez*, 514 U.S. at 560 (emphasis added). Conversely, non-economic activity cannot be regulated merely because it has "substantial effects on employment, production, transit, or consumption," or indirectly affects interstate commerce through a "but-for causal chain." *Morrison*, 529 U.S. at 615. That is because the subject of regulation must have a "close" qualitative "relation to interstate commerce," not merely a substantial "quantitative" impact on the national economy. *NLRB*, 301 U.S. at 37.

The distinction between economic and non-economic activity allowed the Court to determine when it was truly necessary to regulate intrastate commerce without engaging in

6

protracted, and arguably impossible, attempts to evaluate the "more or less necessity or utility" of a measure. Alexander Hamilton, Opinion on the Constitutionality of a National Bank (February 23, 1791), in Legislative and Documentary History of the Bank of the United States 98 (H. St. Clair & D.A. Hall eds., reprinted Augustus M. Kelley 1967) (1832). This Necessary and Proper doctrine limits congressional power to intrastate economic activities when such activities are closely connected to interstate commerce, without recognizing an implied federal power that is so broad as to obstruct or supplant the states' police powers. In other words, to preserve the constitutional scheme of limited and enumerated powers, the Court drew a judicially administrable line beyond which Congress could not go in enacting "necessary and proper" means to execute its power to regulate interstate commerce. The "substantial effects" doctrine, therefore, established the outer bounds of "necessity" under the Necessary and Proper Clause.

Authority for this reasoning can be found in Chief Justice Marshall's defense of his decision in *McCulloch*. Writing pseudonymously as "A Friend of the Constitution," Marshall explained that the constitutionality of congressional acts depend "on their being the natural direct and appropriate means, or the known and usual means, for the execution of a given power." *John Marshall's Defense of McCulloch v. Maryland* 186 (Gerald Gunter ed., Stanford University Press 1969) (from essay of July 5, 1819). *Lopez* and *Morrison* employ Marshall's reasoning: Only the regulation of intrastate *economic* activity can qualify as "natural direct and appropriate means, or the known and usual means" of executing the commerce power.

Most recently, in *Gonzales v. Raich*, 545 U.S. 1 (2005), the Court found the cultivation of marijuana to be an economic activity that Congress could prohibit as a necessary and proper exercise of its commerce power. *Raich* explicitly adhered to the economic/non-economic distinction sketched out in *Lopez* and *Morrison*. As Justice Stevens wrote for the majority, "Our

7

case law firmly establishes Congress's power to regulate purely local activities that are part of an *economic* 'class of activities' that have a substantial effect on interstate commerce." *Id.* at 17 (emphasis added).

*Raich* also rejected the notion that it was Roscoe Filburn's non-purchase of interstate wheat that brought his personal wheat cultivation under congressional power in *Wickard. See* Barnett, *supra*, at 18-19. Instead, Justice Stevens invoked the Webster's Dictionary definition of commerce—"the production, distribution, and consumption of commodities," *Raich*, 545 U.S. at 25—and thus rejected the government's theory that non-participation in the marketplace was itself economic activity.

As Randy Beck has explained, "Given the close relationship between intrastate and interstate economic activity, a statute regulating local economic conduct will usually be calculated to accomplish an end legitimately encompassed within the plenary congressional authority over interstate commerce." J. Randy Beck, *The New Jurisprudence of the Necessary and Proper Clause*, 2002 U. Ill. L. Rev. 581, 625. In short, regulating intrastate *economic* activity can be a "necessary" means of regulating interstate commerce as that term is understood under the Necessary and Proper Clause. The obvious corollary is that regulating non-economic activity cannot be "necessary," regardless of its effect on interstate commerce. And a power to regulate inactivity is even more remote from Congress's power over interstate commerce.

This repeated reaffirmation of the economic/non-economic distinction, as well as the rejection of the government's theory that non-participation in the marketplace is economic activity, has serious ramifications for the individual mandate. Cases that have applied the substantial effects doctrine—including *NLRB, Darby, Wickard, Heart of Atlanta, McClung, Lopez, Morrison,* and *Raich*—all centered on regulation of an intrastate *activity* in which the

persons had chosen to engage. The Supreme Court held in all of these cases that Congress's power under the Commerce and Necessary and Proper Clauses was limited to regulating intrastate *activity* that is *itself* economic—such as the operation of a farm, hotel, or restaurant— and does not extend to activities that may merely have economic *effects*, such as the commission of gender-motivated violence.

The individual mandate, therefore, takes two steps beyond existing doctrine by regulating *inactivity* because of its alleged economic effects. This extraordinary and unprecedented claim, if accepted, would collapse the traditional distinction between acts and omissions by characterizing a failure to act as a "decision" not to act—thereby transforming inactivity into activity by linguistic alchemy. It would also then collapse the distinction between economic and non-economic activity by characterizing an activity as "economic" not based on the type of activity it may be but on whether it has any economic effect. Since any activity, in the aggregate, can be said to have an economic effect, the line the Court drew between intrastate activity that Congress can reach and that which is outside its powers would be destroyed. Consequently, the Secretary's novel theory would end the scheme of limited and enumerated powers, as well as erase the long-held constitutional distinction "between what is truly national and what is truly local." *Lopez*, 514 U.S. at 567-68 (citing *NLRB*, 301 U.S. at 30). All of this transgresses the current state of Commerce and Necessary and Proper Clause doctrine.

## II.    Congress's Taxing Power Does Not Provide a Constitutional Warrant for the Individual Mandate

"Contrary to pre-enactment representations by the Executive and Legislative branches," the Secretary argues alternatively that Congress used its power to tax for the general welfare to enact the individual mandate. *Virginia v. Sebelius*, 702 F. Supp. 2d 598, 612 (E.D. Va. 2010).

This hastily concocted emergency fallback position—undoubtedly devised because the Supreme Court has never validated an attempt to force individuals to engage in commerce—fails for the simple reason that the mandate itself (the "requirement" that persons buy insurance) does not involve the transfer of anyone's money to the Treasury, and cannot possibly be construed as a tax. The constitutionality of this "requirement" must therefore rise and fall on whether it is within the scope of Congress's regulatory authority under the Commerce and Necessary and Proper Clauses—which Congress itself asserted. Patient Protection and Affordable Care Act ("PPACA"), Pub. L. No. 111-148, §§ 1501(a)(1)-(2), 124 Stat. 119 (2010). If it cannot be so justified, there is nothing for the accompanying "penalty" for non-compliance to enforce.

Even when considering the non-compliance penalty in isolation from the mandate, however, the taxing power argument fails for the reasons *amici* described in our previous memorandum, Mem. for the Cato Institute et al. as *Amici Curiae* in Supp. of Pl's. Opp'n to Mot. to Dismiss at 15-20, *Virginia v. Sebelius*, No. 3:10-cv-00188-HEH (E.D. Va. Jun. 17, 2010), and which we summarize here.[2]

First, the penalty for violating the mandate is not a tax; it is a fine to enforce a statutorily imposed duty to obtain qualifying health insurance. The health care legislation levied various "taxes" elsewhere in its provisions but the section of the statute that identified all the "revenue provisions" of the Act failed to include any reference to the insurance mandate. PPACA, §§ 9001-17. While Congress need not specify what power it is exercising, there is no authority for courts to recharacterize a regulation as a tax when doing so is contrary to Congress's express and actual regulatory purpose. *See, e.g., Sonzinsky v. United States*, 300 U.S. 506, 513-14 (1937)

---

[2] For the most comprehensive analysis (and refutation) of the taxing power justification for the individual mandate to date, *see* Steven J. Willis & Nakku Chung, *Constitutional Decapitation and Healthcare*, 128 Tax Notes 169 (2010).

("Inquiry into the hidden motives which may move Congress to exercise a power constitutionally conferred upon it is beyond the competency of courts."). Indeed, in this instance, the "hidden" justification—that the penalty is a tax—was specifically rejected by the president who signed the legislation. George Stephanopoulos, *Obama: Mandate is Not a Tax*, ABC News, Sept. 20, 2009, http://blogs.abcnews.com/george/2009/09/obama-mandate-is-not-a-tax.html.

Second, if we move beyond the form to the substance, the Supreme Court has clearly stated the difference between a tax and a civil penalty or fine: "A tax is an enforced contribution to provide for the support of government; a penalty . . . is an exaction imposed by statute as punishment for an unlawful act." *United States v. La Franca*, 282 U.S. 568, 572 (1931). "[I]f the concept of penalty means anything, it means punishment for an unlawful act or omission." *United States v. Reorganized CF&I Refabricators of Utah, Inc.*, 518 U.S. 213, 224 (1996) (Souter, J.). It is obvious that the individual mandate penalty exists solely to punish people who decline to purchase health insurance. If it worked perfectly—ensuring that everyone owned a policy—it would raise no revenue whatsoever. In substance, the penalty is a fine, not a (necessarily revenue-raising) tax.

Third, if the penalty for noncompliance is nevertheless deemed to be a tax, it's an unconstitutional one. The Constitution allows for three types of federal taxes, depending on the event that triggers their incidence: income, direct, and excise. The mandate penalty is not an income tax because income does not trigger it. Nor is the penalty a direct tax because it is neither a capitation—a fixed tax levied on each person within a jurisdiction—nor does it tax real or personal property. Nor is it apportioned by population as determined by the census, as direct taxes must be. U.S. Const. art. I, §§ 2, 9. Even if the penalty qualifies as an excise tax—a big

11

"if" because no court has ever upheld an excise on inactivity—it is unconstitutional because it is not "uniform," meaning taxed at the same rate across the country. U.S. Const. art. I, § 8, cl. 1.

Fourth, Congress cannot use the taxing power to enforce a regulation of commerce unless this regulation is authorized elsewhere in the Constitution. *Bailey*, 259 U.S. at 38. Thus, as stated above, this Court has no power to look behind Congress's assertion of its commerce power and speculate as to whether the individual mandate was "really" a tax. But if it did, it would find that the mandate is a regulatory tool explicitly designed to compel the purchase of health insurance; the penalty enforces the mandate and must be authorized under an independent enumerated power.

Fifth, and finally, a "tax" has never before been used to mandate—rather than discourage or prohibit—economic activity. Allowing Congress to exercise this newfound tax power would essentially give it the general police power the Supreme Court has always denied existed. The Congress could mandate or punish any activity so long as it labeled such regulation a "tax" and provided for its enforcement by the I.R.S. Because such a theory is even more radical than the claim that Congress may regulate inactivity when such inactivity has economic effects, it is unlikely that the Supreme Court will ever adopt it. But it surely is outside the province of a lower court to go where the Supreme Court has yet to tread.

In sum, the taxing power argument is a red herring. All roads lead to the existing Commerce and Necessary and Proper Clause scope of Congress's power over intrastate (economic) activity—the substantial effects doctrine—but this doctrine does not currently extend to *inactivity*. Even if mandating activity were deemed "necessary" to effectuate a broader regulation of interstate commerce, however, requiring all citizens to enter into a contract with a private company is an "improper" means of regulating interstate commerce.

III.   **The Individual Mandate Constitutes a "Commandeering of the People" That Is Not "Proper" Under the Necessary and Proper Clause**

Unable to directly justify the individual mandate under existing Commerce Clause, Necessary and Proper Clause, and taxing power doctrines, the Secretary has resorted to "the last, best hope of those who defend ultra vires congressional action," *Printz v. United States*, 521 U.S. 898, 923 (1997) (Scalia, J.): that the Necessary and Proper Clause authorizes Congress to mandate economic activity when doing so is an essential part of a broader regulatory scheme. That is, while not itself a regulation of interstate commerce, or even a regulation of intrastate economic activity, an economic mandate is a necessary and proper means of exercising the lawful ends of regulating interstate commerce in health insurance.  But, as described above, the Supreme Court already has a doctrine governing when Congress may reach wholly intrastate activity as a necessary and proper means of regulating interstate commerce: the substantial effects doctrine.  The regulation of inactivity exceeds the scope of power defined by this doctrine, however, so the Secretary is seeking to go beyond existing doctrine.

The Secretary's proposed theory that Congress may reach intrastate non-economic activity rests on a sentence of *dictum* from *Lopez* and a concurring opinion by Justice Scalia in *Raich*.  But even if such a doctrine is someday accepted by a majority of the Supreme Court, these two sources speak only of the regulation of *activity*.  In *Lopez*, the Court referred to reaching "an essential part of a larger regulation of economic activity, in which the regulatory scheme could be undercut unless the intrastate *activity* were regulated." 514 U.S. at 561.  In *Raich,* Justice Scalia proposed that "Congress may regulate even non-economic local *activity* if that regulation is a necessary part of a more general regulation of interstate commerce." 545 U.S. at 37 (emphasis added).  Neither formulation extends to the regulation of inactivity and, as the

above quote from Justice Scalia suggests, there is good reason to doubt that he would ever extend his proposed doctrine so far.

The Supreme Court has affirmed that Congress cannot use its commerce power to commandeer state legislatures and executive officers. *Printz v. United States*, 521 U.S. 898 (1997); *New York v. United States*, 505 U.S. 144 (1992). As Justice Scalia explained, doing so would be "fundamentally incompatible with our constitutional system of dual sovereignty," and therefore improper under our federalist system. *Printz*, 521 U.S. at 935. In *Printz*, Justice Scalia pointed to the Tenth Amendment as the source of "residual state sovereignty" in a constitutional system that confers upon Congress "not all governmental powers, but only discrete, enumerated ones." *Id.* at 919 (citing U.S. Const. amend. X). He then elaborated that the mandate at issue, even if necessary, could not be justified under the Necessary and Proper Clause: "When a 'la[w]…for carrying into Execution' the Commerce Clause violates the principle of state sovereignty reflected in" the Tenth Amendment and other constitutional provisions, "it is not a 'La[w] . . . *proper* for carrying into execution the Commerce Clause.'" *Id.* at 923-24 (quoting U.S. Const. art. I, § 8, cl. 18) (emphasis added).

Yet, just as imposing economic mandates on states is improper commandeering of the states, so too is imposing economic mandates on individual citizens an improper commandeering of the people. *See generally*, Barnett, *supra*, at 27-42. The Tenth Amendment reads: "The powers not delegated by the Constitution to the United States, nor prohibited by it to the states, are reserved to the states respectively, *or to the people*" (emphasis added). In this way, the text of the Tenth Amendment protects not just state sovereignty, but also popular sovereignty.

Chief Justice John Jay affirmed the priority of popular sovereignty in the first great constitutional case before the Supreme Court, *Chisholm v. Georgia*, noting that the "sovereignty

of the nation is in the people of the nation, and the residuary sovereignty of each State in the people of each state," as the people were "truly the sovereigns of the country." 2 U.S. (Dall.) 419, 471-72 (1793). Fellow Founder James Wilson agreed, recognizing that "[i]f one free man, *an original sovereign*, may do all this; why may not an aggregate of free men, *a collection of original sovereigns*, do this likewise?" *Id.* at 456 (emphasis added). Although the Eleventh Amendment reversed the outcome of *Chisholm* and the Supreme Court has interpreted that Amendment as establishing state sovereignty, the Court has never repudiated the priority of popular sovereignty. *See Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886) ("in our system, while sovereign powers are delegated to the agencies of government, sovereignty itself remains with the people, by whom and for whom all government exists and acts.").

Just as the Constitution disallows the "commandeering" of sovereign states as a means of regulating interstate commerce, so too does it bar a commandeering of the people for this purpose. Various express provisions of the Constitution reflect this anti-commandeering principle. For example, persons may not be mandated to quarter soldiers in their homes in time of peace, U.S. Const. amend. III, to testify against themselves, *id.*, amend. V, or to labor for another, *id.*, amend. XIII.

What very few mandates are imposed on the people by the federal government all rest on the fundamental pre-existing duties that citizens owe that government. Such are the duties to register for the draft and serve in the armed forces if called, to sit on a federal jury, and to file a tax return. *See, e.g., Selective Draft Law Cases*, 245 U.S. 366, 378 (1918) (relying on the "supreme and noble duty of contributing to the defense of the rights and honor of the nation" to reject a claim founded on the Thirteenth Amendment). In the United States, there is not even a duty to vote. So there is certainly no comparable pre-existing "supreme and noble duty" to

engage in economic activity when doing so is convenient to the regulation of interstate commerce—an unprecedented and heretofore unheard-of duty.

There are also pragmatic reasons to believe that the individual mandate is not "proper." In *New York v. United States*, Justice O'Connor explained that mandates on states are improper because, "where the Federal Government directs the States to regulate, it may be state officials who will bear the brunt of public disapproval, while the federal officials who devised the regulatory program may remain insulated from the electoral ramifications of their decision." 505 U.S. 144, 169 (1992). That proposition applies to the commandeering of individuals as well: Congress and the president here escaped political accountability for increasing taxes on persons making less than $250,000 per year by compelling them instead to make payments directly to private companies. It is the evasion of that accountability that explains why the mandate was formulated as a regulatory "requirement" enforced by a monetary "penalty."

The individual mandate crosses a fundamental line between limited constitutional government and limitless power cabined only by the vagaries of political will—which is to say, not cabined at all. If the word "proper" is to be more than dead letter, a meaningless constitutional hiccup, it at least means that acts which destroy the very purpose of Article I—to enumerate and limit the powers of Congress—are improper. If the federal power to enact "economic mandates" were upheld here, Congress would be free to require *anything* of the citizenry in the name of a comprehensive regulatory plan. Unsupported by any fundamental, preexisting, or traditional duty of citizenship, imposing "economic mandates" on the people is improper, both in the lay and constitutional senses of that word.

## CONCLUSION

For the first time in American history, the federal government has attempted to "commandeer the people" by imposing on them an "economic mandate." Such economic mandates cannot be justified by existing Supreme Court doctrines defining and limiting the powers of Congress. Upholding the power to impose economic mandates "would fundamentally alter the relationship of the federal government to the states and the people; nobody would ever again be able to claim plausibly that the Constitution limits federal power." Ilya Shapiro, *State Suits Against Health Reform Are Well Grounded In Law—And Pose Serious Challenges*, 29 Health Affairs 1229, 1232 (June 2010).

As this Court has already recognized, "[n]ever before has the Commerce Clause and the associated Necessary and Proper Clause been extended this far." *Virginia v. Sebelius*, 702 F. Supp. 2d at 612. Only the Supreme Court is empowered to reconsider the outer bounds of Congress's powers. Accordingly, *amici* respectfully request that Plaintiff's Motion for Summary Judgment be granted and the Defendant's Motion denied.

Respectfully submitted this 1st day of October, 2010,

Robert A. Levy*
Ilya Shapiro*
David H. Rittgers (VA Bar #77245)
CATO INSTITUTE
1000 Massachusetts Ave., NW
Washington, DC 20001
(202) 842-0200

Hans Bader*
COMPETITIVE ENTERPRISE INSTITUTE
1899 L Street, NW, 12th Floor
Washington, DC 20036
(202) 331-2278

/s/ Patrick M. McSweeney
Patrick M. McSweeney (VA Bar # 5669)
    *Counsel of Record*
G. William Norris, Jr. (VA Bar # 41754)
MCSWEENEY, CRUMP, CHILDRESS &
    TEMPLE, P.C.
11 South 12th Street
Richmond, VA 23219
(804) 783-6802

* - Not admitted in this court

*Attorneys for* Amici Curiae

## CERTIFICATE OF COMPLIANCE

1. This memorandum complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 5,090 words, excluding the parts exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. This memorandum complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2007 in Times New Roman, 12 point font.

/s/ Patrick M. McSweeney

*Attorney for* Amici Curiae

Dated: October 1, 2010

**CERTIFICATE OF SERVICE**

I hereby certify that on the 1st day of October, 2010, I electronically filed the

foregoing with the Clerk of Court using the CM/ECF system, which will send a

notification of such filing (NEF) to the following:

Earle Duncan Getchell, Jr.
Charles E. James, Jr.
Stephen R. McCullough
Wesley Glenn Russell, Jr.
Office of the Attorney General
900 E. Main Street
Richmond, Virginia 23219

Jonathan Holland Hambrick
Office of the U.S. Attorney
600 E Main St
Suite 1800
Richmond, VA 23219

Erika Myers
Ian Gershengorn
Joel McElvain
Sheila M. Lieber
Department of Justice Federal Programs Branch
20 Massachusetts Ave NW
Room 7332
Washington, DC 20001

Colby M. May
American Center for Law & Justice
201 Maryland Ave., NE
Washington, DC 20002

/s/ Patrick M. McSweeney
McSWEENEY, CRUMP, CHILDRESS &
   TEMPLE, P.C.
11 South 12th Street
Richmond, VA 23219
(804) 783-6802