**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA**
Richmond Division

| | |
|---|---|
| COMMONWEALTH OF VIRGINIA, <br> ex rel. Kenneth T. Cuccinelli, II, in his official <br> capacity as Attorney General of Virginia, <br><br>          Plaintiff, <br><br>     v. <br><br> KATHLEEN SEBELIUS, Secretary of the <br> Department of Health and Human Services, <br> in her official capacity, <br><br>          Defendant. | Civil Action No. 3:10-cv-00188-HEH |

**REPLY MEMORANDUM IN SUPPORT OF
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

**Table of Contents**

Introduction ........................................................................................................................1

Argument ...........................................................................................................................4

I.      The minimum coverage provision is valid under the commerce power because
        it is integral to the ACA's larger regulatory scheme ............................................4

II.     Congress validly exercised its commerce power to enact the minimum coverage
        provision because it regulates conduct with substantial effects on interstate
        commerce ...........................................................................................................11

III.    The minimum coverage provision is a valid exercise of congress's independent
        power under the General Welfare Clause ..........................................................17

Conclusion .......................................................................................................................20

## Table of Authorities

*Cases:*                                                                    *Page:*

*A. Magnano Co.* v. *Hamilton,*
    292 U.S. 40 (1934) ........................................................................ 19

*Adventure Res., Inc.* v. *Holland,*
    137 F.3d 786 (4th Cir. 1998) ....................................................... 19

*Berman* v. *Parker,*
    348 U.S. 26 (1954) ........................................................................ 14

*Bob Jones Univ.* v. *Simon,*
    416 U.S. 725 (1974) ...................................................................... 20

*Cherokee Nation* v. *Southern Kan. Ry. Co.,*
    135 U.S. 641 (1890) ...................................................................... 14

*Child Labor Tax Case,*
    259 U.S. 20 (1922) ........................................................................ 20

*Citizens United* v. *FEC,*
    130 S. Ct. 876 (2010) ...................................................................... 7

*Dep't of Revenue of Mont.* v. *Kurth Ranch,*
    511 U.S. 767 (1994) ...................................................................... 20

*Gibbs* v. *Babbitt,*
    214 F.3d 483 (4th Cir. 2000) ......................................................... 5

*Gonzalez* v. *Raich,*
    545 U.S. 1 (2005) ................................................................. *passim*

*Higginbotham* v. *United States,*
    491 F.2d 432 (4th Cir. 1974) ....................................................... 19

*Hoffman* v. *Hunt,*
    126 F.3d 575 (4th Cir. 1997) ....................................................... 10

*Kennedy* v. *Allera,*
    612 F.3d 261 (4th Cir. 2010) ......................................................... 7

*Kohl* v. *United States,*
    91 U.S. 367 (1875) ........................................................................ 14

*Cases:*  *Page:*

*In re Leckie Smokeless Coal Co.,*
　　99 F.3d 573 (4th Cir. 1996) ............................................................. 19

*Luxton* v. *North River Bridge Co.,*
　　153 U.S. 525 (1894).......................................................................... 14

*M'Culloch v. Maryland*
　　17 U.S. 316 (1819).............................................................................. 6

*McConnell* v. *FEC,*
　　540 U.S. 93 (2003).............................................................................. 7

*Nebraska* v. *EPA,*
　　331 F.3d 995 (D.C. Cir. 2003) ......................................................... 16

*Nelson* v. *Sears, Roebuck & Co.,*
　　312 U.S. 359 (1941) .......................................................................... 17

*Nev. Dep't of Human Res.* v. *Hibbs,*
　　538 U.S. 721 (2003)........................................................................... 16

*New York* v. *United States,*
　　505 U.S. 144 (1992)............................................................................. 7

*Norman* v. *Balt. & Ohio R.R. Co.,*
　　294 U.S. 240 (1935)........................................................................... 14

*Nortz* v. *United States,*
　　294 U.S. 317 (1935)........................................................................... 14

*Nurad, Inc.* v. *William E. Hooper & Sons Co.,*
　　966 F.2d 837 (4th Cir. 1992) ....................................................... 2, 12

*Perez v. United States*
　　402 U.S. 146 (1971) .......................................................................... 15

*Rancho Viejo, LLC* v. *Norton,*
　　323 F.3d 1062 (D.C. Cir. 2003) ....................................................... 16

*Sabri* v. *United States,*
　　541 U.S. 600 (2004).................................................................. 5, 15, 16

*Satellite Broad. & Comm. Ass'n* v. *FCC,*
　　275 F.3d 337 (4th Cir. 2001) ............................................................. 6

iii

*Cases:*                                                                          *Page:*

*Simmons* v. *United States,*
    308 F.2d 160 (4th Cir. 1962) ............................................................... 17

*Sonzinsky* v. *United States,*
    300 U.S. 506 (1937)......................................................................... 3

*United States* v. *Ballinger,*
    395 F.3d 1218 (11th Cir. 2005) ........................................................ 16

*United States* v. *City of Huntington,*
    999 F.2d 71 (4th Cir. 1993) .............................................................. 18

*United States* v. *Comstock,*
    130 S. Ct. 1949 (2010).................................................................. 6, 8

*United States* v. *Darby,*
    312 U.S. 100 (1941)......................................................................... 8

*United States* v. *Grimmett,*
    439 F.3d 1263 (10th Cir. 2006) ........................................................ 16

*United States* v. *LaFranca,*
    282 U.S. 568 (1931)....................................................................... 20

*United States* v. *Lopez,*
    514 U.S. 549 (1995).................................................................. 5, 9, 12

*United States* v. *Morrison,*
    529 U.S. 598 (2000)..................................................................... 8, 9

*United States* v. *Raines,*
    362 U.S. 17 (1960)......................................................................... 15

*United States* v. *Sage,*
    92 F.3d 101 (2d Cir. 1996)............................................................... 16

*United States* v. *Salerno,*
    481 U.S. 739 (1987).................................................................. 15, 16

*United States* v. *Sanchez,*
    340 U.S. 42 (1950).................................................................... 19, 20

*United States* v. *South-Eastern Underwriters Ass'n,*
    322 U.S. 533 (1944)......................................................................... 5

*Cases:*                                                                                                    *Page:*

*West Virginia* v. *U.S. Dep't of Health & Human Servs.*,
  289 F.3d 281 (4th Cir. 2002) .......................................................................... 16

*Woods* v. *Cloyd W. Miller Co.*,
  333 U.S. 138 (1948).......................................................................................... 19

**Statutes:**

26 U.S.C. § 5000A(b) ............................................................................................ 17

26 U.S.C. § 5000A(c) ....................................................................................... 18, 20

26 U.S.C. § 5000A(e) ............................................................................................ 17

26 U.S.C. § 5000A(g) ....................................................................................... 18, 20

26 U.S.C. § 5731(c) ............................................................................................... 19

26 U.S.C. § 5761(a) ............................................................................................... 19

26 U.S.C. § 6684 ................................................................................................... 19

26 U.S.C. § 6720C ................................................................................................ 19

26 U.S.C. § 9707 ................................................................................................... 19

42 U.S.C. § 4012a ................................................................................................. 13

49 U.S.C. § 13906 ................................................................................................. 13

Pub. L. No. 111-148, 124 Stat. 119 (2010):
  § 1201........................................................................................................... 4
  § 1501(a)(2)(F)............................................................................................ 11
  § 1501(a)(2)(G)........................................................................................... 11
  § 1501(a)(2)(I) .............................................................................................. 5
  § 9001........................................................................................................... 18
  § 10106(a) ................................................................................................. 5, 11

**Legislative Materials:**                                                                                  *Page:*

155 Cong. Rec. S13,558 (Dec. 20, 2009) ............................................................. 18

155 Cong. Rec. S13,751 (Dec. 22, 2009) ............................................................. 18

*Legislative Materials:*                                                          **Page:**

156 Cong. Rec. H1824 (Mar. 21, 2010) .................................................................. 18

156 Cong. Rec. H1854 (Mar. 21, 2010) .................................................................. 18

*Health Reform in the 21st Century: Insurance Market Reforms: Hearing Before the*
    *H. Comm. on Ways and Means*, 111th Cong. (2009) ........................................ 4, 5

H.R. Rep. No. 111-443 (2010)..................................................................................... 4

JCX-18-10 (Mar. 21, 2010) ........................................................................................ 18

JCX-47-09 (Nov. 5, 2009) .......................................................................................... 18

*Miscellaneous:*

Bradley Herring, *The Effect of the Availability of Charity Care to the Uninsured on the*
    *Demand for Private Health Insurance*, 24 J. of Health Econ. 225 (2005) ............................ 13

Congressional Budget Office, *How Many Lack Health Insurance and For How Long?*
    (May 2003).............................................................................................................. 12

Congressional Budget Office, *Key Issues In Analyzing Major Health Insurance*
    *Proposals* (Dec. 2008) ........................................................................................... 10

Jack Balkin, *Commerce,* 109 Mich. L. Rev. 1, (2010) ............................................. 13

Jonathan Gruber, *Getting the Facts Straight on Health Care Reform,*
    316 New Engl. J. of Med. 2497 (2009)................................................................... 6

Kaiser Fam. Found., *Uninsured and Untreated: A Look at Uninsured Adults Who*
    *Received No Medical Care for Two Years* (2010) ................................................ 12

Katherine Baicker & Amitabh Chandra, *Myths and Misconceptions About U.S. Health*
    *Insurance* 27 HEALTH AFFAIRS w533 (2008) ..................................................... 10

**Introduction**

The Patient Protection and Affordable Care Act ("ACA") embodies the policy judgments of the democratically accountable branches of the United States government, reached after long, careful deliberation and vigorous debate.  As is evident from the campaign-style rhetoric that suffuses the Commonwealth's filings – for example, the hyperbolic claim that the ACA "command[s] that citizens live their lives for the convenience of the government" – the essence of Virginia's attack on the ACA in this Court is political, not legal.  The Commonwealth has not advanced any legal arguments or established any facts that come close to meeting its heavy burden to prove that Congress exceeded its Article I powers in enacting the ACA.  To the contrary, the ACA, and the minimum coverage provision, are fully justified under well-established Supreme Court and Fourth Circuit case law.

*First*, the Commonwealth has no coherent answer to the point that the minimum coverage provision is a valid exercise of the commerce power because it is an integral part of the ACA's reform of the terms on which health insurance is offered in the interstate market.  Virginia does not contest that the ACA's reforms of the insurance industry – which will require insurers to cover 57 million Americans with pre-existing medical conditions and will bar discrimination in premiums based on health status – are well within the commerce power.  And Virginia has conceded that the minimum coverage provision is "essential" to making those reforms work, because it ensures that people cannot wait until they are gravely ill to purchase the insurance they will need.  That concession is fatal because the Supreme Court has made crystal clear that, even if a particular regulation is not justified under the Commerce Clause on a stand-alone basis, it is nonetheless a valid exercise of the commerce power (and of the power conferred on Congress by the Necessary and Proper Clause) if it is "[an] essential part of a larger regulation of economic

1

activity in which the regulatory scheme could be undercut unless the intrastate activity were regulated." *Gonzalez v. Raich*, 545 U.S. 1, 24-25 (2005); *see also id.* at 36 (Scalia, J., concurring in the judgment).  In response, Virginia urges that the minimum coverage provision can be upheld only if it is independently valid as an exercise of the commerce power.  But that argument flies in the face of *Raich* and would turn the Necessary and Proper Clause into a dead letter.

*Second*, Virginia has not rebutted the Secretary's showing that, even considered on a stand-alone basis, the minimum coverage provision is a valid exercise of the commerce power because it regulates conduct that substantially affects interstate commerce.  At some point, virtually every American will participate in the market for health care services by visiting a doctor or a hospital.  The ACA, by requiring minimum insurance coverage, simply regulates how Americans pay for these services.  The combination of features of the health care market that necessitated this regulation also distinguishes that market from every other.  No person can guarantee that he will divorce himself from this market; no person can guarantee that he will never incur a sudden, unanticipated need for expensive care; and very few persons, absent insurance, can guarantee that they will not shift the cost of that care to the rest of society.  Congress expressly found that the $43 billion dollar annual cost that the uninsured impose in this unique market substantially affects interstate commerce.  By any measure, this finding is correct.

Instead, Virginia contends that these substantial effects on commerce are irrelevant because the minimum coverage provision impermissibly attempts to regulate only "passivity."  The Supreme Court has never invalidated a provision on this basis.  It has never even discussed the distinction.  Indeed, Virginia cites no case where *any* court has pronounced a categorical rule that a party can describe his behavior as "passive," and thereby avoid regulation.  To the contrary, when the defendant in *Nurad, Inc. v. William E. Hooper & Sons Co.*, 966 F.2d 837, 845

2

(4th Cir. 1992), asserted that he was not subject to the Superfund Act because he had only "passively" allowed contamination to leak from his property, the court had no difficulty in rejecting that claim.  Even if this new-found distinction were accepted, however, Virginia's claim would still fail because the Act regulates health care financing, which is quintessential economic activity.  The record shows that the uninsured, as a class, are not passive bystanders in the health care market.  Rather, they actively use health care services, regularly shift in and out of coverage, and, when uninsured, routinely shift their costs onto third parties.  Moreover, the record shows that many individuals defer insurance until their need for health care becomes acute and thus create distortions in the insurance market, raising the cost of insurance premiums. Virginia disregards these empirical realities and instead urges the Court to imagine the hypothetical example of a person who is entirely divorced from the health care and health insurance markets.  Even assuming that it would be permissible to "excise" this hypothetical individual from the class as a whole, there would be no basis for invalidating the minimum coverage provision on its face.  Under the controlling precedent, Virginia must show that the provision is not capable of any constitutional applications.  This Virginia cannot possibly do.

*Third*, and wholly apart from the Commerce Clause, Virginia has failed to rebut the argument that Congress has ample authority under the General Welfare Clause to enact the minimum coverage provision.  The best Virginia can do is to suggest that cases such as *Sonzinsky v. United States,* 300 U.S. 506 (1937), upholding Congress's power under the General Welfare Clause to adopt "regulatory taxes," do not apply because Congress did not explicitly call the minimum coverage provision a tax.  The factual premise of that argument fails.  Congress made clear, repeatedly, that the provision was an exercise of the taxing power.  Indeed, key Senators and House members explicitly defended its constitutionality on that basis.  The legal

premise of the argument is also wrong.  What Congress calls a provision does not matter.  The determinative issue is whether the provision operates, in substance, as a tax.  Among other factors here, the penalty under the minimum coverage provision is to be reported and paid by the taxpayer with his annual tax return, and it turns on household income calculated for tax purposes.  The revenues from the provision go to the general treasury.  And, contrary to Virginia's claim, the provision bears none of the hallmarks of a punishment.  It does not impose a punitive or criminal sanction.  In fact, the ACA expressly forbids criminal prosecutions under the provision and limits the penalty to no more than the cost of insurance.

Because Virginia cannot meet its heavy burden to prove that the minimum coverage provision exceeds Congress's Article I powers in any and all applications, the Secretary's motion for summary judgment should be granted.

## Argument

### I.    The Minimum Coverage Provision Is Valid Under the Commerce Power Because It Is Integral to the ACA's Larger Regulatory Scheme

As part of its comprehensive reforms of the interstate health insurance market, the ACA protects the estimated 57 million Americans who have pre-existing medical conditions.  The Act prevents insurers from denying or revoking coverage for those individuals, or charging discriminatory rates based on those conditions.  ACA, § 1201.  Congress found these reforms necessary to protect consumers and to address a market failure in which insurers are effectively unable, on their own, to extend affordable coverage to those who need it.  *See Health Reform in the 21st Century: Insurance Market Reforms: Hearing Before the H. Comm. on Ways and Means*, 111th Cong. 53 (2009) (Linda Blumberg, Senior Fellow, Urban Inst.); *see also* H.R. REP. NO. 111-443, pt. II, at 990 (2010).  These industry reforms directly regulate the interstate market

in health insurance, and thus are within Congress's commerce power.  *See United States v. South-Eastern Underwriters Ass'n*, 322 U.S. 533, 552-53 (1944).

Congress found the minimum coverage provision to be necessary for the "guaranteed issue" and "community rating" reforms to work.  Unless these insurance industry reforms were coupled with a minimum coverage provision, individuals would have powerful incentives to wait until they fell ill before purchasing health insurance.  ACA, §§ 1501(a)(2)(I), 10106(a).  Instead of extending coverage and lowering costs, the reforms would trigger a spiral of rising premiums and a decline in the number of individuals covered.  *See Health Reform in the 21st Century: Insurance Market Reforms* at 13 (Uwe Reinhardt, Ph.D., Professor of Political Economy, Economics, and Public Affairs, Princeton Univ.).  The minimum coverage provision thus is "'an essential part of a larger regulation of economic activity,'" and absent the provision, "'the regulatory scheme could be undercut,'" placing the provision well within the commerce power. *Raich*, 545 U.S. at 24-25 (quoting *United States v. Lopez*, 514 U.S. 549, 561 (1995)); *see also Gibbs v. Babbitt*, 214 F.3d 483, 497 (4th Cir. 2000).  The same result follows under the Necessary and Proper Clause, as Congress had a rational – indeed, compelling – basis to find the provision necessary to effectuate its exercise of an enumerated power to regulate insurance policies in interstate commerce.  *See, e.g.*, *Sabri v. United States*, 541 U.S. 600, 605 (2004).

Virginia has conceded that the minimum coverage provision is "essential" to the ACA's regulatory scheme.  Compl. ¶ 5.  Under binding Supreme Court and Fourth Circuit precedent, that concession is dispositive.  Virginia now seeks several escape routes from this concession. First, Virginia suggests that it does not matter whether the provision is necessary to a larger regulation of commerce unless the provision itself is a "regulation of interstate commerce or of activities substantially affecting interstate commerce." (Pl.'s Mem. in Opp. to Mot. for Summ. J.

17.)  If, however, the provision must independently meet that standard (and here, in fact, it does), then the inquiry whether it is necessary and proper to a larger regulation would be superfluous. Not only does Virginia's approach fly in the face of *Raich,* it also would effectively overturn *M'Culloch v. Maryland* and turn the Necessary and Proper Clause into a dead letter.

Second, Virginia now suggests that the chain of connections between the insurance industry reforms and the minimum coverage provision and the industry reforms is "too attenuated and remote" to sustain the provision under either the commerce power or the Necessary and Proper Clause.  (Pl.'s Opp. 13.)  Virginia cites Justice Kennedy's concurrence in *United States v. Comstock*, 130 S. Ct. 1949 (2010), which took issue with the Court's recitation of the deferential means-end rationality test under the Necessary and Proper Clause, *see id.* at 1956-57, and proposed instead that "a demonstrated link in fact," "not a mere conceivable rational relation," is needed to establish that Congress acted within its enumerated powers, *id.* at 1967 (Kennedy, J., concurring).  The test applied by the majority of the Court is binding here, but the minimum coverage provision satisfies Justice Kennedy's test as well.  The link between the Act's insurance industry reforms and the minimum coverage provision is demonstrable and direct.  The "guaranteed issue" and "community rating" reforms are regulations of insurance policies placed into interstate commerce, and those reforms depend directly on the minimum coverage provision to work.  *See, e,g.*, Jonathan Gruber, *Getting the Facts Straight on Health Care Reform*, 361 New Engl. J. of Med. 2497, 2498 (2009).[1]

---

[1]  Nor is that link purely theoretical.  The Massachusetts insurance reforms, which included a minimum coverage provision, successfully expanded coverage and lowered costs.  In contrast, the reforms in New York and New Jersey, which lacked such a provision, have not succeeded in making coverage affordable and accessible.  *See* Def.'s Mem. in Supp. of Mot. for Summ. J. 14-15.  Virginia takes issue with the Secretary's citation of such empirical support for Congress's policy choices.  (Pl.'s Opp. 7.)  But courts "may also look to evidence outside the legislative record in order to confirm the reasonableness of Congress's predictions." *Satellite Broad. & Comm. Ass'n v. FCC*, 275 F.3d 337, 357 (4th Cir. 2001).

Despite bearing the burden to prove that the ACA is unconstitutional, Virginia does not dispute these facts.  Indeed, in support of its summary judgment motion, Virginia has alleged only the existence of its statute and the ACA.  Congress, however, expressly found that the minimum coverage provision is essential to its reforms of the health insurance industry.  Nothing in the record of this case disputes that link.  The minimum coverage provision thus falls well within Congress's power, whatever test is applied.

Virginia thus must resort to another newly minted test, arguing that the minimum coverage provision cannot be "proper" under the Necessary and Proper Clause because it "violates the principle of state sovereignty."  (Pl.'s Opp. 19.)  Virginia's invocation of this principle is puzzling, as the provision does not threaten state sovereignty at all.  It does not compel state officials to implement a federal regulatory regime, and so does not implicate the Tenth Amendment.  *See Kennedy v. Allera*, 612 F.3d 261, 269 (4th Cir. 2010) (regulation requiring individual to act, but imposing no obligations on a state, does not violate Tenth Amendment); *see also New York v. United States*, 505 U.S. 144, 166 (1992) ("where Congress has the authority under the Constitution to pass laws requiring or prohibiting certain acts it lacks the power directly to compel the States to require or prohibit those acts").  If Virginia's argument is that the minimum coverage provision regulates conduct that state law would declare legal, that is not a limitation under the Tenth Amendment or the Necessary and Proper Clause.  "It is not uncommon for federal law to prohibit private conduct that is legal in some States.  Indeed, such conflict is inevitable in areas of law that involve both state and federal concerns.  It is not in and of itself a marker of constitutional infirmity."  *McConnell v. FEC*, 540 U.S. 93, 186 (2003).[2]

Virginia's assertion of the "principle of state sovereignty" ultimately is circular.  Virginia

---

[2] *McConnell* was overruled in part on other grounds by *Citizens United v. FEC*, 130 S. Ct. 876 (2010).

argues that the minimum coverage provision violates the Tenth Amendment because it represents an "attempt to exercise an unenumerated power" which "by definition is reserved to the States." (Pl.'s Opp. 19.)  But the argument assumes the conclusion, and wrongly at that.  The minimum coverage provision does not rest on Congress's claimed authority to exercise an "unenumerated power."  It rests on Congress's authority to sustain broader reforms and to address substantial effects on interstate commerce.  Moreover, Congress's power to effectuate its broader reforms in regulating the insurance industry is by no stretch of logic "unenumerated."  Congress has authority to take those measures that it rationally finds necessary to give effect to its regulation of interstate commerce.  Congress's enumerated powers include that implementation authority, and, thus, "[v]irtually by definition, these powers are not powers that the Constitution 'reserved to the States.'"  *Comstock*, 130 S. Ct. at 1962 (quoting U.S. CONST. amend. X.).

Virginia also asserts, repeatedly, that the minimum coverage provision exceeds Congress's powers because it is an exercise of a "federal police power lacking principled limits." (Pl.'s Opp. 15; *see also id.* at 2, 3, 5, 11, 12, 14-15, 18, 20, 21, 31, 33.)  Virginia quotes six times the Court's recognition in *Morrison* that it has "always … rejected readings of … the scope of federal power that would permit Congress to exercise a police power."  *United States v. Morrison*, 529 U.S. 598, 618-19 (2000).  (Pl.'s Opp. 2, 5, 12, 14-15, 31, 33.)[3]  But *Morrison* did not empower Virginia simply to label a federal law as an exercise of the police power, and then speculate as to the absence of "principled limits" on Congress's commerce powers.  *See Raich*,

---

[3] Virginia confuses two separate arguments.  The issue in *Morrison* was not whether the federal government could regulate a subject matter that the state could also regulate under its police power.  There is no question that the federal government has that concurrent power.  "It is no objection to the assertion of the power to regulate interstate commerce that its exercise is attended by the same incidents which attend the exercise of the police power of the states." *United States v. Darby,* 312 U.S. 100, 114 (1941).  The concern of the *Morrison* Court was whether the federal government could assert a limitless power, equivalent to the states' unbounded police power, to regulate even noneconomic matters under the Commerce Clause. There is no sense in which the ACA approaches those defined limits on federal power.

545 U.S. at 25 n.34 (rejecting speculation that Congress will use commerce power to target local

conduct).  *Morrison* involved a law directed at violent crime, "the suppression of which has

always been the prime object of the States' police power."  529 U.S. at 615.  Indeed, the Court

found "no better example of the police power, which the Founders denied the National

Government and reposed in the States, than the suppression of violent crime and vindication of

its victims."  *Id.* at 618.  The regulation of noneconomic, violent crime is not the least bit

analogous to the regulation of health insurance and of the interstate health care market.  The

federal government has long been involved in these areas, and its continued involvement extends

no limits on federal authority under the commerce power.

As the Secretary has previously shown, *Lopez* and *Morrison* establish that Congress may

not use the Commerce Clause to regulate a purely non-economic subject matter, if that subject

matter bears no more than an "attenuated" connection to interstate commerce, and if the

regulation does not form part of a broader scheme of economic regulation.  *Morrison*, 529 U.S.

at 615; *Lopez*, 514 U.S. at 567 (Congress may not "pile inference upon inference" to find a link

between the regulated activity and interstate commerce).  But unlike the statutes at issue in those

cases, the ACA directly regulates a "quintessentially economic" subject matter, *Raich*, 545 U.S.

at 25:  the financing of payments in the health care market, in which all participate.  Virginia

concedes, as it must, that financing decisions in the health care market are "economic."  Compl.

¶ 14.[4]  And the effect of those financing decisions on interstate commerce does not turn on

"attenuated" links.  The connection is direct and substantial.  The minimum coverage provision

thus does not implicate the limits articulated in *Lopez* and *Morrison* on Congressional power to

---

[4]  Even under Virginia's theory, Congress would have authority under the Commerce Clause to require that payments for health care services be made only through insurance.  But no civilized society would foreclose access to health care for those who cannot pay.  If Congress has the power to require insurance as a condition of obtaining medical care, it certainly also may take the lesser step of penalizing the failure to obtain insurance.

regulate noneconomic subjects.[5]

Given that the minimum coverage provision falls within the discernible limits to the commerce power, there is no basis for any claim that the provision represents a limitless "national police power," much less the overwrought claim that it is a "naked command[] that citizens live their lives for the convenience of the government," (Pl.'s Opp. 20.)  Such political rhetoric cannot obscure the fact that the provision simply regulates methods of payment in the health care market – a market unlike any other in that all persons are already participants in the market, no person can disclaim the possibility that he will obtain services in that market (even services for which he will be unable to pay), and no person can predict, whether, or when, he will incur large and sudden expenses that will be shifted on to others in the absence of insurance.  *See* CBO, Key Issues in Analyzing Major Health Insurance Proposals 13 (2008); Katherine Baicker & Amitabh Chandra, *Myths and Misconceptions About U.S. Health Insurance*, 27 Health Affairs w533, w534 (2008).  Despite bearing the burden of proof, Virginia does not, and cannot, dispute that the uninsured are already participants in the national health care market.

Because the minimum coverage provision regulates the choice of methods of payment in a market in which all are already participants, it is entirely unlike Virginia's hypothetical laws that would create commerce in order to regulate it, such as a law "ordering citizens to purchase a certain measure of wheat."  (Pl.'s Opp. 20.)  Virginia's argument ignores that the ACA regulates commerce that is already in existence; the uninsured population's active use of health services, for which they shift the bill to the rest of the market.  And its analogy to the wheat market, again,

---

[5]  Virginia wrongly and repeatedly asserts that Congress cannot regulate noneconomic activity at all under the Commerce Clause.  (Pl.'s Opp. 12, 14.)  In fact, Congress may regulate even noneconomic activity that has a close connection and a "direct and profound effect" on an interstate market.  *Hoffman v. Hunt*, 126 F.3d 575, 587 (4th Cir. 1997).  In any event, the minimum coverage provision is indeed economic regulation.

overlooks the unique features of the health care market.  Unlike the hypothetical person who does not buy wheat, those who go without health insurance already are active participants in the national health care market, and health insurance is a means for paying for those services.  In sum, Virginia cannot, by mere repetition, validate its false claim that the minimum coverage provision represents a "federal police power lacking principled limits."  (Pl.'s Opp. 15.)  The Supreme Court has explicitly defined the limits of Congress's powers under the Commerce Clause and the Necessary and Proper Clause, and Congress stayed within those limits.

## II.     Congress Validly Exercised Its Commerce Power to Enact the Minimum Coverage Provision Because It Regulates Conduct with Substantial Effects on Interstate Commerce

As previously explained, the minimum coverage provision is well within Congress's commerce power for a second reason:  it regulates conduct with substantial effects on interstate commerce.  It is well settled that the Commerce Clause affords Congress the authority to "regulate activities that substantially affect interstate commerce."  *Raich*, 545 U.S. at 16-17. Under this test, the question is only whether Congress could rationally find that the class of activities it seeks to regulate has, in the aggregate, a substantial and direct effect on interstate commerce.  *See Raich*, 545 U.S. at 22.  The Secretary has shown – and (despite bearing the burden of proof) Virginia nowhere has disputed – how economic decisions to forego insurance, with the backstop of free care, substantially affect interstate commerce.  Beyond the $43 billion annually in uncompensated health care costs incurred by the uninsured and shifted to others in the market, ACA, §§ 1501(a)(2)(F), 10106(a), these decisions also result in a surfeit of personal bankruptcies, *see* ACA, §§ 1501(a)(2)(G), 10106(a).

Virginia nowhere disputes that the uninsured actively use health care services, or that cost-shifting results.  Instead, it simply ignores the activity in that market, blindly characterizes

the minimum coverage provision as a regulation of "inaction," and – reprising the discredited "semantic or formalistic" approach to Commerce Clause jurisprudence abandoned many decades ago, *see Lopez,* 514 U.S. at 569 (Kennedy, J., concurring) – asserts that inaction is categorically beyond Congress's commerce power to address.   Thus, Virginia claims that "inaction in the present, with respect to one subject matter (insurance), which can lead to undesirable results in the future, is [not] 'activity,'" and therefore beyond the commerce power.   (Pl.'s Opp. 21.)   This standard is incoherent.   Congress can regulate current behavior – even behavior that Virginia would paint as "inaction" – to avert effects on commerce in the future.   The person who allows hazardous waste to leak from his property "without any active human participation" is fairly described as inactive.   Nonetheless, the Fourth Circuit recognized that he could not "insulate himself from liability by virtue of his passivity," and that he was subject to the Superfund Act. *Nurad, Inc. v. William E. Hooper & Sons Co.*, 966 F.2d 837, 845 (4th Cir. 1992).[6]

In any event, Virginia cannot rest on "content-based or subject-matter distinctions," *Lopez,* 514 U.S. at 569 (Kennedy, J., concurring), like "inaction in the present" to meet its burden of proof.   Virginia has pled no facts to support any claim that the uninsured sit passively in relation to the national health care market.   The undisputed record fully rebuts such allegations.   The large majority of the uninsured have used, and will continue to use, health care services.   *See, e.g.*, Kaiser Fam. Found., *Uninsured and Untreated: A Look at Uninsured Adults Who Received No Medical Care for Two Years*, at 1 (2010) (www.kff.org/uninsured/upload/ 8083.pdf).   Even if one were to look only to insurance coverage, the uninsured still do not sit passively; instead, movement in and out of coverage is "highly fluid."   CBO, How Many

---

[6] *Nurad* is binding circuit authority.   Virginia, however, fails to address the case in its opposition, instead noting only that the Superfund Act is constitutional because it regulates activity with substantial effects on interstate commerce.   (Pl.'s Opp. 23.)   This irrelevant point does not diminish the impact of *Nurad* on Virginia's theory.

PEOPLE LACK HEALTH INSURANCE AND FOR HOW LONG?, at 4, 9 (May 2003).  These active

participants in the health care market regularly make economic calculations comparing the

advantages of insurance against those of other methods of payment, including reliance on charity

care funded by other market participants.  *See* Bradley Herring, *The Effect of the Availability of*

*Charity Care to the Uninsured on the Demand for Private Health Insurance*, 24 J. OF HEALTH

ECON. 225, 226 (2005).  All this conduct by the uninsured – active and regular use of health care

services, economic decisions as to how to pay for those services, migration in and out of

insurance coverage, and shifting costs to other market participants – is, as Congress found,

economic activity.  *See* Jack Balkin, *Commerce*, 109 MICH. L. REV. 1, 46-47 (2010).

Congress has well-established power to regulate this economic activity by requiring

consumers to purchase insurance or pay a penalty.  The Secretary has detailed many examples of

insurance-purchase requirements in the U.S. Code, such as the requirement for certain property

owners to buy flood insurance under 42 U.S.C. § 4012a, or the requirement for motor carriers to

obtain liability insurance under 49 U.S.C. § 13906.  Each of these provisions is a requirement to

enter into a commercial transaction.  Each of these provisions regulates "inactivity," as Virginia

would define the term.  Virginia nonetheless attempts to distinguish these authorities by arguing

that they each involve the regulation of a party who is already involved in a market.  (Pl.'s Opp.

23.)  But, by definition, these provisions regulate persons who are not already in the "flood

insurance market" or the "motor-carrier liability insurance market."  They instead regulate

persons who participate in larger markets, of which insurance coverage is a part.  And this

precisely describes the ACA, which requires insurance coverage within the larger health care

market, a market in which all, inevitably, participate.

Virginia's "inaction" argument is also impossible to square with the settled law that

Congress's enumerated powers include authority to exercise eminent domain – that is, to compel a private party to enter into a transaction – if it reasonably determines that that exercise is needed to further the enumerated power. *See Berman v. Parker*, 348 U.S. 26, 33 (1954) ("Once the object is within the authority of Congress, the right to realize it through the exercise of eminent domain is clear. For the power of eminent domain is merely the means to the end."); *see also Kohl v. United States*, 91 U.S. 367, 372 (1875) (recognizing power of eminent domain to effectuate enumerated powers). In particular, Congress's commerce power includes the power to compel a private party to engage in a transaction, if necessary to further a regulation of interstate commerce. *See, e.g., Luxton v. North River Bridge Co.*, 153 U.S. 525, 529-30 (1894); *Cherokee Nation v. Southern Kan. Ry. Co.*, 135 U.S. 641, 656-57 (1890).

Virginia dismisses these authorities with the assertion that the power of eminent domain is a "taking, not a sale." (Pl.'s Opp. 4.) This is a distinction without a difference. Virginia has claimed that Congress categorically lacks power to regulate persons who are "passive" or "inactive," and, in particular, that it lacks power to require people to enter into transactions. The long history of the federal eminent domain power belies any such categorical rule, as does Congress's long-established authority to impose environmental regulations like the Superfund Act, and insurance-purchase requirements like those discussed. Nor can Virginia's categorical claim be squared with the *Gold Clause Cases*, in which the Supreme Court sustained the Congressional exercise of the commerce power to require persons holding gold bullion, coin, or certificates to exchange them for paper currency. *See Nortz v. United States*, 294 U.S. 317, 328 (1935); *see also Norman v. Balt. & Ohio R.R. Co.*, 294 U.S. 240, 296, 303 (1935) (recognizing requirement as exercise of commerce power).

Instead of Virginia's invention of a categorical rule, the applicable standard is whether

the target of regulation has substantial and direct effects on interstate commerce.  The empirical (and undisputed) evidence establishes that the active conduct of the uninsured, as a class, in using health care services and not paying fully for them does impose those substantial and direct effects on the national health care market, $43 billion worth each year.  Given these substantial effects on interstate commerce, Congressional authority to regulate that class is clear.  "'[W]here the class of activities is regulated and that class is within the reach of federal power, the courts have no power to excise, as trivial, individual instances of the class.'"  *Raich*, 545 U.S. at 23 (quoting *Perez v. United States*, 402 U.S. 146, 154 (1971)).

Under *Raich* and *Perez*, this Court may not ignore these undisputed facts and search instead for hypothetical individuals who purportedly would be beyond the commerce power.  Yet this is what Virginia's theory demands.  Virginia entirely refuses to engage the factual data describing the active behavior of the uninsured as a class, and instead asks the Court to imagine in the abstract a person who sits passively on the sidelines, with no connection to the health care market or to the health insurance market.  But "[t]he delicate power of pronouncing an Act of Congress unconstitutional is not to be exercised with reference to hypothetical cases[.]"  *United States v. Raines*, 362 U.S. 17, 22 (1960).  Accordingly, facial challenges, which "allow a determination that the law would be unconstitutionally applied to different parties and different circumstances from those at hand," are disfavored, because "they invite judgments on fact-poor records."  *Sabri*, 541 U.S. 600, 609 (2004) (rejecting facial Article I challenge).

For this reason, the Court has followed, and still follows, the well-established rule that a plaintiff cannot succeed in a facial challenge by imagining circumstances in which a federal statute might be unconstitutional.  Instead, the plaintiff must show that the statute is unconstitutional in *all* its applications.  *See United States v. Salerno*, 481 U.S. 739, 745 (1987);

*West Virginia v. U.S. Dep't of Health & Human Servs.*, 289 F.3d 281, 292 (4th Cir. 2002).  *See also Nev. Dep't of Human Res. v. Hibbs*, 538 U.S. 721, 743 (2003) (Scalia, J., dissenting) (a facial claim that Congress has exceeded its enumerated powers will fail if the statute is capable of some constitutional applications; incorrectly cited by Virginia for the opposite proposition (Pl.'s Opp. 6)).  Contrary to Virginia's claim (Pl.'s Opp. 8-9), there is no exception to this rule for challenges under the Commerce Clause.  Courts have rejected facial challenges in that setting where the federal statute is capable of at least some constitutional applications.  *See, e.g.*, *United States v. Grimmett*, 439 F.3d 1263, 1271 (10th Cir. 2006); *United States v. Ballinger*, 395 F.3d 1218, 1224 n.2 (11th Cir. 2005); *Rancho Viejo, LLC v. Norton*, 323 F.3d 1062, 1077-78 (D.C. Cir. 2003); *Nebraska v. EPA*, 331 F.3d 995, 998 (D.C. Cir. 2003); *United States v. Sage*, 92 F.3d 101, 106 (2d Cir. 1996).  The need noted in *Sabri* for development of a concrete factual record is no less pressing in challenges under Article I than in any other context.

Even under Virginia's theory of "passivity" – which is not the law – the minimum coverage provision validly regulates many persons who are engaged in economic activity, including people who buy insurance, but not enough; people who use and pay for medical services; and people who buy insurance and then drop it.  Thus, even on its own terms, Virginia cannot meet its heavy burden to show that the minimum coverage provision is incapable of *any* constitutional applications.  Indeed, Virginia does not even attempt to argue that it can meet that heavy burden.  Instead, it argues that it should not be subjected to that burden because "the continuing vitality of *Salerno* in any context is in doubt."  (Pl.'s Opp. 10.)  But – as both parties agree, *see, e.g.*, Pl.'s Mem. in Supp. of Mot. for Summ. J. at 21, 22, 23, 24; Pl.'s Opp. at 2, 6, 12, 27 – this Court does not have the authority to overrule governing Supreme Court precedents.  Under the law as it stands now, Virginia must show that the minimum coverage provision cannot

be validly applied in any circumstance.  This it cannot do, and its facial challenge must fail.

**III.    The Minimum Coverage Provision Is a Valid Exercise of Congress's Independent Power Under the General Welfare Clause**

The Secretary has also shown that the minimum coverage provision is within Congress's Article I authority for a third reason.  Congress has the power under the General Welfare Clause to enact the provision, which prescribes a tax penalty to be reported and paid with an individual's annual tax return, for the failure to obtain qualifying insurance coverage.  In its opposition brief, Virginia reiterates that either Congress did not exercise its taxing power in passing the minimum coverage provision, or that the exercise is somehow unconstitutional.   Both arguments fail.

The core of Virginia's argument is that the minimum coverage provision cannot be an exercise of the taxing power – and the cases upholding allegedly regulatory provisions under the taxing power do not apply – because the statute used the term "penalty" rather than "tax."  (Pl.'s Opp. 25.)  But, as has been discussed, it does not matter how Congress labeled the provision.  What matters is how the provision operates in substance.  "In passing on the constitutionality of a tax law [the Court is] concerned only with its practical operation, not its definition or the precise form of descriptive words which may be applied to it."  *Nelson v. Sears, Roebuck & Co.*, 312 U.S. 359, 363 (1941) (internal quotation omitted); *see also Simmons v. United States*, 308 F.2d 160, 166 n.21 (4th Cir. 1962).

As a matter of substance, rather than form, the provision here operates as an exercise of the taxing power.  The penalty applies only to an individual who is required to file an income tax return for the given year.  26 U.S.C. § 5000A(e)(2).  If the penalty applies to such a taxpayer, he reports it on his return for that tax year, as an addition to his income tax liability.  26 U.S.C. § 5000A(b)(2).  The penalty is calculated as a percentage of the taxpayer's household income (subject to a floor of a fixed amount and a cap equal to the average cost of the cheapest

17

qualifying coverage).  26 U.S.C. § 5000A(c)(1), (2).  The penalty is enforced by the Secretary of the Treasury.  26 U.S.C. § 5000A(g).  And the revenues from the penalty go to the general treasury.  These are all hallmarks of an exercise of the taxing power.  The practical operation of the minimum coverage provision shows that it is "[a]n involuntary pecuniary burden, regardless of name, laid upon individuals or property" for the purpose of supporting the government. *United States v. City of Huntington*, 999 F.2d 71, 73 n.4 (4th Cir. 1993).[7]

Virginia identifies no provision that shares these characteristics, but has been found not to be an exercise of the taxing power.  No such example exists.  Virginia asserts instead, without evidence, that Congress never intended the penalty to be treated as a tax, even though Congress placed the provision in the Internal Revenue Code and required any resulting penalty to be included on the taxpayer's annual income tax return.  During the debate in Congress, however, Congressional leaders explicitly defended the provision's constitutionality as an exercise of the taxing power as well as an exercise of the commerce power.  *See, e.g.*, 156 Cong. Rec. H1854, H1882 (Mar. 21, 2010) (Rep. Miller, Chair, House Comm. on Educ. and Labor); 156 Cong. Rec. H1824, H1826 (Mar. 21, 2010) (Rep. Slaughter, Chair, House Comm. on Rules); 155 Cong. Rec. S13,751, S13,753 (Dec. 22, 2009) (Sen. Leahy, Chair, Sen. Comm. on Judiciary); 155 Cong. Rec. S13,558, S13,581-82 (Dec. 20, 2009) (Sen. Baucus, Chair, Sen. Comm. on Finance).[8]

As the Secretary has shown, a statute that operates in substance as a tax is an exercise of

---

[7]  Virginia cites several provisions of the ACA that are taxes, "demonstrating that it knew how to draw the distinction."  (Pl.'s Opp. 25.)  But one of the very provisions Virginia cites, ACA § 9001, includes what the Act expressly denominates as a "penalty."

[8]  Likewise, the Joint Committee of Taxation, which analyzed the revenue-raising nature of the minimum coverage provision, noted that the penalty under the provision is "assessed through the Code and accounted for as an additional amount of Federal tax owed."  JCX-18-10, at 33 (Mar. 21, 2010).  Virginia characterizes this treatment by a non-partisan entity as "post-enactment" legislative history.  (Pl.'s Opp. 28.)  But in fact, the Committee had been considering the tax and revenue-raising nature of the provision for months.  *See* JCX-47-09 (Nov. 5, 2009).

the taxing power, even where (as here) Congress also made findings under the Commerce Clause in support of the tax.  *See Woods v. Cloyd W. Miller Co.*, 333 U.S. 138, 144 (1948); *Adventure Res., Inc. v. Holland*, 137 F.3d 786, 794 (4th Cir. 1998) (Coal Act premiums are taxes). Virginia tries to distinguish the Coal Act on the ground that its taxing provisions did not impose a "penalty."  (Pl.'s Opp. 30.)  This is false.  The Coal Act imposes an assessment that it describes as a "penalty," which has been expressly recognized as an exercise of the taxing power.  26 U.S.C. § 9707; *see In re Leckie Smokeless Coal Co.*, 99 F.3d 573, 583 (4th Cir. 1996).

Virginia, then, cannot reasonably dispute that Congress has exercised its taxing power in addition to its commerce power.  Instead, Virginia repeats its claim that Congress may not use its taxing power to achieve a regulatory end.  (*E.g.*, Pl.'s Opp. 31.)  This is flatly incorrect; the Court has long upheld taxes with regulatory purposes, even those with purposes otherwise beyond Congress's Commerce Clause authority.  "'From the beginning of our government, the courts have sustained taxes although imposed with the collateral intent of effecting ulterior ends which, considered apart, were beyond the constitutional power of the lawmakers to realize by legislation directly addressed to their accomplishment.'"  *United States v. Sanchez*, 340 U.S. 42, 44-45 (1950) (quoting *A. Magnano Co. v. Hamilton*, 292 U.S. 40, 47 (1934)).  Virginia further argues that the tax penalty "would produce no revenue" if it operates perfectly.  (Pl.'s Opp. 28.) This is not the standard for an exercise of the taxing power, either.  "It is beyond serious question that a tax does not cease to be valid merely because it regulates, discourages, or even definitely deters the activities taxed."  *Sanchez*, 340 U.S. at 44; *see also Higginbotham v. United States*, 491 F.2d 432, 434 n.4 (4th Cir. 1974).  Virginia's suggestion that Congress cannot regulate omissions (Pl.'s Opp. 28) is also plainly false.  Numerous provisions in the Internal Revenue Code impose taxes for failures to act.  *See, e.g.*, 26 U.S.C. §§ 5731(c); 5761(a); 6684; 6720C.

At bottom, Virginia claims that some subset of regulatory taxes cannot be enacted through the taxing power alone. In particular, Virginia argues that the minimum coverage provision is not an exercise of the taxing power but is instead an "exaction imposed by statute as punishment for an unlawful act," citing *United States v. LaFranca*, 282 U.S. 568 (1931). (Pl.'s Opp. 26.) Even if the *Lochner*-era cases on which Virginia relies had any lingering validity (and they do not, *see Bob Jones Univ. v. Simon*, 416 U.S. 725, 741 n.12 (1974) (noting that "distinctions between regulatory and revenue-raising taxes" have been "abandoned")), they would not rescue Virginia's claim.[9] The minimum coverage provision does not impose any criminal "punishment." To the contrary, it expressly precludes criminal prosecution for not obtaining coverage. 26 U.S.C. § 5000A(g)(2)(A). The penalty is not "conditioned on the commission of a crime," a factor that the Court more recently has considered as indicating an intent to punish rather than to tax. *Dep't of Revenue of Mont. v. Kurth Ranch*, 511 U.S. 767, 781 (1994) (distinguishing *Sanchez* on this ground). Nor does the minimum coverage provision impose any *scienter* requirement, which in the past had been considered to indicate an intent to impose criminal punishments. *See Child Labor Tax Case*, 259 U.S. 20, 36-37 (1922). And far from imposing a coercive or disproportionate penalty, the provision caps the tax penalty at the cost of qualifying insurance, 26 U.S.C. § 5000A(c)(1)(B). *See Kurth Ranch*, 511 U.S. at 781. The minimum coverage provision does not impose a "punishment," and thus does not present the question whether a provision that does so would exceed the limits of the taxing power.

### Conclusion

For the foregoing reasons, the Court should award summary judgment to the defendant.

---

[9] The *Lochner*-era cases also looked to whether a taxing provision imposed coercive penalties to force the taxpayer into a separate, detailed administrative scheme. The Secretary has explained that these authorities (which, in any event, have been "abandoned") do not call the minimum coverage provision into question, because the regulatory effect stems from the operation of the taxing provision itself. (Doc. 91 at 45.) Virginia has not argued to the contrary.

DATED this 4th day of October, 2010.

Respectfully submitted,

TONY WEST
Assistant Attorney General

IAN HEATH GERSHENGORN (admitted *pro hac vice*)
Deputy Assistant Attorney General

NEIL H. MacBRIDE
United States Attorney

By:      <u>/s/ Jonathan H. Hambrick</u>
JONATHAN H. HAMBRICK, VSB # 37590
Assistant United States Attorney
Office of the United States Attorney
600 East Main Street, Suite 1800
Richmond, Virginia 23219
Telephone:    (804) 819-5400
Fax:          (804) 819-7417
Email:        jay.h.hambrick@usdoj.gov

JENNIFER RICKETTS RIVERA, VSB # 29281
Director
SHEILA M. LIEBER (admitted *pro hac vice*)
Deputy Director
JOEL McELVAIN (admitted *pro hac vice*)
Senior Counsel
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., NW, Room 7332
Washington, D.C. 20001
Telephone:    (202) 514-2988
Fax:          (202) 616-8202
Email:        Joel.McElvain@usdoj.gov

*Attorneys for the Defendant*

## **CERTIFICATE OF SERVICE**

I hereby certify that on the 4th day of October, 2010, I electronically filed the foregoing

with the Clerk of Court using the CM/ECF system, which will send a notification of such filing

(NEF) to the following:

>
> Earle Duncan Getchell, Jr.
> Charles E. James, Jr.
> Stephen R. McCullough
> Wesley Glenn Russell, Jr.
> Office of the Attorney General
> 900 E. Main Street
> Richmond, Virginia 23219

>
>    /s/ Jonathan H. Hambrick
> JONATHAN H. HAMBRICK, VSB # 37590
> Assistant United States Attorney
> Office of the United States Attorney
> 600 East Main Street, Suite 1800
> Richmond, Virginia 23219
> Telephone:   (804) 819-5400
> Fax:         (804) 819-7417
> Email:       jay.h.hambrick@usdoj.gov