## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Richmond Division

| | |
|---|---|
| COMMONWEALTH OF VIRGINIA<br>EX REL. KENNETH T. CUCCINELLI, II,<br>in his official capacity as Attorney<br>General of Virginia,<br><br>    Plaintiff,<br><br>v.<br><br>KATHLEEN SEBELIUS,<br>SECRETARY OF THE DEPARTMENT<br>OF HEALTH AND HUMAN SERVICES,<br>in her official capacity,<br><br>    Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) Civil Action No. 3:10CV188–HEH<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

### MEMORANDUM OPINION
**(Cross Motions for Summary Judgment)**

In this case, the Commonwealth of Virginia (the "Commonwealth"), through its

Attorney General, challenges the constitutionality of the pivotal enforcement mechanism

of the health care scheme adopted by Congress in the Patient Protection and Affordable

Care Act ("ACA" or "the Act"), Pub. L. No. 111-148, 124 Stat. 119 (2010). At issue is

Section 1501 of the Act, commonly known as the Minimum Essential Coverage

Provision ("the Provision"). The Minimum Essential Coverage Provision requires that

every United States citizen, other than those falling within specified exceptions, maintain

a minimum level of health insurance coverage for each month beginning in 2014. Failure

to comply will result in a penalty included with the taxpayer's annual return. As enacted,

Section 1501 is administered and enforced as a part of the Internal Revenue Code.

In its Complaint, the Commonwealth seeks both declaratory and injunctive relief. Specifically, the Commonwealth urges the Court to find that the enactment of Section 1501 exceeds the power of Congress under the Commerce Clause and General Welfare Clause of the United States Constitution. Alternatively, the Commonwealth contends that the Minimum Essential Coverage Provision is in direct conflict with Virginia Code Section 38.2-3430.1:1 (2010), commonly referred to as the Virginia Health Care Freedom Act, thus implicating the Tenth Amendment.

As part of the relief sought, the Commonwealth also requests prohibitory injunctive relief barring the United States government from enforcing the Minimum Essential Coverage Provision within its territorial boundaries.

The case is presently before the Court on Motions for Summary Judgment filed by both parties pursuant to Federal Rule of Civil Procedure 56. Both sides have again filed well-researched memoranda supplying the Court with a thorough analysis of the controlling issues and pertinent jurisprudence. The Court heard oral argument on October 18, 2010. As this Court previously cautioned, this case does not turn on the wisdom of Congress or the public policy implications of the ACA. The Court's attention is focused solely on the constitutionality of the enactment.

A review of the supporting memoranda filed by each party yields no material facts genuinely in issue and neither party suggests to the contrary. The dispute at hand is driven entirely by issues of law.[1]

---

[1] The Secretary takes issue with the Commonwealth's characterization of aspects of the ACA, its economic impact, and the legislative intent underlying Va. Code Section 38.2-3430.1:1. These

The present procedural posture of this case is best summarized by the penultimate paragraph of this Court's Memorandum Opinion denying the Defendant's Motion to Dismiss:

> While this case raises a host of complex constitutional issues, all seem to distill to the single question of whether or not Congress has the power to regulate—and tax—a citizen's decision not to participate in interstate commerce. Neither the U.S. Supreme Court nor any circuit court of appeals has squarely addressed this issue. No reported case from any federal appellate court has extended the Commerce Clause or Tax Clause to include the regulation of a person's decision not to purchase a product, notwithstanding its effect on interstate commerce.

(Mem. Op. 2, Aug. 2, 2010, ECF No. 84.)

## I.

The Secretary, in her Memorandum in Support of Defendant's Motion for Summary Judgment, aptly sets the framework of the debate: "[t]his case concerns a pure question of law, whether Congress acted within its Article I powers in enacting the ACA." (Def.'s Mem. Supp. Mot. Summ. J. 17, ECF No. 91.) At this final stage of the proceedings, with some refinement, the issues remain the same.

Succinctly stated, the Commonwealth's constitutional challenge has three distinct facets. First, the Commonwealth contends that the Minimum Essential Coverage Provision, and affiliated penalty, are beyond the outer limits of the Commerce Clause and associated Necessary and Proper Clause as measured by U.S. Supreme Court precedent. More specifically, the Commonwealth argues that requiring an otherwise unwilling

---

disputed facts are neither substantive nor essential to issue resolution, and consequently do not preclude summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S. Ct. 2505, 2510 (1986).

individual to purchase a good or service from a private vendor is beyond the boundaries of congressional Commerce Clause power. The Commonwealth maintains that the failure, or refusal, of its citizens to elect to purchase health insurance is not economic activity historically subject to federal regulation under the Commerce Clause.

Alternatively, the Commonwealth contends that the Minimum Essential Coverage Provision cannot be sustained as a legitimate exercise of the congressional power of taxation under the General Welfare Clause. It argues that the Provision is mischaracterized as a tax and is, in actuality, a penalty untethered to an enumerated power. Congress may not, in the Commonwealth's view, exercise such power to impose a penalty for what amounts to passive inactivity.

Lastly, the Commonwealth asserts that Section 1501 is in direct conflict with the Virginia Health Care Freedom Act. Its Attorney General argues that the enactment of the Minimum Essential Coverage Provision is an unlawful exercise of police power, encroaches on the sovereignty of the Commonwealth, and offends the Tenth Amendment to the U.S. Constitution.

The Secretary prefaces her response with an acknowledgement that the debate over the constitutionality of the ACA has evolved into a polemic mix of political controversy and legal analysis. When viewed from a purely legal perspective, the Secretary maintains that the requirement that most Americans obtain a minimum level of health insurance coverage or pay a tax penalty "is well within the traditional bounds of Congress's Article I powers." (Def.'s Mem. Supp. 1.) Her argument begins with an explanation of the reformative impact of the health care regime created by the Act.

4

"[T]he Act is an important, but incremental, advance that builds on prior reforms of the interstate health insurance market over the last 35 years." (Def.'s Mem. Supp. 1.)  The Secretary points to congressional findings that the insurance industry has failed to take corrective action to eliminate barriers which prevent millions of Americans from obtaining affordable insurance.  To correct this systemic failure in the interstate health insurance market, Congress adopted a carefully crafted scheme which bars insurers from denying coverage to those with preexisting conditions, and from charging discriminatory premiums on the basis of medical history.

In order to guarantee the success of these reforms, the Secretary maintains that Congress properly exercised its powers under the Commerce Clause, or alternatively the Necessary and Proper Clause, to adopt a regulatory mechanism to effectuate these health care market reform measures, namely the Minimum Essential Coverage Provision.  "[B]ecause the Act regulates health care financing [it] is quintessential economic activity." (Def.'s Reply Mem. 3, ECF No. 132.)

Moreover, the Secretary rejects the Commonwealth's contention that the implementation of the Minimum Essential Coverage Provision through the Necessary and Proper Clause violates state sovereignty.  Since the penalty mechanism does not compel state officials to carry out a federal regulatory scheme, she maintains that it does not implicate the Tenth Amendment.

The Secretary also disputes the logic behind the Commonwealth's contention that the Provision compels health care market participation by individuals who do not wish to

purchase insurance.  She dismisses the notion that uninsured people can sit passively on the market sidelines.  Her reasoning flows from the observation that

> the large majority of the uninsured regularly migrate in and out of insurance coverage.  That is, the uninsured, as a class, often make, revisit, and revise economic decisions as to how to finance their health care needs.  Congress may regulate these economic actions when they substantially affect interstate commerce. . . . Insurance-purchase requirements have long been fixtures in the United States Code.

(Def.'s Mem. Supp. 2.)

Both the Secretary's argument in defense of the Provision and the apparent underlying rationale of Congress are premised on the facially logical assumption that every individual at some point in life will need some form of health care.  "No person can guarantee that he will divorce himself entirely from the market for heath care services." (Def.'s Mem. Opp. Mot. Summ. J. 1, ECF No. 96.)  "[N]o person can guarantee that he will never incur a sudden, unanticipated need for expensive care; and very few persons, absent insurance, can guarantee that they will not shift the cost of that care to the rest of society." (Def.'s Reply Mem. 2.)  In the Secretary's view, failure to appreciate this logic is the fatal flaw in the Commonwealth's position.[2]

On a third front, the Secretary defends the Minimum Essential Coverage Provision as a valid exercise of Congress's independent authority to lay taxes and make expenditures for the general welfare.  Contrary to earlier representations by the

---

[2] In *Florida ex rel. McCollum v. U.S. Dep't of Health & Human Servs.*, Judge Vinson aptly captures the theoretic underpinning of the Secretary's argument. "Their argument on this point can be broken down to the following syllogism: (1) because the majority of people will at some point in their lives need and consume healthcare services, and (2) because some of the people are unwilling or unable to pay for those services, (3) Congress may regulate everyone and require that everyone have specific, federally-approved insurance." 716 F. Supp. 2d 1120, 1162 (N.D. Fla. 2010).

Legislative and Executive branches, the Secretary now states unequivocally that the Provision is a tax, published in the Internal Revenue Code, and enforced by the Internal Revenue Service. The Secretary notes that "[i]ts penalty operates as an addition to an individual's income tax liability on his annual tax return, which is calculated by reference to income." (Def.'s Mem. Supp. 2.) The Secretary also cites projections that it will raise $4 billion annually in general revenue. She takes issue with the Commonwealth's position that there is a legal distinction between penalties that serve regulatory purposes and other forms of revenue raising taxation. In her opinion, any such legal distinction has long been abandoned by the Supreme Court.[3]

Finally, the Secretary highlights several precepts of legal analysis which she suggests should guide the Court in reviewing the issues raised. First, she cautions the Court to remember that the standard for facial challenges establishes a high hurdle. It requires the Commonwealth to demonstrate that there are no possible circumstances in which the Provision could be constitutionally applied. *United States v. Salerno*, 481 U.S. 739, 745, 107 S. Ct. 2095, 2100 (1987). In other words, they "must show that the [statute] cannot operate constitutionally under any circumstance." *West Virginia v. U.S. Dep't of Health & Human Servs.*, 289 F.3d 281, 292 (4th Cir. 2002). Proof of a single constitutional application is all that is necessary in her view. In summary, she explains

---

[3] Because the Minimum Essential Coverage Provision is incorporated into the Internal Revenue Code, and technically under the purview of the Secretary of the Treasury, Secretary Sebelius, at this late stage, maintains that the Secretary of the Treasury is a necessary party, whose absence as such warrants dismissal. This aspect of her motion was rejected by a separate Memorandum Order (Dk. No. 152) dated October 13, 2010.

for Virginia's facial challenge to succeed under its theory, this Court would
have to conclude that no uninsured individual would ever use or be charged
for medical services, and that no uninsured individual would ever make an
active decision whether to purchase insurance. Because such a showing
cannot be made, Virginia's facial challenge must fail.

(Def.'s Mem. Opp. 19.)

On this issue, the Secretary holds the weaker hand. The cases she relies upon,

*Salerno* and *West Virginia*, which are styled as facial challenges, focus on the impact or

effect of the enactment at issue. The immediate lawsuit questions the authority of

Congress—at the bill's inception—to enact the legislation. The distinction is somewhat

analogous to subject matter jurisdiction, the power to act ab initio. By their very nature,

almost all constitutional challenges to specific exercises of enumerated powers,

particularly the Commerce Clause, are facial. "When . . . a federal statute is challenged

as going beyond Congress's enumerated powers, under our precedents the court first asks

whether the statute is unconstitutional *on its face.*" *Nev. Dep't of Human Res. v. Hibbs*,

538 U.S. 721, 743, 123 S. Ct. 1972, 1986 (2003) (Scalia, J., dissenting); *see also City of*

*Boerne v. Flores*, 521 U.S. 507, 516, 117 S. Ct. 2157, 2162 (1997). A careful

examination of the Court's analysis in *Lopez* and *Morrison* does not suggest the standard

articulated in *Salerno*. In both *Lopez* and *Morrison*, the Court declared the statute under

review to be legally stillborn without consideration of its effect downstream.

In fact, the viability of the *Salerno* dictum cited by the Secretary has been

questioned by the Court in *City of Chicago v. Morales*, 527 U.S. 41, 119 S. Ct. 1849

(1999). "To the extent we have consistently articulated a clear standard for facial

challenges, it is not the *Salerno* formulation, which has never been the decisive factor in

8

any decision of this Court, including *Salerno* itself." *Id.* at 55 n.22, 119 S. Ct. at 1858 n.22. *See also Fargo Women's Health Org. v. Schafer*, 507 U.S. 1013, 1013, 113 S. Ct. 1668, 1669 (1993) (O'Connor, J., concurring in denial of stay and injunction); *Planned Parenthood v. Miller*, 63 F.3d 1452, 1458 (8th Cir. 1995).

Even if the Commonwealth is held to the higher standard of proof, unconstitutionality in all applications, it could be met if the enforcement mechanism is itself unconstitutional. Importantly, it is not the effect on individuals that is presently at issue—it is the authority of Congress to compel *anyone* to purchase health insurance. An enactment that exceeds the power of Congress to adopt adversely affects everyone in every application. Indeed, the Minimum Essential Coverage Provision touches every American citizen required to file an annual IRS Form 1040 or 1040A.[4]

Second, the Secretary correctly asks the Court to be mindful that it must presume the constitutionality of federal legislation. *Gibbs v. Babbitt*, 214 F.3d 483, 490 (4th Cir. 2000). Third, she reminds the Court that the task at hand is not to independently review the facts underlying the decision of Congress to exercise its Article I authority to enact legislation. Reviewing courts are confined to a determination of whether a rational basis exists for such congressional action. *See Gonzales v. Raich*, 545 U.S. 1, 22, 125 S. Ct. 2195, 2208 (2005).

---

[4] The Commonwealth also contends that the only application at issue is the conflict with the Virginia Health Care Freedom Act. The Court, however, need not specifically reach this issue.

## II.

In this Court's Memorandum Opinion denying the Defendant's Motion to Dismiss, the Court recognized that the Secretary's application of the Commerce Clause and General Welfare Clause appeared to extend beyond existing constitutional precedent. It was also noted that each side had advanced some authority arguably supporting the theory underlying their position. Accordingly, the Court was unable to conclude at that stage that the Complaint failed to state a cause of action. At this point, the analysis proceeds to the next level. To prevail, the Commonwealth, as Plaintiff, must make "a plain showing that Congress has exceeded its constitutional bounds." *Gibbs*, 214 F.3d at 490 (internal citation omitted). To win summary judgment, the Secretary must convince the Court to the contrary.

Under Federal Rule of Civil Procedure 56(c)(2), summary judgment should be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *News & Observer Publ'g Co. v. Raleigh-Durham Airport Auth.*, 597 F.3d 570, 576 (4th Cir. 2010) (quoting Fed. R. Civ. P. 56(c)(2)). "The moving party is 'entitled to judgment as a matter of law' when the nonmoving party fails to make an adequate showing on an essential element for which it has the burden of proof at trial." *News & Observer Publ'g Co.*, 597 F.3d at 576; *see Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 805–06, 119 S. Ct. 1597, 1603 (1999). Aside from sparring over representations of marginal consequence, there do not

appear to be any material facts genuinely at issue. This case turns solely on issues of law.

Both parties acknowledge that resolution by summary judgment is appropriate.

### III.

Turning to the merits, this Court previously noted that the Minimum Essential

Coverage Provision appears to forge new ground and extends the Commerce Clause

powers beyond its current high water mark. The Court also acknowledged the finite well

of jurisprudential guidance in surveying the boundaries of such power. The historically-

accepted contours of Article I Commerce Clause power were restated by the Supreme

Court in *Perez v. United States*, 402 U.S. 146, 150, 91 S. Ct. 1357, 1359 (1971). The

*Perez* Court divided traditional Commerce Clause powers into three distinct strands.

First, Congress can regulate the channels of interstate commerce. *Id.* Second, Congress

has the authority to regulate and protect the instrumentalities of interstate commerce and

persons or things in interstate commerce. *Id.* Third, Congress has the power to regulate

activities that substantially affect interstate commerce. *Id.* It appears from the tenor of

the debate in this case that only the third category of Commerce Clause power is

presently at issue.

Critical to the Secretary's argument is the notion that an individual's decision not

to purchase health insurance is in effect "economic activity." (Def.'s Mem. Supp. 35.)

The Secretary rejects the Commonwealth's implied premise that a person can simply

elect to avoid participation in the health care market. It is inevitable, in her view, that

every individual—today or in the future—healthy or otherwise—will require medical

care. She adds that a large segment of the population is uninsured and "consume[s] tens

of billions of dollars in uncompensated care each year." (Def.'s Mem. Opp. 14.)  The

Secretary maintains that the irrefutable facts demonstrate that "[t]he conduct of the

uninsured—their economic decision as to how to finance their health care needs, their

actual use of the health care system, their migration in and out of coverage, and their

shifting of costs on to the rest of the system when they cannot pay—plainly is economic

activity." (Def.'s Mem. Opp. 16–17.)

The Secretary relies on what is commonly referred to as an aggregation theory,

which is conceptually based on the hypothesis that the sum of individual decisions to

participate or not in the health insurance market has a critical collective effect on

interstate commerce.  Congress may regulate even intrastate activities if they are within a

class of activities that, in the aggregate, substantially affect interstate commerce.  In

support of this argument, the Secretary relies on the teachings of the Supreme Court in

*Gonzales*, wherein the Court noted that "[w]hen Congress decides that the 'total

incidence' of a practice poses a threat to a national market, it may regulate the entire

class." *Gonzales*, 545 U.S. at 17, 125 S. Ct. at 2205–06 (citing *Perez*, 402 U.S. at 154, 91

S. Ct. at 1361).  In other words, her argument is premised on the theoretical effect of an

aggregation or critical mass of indecision on interstate commerce.

The core of the Secretary's primary argument under the Commerce Clause is that

the Minimum Essential Coverage Provision is a necessary measure to ensure the success

of its larger reforms of the interstate health insurance market.[5]  The Secretary emphasizes

---

[5] The Secretary seems to sidestep the independent freestanding constitutional basis for the
Provision.

that the ACA is a vital step in transforming a currently dysfunctional interstate health insurance market. In the Secretary's view, the key elements of health care reform are coverage of those with preexisting conditions and prevention of discriminatory premiums on the basis of medical history. These features, the Secretary maintains, will have a material effect on the health insurance underwriting process, and inevitably, the cost of insurance coverage. Therefore, without full market participation, the financial foundation supporting the health care system will fail, in effect causing the entire health care regime to "implode." Unless everyone is required by law to purchase health insurance, or pay a penalty, the revenue base will be insufficient to underwrite the costs of insuring individuals presently considered as high risk or uninsurable. Therefore, under the Secretary's reasoning, since Congress has the power under the Commerce Clause to reform the interstate health insurance market, it also possesses, under the Necessary and Proper Clause, the power to make the regulation effective by enacting the Minimum Essential Coverage Provision. *United States v. Wrightwood Dairy Co.*, 315 U.S. 110, 118–19, 62 S. Ct. 523, 525–26 (1942).

The Secretary seeks legal support for her aggregation theory in the Supreme Court's holding in *Wickard v. Filburn*, 317 U.S. 111, 63 S. Ct. 82 (1942) and *Gonzales*. She maintains that the central question is whether there is a rational basis for concluding that the class of activities at issue, when "taken in the aggregate," substantially affects interstate commerce. *Gonzales*, 545 U.S. at 22, 125 S. Ct. at 2208; *Wickard*, 317 U.S. at 127–28. In other words, "[w]here the class of activities is regulated and that class is within reach of federal power, the courts have no power 'to excise, as trivial, individual

instances' of the class." *Gonzales*, 545 U.S. at 23, 125 S. Ct. at 2209 (quoting *Perez*, 402 U.S. at 154, 91 S. Ct. at 1361); *United States v. Malloy*, 568 F.3d 166, 180 (4th Cir. 2009), *cert. denied*, 130 S. Ct. 1736 (2010).

In *Wickard*, the Supreme Court upheld the power of Congress to regulate the personal cultivation and consumption of wheat on a private farm. The Court reasoned that the consumption of such non-commercially produced wheat reduced the amount of commercially produced wheat purchased and consumed nationally, thereby affecting interstate commerce. *Wickard* is generally acknowledged to be the most expansive application of the Commerce Clause by the Supreme Court, followed by *Gonzales*.

At issue in *Gonzales* was whether the aggregate effect of personal growth and consumption of marijuana for medicinal purposes under California law had a sufficient impact on interstate commerce to warrant regulation under the Commerce Clause. The Supreme Court concluded that "[l]ike the farmer in *Wickard*, respondents are cultivating, for home consumption, a fungible commodity for which there is an established, albeit illegal, interstate market. . . . Here too, Congress had a rational basis for concluding that leaving home-consumed marijuana outside federal control would similarly affect price and market conditions." *Gonzales*, 545 U.S. at 18–19, 125 S. Ct. at 2206–07.

The Secretary emphasizes that the Commonwealth's challenge fails to appreciate the significance of the overall regulatory scheme and program at issue. Quoting from *Gonzales*, the Secretary notes that when "a general regulatory statute bears a substantial relation to commerce, the *de minimis* character of individual instances arising under the statute is of no consequence." (Def.'s Mem. Supp. 19 (quoting *Gonzales*, 545 U.S. at 17,

14

125 S. Ct. at 2206).)  Furthermore, the Secretary adds that "[f]or the provisions of '[a] complex regulatory program' to fall within [Congress's] commerce power, '[i]t is enough that the challenged provisions are an integral part of the regulatory program and that the regulatory scheme when considered as a whole satisfies this test.'" (Def.'s Mem. Opp. 9 (quoting *Gibbs*, 214 F.3d at 497).)

When reviewing congressional exercise of the Commerce Clause powers, the Secretary cautions that a court "need not itself measure the impact on interstate commerce of the activities Congress sought to regulate, nor need the court calculate how integral a particular provision is to a larger regulatory program.  The court's task instead is limited to determining 'whether a rational basis exists' for Congress's conclusions."[6] (Def.'s Mem. Supp. 19 (quoting *Gonzales*, 545 U.S. at 22, 125 S. Ct. at 2208).)

Because the Minimum Essential Coverage Provision is the linchpin which provides financial viability to the other critical elements of the overall regulatory scheme, the Secretary concludes that its adoption is within congressional Commerce Clause powers.  She emphasizes that Congress "rationally found that a failure to regulate the

---

[6] In response to footnote 1 in the Court's Memorandum Opinion denying Defendant's Motion to Dismiss, the Secretary addresses the effect of the McCarran-Ferguson Act on the power of Congress to regulate the business of insurance under the Commerce Clause.  The Act expressly declared that the regulation and taxation of the business of insurance, and all who engage in it, should be subject to the laws of the several states unless Congress specifically states the contrary.  15 U.S.C. § 1012.  *Life Partners, Inc. v. Morrison*, 484 F.3d 284, 292 (4th Cir. 2007) *cert. denied*, 552 U.S. 1062 (2007).

The Secretary points out that where Congress exercises that power, its enactment controls over any contrary state law.  *Humana, Inc. v. Forsyth*, 525 U.S. 299, 306, 119 S. Ct. 710, 716 (1999).  Specifically, the Secretary maintains that the ACA reforms the insurance industry by preventing insurers from denying or revoking coverage for those with preexisting conditions and by protecting individuals with such conditions from being charged discriminatory rates.  These provisions, which are effectuated by the Minimum Essential Coverage Provision, in the Secretary's view, regulate the business of insurance.

The Commonwealth counters, however, that an individual's decision not to purchase insurance is not within the logical ambit of the business of insurance.

decision to delay or forego insurance—*i.e.*, the decision to shift one's costs on to the larger health care system—would undermine the 'comprehensive regulatory regime.'" (Def.'s Mem. Supp. 27 (quoting *Gonzales*, 545 U.S. at 27, 125 S. Ct. at 2211).) Therefore, the Secretary posits that because the guaranteed coverage and rate discrimination issues are unquestionably within the Commerce Clause powers, the mechanism chosen by Congress to effectuate those reforms, the Minimum Essential Coverage Provision, is also a proper exercise of that power—either under the Commerce Clause or the associated Necessary and Proper Clause.

## IV.

The Secretary characterizes the Minimum Essential Coverage Provision as the vital kinetic link that animates Congress's overall regulatory reform of interstate health care and insurance markets. "[T]he Necessary and Proper Clause makes clear that the Constitution's grants of specific federal legislative authority are accompanied by broad power to enact laws that are 'convenient, or useful' or 'conducive' to the authority's 'beneficial exercise.'" *United States v. Comstock*, 130 S. Ct. 1949, 1956 (2010) (quoting *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 408 (1819). The Secretary maintains that because Congress has rationally concluded "that the minimum coverage provision is necessary to make the other regulations in the Act effective," it is an appropriate exercise of the Necessary and Proper Clause. (Def.'s Mem. Supp. 29.) Again, the Secretary contends that the determination of whether the means adopted to attain its legislative goals are rationally related is reserved for Congress alone. *Burroughs v. United States*, 290 U.S. 534, 547–48, 54 S. Ct. 287, 291 (1934).

Although the Necessary and Proper Clause vests Congress with broad authority to exercise means, which are not themselves an enumerated power, to implement legislation, it is not without limitation. As the Secretary concedes, the means adopted must not only be rationally related to the implementation of a constitutionally-enumerated power, but it must not violate an independent constitutional prohibition. *Comstock*, 130 S. Ct. at 1956–57. Whether the Minimum Essential Coverage Provision, which requires an individual to purchase health insurance or pay a penalty, is borne of a constitutionally-enumerated power, is the core issue in this case. As the Supreme Court noted in *Buckley v. Valeo*, "Congress has plenary authority in all areas in which it has substantive legislative jurisdiction, . . . so long as the exercise of that authority does not offend some other constitutional restriction." 424 U.S. 1, 132, 96 S. Ct. 612, 688 (1976) (internal citation omitted). The Commonwealth argues that the Provision offends a fundamental restriction on Commerce Clause powers.

In their opposition, the Commonwealth focuses on what it perceives to be the central element of Commerce Clause jurisdiction—economic activity. The Commonwealth distinguishes what was deemed to be "economic activity" in *Wickard* and *Gonzales*, namely a voluntary decision to grow wheat or cultivate marijuana, from the involuntary act of purchasing health insurance as required by the Provision. In *Wickard* and *Gonzales*, individuals made a conscious decision to grow wheat or cultivate marijuana, and consequently, voluntarily placed themselves within the stream of interstate commerce. Conversely, the Commonwealth maintains that the Minimum

Essential Coverage Provision compels an unwilling person to perform an involuntary act and, as a result, submit to Commerce Clause regulation.

Drawing on the logic articulated in *United States v. Lopez*, 514 U.S. 549, 115 S. Ct. 1624 (1995) and *United States v. Morrison*, 529 U.S. 598, 120 S. Ct. 1740 (2000), which limited the boundaries of Commerce Clause jurisdiction to activities truly economic in nature and that actually affect interstate commerce, the Commonwealth contends that a decision not to purchase a product, such as health insurance, is not an economic *activity*. In *Morrison*, the Court noted that "[e]ven [our] modern-era precedents which have expanded congressional power under the Commerce Clause confirm that this power is subject to outer limits." *Morrison*, 529 U.S. at 608, 120 S. Ct. at 1748–49. The Court in *Morrison* also pointed out that "the existence of congressional findings is not sufficient, by itself, to sustain the constitutionality of Commerce Clause legislation." *Id.* at 614, 120 S. Ct. at 1752. Finally, in *Morrison*, the Court rejected "the argument that Congress may regulate noneconomic, violent criminal conduct based solely on the conduct's aggregate effect on interstate commerce." *Id.* at 617, 120 S. Ct. at 1754. The Commonwealth urges a similar analysis in this case.

The Commonwealth does not appear to challenge the aggregate effect of the many moving parts of the ACA on interstate commerce. Its lens is narrowly focused on the enforcement mechanism to which it is hinged, the Minimum Essential Coverage Provision.

The Commonwealth argues that the Necessary and Proper Clause cannot be employed as a vehicle to enforce an unconstitutional exercise of Commerce Clause

power, no matter how well intended. Although the Necessary and Proper Clause grants Congress broad authority to pass laws in furtherance of its constitutionally-enumerated powers, its authority is not unbridled. As Chief Justice John Marshall observed in *McCulloch*, "[l]et the end be legitimate, let it be within the scope of the constitution, and all means which are appropriate, which are plainly adapted to that end, which are not prohibited, but consistent with the letter and spirit of the constitution, are constitutional." *McCulloch*, 17 U.S. (4 Wheat.) at 421.

More recently, in restating the limitations on the scope of the Necessary and Proper Clause, the Supreme Court defined the relevant inquiry, "we look to see whether the statute constitutes a means that is rationally related to the implementation of a constitutionally enumerated power." *Comstock*, 130 S. Ct. at 1956. If a person's decision not to purchase health insurance at a particular point in time does not constitute the type of economic activity subject to regulation under the Commerce Clause, then logically an attempt to enforce such provision under the Necessary and Proper Clause is equally offensive to the Constitution.

The Secretary, in rebuttal, faults the Commonwealth's reasoning as overly simplistic. She argues that the Commonwealth's theory is dependent on which method a person chooses to finance their inevitable health care expenditures. If the costs are underwritten by an insurance carrier, it is activity; if the general public pays by default, it is passivity. She maintains that under the Commonwealth's reasoning, the former is subject to Commerce Clause powers, while the latter is not. The Secretary also points out that under the Commonwealth's approach, "it [is] unclear whether an individual became

'passive,' and therefore supposedly beyond the reach of the commerce power, if he dropped his policy yesterday, a week ago, or a year ago." (Def.'s Mem. Opp. 18.) She characterizes the Commonwealth's logic as untenable.

The Secretary also rejects the notion that the imposition of a monetary penalty for failing to perform an act is outside the spirit of the Constitution. She offers two examples to highlight the point. In the context of Superfund regulation, a property owner cannot avoid liability for allowing contamination on his property by claiming that he was only "passive." Mere ownership of contaminated property under the Superfund Act triggers an obligation to undertake remedial measures. *Nurad, Inc. v. Wm. E. Hooper & Sons Co.*, 966 F.2d 837, 845 (4th Cir. 1992). Moreover, a property owner cannot defeat an action to take a parcel of his land under the power of eminent domain, simply by passively taking no action. *Berman v. Parker*, 348 U.S. 26, 33, 75 S. Ct. 98, 103 (1954).

In addition, the Secretary points out that sanctions have historically been imposed for failure to timely file tax returns or truthfully report or pay taxes due, as well as failure to register for the selective service or report for military duty. The Commonwealth, however, counters that most of the examples presented are directly related to a specific constitutional provision—empowering Congress to assess taxes and to provide and maintain an Army and Navy, U.S. Const. art. I, § 8, or requiring compensation for exercising the power of eminent domain. U.S. Const. amend. V. In the case of the landowner sanctioned for contamination of his property, liability largely stemmed from an active transaction of purchase. In contrast, no specifically articulated constitutional authority exists to mandate the purchase of health insurance.

**V.**

Despite the laudable intentions of Congress in enacting a comprehensive and transformative health care regime, the legislative process must still operate within constitutional bounds. Salutatory goals and creative drafting have never been sufficient to offset an absence of enumerated powers. As the Supreme Court noted in *Morrison*, "[e]ven [our] modern-era of precedents which have expanded congressional power under the Commerce Clause confirm that this power is subject to outer limits." *Morrison*, 529 U.S. at 608, 120 S. Ct. at 1748–49 (quoting *Lopez*, 514 U.S. at 556–57, 115 S. Ct. at 1628). Congressional findings, no matter how extensive, are insufficient to enlarge the Commerce Clause powers of Congress. *Morrison*, 529 U.S. at 614, 120 S. Ct. at 1752.

In *Wickard* and *Gonzales*, the Supreme Court staked out the outer boundaries of Commerce Clause power. In both cases, the activity under review was the product of a self-directed affirmative move to cultivate and consume wheat or marijuana. This self-initialed change of position voluntarily placed the subject within the stream of commerce. Absent that step, governmental regulation could have been avoided.

In *Morrison* and *Lopez*, however, the Supreme Court tightened the reins and insisted that the perimeters of legislation enacted under Commerce Clause powers square with the historically-accepted contours of Article I authority delineated by the Supreme Court in *Perez v. United States*, 402 U.S. 146, 91 S. Ct. 1357 (1971). Pertinent to the immediate case, the Court in *Perez* stated that Congress has the power to regulate *activities* that substantially affect interstate commerce. *Id.* at 150, 91 S. Ct. at 1359. In

*Perez*, the Court upheld a federal prohibition on extortionate credit transactions, even though the specific transaction in question had not occurred in interstate commerce.

The Court in *Lopez* and *Morrison* constrained the boundaries of Commerce Clause jurisdiction to activities truly economic in nature and that had a demonstrable effect on interstate commerce. In *Lopez*, the Court found that the Gun-Free School Zones Act, which made it a federal offense for any individual knowingly to possess a firearm in a school zone, exceeded Congress's Commerce Clause authority. First, the Court held that the statute by its terms had nothing to do with commerce or any sort of economic enterprise. Second, it concluded that the act could not be sustained "under our cases upholding regulations of activities that arise out of or are connected with a commercial transaction, which viewed in the aggregate, substantially affects interstate commerce." *Lopez*, 514 U.S. at 561, 115 S. Ct. at 1631.

Later in *Morrison*, the Court concluded that the Commerce Clause did not provide Congress with the authority to impose civil remedies under the Violence Against Women Act. Despite extensive factual findings regarding the serious impact that gender-motivated violence has on victims and their families, the Court concluded that it was insufficient by itself to sustain the constitutionality of Commerce Clause legislation. *Morrison*, 529 U.S. at 614, 120 S. Ct. at 1752. The Court in *Morrison* ultimately rejected the argument that Congress may regulate noneconomic, violent criminal conduct based solely on that conduct's aggregated effect on interstate commerce. *Id.* at 617, 120 S. Ct. at 1754.

In surveying the legal landscape, several operative elements are commonly encountered in Commerce Clause decisions. First, to survive a constitutional challenge the subject matter must be economic in nature and affect interstate commerce, and second, it must involve activity. Every application of Commerce Clause power found to be constitutionally sound by the Supreme Court involved some form of action, transaction, or deed placed in motion by an individual or legal entity. The constitutional viability of the Minimum Essential Coverage Provision in this case turns on whether or not a person's decision to refuse to purchase health care insurance is such an activity.

In her argument, the Secretary urges an expansive interpretation of the concept of activity. She posits that every individual in the United States will require health care at some point in their lifetime, if not today, perhaps next week or even next year. Her theory further postulates that because near universal participation is critical to the underwriting process, the collective effect of refusal to purchase health insurance affects the national market. Therefore, she argues, requiring advance purchase of insurance based upon a future contingency is an activity that will inevitably affect interstate commerce. Of course, the same reasoning could apply to transportation, housing, or nutritional decisions. This broad definition of the economic activity subject to congressional regulation lacks logical limitation and is unsupported by Commerce Clause jurisprudence.

The power of Congress to regulate a class of activities that in the aggregate has a substantial and direct effect on interstate commerce is well settled. *Gonzales*, 545 U.S. at 22, 125 S. Ct. at 2209. This even extends to noneconomic activity closely connected to

the intended market. *Hoffman v. Hunt*, 126 F.3d 575, 587–88 (4th Cir. 1997). But these regulatory powers are triggered by some type of self-initiated action. Neither the Supreme Court nor any federal circuit court of appeals has extended Commerce Clause powers to compel an individual to involuntarily enter the stream of commerce by purchasing a commodity in the private market.[7] In doing so, enactment of the Minimum Essential Coverage Provision exceeds the Commerce Clause powers vested in Congress under Article I.

Because an individual's personal decision to purchase—or decline to purchase—health insurance from a private provider is beyond the historical reach of the Commerce Clause, the Necessary and Proper Clause does not provide a safe sanctuary. This clause grants Congress broad authority to pass laws in furtherance of its constitutionally-enumerated powers. This authority may only be constitutionally deployed when tethered to a lawful exercise of an enumerated power. *See Comstock*, 130 S. Ct. at 1956–57. As Chief Justice Marshall noted in *McCulloch*, it must be within "the letter and spirit of the constitution." 17 U.S. (4 Wheat.) at 421. The Minimum Essential Coverage Provision is neither within the letter nor the spirit of the Constitution. Therefore, the Necessary and Proper Clause may not be employed to implement this affirmative duty to engage in private commerce.

---

[7] The collective effect of an aggregate of such inactivity still falls short of the constitutional mark.

## VI.

On an alternative front, the Secretary contends that the Minimum Essential Coverage Provision is a valid exercise of Congress's independent taxation power under the General Welfare Clause in Article I.[8]  Despite pre-enactment representations to the contrary by the Executive and Legislative branches, the Secretary now argues that the Minimum Essential Coverage Provision is, in essence, a "tax penalty." The Secretary notes that the Provision is codified in the Internal Revenue Code and the penalty, if applicable, is reported and paid as a part of an individual's annual tax return.

Because the Provision is purportedly a product of congressional power of taxation, judicial review is generally narrow and limited. *United States v. Ptasynski*, 462 U.S. 74, 84, 103 S. Ct. 2239, 2245 (1983).  Relying on *United States v. Aiken*, 974 F.2d 446 (4th Cir. 1992), the Secretary asserts that the power of Congress to lay and collect taxes, duties, and excises under Article I, Section 8 of the U.S. Constitution, requires only that it be a revenue raising measure and that the associated regulatory provisions bear a "reasonable relation" to the statute's taxing power. *Id.* at 448; *see also Sonzinsky v. United States*, 300 U.S. 506, 513, 57 S. Ct. 554, 555–56 (1937) (involving whether a levy on the sale of firearms described as a tax and passed by Congress's taxing power was in fact a tax).  According to the Secretary, the power of Congress to tax for the general welfare is checked only by the electorate. "Unless there are provisions, extraneous to any tax need, courts are without authority to limit the exercise of the taxing power." *United*

---

[8] "The Congress shall have Power To lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the . . . general Welfare." U.S. Const. art. I, § 8, cl. 1.

*States v. Kahriger*, 345 U.S. 22, 31, 73 S. Ct. 510, 515 (1953), *overruled on other grounds, Marchetti v. United States*, 390 U.S. 39, 88 S. Ct. 697 (1968).

The Secretary also reiterates that Congress may use its power under the tax clause even for purposes that would exceed its power under other provisions of Article I. *United States v. Sanchez*, 340 U.S. 42, 44, 71 S. Ct. 108, 110 (1950). As an example, the Secretary highlights the assessment of estate taxes. Congress has the authority to impose inheritance taxes but lacks power under the Commerce Clause to regulate the administration of estates.

The Secretary takes issue with the Commonwealth's contention that the Minimum Essential Coverage Provision is a penalty, rather than a tax, and that there is a legal distinction between the two. "In passing on the constitutionality of a tax law [the court is] 'concerned only with its practical operation, not its definition or the precise form of descriptive words which may be applied to it.'" *Nelson v. Sears, Roebuck & Co.*, 312 U.S. 359, 363, 61 S. Ct. 586, 588 (1941) (internal citation omitted).

Initially she points out that the Provision has all the historic attributes of a tax. First and foremost, the Provision generates revenue forecast to be approximately $4 billion annually to be paid into the general treasury. She argues that this falls squarely within the classic definition of a tax, namely, "a . . . burden, laid upon individuals or property for the purpose of supporting the Government." *United States v. Reorganized CF&I Fabricators of Utah, Inc.*, 518 U.S. 213, 224, 116 S. Ct. 2016, 2113 (1996)

(quoting *New Jersey v. Anderson*, 203 U.S. 483, 492, 27 S. Ct. 137, 140 (1906)).[9] The

income threshold for the penalty to apply under the Minimum Essential Coverage

Provision is based on the statutory level requiring individuals to file income tax returns

and is calculated by reference to the individual's household income for the given year. If

the penalty applies, the taxpayer reports it on his return for that year. The penalty

becomes an additional income tax liability. 26 U.S.C. § 5000A(b)(2). The Secretary

therefore maintains that Congress treated the Minimum Essential Coverage Provision as

an exercise of its taxing power in addition to its commerce power.

The Secretary also dismisses the Commonwealth's contention that the Provision is

a penalty as opposed to a tax. She concedes that the Provision has a regulatory purpose,

but adds that "[e]very tax is in some measure regulatory" to the extent "it interposes an

economic impediment to the activity taxed as compared with others not taxed."

*Sonzinsky*, 300 U.S. at 513, 57 S. Ct. at 555. She also emphasizes that courts have

abandoned the antiquated distinction between revenue raising taxes and regulatory

penalties. *Bob Jones Univ. v. Simon*, 416 U.S. 725, 741 n.12, 94 S. Ct. 2038, 2048

(1974). Although Section 1501 variously employs the terms "tax" and "penalties," "the

labels used do not determine the extent of the taxing power." *Simmons v. United States*,

308 F.2d 160, 166 n.21 (4th Cir. 1962).

Furthermore, despite the Commonwealth's insistence to the contrary, the Secretary

argues that courts have upheld the exercise of congressional taxing power even when its

---

[9] A penalty, on the other hand, imports the notion of a punishment for an unlawful act or omission. *Reorganized CF&I Fabricators of Utah, Inc.*, 518 U.S. at 224, 116 S. Ct. at 2113.

regulatory intent or purpose extends beyond its Commerce Clause authority. "From the beginning of our government the courts have sustained taxes although imposed with the collateral intent of effecting ulterior ends which, considered apart, were beyond the constitutional power of the lawmakers to realize by legislation directly addressed to their accomplishment." *Sanchez*, 340 U.S. at 45, 71 S. Ct. at 110. The Commonwealth's analysis is further flawed, in her view, because their foundational bedrock of supporting authority consists of long discarded criminal as opposed to regulatory cases. The Minimum Essential Coverage Provision does not impose a criminal punishment.

Therefore, the Secretary maintains that because the Minimum Essential Coverage Provision in fact generates revenue and its regulatory features are rationally related to the goal of requiring every individual to pay for the medical services they receive, which is within the ambit of Commerce Clause powers, the Provision must be upheld.

The Commonwealth urges the Court to reject the Secretary's simplistic analysis that casts aside a wealth of historical tax clause jurisprudence. The Commonwealth does not dispute that the principles it relies upon as controlling have been rarely deployed in recent years, but the scope of congressional power under review is without modern counterpart. The Commonwealth also disagrees that the penalty provision in question meets the classic characteristics of a tax—or was intended by Congress to be a tax. The text of Section 1501 unequivocally states that it is a product of the Commerce Clause, not the General Welfare Clause. Moreover, any revenue generated is merely incidental to a violation of a regulatory provision.

Irrespective of labels, the Commonwealth contends that the federal government is seeking to smuggle an unconstitutional exercise of the Commerce Clause past judicial review in the guise of a tax. In the Commonwealth's view, this legislative tactic offends the letter and spirit of the Constitution. "[T]he law is that Congress can tax under its taxing power that which it can't regulate, but it can't regulate through taxation that which it cannot otherwise regulate." (Tr. 81:18-21, July 1, 2010 (*citing Bailey v. Drexel Furniture Co.* (*Child Labor Tax Case*), 259 U.S. 20, 37, 42 S. Ct. 449, 450 (1922))); *see United States v. Butler*, 297 U.S. 1, 68, 56 S. Ct. 312, 320 (1936); *Linder v. United States*, 268 U.S. 5, 17, 45 S. Ct. 446, 448–49 (1925). "[A] 'purported tax' that is actually a penalty to force compliance with a regulatory scheme must be tied to an enumerated power other than the taxing power." (Pl.'s Reply Mem. 11, ECF No. 117.)

The Attorney General of Virginia specifically asks the Court to closely examine the viability of the Secretary's core premise that the terms "tax" and "penalty" are legally synonymous and interchangeable. The Commonwealth maintains that the mainstay of the Secretary's taxation argument founders on the shoals of this faulty assumption. This notion of interchangeable is apparently derived from a footnote in *Bob Jones University*

> It is true that the Court [in earlier cases] drew what it saw at the time as distinctions between regulatory and revenue-raising taxes. But the Court has subsequently abandoned such distinctions. Even if such distinctions have merit, it would not assist petitioner [in this case], since its challenge is aimed at the imposition of federal income, FICA, and FUTA taxes which are clearly intended to raise revenue.

*Bob Jones Univ.*, 416 U.S. at 741 n.12, 94 S. Ct. at 2048 n.12 (internal citations omitted).

The Secretary argues that this cursory footnote disarms the precedential impact of an entire body of constitutional law governing regulatory penalties. In the Commonwealth's view, the Secretary has misconstrued the import and precedential effect of this footnote, which should be accorded no more dignity than dicta. To support this contention, the Commonwealth directs the Court's attention to a contrary position articulated by the Supreme Court in *United States v. La Franca*. "The two words [tax versus penalty] are not interchangeable . . . and if an exaction [is] clearly a penalty it cannot be converted into a tax by the simple expedient of calling it such." *United States v. La Franca*, 282 U.S. 568, 572, 51 S. Ct. 278, 280 (1931); *see also Reorganized CF&I Fabricators of Utah, Inc.*, 518 U.S. at 224, 116 S. Ct. at 2112.[10]

The Attorney General of Virginia maintains that the distinction between a tax and a penalty may be subtle, but is nonetheless significant. He adds that the power of Congress to exact a penalty is more constrained than its taxing authority under the General Welfare Clause because it must be in aid of an enumerated power. *Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381, 393, 60 S. Ct. 907, 912 (1940); *United States v. Butler*, 297 U.S. 1, 61, 56 S. Ct. 312, 317 (1936).

Despite the Secretary's characterization of such cases as superannuated, the Commonwealth hastens to reply that they have never been overruled by the U.S. Supreme Court. In fact, the Commonwealth points out that the holding in the *Child Labor Tax Case* was restated with approval by the Supreme Court in 1994 in *Department*

---

[10] In rejoinder, the Secretary notes that the term "penalty" defined and discussed in *Reorganized CF&I Fabricators of Utah, Inc.* referred to a payment as a penalty for an unlawful act, not a noncompliance sanction, as here.

*of Revenue of Montana v. Kurth Ranch*, 511 U.S. 767, 114 S. Ct. 1937 (1994). "Yet we have also recognized that 'there comes a time in the extension of the penalizing features of the so-called tax when it loses its character as such and becomes a mere penalty with the characteristics of regulation and punishment.'" *Id.* at 779, 114 S. Ct. at 1946 (*citing Child Labor Tax Case*, 259 U.S. at 38). The Commonwealth argues that this is such a case.

The Commonwealth also discounts the significance of Congress's use of the term "tax" in the ACA and the placement of the Minimum Essential Coverage Provision in the Internal Revenue Code. "No inference, implication, or presumption of legislative construction shall be drawn or made by reason of the location or grouping of any particular section or provision of this title . . . ." 26 U.S.C. § 7806(b).

The Commonwealth emphasizes that the best evidence of congressional intent is the language chosen by that legislative body. In the Minimum Essential Coverage Provision (26 U.S.C. § 5000A(b)(1)) Congress specifically denominated this payment for failure to comply with the mandate as a "penalty." "Because the PPACA penalty is an exaction for an omission—one that if it operated perfectly would produce no revenue—it is a penalty as a matter of law . . . ." (Pl.'s Mem. Opp. Mot. Summ. J. 28, ECF No. 95.)

During oral argument on the Secretary's Motion to Dismiss, the Deputy Assistant Attorney General of the United States informed the Court that because the Provision in fact generated revenue, and its regulatory features were rationally related to the goal of requiring every individual to pay for the medical services they receive, "that's the end of the ballgame." (Tr. 44:11, July 1, 2010.) The Commonwealth maintains that the

31

question of whether a provision is a penalty or tax is a question of law for the Court to resolve, relying on *Reorganized CF&I Fabricators of Utah, Inc.*, 518 U.S. at 224–26, 116 S. Ct. 2113–14 and *La Franca*, 282 U.S. at 572, 51 S. Ct. at 280.

Because the noncompliance penalty provision in Section 1501 lacks a bona fide intention to raise revenue for the general welfare, the Commonwealth argues that it does not meet the historical criteria for a tax. Furthermore, the resulting regulatory tax, untethered to an enumerated power, is an unconstitutional encroachment on the state's power of regulation under the Tenth Amendment. *See Butler*, 297 U.S. at 68, 56 S. Ct. at 320; *Child Labor Tax Case*, 259 U.S. at 37–38, 42 S. Ct. at 451. While the Provision may have the incidental effect of raising revenue, the Commonwealth maintains that its clear intended purpose is to exercise prohibited police power to compel individuals to enter into private commercial transactions.

## VII.

The Minimum Essential Coverage Provision reads in pertinent part: "[i]f a taxpayer who is an applicable individual . . . fails to meet the requirement of subsection (a) [mandatory insurance coverage] . . . there is hereby imposed on the taxpayer a penalty . . . ." 26 U.S.C. § 5000A(b)(1). Although purportedly grounded in the General Welfare Clause, the notion that the generation of revenue was a significant legislative objective is a transparent afterthought. The legislative purpose underlying this provision was purely regulation of what Congress misperceived to be economic activity. The only revenue generated under the Provision is incidental to a citizen's failure to obey the law by requiring the minimum level of insurance coverage. The resulting revenue is "extraneous

to any tax need." *See Kahriger*, 345 U.S. at 31, 73 S. Ct. at 515.[11] The use of the term "tax" appears to be a tactic to achieve enlarged regulatory license.

Compelling evidence of the intent of Congress can be found in the Act itself. In the preface to Section 1501, Congress specifically recites the constitutional basis for its actions and includes requisite findings of fact. "The individual . . . [mandate] is commercial and economic in nature, and substantially affects interstate commerce . . . ." 42 U.S.C. § 18091(a)(1). The Secretary is correct that "[i]t is beyond serious question that a tax does not cease to be valid merely because it regulates, discourages, or even definitely deters the activities taxed. The principle applies even though the revenue obtained is obviously negligible, or the revenue purpose of the tax may be secondary." *Sanchez*, 340 U.S. at 44, 71 S. Ct. at 110 (internal citations omitted). The sources cited by the Secretary to support this proposition, however, are readily distinguishable from the immediate case. Unlike the mandate at hand, in *Sanchez* and *Sonzinsky*, the enactment in question purported on its face to be an exercise of the taxing power.

In concluding that Congress did not intend to exercise its powers of taxation under the General Welfare Clause, this Court's analysis begins with the unequivocal denials by the Executive and Legislative branches that the ACA was a tax. In drafting this provision, Congress specifically referred to the exaction as a penalty. "[T]here is hereby imposed on the taxpayer a penalty . . . ." 26 U.S.C. § 5000A(b)(1). Earlier versions of

---

[11] In *Florida ex rel. McCollum*, 716 F. Supp. 2d at 1137–38, Judge Vinson perceptively notes that the Provision fails to mention any revenue generating purposes, characteristic of most tax clause enactments. *See Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 841, 115 S. Ct. 2510, 2522 (1995).

the bill in both the House of Representatives and the Senate used the more politically

toxic term "tax" when referring to the assessment for noncompliance with the insurance

mandate. *See* America's Affordable Health Choices Act of 2009, H.R. 3200, 111th

Cong. (2009); Affordable Health Care for America Act, H.R. 3962, 111th Cong. (2009);

and America's Healthy Future Act, S. 1796, 111th Cong. (2009). Each of these earlier

versions specifically employed the word "tax" as opposed to "penalty" as the sanction for

noncompliance.

In the final version of the ACA enacted by the Senate on December 24, 2009, the

term "penalty" was substituted for "tax" in Section 1501(b)(1). A logical inference can

be drawn that the substitution of this critical language was a conscious and deliberate act

on the part of Congress. *See Russello v. United States*, 464 U.S. 16, 23–24, 104 S. Ct.

296, 300–301 (1983); *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981)

(en banc). This shift in terminology during the final hours preceding an extremely close

floor vote undermines the contention that the terms "penalty" and "tax" are

synonymous.[12]

It is also significant to note that unlike the term "penalty" used in Section

1501(b)(1), other sections of the ACA specifically employ the word "tax." Section 9009

imposes a tax on the sale of any taxable medical device by the manufacturer, producer, or

importer. Section 9001 imposes a tax on high-cost, employer-sponsored health care

coverage. Section 9015 imposes a tax on certain high-income taxpayers. Finally, Section

10907 imposes a tax on any indoor tanning service. The legislature's apparent careful

---

[12] The Secretary's use of the newly-coined expression "tax penalty" adds little to the debate.

choice of words supports the conclusion that the term "tax" was not used indiscriminately. As the Supreme Court observed in *Duncan v. Walker*, "it is well settled that '[w]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.'" 533 U.S. 167, 173, 121 S. Ct. 2120, 2125 (2001) (internal citations omitted).

This Court is also not persuaded that the placement of the Minimum Essential Coverage Provision in the Internal Revenue Code under "miscellaneous excise taxes" has the significance claimed by the Secretary. The Internal Revenue Code itself clearly states that such placement does not give rise to any inference or presumption that the exaction was intended to be a tax. *See* 26 U.S.C. § 7806(b). Given the anomalous nature of this Provision, it is equally plausible that Congress simply docked the Provision in a convenient harbor.

This Court is therefore unpersuaded that Section 1501(b)(1) is a bona fide revenue raising measure enacted under the taxing power of Congress. As the Supreme Court pointed out in *La Franca*, "[t]he two words [tax vs. penalty] are not interchangeable . . . and if an exaction [is] clearly a penalty, it cannot be converted into a tax by the simple expedient of calling it such." *La Franca*, 282 U.S. at 572, 515 S. Ct. at 280. The penalizing feature of this so-called tax has clearly "los[t] its character as such" and has become "a mere penalty with the characteristics of regulation and punishment." *Kurth Ranch*, 511 U.S. at 799, 114 S. Ct. at 1946 (citing *Child Labor Tax Case*, 259 U.S. at 28, 42 S. Ct. at 451). No plausible argument can be made that it has "the purpose of

supporting the Government." *Reorganized CF&I Fabricators of Utah, Inc.*, 518 U.S. at

224, 116 S. Ct. at 2113 (quoting *New Jersey v. Anderson*, 203 U.S. 483, 492, 27 S. Ct.

137, 140 (1906)).

Having concluded that Section 1501(b)(1) is, in form and substance, a penalty as

opposed to a tax,[13] it must be linked to an enumerated power other than the General

Welfare Clause. *See Sunshine Anthracite Coal Co.*, 310 U.S. at 393, 60 S. Ct. at 912;

*Butler*, 297 U.S. at 61, 56 S. Ct. at 317; *Child Labor Tax Case*, 259 U.S. at 38, 42 S. Ct.

at 451. Notwithstanding criticism by the pen of some constitutional scholars, the

constraining principles articulated in this line of cases, while perhaps dormant, remains

viable and applicable to the immediate dispute. Although they have not been frequently

employed in recent years, this absence appears to be more a product of the unprecedented

nature of the legislation under review than an abandonment of established principles.

It is clear from the text of Section 1501 that the underlying regulatory scheme was

conceived as an exercise of Commerce Clause powers. This is supported by specific

factual findings purporting to demonstrate the effect of the health care scheme on

interstate commerce. In order for the noncompliance penalty component to survive

constitutional challenge, it must serve to effectuate a valid exercise of an enumerated

power—here the Commerce Clause. *Sunshine Anthracite Coal Co.*, 310 U.S. at 393, 60

S. Ct. at 912.

---

[13] If allowed to stand as a tax, the Minimum Essential Coverage Provision would be the only tax
in U.S. history to be levied directly on individuals for their failure to affirmatively engage in
activity mandated by the government not specifically delineated in the Constitution.

Earlier in this opinion, the Court concluded that Congress lacked power under the Commerce Clause, or associated Necessary and Proper Clause, to compel an individual to involuntarily engage in a private commercial transaction, as contemplated by the Minimum Essential Coverage Provision.  The absence of a constitutionally viable exercise of this enumerated power is fatal to the accompanying sanction for noncompliance.  The Deputy Assistant Attorney General of the United States intimated as much during oral argument on the Defendant's Motion to Dismiss, "if it is unconstitutional, then the penalty would fail as well." (Tr. 21:10–11, July 1, 2010.)

A thorough survey of pertinent constitutional case law has yielded no reported decisions from any federal appellate courts extending the Commerce Clause or General Welfare Clause to encompass regulation of a person's decision not to purchase a product, notwithstanding its effect on interstate commerce or role in a global regulatory scheme. The unchecked expansion of congressional power to the limits suggested by the Minimum Essential Coverage Provision would invite unbridled exercise of federal police powers.  At its core, this dispute is not simply about regulating the business of insurance—or crafting a scheme of universal health insurance coverage—it's about an individual's right to choose to participate.

Article I, Section 8 of the Constitution confers upon Congress only discrete enumerated governmental powers.  The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the states respectively, or to the people. *See* U.S. Const. amend. X; *Printz v. United States*, 521 U.S. 898, 919, 117 S. Ct. 2365, 2376–77 (1997).

On careful review, this Court must conclude that Section 1501 of the Patient Protection and Affordable Care Act—specifically the Minimum Essential Coverage Provision—exceeds the constitutional boundaries of congressional power.

## VIII.

Having found a portion of the Act to be invalid, the Section 1501 requirement to maintain minimum essential health care coverage, the Court's next task is to determine whether this Section is severable from the balance of the enactment. Predictably, the Secretary counsels severability, and the Commonwealth urges wholesale invalidation. The Commonwealth's position flows in part from the Secretary's frequent contention that Section 1501 is the linchpin of the entire health care regimen underlying the ACA. However, the bill embraces far more than health care reform. It is laden with provisions and riders patently extraneous to health care—over 400 in all.

The most recent guidance on the permissible scope of severance is found in *Free Enterprise Fund v. Public Co. Accounting Oversight Board*, 130 S. Ct. 3138 (2010). "Generally speaking, when confronting a constitutional flaw in a statute, we try to limit the solution to the problem, severing any 'problematic portions while leaving the remainder intact.'" *Id.* at 3161 (quoting *Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 328–29, 126 S. Ct. 961, 967 (2006)). Because "[t]he unconstitutionality of a part of an act does not necessarily defeat or affect the validity of its remaining provisions," *Champlin Refining Co. v. Corp. Comm'n of Okla.*, 286 U.S. 210, 234, 52 S. Ct. 559, 565 (1932), "the 'normal rule' is 'that partial, rather than facial,

invalidation is the required course.'" *Free Enter. Fund*, 130 S. Ct. at 3161 (quoting

*Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 504, 105 S. Ct. 2794, 2802 (1985)).

The teachings of *Free Enterprise* are a direct descendent of the rule restated in

*Alaska Airlines, Inc. v. Brock*, 480 U.S. 678, 107 S. Ct. 1476 (1987). "The standard for

determining the severability of an unconstitutional provision is well established: '[u]nless

it is evident that the Legislature would not have enacted those provisions which are

within its power, independently of that which is not, the invalid part may be dropped if

what is left is fully operative as a law.'" *Id.* at 684, 107 S. Ct. at 1480 (quoting *Buckley v.*

*Valeo*, 424 U.S. 1, 108, 96 S. Ct. 612, 677 (1976)).

In applying this standard, the Court must also consider whether the balance of the

statute will function in a manner consistent with the intent of Congress in the wake of

severance of the unconstitutional provision. *Alaska Airlines*, 480 U.S. at 685, 107 S. Ct.

at 1480. Finally, in evaluating severability, the Court must determine whether in the

absence of the severed unconstitutional provision, Congress would have enacted the

statute. *Id.* at 685, 107 S. Ct. at 1480. Given the vagaries of the legislative process, "this

inquiry can sometimes be 'elusive.'" *Free Enter. Fund*, 130 S. Ct. at 3161 (quoting

*I.N.S. v. Chadha*, 462 U.S. 919, 932, 103 S. Ct. 2764, 2774 (1983)).

The final element of the analysis is difficult to apply in this case given the haste

with which the final version of the 2,700 page bill was rushed to the floor for a Christmas

Eve vote. It would be virtually impossible within the present record to determine

whether Congress would have passed this bill, encompassing a wide variety of topics

related and unrelated to heath care, without Section 1501. Even then, the Court's

conclusions would be speculative at best. Moreover, without the benefit of extensive expert testimony and significant supplementation of the record, this Court cannot determine what, if any, portion of the bill would not be able to survive independently.

Therefore, this Court will hew closely to the time-honored rule to sever with circumspection, severing any "problematic portions while leaving the remainder intact." *Ayotte*, 546 U.S. at 329, 126 S. Ct. at 967. Accordingly, the Court will sever only Section 1501 and directly-dependent provisions which make specific reference to Section 1501.[14]

## IX.

The final issue for resolution is the Commonwealth's request for injunctive relief enjoining implementation of Section 1501—at least until a higher court acts. In reviewing this request, the Commonwealth urges this Court to employ the traditional requirements for injunctive relief articulated in *Monsanto Co. v. Geerston Seed Farms*, 130 S. Ct. 2743, 2756 (2010). This case, however, turns on atypical and uncharted applications of constitutional law interwoven with subtle political undercurrents. The outcome of this case has significant public policy implications. And the final word will undoubtedly reside with a higher court.

Aside from scant guiding precedent on the central issues, there are no compelling exigencies in this case. The key provisions of Section 1501—the only aspect of the ACA squarely before this Court—do not take effect until 2013 at the earliest. Therefore, the

---

[14] A court's ability to rewrite legislation is severely constrained and best left to the legislature. "[S]uch editorial freedom . . . belongs to the Legislature, not the Judiciary. Congress of course remains free to pursue any of these options [to amend legislation] going forward." *Free Enter. Fund*, 130 S. Ct. at 3162.

likelihood of any irreparable harm pending certain appellate review is somewhat minimal. Although the timely implementation of Section 1501 might require each side to take some initial preparatory steps in the ensuing months, none are irreversible.

Historically, federal district courts have been reluctant to invoke the extraordinary remedy of injunctive relief against federal officers where a declaratory judgment is adequate. "[W]e have long presumed that officials of the Executive Branch will adhere to the law as declared by the court. As a result, the declaratory judgment is the functional equivalent of an injunction." *Comm. on the Judiciary of the United States House of Representatives v. Miers*, 542 F.3d 909, 911 (D.C. Cir. 2008); *see also Smith v. Reagan*, 844 F.2d 195, 200 (4th Cir. 1988); *Sanchez-Espinoza v. Regan*, 770 F.2d 202, 208 n.8 (D.C. Cir. 1985). The Commonwealth appears to concede that if the Secretary is duty-bound to honor this Court's declaratory judgment, there is no need for injunctive relief. (Pl.'s Reply Mem. 19.) In this Court's view, the award of declaratory judgment is sufficient to stay the hand of the Executive branch pending appellate review.

## X.

In the final analysis, the Court will grant Plaintiff's Motion for Summary Judgment and deny Defendant's similar motion. The Court will sever Section 1501 from the balance of the ACA and deny Plaintiff's request for injunctive relief.

An appropriate Order will accompany this Memorandum Opinion.

_____/s/_____
Henry E. Hudson
United States District Judge

Date: **Dec. 13 2010**
Richmond, VA